## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK) | * | |
| 1 Massachusetts Avenue, NW Washington, D.C. 20001 | * | |
| | * | CIVIL ACTION NO. |
| PLAINTIFF, | * | |
| v. | * | |
| SUBLEASE INTEREST OBTAINED PURSUANT TO an Assignment and Assumption of Leasehold Interest made as of January 25, 2007, with said property interest PERTAINING TO DESCRIBED LEASEHOLD INTERESTS AT WASHINGTON UNION STATION located at | * * * * | |
| 50 Massachusetts Avenue, NE Washington, D.C. 20002 | * | |
| | * | |
| and | * | |
| UNION STATION INVESTCO, LLC c/o Ashkenazy Acquisition Corp. 150 East 58th Street, Penthouse New York, New York 10155 | * * | |
| SERVE ON: National Registered Agents, Inc. 1209 Orange Street Wilmington, Delaware 19801 Registered Agent | * * * | |
| and | * | |
| UNION STATION SOLE MEMBER, LLC c/o Ashkenazy Acquisition Corp. 600 Madison Ave., 15th Floor New York, New York 10022 | * * | |
| | * | |

**SERVE ON:**                                        *
National Registered Agents, Inc.
1209 Orange Street                                   *
Wilmington, Delaware 19801
**Registered Agent**                                 *

and                                                  *

**KOOKMIN BANK CO., LTD.,**                          *
**Individually and in its capacity as**
**trustee of KTB CRE Debt Fund No. 8,**             *
**a Korean Investment trust**
c/o Kookmin Bank – New York Branch                   *
565 Fifth Avenue, 24th Floor
New York, New York 10017                             *

    **SERVE ON:**                *
    Superintendent of Financial
    Services of New York              *
    One State Street
    New York, New York 10004          *

and                                                  *

**UNKNOWN OWNERS**                                   *

    **DEFENDANTS.**                   *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## COMPLAINT FOR CONDEMNATION AND REQUEST FOR POSSESSION

Plaintiff, National Railroad Passenger Corporation, also known as Amtrak ("Amtrak"), pursuant to authority provided by 49 U.S.C. § 24311 and in compliance with Federal Rule of Civil Procedure 71.1, files this Complaint for condemnation of the property interest that Union Station Investco, LLC ("USI") obtained from Union Station Venture II, LLC by an Assignment and Assumption of Leasehold Interest made as of January 25, 2007 (the "Subject Property Interest," as defined further below).  Amtrak files this action against the Defendants listed above, and all

2

unknown interested parties, and respectfully sets forth the following:

## I.     INTRODUCTION AND DESCRIPTION OF THE SUBJECT PROPERTY INTEREST

1.     Passenger rail service is an essential part of America's transportation system. *See* 49 U.S.C. 24101(a)(5) ("Modern and efficient intercity passenger and commuter rail passenger transportation is important to the viability and well-being of major urban and rural areas and to the energy conservation and self-sufficiency goals of the United States."). Washington Union Station ("WUS" or the "Station") is one of the most critical components of the Nation's passenger rail service, serving more than 5 million rail passengers a year. Amtrak's sublease agreement with USI, however, provides Amtrak possession and control of only approximately 13.4 percent[1] of the Station.[2] Consequently, Amtrak lacks both the space and control to make much needed improvements to facilities and operations at this significant Station. Amtrak now acts to acquire the Subject Property Interest to ensure that the Station is safely and effectively brought back to its full potential as a premier rail passenger station and multimodal transportation hub. More specifically, Amtrak needs to acquire the Subject Property Interest to repair and reinforce the train

---

[1]     As Amtrak understands it, the United States subleased to Union Station Redevelopment Corporation the entirety of the Station, which consisted of approximately 476,795 square feet. The Subject Property Interest is approximately 425,000 square feet of those 476,795 square feet of the Station. Amtrak's current sublease with USI, as discussed below, is for only approximately 63,700 square feet of the USI-subleased space. With the acquisition of the Subject Property Interest, Amtrak will have an additional leasehold interest of approximately 361,300 square feet at the Station.

[2]     Amtrak's  space subleased from USI only includes the train concourse and ticketing area of the Station; it does not include the historic Main Hall/event areas, the parking garage, any of the bathroom areas, any of the mezzanine areas, the food court, any of the retail and office spaces, any space leased to other subtenants, or any of the other space used by the Condemnee.

tunnel that runs through the Station so that safety and stability are maintained, to improve passenger amenities and experience at the Station, including expanding the existing passenger waiting area to handle increased passenger volume, and to effectively manage the Station now and in the future.  With the acquisition of the Subject Property Interest, Amtrak will gain control over much of the Station, including areas essential both to day-to-day management and operations at WUS, and make necessary and enhancing investments in and improvements to the Station for decades to come.

2.      Amtrak is authorized under 49 U.S.C. § 24311 to acquire interests in property necessary for intercity rail passenger transportation through eminent domain. In this action, Amtrak asserts and exercises its right under 49 U.S.C. § 24311(a)(1)(A) to acquire the Subject Property Interest within the Station because it is necessary for intercity rail passenger transportation.  As described below, Amtrak is depositing with the Court the amount it estimates to be just compensation for the Subject Property Interest in accordance with statutory requirements.

### The Location of the Subject Property Interest

3.      The Subject Property Interest is located at 50 Massachusetts Avenue, NE, Washington, D.C., less than a mile from the United States Capitol. The exterior of WUS is depicted[3] in the following photograph:

---

[3]      This photo of WUS is available at https://www.amtrak.com/stations/was.



4.      The Subject Property Interest was acquired by USI from Union Station Venture II, LLC ("USVII") by virtue of an Assignment and Assumption of Leasehold Interest (the "Assignment") made as of January 25, 2007.  A copy of the Assignment is attached as **Exhibit 1.**

*The Subject Property Interest's Relationship to the Northeast Corridor*

5.       WUS is a flagship passenger rail station on the Northeast Corridor (the "Corridor"). The Corridor is one of the busiest, most complex, and economically vital transportation systems in the world, connecting eight states and the District of Columbia through an active and highly traveled rail network.  Additional rail stations south, east and west of the District of Columbia connect onto the Corridor at WUS.[4]  The Corridor is designated by Congress as a "valuable resource of the United States."  49 U.S.C. § 24101(a)(7).  The following describes Amtrak's role within the Corridor:

A.      Amtrak owns and serves as the infrastructure manager for the majority of the Corridor, providing dispatching services, electric propulsion power, and operational

---

[4]      "Each day, the corridor—both the main line and connecting corridors…—serves over 800,000 railroad trips—780 on eight commuter railroads and over 40,000 on Amtrak's intercity services."  NORTHEAST CORRIDOR COMM'N, https://nec-commission.com/corridor/.

support, as well as maintaining and improving the infrastructure and facilities that are used not only by Amtrak, but also by commuter lines and freight operators.

B.      The Corridor is an essential passenger rail artery serving major cities in the Northeast region, connecting Washington, D.C. to Boston, Massachusetts and with connecting corridors to Harrisburg, Pennsylvania, Springfield, Massachusetts, Albany, New York and Richmond, Virginia.[5]

C.      The Northeast's five major metropolitan regions — Boston, New York, Philadelphia, Baltimore, and Washington, D.C. — not only rely upon the Corridor and Amtrak's services for a significant and growing share of business and leisure travel, but also depend upon the Corridor's infrastructure for the daily commuting needs of their workforces. The Corridor "contributes $50 billion annually to the United States gross domestic product.  It provides reliable access to core employment centers that contain one of every three jobs in the larger NEC [Northeast Corridor] region — a region that, if it were its own country, would have the fifth largest economy in the world."[6]

D.      The Corridor has the busiest passenger rail lines in the United States as measured by ridership and service frequency.

6.      The Subject Property Interest is critical to the management and operation of WUS and, thus, to the Corridor.

---

[5]      Created by Congress in 1970, Amtrak operates regional passenger service on the Corridor between Boston, Massachusetts on the north end and across Virginia on the south end.

[6]      *Northeast Corridor Commuter and Intercity Rail Cost Allocation Policy*, NORTHEAST CORRIDOR COMM'N, (eff. Oct. 1, 2020), https://nec-commission.com/app/uploads/2018/04/2020-10-12_Cost-Allocation-Policy_v10.00_For-Publication.pdf.

*__The Subject Property Interest's Relationship to WUS's Governance__*

7.    The Subject Property Interest is critical to the management and operation of passenger rail transportation at the Station.  Depicted below are the areas within the Station that are part of the Subject Property Interest:

A.    A rail passenger entering WUS through the main entrance of the Station enters through a large and expansive Main Hall, the original train waiting area, that is flanked by an East Hall and a West Hall (with both halls being part of the Subject Property Interest).  The vastness of the Main Hall is shown in the following photograph:[7]



B.    After traversing the Main Hall, a rail passenger must then pass through the doors shown in the following photograph:[8]

---

[7]    https://www.usrcdc.com/category/projects/completed/.  This Main Hall is part of the Subject Property Interest.

[8]    https://www.usrcdc.com/projects/active/main-hall-granite-masonry-restoration-project/. The doors and entryway shown are part of the Subject Property Interest.



C.      Rail passengers needing tickets can stop at the Amtrak ticket counter located in a portion of the area north of the Main Hall and surrounded by retail establishments. The ticket counter is depicted in the following photograph:[9]



D.      To wait for and/or to board a train, a rail passenger walks past the ticket counter through WUS to the gates for departing and arriving trains in the Claytor

---

[9]      http://www.trainweb.org/usarail/washingtondc.htm.   This is part of the Subject Property Interest, but is included in the area sub-leased to Amtrak.

Concourse. This concourse is relatively small and narrow.  Because of the narrow and limited space, there are a limited number of chairs in the Claytor Concourse for passengers. During boarding, this queueing area becomes crowded, as shown in the following photograph:[10]



8.      At the time of its opening on October 27, 1907, the Station was heralded as the largest train station in the world.  Its historic significance is well-established: the Station building was designated as a historic landmark by the District of Columbia in 1964 and then listed in the National Register of Historic Places in 1969.

9.      Poor maintenance and lack of capital investment, however, plagued the Station over the years.  A low point came in 1981 when heavy rain caused parts of the Station building's damaged roof to crash down into the main passenger waiting room, forcing WUS to close and

---

[10]      Lori Aratani, *Amtrak Has A New Strategy to Help You Board Your Train at Union Station*, WASH. POST, Sept. 21, 2019, https://www.washingtonpost.com/local/trafficandcommuting/amtrak-has-a-new-strategy-to-help-you-board-your-train-at-union-stsstation/2019/09/21/d3bf6e08-db07-11e9-bfb1-849887369476_story.html.  A portion of the area sub-leased to Amtrak is used for the current concourse.

disrupting travel for passengers using the Station and traveling along the Corridor.  As reported in *The Washington Post* on February 24, 1981:[11]

> Thousands of grumbling train passengers yesterday were forced to walk in the rain more than 400 feet around the old Union Station building to Amtrak's "replacement train station" in the rear.  In Union Station, which was built to be the finest railroad station in the world and is now formally called the National Visitor Center, rainwater puddled up to two inches deep on carpeted floors and small chunks of plaster fell from the barrel-vaulted ceiling.

10.     Shortly thereafter in that same year, Congress, in response to the damage to WUS, passed the Union Station Redevelopment Act (the "USR Act"), originally codified at 40 U.S.C. §§ 801, *et seq.,* rev'd to 40 U.S.C. §§ 6901, *et seq.*  The USR Act affirmed that it was in the national interest to ensure that WUS was restored to and operates as a fully functional and vibrant transportation hub.  The Act required that "the Secretary of Transportation shall provide for the rehabilitation and redevelopment of the Union Station complex primarily as a multiple-use transportation terminal serving the Nation's Capital, and secondarily as a commercial complex."  Goals of the Act included "[p]reservation of the exterior façade and other historically and architecturally significant features of the Union Station building" while restoring WUS as a rail passenger station, with facilities "for charter, transit, and intercity buses in the Union Station complex."  Commercial development of WUS should, "to the extent possible, financially support the continued operation and maintenance of such complex."

11.     The United States is the owner of the Station, having acquired full title to and

---

[11]     Blaine Harden, *Union Station, Leaking Badly, Closed as Unsafe*, Wash. Post, Feb. 24, 1981, https://www.washingtonpost.com/archive/politics/1981/02/24/union-station-leaking-badly-closed-as-unsafe/a7994ffd-04f6-4e67-8775-c62ee2754473/.

ownership of WUS in 1988.[12]  As owner of WUS, the United States must ensure the effective use of this property, as well as its historic preservation.

12.     The United States then subleased the entirety of the Station to Union Station Redevelopment Corporation ("USRC"), a District of Columbia 501(c)(3) non-profit corporation, in 1985.[13]

13.     Also in 1985, USRC subleased most of its subleased interests in the Station[14] to Union Station Venture, Ltd. ("USV"),[15] which then assigned the USV subleased interests to USVII in 2004.[16]

14.     USVII subsequently assigned its rights in and to the subleased interests to USI in

---

[12]     The United States leased the entirety of WUS in 1972, but then acquired full title to and ownership of WUS in 1988.

[13]     This sublease was entitled "SUBLEASE AGREEMENT Between THE UNITED STATES OF AMERICA as Lessor and UNION STATION REDEVELOPMENT CORPORATION as Lessee Dated as of October 31, 1985."  The legal document is called a Sublease Agreement because at the time the United States entered into the Sublease Agreement with USRC, it did not own WUS, it leased it from the original owner.  When the United States purchased WUS, this Sublease Agreement with USRC was left in place.  Later documents acknowledge this but still refer to the document between the United States and USRC as a sublease agreement.

[14]     A multi-level parking garage adjacent to the Station was not subleased to USI.

[15]     USRC entered into a Sublease Agreement with Union Station Venture, Ltd. ("USV") in 1985 (as amended, "USRC/USV Sublease").  Three amendments were made to the USRC/USV Sublease: the first dated August 22, 1986; the second dated June 30, 1994; and the third dated May 9, 2008.  The USRC/USV Sublease has a term of 99 years and expires on October 30, 2084.

[16]     USV assigned its interest in the USRC/USV Sublease to USVII, including the USV/Amtrak Sublease (defined in footnote 13), by virtue of an Assignment and Assumption of Leasehold Interest dated November 5, 2004 ("USVII Assignment").

2007.  USI's subleasing rights and obligations at WUS[17] extend until October 30, 2084.

15.     Amtrak does not own or control the Subject Property Interest.  Amtrak is acquiring necessary ownership and control of the Subject Property Interest through the filing of this condemnation action. Amtrak is taking the Subject Property Interest subject to all existing subordinate leases and/or licenses, which remain in effect in accordance with their terms and conditions.

## II.    PARTIES

16.     As tasked by the United States Congress in the Passenger Rail Investment and Improvement Act of 2008 ("PRIIA"), as amended, Amtrak's mission is to "provide efficient and effective intercity passenger rail mobility consisting of high-quality service that is trip-time competitive with other intercity travel options …."  49 U.S.C. § 24101(b).  Amtrak is a District of Columbia corporation authorized by the Rail Passenger Service Act (currently set forth at 49 U.S.C. § 24101 *et seq.*).  Amtrak's principal place of business is located at 1 Massachusetts Avenue, NW, Washington, D.C. 20001.  Amtrak, the Nation's intercity passenger rail service provider and high-speed rail operator, operates a national rail network of more than 21,400 route miles serving more than 500 destinations in forty-six states, the District of Columbia, and three Canadian provinces.  The United States holds, through the U.S. Secretary of Transportation, 100% of Amtrak's preferred stock.

17.     Upon information and belief, USI is: (a) a limited liability company organized

---

[17]     The subleasing rights and obligations, including all amendments, between USRC and USI are referred to in this Complaint as the "USRC/USI Sublease."

under the laws of the State of Delaware with its principal place of business at c/o Ashkenazy Acquisition Corporation, 150 East 58th Street, Penthouse, New York, New York 10155; and (b) the current owner of the Subject Property Interest.

18.     Upon information and belief, Union Station Sole Member, LLC ("USSM") is a limited liability company organized under the laws of Delaware with its principal place of business at c/o Ashkenazy Acquisition Corporation, 600 Madison Ave., 15th Floor, New York, New York 10022.  Because of its relationship with USI as sole member of USI, USSM may have an interest in the Subject Property Interest, and for that reason, USSM has been named as a defendant in this action.

19.     Upon information and belief, Kookmin Bank Co., Ltd., as trustee of KTB CRE Debt Fund No. 8, a Korean investment trust (referred to herein as the "Secured Party" or "Kookmin Bank"), may hold an interest in the Subject Property Interest, either as a secured lender or otherwise.  The extent of the Secured Party's interest in the Subject Property Interest is unknown to Amtrak at this time. Attached as **Exhibit 2** is an Assignment of Leasehold Deed of Trust, Security Agreement, Assignment of Leases, Financing Statement, and Fixture Filing dated January 5, 2022 (the "Secured Party Assignment") that, upon information and belief, describes some or all of the interest(s) that the Secured Party has in the Subject Property Interest.  The entity through which Kookmin Bank conducts its U.S. operations is its state-licensed New York branch, located at 565 Fifth Avenue, 46 Street, 24th Floor, New York, NY 10017. At the time of the filing of the instant action, Amtrak is unaware of any pending foreclosure proceeding or any sale or conveyance of the Secured Party's interest in the Subject Property Interest. Upon information and belief, the Secured Party has not assigned, transferred, or conveyed its interest in the Subject Property

Interest.

20.     In addition to USI, USSM, and the Secured Party, all named as Defendants, there may be other parties who have, or may claim, some interest in the Subject Property Interest, and whose names are unknown and not reasonably ascertainable by Amtrak at this time.  Such persons or entities are made prospective parties to this action under the designation of "Unknown Owners" as Federal Rule of Civil Procedure 71.1(c)(3) permits.

21.     Amtrak will provide USRC and the United States Department of Transportation ("USDOT") with notice of the filing of this Complaint and provide evidence of those notices to this Court.

### III.     JURISDICTION AND VENUE

22.     The United States District Court for the District of Columbia has original jurisdiction over this civil action pursuant to 28 U.S.C. § 1331 because the authority for Amtrak to acquire an interest in property by eminent domain arises under the laws of the United States, specifically 49 U.S.C. § 24311.

23.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1349 because the United States holds, through the U.S. Secretary of Transportation, 100% of Amtrak's preferred stock.

24.     Venue in the United States District Court for the District of Columbia is proper pursuant to 49 U.S.C. § 24311(b), which requires that actions brought by Amtrak to acquire interests in real property via eminent domain must be brought in the United States District Court for the judicial district in which the property to be acquired is located.  The Subject Property Interest is located in the judicial district for the District of Columbia.

25.     Amtrak hereby exercises its power of eminent domain pursuant to 49 U.S.C. § 24311(a)(1)(A) and 49 U.S.C. § 24311(a)(2) and states that: (1) it has not been able to acquire the Subject Property Interest by contract; and (2) it has not been able to agree with the Condemnee on the purchase price for the Subject Property Interest.

26.     Amtrak is complying with all requirements of 49 U.S.C. § 24311, entitling it to exercise the right of eminent domain to obtain the Subject Property Interest.

## IV.     THE RELATIONSHIP OF WUS TO AMTRAK'S GOALS AND MISSION

### The 2012 Master Plan for WUS

27.     Amtrak's goals and mission require development and growth of WUS and renewal of the Station's important status in the rail passenger system.   Amtrak sets forth herein recent aspects of the Station's history that demonstrate Amtrak's intended use of and need for the Station.

28.     In the early 2010s, various governmental entities engaged in a collaborative planning process for development of WUS, publishing a Master Plan in 2012 for the Station's future development.   Amtrak, USRC, USDOT, the District of Columbia, the Maryland Transit Administration, the Virginia Department of Rail and Public Transportation, and the Washington Metropolitan Area Transit Authority were all involved in this important planning process, thoroughly considering how the then-existing Station could better fit future needs.   As a result of that process, the Master Plan was issued, putting in place "a world-class master plan that addresses existing deficiencies [of WUS] and provides for future growth."[18]   This Master Plan describes the

---

[18]     NAT'L R.R. PASSENGER CORP., UNION STATION MASTER PLAN, WASHINGTON, D.C. (2012),  https://nec.amtrak.com/wp-content/uploads/2017/08/Washington-Union-Station-Master-Plan-201207.pdf.

15

significant potential that the Station has as a premier rail passenger station and a premier multimodal transportation hub.  The Master Plan describes the conditions of WUS as of the Master Plan's publication date as follows:

> While Union Station has served the region for well over 100 years, it is now operating beyond its capacity, especially during rush hours and peak travel periods. Queues of departing Amtrak passengers form a half-hour before boarding begins and routinely extend into the public concourse, blocking flows. . . Many of the station's support facilities are obsolete and inadequate for modern railroad operations.  Realizing the station's potential for growth must be accomplished within the existing station footprint, preserve the iconic existing Union Station, limit negative impacts on surrounding neighborhoods, and respect the legacy of Daniel Burnham's original station design and Washington's city plan.[19]

29.    The Master Plan proposed a significant expansion to the existing Station footprint. After the Master Plan was finalized, Amtrak developed a Second Century Plan to focus on improvements to the existing Station.  The Second Century Plan is a comprehensive improvement initiative comprising of multiple projects that will triple passenger capacity and double train capacity over the twenty years following the date of the Second Century Plan.

30.    The Second Century Plan requires that Amtrak advance several critical projects at WUS to expand operations and capacity to meet present and future projected operation and passenger demands.  Amtrak needs the Subject Property Interest to control the schedule for the implementation of such planned projects, projected needs, and its own future operations at this flagship station.

31.    Amtrak's acquisition of the Subject Property Interest is necessary to make WUS a more efficient, better functioning Station to support the growing populations of rail passengers and

---

[19]    *Id.*

those of other important transportation modes, in the Station both now and into the future.  More specifically, Amtrak needs to acquire the Subject Property Interest for a variety of reasons, including exemplarily: (1) to undertake the Subbasement Reconstruction Program ("the Subbasement Project"); (2) to complete the Concourse Modernization Project ("Concourse Modernization Project"); and (3) to manage the day-to-day operations of WUS effectively.

### Amtrak's Need for the Subject Property Interest to Complete the Subbasement Project

32.      As its mission statement indicates, Amtrak is dedicated to providing superior intercity rail passenger service.  As part of that dedication to providing such superior service, Amtrak needs to ensure that WUS remains structurally sound.  Tracks run through the lower levels of the historic Station.  The infrastructure that supports this tunnel is antiquated and in serious need of repair or replacement.  The repair and replacement of this infrastructure constitutes the Subbasement Project.  The Subbasement Project will replace "structurally deficient beams, girders and columns with a new structural support system."[20]  "The Subbasement Reconstruction program is a necessary State of Good Repair ("SOGR") project, as the Subbasement currently has temporary shoring to keep the track bed for the run-through tracks intact.  Collapse of the Subbasement would have significant impacts to not only the [Corridor], but the entire eastern rail network."[21]  It is critical that this Subbasement Project be completed in the near future for the safety and integrity of the tunnel operations and the WUS building itself.  Accordingly, Amtrak needs the Subject Property Interest in order to accomplish the Subbasement Project.

---

[20]      *Washington Union Station: Subbasement Program*, NORTHEAST CORRIDOR COMM'N, http://nec-commission.com/project/wus-subbasement/ (last updated Oct. 2021).

[21]      *Id.*

A.      Below is a diagram that shows the WUS station building, including the subbasement area to be repaired, circled in red.[22]



33.     The Subbasement Project includes: replacing antiquated subbasement beams, girders, and columns with a new structural system; replacing the existing reinforced concrete slab and waterproofing the new slab; replacing in kind existing ballast and tracks; replacing subgrade drainage elements; and removing, reinstalling and/or replacing catenary lines and poles and communications/signaling cables and boxes.  Additionally, as presently planned, this project will repair the subbasement of WUS as well as replace two electrical substations and an existing code-deficient emergency generator.  This Subbasement Project will also drastically improve the safety and resiliency of WUS by: bringing the Station into compliance with applicable building and

---

[22]     Envision Consultants, Ltd., *Amtrak, Washington Union Station Subbasement Structural Replacement*,https://www.eclimited.com/market/general-buildings/philaport-task-order-professional-services-contract-2/. The red circled area has been added in this Complaint to designate the subbasement area for clarity.

life/safety codes; reducing maintenance costs; enabling more efficient operations; reducing energy cost; and increasing reliability and safety.

34.     To complete the Subbasement Project, Amtrak's equipment and/or facilities will need to be relocated from the subbasement of WUS to areas that Amtrak does not currently sublease.  To facilitate this relocation and, thus, the Subbasement Project, Amtrak needs control over all areas of WUS in which its equipment and facilities are located and/or may need to be relocated.

35.     The Northeast Corridor Commission ("Commission") has determined that implementing the Subbasement Project is critical to WUS's future.

36.     Amtrak has been trying to implement the Subbasement Project for many years.  In 2017, it was projecting that the project could be completed by 2022.  USI's repeated rejections of Amtrak's proposals related to Amtrak's needs for this project have meant that this critical SOGR project has not been effectively started.  Amtrak started to negotiate with USI with respect to the Subbasement Project in 2018, but no agreement on the Project has been achieved to date.

37.     To complete the Subbasement Project, Amtrak will need to locate equipment and/or facilities to areas of WUS not currently subleased by Amtrak.  These areas need to be under the control of Amtrak for operational, safety, and security reasons.

38.     To date, Amtrak has not been able to complete the Subbasement Project because it does not own the Subject Property Interest, and therefore Amtrak lacks control over the physical spaces that it needs to effectuate the Subbasement Project and other much needed improvements.

39.     With the acquisition of the Subject Property Interest, Amtrak will be able to implement the Subbasement Project in an efficient manner and without further costly delays.

Acquisition of the Subject Property Interest will also enable Amtrak to promptly deal with any additional construction and safety issues as they arise.

### Amtrak's Need for the Subject Property Interest to Complete the Concourse Modernization Project

40.     Amtrak operates approximately 90 trains daily in and out of WUS, including train service in the Corridor,[23] National Network[24] and State-Supported service.[25]  As set forth in Amtrak Fact Sheet Fiscal Year 2019 District of Columbia,[26] "Amtrak serves [WUS] and the total number of boardings and alightings at the Station in FY19 was 5,207,223."[27]

---

[23]     Amtrak operates the following Corridor service: the high-speed *Acela* (daily Washington-Baltimore-Wilmington-Philadelphia-Newark-New York-New Haven-Providence-Boston) and the *Northeast Regional* (daily Richmond-Washington-BWI-Baltimore-Wilmington-Philadelphia-Trenton-Newark-New York-New Haven-New London-Providence-Boston).  "Amtrak Fact Sheet Fiscal Year 2019 District of Columbia," AMTRAK, https://www.amtrak.com/content/dam/projects/dotcom/english/public/documents/corporate/statefactsheets/DC19.pdf

[24]     Amtrak operates the following National Network trains through WUS: the Capitol Limited (daily Chicago-Toledo-Cleveland-Pittsburgh-Washington); the Cardinal (tri-weekly New York-Washington-Charlottesville-Charleston-Cincinnati- Indianapolis- Chicago); the Crescent (daily New York-Washington-Charlottesville-Charlotte-Atlanta-Birmingham-New Orleans); the Palmetto (daily New York-Washington, DC-Richmond-Charleston-Savannah); the Silver Meteor (daily New York-Washington DC-Richmond-Charleston-Savannah-Jacksonville-Miami); and the Silver Star (daily New York-Washington DC-Richmond-Columbia-Savannah-Jacksonville-Tampa-Miami). *Id.*

[25]     Amtrak also operates the following trains, which are operated through WUS as Corridor trains but are State-Supported trains away from the Corridor:  the Carolinian (daily New York-Washington-Richmond-Selma/Smithfield-Raleigh-Charlotte)  and  the  Vermonter  (daily Washington-New York-New Haven-Springfield-Lebanon-Essex Junction-St. Albans).  *Id.*

[26]     The Fact Sheet can be viewed at: https://www.amtrak.com/content/dam/projects/dotcom/english/public/documents/corporate/statefactsheets/DC19.pdf.

[27]     *Id.*  Because Covid-19 impacted the transportation industry, pre-Covid numbers from FY19 are included in the Complaint.

41.     Rail passengers should have adequate space for safe and comfortable movement, and the boarding and alighting of trains should be a positive and safe experience.  At WUS, the passenger experience is not as positive as it needs to be because of the lack of a modern concourse areas where passengers can not only wait for trains, but also gather, relax, dine, shop, and work before boarding a train.  As the Station is presently configured and operated, there are virtually no sitting areas for people to wait for trains and/or to wait for passenger pickup.  When people presently wait for trains, they are crammed into a limited sitting and standing area in the rear of the concourse level of the Station, in the Claytor Concourse behind the historic station.

42.     To provide sufficient room for its current and future customers' needs, including any increased ridership, Amtrak needs the Subject Property Interest for the Concourse Modernization Project.  To complete the Concourse Modernization Project, Amtrak will locate equipment and/or facilities to areas of WUS not currently subleased by Amtrak.  These areas need to be under the control of Amtrak for operational, safety, and security reasons.

43.     The plan to improve the Claytor Concourse has evolved over time and now is part of the Second Century Plan.  As Amtrak noted in discussion of the Second Century Plan:[28]

> While Union Station has served the region well for over a century, it is now operating beyond its capacity, particularly during rush hours and peak travel times. Over 37 million people pass through Washington Union Station each year, making it one of the busiest intercity and commuter rail stations for Amtrak, MARC and VRE commuter service and Metrorail service. Ridership has soared, resulting in long and crowded queues of departing passengers that routinely impede the public concourse, blocking flows and diminishing a fluid travel experience.
>
> The Claytor Concourse, Union Station's intercity and commuter concourse, will be modernized and reconfigured to alleviate congested conditions, doubling its present

---

[28]  *Washington   Union   Station   Concourse   Modernization   Project*, AMTRAK, https://nec.amtrak.com/project/washington-union-station-concourse-modernization-project/.

capacity.  The Concourse Expansion Program will enhance passenger comfort and accessibility, while enlivening the space with new architectural finishes and natural light. In addition to the expansion of the concourse, improvements by WMATA for a new Metrorail staircase and new First Street entrance will bring a consolidated set of passenger improvements to the western portion of the concourse.

The planned improvements will complement the introduction of a new *Acela* fleet[,] which is accompanied by more frequent service.

44.    The Concourse Modernization Project is "needed to correct safety egress issues as well as capacity limitations and to improve the overall passenger experience for Amtrak and commuter riders."[29]  Implementation of the Concourse Modernization Project will provide the following benefits:[30]

### An Improved Customer Experience

With nearly double the customer space comes the opportunity to upgrade amenities that will decidedly improve the customer experience.  Among the new amenities are new restrooms, improved passenger comfort and security, accessibility for customers with disabilities, a new and expanded Metropolitan Lounge (formerly Club Acela), and additional seating options with electrical outlets for travelers as they wait for their connections. Passenger boarding gates will be realigned for an improved boarding experience.

### Faster Connectivity to all Modes

A reconfigured, unified and modernized concourse will allow intercity travelers and commuters to reach their multimodal connection with greater ease.  An unloading MARC commuter train holds as many passengers as three 747 planes – this influx of commuters adds to the number of intercity passengers, resulting in a highly congested chokepoint especially when trying to reach Metrorail.  The expansion of this connecting corridor in the concourse will address this chokepoint….

---

[29]    *Washington Union Station: Claytor Concourse Modernization*, NORTHEAST CORRIDOR COMM'N, http://nec-commission.com/project/wus-claytor/ (last updated Oct. 2021).

[30]    "Fact Sheet: Washington Union Station Concourse Modernization," AMTRAK, https://www.amtrak.com/content/dam/projects/dotcom/english/public/documents/corporate/for-was-concourse-fact-sheet-0122.pdf.

**Enhanced Architectural Details**

As part of the Concourse Modernization Project, new architectural details will be considered to brighten the environment with natural lighting, provide for visual wayfinding, and integrate the concourse with the historic iconic station. The program's architectural undertaking will set the foundation for the complete transformation of the complex into a world-class station befitting the Nation's Capital. The Concourse Modernization Project is part of a larger effort to redefine the customer experience on the Northeast Corridor, setting the stage for the future of rail.

45.     To date, Amtrak has not been able to complete the Concourse Modernization Project.  In 2017 Amtrak was projecting that it would take approximately four years to complete the Concourse Modernization Project.  However, now five years later, Amtrak has still not been able to obtain all necessary approvals for this important project from USI – which means that construction for this project has not been initiated in any meaningful way.  With the acquisition of the Subject Property Interest, Amtrak will be able to implement this critical project and promptly deal with development and construction issues as they arise.

46.     With the acquisition of the Subject Property Interest, Amtrak will be able to relocate equipment and operations as needed to perform the Concourse Modernization Project.

47.     With the acquisition of the Subject Property Interest, Amtrak will be able to improve intercity rail transportation by making necessary and critical improvements to WUS in connection with the Concourse Modernization Project.

*Amtrak's Need for the Subject Property Interest to Manage and Operate WUS Effectively*

48.     In order to manage and operate WUS effectively into the future, Amtrak needs to acquire the Subject Property Interest.  Amtrak's ownership of the Subject Property Interest will

ensure that Amtrak can address customer needs directly and immediately, react to emergent situations promptly, and provide stable and experienced management and operations.

49.     Acquisition of the Subject Property Interest will allow Amtrak to expeditiously address customer needs and concerns at WUS, thereby ensuring a more positive future for customers, itself, and the Station:

A.     Public perception of Amtrak significantly impacts rail passenger service and usage.  The public perceives WUS to be owned and operated by Amtrak even though Amtrak subleases only a small portion of WUS and does not have day-to-day management and operational responsibility for the Station.  Amtrak's public perception and brand suffers whenever the public perceives poor, dilapidated and/or unsafe conditions at WUS.

B.     With the acquisition of the Subject Property Interest, Amtrak will be able to implement the necessary and required capital investments to more promptly deliver SOGR, maintenance, and capital improvements that will positively address customer needs and concerns at WUS.

C.     With the acquisition of the Subject Property Interest, Amtrak will have day-to-day management and operational control over essential operations at WUS. This will provide Amtrak greater control over safety, security, repair, maintenance, cleanliness, and the general standard of care at WUS, which will have a positive impact on Amtrak's ability to address customer needs and concerns and improve the public perception of Amtrak.

50.     Acquisition of the Subject Property Interest will allow Amtrak to react to emergent events at WUS and thereby ensure a better future for itself and the Station:

A.     From the damaged roof crashing down in 1981 to the extensive earthquake

damage in 2011, WUS's history demonstrates that unexpected situations arise that require urgent action, both to preserve this historic rail station and to maintain public safety within the Station.

B.     Unforeseen events that impact WUS for its visitors and customers continue to take place.  For example, in January 2022, WUS was subject to vandalism that occurred on USI's watch — namely, white supremacist graffiti scrawled on a substantial part of the exterior and entrances of WUS.

(i)     The prominent placement of this racist graffiti, only a few blocks from the United States Capitol and on the outer location of this prominent rail station, particularly on the west-facing front passenger arcade, is troubling to Amtrak.  No member of the public, including customers of Amtrak, should be faced with such offensive imagery at one of Amtrak's rail stations.  Most, if not all, customers of Amtrak and other transportation modes at the Station could view such graffiti and feel unfavorably disposed towards Amtrak, WUS, or their experience at the Station.

(ii)    Using its expertise and experience with historic preservation, Amtrak could have expeditiously and appropriately reacted to this defacement if it had control over the Subject Property Interest.  Instead, the WUS exterior retains vestiges of the graffiti and damage from attempts to remove it now some three months after the initial defacement.  Amtrak's acquisition and management of the Subject Property Interest could either prevent or minimize such damage to WUS or allow such damage to be repaired with historic preservation at the forefront.

C.     Other emergent events will occur in the decades that remain on the sublease of the Subject Property Interest. Whether such events are triggered by weather, earthquakes, demonstrations including hate groups, or some other cause, Amtrak needs to control the Subject Property Interest so that it can use its expertise and experience with major station operations and management to deal with such events quickly and appropriately.

51.     Acquisition of the Subject Property Interest will allow Amtrak to provide stable and experienced management at WUS and ensure stable future operations.

A.     Based upon a recent Station building assessment report completed by USI and the Federal Railroad Administration ("FRA"), approximately $75 Million in deferred maintenance is needed at WUS, but insufficient funds are available through the Capital Maintenance Reserve Funds defined in the USRC/USI Sublease to undertake this maintenance.

B.     In January of 2022, the Condemnee was subject to two foreclosure actions that were scheduled but then cancelled only shortly before the foreclosures were to proceed. Upon information and belief, one of the foreclosure sales did not proceed because the Secured Party entered into an agreement with a secured entity that resulted in the Secured Party Assignment. Although these foreclosure actions were cancelled, they indicate that USI's management and operations at WUS, and its ability to fulfill its obligations under the USRC/USI Sublease, are under significant financial risk.

C.     The financial condition of the Condemnee could cause it and/or the Secured Party to attempt to sell the Subject Property Interest to some unknown person or entity. An

unknown purchaser is unlikely to have the experience dealing with rail passenger operations or historic preservation on the scale WUS requires.[31]  Amtrak is better suited to manage the essential day-to-day management and operations of WUS than any such unknown person or entity because Amtrak has decades of experience owning and leasing major and historic train stations in the United States.

D.     By acquiring the Subject Property Interest, Amtrak can provide stable and experienced management of WUS that is willing and able to make investments and capital improvements in WUS.

E.     With the acquisition of the Subject Property Interest, Amtrak will be able to provide the following functions at the Station: maintenance, operation of the Station, inside and outside repairs (including all equipment including engines, dynamos, boilers, elevators, machinery, pipes, escalators, plumbing, wiring, gas, HVAC, sidewalks, vaults and all other machinery fixtures or equipment), trash control, snow and ice removal, as well as other essential activities that would need to be handled by Amtrak as the owner of the Subject Property Interest.  The provision of these services will allow Amtrak to better serve its rail passengers and to create a more positive experience at WUS for its customers, rail passengers, and the public.

52.     With the acquisition of the Subject Property Interest, Amtrak will be able to ensure effective management and operations, and a positive future at WUS — a future where customer

---

[31]     It is unlikely that any other potential purchaser of the Subject Property Interests would have similar experience in managing and operating a passenger rail station and intermodal transportation hub as Amtrak does. Amtrak owns and operates significant other historic stations, including Chicago Union Station and William H. Gray III 30th Street Station in Philadelphia.

needs are addressed and where Amtrak can react appropriately and quickly to emergent situations. Amtrak and its customers would no longer need to be concerned about the impermanence or instability of Station management and operations.  With Amtrak in charge of WUS, the Station's development and future would be secure and Amtrak would be able fully to chart and pursue its Congressionally established mission at WUS, to the betterment of intercity rail passenger service in the United States.

### Time is of the Essence

53.     As discussed above, needed improvements to WUS are essential to intercity rail transportation and timing is critical.

54.     Amtrak needs the Subject Property Interest so that capital investments and improvements can be made without delay.  Construction costs are escalating annually with inflation increasing and raw material prices highly volatile. With the acquisition of the Subject Property Interest, Amtrak can achieve considerable savings and reduce delays by quickly performing required and planned projects.

55.     By expeditiously acquiring the Subject Property Interest, Amtrak will be able to reinvest returns received from retail and other commercial operations at WUS back into the Station.  Amtrak's reinvestment would be fully supportive of and consistent with the goals of the USR Act, which provides that commercial development of WUS should "to the extent possible, financially support the continued operation and maintenance of such complex."

56.     With the acquisition of the Subject Property Interest, Amtrak will be able to inject capital funds more quickly into WUS and address critical capital projects in a manner that fosters, protects, and promotes investment, including by the federal government.

***The Nexus of Amtrak's Need for the Subject Property Interest to Amtrak's Statutory Mandates and Mission***

57.     There is a direct nexus between Amtrak's need for the Subject Property Interest and its statutorily-established mandates, including its mission of providing intercity rail passenger transportation in the United States.

      A.     As defined by the United States Congress through the Passenger Rail Investment and Improvement Act of 2008 ("PRIIA"), Amtrak's mission is to "provide efficient and effective intercity passenger rail mobility consisting of high-quality service that is trip-time competitive with other intercity travel options."

      B.     Pursuant to 49 U.S.C. § 24101(c)(1)(E) and (c)(1)(F), "Amtrak shall…use its best business judgment in acting to maximize the benefits of Federal investments, including… (E) controlling or reducing management and operating costs; and (F) providing economic benefits to the communities it serves…."

      C.     Pursuant to 49 U.S.C. § 24101(c)(12), "Amtrak shall…maximize the use of its resources, including the most cost-effective use of employees, facilities, and real property…."

      D.     Pursuant to 49 U.S.C. § 24305(a)(1), "Amtrak may acquire, operate, maintain, and make contracts for the operation and maintenance of equipment and facilities necessary for intercity and commuter rail passenger transportation…."

      E.     Pursuant to 49 U.S.C. § 24305(a)(2), "Amtrak shall operate and control directly, to the extent practicable, all aspects of the rail passenger transportation it provides…."

F.    Amtrak's self-stated mission is "Delivering intercity transportation with superior safety, customer service and financial excellence."

58.    Amtrak needs to acquire the Subject Property Interest immediately to fulfill its statutory mandates, its mission, its vision, and its business goals.

59.    With the acquisition, Amtrak can implement programs and protocols that enhance the future quality of rail passenger experiences and operations at WUS.

60.    Through the acquisition of the Subject Property Interest, Amtrak can maintain and operate WUS to a higher standard, akin to programs and standards implemented at Amtrak's other major historic stations.

61.    Amtrak further needs the Subject Property Interest to better control costs and leverage efficiencies of management and operations at WUS.

62.    Amtrak, whose mission is to deliver intercity transportation with superior safety, customer service, and financial excellence, will reinvest capital and resources to improve the management, operations, and customer experience at WUS.  It will do so in a manner consistent with the USR Act, including through the reinvestment of monies from commercial development that will, "to the extent possible, financially support the continued operation and maintenance of such complex."  Consequently, the acquisition of the Subject Property Interest by Amtrak will be in alignment with its needs, its statutory mandates, its mission and vision, and the USR Act.

63.    On March 22, 2022, Amtrak's Board of Directors adopted a resolution, entitled "Board of Directors Resolutions Authorizing the Acquisition of Certain Leasehold Interests in Washington Union Station" (the "Board Resolution"), approving the acquisition of the Subject Property Interest. This Board Resolution specifically states:

**WHEREAS**, Management has advised and the Board has concluded that the acquisition of the Sublease Interests is necessary to ensure the condition and longevity of WUS as a multimodal transportation center and a key asset of Amtrak's core business and provides an opportunity to improve the lease structure of WUS to serve the long-term interests of this essential multimodal station; and

**WHEREAS**, Management has requested pre-programming authority in connection with Amtrak's acquisition of the Sublease Interests, and the Federal Railroad Administration (***FRA***) has approved such request; and

**WHEREAS**, Management has advised and the Board has concluded that the acquisition of the Sublease Interests is necessary for Amtrak's intercity rail passenger transportation service, is necessary for the accomplishment of Amtrak's mission, and is necessary for the reasons set forth in the business case; and

**WHEREAS**, Management has advised and the Board has concluded that the acquisition of the Sublease Interests would allow Amtrak to directly invest in WUS in a more efficient and effective manner, making improvements with the most benefit for intercity and public transit riders, including enhancement to passenger flow, ticketing and waiting areas, and critical life safety projects; and

**WHEREAS**, Management recommends, and the Board has determined, that it is advisable and in the best interests of the Corporation to pursue the acquisition of the Sublease Interests either by entering into a binding Negotiated Deal, submitting a binding bid at Auction or by Condemnation; and therefore, be it

**RESOLVED**, That the Board has determined that the acquisition of the Sublease Interests is necessary for Amtrak's intercity rail passenger transportation services and is otherwise in the best interests of Amtrak and WUS….

The Board of Directors of Amtrak, including the U.S. Secretary of Transportation through his delegate, the FRA Administrator, unanimously approved this resolution.

## V.    DECLARATION OF TAKING

64.    As set forth above, and for other good and sufficient reasons, acquisition of the Subject Property Interest is necessary for intercity rail passenger transportation in the United States.  The acquisition of the Subject Property Interest has a direct nexus to, and/or significant relationship with, Amtrak's statutory mandates, as well as Amtrak's corporate goals and mission,

31

and is therefore necessary to intercity passenger rail transportation.  Because the Subject Property Interest is necessary for intercity rail passenger transportation, as set forth in 49 U.S.C. §24311(a)(1)(A), Amtrak is entitled to, and does, by this action, acquire the Subject Property Interest by eminent domain.

65.     Amtrak is filing a Declaration of Taking contemporaneously herewith and is depositing the money estimated as just compensation as described in Paragraph 66 hereof.  Amtrak is therefore immediately vested with title to the Subject Property Interest, in total and without lien, pursuant to 49 U.S.C. § 24311(b)(2).

## VI.     STATEMENT OF MONEY ESTIMATED FOR JUST COMPENSATION

66.     At or about the time of the filing of this action, Amtrak is depositing, *via wire transfer,* into the Court, the amount which it estimates to be just compensation for the interests taken pursuant to 49 U.S.C. §§ 24311(b)(1)-(b)(2), namely Two Hundred and Fifty Million Dollars and No Cents ($250,000,000.00) (the "Deposit"), a prerequisite to the filing of a Declaration of Taking and the vesting of title of the Subject Property Interest in Amtrak.

67.     Amtrak has obtained from a certified independent real estate appraiser a valuation of the estimated just compensation for the Subject Property Interest.

68.     The certified independent real estate appraiser ascertained that the fair market value as of January 31, 2022 of the Subject Property Interest is Two Hundred and Fifty Million Dollars and No Cents ($250,000,000.00).

69.     Prior to the filing of this Complaint, Amtrak attempted in good faith to negotiate a purchase price for the Subject Property Interest with USI pursuant to 49 U.S.C. § 24311(a)(2).

70.     On April 6, 2022, Amtrak offered to purchase the Subject Property Interest for a sum of Two Hundred and Fifty Million Dollars and No Cents ($250,000,000.00) (the "Offer") from USI, the same amount that Amtrak is depositing into this Court.

71.     USI did not accept Amtrak's offer to acquire the Subject Property Interest.

72.     Amtrak's attempt to purchase the Subject Property Interest by consent was unsuccessful.  Consequently, Amtrak was not able to acquire the Subject Property Interest by contract or agree with USI as to the purchase price for the Subject Property Interest.

73.     Pursuant to 49 U.S.C. § 24311(b)(3), a finding on the amount that is just compensation for the interest taken in the Subject Property Interest is to be made.  Amtrak requests that the determination of the value of just compensation be referred to a duly appointed commission pursuant to Federal Rule of Civil Procedure 71.1(h)(2).

**VII.     POSSESSION OF THE SUBJECT PROPERTY INTEREST**

74.     Pursuant to 49 U.S.C. § 24311(b)(2)(A), this Court may decide "the time by which, and the terms under which, possession of the property is given to Amtrak[.]"

75.     Amtrak first seeks immediate access to the Subject Property Interest to conduct a thorough inspection.

76.     Second, Amtrak requests that the Court determine the time and terms under which possession of the Subject Property Interest will be given to Amtrak.

77.     Amtrak needs immediate access to the Subject Property Interest because: (1) no just reason exists for delay in allowing Amtrak to inspect the Subject Property Interest; (2) Amtrak's immediate access to the Subject Property Interest will not cause any inconvenience or expense to the Condemnee; and (3) delay in allowing Amtrak access to the Subject Property

Interest will obstruct Amtrak's ability to plan for an orderly transfer of possession and use of the Subject Property Interest for intercity rail passenger transportation.

78.     Amtrak also asserts a right to any proceeds arising from the Subject Property Interest that are collected by USI after the date of the filing of this action.

**VIII.   OUTSTANDING CHARGES**

79.     Pursuant to 49 U.S.C. § 24311(b)(2)(B), upon the filing of the Declaration of Taking, the Court is empowered to decide "the disposition of outstanding charges related to" the Subject Property Interest.

80.     In particular, Amtrak seeks from USI and/or the Secured Party, as applicable, the value of its possession of the Subject Property Interest during the time period running from the date of the filing of the Declaration of Taking, when the Subject Property Interest vests with Amtrak, to the date of possession by Amtrak.

81.     Amtrak seeks the disposition of all such outstanding charges, if any, and requests that such charges be disposed of by imposing them on the Condemnee.

82.     Amtrak also seeks the distribution to it of the security deposits USI and/or the Secured Party, as applicable, is retaining for any of its tenants or licensees.  Amtrak will hold such security deposits in accordance with all legal requirements.

WHEREFORE, Plaintiff, National Railroad Passenger Corporation, also known as Amtrak, respectfully prays for judgment that the Subject Property Interest be and is condemned; and that this Court grant such other relief as may be just, including but not limited to: an order fixing the value of the Subject Property Interest condemned, the time and terms for Amtrak's

possession of the Subject Property, and an order disposing of any outstanding charges thereon.

Respectfully submitted,

**COUNSEL FOR PLAINTIFF NATIONAL RAILROAD PASSENGER CORPORATION**

/s/ Patricia McHugh Lambert
Patricia McHugh Lambert, US DC Bar ID MD0008
Kambon R. Williams, US DC Bar ID MD29872
PESSIN KATZ LAW, P.A.
901 Dulaney Valley Road, Suite 500
Towson, MD  21204
Telephone: 410-938-8800
Fax: 410-832-5650
plambert@pklaw.com
kwilliams@pklaw.com

/s/ Lindsay Harrison
Lindsay Harrison, DC Bar #977407
Jessica Ring Amunson, DC Bar #497223
JENNER & BLOCK, LLP
1099 New York Avenue, NW, Suite 900
Washington, D.C. 20001-4412
Telephone: 202-639-6000
Fax: 202-639-6066
lharrison@jenner.com
jamunson@jenner.com