**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

------------------------------------------------------------------- X

NATIONAL RAILROAD PASSENGER
CORPORATION (AMTRAK),

        Plaintiff,                            No. 1:22-cv-01043(APM)

        v.

SUBLEASE INTEREST PERTAINING TO
DESCRIBED LEASEHOLD INTERESTS
AT WASHINGTON UNION STATION, et al.

        Defendants.

------------------------------------------------------------------- X

## ANSWER TO COMPLAINT FOR CONDEMNATION

Pursuant to Federal Rule of Civil Procedure 71.1(e)(2), Kookmin Bank Co., Ltd.,

individually and in its capacity as trustee ("Trustee" or "Kookmin") of KTB CRE Debt Fund No.

8, a Korean Investment Trust ("Trust"), by its agent on behalf of Trust in Korea, Daol Fund

Management Co. ("Daol Fund") and by its agent on behalf of Trust in United States, Rexmark

Holdings LLC d/b/a Rexmark ("Rexmark Holdings," together with Trustee, Trust, and Daol Fund,

"Lender"), by and through its undersigned counsel, submits this Answer to the Complaint for

Condemnation filed by National Railroad Passenger Corporation ("Amtrak"), and states as

follows:

## OVERVIEW OF ANSWER AND DEFENSES

Congress has granted Amtrak limited authority to take private property.  Amtrak may only

do so when property is "necessary for intercity rail passenger transportation."  Here, Amtrak's

purported taking is far outside that limited statutory authority.  It has filed to acquire the 62 years

remaining on the lease for the entirety of Washington Union Station ("WUS" or the "Station") –

concourses, event spaces, stores, 130,000 square-feet in office space, everything.  And Amtrak's claimed reason for the taking is a pretext.  Controlling the leasehold interest for the Station has never been "necessary for intercity rail passenger transportation" in the 50-year history of Amtrak. The actual motivation for this taking is that Amtrak wants to seize control of a valuable asset or at least leverage its position in order to extract economic concessions to which it is not entitled.  This filing is an abuse of the eminent-domain power and is without support in the law.  The taking should be dismissed, and Amtrak should be prevented from interfering with the private parties and government officials already responsible for the Station's management, leasing, and operation.

**A.      Parties Filing this Answer.**  Trustee is a Korean Bank and the current holder of the documents evidencing a loan in the original principal amount of $330 million made to defendant Union Station Investco, LLC ("USI"), and secured by USI's entire property interest in the Station ("Subject Property Interest").  Amtrak has purported to take the Subject Property Interest by filing this action.  The Trust is also the lender pursuant to that certain Mezzanine Loan Agreement entered into between the Trust and defendant Union Station Sole Member, LLC ("USSM"), evidencing a loan in the original principal amount of $100 million to USSM, secured by the equity interests in USI.  Rexmark Holdings serves as the agent on behalf of the Trust in the United States and oversees the day-to-day management of the loans.  By virtue of its significant relationship to the Subject Property Interest, including its senior secured lien thereon, Lender is intimately familiar with the workings, uses, and value of the Station and the Subject Property Interest.

**B.      Summary of Answer, Objections, and Defenses.**

*First,* Lender objects to Amtrak's condemnation of the Subject Property Interest because Amtrak is without authority under 49 U.S.C. § 24311 to exercise eminent domain over the Subject

Property Interest.  Amtrak has overstepped its limited statutory authority and failed to satisfy the statutory conditions precedent to a proper exercise of authority.[1]  Congress has provided Amtrak the limited right to acquire property only if that property is "necessary for intercity rail passenger transportation."  49 U.S.C. § 24311(a)(1)(A).  The three reasons advanced by Amtrak to argue that the property is "necessary for intercity rail passenger transportation" are each insufficient.

- Amtrak claims that it needs control over the entire leasehold interest in the Station, which consists of 425,000 square feet of office, retail, event venue, and dining space, to complete the repair and replacement of infrastructure in the tunnels of the Station (the "Subbasement Project").  But the Subbasement Project is already in the predevelopment stage with drawings underway.  Completion of this project does not in any way depend upon or require Amtrak being installed as the subtenant in charge of the entire Station.  Moreover, even if the relocation of equipment and facilities for the Subbasement Project turned on Amtrak's control of the subtenant position under the taken sublease (it does not), that would provide no basis for taking and impacting the rest of the Station.

- Amtrak claims that it needs control in order to complete the reconfiguration and modernization of the Claytor Concourse (the "Concourse Modernization Project"). But, again, this project has been planned and envisioned without requiring Amtrak to control the Station, and this project is already in the design phase with no requirement that Amtrak control the sublease position.  Moreover, even if the relocation of equipment and facilities for the Concourse Modernization Project turned on Amtrak's

---

[1]     A complete expression of Rexmark's objections and defenses are discussed *infra* at pages 31-42.

control of the subtenant position under the taken sublease (it does not), that would provide no basis for taking and impacting the rest of the Station.

- Finally, Amtrak asserts that it needs to exercise eminent domain over one of the most iconic spaces in Washington D.C. in order to manage and operate the Station effectively.  But the Station is not plagued by poor maintenance or the lack of capital investment.  It is the obligation of nonparty Union Station Redevelopment Corporation ("USRC"), the sublandlord under the subject sublease, to fund, plan, and implement the projects at the Station.  The record confirms that the Station has been effectively operated by USI, and supported by Lender as necessary.  According to third-party property condition reports over the last eight years, the Station has been well-maintained, and all emergent events have been managed and rectified expeditiously. Pursuant to Lender's powers granted by the Loan Documents, all capital earned from subleases with tenants has been reinvested back into the Station.  Indeed, since May 2020, Lender has not taken any funds to service the debt from the rents generated at WUS.  Similarly, Lender has taken millions of dollars in losses in order to settle back-rent charges that accumulated during the Covid-19 pandemic, incentivize business owners to reopen, and reinvigorate the economy.  The actions that Amtrak purports to "need" to take over are already happening in real time under the current ownership structure.  Amtrak's alleged needs, therefore, serve merely as a pretext for Amtrak to seize the Station at a time when Amtrak believes the Station's value has been diminished by the Covid-19 pandemic, and then profit from the Station's commercial revenue as business and travel return to pre-pandemic levels.  Moreover, Congress did not authorize Amtrak to install itself as a station operator just because Amtrak claims

the Station can be better managed by Amtrak.  Indeed, it is telling that USRC, the landlord of USI, has not asserted that USI is not fulfilling its obligations under the sublease that Amtrak has now purported to take.

In sum, because Amtrak cannot demonstrate that this taking is "necessary for intercity rail passenger transportation," it lacks authority under the statute to file this condemnation, and the Court should dismiss this action.  Amtrak does not have the authority to pronounce its own "public use" to support taking this valuable sublease interest.  It cannot be a "public use" to exceed the limited authorization from Congress.

***Second,*** the statute provides that Amtrak can take possession of a property by condemnation only if it cannot acquire the property interest by contract or agree with the owner on a purchase price.  49 U.S.C. § 24311(a)(2).  Viewing this statutory direction as a limit on Amtrak's authority as well as a condition precedent to the filing of a taking, the record demonstrates that Amtrak did not make a genuine effort to acquire the property or agree on a purchase price.  As reflected in the Complaint, Amtrak made an offer to USI on April 6, 2022, to buy the sublease position for $250 million and filed this action about a week later.  (Compl. ¶¶ 70-71.)  Discovery will almost certainly confirm that Amtrak has been planning to pursue condemnation long before this last-minute offer to USI.  Amtrak knew that Lender paid $358 million in January 2022 to buy the senior mortgage after USI's default under that mortgage.  Amtrak also knew that Lender had extended a $100 million mezzanine loan in connection with the Subject Property Interest that was secured by the membership interests in USI.  This means that when Amtrak approached USI with its $250 million "offer," Amtrak knew that the offer was about $200 million less than would be required to retire existing debt from the senior mortgage and mezzanine loan.  Amtrak knew that the "offer" could not be accepted without Lender consent, and,

given the recent valuations of the Subject Property Interest being more than $700 million (*see below*), Amtrak knew that such a low offer would not be accepted.  Even so, Amtrak waited only eight days after extending its offer before filing this condemnation action over the Subject Property Interest.  Because Amtrak has not complied with the statutory prerequisite of attempting to purchase the interest or reach agreement on a purchase price, it lacks authority to proceed, and the Court should dismiss the case.

**Third,** even if Amtrak had properly exercised its limited eminent-domain authority (it has not), Amtrak's estimated fair market value of $250 million that was deposited with the Court does not constitute just compensation.  A recent appraisal and market valuation – and just common sense – demonstrate that the fair market value of the Subject Property Interest is **hundreds of millions of dollars** more than Amtrak's estimate.  There are over 60 years of sublease term remaining on one of the landmark buildings on the East Coast, which is not only a transportation hub, but also is a retail and food mecca, provides over 130,000 square feet in office space, and contains a unique and historic event venue that is located in a vital and growing area of Washington, D.C.  Indeed, a recent appraisal valued the Subject Property Interest at more than $700 million.  And a large, highly sophisticated investment fund recently paid a hard deposit of $100 million in an arm's-length transaction that was based on a value of the Subject Property Interest of $700 million.  Amtrak knew of both the recent appraisal and market transaction.  Amtrak's $250 million estimate pales in comparison to the actual fair market value of the Subject Property Interest.  Accordingly, Amtrak has failed to meet the statutory requirement to pay just compensation for any condemned property.

Amtrak's inadequate $250 million estimated just compensation deposit highlights Amtrak's failure to satisfy the conditions precedent to taking property by eminent domain.  The

record will demonstrate that the purported independent real estate appraiser relied on by Amtrak lacked the necessary data and information to reliably value the Subject Property Interest, including detailed financial records, financial projections, leases, rent rolls, and physical spaces of the Station, including the basement, retail, and office spaces.  Amtrak knew that Lender considered foreclosing on the senior mortgage in January 2022.  Amtrak knew that Lender paid $358 million for the senior mortgage, over and above the $100 million mezzanine loan previously extended by Lender, which was based on a valuation of the leasehold interest of more than $700 million.  Amtrak's later "offer" of a fraction of these amounts could never constitute a good-faith offer to purchase the Subject Property Interest or a reasonable estimate of just compensation.

*Fourth,*  the taking is pretextual and, therefore, should not be allowed.  Amtrak is purporting to use its limited eminent-domain power to avoid contractual obligations, operate the commercial enterprise at the Station (including assuming a number of retail leases of entities like McDonalds and Starbucks), and "renegotiate" the terms of the lease between USRC and USI by inserting itself into the middle of that contract without statutory authority and in contravention of the traditional, normal processes of eminent domain.  Amtrak does not have a free-ranging commission to address other parties' leases and try to extract value to its benefit, and this condemnation action clearly falls outside Amtrak's limited statutory mission and authority.

*Fifth,* the materials submitted in support of this action are insufficient.  Neither the declaration of taking nor the estimated just compensation deposit comply with the standards necessary to vest title or allow transfer of possession.

For each of these reasons, as well as those set forth below at pages 31-42, Lender objects to the condemnation of the sublease controlling the Station and requests an order dismissing Amtrak's Complaint.

**RESPONSES TO NUMBERED PARAGRAPHS OF THE COMPLAINT**

1.      Lender denies the characterizations of the statute and respectfully refers the Court to 49 U.S.C. § 24101(a)(5) for its full import and meaning.  Lender denies the characterization of Amtrak's sublease agreement for the use of the Station and respectfully refers the Court to the sublease agreement for its full import and meaning.  Lender denies that Amtrak lacks the space and control needed to make improvements to the facilities and operations at WUS.  Lender admits that Amtrak purports to acquire the Subject Property Interest through this action but denies that the acquisition is necessary for the provision of intercity rail passenger transportation. Specifically, Lender denies that acquisition of the Subject Property Interest is necessary for Amtrak to repair and reinforce the train tunnel that runs through WUS, to improve passenger amenities and experience, and to effectively manage WUS.  Lender denies the remaining allegations contained in paragraph 1 of the Complaint.

2.      Paragraph 2 of the Complaint contains legal conclusions to which no response is required.  To the extent a response is required, Lender admits that Amtrak purports to acquire the Subject Property Interest under its statutory authorization in 49 U.S.C. § 24311(a)(1)(A), but denies that such acquisition is necessary for the provision of intercity rail passenger transportation. Amtrak has not properly exercised its power of eminent domain in this action as is further explained in Lender's objections and defenses.  Lender further denies that the amount deposited with the Court is just compensation because the fair market value of the Subject Property Interest is much higher than Amtrak estimated.

3.      Lender admits the allegations contained in paragraph 3 of the Complaint, including that the photograph represents a view of WUS's exterior.

4.      Lender denies the allegations contained in paragraph 4 of the Complaint and respectfully refers the Court to the Assignment, attached to the Complaint as Exhibit 1, for its full import and meaning.

5.      Lender admits that the Northeast Corridor connects eight states and the District of Columbia, with rail stations to the south, east, and west of the District of Columbia.  Lender respectfully refers the Court to 49 U.S.C. § 24101(a)(7) for its full import and meaning regarding Congress's description of the Northeast Corridor.  Lender otherwise denies the allegations contained in paragraph 5 of the Complaint.

A.      Lender lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 5(A) of the Complaint.

B.      Lender admits that the Northeast Corridor serves Washington, D.C., Boston, Harrisburg, Springfield, Albany, and Richmond but otherwise denies the remaining allegations contained in paragraph 5(B) of the Complaint.

C.      Lender denies the allegations contained in paragraph 5(C) of the Complaint and respectfully refers the Court to the Northeast Corridor Commission Policy referenced therein for its full import and meaning.

D.      Lender denies the allegations contained in paragraph 5(D) of the Complaint and respectfully refers the Court to the Northeast Corridor Commission Policy for its full import and meaning.

6.      Lender denies the allegations contained in paragraph 6 of the Complaint.

7.      Lender denies the allegations contained in paragraph 7 of the Complaint.

A.      Lender admits the description of WUS in paragraph 7(A), including that the photograph represents a view of WUS's Main Hall.

B.      Lender admits the description of WUS in paragraph 7(B), including that the photograph represents a view of WUS's Main Hall.

C.      Lender admits the description of WUS in paragraph 7(C), including that the photograph represents a view of the Amtrak ticket counter.

D.      Lender admits that passengers can wait for and/or board a train from the Claytor Concourse and that the photograph represents a view of the Claytor Concourse.  Lender denies the remaining allegations contained in paragraph 7(D).

8.      Lender admits the allegations contained in paragraph 8 of the Complaint.

9.      Lender admits that heavy rain in 1981 – decades before USI purchased the leasehold interest – caused damage to WUS's roof, causing the Station to close for a period of time.  Lender denies that poor maintenance and lack of capital investment have plagued the Station.  Lender denies the remaining allegations contained in paragraph 9 and respectfully refers the Court to The Washington Post article referenced therein for its full import and meaning.

10.     Lender denies the allegations contained in paragraph 10 of the Complaint and respectfully refers the Court to the Union Station Redevelopment Act cited therein for its full import and meaning.

11.     Lender admits that the United States is the owner of WUS.  Lender denies the remaining allegations contained in paragraph 11 of the Complaint.

12.     Lender admits generally the structure of the transaction but respectfully refers the Court to the sublease for its full terms.

13.     Lender admits generally the structure of the transaction but respectfully refers the Court to the contract documents for their full terms.

14. Lender admits generally the structure of the transaction but respectfully refers the Court to the contract documents for its full terms.

15. Lender admits that Amtrak purports to acquire ownership and control of the Subject Property Interest through this action, but denies that Amtrak has properly exercised its limited statutory authorization to condemn property necessary for intercity rail passenger transportation. Lender denies the remaining allegations contained in paragraph 15 of the Complaint.

16. Lender denies the allegations contained in paragraph 16 of the Complaint and respectfully refers the Court to the referenced statutes therein regarding Amtrak's mission and authorization for their full meaning and import. Lender lacks knowledge and information sufficient to form a belief about the truth of the remaining allegations contained in paragraph 16 of the Complaint.

17. Lender lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in paragraph 17 of the Complaint.

18. Lender lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in paragraph 18 of the Complaint.

19. Lender admits that Kookmin, as a trustee of KTB CRE Debt Fund No. 8, a Korean investment trust, holds an interest in the Subject Property Interest. Lender admits that there are no pending foreclosure proceedings on the leasehold interest or any sale or conveyance of Kookmin's interest in the Subject Property Interest. Amtrak was aware of a public UCC foreclosure sale on the mezzanine borrower that had been fully marketed during the Fall of 2021 and scheduled to occur on January 6, 2022. Because Lender purchased the senior note, the foreclosure sale did not go forward. Amtrak knew that Lender was considering an exercise of remedies, including a possible foreclosure on the senior note. On May 13, 2022, Lender provided its Notice of

Disposition of Collateral via a Public Foreclosure Sale Under Article 9 of the Uniform Commercial Code and Reservation of Rights to USSM.  The sale of all right, title, and interest of USSM is scheduled to be held on June 14, 2022, at public auction.  Lender admits that Kookmin has not assigned, transferred, or conveyed its interest in the Subject Property Interest.  Lender denies the remaining allegations contained in paragraph 19 of the Complaint and respectfully refers the Court to the Secured Party Assignment, attached to the Complaint as Exhibit 2, for its full import and meaning.

20.     Lender lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in paragraph 20 of the Complaint.

21.     Paragraph 21 of the Complaint is a legal conclusion to which no answer is required. To the extent an answer is required, Lender lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in paragraph 21 of the Complaint.

22.     Paragraph 22 of the Complaint is a legal conclusion to which no response is required.

23.     Paragraph 23 of the Complaint is a legal conclusion to which no response is required.

24.     Lender admits that the Subject Property Interest is located in the judicial district of the District of Columbia.  Paragraph 24 of the Complaint is otherwise a legal conclusion to which no response is required.

25.     Lender denies that Amtrak has properly exercised its power of eminent domain pursuant to 49 U.S.C. § 24311(a)(1)(A) and 49 U.S.C. § 24311(a)(2) as is further detailed in Lender's objections and defenses.  Lender further denies the remaining allegations contained in paragraph 25 of the Complaint.

26.     Lender denies that Amtrak is complying with all the requirements of 49 U.S.C. § 24311 and denies that Amtrak is entitled to exercise the right of eminent domain to obtain the Subject Property Interest.

27.     Lender denies the allegations contained in paragraph 27 of the Complaint, specifically denying that Amtrak needs the Station to meet its goals and mission.  Amtrak fulfills its goals and mission at other stations across the country – and along the Northeast Corridor – without owning the station, including that of South Station in Boston, Massachusetts, which is owned by an affiliate of USI.

28.     Lender denies the allegations contained in paragraph 28 of the Complaint and respectfully refers the Court to the Union Station Master Plan cited therein for its full import and meaning.

29.     Lender lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in paragraph 29 of the Complaint.

30.     Lender denies that Amtrak needs the Subject Property Interest to implement the planned projects from the Second Century Plan or to control Amtrak's future operations.  Lender otherwise lacks knowledge and information sufficient to form a belief about the truth of the remaining allegations contained in paragraph 30 of the Complaint.

31.     Lender denies the allegations contained in paragraph 31 of the Complaint. Specifically, Lender denies that Amtrak's purported acquisition of the Subject Property Interest is necessary to make WUS more efficient and better functioning.  Lender denies that Amtrak needs to acquire the Station to undertake the Subbasement Project, to complete the Concourse Modernization Project, or to manage the day-to-day operations of the Station effectively.

32.     Lender admits that one of the current projects anticipated for construction is the repair and/or replacement of the tunnels running through the Station, known as the Subbasement Project.  Lender denies that Amtrak needs the Subject Property Interest in order to accomplish the Subbasement Project.  Lender further denies the allegations regarding the Subbasement Project in paragraph 32 of the Complaint and respectfully refers the Court to the website cited therein for its full import and meaning.  Fact and expert discovery will demonstrate that Amtrak does not need to acquire the Subject Property Interest to complete the Subbasement Project.

A.     Lender denies the allegations in paragraph 32(A) of the Complaint and respectfully refers the Court to the website cited therein for its full import and meaning.

33.     Lender lacks knowledge and information sufficient to form a belief about the truth of the specifics of the Subbasement Project as described in paragraph 33 of the Complaint.

34.     Lender lacks knowledge and information sufficient to form a belief about the truth of whether Amtrak's equipment and/or facilities need to be relocated to complete the Subbasement Project.  Amtrak has not provided any support in its pleading for its allegation that equipment and/or facilities need to be relocated.  Regardless, Lender denies that Amtrak needs control over all areas of WUS in which its equipment and facilities are located and/or may need to be relocated for the Subbasement Project, particularly as that allegation purports to justify Amtrak's attempt to take over the entire Subject Property Interest.

35.     Lender lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in paragraph 35 of the Complaint.

36.     Lender denies the allegations contained in paragraph 36 of the Complaint.  Based on property-level information, the drawings for the Subbasement Project were only 30 percent completed as of January 18, 2022.

37.     Lender denies the allegations contained in paragraph 37 of the Complaint.  Lender denies that Amtrak needs to have control over areas of WUS not currently subleased by Amtrak in order to complete the Subbasement Project.  Amtrak has not provided any support in its pleading for its allegation that equipment and/or facilities require relocation to areas not currently subleased by Amtrak or that these areas need to be under Amtrak's control.  Discovery, including, but not limited to, engineering, station management, and safety expert testimony, will demonstrate that owning and controlling these areas are not necessary to complete the Subbasement Project.

38.     Lender denies the allegations contained in paragraph 38 of the Complaint. Specifically, Lender denies that Amtrak's failure to complete the Subbasement Project is due to it not owning the Subject Property Interest.

39.     Paragraph 39 of the Complaint contains statements of future speculation to which no response is required.  To the extent a response is required, Lender denies the allegations contained in paragraph 39 of the Complaint.  Acquiring the Subject Property Interest is not necessary to complete the Subbasement Project.

40.     Lender admits that Amtrak operates the trains described in paragraph 40 of the Complaint for the Northeast Corridor, National Network, and State-Supported service.  Lender denies the remaining allegations contained in paragraph 40 of the Complaint and respectfully refers the Court to the Amtrak Fact Sheet Fiscal Year 2019 District of Columbia cited therein for its full import and meaning.

41.     Lender admits that Claytor Concourse is the designated waiting area for passengers of Amtrak.  Lender otherwise denies the remaining allegations contained in paragraph 41 of the Complaint.  Lender further avers that Amtrak can modify and create a positive and safe experience for its customers without acquiring the Subject Property Interest.

42.     Lender lacks knowledge and information sufficient to form a belief about the truth of whether Amtrak needs to locate equipment and/or facilities to areas of WUS not currently subleased by Amtrak to complete the Concourse Modernization Project.  Lender denies the remaining allegations contained in paragraph 42 of the Complaint, specifically denying that Amtrak needs the Subject Property Interest in order to complete the Concourse Modernization Project and to control the operation, safety, and security of the area.  Amtrak has not provided any support in its pleading for its allegations.  Discovery, including, but not limited to, engineering, station management, and safety expert testimony, will demonstrate that owning and controlling these areas are not necessary to complete the Concourse Modernization Project.

43.     Lender denies the allegations contained in paragraph 43 of the Complaint and respectfully refers the Court to the Second Century Plan referenced therein for its full import and meaning.

44.     Lender denies the allegations contained in paragraph 44 of the Complaint and respectfully refers the Court to the websites cited therein for their full import and meaning.

45.     Lender denies the allegations contained in paragraph 45 of the Complaint. According to property-level information, the renovation of the Amtrak concourse remains at the design phase as of January 18, 2022.

46.     Paragraph 46 of the Complaint contains future speculation to which no response is required.  To the extent a response is required, Lender denies the allegations contained in paragraph 46 of the Complaint.

47.     Paragraph 47 of the Complaint contains future speculation to which no response is required.  To the extent a response is required, Lender denies the allegations contained in paragraph

47 of the Complaint.  Acquiring the Subject Property Interest is not necessary to complete the Concourse Modernization Project.

48.     Paragraph 48 of the Complaint contains future speculation to which no response is required.  To the extent a response is required, Lender denies the allegations contained in paragraph 48 of the Complaint.  Amtrak does not need to acquire the Subject Interest Property to respond to customer needs directly and immediately, react to emergent situations promptly, or provide stable and experienced management and operations.  As is further addressed in Lender's objections and defenses, Amtrak's attempt to acquire the Subject Property Interest as a necessity for the provision of intercity rail passenger transportation is merely a pretext to take advantage of what it perceives as the lower fair market value of the Station during the economic recovery from the Covid-19 pandemic.  Amtrak does not own other stations along the Northeast Corridor, yet manages to perform its goals and mission at those stations.  Discovery, including, but not limited to, station management expert testimony, will demonstrate that Amtrak does not need to possess the Subject Property Interest to provide intercity rail passenger transportation.

49.     Paragraph 49 of the Complaint contains future speculation to which no response is required.  To the extent a response is required, Lender denies the allegations contained in paragraph 49 of the Complaint.   Amtrak does not need to acquire the Subject Interest Property to expeditiously address customer needs and concerns at WUS.

A.     Lender denies the allegations contained in paragraph 49(A), specifically denying that WUS currently provides poor, dilapidated, and/or unsafe conditions.

B.     Paragraph 49(B) of the Complaint contains future speculation to which no response is required.  To the extent a response is required, Lender denies that Amtrak needs to acquire the Subject Property Interest in order to promptly deliver SOGR, maintenance, and capital

improvements to address customer needs and concerns.  Amtrak does not own other stations along the Northeast Corridor or other main train stations around the country, demonstrating that Amtrak does not need to acquire the Subject Property Interest to implement the necessary and required capital investments claimed in paragraph 49(B).  Lender further denies the inference contained therein that USI does not promptly deliver SOGR, maintenance, and capital improvements or otherwise address customer needs and concerns at the Station.

  C. Paragraph 49(C) of the Complaint contains future speculation to which no response is required.  To the extent a response is required, Lender denies the allegations contained in paragraph 49(C) of the Complaint, specifically denying that Amtrak needs to acquire the Subject Property Interest to address customer needs and concerns or improve the public perception of Amtrak.

  50. Paragraph 50 of the Complaint contains future speculation to which no response is required.  To the extent a response is required, Lender denies the allegations contained in paragraph 50 of the Complaint.  Lender further denies the inference contained therein that USI has not reacted to emergent events effectively or expeditiously.  There is no reason to expect that Amtrak could react more efficiently to emergent events at WUS through ownership of the Subject Property Interest.

  A. Lender admits that heavy rain caused damage to the Station's roof in 1981 and that an earthquake caused damage in 2011.  Lender admits that these types of natural disasters require urgent action to maintain public safety and preserve the Station.  Lender denies the inference contained in paragraph 50(A) of the Complaint that USI has not acted appropriately or expeditiously after a natural disaster befell the Station and that Amtrak could perform these tasks more effectively.

B.       Lender admits that the Station was subject to vandalism in January 2022. Lender denies the inference contained in paragraph 50(B) of the Complaint that USI had not acted appropriately or expeditiously after the graffiti was discovered.  In conjunction with USRC, USI handled the graffiti promptly, lawfully, and correctly.  USRC was completely involved in the means and methods of removing the graffiti – including the selection and approval of vendors given the Station's landmark façade – and commended USI on how it addressed the vandalism.

(i)       Lender admits that the west-facing front passenger arcade contained some of this offensive graffiti, which was rectified shortly after it was discovered. Lender lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in paragraph 50(B)(i) of the Complaint regarding how Amtrak perceived the graffiti and how the public perceived Amtrak, the Station, or their experience at the Station due to the graffiti.  Lender denies the remaining allegations contained in paragraph 50(B)(i) of the Complaint.

(ii)       Lender lacks knowledge and information sufficient to form a belief about the truth of the allegation regarding Amtrak's expertise and experience with historic preservation.  Lender denies the remaining allegations contained in paragraph 50(B)(ii) of the Complaint.  Specifically, Lender denies that the WUS exterior retains vestiges of the graffiti or damage from attempts to remove the graffiti.  Lender avers that after the graffiti was discovered, a specialist who could remove the graffiti from the Station without damage to the historic property was hired and removed it in an expeditious manner.  Lender denies that the removal of the graffiti was not done with historic preservation at the forefront.  Lender also denies that Amtrak could have acted in a more expeditious or appropriate manner, prevented the vandalism, or minimized any resulting damage.

C.     Paragraph 50(C) of the Complaint contains future speculation to which no response is required.  To the extent a response is required, Lender admits that other emergent events could occur during the remainder of the sublease of the Subject Property Interest.  Lender denies the remaining allegations contained in paragraph 50(C) of the Complaint, specifically denying that Amtrak needs to control the Subject Property Interest to use its purported expertise and experience with major station operations and management to deal with other emergent events quickly and appropriately.  Lender further denies the inference contained in paragraph 50(C) of the Complaint that Amtrak could deal with such events more expeditiously and effectively than USI.

51.     Paragraph 51 of the Complaint contains future speculation to which no response is required.  To the extent a response is required, Lender denies the allegations contained in paragraph 51 of the Complaint.

A.     Lender lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in paragraph 51(A) of the Complaint.

B.     Lender admits that the Condemnee was subject to two foreclosure actions that were scheduled but cancelled.  Lender avers that Amtrak knew of Lender's right to foreclose and that Amtrak intended to be a bidder at the anticipated auction on the senior mortgage.  Lender denies the remainder of the allegations contained in paragraph 51(B).

C.     Lender denies the allegations contained in paragraph 51(C) of the Complaint.  Lender denies that it would attempt to sell the Subject Property Interest to some unknown person or entity that lacks experience with rail passenger operations or historic preservation.  Lender further denies that Amtrak is better suited to manage the day-to-day

management of WUS, which not only provides rail transportation, but also contains retail, office, and entertainment spaces.

D.      Paragraph 51(D) of the Complaint contains future speculation to which no response is required.  To the extent a response is required, Lender denies the allegations contained in paragraph 51(D) of the Complaint.  Lender, pursuant to the powers granted to Trustee under the Loan Documents, and USI have provided stable and experienced management and are willing and able to make investments and capital improvements in WUS.  When Lender purchased the mortgage note in January 2022, the Lender had expressly reserved more than $25 million to account for property-level obligations.

E.      Paragraph 51(E) of the Complaint contains future speculation to which no response is required.  To the extent a response is required, Lender denies the allegations contained in paragraph 51(E) of the Complaint.  Amtrak does not need to acquire the Subject Property Interest to serve its rail passengers or create a positive experience at WUS.  Lender denies the inference contained in paragraph 51(E) of the Complaint that USI does not adequately or effectively provide the following functions at the Station:  maintenance, operation of the Station, inside and outside repairs, trash control, and snow and ice removal.

52.     Paragraph 52 of the Complaint contains future speculation to which no response is required.  To the extent a response is required, Lender denies the allegations contained in paragraph 52 of the Complaint.  Specifically, Lender denies the inference contained in paragraph 52 of the Complaint that USI does not effectively manage or operate the WUS, address customer needs, or react appropriately or quickly to emergent situations.  Lender denies the allegation that there is impermanence or instability with the Station's management or operations.  Lender further denies

that Amtrak needs to acquire the Subject Property Interest for the provision of intercity rail passenger service.

53.     Lender denies the allegations contained in paragraph 53 of the Complaint.

54.     Lender denies the allegations contained in paragraph 54 of the Complaint. Specifically, Lender denies that Amtrak needs to acquire the Subject Property Interest to make capital investments or improvements.   Lender further denies that Amtrak would achieve considerable savings and reduce delays by first acquiring the Subject Property Interest (and paying just compensation for condemning that interest) and then completing the planned projects.

55.     Lender denies the allegations contained in paragraph 55 of the Complaint and respectfully refers the Court to the USR Act for its full import and meaning.   Paragraph 55 otherwise contains future speculation to which no response is required.   To the extent a response is required, Lender denies the remaining allegations contained in paragraph 55 of the Complaint. Specifically, Lender denies the inference contained in paragraph 55 of the Complaint that returns received from the retail and other commercial operations at WUS are not being reinvested back into the Station.   Lender has caused all capital earned from subleases with tenants to be reinvested back into the Station since acquiring its interest in the Subject Property Interest.   Since May 2020, Lender has not taken any funds to service the debt from the rents generated at WUS.   Similarly, Lender has taken millions of dollars in losses in order to settle back-rent charges that accumulated during the Covid-19 pandemic, incentivize business owners to reopen, and reinvigorate the economy.

56.     Paragraph 56 of the Complaint contains future speculation to which no response is required.   To the extent a response is required, Lender denies the allegations contained in paragraph 55 of the Complaint.   Lender specifically denies the inference therein that USI is not injecting

capital funds and addressing capital projects effectively or expeditiously.  Each month, money is entering the Capital Maintenance Reserve Fund ("CMRF"), which is subsequently spent on capital projects at the Station.

57.     Lender denies the allegations contained in paragraph 57 of the Complaint.

A.     Lender denies the allegations contained in paragraph 57(A) of the Complaint and respectfully refers the Court to the Passenger Rail Investment and Improvement Act of 2008 for its full import and meaning.

B.     Lender denies the allegations contained in paragraph 57(B) of the Complaint and respectfully refers the Court to the statute referenced therein for its full import and meaning.

C.     Lender denies the allegations contained in paragraph 57(C) of the Complaint and respectfully refers the Court to the statute referenced therein for its full import and meaning.

D.     Lender denies the allegations contained in paragraph 57(D) of the Complaint and respectfully refers the Court to the statute referenced therein for its full import and meaning.

E.     Lender denies the allegations contained in paragraph 57(E) of the Complaint and respectfully refers the Court to the statute referenced therein for its full import and meaning.

F.     Lender lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in paragraph 57(F) of the Complaint.

58.     Lender denies the allegations contained in paragraph 58 of the Complaint.  Amtrak does not need to acquire the Subject Property Interest immediately – or otherwise – to fulfill its statutory mandate, mission, vision, or business goals.

59.     Paragraph 59 of the Complaint contains future speculation to which no response is required.  To the extent a response is required, Lender denies the allegations contained in paragraph 59 of the Complaint.

60.     Lender denies the allegations contained in paragraph 60 of the Complaint, specifically denying the inference that USI does not maintain and operate WUS to a high standard.

61.     Lender denies the allegations contained in paragraph 61 of the Complaint.  Amtrak does not need the Subject Property Interest to better control costs and leverage efficiencies of management and operations at WUS.  This lack of necessity is further evidenced by the fact that Amtrak does not own all the stations it operates within along the Northeast Corridor, including South Street in Boston, nor does Amtrak own many of the major rail stations it uses across the country.

62.     Paragraph 62 of the Complaint contains future speculation to which no response is required.  To the extent a response is required, Lender denies the allegations contained in paragraph 62 of the Complaint and respectfully refers the Court to the USR Act referenced therein for its full import and meaning.  Lender further denies that acquiring the Subject Property Interest is in alignment with Amtrak's needs, its statutory mandates, its mission and vision, or the USR Act.

63.     Lender lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in paragraph 63 of the Complaint.  As is further addressed in Lender's objections and defenses, Lender avers that Amtrak's "business case" did not follow Amtrak's internal procedures by ignoring critical steps and relying on faulty assumptions.

64.     Paragraph 64 of the Complaint contains legal conclusions to which no response is required.  To the extent a response is required, Lender denies the allegations contained in paragraph 64 of the Complaint.   Specifically, Lender denies that the acquisition of the Subject Property Interest is necessary for intercity rail passenger transportation.  Nor does the acquisition of the Subject Property Interest have a direct nexus to and/or significant relationship with Amtrak's statutory mandates or its corporate goals and mission.  Amtrak is, therefore, not entitled to take the Subject Property Interest by eminent domain.

65.     Paragraph 65 of the Complaint contains legal conclusions to which no response is required.  To the extent a response is required, Lender denies that Amtrak's deposit constitutes just compensation because the fair market value of the Subject Property Interest is much higher than Amtrak estimated.  Lender also denies that the Declaration of Taking is legally sufficient to vest title or allow for possession.

66.     Lender admits the allegation contained in paragraph 66 of the Complaint that Amtrak deposited $250 million with the Court.  Lender denies that $250 million adequately constitutes just compensation because the fair market value of the Subject Property Interest is much higher than Amtrak estimated.

67.     Lender lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in paragraph 67 of the Complaint.  Lender denies that Amtrak's estimate of $250 million is adequate for just compensation of the Subject Property Interest. Amtrak's independent real estate appraiser did not have access to necessary data and information, including financial records or physical spaces of the Station, to reliably value the Station.  Upon information and belief, Amtrak obtained multiple appraisals for the Subject Property Interest throughout 2021.

68.     Lender lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in paragraph 68 of the Complaint.  Lender denies that $250 million constitutes just compensation because the fair market value of the Subject Property Interest is much higher than Amtrak estimated.

69.     Lender lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in paragraph 69 of the Complaint.  Lender avers that Amtrak's offer of $250 million was not made in good faith because the fair market value of the Subject Property Interest is much higher than Amtrak estimated and Amtrak knew that its estimate severely undervalued the interest.  Amtrak knew that Lender bought the senior mortgage note for $358 million and that the property interest was appraised at more than $700 million.

70.     Lender lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in paragraph 70 of the Complaint.  Lender avers that Amtrak's offer of $250 million was not made in good faith because the fair market value of the Subject Property Interest is much higher than Amtrak estimated and Amtrak knew that its estimate severely undervalued the interest.  Amtrak knew that Lender bought the senior mortgage note for $358 million and that the property interest was appraised at more than $700 million.

71.     Lender lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in paragraph 71 of the Complaint.

72.      Lender lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in paragraph 72 of the Complaint.  Lender avers that Amtrak's offer of $250 million was not made in good faith because the fair market value of the Subject Property Interest is  much  higher  than  Amtrak  estimated  and  Amtrak  knew  that  its  estimate  severely

undervalued the interest.  Amtrak knew that Lender bought the senior mortgage note for $358 million and that the property interest was appraised at more than $700 million.

73.     Paragraph 73 of the Complaint contains legal conclusions to which no response is required.  To the extent a response is required, Lender denies the allegations contained in paragraph 73 of the Complaint.

74.     Paragraph 74 of the Complaint contains legal conclusions to which no response is required.

75.     Lender objects to the request made in paragraph 75 of the Complaint for Amtrak to seek immediate access to the Subject Property Interest to conduct a thorough inspection.

76.     Lender denies that Amtrak should be given possession of the Subject Property Interest as is further explained in Lender's objections and defenses.  The acquisition of the Subject Property Interest is not necessary for the provision of intercity rail passenger transportation.  The Court should refrain from giving possession of the Subject Property Interest until the issue of Amtrak's authority to exercise eminent domain is adjudicated.

77.     Lender denies the allegations contained in paragraph 77 of the Complaint.  Amtrak does not need immediate access to the Subject Property Interest.  Amtrak will not be prejudiced by delaying access to the Subject Property Interest until Amtrak's authority to exercise eminent domain is adjudicated.

78.     Lender denies the allegations contained in paragraph 78 of the Complaint. Amtrak's purported right to the proceeds arising from the Subject Property Interest demonstrates that Amtrak's claimed necessity is a pretext to take advantage of the Covid-19 pandemic as is further explained in Lender's objections and defenses.

79.     Paragraph 79 of the Complaint contains legal conclusions to which no answer is required.

80.     Lender denies the allegations contained in paragraph 80 of the Complaint and that Amtrak is entitled to the value of the Subject Property Interest during the time period running from the date of the filing of the Declaration of the Taking to the date of possession.  Lender denies that Amtrak has properly exercised its power of eminent domain in this action as is further explained in Lender's objections and defenses.  Amtrak, therefore, should not be given possession of the Subject Property Interest.

81.     Lender denies the allegations contained in paragraph 81 of the Complaint and that Amtrak is entitled to the relief sought therein.  Lender denies that Amtrak has properly exercised its power of eminent domain in this action as is further explained in Lender's objections and defenses.  Amtrak, therefore, should not be given possession of the Subject Property Interest.

82.     Lender denies the allegations contained in paragraph 82 of the Complaint and that Amtrak is entitled to the relief sought therein.  Lender denies that Amtrak has properly exercised its power of eminent domain in this action as is further explained in Lender's objections and defenses.  Amtrak, therefore, should not be given possession of the Subject Property Interest.

WHEREFORE, Lender denies that Amtrak is entitled to the relief requested in the *ad damnum* clause, or to any relief at all.

## <u>LENDER'S OBJECTIONS AND DEFENSES TO THE TAKING</u><br><u>PURSUANT TO FED. R. CIV. P. 71.1(e)(2)</u>

### A.  <u>Lender's Interests</u>

1.      Trustee has clear rights and interest in the Subject Property Interest, which arise out of its assumption of that certain Mortgage Loan in the original principal amount of Three Hundred Thirty Million and No/100 Dollars ($330,000,000.00) (the "Mortgage Loan") made by Citi Real Estate Funding Inc., a New York corporation ("Citi"), and Natixis Real Estate Capital LLC, a Delaware limited liability company ("Natixis"; together with Citi, "Original Mortgage Lender"), to USI ("Mortgage Borrower"), as evidenced, *inter alia*, by that certain Mortgage Loan Agreement dated as of May 8, 2018, as modified by that certain First Modification of Loan Agreement and Forbearance dated as of July 8, 2020, made by and between Mortgage Borrower and Wilmington Trust, National Association, in its capacity as trustee for US 2018-USDC, Commercial Mortgage Pass-Through Certificates, Series 2018-USDC (as amended, modified, restated, and/or replaced from time to time, the "Mortgage Loan Agreement"), by and between Original Mortgage Lender and Mortgage Borrower, and certain other Loan Documents (as defined in the Mortgage Loan Agreement) (collectively, the "Mortgage Loan Documents").

2.      By way of example, the Mortgage Loan Agreement vests the Trustee with the authority to act as USI's attorney-in-fact in connection with any actual or threatened condemnation following default by USI.  Specifically, Section 5.2.2 of the Mortgage Loan Agreement provides, in relevant part, as follows:

> 5.2.2.  Condemnation. . . . . Lender is hereby irrevocably appointed to act after the occurrence and during the continuance of an Event of Default as Borrower's attorney-in-fact, coupled with an interest, with exclusive power to collect, receive and retain any Award and to make any compromise or settlement in connection with any Material Condemnation.

3.     As Multiple Events of Default have occurred and are continuing under the Mortgage Loan Agreement, Rexmark Holdings is now USI's attorney-in-fact, coupled with an interest, with exclusive power to collect, receive, and retain any condemnation award and to make any compromise or settlement in connection with this Action.  Rexmark Holdings provided notice to USI and Amtrak on April 28, 2022.

4.     In connection with its interest in the Mortgage Loan, Trustee was also granted certain, rights, liens, and security interests contained in the certain Leasehold Deed of Trust, Security Agreement, Assignment of Leases and Rents, Financing Statement and Fixture Filing, dated as of May 8, 2018, made by Mortgage Borrower to Lawyers Title Realty Services, Inc., as trustee, for the benefit of Original Mortgage Lender as beneficiary, and as assigned by Original Mortgage Lender to Wilmington Trust, National Association, as trustee on behalf of the holders of US 2018-USDC Commercial Mortgage Pass-Through Certificates, Series 2018-USDC pursuant to that certain Assignment of Leasehold Deed of Trust, Security Agreement, Assignment of Leases and Rents, Financing Statement and Fixture Filing, dated as of June 19, 2018 (collectively, the "Deed of Trust"), which encumbers USI's leasehold estate in the land (i.e., the Subject Property Interest).

5.     Trustee also has rights implicated in this action by reason of its status as Mezzanine Lender (as defined below) pursuant to that certain Mezzanine Loan in the original principal amount of One Hundred Million Dollars ($100,000,000.00) ("Mezzanine Loan") made by Kookmin, as Trustee of the Trust ("Mezzanine Lender"), to USSM ("Mezzanine Borrower"), as evidenced, *inter alia*, by that certain Mezzanine Loan Agreement dated as of May 8, 2018, as modified by that certain First Modification of Mezzanine Loan Agreement and Forbearance dated as of July 8, 2020 (as further amended, modified, restated, and/or replaced from time to time "Mezzanine Loan

Agreement"), by and between Mezzanine Lender and Mezzanine Borrower, and any other Loan Documents (as defined in the Mezzanine Loan Agreement), and secured by, *inter alia*, that certain Pledge and Security Agreement dated as of May 8, 2018 ("Pledge Agreement") made by Mezzanine Borrower (in such capacity, "Pledgor").

6.      USSM is 100% owner of the membership interest in USI.  USSM through the Pledge Agreement pledged and granted that ownership interest, among others things, as collateral to Trustee in connection with the Mezzanine Loan.  As a result of the multiple Events of Default that occurred and are continuing, Trustee, under various provisions of the Pledge Agreement, has the right to manage and control USI with respect to, among other things, Trustee's interest in and protection of its Collateral (defined in the Pledge Agreement), which includes, but is not limited to, the Subject Property Interest.

7.      Specifically, under paragraph 9(a) of the Pledge Agreement, Trustee has the right to act (and exercised such right) "as if [Trustee] were the sole and absolute owner" of the Collateral (defined in the Pledge Agreement), which includes all Pledged Company Interests (defined in Pledge Agreement) – namely the 100% ownership interest in USI.

8.      Further, the Pledge Agreement provides in paragraph 8(a) (titled "Rights of Lender") that "[i]f an Event of Default shall occur and be continuing, then all such [USI] interests at [Trustee's]'s option and in accordance with an exercise of remedies pursuant to the terms of this [Pledge Agreement], shall be registered in the name of [Trustee] or its nominee . . . ."  Once registered, Trustee may "thereafter exercise (i) all voting, managerial, limited liability company and other rights pertaining to the [USI] Interests and the business and affairs of [USI] . . . as if it were the absolute owner thereof . . . ."

9.    Trustee provided USSM written notice of its election to exercise its rights under paragraph 8(a) of the Pledge Agreement, which notice and instruction is to be complied with by USI without any further instruction from USSM under paragraph 18(h) of the Pledge Agreement.

10.    Lastly, similar to other provisions of the other loan documents, Trustee is appointed as attorney-in-fact for USSM under paragraph 13 of the Pledge Agreement.  As attorney-in-fact, Trustee is empowered to carry out the provisions of the Pledge Agreement, and to take action in and sign in USSM's name.  Under this provision of the Pledge Agreement, USSM is to receive five days' notice, which occurred on May 13, 2022.

11.    With respect to each of the rights provided for under the Pledge Agreement that are described above, Trustee obtained voting and managerial rights of USI as if it is the owner, and in such capacity, Trustee amended the operating agreement to remove and replace the manager of USI.

**B.  Lender's Objections and Defenses**

12.    Lender objects to the taking on the following grounds:

a.    Amtrak did not properly serve Kookmin in accordance with Federal Rule of Civil Procedure, Rule 4.

b.    Kookmin does not have an interest in the Subject Property Interest in its individual capacity.  As such, Kookmin is improperly named as an individual defendant in this matter.

c.    Amtrak's taking of the Subject Property Interest is not "necessary for intercity rail passenger transportation" as required by 49 U.S.C. § 24311(a)(1)(A).  In the 50-year history of Amtrak, the company has not held the leasehold position it seeks to take by eminent

domain, demonstrating that its control of that leasehold has never been necessary for intercity rail passenger transportation.

Amtrak now claims that it needs to acquire the leasehold interest over the entire Station for three reasons:  (1) to complete the Subbasement project; (2) to complete the Concourse Modernization Project; and (3) to manage and operate WUS effectively.  Amtrak does not need to own the Subject Property Interest to complete the Subbasement Project or the Concourse Modernization Project.  Amtrak had planned to pursue these projects prior to the exercise of eminent domain.  Both projects are in the predevelopment phase, with the Subbasement Project still in the drawing phase and the Concourse Modernization Project in the design phase.  These projects, moreover, require (at most) only limited space for the relocation of facilities and equipment during the projects' construction, and Amtrak cannot prove that taking over the Subject Property Interest is necessary to complete these projects, much less to take the Station by eminent domain.  Fact and expert testimony will demonstrate that Amtrak does not need the Subject Property Interest to complete either of these projects.  The Subject Property Interest includes much more than merely the Amtrak boarding gates, passenger waiting area, and the space Amtrak purports to need for the relocation and maintenance of its equipment.  The Subject Property Interest includes retail stores, restaurants, offices, and entertainment venues that do not have a direct nexus or significant relationship to the provision of intercity rail passenger transportation.

For its third purported need to justify Amtrak's exercise of eminent domain over the rest of the Station, Amtrak relies on public perception and generic "customer needs and concerns" in its attempt to create a significant relationship to intercity rail passenger transportation.  These broad and ambiguous explanations fail to provide a direct nexus to Amtrak's limited statutory mandate.  Regardless, Amtrak's purported purpose of acquiring the Subject Property Interest, namely to

provide customer service and respond to emergent events, is already effectively managed by USI. Amtrak cannot prove that the Station is being ineffectively managed and operated by USI or that the Station is ill-maintained – or that a change in the subtenant position is "necessary for intercity rail passenger transportation."

d.     Amtrak has the burden to prove that its taking is authorized by statute, and the Court does not owe Amtrak deference on its determination of purported necessity.   As a government-sponsored for-profit corporation, Amtrak does not benefit from the deferential review afforded a governmental agency.   This eminent-domain proceeding does not fall within the federal government's Constitutional right to take property for just compensation.   *See* U.S. Const. amend V.   The statutory authorization for Amtrak to exercise eminent domain is a limited grant of power, and, according to Amtrak's own pleading, Amtrak must demonstrate that the property is "necessary for intercity rail passenger transportation."   49 U.S.C. § 24311(a)(1)(A).   The taking must have a direct nexus to the provision of rail services or Amtrak's other mandates recognized by statute.   49 U.S.C. § 24101(c).   Amtrak's condemnation of the Subject Property Interest does not have this direct nexus or significant relationship to Amtrak's statutory mandate; the taking is based on mere convenience to seek financial gain not sanctioned by Amtrak's statutory mandate. Discovery will further demonstrate that taking over the Subject Property Interest is not necessary for intercity rail passenger transportation.

e.     Amtrak's claimed necessity is merely a pretext to take advantage of the Covid-19 economic recovery.   Pursuant to Lender's power granted by the Loan Documents, all capital earned from subleases with tenants has been reinvested back into the Station.   Since May 2020, Lender has not taken any money out of the profits earned by the Station.   Similarly, Lender has taken millions of dollars in losses in order to settle back-rent charges that accumulated during

the Covid-19 pandemic, incentivizing business owners to reopen.   Although the Covid-19 pandemic decimated both the transportation and retail industries, Lender has worked with tenants to reinvigorate the economic recovery at the Station.   After two years of shutdowns and public health restrictions and as the economy has begun to rebound, Amtrak now seeks to exercise its power under eminent domain to take over the Station, alleging that it will do the actions that Lender has already taken.   Amtrak seeks to take advantage of the ongoing economic recovery and acquire the Station at a lower market value, evidenced by Amtrak's unsupportable, low estimate of just compensation.

       f.       Amtrak knew about Lender's right to foreclose on the membership interest under the mezzanine loan and mortgage loan.   Amtrak knew that the loans had been accelerated, and Amtrak expressed interest in bidding on the membership interest at auction if one were to occur.   Amtrak knew that the property interest was valued at more than $700 million.   Lender chose not to foreclose because Lender instead purchased the senior note for $358 million and expressly reserved more than $25 million to account for property-level obligations.   Amtrak knew that Lender purchased the senior note for $358 million.   Yet, Amtrak offered USI only $250 million as a purported good-faith offer to purchase the Subject Property Interest.   After waiting only eight days for a response, Amtrak filed the instant action.   Amtrak's decision to bring the instant eminent-domain proceeding after being involved in the potential foreclosure and learning of the underlying valuation shows further pretext behind Amtrak's strategy to take over the Station.

       g.       Amtrak's taking of the Subject Property Interest is not for public use. Evidenced by Amtrak's purported "needs," Amtrak seeks to profit from the taking by becoming the owner of the leasehold interest over the offices, restaurants, event venue space, and retail establishments in the Station.   Because Amtrak is acting outside its limited statutory authority, the

taking is not for a public use.  Moreover, through a combination of law and contract, the proper parameters of public use have already been established by Congress and the Department of Transportation:  nonparty United States (Department of Transportation) owns the building; it has an approved long-term lease with nonparty USRC, which, in turn, entered into the subject sublease with what is now USI.  The statute does not authorize Amtrak to disrupt this arrangement and "condemn over" the existing leases that the government and government-controlled entities established.

       h.    Amtrak brought this eminent-domain proceeding for its commercial benefit rather than because it was necessary for the provision of "intercity rail passenger transportation." 49 U.S.C. § 24311(a)(1)(A).  This ulterior motive is demonstrated by the process that led to this proceeding.  The United States Government owns the full title to the Station.  Amtrak's Board of Directors allegedly adopted a resolution to condemn the Subject Property Interest with unanimous approval.  Amtrak's Board consists of the President and CEO, Stephen Gardner, the Secretary of the Department of Transportation, and other individuals.  Conveniently, some of these same board members overlap with USRC's Board of Directors.  USRC is a nonprofit organization tasked with preserving the Station, maintaining the Station as a multimodal transportation center, and enhancing the retail and amenities within the Station.  As such, one of USRC's obligations is to fund, plan, and implement the CMRF projects.  Reading Amtrak's Complaint, however, puts the blame for capital shortfalls and delay to construction solely on USI – an entity that has no involvement in the funding, implementation, or planning of the CMRF projects.  Amtrak is essentially seeking to wipe out the middleman by taking the Subject Property Interest by eminent domain, not out of necessity for intercity rail purposes, but out of a desire for financial gain not

sanctioned by its statutory mandate.  The claimed necessity serves only as a pretext for Amtrak's ulterior motives.

i.      Amtrak improperly seeks to condemn the Station under its limited statutory authority based on alleged need for "intercity rail passenger transportation," but the statute provides for a more specific framework when concerning WUS.  Pursuant to 49 U.S.C. § 24311(a)(1)(B), Amtrak may use eminent domain to acquire property "requested by the Secretary of Transportation in carrying out the Secretary's duty to design and build an intermodal transportation terminal at Union Station in the District of Columbia if the Secretary assures Amtrak that the Secretary will reimburse Amtrak."  Amtrak admittedly does not seek to acquire the Subject Property Interest in order to design and build an intermodal transportation terminal at the Station. The canon of construction *expressio unius est exclusio alterius* provides that when a statute expresses one thing, it should be construed to exclude the alternative.  In relying on 49 U.S.C. § 24311(a)(1)(A) as authority to condemn the Station, and failing to explain why the condemnation is not brought under the section of the statute that applies to the Station specifically, Amtrak ignores the logic and language of the statute that granted it limited eminent-domain authority.

j.      Lender objects to Amtrak's request for immediate access to the Subject Property Interest to conduct an inspection and ease the transition for the transfer of control. Amtrak seeks control over the Subject Property Interest for its commercial benefit rather than the necessity of "intercity rail passenger transportation."  49 U.S.C. § 24311(a)(1)(A).  Amtrak claims that the immediate transfer of control and possession will allow Amtrak to reinvest money into the Subject Property Interest, but this is already being done under the leasehold.  Lender, pursuant to the powers granted by the Loan Documents, has reinvested all of the capital earned from the tenants back into the Station.  Since May 2020, Lender has not taken any money out of the profits

earned by the Station.  Similarly, Lender has taken millions of dollars in losses in order to settle back-rent charges that accumulated during the Covid-19 pandemic, incentivize business owners to reopen, and reinvigorate the economy.  Amtrak has no need to control the Subject Property Interest as it is already being properly managed and maintained at a high standard.

k.     Amtrak is a for-profit corporation that has limited statutory authority to acquire property by eminent domain.  The statute requires that the property be "necessary for intercity rail passenger transportation."  49 U.S.C. § 24311(a)(1)(A).  That limited authority is subject to the Court's review of Amtrak's decision and the determination of whether Amtrak has abused its discretion by making an unreasonable business judgment that the condemnation of the property is necessary.

l.     Amtrak has abused its discretion, acted in bad faith, and made an unreasonable business judgment in determining to condemn the Subject Property Interest and in determining that such condemnation is "necessary for intercity rail passenger transportation."  49 U.S.C. § 24311(a)(1)(A).  Amtrak's purported condemnation of the Subject Property Interest cannot be reasonably viewed as a useful and appropriate means of furthering any of Amtrak's statutory goals, which have been established by Congress:

  i.   "Amtrak shall . . . use its best business judgment in acting to minimize United States subsidies . . . ."  49 U.S.C. § 24101(c)(1);

  ii.  Amtrak shall "maximize the use of its resources, including the most cost-effective use of employees, facilities, and real property."  *Id.* at § 24101(c)(12); and

  iii. "Amtrak is encouraged to make agreements with the private sector entities and undertake initiatives that are consistent with good business judgment

and designed to generate additional revenues to advance the goals described in subsection (c)."  *Id.* at § 24101(d).

Upon information and belief, by acquiring the Subject Property Interest at a cost of (well over) $250 million, Amtrak will bear increased financial obligations, which will subsequently increase its need for federal subsidies and impede its ability to maximize revenues and resources.  Owning the Subject Property Interest will increase Amtrak's leasehold interest from approximately 13.4 percent to 100 percent, along with all attendant expenses.  (*See* Compl. at ¶ 1.)  Undertaking this action without a good-faith attempt to reach agreement with USI is directly contradictory to Amtrak's statutory mandate.  Indeed, Congress has encouraged Amtrak to make agreements with the private sector, which is the current relationship between Amtrak and USI.  By filing its declaration of taking, Amtrak has flouted its Congressional mandate in order to take advantage of the Covid-19 pandemic and oust USI.  Amtrak's claimed necessity is merely a pretext to take advantage of the economic recovery from the Covid-19 pandemic.  This decision is not the result of a reasoned decision that the Station is "necessary for intercity rail passenger transportation," nor is it a useful or appropriate way for Amtrak to accomplish its statutory goals.  Amtrak abused its discretion, exercised bad faith, and has not exercised best business judgment when deciding to condemn the Subject Property Interest.

m.     Amtrak failed to follow its internal procedures when determining that Amtrak should exercise eminent domain over the Subject Property Interest.  Amtrak claims that the acquisition of the Subject Property Interest "is necessary for Amtrak's intercity rail passenger transportation service, is necessary for the accomplishment of Amtrak's mission, and is necessary for the reasons set forth in the business case."  (Compl. at ¶ 63.)  Lender avers that Amtrak relied on faulty assumptions when developing the "business case" for exercising eminent domain over

the Subject Property Interest.  Lender avers that Amtrak failed to follow its internal procedures including, but not limited to, securing grant funding from the Federal Railroad Administration to pay fair market value, accurately estimating costs and benefits, identifying risks to acquiring the Subject Property Interest by eminent domain, and challenging assumptions.  Amtrak skipped critical steps before determining whether eminent domain could be exercised in this case.

n.      Given that the underlying property is owned by the United States, even if eminent domain would otherwise be proper (it is not), removing the leaseholder here is not necessary because Amtrak could directly work with the U.S. Government who owns the actual real property to pursue its mission and goals.

o.      Similarly, to the extent that Amtrak's position is based on the alleged failure of USI to manage the Station properly, that would be a breach of contract claim between the sublandlord (USRC) and subtenant (USI).  Amtrak does not have the right to "enforce" purported standards of station management even if USRC had that right.  Amtrak should not be allowed to bootstrap itself into a contract position using eminent domain.

p.      Amtrak failed to demonstrate that it could not "acquire the interest in the property by contract" or "agree with the owner on the purchase price for the interest," as required by 49 U.S.C. § 24311(a)(2), preventing Amtrak from exercising its power of eminent domain.  As alleged in its Complaint, Amtrak offered to purchase the Subject Property Interest for $250 million on April 6, 2022.  (Compl. at ¶ 70.)  Amtrak does not allege that it followed up with the owner of the Subject Property Interest.  Amtrak does not allege that the owner flatly refused the offer. Amtrak does not allege that any negotiations – or even basic discussions – took place.  Rather, Amtrak waited a mere eight days after offering a purchase price far below fair market value to file

the declaration of taking with this Court.  Amtrak's "offer" did not constitute a good-faith offer to purchase the Subject Property Interest at a price close to the fair market value.

        q.     In order to properly exercise eminent domain, be vested with title, or be put in possession of property, a condemnor is required to file a declaration of taking.  Traditionally, such declarations are signed by the authority empowered by law to acquire the property, *e.g.*, an agency head or the mayor.  For example, under the federal Declaration of Taking Act, if the United States acquires land outside the District of Columbia, the Declaration must be "signed by the authority empowered by law to acquire the land described in the petition."  40 U.S.C. § 3114(a).  Such a declaration also has the effect of establishing that the condemning authority is committed to pay whatever is determined to be the final compensation award.  Under such standards, Amtrak's Declaration of Taking is insufficient.  It is not executed by any person with authority to acquire the property.  It does not reflect that Amtrak has complied with statutory requirements to take, fails to provide an accurate statement of reasons for the taking, and does not set forth a reasonable estimate of just compensation.  Indeed, the Declaration of Taking here does not even confirm Amtrak's authority or ability to pay an award of just compensation.  The reference in the Complaint to a meeting of Amtrak's Board of Directors is not a substitute for a proper declaration of taking.

        r.     The amount of just compensation is palpably inadequate for the Station based on the size, actual and potential income, historic prominence, and status as "one of the most critical components of the Nation's passenger rail service."  (Compl. at ¶ 1.)  Amtrak's deposit with the Court severely undervalues the property.  The fair market value of the Station is far higher than the $250 million estimated.  In fact, a recent appraisal valued the Subject Property Interest at more than $700 million.  Similarly, in an arm's-length market transaction, a large, highly

sophisticated investment fund recently paid a hard deposit of $100 million based on a valuation of the Subject Property Interest at $700 million.  Amtrak knew of both the recent appraisal and market transaction.  Amtrak's paltry estimate does not constitute just compensation, thereby failing to meet the statutory requirements for Amtrak's limited power to acquire property by eminent domain.  The estimated just compensation is also insufficient to support Amtrak's claim for vesting of title or immediate possession.

s.     Finally, the deficient deposit also highlights Amtrak's failure to satisfy the conditions precedent regarding the offer to buy the property of interest.  The purported independent real estate appraiser did not review relevant data and information, including WUS's financial records, financial projections, leases, rent rolls, and physical spaces.  The resulting valuation of $250 million is based on outdated and incomplete information that will not withstand judicial scrutiny.  And Amtrak knew that this estimation fell short.  Amtrak knew that Lender paid $358 million for the senior mortgage, which was based on a valuation of the leasehold interest amounting to more than $700 million.   Yet, Amtrak's independent real estate appraiser inexplicably valued the Subject Property Interest at a mere $250 million.  This unsupportable estimate could never constitute a good-faith offer to purchase the Subject Property Interest.  Amtrak is statutorily mandated to attempt to acquire the property interest by contract before seeking to condemn property by eminent domain.  Both the offer made to USI and the amount subsequently deposited with the Court severely undervalue the Subject Property Interest.  Amtrak's failure to engage in a good-faith offer and negotiation process precludes its purported taking of the Station.

WHEREFORE, Defendant Kookmin prays that this Court enter an Order dismissing Plaintiff's Complaint and awarding attorneys' fees and all other costs and expenses in

the defense of this action, along with any other such relief as the Court may deem just and proper,

to Defendant Kookmin.

MORRISON COHEN LLP

*/s/ Y. David Scharf*
Y. David Scharf
Brett Dockwell
Kristin T. Roy
Latisha V. Thompson
Amber R. Will
Mahnoor Misbah
909 Third Avenue
New York, New York 10022
(212) 735-8600

*-and-*

HOLLAND & KNIGHT LLP

*/s/ Paul J. Kiernan*
Paul J. Kiernan
Louis J. Rouleau
800 17th Street N.W.
Suite 1100
Washington, D.C. 20006
Phone: 202-663-7276
Fax: 202-955-5564
Paul.kiernan@hklaw.com

*Attorneys for Defendant Kookmin*
*Bank Co., Ltd.*