IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK),<br><br>        Plaintiff,<br><br>     v.<br><br>Sublease Interest Obtained Pursuant to an Assignment and Assumption of Leasehold Interest made as of January 25, 2007, with said property interest Pertaining To Described Leasehold Interests at Washington Union Station located at 50 Massachusetts Avenue, NE Washington, D.C. 20002, UNION STATION INVESTCO, LLC, UNION STATION SOLE MEMBER, LLC, KOOKMIN BANK CO., LTD. INDIVIDUALLY AND IN ITS CAPACITY AS TRUSTEE OF KTB CRE DEBT FUND NO. 8, A KOREAN INVESTMENT TRUST, and UNKNOWN OWNERS,<br><br>        Defendants. | Civil Action No. 1:22-cv-01043-APM |

**UNION STATION INVESTCO, LLC AND UNION STATION SOLE MEMBER, LLC'S ANSWER TO PLAINTIFF'S COMPLAINT FOR CONDEMNATION AND REQUEST FOR POSSESSION[1]**

Defendants Union Station Investco, LLC ("Investco") and Union Station Sole Member, LLC ("Sole Member," and together with Investco, "Owners"), by and through their undersigned attorneys, for their answer, pursuant to Federal Rule of Civil Procedure 71.1(e)(2), to National Railroad Passenger Corporation's ("Amtrak") Complaint for Condemnation and Request for Possession (the "Complaint"), state as follows:

---

[1] The answer purported to be filed as Document Number 36 was not authorized by Union Station Investco, LLC.

## OVERVIEW

1. This proceeding is an unconstitutional, unlawful, and unnecessary taking of Owners' property interests in a substantial portion of Washington Union Station ("Union Station" or the "Station"), the famed transportation hub and retail and dining center located in the heart of Washington, D.C. at 50 Massachusetts Avenue NE. For more than 15 years, Owners and their affiliates have successfully managed and controlled Union Station, and have engaged in substantial efforts to attract and retain high-end commercial tenants and develop the Station, including through tens of millions of dollars of improvements. This action seeks to wrongfully deprive Owners of their lawful property interests in a marquee, historical property. This unlawful condemnation also cannot be remedied by the grossly inadequate $250,000,000 that Amtrak claims is "just compensation."

2. Congress has limited Amtrak's authority to use the extraordinary power of eminent domain only where it is "necessary for intercity rail passenger transportation." Even where such necessity is met, Amtrak may execute a taking "only if it cannot" acquire the interest in the property by contract or agree with the owner on a purchase price for the property. None of these prerequisites have been met here.

3. Amtrak has operated intercity rail passenger transportation services at Union Station for decades without the need to own the Station itself, including the dozens of commercial spaces which are subject to leases (which Amtrak claims it is assuming under the taking). It now alleges in the Complaint three reasons why it is supposedly "necessary" that Amtrak now own the Station: (i) completion of the "Subbasement Project," (ii) completion of the "Concourse Modernization Project," and (iii) to manage the day-to-day operations of Union Station effectively.

4.      There are substantial flaws with Amtrak's claim that owning the Station is necessary to complete the Subbasement Project and Concourse Modernization Project.  First, as the Complaint makes clear, the bulk of these two projects will take place in areas already subleased by Amtrak, much of which -- such as the antiquated ticketing area -- Amtrak underutilizes.  To the extent Amtrak needs additional space for these projects, Amtrak has already obtained all the space that it requires through agreements with the Owners.  Amtrak also has the option to take over additional space at Union Station under its existing sublease.  If additional space is needed for these projects, Amtrak has not even attempted to reach an agreement with Owners to obtain it, other than through its low-ball, bad faith offer to purchase Union Station in its entirety, as discussed below.

5.      Second, even if Amtrak "needed" additional space to complete these projects -- which Amtrak has not requested and, upon information and belief, it has no plans for -- neither of these projects necessitate taking the entirety of Union Station, which is approximately 420,797 square feet.  Nor could Amtrak expand its operations into many parts of the Station because they are protected as historic sites.  Tellingly, Amtrak alleges that its taking of the entirety of Union Station is subject to all existing subordinate leases and/or licenses, *i.e.*, existing commercial tenants will remain in place, many of which have years remaining in lease term and restrictions as to ingress, egress, and reconfiguration of Union Station.  In other words, on the one hand Amtrak concedes that it has no intent to use any of this commercial space and will not disturb the existing tenants or their rights, and on the other it purports to desperately and immediately need this same space.  Amtrak's complaint thus concedes, and discovery will conclusively establish, that Amtrak's plans for these two projects will only utilize spaces that are not currently occupied

by commercial subtenants, such that this taking is, at a bare minimum, impermissibly overbroad in scope.

6. As to managing the day-to-day operations of Union Station, Amtrak's (false) allegations that it can more effectively manage Union Station than Owners does not come close to meeting the statutory requirement that the taking be "necessary for intercity rail passenger transportation." Amtrak also does not -- because it cannot -- allege that Owners have mismanaged Union Station. Amtrak tellingly cites to a single instance of vandalism as the sole example of Owners' supposedly ineffective management, without explaining how -- if Amtrak managed the Station -- it could have somehow prevented the vandalism or done a better job of remediation. In the more than 15 years that Owners have operated, managed, and developed Union Station, Owners have substantially improved the mix of the Station's tenants by turning it into a premier dining and retail location and completing numerous capital projects. In addition, Owners have also effectively and successfully run the day-to-day operations of the Station. By contrast, Amtrak has a history of gross mismanagement and financial losses. Amtrak's own Inspector General has repeatedly issued public reports on Amtrak's substantial cost overruns, delays in completing projects, and general inefficiencies. Amtrak also routinely fails inspections by the Federal Railroad Administration, which oversees the Subject Property, including in particular with respect to Amtrak's outdated fire alarm system and lack of sufficient smoke detectors and sprinklers in areas under Amtrak's control, placing Amtrak's passengers and workers at severe risk. Nothing about Amtrak's past record demonstrates that it can operate Union Station at all, much less in a way that is "necessary for intercity rail transportation." The facts will show that Amtrak is thoroughly incapable of running Union Station's non-rail operations, and that this attempted taking is both constitutionally and statutorily invalid.

7. Amtrak also failed to make a good faith attempt to agree to the purchase price of Union Station with Owners. Amtrak offered a mere $250 million to purchase the many years remaining on Owners' lease of the Station. Amtrak is well aware that Union Station is worth hundreds of millions more than its low-ball offer. Amtrak also imposed an artificial deadline of seven days for Owners to respond to its "offer." Seven days is not remotely sufficient time to consider and negotiate the sale of any significant commercial property, let alone one that is as large and complex as Union Station. Further, Amtrak rebuffed Owners' offer to meet with Amtrak and discuss the offer, which was in response to Amtrak's own request to meet. Amtrak's offer process was no process at all. Amtrak's sham "offer" was nothing more than pretext for it to file this lawsuit.

8. In addition, putting aside the completely invalid and otherwise legally insufficient purported "need" for the condemnation, $250 million is in no way "just compensation" for Union Station. The appraisal relied upon by Amtrak for its estimate was made without sufficient analysis, including, for example, the Station's actual financial information or the revenue generated under the rents due from commercial tenants which is not publicly available. By contrast to Amtrak's incompetent valuation, and by way of example only, a recent potential investment -- for which the investor deposited $100 million in escrow -- valued Union Station at more than $700 million. Under any reasonable standard, Amtrak's proposed compensation is woefully unjust and orders of magnitude less than the true value of the interests Amtrak seeks to condemn.

## THE PROPERTY INTERESTS

9. Owners' property interests (the "Subject Property") consist of a sub-lease of approximately 420,797 square feet of Union Station comprised of approximately 200,000 square

feet of retail space, which is comprised of the main entrance hall, train concourse, mezzanine level, and lower level food court; 135,652 square feet of office space located on the second, third, and fourth floors; 63,770 square feet of Amtrak train space, consisting of the train concourse space and commuter waiting areas; and 20,825 square feet of event space, located primarily in the east hall and main hall.  The Subject Property is described in greater, more technical detail in Exhibit 1 to Plaintiff's Declaration of Taking.

10.     The Subject Property is owned in fee by the United States of America, acting through the Federal Railroad Administrator, and is subject to a ground lease to the quasi-governmental Union Station Redevelopment Corporation ("USRC") and a 1985 sub-lease from USRC to Union Station Venture, Ltd. ("USV").  USV assigned its interest in the ground lease to Investco in 2007.  The ground lease extends for 62 years.

11.     Amtrak has operated rail service at Union Station for decades.  Amtrak subleases a portion of the Subject Property from Owners consisting of approximately 60,000 square feet and including areas such as the train concourse, ticketing area, loading area, baggage area, and various electrical, maintenance, and storage spaces (the "Sublease").  There are also additional areas of Union Station that Amtrak owns, such as the tracks, platforms, substantial portions of the lower level, and substantial areas on the northern side of the Station.

12.     Investco and Sole Member have standing to participate in this action. Investco is the owner of the Subject Property interest and Sole Member is the sole member of Investco. Both Investco and Sole Member have been named as defendants herein.  Though the answer filed by defendant Kookmin asserts that it alone has the authority to act on behalf of Investco, Kookmin is wrong.  Kookmin alleges in paragraph 2 of its Objections and Defenses that Kookmin has the right under Section 5.2.2 of the Mortgage Loan Agreement to "collect, receive

and retain any [condemnation] Award and to make any compromise or settlement in connection with" the condemnation proceeding. But nothing in that provision bars Investco, through Owners, from challenging this condemnation -- a right reserved to Investco and not granted to Kookmin -- nor does it bar Owners from protecting their interests in the Subject Property. Indeed, under Section 5.2.2, "[i]f the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the Award or a portion thereof *sufficient to pay the Debt in full*," which limitation unequivocally demonstrates that Investco retains the right to receive any excess above that amount. Similarly, under Section 5.2.2 of the Mezzanine Loan Agreement, "[s]ubject to the rights of Mortgage Lender under the Mortgage Loan Documents, if the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the Award or a portion thereof *sufficient to pay the Debt in full*," with Sole Member retaining the right to receive any excess above that amount.

### OWNERS' OBJECTIONS AND DEFENSES TO THE TAKING

### The Taking Is Not Necessary and Amtrak Either Already Possesses or May Acquire the Interests it Purportedly Needs

13. The United States Constitution only permits takings that are in the public interest and necessary. Amtrak's limited authority to exercise eminent domain arises from 49 U.S.C. § 29311 and is narrower than the authority granted by the Constitution. In pertinent part, Section 29311(a) permits Amtrak to obtain property by eminent domain only where the property is "necessary for intercity rail passenger transportation," and where Amtrak cannot "acquire the interest in the property by contract" or "agree with the owner on the purchase price for the

interest."  The taking here is both unconstitutional and does not meet the statutory requirements set forth in Section 29311(a) because (i) it is not "necessary for intercity rail passenger transportation," (ii) Amtrak can acquire any additional space it actually needs by contract, and (iii) Amtrak has not made a good faith offer or good faith efforts to engage Owners to purchase the Subject Property.

14. Although Amtrak has successfully provided intercity rail transportation through Union Station for decades, Amtrak now suddenly alleges that ownership of the Subject Property is "necessary for intercity rail passenger transportation."  Amtrak's purported justification for why this taking is "necessary" is so that it may complete the Subbasement Project and Concourse Modernization Project, and also to manage the day-to-day operations of the Station effectively. None of these contrived justifications, which are addressed below, necessitate this taking.

15. ***The Subbasement Project***.  The Subbasement Project is not "necessary for intercity rail passenger transportation."  The Subbasement Project may also be completed by using space in Amtrak's existing sublease and other areas of the Station that Owners have already agreed to provide to Amtrak and Owners are prepared to discuss any additional space needs, if so requested.  In no event does Amtrak require taking the entirety of the Subject Property to complete the Subbasement Project.

16. Amtrak does not allege that any of the work it needs to perform to complete the Subbasement Project will take place outside of the Sublease area.  In fact, all of the work that Amtrak needs to perform in conjunction with this project is contained within space that Amtrak already possesses by way of the Sublease or otherwise.  Rather, Amtrak claims that as part of this project, it needs to relocate its equipment and/or facilities to areas inside of Union Station that are outside of the Sublease property.

17. Amtrak alleges that it has been unable to reach an agreement with Owners to meet Amtrak's needs to complete the Subbasement Project.  That is untrue.  Months prior to Amtrak commencing this proceeding, Amtrak and Owners reached an agreement whereby Owners would provide Amtrak the space it needs to relocate its equipment and/or facilities in order to complete this project.  Since then, Amtrak has not requested additional space for the Subbasement Project (or for any other reason).

18. Even if Owners and Amtrak had not reached an agreement with respect to areas where Amtrak could relocate its equipment and/or facilities (though they have), the space Amtrak apparently requires for this project is substantially smaller than the Subject Property.

19. Amtrak also alleges that its taking would be "subject to all existing subordinate leases and/or licenses, which remain in effect in accordance with their terms and conditions." (Complaint ¶ 15.)  In other words, Amtrak has no intention -- let alone a need -- to disrupt any of the Station's commercial spaces as part of its taking.  Plainly Amtrak does not need any such space to complete the Subbasement Project or conduct rail operations.  The taking is therefore not necessary nor warranted as regards Union Station's commercial areas.  The taking is facially defective given its overbreadth.

20. ***The Concourse Modernization Project***.  The Concourse Modernization Project is not "necessary for intercity rail passenger transportation."  The Concourse Modernization Project may also be completed by using space in Amtrak's existing sublease and other areas of the Station that Owners have already agreed to provide to Amtrak.  Further, in no event does Amtrak require taking the entirety of the Subject Property to complete the Concourse Modernization Project.

21. Amtrak alleges that the Sublease provides insufficient space for its Concourse Modernization Project. Amtrak ignores that it has over time reached agreement with Owners to provide Amtrak with additional space in furtherance of this project. For example, in 2017, Amtrak and Investco entered into an agreement whereby Amtrak could lease an area known as the "East Concourse" in furtherance of the Concourse Modernization Project. This agreement arose out of a "take back" option that Amtrak has in the Sublease which, as the name suggests, permits Amtrak to take back certain additional space inside of Union Station. The Sublease's take back option permits Amtrak to take additional space beyond what it requested and received pursuant to the 2017 agreement and which Amtrak could use for, among other things, the Concourse Modernization Project. Amtrak has not requested any additional space, however, nor has it exercised its rights under the Sublease to take more space. Amtrak also underutilizes the space that it currently possesses through the Sublease which could be used for the Concourse Modernization Project, further demonstrating that the taking is unnecessary, and overbroad in scope.

22. Additionally, there are other areas of the Station that Amtrak may be able to use to complete its Concourse Modernization Project that would not require taking the entire Subject Property, and which Amtrak could -- but has not attempted to -- reach an agreement with Owners to obtain interests in.

23. ***Management of Day-to-Day Operations***. Amtrak alleges that it must take over management of Union Station's day-to-day operations so that, for example, Amtrak may "expeditiously address customer needs and concerns" at the Station. (Complaint ¶ 49.) Owners dispute that Amtrak's management of Union Station's day-to-day operations is "necessary for intercity rail passenger transportation," nor would it in any way impact Amtrak's ability to

"expeditiously address customer needs and concerns." Amtrak also fails to demonstrate how Owners, who are the current managers and operators of Union Station, are failing to meet the needs of the Station generally, or the needs of Amtrak and its customers.

24. Owners have successfully managed and operated Union Station for over 15 years. In that regard, Owners have also made substantial and significant improvements to the Station including developing the Station into a premier dining and retail location -- available to Amtrak's customers and millions of others who use Union Station for transportation or otherwise -- and Owners have overseen tens of millions of dollars in investments, such as an $18 million project to restore the historic and iconic ceiling in the main hall following an earthquake.[2]

25. Amtrak fails to allege much less demonstrate that it could manage and operate Union Station better than Owners can. Tellingly, Amtrak cites only a single instance of supposed "mismanagement" in the 15 years that Owners have managed the Station, which relates to vandalism that occurred in January 2022. Amtrak does not allege that it somehow could have prevented this criminal act, nor remediated the damage done any better than Owners.[3] Owners are able to meet -- and indeed have previously met -- all of the management and operational needs Amtrak cites to, including handling emergent and unforeseen events (such as repairing

---

[2] This project received numerous accolades, including in Architectural Digest magazine, commendation from the National Trust for Historic Preservation, and a congratulatory letter from then-Vice President Joseph Biden.

[3] Amtrak alleges that the Station retains "vestiges" of the graffiti which Amtrak could have done a better job of cleaning. (Complaint ¶ 50.B.ii.) If Amtrak was as good a steward of historical preservation as it claims, it would know that one cannot simply take a power washer to Union Station's historic exterior to remove graffiti. Owners worked in tandem with USRC to follow guidelines for preserving historic sites to remove the graffiti and restore the affected area. Amtrak is aware of this because it was involved in this process, although it never once made any suggestions -- despite the supposed expertise it touts in the Complaint -- to Owners to do anything differently.

damage from the 2011 earthquake, which Amtrak does not allege Owners failed to do) and providing "stable and experienced" management.

26.　　As to the allegations concerning a shortfall of operational funds, these funds are provided and controlled by USRC.  Amtrak's allegations in this regard are at both invalid and ironic.  On information and belief, Amtrak itself is responsible for the shortfall because it has siphoned off tens of millions of dollars from USRC, making such funds unavailable to the Station's capital maintenance reserve fund ("CMRF"), the primary source of funds for the Station.  In any event, Owners have no control over USRC or the CMRF funds -- and neither would Amtrak pursuant to its taking, which would put it in Owner's shoes as USRC's sublessee.

27.　　As to Amtrak's allegations of some speculative sale of Union Station to a third party who is "unlikely to have the experience dealing with rail passenger operations or historic preservation" (Complaint ¶ 51.B), such a sale would be virtually impossible because USRC would need to approve any such sale and has a duty to ensure that the Station is managed responsibly.

28.　　While Amtrak alleges that it would be a more effective manager of Union Station than Owners (even though this is not a basis for Amtrak to exercise its eminent domain powers), history demonstrates Amtrak's many management failures.  Amtrak is frequently derided for gross mismanagement to the point where Amtrak's own Inspector General, who issues frequent reports on the subject, has stated that Amtrak has faced challenges "delivering large, complex programs on time and within budget."[4]  For example, the August 2020 Amtrak Inspector

---

[4] *See Governance: Early Planning and Oversight Deficiencies Led to Initial Program Failures and Continued Risks to the Moynihan Train Hall Program*, Amtrak Office of the Inspector General, Aug. 17, 2020, at 1, available at *https://amtrakoig.gov/sites/default/files/reports/OIG-A-2020-014%20Moynihan%20%28REDACTED%29.pdf*.

General's report states that to date Amtrak had underestimated costs to build the Moynihan Train Hall, Amtrak's flagship location in New York City, by $72.8 million (or 69%) because Amtrak did not "budget for major costs that a major construction project would typically include" or provide "executive oversight of additional cost commitments to ensure that they were justified."[5] Regarding Union Station, another Amtrak Inspector General report, from July 2018, summarized that Amtrak's "nine ongoing improvement projects for Union Station face risks of delays and cost overruns due to weaknesses in its practices for scheduling, cost estimating, and project management."[6] In March 2022, Amtrak's conduct with respect to the Station triggered the Inspector General to initiate an audit of Amtrak's cost management practices.

29. Thus, Amtrak has not alleged that its condemnation of Owners' Subject Property is "necessary for intercity rail passenger transportation" or that it cannot acquire the interest in the property by contract or agree with Owners on the purchase price for the interest. The taking is also unlawfully overbroad including because it seeks to condemn areas of the Subject Property that Amtrak does not conceivably need to complete the Subbasement Project and Concourse Modernization Project, such as Union Station's commercial areas.

30. ***No Good Faith Effort to Agree On Purchase Price***. 49 U.S.C. § 24311(a)(2) permits Amtrak to use eminent domain only if it cannot "acquire the interest in the property by contract" or "agree with the owner on a purchase price for the interest." As described above, Amtrak either has or may acquire the interest in the property it claims it needs by contract. Insofar as Amtrak claims it made a good faith, statutorily require effort to agree on a purchase

---

[5] *Id.* at 2-3.

[6] *See Asset Management: Better Schedules, Cost Estimates, and Project Management Could Help Mitigate Risks to Washington Union Station Projects*, Amtrak Office of the Inspector General, July 24, 2018, available at *https://amtrakoig.gov/sites/default/files/reports/OIG-A-2018-008%20-%20Washington%20Union%20Station%20Projects%20%28REDACTED%29.pdf*.

price with the Owners, Amtrak has misrepresented the facts. Its offer process was no process at all -- it was a sham and a pretext to justify this otherwise invalid taking.

31.     On April 6, 2022, Amtrak sent a letter to Investco offering to purchase the Subject Property for $250 million. While, as described below, this offer grossly undervalues the Subject Property, Amtrak also only agreed to keep its offer open for a mere seven days -- and then commenced this condemnation proceeding the day after its artificial deadline expired. This is the epitome of bad faith, and Amtrak cannot now credibly allege that it could not reach an agreement with Owners after such a bad faith attempt to purchase the Subject Property.

32.     Amtrak also cannot credibly claim that its need to take Union Station was so urgent that it could only keep its offer open for a week or that it had to commence this proceeding before it could reasonably engage and negotiate with Owners. As stated above, Amtrak has operated at Union Station for decades without owning the Station outright. There has been no change in circumstances that warrants Amtrak suddenly needing to take over the Station immediately, and in violation of its statutory obligations.

## The Compensation Is Grossly Insufficient

33.     The U.S. Constitution and 49 U.S.C. § 24311 require Amtrak to provide just compensation for any taking. The $250 million compensation that Amtrak asserts is "just" is anything but. The Subject Property is worth hundreds of millions of dollars more than Amtrak's estimate for the compensation, which is evidenced by, among other things, a recent investor valuing the rights at over $700 million, as discussed above.

34.     Additionally, Amtrak's estimate for the compensation relies upon a faulty appraisal that was made without sufficient analysis, including, for example, the Station's actual financial information or the revenue generated under the rents due from commercial tenants.

### Management of the Subject Property

35.     In paragraph 76 of the Complaint, Amtrak requests that the Court determine the time and terms under which possession of the Subject Property should be given to Amtrak. The Subject Property is currently managed by JLL, a well-known and experienced property management firm under the Owners' direct supervision. Because Amtrak has not demonstrated that possession of the Subject Property is necessary for the provision of intercity rail passenger transportation, Amtrak will not be prejudiced by permitting JLL to continue to manage the Subject Property and delaying granting possession to Amtrak until Amtrak's authority to exercise eminent domain is adjudicated. Given the very serious questions as to Amtrak's compliance with the constitutional and statutory prerequisites to its attempted taking, the status quo, which has served the parties well for decades, should be maintained. To the extent Amtrak requires access in addition to the access it already has as a result of its sublease and its agreements with Owners as described, Owners have no objection to providing such access under reasonable terms and conditions.

### Summary of Defenses and Objections

36.     Based on and without limiting the foregoing, Owners' defenses and objections to the condemnation and amount of compensation can be summarized as follows:

   a. The taking violates the U.S. Constitution because there is no public need and no necessity for the taking.

   b. The taking violates the U.S. Constitution because the taking is excessive in extent and scope of the property rights sought to be taken.

c. The taking violates the U.S. Constitution because it is excessive in terms of the rights being condemned. A taking should be limited to only what is necessary to satisfy the public need. Here, a sublease or easement would be sufficient.

d. The taking violates the U.S. Constitution because Amtrak already leases, and/or has options to lease additional, property sufficient for its supposed needs.

e. Under 49 U.S.C. § 24311, Amtrak is only authorized to condemn the Subject Property pursuant to subsection (a)(1)(B) and not (a)(1)(A). Section 24311(a)(1)(B) permits Amtrak to acquire by eminent domain interests in property "requested by the Secretary of Transportation in carrying out the Secretary's duty to design and build an intermodal transportation terminal at Union Station in the District of Columbia." Amtrak does not allege, much less demonstrate, that the Secretary of Transportation made such a request.

f. The taking violates 49 U.S.C. § 24311(a)(1) because it is not "necessary for intercity rail passenger transportation."

g. The taking violates 49 U.S.C. § 24311(a)(2)(A) because Amtrak has already acquired or may acquire the interest in the property it allegedly needs by contract, or, alternatively, has not attempted to acquire the interest in the Subject Property it allegedly needs by contract.

h. The taking violates 49 U.S.C. § 24311(a)(2)(B) because Amtrak's claimed attempt to agree with the Owners on the purchase price for the Subject Property was a pretextual sham. Amtrak's offer to purchase the Subject Property for $250 million also was not made in good faith, as evidenced by its severe undervaluing

      of the Subject Property by hundreds of millions of dollars and placing an artificial deadline for Owners to respond to the "offer" within seven days.

i. The taking violates 49 U.S.C. § 24311(b) because Amtrak's estimate of "just compensation" for the Subject Property is based on a bad faith, invalidly conducted valuation.

j. The taking violates 49 U.S.C. § 24311(b) because Amtrak grossly underestimates the "just compensation" for the Subject Property.

k. The amount of Amtrak's $250 million deposit is inadequate and insufficient because it does not represent just compensation for the Subject Property.

l. The Complaint is materially false, including and not limited to the allegations as to Amtrak's claimed "needs," the valuation, the history of Amtrak's dealings with Owners and their affiliates, and the pre-condemnation offer process.

m. The taking is invalid by reason of Amtrak's misrepresentations, bad faith, and by the doctrines of estoppel, waiver, and unclean hands.

n. Amtrak is not entitled to appointment of a commission under Federal Rule of Civil Procedure 71.1(h)(2) as 49 U.S.C.A. § 24311(b)(3) vests the Court with sole authority to determine just compensation.

o. Amtrak did not properly serve Owners in accordance with FRCP Rule 4.

p. The Declaration of Taking is materially deficient.

q. The Complaint fails to state a claim for which relief may be granted.

Dated: May 19, 2022          KASOWITZ BENSON TORRES LLP

By: /s/ *Henry B. Brownstein*
    Henry B. Brownstein
    D.C. Bar No. 1026042
    1399 New York Avenue, Suite 201
    Washington, D.C. 20005
    Tel.: (202) 760-3400
    hbrownstein@kasowitz.com

    David E. Ross (*pro hac vice admission to be sought*)
    David J. Mark (*pro hac vice admission to be sought*)
    Daniel J. Koevary (*pro hac vice admission to be sought*)
    1633 Broadway
    Tel.: (212) 506-1700
    New York, NY 10019
    dross@kasowitz.com
    dmark@kasowitz.com
    dkoevary@kasowitz.com

    *-and-*

    ARENTFOX SCHIFF LLP

    /s/ *James H. Hulme*
    James H. Hulme
    D.C. Bar #323014
    Laurel LaMontagne
    D.C. Bar #1613468
    1717 K Street, NW
    Washington, DC 20006
    Telephone: (202) 857-6000
    Facsimile: (202) 857-6395
    James.Hulme@afslaw.com

    *Attorneys for Defendants Union Station Investco, LLC and Union Station Sole Member, LLC*