## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK),

        Plaintiff,

    v.

Sublease Interest Obtained Pursuant to an Assignment and Assumption of Leasehold Interest made as of January 25, 2007, with said property interest Pertaining To Described Leasehold Interests at Washington Union Station located at 50 Massachusetts Avenue, NE Washington, D.C. 20002, UNION STATION INVESTCO, LLC, UNION STATION SOLE MEMBER, LLC, KOOKMIN BANK CO., LTD. INDIVIDUALLY AND IN ITS CAPACITY AS TRUSTEE OF KTB CRE DEBT FUND NO. 8, A KOREAN INVESTMENT TRUST, and UNKNOWN OWNERS,

        Defendants.

Case No. 1:22-cv-01043-APM

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS UNION STATION INVESTCO LLC'S AND UNION STATION SOLE MEMBER LLC'S MOTION TO STRIKE

ARENTFOX SCHIFF LLP

James H. Hulme
D.C. Bar No. 323014
Laurel LaMontagne
D.C. Bar No. 1613468
1717 K Street, NW
Washington, DC 20006
Telephone: (202) 857-6000
Facsimile: (202) 857-6395

KASOWITZ BENSON TORRES LLP

Henry B. Brownstein
D.C. Bar No. 1026042
1399 New York Avenue, Suite 201
Washington, D.C. 20005
Tel.: (202) 760-3400
hbrownstein@kasowitz.com

David E. Ross (*admitted pro hac vice*)
David J. Mark (*admitted pro hac vice*)
Daniel J. Koevary (*admitted pro hac vice*)
1633 Broadway
Tel.: (212) 506-1700

*Attorneys for Defendants Union Station Investco LLC and Union Station Sole Member LLC*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT .................................................................................... 1

RELEVANT FACTS ...................................................................................................... 4

    A.    Background on Union Station and Owners ........................................... 4

    B.    Lender's Wrongful Acts Preceding This Condemnation ...................... 6

    C.    Lender Attempts to Hijack Control of Union Station ........................... 8

    D.    Relevant Sections of The Loan Documents Confirm Owners' Rights
           to Participate in this Proceeding ........................................................ 10

ARGUMENT ................................................................................................................ 11

    A.    The Loan Agreements Do Not Allow Lender to Act As Investco Here ............... 12

    B.    Lender's Arguments Violate Longstanding Law Related to Takings
           and Would Result in an Illegal Voidable Transaction .......................... 17

           i.    Takings Law Permits Owners to Participate in this Action
                to Conclusion ......................................................................... 17

           ii.    Lender's Interpretation of the Agreements in the Context of
                Condemnation Violates the Anti-Assignment Act ................... 19

    C.    Owners Are in the Best Position to Contest this Litigation and Will Be
           Prejudiced If Lender Is Permitted to Continue Their Improper Actions ............. 21

    D.    The Mezzanine Loan Foreclosure Noticed By Lender Will Not
           Affect Owners' Ability to Participate Here .......................................... 23

CONCLUSION............................................................................................................. 24

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alamo Land & Cattle Co., Inc. v. Arizona*,
424 U.S. 295 (1976)................................................................................................22

*Alto v. Sun Pharm. Indus., Inc.*,
No. 1:19-CV-09758-GHW, 2021 WL 4803582 (S.D.N.Y. Oct. 13, 2021) ...........................16

*Bailey v. United States*,
78 Fed. Cl. 239 (Fed. Cl. 2007) .............................................................................19

*Dep't of Trans. v. Assoc. of Am. Railroads*,
575 U.S. 43 (2015)................................................................................................19

*Government of Virgin Islands v. 19.623 Acres of Land*,
536 F.2d 566 (3d Cir. 1976).................................................................................18

*\*JPMCC 2006-CIBC14 Eads Parkway, LLC v. DBL Axel, LLC*,
977 N.E.2d 354, 362 (Ind. Ct. App. 2012)............................................................16

*\*Knick v. Twp. of Scott, Pennsylvania*,
__ U.S. __, 139 S. Ct. 2162 (2019)........................................................17, 18, 24

*Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*,
830 F.3d 152 (2d Cir. 2016)..................................................................................15

*PennEast Pipeline Co., LLC v. New Jersey*,
__ U.S. __, 141 S. Ct. 2244 (2021).....................................................................17

*Rogers v. United States*,
104 Fed. Cl. 142 (Fed. Cl. 2012) .....................................................................19, 24

*Rutgerswerke AG and Frendo S.p.A. v. Abex Corp.*,
2002 WL 1203836 (S.D.N.Y. June 4, 2002) ........................................................13

*Sabo v. United States*,
127 Fed. Cl. 606 (Fed. Cl. 2016) ..........................................................................20

*Sec. Indus. & Fin. Markets Ass'n v. CFTC*,
67 F. Supp. 3d 373 (D.D.C. 2014) ........................................................................18

*St. Paul & D. R. Co. v United States*,
112 U.S. 733 (1885)..............................................................................................23

* - cases upon which Owners chiefly rely

*Toles v. United States*,
   371 F.2d 784 (10th Cir. 1967) .................................................................................20, 22, 23

*TVT Recs. v. Island Def Jam Music Grp.*,
   412 F.3d 82 (2d Cir. 2005).................................................................................................15

*United States v. All Assets Held at Bank Julius*,
   480 F. Supp. 3d 1 (D.D.C. 2020) .....................................................................................11

*United States v Dow*,
   357 U.S. 17 (1958).................................................................................................17, 19, 20, 23

*United States v. Sum of Three Hundred Nine Million Five Hundred Thousand*
   *Dollars*,
   85 F. Supp. 3d 111 (D.D.C. 2015) ...................................................................................11

*Wiggins v. Philip Morris, Inc.*,
   853 F. Supp. 457 (D.D.C. 1994) ......................................................................................11

*In re Yelverton*,
   No. 09-00414, 2014 WL 36585 (Bankr. D.D.C. Jan. 6, 2014)..........................................18

**Statutes**

31 U.S.C. § 3727..............................................................................................................19, 23

49 U.S.C. § 24311..................................................................................................................13

**Other Authorities**

Fed. R. Civ. P. 12...................................................................................................................11

Fed. R. Civ. P. 71.1...........................................................................................................18, 20

Wright & Miller, Fed. Prac. & P. § 1383 .............................................................................11

Defendants Union Station Investco LLC ("Investco") and Union Station Sole Member LLC ("Sole Member," and together with Investco, "Owners"), respectfully submit this memorandum of law in support of their motion (the "Motion") to strike the purported answer, ECF No. 36 (the "Neuberger/Investco Answer"), invalidly submitted on Investco's behalf by Neuberger, Quinn, Gielen, Rubin & Gibber, P.A. ("Neuberger") at the behest of Defendant Kookmin Bank Co., Ltd., as Trustee of KTB CRE Debt Fund No. 8 ("Lender" or "Kookmin").

## PRELIMINARY STATEMENT

For the past fifteen years, and at the time Plaintiff National Railroad Passenger Corporation ("Amtrak") filed this "quick take" condemnation action, Investco and Sole Member owned and operated Union Station. Though their respective standing as owners, operators, residual rights holders and equity holders is beyond question, Lender and its agents have now asserted—post-filing—that Owners and Sole Member have no rights of any kind here, and Lender has gone so far as to file an answer in Investco's name and invoking its rights. This usurpation of Owners' rights is contrary to the loan documents, contrary to condemnation law, and contrary to Owners' Fifth Amendment rights to challenge the legality of the condemnation and, alternatively, to just compensation. Lender's motivation could not be more transparent: Lender hopes to silence Owners so that Lender has a clear field to negotiate a condemnation award from Amtrak that fills its pockets, and leaves nothing for Owners. Lender cannot validly squelch Owners' standing and right to participate fully in this action. Their attempt to do so is both unlawful and inequitable. Depriving Owners' of their rightful participation in this case would not only violate Owners' fundamental rights, it would taint this case *ab initio*. Lender's invalid "Neuberger/Investco Answer" should be stricken in its entirety.

\*                    \*                    \*

Investco, along with Sole Member, filed their Answer (ECF No. 38 ("Owners' Answer")) to Amtrak's Complaint for Condemnation (the "Complaint"), which seeks to condemn the historic Washington Union Station ("Union Station" or the "Station"), which Owners have successfully and safely owned, managed, and operated for over fifteen years.  Neither Investco nor Sole Member consented to or authorized the filing of the Neuberger/Investco Answer, and did not retain Neuberger or authorize it to represent Investco.[1]  Accordingly, this Motion seeks to strike the unauthorized Neuberger/Investco Answer from the record.

The Neuberger/Investco Answer is the latest in a series of wrongful actions by Lender to improperly wrest control of Union Station from Owners in the wake of this condemnation filing. Lender's misconduct has included (i) preventing Owners from communicating with prospective tenants, buyers, and brokers, (ii) meeting with existing Union Station tenants and acting as Owners, and (iii) purporting to terminate Union Station's management company and advising Owners that, in contravention of relevant contracts, Lender would be selecting the new management company.

Now, compounding their wrongful interference with Owners' rights, Lender is attempting to prevent Owners from exercising their basic right to participate as a party and to be represented by counsel of their own choosing in this condemnation case.  Lender's effort to "bind and gag" Owners is based on a patently flawed reading of the Loan Documents (defined herein), which govern a mortgage loan in the principal amount of $330 million given to Investco and assumed by Lender (the "Mortgage Loan"), and a mezzanine loan in the principal amount of $100 million given to Sole Member by Lender (the "Mezzanine Loan").  Specifically, Lender claims, among

---

[1]  Neuberger initially made an appearance as counsel to Lender (*see* ECF No. 26), and then subsequently withdrew and filed an appearance for Investco on May 19, 2022 (*see* ECF No. 37), which Investco did not authorize.  Neuberger is plainly acting for and at the direction of Lender.

other things, that the Loan Documents grant it authority to act as Investco's attorney-in-fact for all purposes relating to a condemnation that occurs following an Event of Default, as defined in the Loan Documents, which has occurred here.  Lender is flat wrong.  A plain reading of the Loan Documents demonstrates that while Lender has the right to enter into a compromise and settlement with respect to the financial components of any condemnation award, it is the Owners who have the right to challenge the condemnation and the right to conduct the litigation.  Indeed, the Loan Documents specifically provide for it in order to allow Owners to protect their property interest in Union Station.  Owners have done precisely that by filing their own answer, the only one filed on behalf of Investco that is validly before the Court.  *See* ECF No. 38.

Lender's attempts to usurp Owners' rights also violates basic tenets of condemnation and takings law, as Lender attempts to exercise rights that clearly belong to Owners.  In particular, there can be no dispute that at the time of the taking Owners owned and possessed the leasehold that Amtrak has condemned.  Accordingly, it is Owners' Fifth Amendment rights that are implicated by the condemnation.  While Lender may be able to participate here based on its interest in the proceeds of this case, they cannot vitiate Owners' entitlement to participate in their own name, on their own behalf, and by counsel of their own choosing.

Allowing the Neuberger/Investco Answer to stand also will severely prejudice Owners, effectively precluding them from participating in this action which concerns *disposition of property they own*.  On the other hand, striking the Neuberger/Investco Answer will work no prejudice to Lender since it already has filed an Answer in its own name and it will participate in this case in its capacity as Lender.  *See* ECF No. 35 (the "Lender Answer").

As Lender has no right to speak for Owners in this condemnation proceeding, nor to squelch Owners' indisputable right to protect their interests in this case, Owners respectfully submit that the Court should strike the Neuberger/Investco Answer.

## RELEVANT FACTS[2]

### A.      Background on Union Station and Owners

Owners are the operators and managers of Union Station and, prior to the commencement of this condemnation proceeding, were the holders of the leasehold interest at issue in this proceeding.  Complaint ¶ 1 n. 1; Owners' Answer ¶ 9.  Union Station is owned by the federal government and is leased to the Union Station Redevelopment Corporation ("USRC"), a quasi-governmental, non-profit corporation tasked with overseeing and maintaining the Station through an ownership structure created by Congress.  Complaint ¶ 1; Owners' Answer ¶ 10.  In turn, USRC sub-leased a large portion (approximately 90%) of Union Station to Investco, including retail, office, and event space.  Complaint ¶ 1; Owners' Answer ¶ 10.  The sub-lease has a remaining term of 62 years.  Complaint ¶ 14; Owners' Answer ¶ 10.  Amtrak, the plaintiff in this action, further sub-leased from Investco approximately 64,000 square feet of Union Station (approximately 15% of the overall leased property held by Investco) for the operation of passenger railroads and for offices.  Complaint ¶ 1 n. 1; Owners' Answer ¶ 11.  Through this action, Amtrak seeks to condemn and take possession of Investco's Union Station leasehold interest.

---

[2]  This motion is based on Amtrak's Complaint, ECF No. 1 ("Complaint"), Owners' Answer, and the Declaration of Yossi Preiserowicz (a/k/a "Joe Press"), sworn to on June 3, 2022 ("Press Decl.") and submitted herewith.  Owners incorporate the facts set forth in these documents by reference as if fully set forth herein and summarize them below.

For the last fifteen years, Owners have overseen all of the day-to-day management and operations of Union Station.  While there is a property manager, Jones Lang LaSalle Americas, Inc. ("JLL"), responsible for certain administrative, accounting, and employment-related tasks under Owners' supervision and at Owners' direction, Owners are solely responsible for the oversight, management, and performance of all construction related to Union Station and the maintenance of its complex safety, security, and operational systems, including lighting, plumbing, ventilation, mechanical systems (escalators, elevators, etc.), crowd control, fire and smoke detection, and other critical infrastructure necessary to running the property each day. Press Decl. ¶ 8.  Owners are also responsible for, among other things, overseeing all capital improvement projects and maintenance in partnership with USRC, directing all construction related to Union Station, including confirming compliance with all applicable landmark preservation laws, hiring all vendors and approving vendor expenses, and handling all issues related to tenants at Union Station, including communications, finances, and leasing.  Press Decl. ¶ 9.  All employees on-site at Union Station are hired at the direction of and are supervised by Owners.  *Id.*  Owners also regularly interface and coordinate with JLL, Union Station's tenants and other vendors, representatives of USRC, and Washington, D.C. and federal transportation authorities, as well as, on occasion, representatives of national and local security agencies.  Press Decl. ¶ 12.  As a result of these efforts, Owners are intimately familiar with all aspects of Union Station and its operations.

In order to obtain funding for the operation of the station, on May 8, 2018, Investco and Defendant Kookmin's predecessors in interest (the "Mortgage Lender") entered into a loan agreement (the "Mortgage Loan Agreement"), a deed of trust, and other loan documents (the "Mortgage Loan Documents"), pursuant to which the Mortgage Lender provided a loan to

Investco in the aggregate original principal amount of $330 million secured by a mortgage on Investco's leasehold interest in Union Station (the "Mortgage Loan").  Press Decl. ¶ 13.[3]

The same day, Sole Member, the sole member of Investco, and Kookmin entered into an agreement (the "Mezzanine Loan Agreement"), a pledge and security agreement (the "Pledge Agreement"), and other loan documents (the "Mezzanine Loan Documents," and together with the Mortgage Loan Documents, the "Loan Documents") pursuant to which Kookmin provided a loan to Sole Member in the aggregate principal amount of $100 million (the "Mezzanine Loan"). Press Decl. ¶ 16.[4]  The Mezzanine Loan is secured by a pledge of Sole Member's membership interest in Investco (the "Mezzanine Collateral").  *Id.*  In January 2022, Kookmin purchased the Mortgage Loan from the previous holder.  Press Decl. ¶ 15; Lender Answer at 5.  As a result, Lender is now the holder of both the Mezzanine Loan and the Mortgage Loan.[5]

### B.    Lender's Wrongful Acts Preceding This Condemnation

The COVID-19 pandemic had a severe impact on Owners and the operation of Union Station.  Prior to the onset of the pandemic, Owners were current on all of their obligations under the Loan Documents, including their payment obligations.  However, Union Station's business was devastated by the pandemic.  Among other things, lockdowns and travel restrictions led to an enormous reduction in the number of travelers, shoppers, and other visitors to Union Station. As a result, many of the retail and dining tenants Investco had secured went out of business or were otherwise unable to pay some or all of their rent.  That systemic shock caused a substantial

---

[3] A true and correct copy of the Mortgage Loan Agreement is attached as Exhibit 1 to the Press Declaration.

[4] True and correct copies of the Mezzanine Loan Agreement and Pledge Agreement are attached to the Press Declaration as Exhibits 2 and 3, respectively.

[5] Lender is a Korean bank, and acts in the United States entirely through its authorized representative Rexmark Holdings LLC.  Lender Answer at 2; Press Decl. ¶ 17.

decrease in Owners' revenue.  Press Decl. ¶ 20.  Pedestrian traffic through Union Station still has

not recovered to pre-pandemic levels.  Press Decl. ¶ 22.

This drastic decline in revenue affected Owners' ability to make payments on the Loans.

Beginning with a payment due on or before May 9, 2020, Borrowers have been unable to make

full monthly debt service payments on either the Mortgage Loan or the Mezzanine Loan.  Press

Decl. ¶ 21.  Thereafter, Owners and the then-existing lenders entered into extensive negotiations

and repeatedly delayed and agreed to restructurings of the payments due on the Loans.  *Id.*

Owners have repeatedly attempted to find new financing in order to bring the Loans

current and begin making additional improvements to Union Station.  Most notably, in

December 2020, an affiliate of Owners entered into a confidential agreement with a large and

well-capitalized sovereign wealth fund (the "Investor"), providing for the Investor to purchase an

ownership stake in Ashkenazy Holdings, an affiliate of Owners, in exchange for capital valuing

Investco's interest in Union Station at more than $700 million (the "Investment").  Press Decl. ¶

23.  These funds would have allowed Owners to come current under the Loans, and the valuation

would have provided approximately $300 million in new equity above the debt.  In furtherance

of the Investment, the Investor deposited the extraordinarily large sum of $100 million into an

escrow account, demonstrating its intention and capitalization to complete this crucial funding

solution.  Press Decl. ¶ 24.

Due to the change in ownership structure, Owners were required to seek consent from the

then-existing lenders to the Investment.  Rather than consent to a transaction that would have

rescued Union Station from its pandemic-induced hardships, both the Mortgage Lender and

Kookmin unreasonably withheld consent to the Investment under the Loan Documents and

refused to allow the transaction to proceed.  Press Decl. ¶ 25.  This failure to obtain consent and

Lender's predatory conduct caused the Investor to terminate the Investment.  *Id.*  Mortgage Lender's and Lender's misconduct with respect to this Investment has prevented Owners from becoming current under the Loans.  *Id.*

Following termination of the Investment, Owners once again began negotiating a workout with the lenders.  During this process, foreclosures under both Loans were noticed and scheduled for January 2022, but each was canceled following Lender's purchase of the Mortgage Loan.  Press Decl. ¶ 27.  Thus, there was no foreclosure noticed nor pending at the time of Amtrak's condemnation effected by the filing of its Complaint.

### C.     Lender Attempts to Hijack Control of Union Station

While Owners were led to believe that Lender's purchase of the Mortgage Loan would allow the parties to work together cooperatively to reinvigorate Union Station, Lender's actions in the last five months have proven that to be untrue.  In addition to wrongfully preventing Owners from consummating the mutually beneficial Investment, Lender also has interfered with Owners' day-to-day operation of Union Station.  Among other actions, Lender has interfered with Owners' ability to lease space in Union Station to prospective tenants by instructing brokers and others not to negotiate or speak with Owners.  Press Decl. ¶ 29.  Moreover, Lender has itself met with existing Union Station tenants, and with others with whom Owners were actively attempting to negotiate, about leasing space inside Union Station.  *Id.*  Finally, and only after this action was commenced and the property was condemned, Lender purported to terminate Union Station's management company in contravention of the Loan Documents.  Press Decl. ¶ 33.  The termination was only rescinded after Amtrak filed an emergency motion in this action.  *Id.*  In sum, Lender has waged a campaign to take control of Union Station for themselves and to cut Owners out of their rights under the Loan Documents and Union Station lease.

These efforts continued following the initiation of this action.  On May 13, 2022, Lender sent Owners three letters claiming to exercise its "rights" under the Loan Documents (the "May 13 Letters").[6]  The letters stated that Lender purportedly 1) had exercised their option under Section 8(a) of the Pledge Agreement to register all of the ownership interest in Investco (currently held by Sole Member) in Kookmin's name; 2) had exercised their right under Section 9(a)(i) of the Pledge Agreement to terminate the current manager of Investco and to appoint a new manager; and 3) had exercised their option under Section 13 of the Pledge Agreement to act as attorney-in-fact for Sole Member.  Press Decl. ¶ 31.  In short, and as explained more fully below, Lender wrongfully asserted complete control over Union Station and its management.

The improperly-appointed new "manager" of Investco, who was appointed by Lender, apparently retained Neuberger to file the Neuberger/Investco Answer.  Throughout this invalid filing, Lender repeatedly asserts that "[t]he management of Defendant recently changed upon the exercise of certain rights and remedies granted to Defendant's lender and Defendant's new manager recently retained undersigned counsel."  Neuberger/Investco Answer ¶¶ 18, 51, 70.  That is untrue.  Upon the filing of this action, Amtrak condemned Owners' interests in Union Station.  From that point on, Lender's rights and powers were limited to those contained in the contract provisions relating to condemnation proceedings, which are Section 5.2.2 in both the Mortgage Loan Agreement and Mezzanine Loan Agreement.  Accordingly, Lender's purported attempt to transfer control of Investco to themselves and to appoint new management of the company was not effective, as more fully explained below.

---

[6] True and correct copies of the May 13 Letters are attached as Exhibits 4-6 to the Press Declaration.

**D.      Relevant Sections of The Loan Documents Confirm Owners' Rights to Participate in this Proceeding**

In relevant part, Section 5.2.2 of Mortgage Loan Agreement states:

> Lender is hereby irrevocably appointed to act after the occurrence and during the continuance of an Event of Default as Borrower's attorney-in-fact, coupled with an interest, with exclusive power ***to collect, receive and retain any Award and to make any compromise or settlement in connection with any Material Condemnation***. . . . If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, ***to receive the Award or a portion thereof sufficient to pay the Debt in full***.

Mortgage Loan Agreement § 5.2.2 (emphasis added).  Section 5.2.2 of the Mezzanine Loan Agreement is substantially similar, stating in relevant part:

> Subject to the rights of Mortgage Lender under the Mortgage Loan Documents, Lender is hereby irrevocably appointed to act after the occurrence and during the continuance of an Event of Default as Borrower's attorney-in-fact, coupled with an interest, with exclusive power ***to collect, receive and retain any Award and to make any compromise or settlement in connection with any Material Condemnation***. . . . Subject to the rights of Mortgage Lender under the Mortgage Loan Documents, if the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, ***to receive the Award or a portion thereof sufficient to pay the Debt in full***.

Mezzanine Loan Agreement § 5.2.2 (emphasis added).  Both of the Loan Agreements provide that "[i]n the event of any conflict between the provisions of this [Loan] Agreement and any of the other Loan Documents, the provisions of this Agreement shall control."  Mortgage Loan Agreement § 11.20; Mezzanine Loan Agreement § 11.20.

Owners do not dispute that these provisions give Lender the power to collect any award for the condemnation up to the amount of any outstanding debt, to participate directly in the condemnation proceedings, or to "enter into a compromise or settlement" with respect to the condemnation.  But that is all Lender has the right to do.  And Lender may only do so in its own

name.  These provisions clearly contemplate and permit Owners to participate in this proceeding, specifically to challenge the condemnation, and to receive any award in excess of the debt.

Because Investco did not authorize Neuberger to represent it or file the Neuberger/Investco Answer, Press Decl. ¶¶ 34, 36, Owners' counsel demanded that Neuberger withdraw their appearance and cease taking any actions on Investco's behalf.  To date, Neuberger has refused that demand.

Owners therefore bring this Motion to strike the Neuberger/Investco Answer from the Court's docket because it has not been authorized by Investco, and because it prejudices Owners' rights to participate in this litigation, including their right to challenge the validity of the condemnation, in their own name and through their own counsel.

## ARGUMENT

A federal court has the authority to strike from the record "any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  The Court's authority is not limited to those categories.  The Court may strike a pleading that is a "sham" or that is "false."  Wright & Miller, FED. PRAC. & P. § 1383 (collecting cases).  Courts will also strike an answer where the party filing it lacks standing to participate in the suit or is not the proper party to contest the claims at issue.  Similarly, in this District, courts routinely grant motions to strike answers filed by purported claimants in connection with Government forfeiture applications for lack of the claimant's standing to contest the forfeiture.  *See, e.g.*, *United States v. All Assets Held at Bank Julius*, 480 F. Supp. 3d 1 (D.D.C. 2020); *United States v. Sum of Three Hundred Nine Million Five Hundred Thousand Dollars*, 85 F. Supp. 3d 111 (D.D.C. 2015).  Courts also will consider any prejudice to the moving party in connection with a motion to strike.  *See Wiggins v. Philip Morris, Inc.*, 853 F. Supp. 457, 457 (D.D.C. 1994).

11

Here, the Neuberger/Investco Answer must be stricken because it was not filed by Investco, but instead by counsel controlled and directed by Lender.  Lender has no right to exclude Investco from participating directly in this litigation.  Indeed, the Loan Documents expressly provide for Owners' participation in this case.  And, because Lender already has filed its own answer, Lender will not be prejudiced by the striking of the Neuberger/Investco Answer, while Owners will be severely prejudiced if they are prevented from or severely limited in participating in a case concerning property they owned until it was condemned.

### A.     The Loan Agreements Do Not Allow Lender to Act As Investco Here

In the May 13 Letters, Lender 1) demanded that all ownership interests in Investco be registered in its name; 2) claimed that the current manager of Investco was terminated and replaced by a new manager; and 3) asserted that Lender would act as Investco's attorney in fact. None of those demands were effective, and none provide a basis for the filing of the Neuberger/Investco Answer in Investco's name because they violate the clear terms of the relevant contracts.[7]

As an initial matter, Lender's claimed replacement of the management of Investco had no effect.  Section 8(a) of the Pledge Agreement allows Lender to demand that "the Pledged Company Interests [the membership interests in Investco] . . . be registered in the name of Lender or its nominee."  *See* Pledge Agreement § 8(a).  However, this provision provides only that "Lender or its nominee may *thereafter* exercise (i) all voting, managerial, limited liability company and other rights pertaining to the Pledged Company Interests and the business and affairs of Mortgage Borrower."  *Id.*  As of the date of this filing, the ownership interests in

---

[7] New York law governs the interpretation of the Loan Documents.  *See* Mortgage Loan Agreement § 11.3; Mezzanine Loan Agreement § 11.3; Pledge Agreement § 18(f).

Investco are not registered in Kookmin's name and have never been registered in their name.[8] Thus, Lender cannot yet take any "voting, managerial, limited liability company, or other rights" inherent in owning Investco, including the termination of Investco's current management. Section 9(a)(i) of the Pledge Agreement, which Lender cites as their authority for the termination of the manager, references "voting, managerial, consensual, and other powers of ownership." *See* Pledge Agreement § 9(a)(i). Thus, because the interests in Investco are not registered in Lender's name, they do not have authority to exercise those managerial powers and the May 13 Letter purporting to do so is void.[9]

However, even if Lender can exercise certain powers without being the registered owner of the membership interest, the pendency of this action prevents Lender from controlling or acting as Investco. Upon the filing of the Complaint and Declaration of Taking by Amtrak here, *see* ECF Nos. 1, 4, title to Owners' leasehold interest in Union Station vested in Amtrak and a condemnation was effected. *See* 49 U.S.C. § 24311(b)(2). While Owners dispute Amtrak's right to the taking (*see generally* Owners' Answer), nevertheless, as of the condemnation of the property interest, Lender's authority became limited by the specific condemnation-related

---

[8] It is also not clear whether Kookmin is able to take control of Investco or the leasehold interest in Union Station because, as far as Owners know, the Committee on Foreign Investment in the United States ("CFIUS") has not approved Kookmin—a South Korean entity—taking on control or management of any aspect of Union Station—a United States key infrastructural asset.

[9] Lender may reply that Section 9(a)(i) provides for Lender's exercise of authority "as if" Lender were the sole and absolute owner of Investco, thus eliminating any need to register the membership interests in Lender's name. However, this ignores that Section 9(a)(i) also provides that "Borrower agrees to take all such action as may be appropriate to give effect to such right [to act as owner of Investco]." *See* Pledge Agreement § 9(a)(i). Thus, this provision requires action by Owners to effectuate the exercise of Section 9(a) authority. Here, the only possible action is the registration of the membership interests in Kookmin's name. In interpreting the Pledge Agreement, the Court must give effect to this portion of the agreement. *See, e.g.*, *Rutgerswerke AG and Frendo S.p.A. v. Abex Corp.*, 2002 WL 1203836, at *7 (S.D.N.Y. June 4, 2002) ("[U]nder New York law . . . a court must interpret a contract so as to give effect to all of its clauses and to avoid an interpretation that leaves part of a contract meaningless.").

provisions of the Loan Documents.  As described above, Section 5.2.2 of both the Mortgage

Loan Agreement and the Mezzanine Loan Agreement gives Lender limited rights to participate

in litigation about a condemnation and to collect proceeds of any condemnation award, but does

not permit them to act as Owners.  In particular, these provisions limit Lender's involvement

once a condemnation has been effected only to participating in the collection of any award, the

negotiation of the settlement, or participation, on their own behalf, in litigation.  It does *not*

provide Lender any additional authority to act as or for Investco.  Indeed, Section 5.2.2

specifically also provides that Owners, and not Lender, "shall, at its cost and expense, diligently

prosecute any such [condemnation litigation]."  Mortgage Loan Agreement § 5.2.2; *see*

Mezzanine Loan Agreement § 5.2.2 (similar).

Lender effectively concedes as much, and instead claims that a more generic provision of

the Pledge Agreement, which provides the Mezzanine Loan lender the right to act as attorney-in-

fact for Investco, allows them to impersonate Investco and squelch Owners' rights to participate

in this action.  *See* Press Decl. ¶ 31, Ex. 6.  Notwithstanding that the Mezzanine Loan Agreement

provides that it governs when there is a conflict between it and the Pledge Agreement, *see*

Mezzanine Loan Agreement § 11.20, the Pledge Agreement provisions relied on by Lender do

not support its arguments either.

Section 13 of the Pledge Agreement states in relevant part:

Lender is hereby appointed, which appointment as attorney-in-fact is irrevocable
(until the Debt is indefeasibly repaid in full) and coupled with an interest
(provided, however, that Lender shall not exercise its rights pursuant to such
appointment without first giving Borrower five (5) days prior notice of its
intention to do so), the attorney-in-fact of Pledgor for the purpose of carrying out
the provisions of this Agreement and taking any action and executing any
instruments which Lender may deem necessary or advisable to accomplish the
purposes hereof

Pledge Agreement § 13.  Lender's invocation of and reliance on Section 13 fails for at least two reasons.

*First*, the grant of authority in Section 13 is limited to actions "necessary or advisable to accomplish the purposes" of the Pledge Agreement.  *Id*.  The purpose of the Pledge Agreement is to provide collateral for the Mezzanine Loan.  *See* Pledge Agreement at Recitals.  To date, Lender has not explained how their purported exercise of authority "as Investco" is necessary, or even related, to the repayment or security of the Mezzanine Loan, nor could they because Lender and Owners' Answers are both seeking to overturn the condemnation and, alternatively, just compensation beyond the plainly insufficient amount posted by Amtrak to effectuate its purported taking.

*Second*, Lender's invocation of Section 13 in connection with a condemnation proceeding violates the express terms of the Loan Documents.  Because the Loan Agreements and the Pledge Agreement were executed on the same day as part of the same financing transaction, *see* Press Decl. ¶ 18, they must be read together and harmonized.  *See TVT Recs. v. Island Def Jam Music Grp.*, 412 F.3d 82, 89 (2d Cir. 2005) ("Under New York law, 'all writings which form part of a single transaction and are designed to effectuate the same purpose [must] be read together, even though they were executed on different dates and were not all between the same parties.'" (quoting *This is Me, Inc. v. Taylor*, 157 F.3d 139, 143 (2d Cir. 1998) (alteration in original))); *see also Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 157 (2d Cir. 2016) ("[A] contract should be construed as to give full meaning and effect to all of its provisions.").  And, even if there is a conflict, the Loan Agreement (specifically the Mezzanine Loan Agreement) controls.  *See* Mezzanine Loan Agreement § 11.20.

Indeed, the Mezzanine Loan Agreement repeatedly references and incorporates provisions of the Mortgage Loan Agreement, evidencing that they are part of the same transaction.  *See, e.g.*, Mezzanine Loan Agreement at Recitals, §§ 2.1.4, 2.5, 4.1.4, 5.2.2. Likewise, the Pledge Agreement expressly incorporates and references the Mezzanine Loan Agreements.  *See, e.g.*, Pledge Agreement at 3 [Definitions], §§ 5(b), 7, 8(a).  As a result, the more specific provisions of the Loan Agreements which set out Lender's rights or powers following condemnation of the Owners' property must limit the more general grant of rights or powers in other agreements.  *Alto v. Sun Pharm. Indus., Inc.*, No. 1:19-CV-09758-GHW, 2021 WL 4803582, at *41 (S.D.N.Y. Oct. 13, 2021) ("Under New York law, 'where there is an inconsistency between a specific provision and a general provision of a contract, the specific provision controls.'" (quoting *Oldcastle Precast, Inc. v. U.S. Fid. & Guar. Co.*, 458 F. Supp. 2d 131, 142 (S.D.N.Y. 2006)) (cleaned up)).  Thus, rather than a broad grant of authority to act as "attorney-in-fact" for Investco for all purposes, Lender is limited to the narrower authority contained in Section 5.2.2 of the Loan Agreements, allowing them only to collect payments related to a condemnation and to negotiate a settlement of the case.

The addition of "attorney-in-fact" rights in Section 5.2.2 of the Loan Agreements does not change this.  At least one court interpreting identical contract provisions in a condemnation context has embraced this logic.  Specifically, in *JPMCC 2006-CIBC14 Eads Parkway, LLC v. DBL Axel, LLC*, when interpreting an identical "attorney-in-fact" provision in a mortgage agreement, the court held that the provision "merely makes [Lender] the agent in charge of receiving any condemnation proceeds otherwise payable to [Borrower] and gives [Lender] the authority to approve any condemnation settlement award."  977 N.E.2d 354, 362 (Ind. Ct. App. 2012).  Just so here, the Court should hold that Lender has an interest in the proceeds of this

action and, as a result, may participate on their own behalf.  But, the grant of authority in Section 5.2.2 does not allow Lender to supplant Owners' ability to contest the condemnation in their own right, on their own terms, and with counsel of their choosing.

Thus, the Loan Documents support Owners' view that they speak for Investco after the initiation of a condemnation action and that the Neuberger/Investco Answer should be stricken.

## B.   Lender's Arguments Violate Longstanding Law Related to Takings and Would Result in an Illegal Voidable Transaction

### i.   Takings Law Permits Owners to Participate in this Action to Conclusion

Owners' right to contest this action on their own behalf is also inherent in takings law. The law is clear that the rights of the parties in relation to a taking or condemnation are fixed when the taking occurs, which is upon the earlier of the condemnor taking possession of the property in question or the condemnor's filing a declaration of taking and depositing funds with the court.  *See United States v Dow*, 357 U.S. 17, 21 (1958).[10]  Once the taking has occurred, no more is needed for the property owner to contest the fact of the taking and the amount of compensation.  *E.g.*, *Knick v. Twp. of Scott, Pennsylvania*, __ U.S. __, 139 S. Ct. 2162, 2171 (2019).  And, the property owner is entitled to "compensation as if it had been 'paid contemporaneously with the taking'—that is, the compensation must generally consist of the total value of the property when taken, plus interest from that time."  *Id*. (quoting *Jacobs v. United States*, 290 U.S. 13, 17 (1933)).

Here, Owners were the owner of the leasehold interest at issue when Amtrak filed this action and its Declaration of Taking, and Lender does not argue otherwise or suggest that they

---

[10] For the avoidance of doubt, when a private entity exercises condemnation authority granted by Congress, the entity is exercising government authority and acting in the government's shoes. *PennEast Pipeline Co., LLC v. New Jersey*, __ U.S. __, 141 S. Ct. 2244, 2257 (2021).

exercised control over Investco prior to or at the time the taking occurred.  Thus, the taking was effected when Owners were the only party with ownership standing, and under the Fifth Amendment, Owners have a right to contest the taking and the amount of compensation.  *Knick*, 139 S. Ct. at 2171.  This conclusion is not altered by Lender's potential interest in the *proceeds* of this action, which Owners do not currently contest gives Lender an interest sufficient to appear and participate on their own behalf, but only to the extent of their debt.  Indeed, Owners have the equity rights to proceeds in this action as to the hundreds of millions of dollars of potential recovery above Lender's interest and the interest in ownership of the leasehold if Amtrak's condemnation ultimately is ruled unlawful or is reversed.

Thus, Owners are the party whose rights were affected by the taking and who have standing to contest it here.  Because Lender, through the Neuberger/Investco Answer, are asserting claims and defenses that belong to Owners and not to Lender, the Answer may also be stricken on this independent ground.  *E.g.*, *Sec. Indus. & Fin. Markets Ass'n v. CFTC*, 67 F. Supp. 3d 373, 407 (D.D.C. 2014) (collecting cases dismissing claims and defenses that belong to a party other than the one asserting them); *In re Yelverton*, No. 09-00414, 2014 WL 36585, at *2 (Bankr. D.D.C. Jan. 6, 2014).[11]

---

[11] Likewise, because there are two answers in Investco's name, if both are permitted to remain in the record, it is not clear whether all of the defenses Investco raised in its Answer will actually be preserved unless they were also raised in the Neuberger/Investco Answer.  This is a particularly acute concern given that courts strictly interpret answers in condemnation proceedings and do not allow new defenses to be raised later.  *See* Fed. R. Civ. P. 71.1(e)(3) ("A defendant waives all objections and defenses not stated in its answer.  No other pleading or motion asserting an additional objection or defense is allowed."); *Government of Virgin Islands v. 19.623 Acres of Land*, 536 F.2d 566 (3d Cir. 1976).

### ii.  Lender's Interpretation of the Agreements in the Context of Condemnation Violates the Anti-Assignment Act

The Court also should reject Lender's broad claim of authority because it would result in a voidable assignment under the Anti-Assignment Act.  *See* 31 U.S.C. § 3727.[12]  The federal Anti-Assignment Act provides that no claim against the federal government may be voluntarily assigned to another person until 1) the claim is allowed, 2) the amount of the claim is decided, and 3) a warrant for payment of the claim has been issued.  *Id.* § 3727(b).  This rule is applicable to claims for compensation due to a federal government taking.  *See, e.g.*, *United States v. Dow*, 357 U.S. 17, 21 (1958); *Bailey v. United States*, 78 Fed. Cl. 239, 267-68 (Fed. Cl. 2007) (collecting cases).

Lender asserts that upon its election at any point after they have noticed an Event of Default, it may take over the ability to litigate on behalf of and to make all decisions for Investco.  If such a right existed in the Loan Documents, it would effectively assign the claims belonging to Investco to Lender.  In similar circumstances, Courts have found that the Anti-Assignment Act is implicated by a second party's appearance in a case to contest a takings claim that is possessed by a single real party in interest.  *See Rogers v. United States*, 104 Fed. Cl. 142, 149-50 (Fed. Cl. 2012) (Anti-Assignment Act implicated where recognizing the assignment "would force the Government to defend against additional arguments, be subjected to more extensive processes, including cross-examination of its experts, and engage in negotiations with an additional party on . . . the very same claim the Government is already defending.").

---

[12] In 2015, the Supreme Court held that Amtrak was a government entity, rather than an autonomous private company, and reiterated that Amtrak is subject to certain of the same restrictions that apply to conduct by a government actor, such as the First Amendment.  *See Dep't of Trans. v. Assoc. of Am. Railroads*, 575 U.S. 43, 53-54 (2015).  It follows that if Amtrak is subject to restrictions on government authority that it also is entitled to the protections of it, like the Anti-Assignment Act.

Again, there can be no dispute that Owners were the real party in interest at the time Amtrak effected the condemnation. *See Dow*, 357 U.S. at 21 (holding that a condemnation is effected upon the Government taking possession of property or once the Government has filed a Declaration of Taking and has deposited funds with the Clerk of Court). Here, Lender attempted to exercise their purported rights as Investco on May 13, 2022, nearly a month after this action was filed. *See* Press Decl. ¶ 31.[13]  As discussed above, Lender was seeking to exercise rights for which the Loan Documents do not provide after the condemnation proceeding began. But, assuming *arguendo* that such an exercise was potentially valid, it would constitute a voidable assignment of the right to litigate the claims in this case. *See Sabo v. United States*, 127 Fed. Cl. 606, 619 (Fed. Cl. 2016) (collecting cases holding that a litigant's pre-litigation assignment of claims to an attorney is invalid).

Importantly, this does not affect Lender's ability to seek payment on the loan from any proceeds of this action, or Lender's ability to litigate in this case on their own behalf. *See id.* at 620 (collecting cases holding that contracts for payment of a debt out of proceeds of a litigation do not violate the Anti-Assignment Act as long as they do not assign rights to the claim itself); *see also Toles v. United States*, 371 F.2d 784, 785-86 (10th Cir. 1967) (holding that assignee of a claim did not have an interest sufficient to intervene in a condemnation action where taking was effected before the assignment). Indeed, Lender's contractual interest in the proceeds of the condemnation likely provides them sufficient interest to be heard on their own behalf. *Cf.* Fed. R. Civ. P. 71.1(c)(3) (requiring the plaintiff in a condemnation action to "add as defendants all those persons who have or claim an interest"). But, Lender's attempt to assign to themselves the

---

[13] Lender also previously had sent a separate notice of the exercise of rights to act as "attorney-in-fact" for Investco to the company on April 24, 2022. But, this notice also came after the filing of this action.

right to litigate the claims on Investco's behalf after the condemnation actually occurred violates the Anti-Assignment Act, which provides an alternative basis for striking the Neuberger/Investco Answer.

C. **Owners Are in the Best Position to Contest this Litigation and Will be Prejudiced If Lender Is Permitted to Continue Their Improper Actions**

In addition to Lender's violation of the clear terms of the Loan Agreements and longstanding condemnation law, if the Court permits Lender to continue to act in Investco's name, Owners will be severely prejudiced and the party in the best position to vindicate Owners' rights would be excluded from participation.

As detailed previously, Owners, not Lender and not JLL, are responsible for the day-to-day operation and management of Union Station. *See* Press Decl. ¶¶ 3, 9. Amtrak's condemnation claim revolves around the alleged necessity of taking Union Station in order to operate, grow, and improve their activities there and in the regional rail system in the "Northeast Corridor." *See, e.g.*, Complaint ¶¶ 2, 5, 31, 47, 64. Given Owners' fifteen-year experience owning and operating Union Station, and dealing with its tenant, Amtrak, it is obviously Owners that have the knowledge and first-hand experience to challenge Amtrak's purported bases for the condemnation and its valuation assumptions as well.

And, to make matters worse, Owners will be severely prejudiced if they are precluded from participating on their own behalf. This action concerns property that was owned by Owners, not Lender. It is self-evident that Owners would be prejudiced by being precluded from participating in the resolution of an action concerning their property. Moreover, the Loan Agreements are clear that Owners will receive any portion of the condemnation award over the amount of the outstanding debt owed to Lender. *See* Mortgage Loan Agreement § 5.2.2;

Mezzanine Loan Agreement § 5.2.2.[14]  That interest in the residual of the award in this action is sufficient to allow Owners to participate here.  *Cf. Alamo Land & Cattle Co., Inc. v. Arizona*, 424 U.S. 295, 303 (1976) ("It has long been established that the holder of an unexpired leasehold interest in the land is entitled, under the Fifth Amendment, to just compensation for the value of that interest when it is taken upon condemnation by the United States.").  Owners must be permitted to participate in order to maximize recovery in this action, since Lender is not incentivized to seek any amount over the total debt owed.[15]

On the other hand, no prejudice will befall Lender if the Neuberger/Investco Answer is stricken.  Lender already has filed its own Answer.  *See* Lender Answer, ECF No. 35.  In fact, the Neuberger/Investco Answer incorporates the Lender Answer for most of its claims and defenses.  Neuberger/Investco Answer at 15-16.  Lender was named as a defendant in this action by Amtrak and will have the opportunity to contest the condemnation alongside Owners.  And, even if they were not so named, the Loan Documents clearly give Lender the ability to participate in and consult with Owners in this action, but not to control and preclude Owners' involvement.  As a result, Lender will not be harmed by the striking of the Neuberger/Investco Answer, while allowing it to stand threatens to prejudice Owners' rights to participate in litigation over property they owned until this action was filed.

---

[14]  As discussed below, Lender also has noticed the foreclosure of the Loans, but this does not affect the Owners' rights to participate in this proceeding.  *See* Press Decl. ¶ 32, Ex. 7. Foreclosure does not affect the right of the Owners to receive any amount of proceeds above the outstanding debt.  *See* Mortgage Loan Agreement § 5.2.2; Mezzanine Loan Agreement § 5.2.2.

[15] Even if Lender were to argue that they are more incentivized to seek a higher recovery, this is not a sufficient ground to participate in the action at all, let alone a ground to supplant Owners and act as Investco.  *See, e.g.*, *Toles*, 371 F.2d at 785-86 (denying motion to intervene in condemnation action based, in part, on argument that grantee of interest in the property was more incentivized to seek a higher recovery).

### D.     The Mezzanine Loan Foreclosure Noticed By Lender Will Not Affect Owners' Ability to Participate Here

Lender's noticed foreclosure of the Mezzanine Loan also will not deprive Owners of their rights to participate in this action or change any of the analysis above.

*First*, as noted previously, the rights affected by Amtrak's condemnation are solely those of Owners, as they were the owner of the leasehold when the condemnation occurred.  The later transfer of an interest in the property cannot upset that since it is Owners' rights, not Lender's, which the taking impacts.  *See Dow*, 357 U.S. at 21; *Toles*, 371 F.2d at 785-86 (holding that assignee of a claim did not have an interest sufficient to intervene in a condemnation action where taking was effected before the assignment).

*Second*, the foreclosure sale also would constitute a voidable assignment that cannot effectively transfer the right to litigate this case to Lender.  *See St. Paul & D. R. Co. v United States*, 112 U.S. 733 (1885).  This is especially true here where the manner of the foreclosure sale—a nonjudicial auction of the right to be Investco under the provisions of the Uniform Commercial Code—is quintessentially a voluntary assignment of the rights and claims in this action which Investco holds and which the Anti-Assignment Act voids.  *See* Press Decl. ¶ 32; 31 U.S.C. § 3727.

*And third*, as noted above, the occurrence of the condemnation triggers at that time the parties' rights under Section 5.2.2 of the Loan Agreements, which entitle Owners to any residual of the proceeds of the condemnation action over the amount of the Loans outstanding.  Allowing Owners to keep and effectuate this interest is the only interpretation of the Loan Documents that

ensures the parties receive "compensation as if it had been 'paid contemporaneously with the taking.'" *Knick*, 139 S. Ct. 2171 (quoting *Jacobs*, 290 U.S. at 17).[16]

Accordingly, the foreclosure, in which the Lender has done no more than issue perfunctory notices with the expectation that it will bid in its own debt, is nothing more than a charade that will have no effect on its rights in this proceeding. These efforts all fail because Lender cannot escape the clear import of both eminent domain law and the parties' agreements.

## **CONCLUSION**

For the foregoing reasons, Owners respectfully request that the Court grant the Motion to Strike the Neuberger/Investco Answer.

Dated: June 3, 2022                              KASOWITZ BENSON TORRES LLP

By: /s/ David E. Ross
　　Henry B. Brownstein
　　D.C. Bar No. 1026042
　　1399 New York Avenue, Suite 201
　　Washington, D.C. 20005
　　Tel.: (202) 760-3400
　　hbrownstein@kasowitz.com

　　David E. Ross (*admitted pro hac vice*)
　　David J. Mark (*admitted pro hac vice*)
　　Daniel J. Koevary (*admitted pro hac vice*)
　　1633 Broadway
　　Tel.: (212) 506-1700
　　New York, NY 10019
　　dross@kasowitz.com
　　dmark@kasowitz.com
　　dkoevary@kasowitz.com

　　*-and-*

---

[16] Owners also will continue to be involved in this case to pursue the rights of Sole Member, which was named as a Defendant and will retain an interest in residual funds from the condemnation over the amount of the Mezzanine Loan. *See* Mezzanine Loan Agreement § 5.2.2. Thus, since Lender already has appeared in its own capacity, permitting Owners to continuing litigating in their capacity will streamline the proceeding as much as possible. Permitting Lender to control, and hire separate counsel for, Investco, adds an unnecessary and, as discussed above, unlawful third layer to the litigation. *Rogers*, 104 Fed. Cl. at 149-50.

ARENTFOX SCHIFF LLP

James H. Hulme
D.C. Bar #323014
Laurel LaMontagne
D.C. Bar #1613468
1717 K Street, NW
Washington, DC 20006
Telephone: (202) 857-6000
Facsimile: (202) 857-6395
James.Hulme@afslaw.com

*Attorneys for Defendants Union Station Investco LLC
and Union Station Sole Member LLC*