IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK),<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>Sublease Interest Obtained Pursuant to an Assignment and Assumption of Leasehold Interest made as of January 25, 2007, with said property interest Pertaining To Described Leasehold Interests at Washington Union Station located at 50 Massachusetts Avenue, NE Washington, D.C. 20002, UNION STATION INVESTCO, LLC, UNION STATION SOLE MEMBER, LLC, KOOKMIN BANK CO., LTD. INDIVIDUALLY AND IN ITS CAPACITY AS TRUSTEE OF KTB CRE DEBT FUND NO. 8, A KOREAN INVESTMENT TRUST, and UNKNOWN OWNERS,<br><br>　　　　　Defendants. | Case No. 1:22-cv-01043-APM |

## DECLARATION OF YOSSI PREISEROWICZ

YOSSI PREISEROWICZ, being duly sworn, deposes and says:

1.　I am Chief Operating Officer of Ashkenazy Acquisition Corporation ("AAC"), which is an affiliate of both Union Station Investco LLC ("Investco") and Union Station Sole Member LLC ("Sole Member," and together with Investco, "Owners"). Professionally, I go by the name "Joe Press." Owners are the operators and managers of Washington Union Station ("Union Station" or the "Station") and, prior to the commencement of this condemnation proceeding, were the holders of the leasehold interest at issue in this proceeding. Through Owners, AAC provides direction and oversight for the management of Union Station.

2.　I make this Declaration in support of Owners' Motion to strike the purported answer (the "Neuberger/Investco Answer") invalidly submitted on Investco's behalf by the law firm

Neuberger, Quinn, Gielen, Rubin & Gibber, P.A. ("Neuberger") at the behest of Defendant Kookmin Bank Co., Ltd., as Trustee of KTB CRE Debt Fund No. 8 ("Lender").

3. In my role as COO of AAC, I am familiar with the day-to-day management of Union Station, and I direct the actions of AAC at Union Station. As such, I am fully familiar with the facts and circumstances sworn to in this affidavit based upon my own personal knowledge.

4. Union Station is a large, historic, national landmark owned by the federal government that is operated as one of the nation's busiest transit hubs along with a retail shopping center, commercial office space, and dining components. Each year, Union Station serves tens of millions of visitors and commuters. Operation of Union Station is complex, akin to running a train station, major mall, and office complex at once and at the same location. I have been in charge of management of Union Station since Owners acquired their leasehold interest in 2007.

### Background On Union Station

5. The leasehold interest at issue in this proceeding consists of 420,797 square feet, comprised of approximately: 200,550 square feet of retail space, which occupies Union Station's main entrance hall, train concourse, mezzanine level, and lower level food court; 135,652 square feet of office space located on the second, third and fourth floors; 63,770 square feet of Amtrak train space, consisting of the train concourse space and commuter waiting areas; and 20,825 square feet of event space, located primarily in the east hall and main hall.

6. In 1964, the District of Columbia designated Union Station a historic landmark, and in 1969 it was listed in the National Register of Historic Places. Columbus Plaza, located in the front of Union Station, was listed in the National Register of Historic Places in 1980.

7. Union Station is owned in fee by the United States of America, acting through the Federal Railroad Administration, and was ground leased to the quasi-governmental Union

Station Redevelopment Corporation ("USRC").  The Station then was sub-leased from USRC to Union Station Venture, Ltd. ("USV") in 1985.  USV sold its interest in the ground lease to Investco in 2007.  The ground lease expires on October 31, 2084.

8. The day-to-day operations of Union Station are a massive undertaking, in large part because of the millions of people who pass through Union Station annually and because the property is a nationally-significant transit hub, serving the busiest transit corridor in the country. Among Owners' responsibilities, which I oversee and execute, are oversight of Union Station's complex safety, security, and operational systems, including lighting, plumbing, ventilation, mechanical systems (escalators, elevators, etc.), crowd control, fire and smoke detection, and other critical infrastructure necessary to running the property each day.

9. Owners handle nearly all of the day-to-day operation of Union Station, but the property manager, Jones Lang LaSalle Americas, Inc. ("JLL") (who is retained by AAC through a limited-services management agreement), is responsible for certain limited accounting issues and all human resources/payroll issues for employees.  All employees on-site at Union Station are hired at the direction of and supervised by AAC but are employed by JLL and report to the JLL-employee General Manager ("GM").  The GM reports to AAC, and specifically to me.  Owners are solely responsible for the oversight, management, and performance of all construction related to Union Station and the maintenance of its complex safety, security, and operational systems, including lighting, plumbing, ventilation, mechanical systems (escalators, elevators, etc.), crowd control, fire and smoke detection, and other critical infrastructure necessary to running the property each day.  Owners are also responsible for, among other things, overseeing all capital improvement projects and maintenance in partnership with USRC, directing all construction related to Union Station, including confirming compliance with all applicable landmark preservation laws; hiring

all vendors and approving vendor expenses; and handling all issues related to tenants at Union Station, including communications, finances, and leasing.

10. I am also the point of contact at Union Station, and have been for fifteen years, for all critical and crisis management circumstances. In the past, when Union Station, or portions of it, has been compromised by acts of god, major mechanical failures, or sensitive operational circumstances, including the safe passage of political leaders or others facing significant life threat, I have coordinated and communicated with all necessary government agencies and actors to address the issues. Owners are the only organizations currently equipped to manage and mitigate these circumstances and run Union Station smoothly and effectively.

11. On top of those responsibilities, Owners are also responsible for the commercial operations of Union Station, including a complex network of tenants, vendors, and other sources of income. Owners also ensure compliance with a web of unique licensure rules that apply to the property because Union Station is administered by the Federal Railroad Administration and is a National Registered landmark.

12. And, in addition to Owners' operational responsibilities, on any given day, Owners must coordinate efforts between JLL, Union Station's tenants and vendors, representatives of USRC, and Washington, D.C. and federal transportation authorities, as well as, on occasion, representatives of national and local security agencies due to Union Station's presence on an important national transit corridor and location in the nation's capital.

## The Mortgage and Mezzanine Loans

13. In order to obtain funding for the operation of the Station, on May 8, 2018, Investco and lenders Citi Real Estate Funding Inc. ("Citi") and Natixis Real Estate Capital LLC ("Natixis," and together with Citi, the "Original Mortgage Lenders") entered into a loan agreement (the

4

"Mortgage Loan Agreement"), a deed of trust, and other loan documents (the "Mortgage Loan Documents"), pursuant to which Original Mortgage Lenders provided a loan (the "Mortgage Loan") to Investco in the aggregate original principal amount of $330 million secured by a leasehold mortgage on the Station (the "Mortgage Collateral"). A true and correct copy of the Mortgage Loan Agreement, excluding the attached schedules, is attached hereto as Exhibit 1.

14. Following the execution of the Mortgage Loan Documents, the Mortgage Loan was securitized and, Wilmington Trust, N.A., in its capacity as Trustee of the US 2018-USDC, Commercial Mortgage Pass-Through Certificates, Series 2018-USDC, became the successor-in-interest to the Original Lenders ("Second Mortgage Lender").

15. In January 2022, the Mortgage Loan was purchased out of the securitization Trust by Kookmin (defined below).

16. Also on May 8, 2018, Sole Member, the sole owner of Investco, and Kookmin Bank Co., Ltd. ("Kookmin," or "Lender") entered into an agreement (the "Mezzanine Loan Agreement"), a pledge and security agreement (the "Pledge Agreement"), and other loan documents (the "Mezzanine Loan Documents," and together with the Mortgage Loan Documents, the "Loan Documents"), pursuant to which Kookmin provided a loan to Sole Member in the aggregate principal amount of $100 million (the "Mezzanine Loan," and together with Mortgage Loan, the "Loans"), secured by Sole Member's membership interests in Investco (the "Mezzanine Collateral"). True and correct copies of the Mezzanine Loan Agreement, excluding the attached schedules, and the Pledge Agreement are attached hereto as Exhibits 2 and 3, respectively.

17. Kookmin acts through its authorized representative Rexmark Holdings LLC ("Rexmark").

18. The Mortgage Loan and Mezzanine Loan are part of a single financing transaction.

**COVID'S Effect on Union Station**

19. Prior to the COVID-19 pandemic, Owners were current on all of their obligations under the Loan Documents, including their payment obligations.

20. Union Station was devastated by the COVID-19 pandemic. Among other things, lockdowns and travel restrictions led to an enormous reduction in the number of travelers, shoppers, and other visitors to Union Station. As a result, many of Investco's tenants went out of business or have otherwise been unable to pay rent, or have been paying reduced rents, to Investco. This has caused a substantial decrease in Investco's, and in turn Sole Member's, revenues.

21. As a result of this lost income, beginning with the payment due on or before May 9, 2020, Owners have been unable to make full monthly debt service payments on the Loans. On May 13, 2020, Second Mortgage Lender and Kookmin declared Events of Default for failure to make the May 2020 payment. Following this declaration, Owners entered into extensive negotiations with those lenders and, recognizing that financial difficulties were temporary, entered into modification and forbearance agreements through which the lenders agreed to forbear from the exercise of their rights and remedies under the Loan Documents until at least March 2021.

22. Owners are still suffering severely from the massive disruptions COVID-19 has caused. While government-mandated lockdowns and stay-at-home orders have been lifted, and businesses and office buildings have been permitted to reopen their doors, many have not reopened and many have only reopened on a limited basis. As a result, the number of daily commuters and travelers to Washington, D.C., both for business and leisure, still pales in comparison to pre-pandemic numbers. Because of this drastic reduction in foot traffic through Union Station, as well as the fact that many of Investco's commercial tenants at Union Station are no longer in business, Owners' revenues are still severely depressed to this day.

**Lenders Preclude Investco From
<u>Closing A Substantial Investment In Investco's Owner</u>**

23.     Although the parties believed that Owners' financial difficulties brought about by COVID-19 were temporary, I and others at AAC engaged in substantial efforts to raise additional capital.  These efforts bore fruit and in December 2020, Ashkenazy Union Station Holdings LLC ("Ashkenazy Holdings"), the parent company to Investco and Sole Member, entered into a confidential agreement with a large and well-capitalized sovereign wealth fund (the "Investor") providing for the Investor to purchase a 50% ownership stake in Ashkenazy Holdings in exchange for an investment that valued Investco's sub-leasehold interest in Union Station at over $700 million (the "Investment").  The Investment would have allowed Owners to come current under the Loans and make future payments, and the valuation would have provided approximately $300 million in new equity above the debt.

24.     In furtherance of the Investment, the Investor deposited the extraordinarily large sum of $100 million into an escrow account, demonstrating its intention to complete this crucial funding solution.

25.     Due to the change in ownership structure, Owners were required to seek consent from the then-existing lenders to the Investment.  Rather than consent to a transaction that would have rescued Union Station from its pandemic-induced hardships, both the Mortgage Lender and Lender unreasonably withheld consent to the Investment under the Loan Documents and refused to allow the transaction to proceed.  This failure to obtain consent caused the Investor to pull out of the deal.  Mortgage Lender's and Lender's misconduct with respect to this Investment has prevented Owners from becoming current under the Loans.

**The Parties Attempt to Negotiate a Resolution**

26.     Following the failure of the Investment, Owners attempted to negotiate with the lenders in good faith to avoid further damage to the Station.  The negotiations culminated in an agreement whereby the lenders agreed in principle to forbear from exercising any remedies in connection with the Loans while Owners agreed to a schedule for the resumption of debt payments.

27.     However, before the agreement was reduced to writing, both Second Mortgage Lender and Kookmin noticed foreclosure sales for their respective loans.  The sales did not come to pass, however.  On January 5, 2022, title to the Mortgage Loan was transferred to Kookmin and the Foreclosure Sales were terminated.  Owners hoped that Kookmin, now the Lender for both Loans, would cooperate in attempting a mutually beneficial restructuring and workout of the Loans.

**Lender Begins to Interfere with Owners' Operation of the Station**

28.     Almost immediately after taking ownership of the Mortgage Loan, Lender began to interfere with Owners' operation of the Station.

29.     Among other things, Rexmark, acting on Kookmin's behalf, has interfered with Owners' ability to lease space in Union Station to prospective tenants by instructing brokers and others not to negotiate or speak with Owners' representatives.  Moreover, Rexmark has itself met with existing Union Station tenants, and with others who Owners were actively attempting to negotiate with, about leasing space inside Union Station.

30.     Following the months of interference by Kookmin and Rexmark, Owners were blindsided when Amtrak, which subleases approximately fifteen percent of the space subject to Investco's lease, filed their complaint for condemnation of the Station in this action.

31. Almost a month after the condemnation complaint was filed, on May 13, 2022, Owners received three letters (the "May 13 Letters") from Lender's counsel purporting to exercise certain rights under the Pledge Agreement. Specifically, the letters informed Owners that Lender purportedly 1) had exercised its option under Section 8(a) of the Pledge Agreement to register all of the ownership interest in Investco (currently held by Sole Member) in Kookmin's name; 2) had exercised its right under Section 9(a)(i) of the Pledge Agreement to terminate the current manager of Investco; and 3) had exercised its option under Section 13 of the Pledge Agreement to act as attorney-in-fact for Sole Member. True and correct copies of the May 13 Letters are attached hereto as Exhibits 4-6.

32. The same day, Lender also noticed a nonjudicial foreclosure sale of the Mezzanine Loan to take place on June 14, 2022. A true and correct copy of the Notice of Foreclosure and the Terms of the Foreclosure Sale are attached hereto as Exhibit 7.

33. Also after the condemnation was effected, Lender purported to terminate Union Station's management company, JLL. After objections both from Owners and Amtrak, Kookmin rescinded that termination, but only after Amtrak filed an emergency motion in this action seeking to maintain JLL as the Station's manager.

34. Without Owners' consent, Lender retained Neuberger purportedly as counsel for Investco and directed Neuberger to file the Neuberger/Investco Answer in Investco's name. That answer is filed on the ECF docket in this action at ECF No. 36.

35. Owners have retained counsel at Kasowitz Benson Torres LLP ("Kasowitz") and ArentFox Schiff LLP ("ArentFox") to represent them in connection with this proceeding.

36. The Answer filed in this action at ECF No. 38 by Kasowitz and ArentFox reflects the views of Owners and was authorized by them. Owners have not and do not consent to

Lender acting in Investco's name in this action.  Owners also have not authorized anyone other than lawyers at Kasowitz and ArentFox to represent them in this action.  This includes Neuberger, who purports in a notice of appearance (ECF No. 37) and a putative answer (ECF No. 36) to represent Investco.  Owners did not authorize Neuberger to appear on Investco's behalf or file an answer, which was not approved by Owners.  Nor is Neuberger authorized by Owners to take any actions on Investco's behalf.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: June 3, 2022

_____
Yossi Preiserowicz