# EXHIBIT 1

Loan No. 11449

---

## LOAN AGREEMENT

Dated as of May 8, 2018

Between

**UNION STATION INVESTCO LLC**, as Borrower

and

**CITI REAL ESTATE FUNDING INC. and NATIXIS REAL ESTATE CAPITAL LLC**,
collectively, as Lender

---

# TABLE OF CONTENTS

**Page**

I.     DEFINITIONS; PRINCIPLES OF CONSTRUCTION ..................................................... 1

    **Section 1.1.**   Definitions.......................................................................................... 1

    **Section 1.2.**   Principles of Construction......................................................... 37

II.    THE LOAN................................................................................................................. 37

    **Section 2.1.**   The Loan. ...................................................................................... 37

        2.1.1.   Agreement to Lend and Borrow ..................................... 37

        2.1.2.   Single Disbursement to Borrower................................... 37

        2.1.3.   The Note ............................................................................ 38

        2.1.4.   Use of Proceeds ............................................................... 38

    **Section 2.2.**   Interest Rate. ............................................................................... 38

        2.2.1.   Interest Rate ...................................................................... 38

        2.2.2.   Default Rate ...................................................................... 38

        2.2.3.   Interest Calculation ......................................................... 38

        2.2.4.   Usury Savings ................................................................... 38

        2.2.5.   EEA Financial Institutions ............................................. 38

    **Section 2.3.**   Loan Payments............................................................................ 39

        2.3.1.   Payment Before Maturity Date ...................................... 39

        2.3.2.   Application of Payments to Note A-1 and Note A-2.......................... 39

        2.3.3.   Payment on Maturity Date .............................................. 39

        2.3.4.   Late Payment Charge ...................................................... 39

        2.3.5.   Method and Place of Payment ....................................... 40

    **Section 2.4.**   Prepayments. ............................................................................... 40

        2.4.1.   Voluntary Prepayments................................................... 40

        2.4.2.   Mandatory Prepayments ................................................. 41

        2.4.3.   Prepayments After Default ............................................. 41

    **Section 2.5.**   Defeasance. ................................................................................. 41

        2.5.1.   Conditions to Defeasance ............................................... 41

        2.5.2.   Defeasance Collateral Account...................................... 43

        2.5.3.   Successor Borrower ......................................................... 43

    **Section 2.6.**   Release of Property. ................................................................... 44

    **Section 2.7.**   Clearing Account/Cash Management Account........................ 44

        2.7.1.   Clearing Account. ............................................................ 44

# TABLE OF CONTENTS
## (continued)

**Page**

| | | | |
|---|---|---|---|
| | 2.7.2. | Cash Management Account | 46 |
| | 2.7.3. | Payments Received Under Clearing Account/Cash Management Agreement | 48 |
| | 2.7.4. | Destination Account | 49 |
| | 2.7.5. | Borrower Distributions | 49 |
| III. | | REPRESENTATIONS AND WARRANTIES | 49 |
| | **Section 3.1.** | Borrower Representations | 49 |
| | 3.1.1. | Organization | 49 |
| | 3.1.2. | Proceedings | 50 |
| | 3.1.3. | No Conflicts | 50 |
| | 3.1.4. | Litigation | 50 |
| | 3.1.5. | Agreements | 50 |
| | 3.1.6. | Consents | 51 |
| | 3.1.7. | Title | 51 |
| | 3.1.8. | No Plan Assets | 51 |
| | 3.1.9. | Compliance | 51 |
| | 3.1.10. | Financial Information | 52 |
| | 3.1.11. | Condemnation | 52 |
| | 3.1.12. | Easements; Utilities and Public Access | 52 |
| | 3.1.13. | Separate Lots | 52 |
| | 3.1.14. | Assessments | 53 |
| | 3.1.15. | Enforceability | 53 |
| | 3.1.16. | Assignment of Leases | 53 |
| | 3.1.17. | Insurance | 53 |
| | 3.1.18. | Licenses | 53 |
| | 3.1.19. | Flood Zone | 53 |
| | 3.1.20. | Physical Condition | 53 |
| | 3.1.21. | Boundaries | 54 |
| | 3.1.22. | Leases | 54 |
| | 3.1.23. | Filing, Recording and Other Taxes | 54 |
| | 3.1.24. | Single Purpose | 55 |
| | 3.1.25. | Tax Filings | 59 |

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| 3.1.26. | Solvency | 59 |
| 3.1.27. | Federal Reserve Regulations | 59 |
| 3.1.28. | Organizational Chart | 59 |
| 3.1.29. | Bank Holding Company | 59 |
| 3.1.30. | No Other Debt | 59 |
| 3.1.31. | Investment Company Act | 59 |
| 3.1.32. | Intentionally Omitted. | 60 |
| 3.1.33. | No Bankruptcy Filing | 60 |
| 3.1.34. | Full and Accurate Disclosure | 60 |
| 3.1.35. | Foreign Person | 60 |
| 3.1.36. | No Change in Facts or Circumstances; Disclosure | 60 |
| 3.1.37. | Management Agreement | 60 |
| 3.1.38. | Perfection of Accounts | 60 |
| 3.1.39. | Ground Lease | 61 |
| 3.1.40. | Prime Lease | 63 |
| 3.1.41. | Patriot Act. | 64 |
| 3.1.42. | Intentionally Omitted | 64 |
| 3.1.43. | No Casualty | 64 |
| 3.1.44. | Purchase Options | 64 |
| 3.1.45. | Use of Property | 64 |
| 3.1.46. | Fiscal Year | 64 |
| 3.1.47. | Material Agreements | 64 |
| 3.1.48. | Other Obligations and Liabilities | 65 |
| 3.1.49. | Illegal Activity | 65 |
| 3.1.50. | Underwriting Representations | 65 |
| 3.1.51. | Subsidiaries | 65 |
| **Section 3.2.** | Survival of Representations | 66 |
| IV. | BORROWER COVENANTS | 66 |
| **Section 4.1.** | Borrower Affirmative Covenants | 66 |
| 4.1.1. | Existence; Compliance with Legal Requirements | 66 |
| 4.1.2. | Taxes and Other Charges | 67 |
| 4.1.3. | Litigation | 67 |

# TABLE OF CONTENTS
### (continued)

**Page**

4.1.4.    Access to Property ..................................................................... 67

4.1.5.    Further Assurances; Supplemental Mortgage Affidavits..................... 68

4.1.6.    Financial Reporting..................................................................... 68

4.1.7.    Title to Property ........................................................................ 71

4.1.8.    Estoppel Statement ..................................................................... 71

4.1.9.    Leases...................................................................................... 72

4.1.10.   Alterations ................................................................................ 74

4.1.11.   Required Repairs......................................................................... 76

4.1.12.   Material Agreements.................................................................... 76

4.1.13.   Unfunded Obligations .................................................................. 76

4.1.14.   Costs of Enforcement/Remedying Defaults ...................................... 76

4.1.15.   Business and Operations ............................................................... 77

4.1.16.   Station Renovations ..................................................................... 77

4.1.17.   Intentionally Omitted................................................................... 77

4.1.18.   Handicapped Access .................................................................... 77

4.1.19.   Recycled Entity .......................................................................... 77

4.1.20.   Notice of Certain Events .............................................................. 77

4.1.21.   Further Assurances; Power of Attorney............................................ 77

4.1.22.   Taxes on Security ....................................................................... 78

4.1.23.   Ground Lease ............................................................................. 78

4.1.24.   Prime Lease............................................................................... 81

4.1.25.   Patriot Act Compliance ................................................................ 83

**Section 4.2.**    Borrower Negative Covenants ................................................. 83

4.2.1.    Liens........................................................................................ 83

4.2.2.    Dissolution ................................................................................ 83

4.2.3.    Change in Business...................................................................... 84

4.2.4.    Debt Cancellation ....................................................................... 84

4.2.5.    Affiliate Transactions ................................................................... 84

4.2.6.    Zoning...................................................................................... 84

4.2.7.    Assets ...................................................................................... 84

4.2.8.    No Joint Assessment .................................................................... 84

4.2.9.    Principal Place of Business............................................................ 85

# TABLE OF CONTENTS
### (continued)

**Page**

|  | 4.2.10. | ERISA | 85 |
|  | 4.2.11. | Material Agreements, Operating Agreements | 85 |
|  | 4.2.12. | Change of Name, Identity or Structure | 85 |
|  | 4.2.13. | Special Purpose | 86 |
|  | 4.2.14. | Prohibited Person | 86 |
|  | 4.2.15. | Ground Lease | 86 |
|  | 4.2.16. | Prime Lease | 87 |
|  | 4.2.17. | Bankruptcy-Related Covenants | 87 |
| V. | INSURANCE, CASUALTY AND CONDEMNATION | | 87 |
| Section 5.1. | Insurance. | | 87 |
| Section 5.2. | Casualty and Condemnation. | | 92 |
|  | 5.2.1. | Casualty | 92 |
|  | 5.2.2. | Condemnation | 93 |
|  | 5.2.3. | Casualty Proceeds | 93 |
| Section 5.3. | Delivery of Net Proceeds. | | 93 |
|  | 5.3.1. | Minor Casualty or Condemnation | 93 |
|  | 5.3.2. | Major Casualty or Condemnation | 94 |
|  | 5.3.3. | Net Proceeds – Ground Lease | 98 |
| VI. | RESERVE FUNDS | | 98 |
| Section 6.1. | Intentionally Omitted. | | 98 |
| Section 6.2. | Tax Funds. | | 98 |
|  | 6.2.1. | Deposits of Tax Funds | 98 |
|  | 6.2.2. | Release of Tax Funds | 99 |
| Section 6.3. | Insurance Funds. | | 99 |
|  | 6.3.1. | Deposits of Insurance Funds | 99 |
|  | 6.3.2. | Release of Insurance Funds | 100 |
| Section 6.4. | Intentionally Omitted. | | 100 |
| Section 6.5. | Lease Termination Funds. | | 100 |
|  | 6.5.1. | Deposits of Lease Termination Funds | 100 |
|  | 6.5.2. | Release of Lease Termination Funds | 101 |

# TABLE OF CONTENTS

(continued)

**Page**

**Section 6.6.**   Intentionally Omitted. .................................................................. 102

**Section 6.7.**   Excess Cash Flow Funds. ............................................................. 102

    6.7.1.   Deposits of Excess Cash Flow Funds ................................ 102

    6.7.2.   Release of Excess Cash Flow Funds .................................. 102

**Section 6.8.**   Ground Rent Funds. ...................................................................... 103

    6.8.1.   Deposit of Ground Rent Funds ........................................... 103

    6.8.2.   Release of Ground Rent Funds. .......................................... 104

**Section 6.9.**   Capital Reserve Account Funds ................................................... 104

    6.9.1.   Deposit of Capital Reserve Account Funds ........................ 104

    6.9.2.   Release of Capital Reserve Account Funds. ....................... 105

**Section 6.10.**  Intentionally Omitted .................................................................. 105

**Section 6.11.**  Unfunded Obligations Funds. ...................................................... 105

    6.11.1.  Deposits of Unfunded Obligations Funds .......................... 105

    6.11.2.  Release of Unfunded Obligations Funds ............................ 106

**Section 6.12.**  Reserve Funds. ............................................................................ 107

    6.12.1.  Security Interest ................................................................. 107

    6.12.2.  Investments; Income Taxes ................................................ 107

    6.12.3.  Indemnity ........................................................................... 108

**Section 6.13.**  Provisions Regarding Letters of Credit ...................................... 108

    6.13.1.  Event of Default ................................................................. 108

    6.13.2.  Security for Debt ................................................................ 108

    6.13.3.  Limitations on Letters of Credit ........................................ 108

    6.13.4.  Additional Rights of Lender .............................................. 109

# TABLE OF CONTENTS
## (continued)

**Page**

VII.  PROPERTY MANAGEMENT ................................................................. 109

**Section 7.1.**  Management Agreement ................................................ 109

**Section 7.2.**  Prohibition Against Termination or Modification ................................. 109

**Section 7.3.**  Replacement of Manager ................................................ 110

**Section 7.4.**  Matters Concerning Manager ................................................ 110

VIII.  TRANSFERS ................................................................. 110

**Section 8.1.**  Transfers Generally ................................................ 110

**Section 8.2.**  Permitted Property Transfer (Assumption) ................................ 112

**Section 8.3.**  Permitted Transfers of Interests in Borrower ................................ 114

**Section 8.4.**  Property Documents ................................................ 116

**Section 8.5.**  Economic Sanctions, Anti-Money Laundering and Transfers ................. 116

**Section 8.6.**  Subordinate Mezzanine Loan ................................................ 117

IX.  SALE AND SECURITIZATION OF LOAN ................................................. 118

**Section 9.1.**  Sale of Loan and Securitization ................................................ 118

**Section 9.2.**  Securitization Indemnification ................................................ 120

X.  DEFAULTS ................................................................. 124

**Section 10.1.**  Event of Default ................................................ 124

**Section 10.2.**  Remedies ................................................ 127

**Section 10.3.**  Right to Cure Defaults ................................................ 128

**Section 10.4.**  Remedies Cumulative ................................................ 128

XI.  MISCELLANEOUS ................................................................. 129

**Section 11.1.**  Successors and Assigns ................................................ 129

**Section 11.2.**  Lender's Discretion ................................................ 129

**Section 11.3.**  Governing Law ................................................ 129

**Section 11.4.**  Modification, Waiver in Writing ................................................ 130

**Section 11.5.**  Delay Not a Waiver ................................................ 131

**Section 11.6.**  Notices ................................................ 131

**Section 11.7.**  Trial by Jury ................................................ 133

**Section 11.8.**  Headings ................................................ 133

**Section 11.9.**  Severability ................................................ 133

**Section 11.10.** Preferences ................................................ 133

**Section 11.11.** Waiver of Notice ................................................ 133

# TABLE OF CONTENTS
(continued)

**Page**

**Section 11.12.** Remedies of Borrower ................................................................ 134

**Section 11.13.** Expenses; Indemnity ................................................................ 134

**Section 11.14.** Schedules Incorporated ................................................................ 135

**Section 11.15.** Offsets, Counterclaims and Defenses ................................................ 135

**Section 11.16.** No Joint Venture or Partnership ................................................ 135

**Section 11.17.** Publicity ................................................................ 136

**Section 11.18.** Waiver of Marshalling of Assets ................................................ 136

**Section 11.19.** Waiver of Offsets/Defenses/Counterclaims ................................................ 136

**Section 11.20.** Conflict; Construction of Documents; Reliance ................................................ 136

**Section 11.21.** Brokers and Financial Advisors ................................................ 137

**Section 11.22.** Exculpation ................................................................ 137

**Section 11.23.** Prior Agreements ................................................................ 141

**Section 11.24.** Servicer ................................................................ 141

**Section 11.25.** Intentionally Omitted ................................................................ 142

**Section 11.26.** Creation of Security Interest ................................................ 142

**Section 11.27.** Intentionally Omitted. ................................................................ 142

**Section 11.28.** Set-Off ................................................................ 142

**Section 11.29.** Component Notes; Adjustment of Loan ................................................ 142

**Section 11.30.** New Mezzanine Loan ................................................................ 143

**Section 11.31.** Approvals; Third Parties; Conditions ................................................ 145

**Section 11.32.** Limitation on Liability of Lender's Officers, Employees, etc ................................ 145

**Section 11.33.** Certain Additional Rights of Lender (VCOC) ................................................ 145

**Section 11.34.** Intercreditor Agreement ................................................................ 146

**Section 11.35.** Agent. ................................................................ 146

**Section 11.36.** Syndication. ................................................................ 148

SCHEDULES

Schedule I          –     Rent Roll

Schedule II         –     Immediate Repairs

Schedule III        –     Organizational Chart

**TABLE OF CONTENTS**
(continued)

**Page**

Schedule IV       –    Form of SNDA

Schedule V        –    Unfunded Obligations

Schedule VI       –    Permitted Fund Manager


Exhibit A         –    Description of Ground Lease

Exhibit B         –    Description of Prime Lease

Exhibit C         –    Form of Indemnification Certificate

# LOAN AGREEMENT

**THIS LOAN AGREEMENT**, is dated and entered into as of May 8, 2018 (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "**Agreement**"), between **CITI REAL ESTATE FUNDING INC.**, a New York corporation, having an address at 388-390 Greenwich Street, New York, New York 10013 (together with its successors and assigns, "**Citi**"), and **NATIXIS REAL ESTATE CAPITAL LLC**, a Delaware limited liability company, having an address at 1251 Avenue of the Americas, New York, New York 10020 (together with its successors and assigns, "**Natixis**"; and together with Citi, collectively, "**Lender**") and **UNION STATION INVESTCO LLC**, a Delaware limited liability company having an address at c/o Ashkenazy Acquisition Corp., 150 East 58th Street, Penthouse, New York, New York 10155 (together with its permitted successors and assigns, collectively "**Borrower**").

All capitalized terms used herein shall have the respective meanings set forth in Article I hereof.

## W I T N E S S E T H:

**WHEREAS**, Borrower desires to obtain the Loan from Lender; and

**WHEREAS**, subject to and in accordance with the terms and conditions of this Agreement and the other Loan Documents and based upon the representations, warranties, covenants and undertakings of Borrower herein and therein contained, Lender is willing to make the Loan to Borrower.

**NOW, THEREFORE**, in consideration of the covenants set forth in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree, represent and warrant as follows:

## I. DEFINITIONS; PRINCIPLES OF CONSTRUCTION

**Section 1.1.** <u>Definitions</u>. For all purposes of this Agreement, except as otherwise expressly provided:

"**2018 Annual Expenditure Schedule**" shall have the meaning set forth in Section 4.1.6(h) hereof.

"**Actual Operating Expenses**" shall have the meaning set forth in Section 2.7.2(c) hereof.

"**Affiliate**" shall mean, as to any Person, any other Person that (i) directly or indirectly, owns ten percent (10%) or more of the legal, beneficial or economic interests in such Person, (ii) is in Control of, is Controlled by or is under common ownership or Control with such Person, (iii) is a director or officer of such Person or of an Affiliate of such Person and/or (iv) is the spouse, issue or parent of such Person or of an Affiliate of such Person.

"**Affiliated Manager**" shall mean any Manager that is an Affiliate of Borrower, Mezzanine Borrower, Subordinate Mezzanine Borrower, or Guarantor.

"**Aggregate Debt Service Coverage Ratio**" shall mean the ratio calculated by Lender on a monthly basis of (i) Underwritable Cash Flow to (ii) the aggregate amount of Debt Service, Mezzanine Debt Service, and Subordinate Mezzanine Debt Service, if any, for the twelve (12) month period immediately preceding the date of calculation; provided, that the foregoing shall be calculated by Lender (A) based upon the actual amount of debt service which would be due for such period, and (B) assuming that the Loan, the Mezzanine Loan, and the Subordinate Mezzanine Loan, if any, had been in place for the entirety of said period.

"**Aggregate Debt Yield**" shall mean, as of any date of calculation, a ratio conveyed as a percentage in which: (i) the numerator is the Underwritable Cash Flow; and (ii) the denominator is the then outstanding aggregate principal balance of the Loan, the Mezzanine Loan, and the Subordinate Mezzanine Loan.

"**Agreement**" shall have the meaning set forth in the introductory paragraph hereto.

"**ALTA**" shall mean American Land Title Association or any successor thereto.

"**Alteration Costs**" shall have the meaning set forth in Section 4.1.10 hereof.

"**Alteration Threshold**" shall mean five percent (5%) of the original principal amount of the Loan.

"**Amtrak**" shall mean the National Railroad Passenger Corporation, a District of Columbia corporation doing business as "Amtrak", together with its successors and assigns.

"**Annual Budget**" shall mean the operating and capital budget for the Property prepared by Borrower in accordance with Section 4.1.6(h) hereof for the applicable period or Fiscal Year.

"**Appraisal**" shall mean an appraisal of the Property in its then "as is" condition, prepared not more than ninety (90) days prior to the Closing Date (or other relevant date with respect to an updated Appraisal or an Appraisal) by a member of the American Institute of Real Estate Appraisers selected by Lender, which appraisal (i) shall meet the minimum appraisal standards for national banks promulgated by the Comptroller of the Currency pursuant to Title XI of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, as amended (FIRREA), and (ii) otherwise shall be in form and substance satisfactory to Lender in its reasonable discretion.

"**Approved Accounting Method**" shall mean GAAP, federal tax basis accounting (consistently applied) or such other method of accounting, consistently applied, as may be reasonably acceptable to Lender.

2

"**Approved Annual Budget**" shall have the meaning set forth in Section 4.1.6(h) hereof.

"**Ashkenazy**" shall mean Ben Ashkenazy, an individual.

"**Assignment and Assumption**" shall have the meaning set forth in Section 11.36 hereof.

"**Assignment of Leases**" shall mean that certain first-priority Assignment of Leases and Rents, dated as of the Closing Date, from Borrower, as assignor, to Lender, as assignee, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Assignment of Management Agreement**" shall mean that certain Assignment of Management Agreement and Subordination of Management Fees, dated as of the Closing Date, among Lender, Borrower and Manager, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Award**" shall mean any compensation paid by any Governmental Authority in connection with a Condemnation.

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"**Bail-In Legislation**" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"**Bankruptcy Action**" shall mean, with respect to any Person, (i) such Person filing a voluntary petition under the Bankruptcy Law; (ii) the filing of an involuntary petition against such Person under the Bankruptcy Law, which involuntary petition is not discharged, stayed or dismissed within sixty (60) days; (iii) such Person filing an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other Person under the Bankruptcy Law, or soliciting or causing to be solicited petitioning creditors for an involuntary petition from any Person; (iv) such Person consenting to or acquiescing in or joining in an application for the appointment of a custodian, receiver, trustee, or examiner for such Person or any portion of the Property; or (v) such Person making an assignment for the benefit of creditors, or admitting, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due.

"**Bankruptcy Law**" shall mean the U.S. Bankruptcy Code, any other federal, state or foreign bankruptcy or insolvency law and any comparable foreign laws relating to bankruptcy, insolvency or creditors' rights.

"**Borrower**" shall have the meaning set forth in the introductory paragraph hereto.

3

"**Borrower's Operating Agreement**" shall mean that certain Second Amended and Restated Limited Liability Company Agreement of Borrower, dated as of the date hereof, among Mezzanine Borrower, as the Member (as defined therein) and the independent managers named therein each as an Independent Manager (as defined therein), as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the terms and provisions hereof.

"**Borrower's Recourse Liabilities**" shall have the meaning set forth in Section 11.22 hereof.

"**Budgeted Operating Expenses**" shall have the meaning set forth in Section 2.7.2(c) hereof.

"**Business Day**" shall mean any day other than a Saturday, a Sunday or a legal holiday on which national banks are not open for general business in (i) the State of New York, (ii) the state where the corporate trust office of the Trustee is located, (iii) the state where the servicing offices of the Servicer are located, or (iv) the state where the Cash Management Bank's offices are located.

"**Capital Expenditure Work**" shall mean any labor performed or materials provided or installed in connection with any Capital Expenditures.

"**Capital Expenditures**" shall mean, for any period, the amounts expended for items capitalized under GAAP (including expenditures for replacements, building improvements, major repairs, alterations, tenant improvements and leasing commissions).

"**Capital Reserve Account**" shall have the meaning set forth in the Ground Lease for the "Capital Maintenance Reserve Fund".

"**Capital Reserve Deposit Account**" shall have the meaning set forth in Section 6.9.1 hereof.

"**Capital Reserve Account Funds**" shall have the meaning set forth in Section 6.9.1 hereof.

"**Cash Flow Adjustments**" shall mean adjustments made by Lender in its calculation of Underwritable Cash Flow and the components thereof, in each case, based upon Lender and Rating Agency underwriting criteria, which such adjustments shall include, without limitation, adjustments (A) for (i) items of a non-recurring nature (provided, however, Lender will include sponsorship revenue and experiential income in its calculation of Underwritable Cash Flow), (ii) a credit loss/vacancy allowance equal to the greater of actual and three percent (3%) as determined by Lender and (iii) imminent liabilities and/or other expense increases (including, without limitation, imminent increases to Taxes and Insurance Premiums); and (B) to exclude rental income attributable to any Tenant (1) in bankruptcy that has not affirmed its Lease in the applicable bankruptcy proceeding pursuant to a final, non-appealable order of a court of competent jurisdiction, (2) in monetary (except for common area maintenance reimbursement disputes of sixty (60) days or less) or material non-monetary default under its Lease beyond any

4

applicable notice and cure periods, (3) that has provided written notice to Borrower of its intention to not renew, terminate, cancel and/or reject its applicable Lease (provided, however, that, with respect to this subclause (3) Gross Rents and Operating Income shall still include rental income from such Tenant until the date which is six (6) months prior to the date of such termination and/or expiration of such applicable Lease, and provided, further, that Borrower shall have the right to consult with Lender with respect to any termination notices provided by a Tenant for which Borrower believes such notice is not a valid notice of termination), (4) whose tenancy at the Property is month-to-month (provided, however, Lender will include in its calculation of Underwritable Cash Flow income from Tenants at the Property whose tenancy has been month-to-month for six (6) months or more, subject to a cap in an amount equal to five percent (5%) of Gross Rents (including any percentage rent, but excluding signage income), and/or (5) other than as set forth in clause (4) above, under a Lease which expires within 60 days or less of the applicable date of calculation hereunder.

"**Cash Management Account**" shall have the meaning set forth in Section 2.7.2(a) hereof.

"**Cash Management Agreement**" shall mean that certain Cash Management Agreement, dated as of the Closing Date, by and between Lender and Borrower, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Cash Management Bank**" shall mean any Eligible Institution acting as Cash Management Bank under the Cash Management Agreement.

"**Casualty**" shall mean any casualty, damage or injury, by fire or otherwise, to the Property or any part thereof.

"**Casualty Consultant**" shall have the meaning set forth in Section 5.3.2(c) hereof.

"**Casualty Retainage**" shall have the meaning set forth in Section 5.3.2(d) hereof.

"**Citi**" shall have the meaning set forth in the preamble hereof.

"**Citi Securitization**" shall have the meaning set forth in Section 11.35 hereof.

"**Clearing Account**" shall have the meaning set forth in Section 2.7.1 hereof.

"**Clearing Account Agreement**" shall mean (a) the Closing Date Clearing Account Agreement, or (b) if the context requires, any Replacement Clearing Account Agreement, in each case as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Clearing Bank**" shall mean (a) Wells Fargo Bank, N.A. and (b) if the context requires, any Replacement Clearing Account Bank.

"**Closing Date**" shall mean the date hereof.

5

"**Closing Date Clearing Account Agreement**" shall mean that certain Deposit Account Control Agreement (Hard Lockbox), dated as of the Closing Date, among Lender, Borrower and Clearing Bank, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Co-Lender**" shall have the meaning set forth in Section 11.36 hereof.

"**Co-Lending Agreement**" shall mean any co-lending agreement entered into between Citi, individually as a Co-Lender and as agent and the other Co-Lenders, as the same may be further supplemented modified, amended or restated.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended and as it may be further amended from time to time, any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"**Condemnation**" shall mean a temporary or permanent taking by any Governmental Authority as the result or in lieu or in anticipation of the exercise of the right of condemnation or eminent domain, of all or any part of the Property, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade affecting the Property or any part thereof.

"**Control**" means (a) the ownership, directly or indirectly, of fifty percent (50%) or more of the equity interests in a Person, (b) the right to receive at least fifty percent (50%) of any distributions from such entity or (c) the possession, directly or indirectly, of the power to direct or cause the direction of the management, policies or activities of a Person, whether through ownership of voting securities, by contract or operation of law or otherwise, and the terms "**Controlled**" and "**Controlling**" shall have correlative meanings.

"**Control Affiliate**" shall mean, as to any Person, any other Person that is in Control of, is Controlled by or is under common ownership or Control with such Person.

"**Covered Disclosure Information**" shall have the meaning set forth in Section 9.2(b) hereof.

"**Crowdfunded Person**" means a Person capitalized primarily by monetary contributions (A) of less than $35,000 each from more than 35 investors who are individuals and (B) which are funded primarily (I) in reliance upon Regulation Crowdfunding promulgated by the Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended and/or (II) through internet-mediated registries, platforms or similar portals, mail-order subscriptions, benefit events and/or other similar methods.

"**DBRS**" means DBRS, Inc., and its successor-in-interest.

"**De Minimis Income**" shall mean, collectively, certain de minimis amounts of Rents received directly by Borrower or Manager from sources other than Leases and Net Proceeds, including sources such as holiday photo sales and change retrieved from fountains.

"**Debt**" shall mean the Outstanding Principal Balance, together with all interest accrued and unpaid thereon, and all other sums due to Lender in respect of the Loan under the Note, this Agreement or any other Loan Document.

"**Debt Service**" shall mean, with respect to any particular period of time, the aggregate amount of scheduled principal and interest payments due and payable under the Note and this Agreement.

"**Deemed Approval Requirements**" shall mean, with respect to any matter, that Lender shall not withhold its consent or disapproval to any such action for more than five (5) Business Days after Second Notice for approval thereof has been delivered by Borrower, accompanied by the applicable documents and a detailed description of the request including any descriptive information reasonably required for Lender to make an informed decision for which approval is sought, provided that (i) Borrower has submitted a request ("**Initial Notice**") for Lender's approval in an envelope labeled "Priority" and delivered to Lender by overnight delivery and otherwise in accordance with the provisions of Section 11.6 and which request stated at the top of the first page in bold lettering **"LENDER'S RESPONSE IS REQUIRED WITHIN TEN (10) BUSINESS DAYS OF RECEIPT OF THIS NOTICE PURSUANT TO THE TERMS OF A LOAN AGREEMENT BETWEEN THE UNDERSIGNED AND LENDER;"** (ii) Lender shall have failed to respond to the Initial Notice within the aforesaid time-frame;  (iii) Borrower has submitted a second request ("**Second Notice**") for Lender's approval in an envelope labeled "Priority" and delivered to Lender by overnight delivery and otherwise in accordance with the provisions of Section 11.6 and which request stated at the top of the first page in bold lettering **"LENDER'S RESPONSE IS REQUIRED WITHIN FIVE (5) BUSINESS DAYS OF RECEIPT OF THIS NOTICE PURSUANT TO THE TERMS OF A LOAN AGREEMENT BETWEEN THE UNDERSIGNED AND LENDER;"** and (iv) Lender shall have failed to respond to the Second Notice within the aforesaid time-frame.  In the event that Lender fails to make a reasonable request for more information or to either approve such request or disapprove such request (such disapproval stating the reasons for such disapproval) for more than five (5) Business Days after receipt of the Second Notice, the action that was the subject of said request shall be deemed approved.

"**Default**" shall mean the occurrence of any event hereunder or under any other Loan Document which, but for the giving of notice or passage of time, or both, would be an Event of Default.

"**Default Rate**" shall mean, with respect to the Loan, a rate per annum equal to the lesser of (i) the Maximum Legal Rate or (ii) the greater of (A) one percent (1%) above the Prime Rate or (B) five percent (5%) above the Interest Rate.

"**Defeasance Collateral**" shall mean, in connection with the Defeasance Event, U.S. Obligations which provide payments (i) on or prior to, but as close as possible to, the Business Day immediately preceding all scheduled Monthly Payment Dates up to and including payment in full of the Loan on the Open Prepayment Commencement Date and other scheduled payment dates, if any, under the Note after the Defeasance Date upon which payments are required under the Note and this Agreement, and (ii) in amounts equal to the scheduled payments

due on such Monthly Payment Dates up to and including the payment in full of the Loan on the Open Prepayment Commencement Date or other scheduled payment dates under the Note and this Agreement (including, without limitation, scheduled payments of principal, interest, servicing fees (if any), and any other amounts due under the Loan Documents on such Monthly Payment Dates or other scheduled payment dates) (such scheduled payments, collectively, the "**Scheduled Defeasance Payments**").

"**Defeasance Collateral Account**" shall have the meaning set forth in Section 2.5.2 hereof.

"**Defeasance Date**" shall have the meaning set forth in Section 2.5.1(a) hereof.

"**Defeasance Event**" shall have the meaning set forth in Section 2.5.1 hereof.

"**Defeasance Expiration Date**" shall mean the date that is two (2) years from the "startup day" within the meaning of Section 860G(a)(9) of the Code for the REMIC Trust established in connection with the last Securitization involving any portion of the Loan.

"**Defeasance Security Agreement**" shall mean a pledge and security agreement in form and substance that would be satisfactory to a prudent lender pursuant to which Borrower grants Lender a perfected, first-priority security interest in the Defeasance Collateral Account and the Defeasance Collateral.

"**Destination Account**" shall mean an account of Borrower designated by Borrower in accordance with the Cash Management Agreement.

"**Disclosure Document(s)**" shall mean any written materials used or provided to any prospective investors and/or Rating Agencies in connection with any public offering or private placement of Securities in a Securitization, including, without limitation, a prospectus, prospectus supplement, private placement memorandum, offering memorandum, offering circular, term sheet, road show presentation materials or other offering documents, marketing materials or information provided to prospective investors, and Exchange Act Filings and information therein, in each case in preliminary or final form and including any amendments, supplements, exhibits, annexes and other attachments thereto in connection with a Securitization and designated as a "Disclosure Document" by Lender in its sole and absolute discretion.

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Eligibility Requirements**" shall mean, with respect to any Person, that such Person (i) has total assets (in name or under management or advisement) in excess of $1,000,000,000 and (except with respect to a pension advisory firm, asset manager or similar fiduciary) capital/statutory surplus or shareholder's equity of at least $400,000,000 and (ii) is regularly engaged in the business of making or owning (or, in the case of a pension advisory firm or similar fiduciary, regularly engaged in managing investments in) commercial real estate loans (including mezzanine loans to direct or indirect owners of commercial properties, which loans are secured by pledges of direct or indirect ownership interests in the owners of such commercial properties) or operating commercial properties.

"**Eligible Account**" shall mean a separate and identifiable account from all other funds held by the holding institution that is either (i) an account or accounts (or subaccounts thereof) maintained with a federal or state-chartered depository institution or trust company which complies with the definition of Eligible Institution or (ii) a segregated trust account or accounts (or subaccounts thereof) maintained with a federal or state chartered depository institution or trust company acting in its fiduciary capacity that has a Moody's rating of at least "Baa3" and that, in the case of a state chartered depository institution or trust company is subject to regulations substantially similar to 12 C.F.R. § 9.10(b), having in either case a combined capital and surplus of at least $50,000,000 and subject to supervision or examination by federal and state authority.  An Eligible Account shall not be evidenced by a certificate of deposit, passbook or other instrument.

"**Eligible Institution**" shall mean (a) a depository institution or trust company insured by the Federal Deposit Insurance Corporation (i) the short term unsecured debt obligations or commercial paper of which are rated at least "A-1+" (or its equivalent) from each of the Rating Agencies (in the case of accounts in which funds are held for thirty (30) days or less) and (ii) the long term unsecured debt obligations of which are rated at least "A+" (or its equivalent) from each of the Rating Agencies (in the case of accounts in which funds are held for more than thirty (30) days) or (b) such other depository institution otherwise approved by the Rating Agencies from time-to-time.

"**Enforcement Action**" shall mean any initiation by Lender of foreclosure proceedings, exercise of a power of sale, or proceedings for the appointment of a receiver (or the initiation by Lender of any judicial action in respect of the Note as a predicate to any such proceedings or exercise of a power of sale).  For avoidance of doubt, a filing of a complaint in a court of competent jurisdiction, or a delivery of notice of foreclosure by power of sale in accordance with applicable law, or an application for appointment of a receiver in accordance with applicable law, or the filing of an executed notice of default in the real property records, shall each independently constitute an Enforcement Action even if there is a subsequent delay. In addition, an "Enforcement Action" shall be deemed to have occurred, without any need for further action by Lender or any other party, immediately upon the occurrence of any of the following: (x) the Maturity Date (unless Lender fails to initiate any of the foregoing actions

9

within thirty (30) days thereafter), (y) any Bankruptcy Action in respect of Borrower or Guarantor, or (z) any affirmative or collusive action by Borrower, Guarantor, any Affiliate, officer, director or representative of Borrower that controls Borrower, the holder of the Mezzanine Loan, the holder of any Subordinate Mezzanine Loan, or any other party to stay, hinder or delay Lender's ability to initiate an Enforcement Action.

"**Environmental Indemnity**" shall mean that certain Environmental Indemnity Agreement, dated as of the Closing Date, executed by Borrower and Guarantor in connection with the Loan for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**ERISA**" shall have the meaning set forth in Section 4.2.10 hereof.

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"**Event of Default**" shall have the meaning set forth in Section 10.1 hereof.

"**Excess Cash Flow**" shall have the meaning set forth in Section 2.7.2(b)(xiii) hereof.

"**Excess Cash Flow Account**" shall have the meaning set forth in Section 6.7.1 hereof.

"**Excess Cash Flow Funds**" shall have the meaning set forth in Section 6.7.1 hereof.

"**Exchange Act**" shall have the meaning set forth in Section 9.2(a) hereof.

"**Exchange Act Filing**" shall mean a filing pursuant to the Exchange Act in connection with or relating to a Securitization.

"**Executive Order**" shall mean an Executive Order of the President of the United States of America.

"**Extraordinary Expense**" shall have the meaning set forth in Section 4.1.6(h) hereof.

"**Fiscal Year**" shall mean each twelve (12) month period commencing on January 1 and ending on December 31 during each year of the Term.

"**Fitch**" shall mean Fitch, Inc.

"**Flood Acts**" shall have the meaning set forth in Section 5.1(a)(viii)(C) hereof.

"**GAAP**" shall mean generally accepted accounting principles, consistently applied, in effect from time to time, as set forth in the opinions and pronouncements of the

10

Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the accounting profession), or in such other statements by such entity as may be in general use by significant segments of the U.S. accounting profession.

"**Government List**" shall mean, collectively, (i) the Specially Designated Nationals and Blocked Persons Lists maintained by OFAC, (ii) any other list of terrorists, terrorist organizations or narcotics traffickers maintained pursuant to any of the Rules and Regulations of OFAC, and (iii) any similar lists maintained by the United States Department of State, the United States Department of Commerce or any other Governmental Authority or pursuant to any Executive Order.

"**Governmental Authority**" shall mean any court, agency, board, bureau, commission, department, office or other authority of any nature whatsoever of any governmental unit (foreign, federal, state, county, district, municipal, city or otherwise) whether now or hereafter in existence.

"**Grantor Trust**" shall mean a grantor trust under Subpart E of Part 1 of Subchapter J of the Code.

"**Gross Rents**" shall mean an amount equal to annual base rental income reflected in a current rent roll for all Tenants (i) paying rent, (ii) open for business (unless, with respect to this clause (ii), such Tenant has a long term unsecured debt rating of not less than "BBB" by S&P, "BBB" by Fitch, or "Baa3" by Moody's) and (iii) in actual physical occupancy of their respective space demised pursuant to Leases which are in full force and effect, unless, in each case, such Tenant has accepted its leased premises and a free rent/gap rent period under such Lease has commenced and is continuing, so long as the amount of free rent/gap rent granted to such Tenant pursuant to such lease has been deposited into the Unfunded Obligations Account in accordance with the terms and conditions of Section 6.11 hereof.

"**Ground Lease**" shall mean that certain Sublease Agreement, by and between Ground Lessor, as landlord, and Borrower, as tenant, dated as of October 31, 1985, as assigned to Borrower, and as the same has been amended as set forth on Exhibit A, and as may be further amended, restated, supplemented or otherwise modified from time to time in accordance with the terms hereof.

"**Ground Lessor**" shall mean Union Station Redevelopment Corp., a District of Columbia nonprofit corporation, together with its successors and assigns.

"**Ground Rent**" shall mean any rent, additional rent or other charge payable by the tenant under the Ground Lease.

"**Ground Rent Account**" shall have the meaning set forth in Section 6.8.1 hereof.

"**Ground Rent Funds**" shall have the meaning set forth in Section 6.8.1 hereof.

"**Guarantor**" shall mean (a) Ashkenazy and/or (b) if the context requires, a Replacement Guarantor that has assumed all obligations of Guarantor under any Guaranty or Environmental Indemnity in accordance with the terms and conditions of this Agreement, the Recourse Guaranty and any other Loan Documents (or, as the case may be, has delivered one or more Replacement Recourse Documents in accordance with the terms and conditions hereof).

"**Guarantor Control Condition**" shall mean a condition which shall be deemed satisfied if Borrower is Controlled (under clause (c) of the definition of Control) (directly or indirectly) by one or more Guarantors.

"**Guaranty**" shall mean, individually or collectively as the context requires, the Recourse Guaranty or any other guaranty or indemnity (other than the Environmental Indemnity or any replacement thereof) provided by Guarantor to Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Hazardous Substances**" shall have the meaning set forth in the Environmental Indemnity.

"**Immediate Repairs**" shall have the meaning set forth in Section 4.1.11 hereof.

"**Improvements**" shall have the meaning set forth in the granting clause of the Security Instrument.

"**Indebtedness**" shall mean, for any Person, without duplication: (i) all indebtedness or liability of such Person (including, without limitation, for borrowed money, for amounts drawn under a letter of credit, or for deferred purchase price of property or services (including trade obligations) for which such Person or its assets is liable), (ii) all unfunded amounts under a loan agreement, letter of credit, or other credit facility for which such Person would be liable if such amounts were advanced thereunder, (iii) all amounts required to be paid by such Person pursuant to any agreement to purchase, to provide funds for payment, to supply funds, or to invest in any Person, (iv) all indebtedness or liabilities guaranteed by such Person, directly or indirectly, (v) all obligations under leases that constitute capital leases for which such Person is liable, (vi) all obligations of such Person under interest rate swaps, caps, floors, collars and other interest hedge agreements, in each case whether such Person is liable contingently or otherwise, as obligor, guarantor or otherwise, or in respect of which obligations such Person otherwise assures any other Person against loss, and (vii) any property-assessed clean energy loans or similar indebtedness, including, without limitation, if such loans or indebtedness are made or otherwise provided by any Governmental Authority and/or secured or repaid (directly or indirectly) by any taxes or similar assessments.

"**Indemnified Liabilities**" shall have the meaning set forth in Section 11.13(b) hereof.

"**Independent Manager**" shall mean an individual who has at least three (3) years of prior experience as an independent director, independent manager or independent member and who is provided by CT Corporation, Corporation Service Company, National Registered Agents, Inc., Wilmington Trust Company, Stewart Management Company, Lord

12

Securities Corporation or, if none of those companies is then providing professional Independent Managers, another nationally-recognized company reasonably approved by Lender, in each case that is not an Affiliate of Borrower and that provides professional Independent Managers and other corporate services in the ordinary course of its business, and which individual is duly appointed as an Independent Manager and is not, and has never been, and will not while serving as Independent Manager be, any of the following:

(a)     a member, partner, equity holder, manager, director, officer or employee of Borrower, Mezzanine Borrower, Subordinate Mezzanine Borrower, or any of their respective equity holders or Affiliates (other than as an Independent Manager or Special Member (as defined in Borrower's Operating Agreement) of Borrower or an Affiliate of Borrower that is not in the direct chain of ownership of Borrower and that is required by a creditor to be a single-purpose bankruptcy-remote entity, provided that such Independent Manager is employed by a company that routinely provides professional Independent Managers or managers in the ordinary course of its business);

(b)     a creditor, supplier or service provider (including provider of professional services) to Borrower, Mezzanine Borrower, Subordinate Mezzanine Borrower, or any of their equity holders or Affiliates (other than a nationally-recognized company that routinely provides professional Independent Managers and other corporate services to Borrower, Mezzanine Borrower, Subordinate Mezzanine Borrower, or any of their respective Affiliates in the ordinary course of their businesses);

(c)     a family member of any such member, partner, equity holder, manager, director, officer, employee, creditor, supplier or service provider; or

(d)     a Person that Controls any of (a), (b) or (c) above.

The same natural person may not serve as an Independent Manager of Borrower, Mezzanine Borrower, or Subordinate Mezzanine Borrower.

"**Information**" shall have the meaning set forth in Section 11.36(b)(ii) hereof.

"**Initial Notice**" shall have the meaning set forth in the definition of "Deemed Approval Requirements" in Section 1.1 hereof.

"**Insolvency Opinion**" shall mean, as the context may require, (i) that certain bankruptcy non-consolidation opinion letter, dated the Closing Date, rendered by O'Halloran Ryan PLLC in connection with the Loan or (ii) any other bankruptcy non-consolidation opinion delivered to Lender in connection with the Loan (including any bankruptcy non-consolidation opinion delivered to Lender subsequent to the closing of the Loan in accordance with the Loan Documents).

"**Insurance Account**" shall have the meaning set forth in Section 6.3.1 hereof.

"**Insurance Funds**" shall have the meaning set forth in Section 6.3.1 hereof.

13

"**Insurance Premiums**" shall have the meaning set forth in <u>Section 5.1(b)(vi)</u> hereof.

"**Insurance Proceeds**" shall mean the amount of all insurance proceeds paid under the Policies.

"**Intercreditor Agreement**" shall mean, individually or collectively, as the context requires, the Mezzanine Intercreditor Agreement and the Subordinate Mezzanine Intercreditor Agreement, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Interest Period**" shall mean, with respect to any Monthly Payment Date, the period beginning on (and including) the ninth (9th) day of each calendar month during the term of the Loan and ending on (and including) the eighth (8th) day of the succeeding calendar month; <u>provided</u>, <u>however</u>, that the initial Interest Period shall begin on (and include) the Closing Date and shall end on (and include) the eighth (8th) day of the calendar month succeeding the Closing Date.

"**Interest Rate**" shall mean 4.5147%.

"**IRS Code**" shall mean the Internal Revenue Code of 1986, as amended from time to time or any successor statute.

"**JLL Management Agreement**" shall mean that certain Master Retail Management Agreement dated as of June 5, 2007, by and between JLL and certain affiliates of Borrower, among others, as the same has been amended from time to time.

"**JLL**" shall mean Jones Lang LaSalle Americas, Inc., a Maryland corporation.

"**KTB**" shall mean Kookmin Bank Co., Ltd., as trustee of KTB CRE Debt Fund No. 8, a Korean investment trust.

"**Land**" shall have the meaning set forth in the granting clause of the Security Instrument.

"**Lease**" shall mean any lease, sublease, subsublease, letting, license (including, without limitation the New Tradition License Agreement), concession or other agreement (whether now or hereafter in effect) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of any space in the Property, and every modification, amendment or other agreement relating to such lease, sublease, subsublease, letting, license, concession or other agreement and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto; provided, however, notwithstanding anything to the contrary in the Security Instrument, for purposes of this Agreement, the term Lease shall exclude the Ground Lease and the Prime Lease.

14

"**Lease Termination Reserve Account**" shall have the meaning set forth in Section 6.5.1 hereof.

"**Lease Termination Funds**" shall have the meaning set forth in Section 6.5.1 hereof.

"**Legal Requirements**" shall mean all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees, demands and injunctions of Governmental Authorities affecting the Loan, any Secondary Market Transactions with respect to the Loan, Borrower, Guarantor or the Property or any part thereof or the ownership, construction, alteration, use, management or operation of the Property or any part thereof, whether now or hereafter enacted and in force, including, without limitation, zoning and land use laws and the Americans with Disabilities Act of 1990, and all permits, licenses and authorizations and regulations relating thereto.

"**Lender**" shall have the meaning set forth in the introductory paragraph hereto.

"**Lender Indemnitees**" shall mean (i) Lender and any designee of Lender, (ii) any Affiliate of Lender that has filed any registration statement relating to a Securitization or has acted as the sponsor or depositor in connection with such Securitization, (iii) any Affiliate of Lender that acts as an underwriter, placement agent or initial purchaser in connection with a Securitization, (iv) any other co-underwriters, co-placement agents or co-initial purchasers in connection with a Securitization, (v) each Person who controls (within the meaning of Section 15 of the Exchange Act) any Person described in any of the foregoing clauses, (vi) any Person who is or will have been involved in the origination of the Loan, (vii) any Person who is or will have been involved in the servicing of the Loan, (viii) any Person in whose name the Lien created by the Security Instrument and the other Loan Documents are or will be recorded or filed, (ix) any Person who may hold or acquire or will have held a full or partial interest in the Loan (including, but not limited to, investors or prospective investors in the Securities, as well as custodians, trustees and other fiduciaries who hold or have held a full or partial interest in the Loan evidenced for the benefit of third parties), (x) any Person who holds or acquires or will have held a participation or other full or partial interest in the Loan, whether during the Term or as a part of or following a foreclosure of the Loan, (xi) any successors by merger, consolidation or acquisition of all or a substantial portion of Lender's assets and business and (xii) the respective officers, directors, shareholders, partners, members, employees, agents, representatives, contractors, subcontractors, Affiliates, participants, successors and assigns of any Person described in any of the foregoing clauses.

"**Letter of Credit**" shall mean an irrevocable, unconditional, transferable (without payment of any transfer fee), clean sight draft letter of credit reasonably acceptable to Lender and, following a Securitization, acceptable to the Rating Agencies (either an evergreen letter of credit or one which does not expire until at least thirty (30) days after (i) the Stated Maturity Date or (ii) such earlier date as such Letter of Credit is no longer required pursuant to the terms of this Agreement and the other Loan Documents) in favor of Lender and entitling Lender to draw thereon in New York, New York based solely on a statement purportedly executed by an officer of Lender stating that it has the right to draw thereon, issued by a

15

domestic Eligible Institution or the U.S. agency or branch of a foreign Eligible Institution. If at any time the bank issuing any such Letter of Credit shall cease to be an Eligible Institution, Lender shall have the right immediately to draw down the same in full and hold the proceeds of such draw in accordance with the applicable provisions of this Agreement.

"**Lien**" shall mean any mortgage, deed of trust, deed to secure debt, indemnity deed of trust, lien (statutory or otherwise), pledge, hypothecation, assignment, security interest, easement, restrictive covenant, preference, or any other encumbrance, charge or transfer of, or any agreement to enter into or create any of the foregoing affecting all or any portion of the Property or any interest therein, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialman's and other similar liens and encumbrances.

"**Loan**" shall mean the loan in the original principal amount of Three Hundred Thirty Million and No/100 Dollars ($330,000,000.00) made by Lender to Borrower pursuant to this Agreement.

"**Loan Documents**" shall mean, collectively, this Agreement, the Note, the Security Instrument, the Assignment of Leases, the Guaranty, the Environmental Indemnity, the O&M Plan, the Assignment of Management Agreement, the Cash Management Agreement, the Clearing Account Agreement, the Post-Closing Agreement, and all other documents, agreements, certificates and instruments now or hereafter executed and/or delivered in connection with the Loan.

"**Loan-to-Value Ratio**" shall mean a ratio, as determined by Lender as of a particular date, in which: (i) the numerator is equal to the sum of the Outstanding Principal Balance, and (ii) the denominator is equal to the appraised value of the Property based on an Appraisal.

"**Major Lease**" shall mean any Lease which (i) either individually or when taken together with (A) any other Lease with the same Tenant and (B) any other Lease for contiguous space with an Affiliate of such Tenant, and assuming the exercise of all expansion rights exercisable prior to the Stated Maturity Date contained in such Lease or Leases, covers or is expected to cover more than (x) if for office use, twenty-five thousand (25,000) square feet at the Property or (y) if for any other use, ten thousand (10,000) square feet at the Property, (ii) either individually or when taken together with any other Lease with the same Tenant accounts for ten percent (10%) or more of the total gross income for the Property, (iii) contains an option or preferential right to purchase all or any portion of the Property, (iv) is with an Affiliate of Borrower, Guarantor or any Manager (but not including any management office demising space not in excess of one thousand (1,000) square feet) as Tenant, or (v) is entered into during the continuance of an Event of Default.

"**Management Agreement**" shall mean, collectively, (i) the JLL Management Agreement, or (ii) any other management agreement executed and delivered by Borrower in accordance with the terms and provisions hereof pursuant to which a Manager manages the

Property, <u>provided</u> that any such management agreement shall be a management agreement with a Qualified Manager and shall be in form and substance reasonably acceptable to Lender; provided, that, Lender, at its option following a Securitization, may require that Borrower shall have obtained a Rating Agency Confirmation from the Rating Agencies.

"<u>**Manager**</u>" shall mean (i) JLL or (ii) if the context requires, a Qualified Manager that manages the Property in accordance with the terms and provisions of this Agreement and the other Loan Documents pursuant to a Management Agreement or Replacement Management Agreement, as the case may be.

"<u>**Material Action**</u>" shall have the meaning set forth in <u>Section 3.1.24(s)</u>.

"<u>**Material Adverse Effect**</u>" shall mean any material adverse effect upon (i) the business operations, economic performance, assets, condition (financial or otherwise), equity, contingent liabilities, prospects, material agreements or results of operations of Borrower or the Property, (ii) the ability of Borrower or Guarantor to perform its obligations under any Loan Document to which it is a party or any Major Lease, the Ground Lease or the Prime Lease, (iii) the enforceability or validity of any Loan Document, the perfection or priority of any Lien created under any Loan Document or the rights, interests and remedies of Lender under any Loan Document or (iv) the value, use or operation of the Property or the cash flows from the Property.

"<u>**Material Agreements**</u>" shall mean (a) any agreement related to any renovation of the Property or any renovation impacting the Property, (b) each management, brokerage or leasing agreement (other than any Management Agreement) of a material nature, (c) any cleaning, maintenance, service or other contract or agreement of any kind (other than the Leases, the Prime Lease and the Ground Lease) of a material nature (materiality for purposes of this definition shall include, without limitation, any contract with a term longer than one year or any contract that is not cancelable on thirty (30) days' or less notice without the payment of any material termination fee or other material payments of any kind), in either case relating to the ownership, development, leasing, management, use, operation, maintenance, repair, improvement or restoration of the Property, whether written or oral, and (d) all material covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower (other than the Ground Lease and the Prime Lease), at any time in force affecting Borrower, Guarantor or the Property or any part thereof, including, without limitation, any which may (i) require material repairs, modifications or alterations in or to the Property or any part thereof or (ii) in any way materially limit the use and enjoyment thereof.

"<u>**Material Condemnation**</u>" shall mean a Condemnation (a) in which more than fifteen percent (15%) of the land constituting the Property is taken, (b) in which any land taken is located on any portion of the Property other than along the perimeter or periphery thereof, (c) in which any portion of the Improvements is taken, (d) the proffered Award for which, or the anticipated amount of any settlement or compromise of which, exceeds one percent (1%) of the original principal amount of the Loan, or (e) which results in the amount of parking at the Property not being in compliance with Legal Requirements, the REA and each Major Lease.

17

"**Maturity Date**" shall mean the date on which the final payment of principal of the Note becomes due and payable as therein or herein provided, whether at the Stated Maturity Date, by declaration of acceleration, or otherwise.

"**Maximum Legal Rate**" shall mean the maximum non-usurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the Indebtedness evidenced by the Note and as provided for herein or in the other Loan Documents, under the laws of such Governmental Authorities whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the Loan.

"**Mezzanine Borrower**" shall mean Union Station Sole Member LLC, a Delaware limited liability company, and its successors and/or assigns.

"**Mezzanine Debt Service**" shall mean "Debt Service" as defined in the Mezzanine Loan Documents.

"**Mezzanine Intercreditor Agreement**" shall mean that certain Intercreditor Agreement, dated as of the date hereof, among Lender and Mezzanine Lender, as such agreement may be amended, modified, replaced and/or otherwise changed from time to time, and which agreement (as the same may be modified, replaced, restated and/or otherwise changed from time to time) may be on such terms as Lender and Mezzanine Lender agree in their respective sole discretion.

"**Mezzanine Lender**" shall mean Kookmin Bank Co., Ltd., as trustee of KTB CRE Debt Fund No. 8, and its successors and/or assigns in such capacity.

"**Mezzanine Loan**" shall mean that certain loan made as of the date hereof by Mezzanine Lender to Mezzanine Borrower in the original principal amount of One Hundred Million and No/100 Dollars ($100,000,000.00).

"**Mezzanine Loan Agreement**" shall mean that certain Mezzanine Loan Agreement dated as of the date hereof by and between Mezzanine Borrower and Mezzanine Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the Intercreditor Agreement.

"**Mezzanine Loan Documents**" shall mean the documents evidencing or securing the Mezzanine Loan, as any of the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the Intercreditor Agreement.

"**Mezzanine Loan Event of Default**" shall mean an "Event of Default" as defined in the Mezzanine Loan Documents.

"**Mezzanine Reserve Funds**" shall mean any reserve or escrow fund established under the Mezzanine Loan.

"**Minimum Disbursement Amount**" shall mean Twenty-Five Thousand and No/100 Dollars ($25,000).

18

"**Monthly Capital Reserve Account Deposit**" shall have the meaning set forth in Section 6.9.1 hereof.

"**Monthly Debt Service Payment Amount**" shall mean, with respect to each Monthly Payment Date, a payment equal to the amount of interest which has accrued during the preceding Interest Period computed at the Interest Rate.

"**Monthly Delinquency Deposit**" shall mean the monthly amount due on the applicable Monthly Payment Date to pay any interest accruing at the Default Rate (without duplication with the Monthly Debt Service Payment Amount), late payment charges and any other amounts then due and payable under the Loan Documents.

"**Monthly Ground Rent Deposit**" shall have the meaning set forth in Section 6.8.1 hereof.

"**Monthly Insurance Deposit**" shall have the meaning set forth in Section 6.3.1 hereof.

"**Monthly Payment Date**" shall mean the ninth (9th) day of every calendar month occurring during the Term commencing with June 9, 2018.

"**Monthly Tax Deposit**" shall have the meaning set forth in Section 6.2.1 hereof.

"**Moody's**" shall mean Moody's Investors Service, Inc.

"**Mortgage Borrower**" shall have the meaning set forth in Section 11.30 hereof.

"**Mortgage Debt Service Coverage Ratio**" shall mean the ratio calculated by Lender on a monthly basis of (i) Underwritable Cash Flow to (ii) the aggregate amount of Debt Service for the twelve (12) month period immediately preceding the date of calculation; provided, that the foregoing shall be calculated by Lender (A) based upon the actual amount of debt service which would be due for such period, and (B) assuming that the Loan had been in place for the entirety of said period.

"**Mortgage Loan**" shall have the meaning set forth in Section 11.30 hereof.

"**Natixis**" shall have the meaning set forth in the preamble hereof.

"**Net Proceeds**" shall mean:  (i) the net amount of all Insurance Proceeds, after deduction of reasonable costs and expenses (including, but not limited to, reasonable attorneys' fees), if any, in collecting such Insurance Proceeds; provided that, for purposes of Section 5.3 hereof, "**Net Proceeds**" shall mean such net amount of Insurance Proceeds to the extent received by Lender pursuant to the Policies required under Sections 5.1(a)(i), (iv), (vi), (viii) and (ix) as a result of the applicable Casualty, or (ii) the net amount of the Award, after deduction of reasonable costs and expenses (including, but not limited to, reasonable attorneys' fees), if any, in collecting such Award.

19

"**Net Proceeds Deficiency**" shall have the meaning set forth in <u>Section 5.3.2(f)</u> hereof.

"**New Mezzanine Borrower**" shall have the meaning set forth in <u>Section 11.30</u> hereof.

"**New Mezzanine Lender**" shall have the meaning set forth in <u>Section 11.30</u> hereof.

"**New Mezzanine Loan**" shall have the meaning set forth in the <u>Section 11.30</u> hereof.

"**New Mezzanine Option**" shall have the meaning set forth in <u>Section 11.30</u> hereof.

"**New Tradition License Agreement**" shall mean that certain License Agreement, dated as of November 13, 2017, between Borrower, as licensor, and New Tradition Outdoor LLC, as licensee, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Non-Core Income**" shall mean, collectively, (i) De Minimis Income, and (ii) Sponsorship Income.

"**Note**" shall mean, individually and/or collectively, as the context may require (i) that certain Promissory Note A-1 of even date herewith in the principal amount of $205,000,000, made by Borrower in favor of Citi ("**Note A-1**"), as the same may be amended, restated, replaced, extended, renewed, supplemented, severed, split, or otherwise modified from time to time and (ii) that certain Promissory Note A-2 of even date herewith in the principal amount of $125,000,000, made by Borrower in favor of Natixis ("**Note A-2**"), as the same may be amended, restated, replaced, extended, renewed, supplemented, severed, split, or otherwise modified from time to time.

"**Note A-1**" shall have the meaning set forth in the definition of "Note" in <u>Section 1.1</u> hereof.

"**Note A-2**" shall have the meaning set forth in the definition of "Note" in <u>Section 1.1</u> hereof.

"**Notice**" shall have the meaning set forth in <u>Section 11.6</u> hereof.

"**O&M Plan**" shall mean that certain Asbestos Operations & Maintenance Plan, dated April 27, 2018 prepared by EBI Consulting, with respect to the Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Obligations**" shall mean, collectively, Borrower's obligations for the payment of the Debt and the performance of the Other Obligations.

20

"**OFAC**" shall mean the Office of Foreign Assets Control or, if the context requires, any successor Governmental Authority.

"**Officer's Certificate**" shall mean a certificate delivered to Lender by Borrower which is signed by an authorized officer of Borrower.

"**Open Prepayment Commencement Date**" shall mean the Monthly Payment Date occurring two (2) Monthly Payment Dates prior to the Stated Maturity Date.

"**Operating Agreement**" shall mean each of the REA and any other covenants, restrictions or agreements of record and of a material nature relating to the construction, operation or use of the Property.

"**Operating Expenses**" shall mean the total of all expenditures, computed in accordance with the Approved Accounting Method, of whatever kind relating to the operation, maintenance and management of the Property that are incurred on a regular monthly or other periodic basis, including without limitation, (and without duplication) (a) Ground Rent, utilities, ordinary repairs and maintenance (including amounts deposited into the Capital Reserve Account), insurance, license fees, property taxes and assessments, advertising expenses, payroll and related taxes, computer processing charges, management fees (which management fees shall be assumed in the event that Borrower is self-managing the Property in accordance with the terms and conditions of this Agreement) (equal to the greater of (x) $1,000,000 or (y) actual management fees payable under the Management Agreement), operational equipment or other lease payments as approved by Lender, but specifically excluding (i) depreciation, (ii) Debt Service, (iii) non-recurring expenses or Extraordinary Expenses, (iv) deposits into the Reserve Funds, any Mezzanine Reserve Funds, or any Subordinate Mezzanine Reserve Funds, (v) Mezzanine Debt Service, and (vi) Subordinate Mezzanine Debt Service; and (b) normalized tenant improvement and leasing commission expenditures equal to $685,000 per annum.

"**Operating Income**" shall mean all income, computed in accordance with the Approved Accounting Method, derived from the ownership and operation of the Property from whatever source, including, but not limited to common area maintenance, real estate tax recoveries (including any real estate taxes reimbursed by Ground Lessor), utility recoveries, other miscellaneous expense recoveries, percentage rent, rent concessions or credits, if any, parking income, signage income, income from kiosks and vending machines, and other miscellaneous income, but excluding Gross Rents, sales, use and occupancy or other taxes on receipts required to be accounted for by Borrower to any Governmental Authority, refunds and uncollectible accounts, sales of furniture, fixtures and equipment, interest income from any source other than the escrow accounts and/or reserve accounts required pursuant to this Agreement or the other Loan Documents, Insurance Proceeds (other than business interruption or other loss of income insurance), Awards, security deposits, utility and other similar deposits, income from Tenants not paying rent (provided, that, Operating Income shall include common area maintenance and real estate tax recoveries paid by a Tenant which is in a free rent period under such Tenant's Lease), non-recurring or extraordinary income (provided, however, Lender will include sponsorship revenue and experiential income in Operating Income), including, without limitation lease termination payments, and any disbursements to Borrower from the

21

Reserve Funds.  Operating Income shall not be diminished as a result of the Security Instrument or the creation of any intervening estate or interest in the Property or any part thereof.

"**Organizational Documents**" shall mean, as to any Person, the organizational or governing documents of such Person, including the certificate of incorporation and by-laws with respect to a corporation; the certificate of formation or organization and operating agreement with respect to a limited liability company; and the certificate of limited partnership and partnership agreement with respect to a limited partnership.

"**Other Charges**" shall mean all ground rents (other than the Ground Rent), maintenance charges, impositions (other than Taxes), and any other charges, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or imposed against the Property or any part thereof.

"**Other Obligations**" shall mean:  (i) all obligations of Borrower contained in this Agreement, the Note or any other Loan Document, and (ii) all obligations of Borrower contained in any renewal, extension, amendment, restatement, modification, consolidation, change of, or substitution or replacement for all or any part of this Agreement, the Note or any other Loan Document, excluding, in each case, Borrower's obligation for the payment of the Debt.

"**Outstanding Principal Balance**" shall mean, as of any date, the outstanding principal balance of the Loan.

"**Patriot Act**" shall mean, collectively, (i) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (USA PATRIOT ACT) of 2001, as the same was restored and amended by Uniting and Strengthening America by Fulfilling Rights and Ensuring Effective Discipline Over Monitoring Act (USA FREEDOM Act) of 2015, (ii) all statutes, orders, rules and regulations of the United States government and its various executive departments, agencies and offices related to applicable anti-money laundering laws, rules and regulations and (iii) any amendment, extension, replacement or other modification of any of the foregoing from time to time and any corresponding provisions of future laws.

"**Peg Balance**" shall mean an amount not to exceed Five Thousand and No/100 Dollars ($5,000.00).

"**Permitted Encumbrances**" shall mean, collectively, (i) the Liens and security interests created by the Loan Documents, (ii) all Liens, encumbrances and other matters expressly set forth on Schedule A or Schedule B of the Title Insurance Policy, (iii) Liens, if any, for Taxes or Other Charges imposed by any Governmental Authority not yet due or delinquent, (iv) such other title and survey exceptions as Lender has approved or may approve in writing in Lender's sole discretion (including those items shown on the Survey delivered by Borrower to Lender prior to the Closing Date), (v) Property Documents entered into in accordance with Section 8.4 hereof, (vi) rights of existing and future Tenants as tenants only pursuant to written Leases entered into in conformity with the provisions of the Loan Documents, (vii) mechanics', materialmen's or similar Liens, if any, and Liens for delinquent taxes or impositions, in each

case only if such Liens are being contested in accordance with the terms of the Loan Documents, or are discharged within sixty (60) days of their filing, and (viii) Liens with respect to Permitted Equipment Financing.

"**Permitted Equipment Financing**" shall mean the financing or leasing of equipment entered into by Borrower as lessee, in the ordinary course of business of owning and operating the Property and in compliance with the requirements of Section 3.1.24(e) hereof, which Liens shall encumber only the equipment that is the subject of such financing or lease.

"**Permitted Fund Manager**" shall mean any Person that on the date of determination is not subject to a case under the Bankruptcy Code or a Prohibited Person and is either (i) one of the entities listed on Schedule VI attached hereto or any other nationally-recognized manager of investment funds investing in debt or equity interests relating to commercial real estate, or (ii) an entity that is a Qualified Lender pursuant to clauses (vii)(A), (B), (C) or (D) of the definition thereof, in each case which are investing through a fund or funds with aggregate committed capital under management of at least $400,000,000.

"**Permitted Investments**" shall mean "permitted investments" as then defined and required by the Rating Agencies.

"**Permitted Release Date**" shall mean the third (3rd) anniversary of the Closing Date.

"**Permitted Transfer**" shall mean any of the following:  (i) any Lease of space in the Improvements to Tenants in accordance with the terms and provisions of Section 4.1.9 hereof, (ii) any Transfer permitted without Lender's prior consent in accordance with the terms and provisions of Section 8.3 hereof, and (iii) a pledge by Mezzanine Borrower or Subordinate Mezzanine Borrower of direct or indirect interests in Borrower and other collateral pursuant to the applicable Mezzanine Loan Documents and Subordinate Mezzanine Loan Documents in connection with the Mezzanine Loan or the Subordinate Mezzanine Loan, and a foreclosure or transfer in lieu of foreclosure of any such interest or collateral pursuant to any exercise of remedies under the applicable Mezzanine Loan Documents or Subordinate Mezzanine Loan Documents, in each case (with respect to each pledge, foreclosure or transfer in lieu) in accordance with the Intercreditor Agreement, this Agreement and the other Loan Documents.

"**Permitted Transferee**" shall mean (i) Guarantor, (ii) any trust directly or indirectly owned and Controlled by Guarantor for the benefit of Guarantor, Guarantor's spouse and/or Guarantor's children, (iii) an entity that is (x) any one of (a) a pension fund or plan that owns (1) at least $750,000,000 in real estate assets or (2) at least $750,000,000 in assets, provided that in the case of such pension fund or plan it is managed by an entity that controls at least $750,000,000 in real estate assets, (b) a pension fund or plan advisor that immediately prior to the transfer controls at least $750,000,000 in real estate assets and is acting on behalf of a party that satisfies clause (a) above, (c) a U.S. insurance company with a net worth of at least $250,000,000 and that controls at least $750,000,000 in real estate assets, (d) a U.S. banking corporation with combined capital and surplus of at least $250,000,000 and that controls at least $750,000,000 in real estate assets, (e) intentionally omitted, (f) any entity that owns or operates

23

comparable retail buildings in central business districts of major metropolitan markets in the United States totaling at least 3,000,000 square feet, has a net worth of at least $250,000,000 and controls at least $750,000,000 in real estate assets, or (g) any government entity or plan, real estate company or investment fund that has a net worth of at least $250,000,000 and that either controls at least $750,000,000 in real estate assets or is managed by an entity that controls at least $750,000,000 in real estate assets and (y) approved by Lender (the consent of the Lender shall not to be unreasonably withheld, conditioned or delayed).  Each of the thresholds contained in this definition shall be exclusive of the Property.

"**Person**" shall mean any individual, corporation, partnership, limited liability company, joint venture, estate, trust, unincorporated association, any other entity, any Governmental Authority and any fiduciary acting in such capacity on behalf of any of the foregoing.

"**Petty Cash**" shall have the meaning set forth in Section 2.7.1(b) hereof.

"**Policies**" or "**Policy**" shall have the meaning set forth in Section 5.1(b)(i) hereof.

"**PPI Index**" shall mean, as of any date, the most recent Producer Price Index (all Commodities) as published by the U.S. Department of Labor, Bureau of Labor Statistics, or any substitute index hereafter adopted by the U.S. Department of Labor.

"**Prepayment Date**" shall mean the date on which the Loan is prepaid in accordance with the terms hereof.

"**Prime Lease**" shall mean that certain Sublease Agreement, by and between Prime Lease Lessor, as landlord, and Ground Lessor, as tenant, dated as of October 31, 1985, as the same has been amended as set forth on Exhibit B and as may be further amended, restated, supplemented or otherwise modified from time to time in accordance with the terms hereof.

"**Prime Lease Lessor**" shall mean the United States of America, acting through the Federal Railroad Administrator, together with its successors and assigns.

"**Prime Rate**" shall mean the rate of interest published in The Wall Street Journal from time to time as the "**Prime Rate**."  If The Wall Street Journal ceases to publish the "**Prime Rate**," the Lender shall select an equivalent publication that publishes such "**Prime Rate**," and if such "**Prime Rates**" are no longer generally published or are limited, regulated or administered by a governmental or quasi-governmental body, then Lender shall select a comparable interest rate index.

"**Prohibited Entity**" means any Person which (i) is a statutory trust or similar Person, (ii) owns a direct or indirect interest in Borrower or the Property through a tenancy-in-common or other similar form of ownership interest and/or (iii) is a Crowdfunded Person.

"**Prohibited Person**" shall mean any Person:

24

(i)     listed in the Annex to, or is otherwise subject to the prohibitions of, Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism or any other similar prohibitions contained in the rules and regulations of OFAC or in any enabling legislation or other Executive Orders;

(ii)    that is owned or Controlled by, or acting for or on behalf of, any Person that is listed in the Annex to, or is otherwise subject to the prohibitions of, Executive Order No. 13224;

(iii)   with whom Lender is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering law, including Executive Order No. 13224;

(iv)    who commits, threatens, conspires to commit or supports "terrorism" as defined in Executive Order No. 13224;

(v)     that is named as a "specially designated national and blocked person" on the most current list published by OFAC at its official website or at any replacement website or other replacement official publication of such list;

(vi)    that is subject to trade restrictions under United States law, including, without limitation, the Patriot Act, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder;

(vii)   that is listed on any Government List; or

(viii)  who is an Affiliate of any Person that is described by or that satisfies any of clauses (i) through (vii) above.

"**Projections**" shall have the meaning set forth in Section 11.36 hereof.

"**Property**" shall mean the Land, the Improvements now or hereafter erected, situated or installed thereon and all personal property owned by Borrower and encumbered by the Security Instrument, together with all rights pertaining to such property (real and personal) and the Improvements, all as more particularly described in the granting clauses of the Security Instrument.

"**Property Documents**" shall have the meaning set forth in Section 8.4 hereof.

"**Property Expenses**" shall mean all costs and expenses incurred by or on behalf of Borrower in connection with the ownership, operation, development, use, alteration, repair,

25

improvement, leasing, maintenance and management of the Property, including without limitation, Taxes, Other Charges, Insurance Premiums and Ground Rent.

"**Qualified Lender**" shall mean (i) Citi, (ii) any affiliate of Citi, (iii) Natixis, (iv) any affiliate of Natixis, (v) KTB, (vi) any affiliate of KTB, or (vii) one or more of the following:

(A)     a real estate investment trust, bank, saving and loan association, investment bank, insurance company, trust company, commercial credit corporation, pension plan, pension fund or pension advisory firm, mutual fund, government entity or plan, provided that any such Person referred to in this clause (vii)(A) satisfies the Eligibility Requirements;

(B)     an investment company, money management firm or "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act or an institutional "accredited investor" within the meaning of Regulation D under the Securities Act, provided that any such Person referred to in this clause (vii)(B) satisfies the Eligibility Requirements;

(C)     an institution substantially similar to any of the foregoing entities described in clause (vii)(A), (vii)(B) or (vii)(E) that satisfies the Eligibility Requirements;

(D)     any entity Controlled by, Controlling or under common Control with any of the entities described in clause (vii)(A), (vii)(B) or (vii)(C) above or clause (vii)(E) below; or

(E)     an investment fund, limited liability company, limited partnership or general partnership where a Permitted Fund Manager acts as general partner, managing member or fund manager and at least fifty percent (50%) of the equity interests in such investment vehicle are owned, directly or indirectly, by one or more of the following: a Qualified Lender under clause (vii)(A), (vii)(B), (vii)(C) or (vii)(D) above, an institutional "accredited investor", within the meaning of Regulation D promulgated under the Securities Act, and/or a "qualified institutional buyer" or both within the meaning of Rule 144A promulgated under the Exchange Act, provided such institutional "accredited investors" or "qualified institutional buyers" that are used to satisfy the fifty percent (50%) test set forth above in this clause (vii)(E) satisfy the financial tests in clause (i) of the definition of Eligibility Requirements.

"**Qualified Manager**" shall mean (i) JLL, (ii) a management company that is an Affiliate of Borrower and is Controlled by Ashkenazy, or (iii) a reputable and experienced manager (which may be an Affiliate of Borrower) which, in the reasonable judgment of Lender, possesses experience in managing properties similar in location, size, class, use and operation of the Property (it being understood and agreed that any entity that owns or operates comparable retail buildings in central business districts of major metropolitan markets in the United States totaling at least 3,000,000 square feet shall be deemed to satisfy such experience requirement); provided, that, in each case, (a) following a Securitization, Borrower shall have obtained a Rating Agency Confirmation, (b) if such Person is an Affiliate of Borrower, a new bankruptcy non-consolidation opinion reasonably acceptable to Lender in its reasonable discretion and,

26

following a Securitization, acceptable to the Rating Agencies in their respective sole discretion, and (c) such Person's management of the Property must be permitted pursuant to the terms and provisions of the Ground Lease and the Prime Lease.

"**Radius**" shall have the meaning set forth in <u>Section 5.1(c)</u> hereof.

"**Rating Agencies**" shall mean, prior to the first Securitization of the Loan, each of S&P, Moody's, Fitch, Morningstar Credit Ratings, LLC and DBRS, or any other nationally-recognized statistical rating agency which has been designated by Lender and, after the first Securitization of the Loan, shall mean any of the foregoing that has rated any of the Securities.

"**Rating Agency Confirmation**" shall mean, collectively, a written affirmation from each of the Rating Agencies that the rating of the Securities (or any class thereof) by such Rating Agency immediately prior to the occurrence of the event with respect to which such Rating Agency Confirmation is sought will not be qualified, downgraded or withdrawn as a result of the occurrence of such event, which affirmation may be granted or withheld in such Rating Agency's sole and absolute discretion.  For the purposes of this Agreement and the other Loan Documents, if any Rating Agency shall waive, decline or refuse to review or otherwise engage any request for a Rating Agency Confirmation hereunder or under the other Loan Documents (hereinafter, a "**RA Consent**"), such RA Consent shall be deemed to eliminate, for such request only, the condition that a Rating Agency Confirmation by such Rating Agency (only) be obtained for purposes of this Agreement or the other Loan Documents, as applicable; provided, however, if Lender does not have a separate and independent approval right with respect to such event set forth herein or in the other Loan Documents, as applicable, then the term "**Rating Agency Confirmation**" shall be deemed instead to require the approval of Lender based on its good faith determination.  For purposes of clarity, any such waiver, declination or refusal to review or otherwise engage in any request for a Rating Agency Confirmation hereunder or under the other Loan Documents shall not be deemed a waiver, declination or refusal to review or otherwise engage in any subsequent request for a Rating Agency Confirmation hereunder or under the other Loan Documents, and the condition for Rating Agency Confirmation pursuant to this Agreement and the other Loan Documents for any subsequent request shall apply regardless of any previous waiver, declination or refusal to review or otherwise engage in such prior request.

"**REA**" shall mean, individually and/or collectively (as the context requires), any reciprocal easement, material easement agreement, or any other similar agreement affecting the Property (or any portion thereof) (if any), any amendment, restatement, replacement or other modification thereof, any future reciprocal easement or similar agreement affecting the Property (or any portion thereof) entered into in accordance with the applicable terms and conditions hereof and any amendment, restatement, replacement or other modification thereof.

"**Reconciliation Statement**" shall have the meaning set forth in <u>Section 2.7.2(c)</u> hereof.

"**Recourse Guaranty**" shall mean that certain Guaranty of Recourse Obligations, dated as of the Closing Date, executed by Guarantor in connection with the Loan for the benefit

of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Registration Statement**" shall have the meaning set forth in Section 9.2(b) hereof.

"**Regulation AB**" shall mean Regulation AB under the Securities Act and the Exchange Act, as such regulation may be amended from time to time.

"**REMIC Trust**" shall mean a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code that holds the Note or any interest therein.

"**Renewal Trigger Event**" shall have the meaning set forth in the definition of "Specified Tenant Trigger Period" in Section 1.1 hereof.

"**Rents**" shall mean all rents (including, without limitation, percentage rents and Non-Core Income), rent equivalents, moneys payable as damages (including payments by reason of the rejection of a Lease in a Bankruptcy Action) or in lieu of rent or rent equivalents, Termination Income Payments, royalties (including, without limitation, all oil and gas or other mineral royalties and bonuses), income, fees, receivables, receipts, revenues, deposits (including, without limitation, security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other payment and consideration of whatever form or nature received by or paid to or for the account of or the benefit of Borrower, any Manager or any of their respective agents or employees from any and all sources arising from or attributable to the Property, and all other receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of the Property or rendering of services by Borrower, any Manager or any of their respective agents or employees, and the Insurance Proceeds, if any, from business or rental interruption or other loss of income insurance, but only to the extent Lender elects to treat such Insurance Proceeds as business or rental interruption Insurance Proceeds in accordance with Section 5.2.3 hereof.

"**Replacement Clearing Account Agreement**" shall mean any clearing account agreement entered into by and among Borrower, Manager (if a Person other than Borrower), Lender and a Replacement Clearing Account Bank, provided that such clearing account agreement is in form and substance substantially similar to the Closing Date Clearing Account Agreement (with such changes, if applicable, as are necessary to reflect the fact that the Cash Management Account is not the same account as the Clearing Account) or is otherwise in form and substance reasonably acceptable to Lender.

"**Replacement Clearing Account Bank**" shall mean any Eligible Institution which maintains and holds the Clearing Account and either (a) assumes the obligations of Clearing Bank being replaced under the then-existing Clearing Account Agreement or (b) executes and delivers a Replacement Clearing Account Agreement.

"**Replacement Guarantor**" shall mean one or more substitute guarantors that each (i) has a net worth of not less than Five Hundred Million Dollars ($500,000,000) as

28

24427924.15

determined by Lender in its reasonable discretion and liquidity (including up to Five Million Dollars ($5,000,000.00) of availability under unrestricted lines of credit) of Twenty Million Dollars ($20,000,000) in each case, exclusive of the Property, (ii) is not a Prohibited Person, (iii) is not subject to a Bankruptcy Action and (iv) is otherwise reasonably acceptable to Lender.

"**Replacement Management Agreement**" shall mean, collectively, either (i) a management agreement with a Qualified Manager substantially in the same form and substance as the Management Agreement that it is replacing, or (ii) a management agreement with a Qualified Manager, which management agreement shall be in form and substance reasonably acceptable to Lender; provided, that, with respect to this clause (ii), Lender, at its option following a Securitization, may require that Borrower shall have obtained a Rating Agency Confirmation from the Rating Agencies, and an Assignment of Management Agreement.

"**Replacement Recourse Documents**" shall have the meaning set forth in Section 8.2(xv) hereof.

"**Reserve Accounts**" shall mean, collectively, the Tax Account, the Insurance Account, the Lease Termination Fee Reserve Account, the Ground Rent Account, the Unfunded Obligations Account, the Excess Cash Flow Account, and any other account holding escrow or reserve funds established by the Loan Documents.

"**Reserve Funds**" shall mean, collectively, the Tax Funds, the Insurance Funds, the Ground Rent Funds, the Lease Termination Funds, the Unfunded Obligations Funds, Excess Cash Flow Funds and any other escrow or reserve fund established by the Loan Documents.

"**Restoration**" shall mean the repair and restoration of the Property after a Casualty or Condemnation as nearly as possible to the condition the Property was in immediately prior to such Casualty or Condemnation, with any alterations as Borrower may make in accordance with the terms and conditions of Section 4.1.10 hereof.

"**Restoration Completion**" shall have the meaning set forth in Section 5.3.2(g) hereof.

"**Restoration Threshold**" shall mean five percent (5%) of the original principal amount of the Loan.

"**Restricted Party**" shall mean, collectively, (i) Borrower, Mezzanine Borrower, and Guarantor, and (ii) any shareholder, partner, member, non-member manager or any other direct or indirect legal or beneficial owner of, Borrower, Mezzanine Borrower, Guarantor or any non-member manager.

"**S&P**" shall mean Standard & Poor's Ratings Services.

"**Satisfactory Search Results**" shall mean the results of Lender's customary "know your customer", credit history check, litigation, lien, bankruptcy, judgment and other similar searches with respect to the applicable transferee and its applicable affiliates, in each case, (i) revealing no matters which would have a Material Adverse Effect and (ii) yielding

29

results which are otherwise acceptable to Lender in its reasonable discretion. Borrower shall pay all of Lender's costs, fees and expenses in connection with the foregoing and, notwithstanding the forgoing, no such search results shall constitute "Satisfactory Search Results" until such costs, fees and expenses are paid in full.

"**Scheduled Defeasance Payments**" shall have the meaning set forth in the definition of the term "Defeasance Collateral".

"**Secondary Market Transactions**" shall have the meaning set forth in Section 9.1(a) hereof.

"**Second Notice**" shall have the meaning set forth in the definition of "Deemed Approval Requirements" in Section 1.1 hereof.

"**Securities**" shall have the meaning set forth in Section 9.1(a) hereof.

"**Securities Act**" shall have the meaning set forth in Section 9.2(a) hereof.

"**Securitization**" shall have the meaning set forth in Section 9.1(a) hereof.

"**Securitization Indemnified Parties**" shall have the meaning set forth in Section 9.2(b) hereof.

"**Securitization Vehicle**" means each REMIC Trust or a Grantor Trust into which all or a portion of the Loan has been transferred.

"**Security Instrument**" shall mean that certain first-priority Leasehold Mortgage, Security Agreement, Assignment of Leases and Rents, Financing Statement and Fixture Filing, dated as of the Closing Date, executed and delivered by Borrower as security for the Loan and encumbering the Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Servicer**" shall have the meaning set forth in Section 11.24(a) hereof.

"**Servicing Agreement**" shall have the meaning set forth in Section 11.24(a) hereof.

"**Severed Loan Documents**" shall have the meaning set forth in Section 10.2(d) hereof.

"**SNDA**" shall have the meaning set forth in Section 4.1.9(f) hereof.

"**SPE Party**" shall have the meaning set forth in Section 3.1.24(n) hereof.

"**Special Purpose Entity**" shall mean a Person which (i) complies with the provisions of Section 3.1.24 or (ii) otherwise qualifies as a single-purpose, bankruptcy-remote entity under criteria established by the Rating Agencies.

"**Specified Tenant**" shall mean, as applicable, each of (i) Amtrak, together with any parent or affiliate thereof providing credit support or a guaranty under the related Specified Tenant Lease, or (ii) any other Tenant whose Lease either individually or when taken together with (A) any other Lease with the same Tenant and (B) any other Lease for contiguous space with an Affiliate of such Tenant, and assuming the exercise of all expansion rights exercisable prior to the Stated Maturity Date contained in such Lease or Leases, either individually or when taken together either (X) accounts for fifteen percent (15%) or more of the total rental income for the Property or (Y) demises fifteen percent (15%) or more of the total gross rentable square footage of the Property. As of the Closing Date, Amtrak is the only Specified Tenant.

"**Specified Tenant Cure Conditions**" shall mean each of the following, as applicable and in each case as confirmed by evidence reasonably satisfactory to Lender, (A) (i) the applicable Specified Tenant has cured all monetary or material non-monetary defaults under the applicable Specified Tenant Lease, (ii) with respect to a Vacancy Trigger Event, the affected Specified Tenant Space is leased and the applicable Specified Tenant is in actual, physical possession of, with respect to Amtrak, one hundred percent (100%), and, with respect to any other Specified Tenant, at least eighty percent (80%), of the applicable Specified Tenant Space, open to the public for business during customary hours and not "dark" (excluding "dark" periods for alterations and/or re-stocking, in each case in the ordinary course of business) with respect to Amtrak, in all or any portion of the Specified Tenant Space, and, with respect to any other Specified Tenant, in more than twenty percent (20%) of the applicable Specified Tenant Space (the "**Vacancy Trigger Cure**"), (iii) the applicable Specified Tenant has revoked or rescinded all termination or cancellation notices with respect to the applicable Specified Tenant Lease (as to all of the applicable Specified Tenant Space) and has re-affirmed the applicable Specified Tenant Lease as being in full force and effect or otherwise entered into a new Lease for such Specific Tenant Space in accordance with the terms hereof, (iv) with respect to any applicable bankruptcy or insolvency proceedings involving the applicable Specified Tenant and/or the applicable Specified Tenant Lease, the applicable Specified Tenant is no longer insolvent or subject to any bankruptcy or insolvency proceedings and has affirmed the applicable Specified Tenant Lease pursuant to final, non-appealable order of a court of competent jurisdiction, and (v) with respect to a Renewal Trigger Event, either (1) the applicable Specified Tenant has renewed the applicable Specified Tenant Lease prior to its then applicable lease expiration or (2) (X) the applicable Specified Tenant Space is leased to a new Tenant or Tenants pursuant to a Lease or Leases which, in each case, have a minimum term of five (5) years and is/are in full force and effect with no termination options (except for customary termination rights in connection with casualty and condemnation), (Y) the Tenant or Tenants under any such new Lease or Leases is/are in occupancy and paying full, unabated rent (unless any outstanding free rent with respect thereto has been reserved for in accordance with the following clause (Z)), and (Z) there are no outstanding Borrower obligations such as tenant improvement allowances or free rent outstanding with respect to such new Lease for the applicable Specified Tenant Space, or if there are such amounts outstanding, either (1) Borrower has deposited an amount equal to one hundred percent (100%) of any such amounts into the Unfunded Obligations Reserve to be held and disbursed in accordance with Section 6.11 hereof or (2) Lender has determined in its sole but reasonable discretion that sufficient funds are available to be disbursed to Borrower pursuant to Section 6.5 and Section 6.7 hereof to cover the amount of such Borrower obligations, and (B) in each case (i) through (v), the Tenant in the applicable Specified Tenant Space is paying full,

31

unabated rent under the applicable Specified Tenant Lease (unless in any case either (1) Borrower has deposited an amount equal to one hundred percent (100%) of any outstanding free rent amounts into the Unfunded Obligations Reserve to be held and disbursed in accordance with Section 6.11 hereof or (2) Lender has determined in its sole but reasonable discretion that sufficient funds are available to be disbursed to Borrower pursuant to Section 6.5 and Section 6.7 hereof to cover the amount of any outstanding free rent).

"**Specified Tenant Lease**" shall mean, collectively and/or individually (as the context requires), each Lease at the Property with Specified Tenant (including, without limitation, any guaranty or similar instrument furnished thereunder), as the same may have been or may hereafter be amended, restated, extended, renewed, replaced and/or otherwise modified. For the avoidance of doubt, with respect to each Lease at the Property with Amtrak, "Specified Tenant Lease" shall mean each of such Leases taken as one collective whole.

"**Specified Tenant Space**" shall mean that portion of the Property demised as of the date hereof to the initial Specified Tenant pursuant to the initial Specified Tenant Lease. References herein to "applicable portions" of the Specified Tenant Space (or words of similar import) shall be deemed to refer to the portion of the Specified Tenant Space demised pursuant to the applicable Specified Tenant Lease(s) entered into after the date hereof in accordance with the applicable terms and conditions hereof.  For the avoidance of doubt, with respect to portion of the Property demised to Amtrak, "Specified Tenant Space" shall mean the portion of the Property demised to Amtrak taken as one collective whole.

"**Specified Tenant Trigger Period**" shall mean a period (A) commencing upon the first to occur of (i) any Specified Tenant being in monetary (except for common area maintenance reimbursement disputes of sixty (60) days or less) or material non-monetary default under the applicable Specified Tenant Lease beyond applicable notice and cure periods, (ii) any Specified Tenant failing to be in actual, physical possession of, with respect to Amtrak, one hundred percent (100%), and, with respect to any other Specified Tenant, at least eighty percent (80%), of the applicable Specified Tenant Space and/or "going dark" (excluding "dark" periods for alterations and/or re-stocking, in each case in the ordinary course of business) with respect to Amtrak, in all or any portion of the applicable Specified Tenant Space and, with respect to any other Specified Tenant, in more than twenty percent (20%) of the applicable Specified Tenant Space (the "**Vacancy Trigger Event**"), (iii) any Specified Tenant giving notice that it is terminating its Lease, with respect to Amtrak, as to all or any portion of the applicable Specified Tenant Space, and, with respect to any other Specified Tenant, as to twenty percent (20%) or more of the applicable Specified Tenant Space (provided, that Borrower shall have the right to consult with Lender with respect to any termination notices provided by a Specified Tenant for which Borrower believes such notice is not a valid notice of termination), (iv) any termination or cancellation of any Specified Tenant Lease (including, without limitation, rejection in any bankruptcy or similar insolvency proceeding), with respect to Amtrak, as to all or any portion of the applicable Specified Tenant Space, and, with respect to any other Specified Tenant, as to twenty percent (20%) or more of the applicable Specified Tenant Space, and/or any Specified Tenant Lease failing to otherwise be in full force and effect, with respect to Amtrak, as to all or any portion of the applicable Specified Tenant Space, and, with respect to any other Specified Tenant, as to

32

twenty percent (20%) or more of the applicable Specified Tenant Space, (v) any bankruptcy or similar insolvency of any Specified Tenant; or (vi) any Specified Tenant failing to provide written notice to Borrower of its renewal of the applicable Specified Tenant Lease for the applicable Specified Tenant Space, prior to the earlier to occur of (X) one (1) year prior to its then current applicable lease expiration or (Y) the renewal notice period required under the applicable Specified Tenant Lease, in either case for a minimum renewal term of at least five (5) years (a "**Renewal Trigger Event**"); and (B) expiring upon Lender's receipt of evidence reasonably acceptable to Lender (which such evidence shall include, without limitation, a duly executed estoppel certificate from the applicable Specified Tenant in form and substance acceptable to Lender) of the satisfaction of the Specified Tenant Cure Conditions.

"**Sponsorship Income**" shall mean, collectively, certain Rents generated pursuant to multi-property sponsorship and advertising programs which are attributable to the Property.

"**Springing Recourse Event**" shall have the meaning set forth in Section 11.22 hereof.

"**State**" shall mean the State or Commonwealth in which the Property or any part thereof is located.

"**Stated Maturity Date**" shall mean May 9, 2028; provided, however, that, in the event Lender changes the Monthly Payment Date in accordance with this Agreement, the Stated Maturity Date shall also be deemed to have been changed such that the Stated Maturity Date and the Monthly Payment Date shall occur on the same calendar day and, if requested by Lender, Borrower shall promptly execute an amendment to this Agreement to evidence such change.

"**Subordinate Mezzanine Borrower**" shall have the meaning set forth in Section 8.6 hereof.

"**Subordinate Mezzanine Debt Service**" shall mean, with respect to any particular period of time, the aggregate amount of scheduled principal and interest payments due and payable under the Subordinate Mezzanine Loan Documents.

"**Subordinate Mezzanine Event of Default**" shall mean a default by Subordinate Mezzanine Borrower under any Subordinate Mezzanine Loan Document beyond any applicable notice and cure period.

"**Subordinate Mezzanine Intercreditor Agreement**" shall have the meaning set forth in Section 8.6(g) hereof.

"**Subordinate Mezzanine Lender**" shall have the meaning set forth in Section 8.6(f) hereof.

"**Subordinate Mezzanine Loan**" shall have the meaning set forth in Section 8.6 hereof.

33

"**Subordinate Mezzanine Loan Documents**" shall have the meaning set forth in Section 8.6(b) hereof.

"**Subordinate Mezzanine Loan Event of Default**" shall mean an "Event of Default" as defined in the Subordinate Mezzanine Loan Documents.

"**Subordinate Mezzanine Reserve Funds**" shall mean any reserve or escrow fund established under the Subordinate Mezzanine Loan.

"**Successor Borrower**" shall have the meaning set forth in Section 2.5.3 hereof.

"**Survey**" shall mean a current land survey for the Property, certified to the title insurance company and Lender and its successors and assigns, in form and substance satisfactory to Lender and prepared by a professional and properly licensed land surveyor satisfactory to Lender in accordance with the most current Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys together with the surveyor's seal affixed to the Survey and a certification from the surveyor in form and substance acceptable to Lender.

"**Syndication**" shall have the meaning set forth in Section 11.36 hereof.

"**Tax Account**" shall have the meaning set forth in Section 6.2.1 hereof.

"**Tax Funds**" shall have the meaning set forth in Section 6.2.1 hereof.

"**Taxes**" shall mean all real estate and personal property taxes, assessments, water rates or sewer rents, payments to Governmental Authorities in lieu of taxes, now or hereafter levied or assessed or imposed against the Property or any part thereof, together with all interest and penalties thereon.

"**Tenant**" shall mean any Person obligated by contract or otherwise to pay monies (including a percentage of gross income, revenue or profits) under any Lease now or hereafter affecting all or any part of the Property.

"**Tenant Estoppel**" shall mean each estoppel certificate from a Tenant in connection with the Loan delivered to Lender on or prior to the Closing Date.

"**Term**" shall mean the term of the Loan.

"**Termination Income Payments**" shall have the meaning set forth in Section 6.5.1 hereof.

"**Title Insurance Policy**" shall mean an ALTA mortgagee title insurance policy in the form acceptable to Lender (or, if the Property is in a State which does not permit the issuance of such ALTA policy, such form as shall be permitted in such State and acceptable to Lender) issued with respect to the Property and insuring the lien of the Security Instrument, together with such endorsements and affirmative coverages as Lender may require.

34

"**Trade Debt**" shall have the meaning set forth in <u>Section 3.1.24(e)</u> hereof.

"**Trade Debt Threshold Amount**" shall mean an amount not to exceed two percent (2%) of the outstanding principal balance of the Loan.

"**Transfer**" shall have the meaning set forth in <u>Section 8.1(a)</u> hereof.

"**Transferee**" shall have the meaning set forth in <u>Section 8.2(a)(iii)</u> hereof

"**Transferee's SPE Constituent Entity**" shall mean, with respect to any Transferee, the entity that qualifies as a single purpose, bankruptcy remote entity under criteria established by the Rating Agencies that is (i) the general partner of such Transferee, if such Transferee is a limited partnership, or (ii) the managing member of such Transferee, if such Transferee is a multi-member limited liability company.

"**Transferee's Sponsors**" shall mean, with respect to any Transferee, such Transferee's shareholders, general partners or managing members that, directly or indirectly, (i) own fifty percent (50%) or more of the legal, beneficial and economic interests in such Transferee and (ii) are in Control of such Transferee.

"**Treasury Note Rate**" shall mean, at the time of the prepayment, as applicable, the rate of interest per annum equal to the yield to maturity (converted by Lender to the equivalent monthly yield using Lender's then system of conversion) of the United States Treasury obligations selected by the holder of the Note having maturity dates closest to, but not exceeding, the remaining term to the Stated Maturity Date.

"**Trigger Period**" shall mean a period (A) commencing upon the earliest of (i) the occurrence and continuance of an Event of Default, the occurrence of an Mezzanine Loan Event of Default (Lender's receipt of written notice from the Mezzanine Lender shall be conclusive evidence that a Mezzanine Loan Event of Default has occurred) or the occurrence of a Subordinate Mezzanine Loan Event of Default (Lender's receipt of written notice from the Subordinate Mezzanine Lender shall be conclusive evidence that a Subordinate Mezzanine Loan Event of Default has occurred), (ii) the Aggregate Debt Service Coverage Ratio being less than 1.20 to 1.00, (iii) the Mortgage Debt Service Coverage Ratio being less than 1.67 to 1.00, or (iv) the occurrence of Specified Tenant Trigger Period; and (B) expiring upon (w) with regard to any Trigger Period commenced in connection with clause (i) above, the cure (if applicable) of such Event of Default, Mezzanine Loan Event of Default (Lender's receipt of written notice from the Mezzanine Lender shall be conclusive evidence that a Mezzanine Loan Event of Default has been cured), or Subordinate Mezzanine Loan Event of Default (Lender's receipt of written notice from the Subordinate Mezzanine Lender shall be conclusive evidence that a Subordinate Mezzanine Loan Event of Default has been cured), (x) with regard to any Trigger Period commenced in connection with clause (ii) above, the date that the Aggregate Debt Service Coverage Ratio is equal to or greater than 1.25 to 1.00 for two (2) consecutive calendar quarters, (y) with regard to any Trigger Period commenced in connection with clause (iii) above, the date that the Mortgage Debt Service Coverage Ratio is equal to or greater than 1.74 to 1.00 for two (2) consecutive calendar quarters or (z) with regard to any Trigger Period commenced in connection with clause (iv) above, a Specified Tenant Trigger Period ceasing to exist in

35

accordance with the terms hereof.  Notwithstanding the foregoing, a Trigger Period shall not be deemed to expire in the event that a Trigger Period then exists for any other reason.

"**TRIPRA**" shall have the meaning set forth in Section 5.1(a)(ix) hereof.

"**Trustee**" shall mean any trustee of a Securitization Vehicle.

"**UCC**" or "**Uniform Commercial Code**" shall mean the Uniform Commercial Code as in effect in the State or, if the context requires, in the State of Delaware.

"**Underwritable Cash Flow**" shall mean an amount calculated by Lender on a monthly basis equal to the sum of Gross Rents plus the trailing twelve (12) months Operating Income, less the trailing twelve (12) months Operating Expenses, each of which shall be subject to Lender's application of the Cash Flow Adjustments.  Lender's calculation of Underwritable Cash Flow (including determination of items that do not qualify as Operating Income or Operating Expenses) shall be calculated by Lender in good faith based upon Lender's determination of Rating Agency criteria and shall be final absent manifest error.

"**Updated Information**" shall have the meaning set forth in Section 9.1(a)(i) hereof.

"**Unfunded Free/Gap Rent Amounts**" those certain unfunded obligations to third parties designated as "Free Rent " and "Gap Rent" on Schedule V attached hereto.

"**Unfunded Obligations**" shall mean, collectively, the Unfunded TI/LC Amounts, and the Unfunded Free/Gap Rent Amounts, incurred prior to the date hereof and set forth on Schedule V attached hereto.

"**Unfunded Obligations Funds**" shall have the meaning set forth in Section 6.11.1 hereof.

"**Unfunded Obligations Account**" shall have the meaning set forth in Section 6.11.1 hereof.

"**Unfunded TI/LC Amounts**" those certain unfunded obligations to third parties designated as "Outstanding Landlord TI Obligations/Credits" on Schedule V attached hereto.

"**U.S. Bankruptcy Code**" shall mean Title 11 of the United States Code entitled "**Bankruptcy**", as amended from time to time, and any successor statute or statutes and all rules and regulations from time to time promulgated thereunder.

"**U.S. Obligations**" shall mean (i) direct full faith and credit obligations of the United States of America that are not subject to prepayment, call or early redemption or (ii) to the extent acceptable to the Rating Agencies, other "government securities" within the meaning of Section 2(a)(16) of the Investment Company Act of 1940, as amended.

"**Vacancy Trigger Event**" shall have the meaning set forth in the definition of "Specified Tenant Trigger Period" in Section 1.1 hereof.

"**Vacancy Trigger Cure**" shall have the meaning set forth in the definition of "Specified Tenant Cure Period" in Section 1.1 hereof.

"**Vacancy Trigger Period**" shall mean a period commencing upon the occurrence of a Vacancy Trigger Event and expiring upon the occurrence of a Vacancy Trigger Cure, so long as no other Trigger Period has occurred and is continuing at any time during such Vacancy Trigger Period.

"**Work Threshold**" shall mean Three Hundred Thousand and No/100 Dollars ($300,000.00).

"**Write-Down and Conversion Powers**" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

"**Yield Maintenance Premium**" shall mean an amount equal to the excess, if any, of (a) the present value (determined using a discount rate equal to the Treasury Note Rate at such time) of all scheduled payments of principal and interest payable in respect of the principal amount of the Loan being prepaid through the Open Prepayment Commencement Date over (b) the principal amount of the Loan being prepaid.

**Section 1.2.**   Principles of Construction.   All references to sections and schedules are to sections and schedules in or to this Agreement unless otherwise specified.  All uses of the word "including" shall mean "including, without limitation," unless the context shall indicate otherwise.  Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.

## II.    THE LOAN

**Section 2.1.**   The Loan.

2.1.1.   Agreement to Lend and Borrow.   Subject to and upon the terms and conditions set forth herein, Lender shall make the Loan to Borrower and Borrower shall accept the Loan from Lender on the Closing Date.

2.1.2.   Single Disbursement to Borrower.   Borrower shall receive only one (1) borrowing hereunder in respect of the Loan and any amount borrowed and repaid hereunder in respect of the Loan may not be reborrowed.

2.1.3.  <u>The Note</u>.  The Loan shall be evidenced by the Note and shall be repaid in accordance with the terms of this Agreement and the Note.

2.1.4.  <u>Use of Proceeds</u>.  Borrower shall use the proceeds of the Loan to (a) payoff any existing loans secured by the Property, (b) deposit the Reserve Funds, if any, (c) pay costs and expenses incurred in connection with the closing of the Loan, as approved by Lender, (d) fund any working capital requirements of the Property, as approved by Lender, and (e) after payment of the amounts specified in clauses (a) through (d) above, distribute to Borrower's principals in such amounts as determined by Borrower.

**Section 2.2.**   <u>Interest Rate</u>.

2.2.1.  <u>Interest Rate</u>.  Interest on the Outstanding Principal Balance shall accrue and be payable from the Closing Date up to and including the end of the last Interest Period related to the Maturity Date at the Interest Rate.

2.2.2.  <u>Default Rate</u>.  In the event that, and for so long as, any Event of Default has occurred and remains outstanding, the Outstanding Principal Balance and, to the extent permitted by law, overdue interest in respect of the Loan, shall accrue interest at the Default Rate, calculated from the date such payment was due without regard to any grace or cure periods contained herein.

2.2.3.  <u>Interest Calculation</u>.  Interest on the Outstanding Principal Balance shall be calculated by multiplying (a) the actual number of days in the period for which the calculation is being made by (b) a daily rate based on a three hundred sixty (360) day year (that is, the Interest Rate or the Default Rate, as then applicable, expressed as an annual rate divided by 360) by (c) the Outstanding Principal Balance.

2.2.4.  <u>Usury Savings</u>.  This Agreement and the other Loan Documents are subject to the express condition that at no time shall Borrower be required or obligated to pay interest on the principal balance of the Loan at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate.  If by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of the Maximum Legal Rate, the Interest Rate or the Default Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal (without penalty or premium) and not on account of the interest due hereunder.  All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the sums due under the Loan shall, to the extent permitted by the applicable Legal Requirements, be amortized, prorated, allocated, and spread throughout the full stated Term until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

2.2.5.  <u>EEA Financial Institutions</u>.  Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any of the following Persons, Borrower, each Restricted Party and Lender acknowledge that any liability of

any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by (i) the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and (ii) the effects of any Bail-In Action on any such liability, including, if applicable (A) a reduction in full or in part or cancellation of any such liability; (B) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; and/or (C) the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

**Section 2.3.**   <u>Loan Payments</u>.

2.3.1.   <u>Payment Before Maturity Date</u>.  Borrower shall make a payment to Lender of interest only on the Closing Date for the initial Interest Period.  Borrower shall make a payment to Lender equal to the Monthly Debt Service Payment Amount on the Monthly Payment Date occurring in June, 2018, and on each Monthly Payment Date thereafter to and including the Maturity Date.

2.3.2.   <u>Application of Payments to Note A-1 and Note A-2</u>.  Without limiting the restrictions on prepayment set forth in <u>Section 2.4</u> hereof, so long as no Event of Default has occurred and is then continuing, each payment hereunder shall be applied to Note A-1 and Note A-2 on a *pro rata* and *pari passu* basis based on the relative principal balance of each of Note A-1 and Note A-2.  Any payment received by Lender during the continuance of an Event of Default, shall be applied to the Debt in such order and priority as may be determined by Lender in its sole discretion.

2.3.3.   <u>Payment on Maturity Date</u>.  Borrower shall pay to Lender on the Maturity Date the Outstanding Principal Balance, all interest which has accrued or would accrue through and including the last day of the Interest Period related to the Maturity Date and all other amounts due hereunder and under the Note and the other Loan Documents.

2.3.4.   <u>Late Payment Charge</u>.  If any principal, interest or any other sum due under the Loan Documents (except the Outstanding Principal Balance due and payable on the Stated Maturity Date or such earlier date by reason of an Event of Default for which the Loan has been accelerated) is not paid by Borrower on or before the expiration of any applicable grace or cure period, Borrower shall pay to Lender upon demand a one-time charge in an amount equal to the lesser of (a) five percent (5%) of such unpaid sum or (b) the maximum amount permitted by applicable law in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment.  Any such amount shall be secured by the Security Instrument and the other Loan Documents to the extent permitted by applicable law.  Notwithstanding the foregoing, no late payment charge shall be applicable to any payments with respect to which interest is accruing at

the Default Rate, <u>provided</u> that to the extent Borrower fails to pay any late payment charge when due, the unpaid amount of such late payment charge shall accrue interest at the Default Rate.

### 2.3.5. <u>Method and Place of Payment</u>.

(a)     Except as otherwise specifically provided herein, all payments and prepayments under this Agreement, the Note and the other Loan Documents shall be made to Lender not later than 3:00 P.M., New York City time, on the date when due and shall be made in lawful money of the United States of America in immediately available funds at Lender's office or as otherwise directed by Lender, and any funds received by Lender after such time shall, for all purposes hereof, be deemed to have been paid on the next succeeding Business Day. Notwithstanding the foregoing, the payment made to Lender upon maturity of the Loan shall be made not later than 3:00 P.M. CST.

(b)     Whenever any payment to be made hereunder or under any other Loan Document shall be stated to be due on a day which is not a Business Day, the due date thereof shall be deemed to be the immediately succeeding Business Day (notwithstanding such adjustment of due dates, Borrower shall not be entitled to any deduction of interest due under this Agreement, the Note or any of the other Loan Documents).

(c)     All payments required to be made by Borrower hereunder or under the Note or the other Loan Documents shall be made irrespective of, and without deduction for, any setoff, claim or counterclaim and shall be made irrespective of any defense thereto.

### Section 2.4.    <u>Prepayments</u>.

2.4.1. <u>Voluntary Prepayments</u>.  Except as otherwise provided herein, Borrower shall not have the right to prepay the Loan in whole or in part.  Subject to <u>Sections 2.4.2</u> and <u>2.4.3</u> hereof, on and after the Open Prepayment Commencement Date, Borrower may, at its option, prepay the Debt in whole (but not in part) on any Business Day upon not less than seven (7) Business Days' prior notice to Lender (which notice shall specify the proposed Prepayment Date).  Any prepayment received by Lender shall be accompanied by (a) following a Securitization, all interest which would have accrued on the principal amount of the Loan to be prepaid through and including the last day of the Interest Period related to the Monthly Payment Date next occurring following the date of such prepayment (or, if such prepayment occurs on a Monthly Payment Date, through and including the last day of the Interest Period related to such Monthly Payment Date) and (b) all other sums due and payable under this Agreement, the Note, and the other Loan Documents, <u>provided</u>, <u>however</u>, that no prepayment premium of any kind shall be due in connection with a permitted prepayment made pursuant to this <u>Section 2.4.1</u> (Borrower acknowledging that the foregoing shall not relieve Borrower of its obligation to pay any other amount expressly due under the Loan Documents in connection with such prepayment).  If a notice of prepayment is given by Borrower to Lender pursuant to this <u>Section 2.4.1</u> and such notice is rescinded by Borrower on or prior to the proposed Prepayment Date, Borrower shall promptly pay all of Lender's actual out-of-pocket customary and reasonable costs and expenses incurred in connection with such rescinded prepayment. Borrower hereby acknowledges and agrees that Lender's acceptance of a prepayment, whether or

not such prepayment is later rescinded by Borrower, does not operate as or constitute a waiver of the provisions of this Section 2.4 with respect to any future prepayments of the Loan.

2.4.2.  Mandatory Prepayments.  On each date on which Lender actually receives any Net Proceeds, and if Lender is not obligated to and elects not to make such Net Proceeds available to Borrower for a Restoration in accordance with this Agreement, Borrower shall, at Lender's option, by Lender's application of such Net Proceeds, prepay all or a portion of the Debt in an amount equal to one hundred percent (100%) of such Net Proceeds; provided that, if an Event of Default has occurred and remains outstanding, Lender may apply such Net Proceeds to the payment of the Debt in any order, proportion and priority as Lender may determine in its sole and absolute discretion.  Any prepayment received by Lender in accordance with this Section 2.4.2 shall be (a) accompanied by (i) following a Securitization, all interest which would have accrued on the principal amount of the Loan to be prepaid through and including the last day of the Interest Period related to the Monthly Payment Date next occurring following the date of such prepayment (or, if such prepayment occurs on a Monthly Payment Date, through and including the last day of the Interest Period related to such Monthly Payment Date) and (ii) all other sums due and payable under this Agreement, the Note, and the other Loan Documents and (b) subject to Section 2.4.3 hereof, provided, however, that no prepayment premium of any kind shall be due in connection with a prepayment made pursuant to this Section 2.4.2 (Borrower acknowledging that the foregoing shall not relieve Borrower of its obligation to pay any other amount expressly due under the Loan Documents in connection with such prepayment).

2.4.3.  Prepayments After Default.  If, during the continuance of any Event of Default, prepayment of all or any part of the Debt is tendered by Borrower (which tender Lender may reject to the extent permitted by the applicable Legal Requirements), a purchaser at foreclosure or any other Person, Borrower, such purchaser at foreclosure or other Person shall pay, in addition to the principal amount of the Loan to be prepaid, (a) an amount equal to the Yield Maintenance Premium, (b) all interest which would have accrued on the principal amount of the Loan to be prepaid through and including the last day of the Interest Period related to the Monthly Payment Date next occurring following the date of such prepayment (or, if such prepayment occurs on a Monthly Payment Date, through and including the last day of the Interest Period related to such Monthly Payment Date), and (c) all other sums due and payable under the Loan Documents.

**Section 2.5.**   Defeasance.

2.5.1.  Conditions to Defeasance.  So long as no Event of Default has occurred and remains outstanding, Borrower shall have the right at any time after the earlier of the Defeasance Expiration Date and the Permitted Release Date and prior to the Open Prepayment Commencement Date to voluntarily defease the entire Loan and obtain a release of the Lien of the Security Instrument (a "**Defeasance Event**"), subject to the satisfaction of the following conditions precedent:

(a)      Borrower shall provide Lender not less than thirty (30) days' prior notice (or such shorter period of time if permitted by Lender in its sole discretion) specifying a Business Day (the "**Defeasance Date**") on which the Defeasance Event is to occur;

41

(b)     Borrower shall pay to Lender (i) the Monthly Debt Service Payment Amount due on the Defeasance Date and (ii) all other sums due and payable under this Agreement, the Note and the other Loan Documents;

(c)     Borrower shall deposit the applicable Defeasance Collateral into the Defeasance Collateral Account and otherwise comply with the provisions of Sections 2.5.2 and 2.5.3 hereof;

(d)     Intentionally Omitted;

(e)     Borrower shall execute and deliver to Lender a Defeasance Security Agreement in respect of the Defeasance Collateral Account and the Defeasance Collateral;

(f)     Borrower shall deliver to Lender an opinion of counsel for Borrower that is standard in commercial lending transactions and subject only to customary qualifications, assumptions and exceptions opining, among other things, that (i) Borrower has legally and validly transferred and assigned the Defeasance Collateral and all rights and obligations under the Note to Successor Borrower, (ii) Lender has a legal and valid perfected first-priority security interest in the Defeasance Collateral Account and the Defeasance Collateral, (iii) if a Securitization has occurred, the Securitization Vehicle formed in connection with such Securitization will not fail to maintain its status as a Securitization Vehicle as a result of the Defeasance Event, (iv) the Defeasance Event will not result in a deemed exchange for purposes of the Code and will not adversely affect the status of the Note as indebtedness for federal income tax purposes, and (v) the delivery of the Defeasance Collateral and the grant of a security interest in the Defeasance Collateral Account and the Defeasance Collateral to Lender shall not constitute an avoidable preference under Section 547 of the U.S. Bankruptcy Code or any other Bankruptcy Law;

(g)     If required by the Rating Agencies following a Securitization, Borrower shall deliver to Lender a bankruptcy non-consolidation opinion with respect to Successor Borrower reasonably acceptable to Lender and acceptable to the Rating Agencies in their sole discretion;

(h)     Following a Securitization, Borrower shall deliver to Lender a Rating Agency Confirmation as to the Defeasance Event;

(i)     Borrower shall deliver a certificate of a "big four" or other nationally recognized public accounting firm acceptable to Lender certifying that the Defeasance Collateral will generate amounts equal to or greater than the applicable Scheduled Defeasance Payment on or prior to each corresponding Monthly Payment Date or other scheduled payment date.  The public accounting firms of Grant Thorton, Shanholt, Glassman, Klein, Kramer & Co., and Berdon LLP are preapproved by Lender for such purpose; provided, however, that such preapproval may be revoked by Lender if Lender has a reasonable basis for such revocation;

(j)     Borrower shall deliver such other certificates, opinions, documents and instruments as Lender may reasonably request;

42

(k)     Borrower shall deliver an Officer's Certificate certifying that the requirements set forth in this <u>Section 2.5</u> have been satisfied; and

(l)     Borrower shall pay all reasonable out-of-pocket costs and expenses incurred by Lender in connection with the Defeasance Event or otherwise required to accomplish the agreements set forth in this <u>Section 2.5</u> hereof, including (i) reasonable attorneys' fees and expenses, (ii) the fees and reasonable out-of-pocket costs and expenses of the Rating Agencies, (iii) any revenue, documentary stamp or intangible taxes or any other tax or charge due in connection with the transfer of the Note, and (iv) the reasonable out-of-pocket costs and expenses of Servicer and any Trustee.   Simultaneously with the notice described in <u>Section 2.5.1(a)</u> above, Borrower shall deliver to Lender an amount reasonably determined by Lender to be sufficient to pay such fees, costs and expenses, which amount may be used by Lender to pay such fees, costs and expenses if a proposed Defeasance Event does not occur.

2.5.2.   <u>Defeasance Collateral Account</u>.   On or before the date on which Borrower delivers the Defeasance Collateral, Borrower shall open at an Eligible Institution the defeasance collateral account (the "**<u>Defeasance Collateral Account</u>**") which shall at all times be an Eligible Account.   Each of the U.S. Obligations that constitutes a part of the Defeasance Collateral shall be duly endorsed by the holder thereof as directed by Lender or accompanied by a written instrument of transfer in form and substance that would be satisfactory to a prudent lender (including, without limitation, such instruments as may be required by the Eligible Institution at which the Defeasance Collateral Account is to be maintained to effectuate book-entry transfers and pledges through the book-entry facilities of such Eligible Institution) in order to perfect, upon the delivery of the Defeasance Collateral, a first-priority security interest therein in favor of Lender in conformity with all applicable Legal Requirements governing the granting of such security interest.   The Defeasance Collateral Account shall contain only (a) the Defeasance Collateral and (b) cash from principal and interest paid on the Defeasance Collateral or other cash proceeds thereof.   Pursuant to the Defeasance Security Agreement or other appropriate agreement or instrument, Borrower or Successor Borrower, as applicable, shall authorize and direct that all payments received from and all proceeds of the Defeasance Collateral be made or paid directly to the Cash Management Account (unless otherwise directed by Lender) and applied to satisfy the Debt Service and, if applicable, other payment Obligations of Borrower under the Note.   Borrower or Successor Borrower, as applicable, shall be the owner of the Defeasance Collateral Account and shall report all income accrued on the Defeasance Collateral for federal, state and local income tax purposes in its income tax return.   Borrower or Successor Borrower, as applicable, shall prepay all fees, costs and expenses associated with opening and maintaining the Defeasance Collateral Account.   Lender shall not in any way be liable by reason of any insufficiency in the Defeasance Collateral Account.   Upon payment in full of the Debt, any Defeasance Collateral and cash from principal and interest paid on the Defeasance Collateral or other cash proceeds thereof thereafter remaining in the Defeasance Collateral Account shall be paid to or at the direction of Borrower.

2.5.3.   <u>Successor Borrower</u>.   In connection with a Defeasance Event, Borrower shall establish a successor entity designated by Borrower and reasonably approved by Lender (in each case, a "**<u>Successor Borrower</u>**") which (a) shall be a Special Purpose Entity and (b) following a Securitization, shall be approved by the Rating Agencies.   Any Successor

Borrower may, at Borrower's option, be an Affiliate of Borrower unless the Rating Agencies (following a Securitization) shall require otherwise. Borrower shall transfer and assign all rights and Obligations under and to the Note, and the Defeasance Security Agreement, together with the Defeasance Collateral, to such Successor Borrower. Such Successor Borrower shall assume the Obligations under the Note and the Defeasance Security Agreement and Borrower shall be relieved of its Obligations under such documents. Borrower shall pay a minimum of One Thousand and No/100 Dollars ($1,000) to any Successor Borrower as consideration for assuming the Obligations under the Note and the Defeasance Security Agreement. Borrower shall pay all fees and reasonable out-of-pocket costs and expenses incurred by Lender and the Rating Agencies in connection therewith.

Section 2.6.    Release of Property.

(a)    Except as set forth in Section 2.5 and this Section 2.6, no repayment, prepayment or defeasance of all or any portion of the Loan shall cause, give rise to a right to require, or otherwise result in, the release of the Lien of the Security Instrument on the Property.

(b)    If Borrower has elected to defease the Loan and the requirements of Section 2.5 and this Section 2.6 have been fully satisfied, the Property shall be released from the Lien of the Security Instrument and the Defeasance Collateral Account and the Defeasance Collateral, pledged pursuant to the Defeasance Security Agreement, shall be the sole source of collateral securing the Note.

(c)    Upon defeasance of the Loan or payment in full of all principal and interest due on the Loan and all other amounts due and payable under the Loan Documents in accordance with the terms and provisions of the Loan Documents and not less than thirty (30) days' prior written notice (or such shorter period of time if permitted by Lender in its sole discretion) and at the sole but reasonable cost and expense of Borrower, Lender shall release the Lien of the Security Instrument and shall promptly refund any Reserve Funds held by Lender to Borrower.

(d)    In connection with the release of the Security Instrument, Borrower shall submit to Lender, concurrently with the notice under Section 2.5.1(a), a release of Lien (and the related Loan Documents) for the Property for execution by Lender. Such release shall be in a form appropriate in the jurisdiction in which the Property is located and that would be satisfactory to a prudent lender and contains standard provisions, if any, protecting the rights of the releasing lender. In addition, Borrower shall provide all other certificates, documents and instruments Lender reasonably requires to be delivered by Borrower in connection with such release, together with an Officer's Certificate certifying that such documentation (i) is in compliance with all applicable Legal Requirements, and (ii) will effect such release in accordance with the terms of this Agreement.

Section 2.7.    Clearing Account/Cash Management Account.

2.7.1.    Clearing Account.

44

(a)      As of the Closing Date and throughout the Term, Borrower shall establish and maintain a segregated Eligible Account (the "**Clearing Account**") with Clearing Bank in trust for the benefit of Lender in accordance with the Clearing Account Agreement. The Clearing Account shall be under the sole dominion and control of Lender. Lender and Servicer shall have the sole right to make withdrawals from the Clearing Account. All costs and expenses for establishing and maintaining the Clearing Account shall be paid by Borrower.

(b)      Borrower shall cause all Rents (excluding (i) Rents paid by Tenants under licensees (other than any signage agreements) and other miscellaneous payors and (ii) Non-Core Income except to the extent provided below) to be delivered directly to the Clearing Account. Borrower represents and warrants that Borrower has, or has caused Manager to, within five (5) Business Days of the closing date, deliver written instructions to all Tenants at the Property as of the Closing Date (other than licensees (other than any signage agreements) and miscellaneous payors) to deliver all Rents payable thereunder directly to the Clearing Account. Borrower shall, or shall, if applicable, cause Manager to, deliver written instructions to all Tenants leasing space at the Property from and after the Closing Date (other than licensees (other than any signage agreements) and miscellaneous payors) to deliver all Rents payable thereunder directly to the Clearing Account. Notwithstanding anything to the contrary contained herein or in any other Loan Documents, in the event Borrower, its Affiliates or any Manager shall receive any amounts constituting Rents (including, without limitation, licensees (other than any signage agreements) and other revenues which are not sent directly to the Clearing Account or Cash Management Account but excluding Non-Core Income except to the extent provided below), Borrower shall, and shall cause such Affiliate and such Manager to, deposit all such amounts received by Borrower, such Affiliate or such Manager into the Clearing Account within three (3) Business Days after Borrower, such Affiliate or such Manager obtains knowledge of receipt thereof (but in no event later than ten (10) Business Days after receipt thereof). Non-Core Income, if any, may be (A) deposited into the Clearing Account or Cash Management Account on a less frequent basis than the third (3rd) Business Day after Borrower's or any Manager's knowledge of receipt thereof, but in no event more than ten (10) Business Days after Borrower's or such Manager's knowledge of receipt thereof, or (B) retained at the Property to fund petty cash or other de minimis accounts in an amount not to exceed $1,000 per month (collectively "**Petty Cash**"), which Petty Cash may be used to pay certain de minimis Property Expenses.

(c)      The Clearing Account Agreement shall provide, among other things, that the Clearing Bank shall transfer to the Cash Management Account in immediately available funds by federal wire transfer all amounts on deposit in the Clearing Account once every Business Day throughout the Term.

(d)      Upon the earlier of Lender's acceleration of the Loan or the occurrence of an Enforcement Action, Lender may, in addition to any and all other rights and remedies available to Lender, apply any amounts then on deposit in the Clearing Account to the payment of the Debt in any order, proportion and priority as Lender may determine in its sole and absolute discretion.

(e)      The Clearing Account shall not be commingled with other monies held by Borrower or Clearing Bank.

45

(f)     Borrower shall not further pledge, assign or grant any security interest in the Clearing Account or the monies deposited therein or permit any Lien or encumbrance to attach thereto, or any levy to be made thereon, or any UCC-1 Financing Statements, except those naming Lender as the secured party, to be filed with respect thereto.

(g)     Borrower shall indemnify Lender and hold Lender harmless from and against any and all actions, suits, claims, demands, liabilities, losses, damages, obligations and costs and expenses (including reasonable attorneys' fees and expenses) arising from or in any way connected with the Clearing Account and/or the Clearing Account Agreement or the performance of the obligations for which the Clearing Account was established except to the extent that Lender's loss, cost or damage results from its illegal act, fraud, gross negligence or willful misconduct.

2.7.2.   Cash Management Account.

(a)     As of the Closing Date and throughout the Term, Borrower shall establish and maintain a segregated Eligible Account (the "**Cash Management Account**"), to be held by Cash Management Bank in trust and for the benefit of Lender in accordance with the Cash Management Agreement.  The Cash Management Account shall be under the sole dominion and control of Lender.  Lender and Servicer shall have the sole right to make withdrawals from the Cash Management Account.  All costs and expenses for establishing and maintaining the Cash Management Account shall be paid by Borrower.

(b)     Funds on deposit in the Cash Management Account shall be applied on each Monthly Payment Date in the following amounts and order of priority:

(i)     First, funds sufficient to pay any Monthly Ground Rent Deposit to the Ground Rent Account in accordance with the terms and conditions of Section 6.8 hereof (notwithstanding anything herein to the contrary, the disbursements described in this subsection (i) shall be made even during the continuance of an Event of Default);

(ii)     Second, funds sufficient to pay any  Monthly Capital Account Reserve Deposit to the Capital Reserve Deposit Account in accordance with the terms and conditions of  Section 6.9  hereof (notwithstanding anything herein to the contrary, the disbursements described in this subsection (ii) shall be made even during the continuance of an Event of Default);

(iii)     Third, funds sufficient to pay the next Monthly Tax Deposit to the Tax Account in accordance with the terms and conditions of Section 6.2 hereof;

(iv)     Fourth, funds sufficient to pay the next Monthly Insurance Deposit to the Insurance Account in accordance with the terms and conditions of Section 6.3 hereof;

(v)     Fifth, funds sufficient to pay the fees and expenses of Cash Management Bank then due and payable to Cash Management Bank in accordance with the Cash Management Agreement;

46

(vi)     Sixth, funds sufficient to pay the next Monthly Debt Service Payment Amount;

(vii)    Intentionally omitted;

(viii)   Intentionally omitted;

(ix)     Seventh, funds sufficient to pay any Monthly Delinquency Deposit;

(x)      Eighth, during a Trigger Period, funds sufficient to pay for Operating Expenses (other than Operating Expenses which are payable to any Affiliate of Borrower) for the applicable period each incurred in accordance with an Approved Annual Budget and as set forth in a request for payment submitted by Borrower to Lender specifying the individual Operating Expenses in form and substance reasonably acceptable to Lender  shall be deposited into the Destination Account in accordance with the Cash Management Agreement; provided, however that in no event shall the aggregate management fees payable under the Management Agreements disbursed pursuant to this clause (x) or clause (xiii) below exceed two percent (2%) of the gross monthly base rent generated by the Property;

(xi)     Ninth, funds sufficient to pay for Extraordinary Expenses for the applicable period approved by Lender, if any;

(xii)    Tenth, subject to <u>Section 2.7.5</u> below, funds sufficient to pay the next monthly installment of Mezzanine Debt Service;

(xiii)   Eleventh, during a Trigger Period, funds sufficient to pay for Operating Expenses which are payable to Affiliates of Borrower for the applicable period each incurred in accordance with an Approved Annual Budget and as set forth in a request for payment submitted by Borrower to Lender specifying the individual Operating Expenses in form and substance reasonably acceptable to Lender shall be deposited into the Destination Account in accordance with the Cash Management Agreement; provided, however that in no event shall the aggregate management fees payable under the Management Agreements disbursed pursuant to clause (x) above and this clause (xiii) exceed two percent (2%) of the gross monthly base rent generated by the Property;

(xiv)    Twelfth, subject to <u>Section 2.7.5</u> below, funds sufficient to pay the next monthly installment of Subordinate Mezzanine Debt Service (if any);

(xv)     Lastly, (A) in the absence of a Trigger Period, the remaining amount net of the Peg Balance (the "**Excess Cash Flow**") shall be deposited into the Destination Account, (B) during a Trigger Period, the Excess Cash Flow shall be deposited into the Excess Cash Flow Account and held and applied in accordance with the terms and conditions of <u>Section 6.7</u> hereof.

(c)      With respect to the disbursement of the Operating Expenses during a Trigger Period in accordance with the Approved Annual Budget and in accordance with <u>Section</u>

47

2.7.2(b)(x) hereof, Borrower shall submit to Lender on or before (i) sixty (60) days after the end of the first, second and third calendar quarters of each Fiscal Year and (ii) ninety (90) days after the fourth calendar quarter of each Fiscal Year, a written statement (each, a "**Reconciliation Statement**"), in a form reasonably acceptable to Lender, reconciling the amount of Operating Expenses disbursed to Borrower for such calendar quarter in accordance with the Approved Annual Budget (the "**Budgeted Operating Expenses**") to the actual Operating Expenses incurred by Borrower for such calendar quarter (the "**Actual Operating Expenses**"). Notwithstanding anything contained herein to the contrary, (x) if the amount of the Budgeted Operating Expenses exceeds the Actual Operating Expenses, then Borrower shall return such excess to Lender for deposit by Lender to the Cash Management Account within fifteen (15) days of Lender's receipt of a Reconciliation Statement, or (y) provided that no Event of Default has occurred and is continuing, if the amount of the Actual Operating Expenses exceeds the Budgeted Operating Expenses, then Lender shall disburse funds on deposit in the Excess Cash Flow Account, to the extent such funds are available, in an amount not to exceed 10% of the Budgeted Operating Expenses for such calendar quarter to Borrower to reimburse Borrower for the portion of such excess.

(d)     Notwithstanding anything to the contrary contained in this Agreement, the Note or the other Loan Documents, except as set forth in Section 2.7.2(b)(i) and (ii) during the continuance of an Event of Default, Lender may, in addition to any and all other rights and remedies available to Lender, apply any amounts then on deposit in the Cash Management Account (including without limitation the Peg Balance) to the payment of the Debt in any order, proportion and priority as Lender may determine in its sole and absolute discretion.

(e)     Borrower hereby agrees that Lender may modify the Cash Management Agreement for the purpose of establishing sub-accounts in connection with any payments otherwise required under this Agreement, the Note and the other Loan Documents, which sub-accounts shall at all times be Eligible Accounts (and may be ledger or book entry accounts and not actual accounts).  All costs and expenses for establishing and maintaining such accounts shall be paid by Borrower.

(f)     Notwithstanding anything to the contrary contained herein, to the extent any Tenant makes a late payment of Rent after a Monthly Payment Date but prior to the end of a calendar month, provided no Trigger Period has occurred and is continuing, Borrower may request that Cash Management Bank disburse such amounts into the Destination Account.

(g)     Notwithstanding anything contained herein or in the other Loan Documents to the contrary, Lender agrees that, notwithstanding the existence of a Trigger Period, any amounts which are reimbursed to Borrower by Ground Lessor from the Capital Reserve Account for Capital Expenditures pursuant to the terms of the Ground Lease shall be deposited into the Destination Account.

2.7.3.   Payments Received Under Clearing Account/Cash Management Agreement.   The insufficiency of funds on deposit in the Clearing Account or the Cash Management Account shall not relieve Borrower from the obligation to make any payments, as and when due pursuant to this Agreement, the Note and the other Loan Documents, and such

48

obligation shall be separate and independent, and not conditioned on any event or circumstance whatsoever.  Notwithstanding anything to the contrary contained in this Agreement, the Note or the other Loan Documents, and <u>provided</u> that no Event of Default shall have occurred and remain outstanding, Borrower's obligations with respect to the payment of the Monthly Debt Service Payment Amount and amounts required to be deposited into the Reserve Funds, if any, shall be deemed satisfied to the extent sufficient amounts are deposited in the Cash Management Account to satisfy such Obligations pursuant to the Cash Management Agreement on the dates each such payment is required, regardless of whether any of such amounts are so applied by Lender.

2.7.4.  <u>Destination Account</u>.  Borrower hereby grants a first-priority security interest in favor of Lender in and to the Destination Account, together with all rights of a secured party with respect thereto.  Upon the occurrence of an Enforcement Action, Borrower shall no longer have any right to make any use of amounts contained in the Destination Account, and all such amounts shall be remitted to the Cash Management Account (excluding only amounts sufficient to honor any and all outstanding checks).

2.7.5.  <u>Borrower Distributions</u>.  Any transfer of Borrower's funds, or any allocation, application or disbursement of cash or any other payments under this Agreement or the other Loan Documents from the Cash Management Account or other sources to or for the benefit of the Mezzanine Lender, the Mezzanine Borrower, Subordinate Mezzanine Lender, Subordinate Mezzanine Borrower, the Cash Management Agreement or any of the other Loan Documents, is intended by the parties to constitute, and shall constitute, a distribution from the Borrower to the Mezzanine Borrower, and from the Mezzanine Borrower to the Subordinate Mezzanine Borrower, as applicable, and shall be treated as such on the books and records of each party.  All such distributions by Borrower shall be conducted by Borrower in accordance with the separateness provisions of <u>Section 3.1.24</u> hereof.  All such distributions must comply with the requirements of Section 18-607 of the Delaware Limited Liability Company Act.  No provision of any Loan Document is intended to nor shall create a debtor-creditor relationship between Borrower and Mezzanine Lender or Subordinate Mezzanine Lender.

### III.    REPRESENTATIONS AND WARRANTIES

**Section 3.1.**    <u>Borrower Representations</u>.  Borrower represents and warrants to Lender that:

3.1.1.  <u>Organization</u>.

(a)    Borrower is duly organized, validly existing and in good standing with full power and authority to own its assets and conduct its business, and is duly qualified and in good standing in all jurisdictions in which the ownership or leasing of its property or the conduct of its business requires such qualification (except where the failure to be so qualified would not have a Material Adverse Effect) and Borrower has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the other Loan Documents by it, and has the power and authority to execute, deliver and perform under this Agreement, the other Loan Documents and all the transactions contemplated hereby and thereby.

(b)     Borrower's exact legal name is correctly set forth in the first paragraph of this Agreement.  Borrower is an organization of the type specified in the first paragraph of this Agreement.  Borrower is incorporated or organized under the laws of the state specified in the first paragraph of this Agreement.  Borrower's principal place of business and chief executive office, and the place where Borrower keeps its books and records not otherwise kept at the Property, including recorded data of any kind or nature, regardless of the medium of recording, including software, writings, plans, specifications and schematics, has been for the preceding four (4) months (or, if less than four (4) months, the entire period of the existence of Borrower) and will continue to be the address of Borrower set forth in the first paragraph of this Agreement (unless Borrower notifies Lender in writing at least thirty (30) days prior to the date of such change).     Borrower's organizational identification number assigned by the state of its organization is 4240039.   The federal tax identification number applicable to Borrower is 20-5795962.

3.1.2.   <u>Proceedings</u>.  This Agreement and the other Loan Documents have been duly authorized, executed and delivered by or on behalf of Borrower and constitute legal, valid and binding obligations of Borrower, enforceable against Borrower in accordance with their respective terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether such enforcement is sought in a proceeding in equity or at law).

3.1.3.   <u>No Conflicts</u>.  The execution, delivery and performance of this Agreement and the other Loan Documents by Borrower will not conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any Lien, charge or encumbrance (other than pursuant to the Loan Documents) upon any asset or property of Borrower pursuant to the terms of any indenture, mortgage, deed of trust, loan agreement, partnership agreement, management agreement or other agreement or instrument to which Borrower is a party or by which any of Borrower's assets or properties is subject, nor will such action result in any violation of the provisions of any Legal Requirements of any Governmental Authority having jurisdiction over Borrower or any of Borrower's assets or properties.

3.1.4.   <u>Litigation</u>.  There is no action, suit, proceeding or investigation pending or, to Borrower's knowledge, threatened against Borrower, Mezzanine Borrower, Guarantor, or Manager in any court or by or before any other Governmental Authority that could have a Material Adverse Effect.  To Borrower's knowledge, there is no action, suit, proceeding or investigation pending or threatened against the Property in any court or by or before any other Governmental Authority that could have a Material Adverse Effect.

3.1.5.   <u>Agreements</u>.  Borrower is not a party to any agreement or instrument or subject to any restriction which could materially and adversely affect Borrower or the Property, or Borrower's business, assets or properties, operations or condition (financial or otherwise).  Borrower is not in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any Permitted Encumbrance or any other agreement or instrument to which it is a party or by which Borrower or the Property is

50

bound.  Borrower has no material financial obligation (contingent or otherwise) under any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which Borrower is a party or by which Borrower or the Property is otherwise bound, other than (a) obligations incurred in the ordinary course of the operation of the Property as permitted under Section 3.1.24(e) hereof and (b) obligations under the Loan Documents.

3.1.6.  <u>Consents</u>.  Each consent, approval, authorization, order, registration or qualification of or with any court or any other Governmental Authority required for the execution, delivery and performance by Borrower of this Agreement and the other Loan Documents has been obtained and is in full force and effect.

3.1.7.  <u>Title</u>.  Borrower has good, indefeasible and insurable leasehold title to the real property comprising the Property and good title to the balance of the Property, in each case, free and clear of all Liens whatsoever except the Permitted Encumbrances.  The Security Instrument, together with any Uniform Commercial Code financing statements required to be filed in connection therewith, when properly recorded in the appropriate records, will create (i) a valid, perfected first-priority lien on the Property, subject only to Permitted Encumbrances, and (ii) perfected security interests in and to, and perfected collateral assignments of, all personalty (including the Leases), all in accordance with the terms thereof, in each case subject only to the Permitted Encumbrances.  To Borrower's best knowledge, other than Permitted Encumbrances, there are no claims for payment or mechanic's, materialman's or other similar liens or claims which have been filed for work, labor or materials affecting the Property which are or may become Liens prior to, or of equal priority with, the Lien of the Security Instrument and the other Loan Documents.  In Borrower's reasonable opinion, none of the Permitted Encumbrances (nor any unrecorded document relating to any REA, the Ground Lease or the Prime Lease), individually or in the aggregate, materially interfere with the benefits of the security intended to be provided by the Security Instrument and the other Loan Documents, materially and adversely affect the value of the Property, impair the use or operation of the Property or impair Borrower's ability to perform its Obligations in a timely manner.

3.1.8.  <u>No Plan Assets</u>.  As of the Closing Date and throughout the Term, (a) Borrower does not sponsor, is not obligated to contribute to and is not itself and will not be an "employee benefit plan," as defined in Section 3(3) of ERISA, subject to Title I of ERISA or Section 4975 of the Code, (b) none of the assets of Borrower constitutes or will constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3-101, as modified by Section 3(42) of ERISA, (c) Borrower is not and will not be a "governmental plan" within the meaning of Section 3(32) of ERISA, and (d) transactions by or with Borrower are not and will not be subject to any state statute, rule or regulation regulating investments of, or fiduciary obligations with respect to, "governmental plans" within the meaning of Section 3(32) of ERISA which is similar to the provisions of Section 406 of ERISA or Section 4975 of the Code and which prohibit or otherwise restrict the transactions contemplated by this Agreement (including, but not limited to, the exercise by Lender of any of its rights under the Loan Documents).

3.1.9.  <u>Compliance</u>.  Borrower and the Property and the use thereof comply in all material respects with all applicable Legal Requirements, including, without limitation, building

51

and zoning ordinances and codes.  In the event that all or any part of the Improvements are destroyed or damaged, said Improvements can be legally reconstructed to their condition prior to such damage or destruction, and thereafter exist for the same use without violating any zoning or other ordinances applicable thereto and without the necessity of obtaining any variances or special permits.  No legal proceedings are pending or, to the knowledge of Borrower, threatened with respect to the zoning of the Property.  Neither the zoning nor any other right to construct, use or operate the Property is in any way dependent upon or related to any property other than the Property.  Borrower is not in default or violation of any order, regulation, writ, injunction, decree or demand of any Governmental Authority, the violation of which could have a Material Adverse Effect.  There has not been committed by Borrower or to Borrower's knowledge any other Person in occupancy of or involved with the operation or use of the Property any act or omission affording the federal government, any state or local government or any other Governmental Authority the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's Obligations under any of the Loan Documents.

3.1.10. <u>Financial Information</u>.  All financial data, including, without limitation, the statements of cash flow and income and operating expense, that have been delivered to Lender in connection with the Loan and the Property (i) are true, correct and complete in all material respects, (ii) accurately represent the financial condition of Borrower and the Property, as applicable, as of the date of such reports in all material respects, and (iii) have been prepared in accordance with an Approved Accounting Method throughout the periods covered, except as disclosed therein.  Borrower does not have any contingent liabilities, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments that are known to Borrower and that could have a Material Adverse Effect.  Since the date of such financial statements, there has been no material adverse change in the financial condition, operation or business of Borrower or the Property from that set forth in said financial statements.

3.1.11. <u>Condemnation</u>.  No Condemnation or other similar proceeding has been commenced or, has been threatened or, to Borrower's knowledge, is contemplated with respect to all or any portion of the Property or for the relocation of roadways providing access to the Property.

3.1.12. <u>Easements; Utilities and Public Access</u>.  The Property has rights of access to public ways and is served by water, sewer, sanitary sewer and storm drain facilities adequate to service the Property for its intended uses.  All public utilities necessary or convenient to the continued use and enjoyment of the Property are located either in the public right-of-way abutting the Property (which are connected so as to serve the Property without passing over any other property) or in recorded easements serving the Property and such easements are set forth in and insured by the Title Insurance Policy.  All roads necessary for the use of the Property for its current purposes have been completed and dedicated to public use and accepted by all applicable Governmental Authorities.

3.1.13. <u>Separate Lots</u>.  The Property is comprised of one (1) or more parcels which constitute a separate tax lot or lots and does not constitute a portion of any other tax lot not a part of the Property.

52

24427924.15

3.1.14. <u>Assessments</u>.  Except as disclosed in the Title Insurance Policy delivered as of the Closing Date, to Borrower's knowledge, there are no pending or proposed special or other assessments for public improvements or otherwise affecting the Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments.

3.1.15. <u>Enforceability</u>.  The Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense by Borrower, Mezzanine Borrower, or Guarantor, including the defense of usury, nor would the operation of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents unenforceable (subject only to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and, as to enforceability, to principles of equity), and neither Borrower, Mezzanine Borrower, nor Guarantor has asserted any right of rescission, set-off, counterclaim or defense with respect thereto.

3.1.16. <u>Assignment of Leases</u>.  The Assignment of Leases creates a valid assignment of, or a valid security interest in, certain rights under the Leases, subject only to a license granted to Borrower to exercise certain rights and to perform certain obligations of the lessor under the Leases, as more particularly set forth therein.  No Person other than Lender has any interest in or assignment of the Leases or any portion of the Rents due and payable or to become due and payable thereunder.

3.1.17. <u>Insurance</u>.  Borrower has obtained and has delivered to Lender original certificates evidencing the Policies (and, to the extent requested by Lender, complete copies thereof), with all premiums prepaid thereunder, reflecting the insurance coverages, amounts and other requirements set forth in this Agreement.  No claims have been made under any of the Policies, and no Person, including Borrower, has done, by act or omission, anything which would impair the coverage of any of the Policies.

3.1.18. <u>Licenses</u>.  To Borrower's knowledge, all approvals, authorizations, certifications, licenses and permits, including, without limitation, certificates of completion and occupancy, required by any Governmental Authority or otherwise necessary for the legal ownership, use, occupancy and operation of the Property in the manner in which the Property is currently being owned, used, occupied and operated have been obtained by or on behalf of Borrower and are in full force and effect, except to the extent the failure by Borrower to obtain the same or maintain the same in full force and effect would not have a Material Adverse Effect.

3.1.19. <u>Flood Zone</u>.  None of the Improvements on the Property is located in an area identified by the Federal Emergency Management Agency as a special flood hazard area (or, if so located, the flood insurance required pursuant to <u>Section 5.1(a)(viii)(C)</u> is in full force and effect with respect to the Property).

3.1.20. <u>Physical Condition</u>.  Subject to any matters disclosed in the Physical Condition Report, (i) to Borrower's knowledge, the Property, including, without limitation, all buildings, improvements, parking facilities, sidewalks, storm drainage systems, roofs, plumbing systems, HVAC systems, fire protection systems, electrical systems, equipment, elevators, exterior sidings and doors, landscaping, irrigation systems and all structural components, are in

good condition, order and repair in all material respects; and (ii) there exists no structural or other material defects or damages in the Property, whether latent or otherwise.  Borrower has not received notice from any insurance company or bonding company of any defects or inadequacies in the Property, or any part thereof, which would adversely affect the insurability of the same or cause the imposition of extraordinary premiums or charges thereon or any termination or threatened termination of any policy of insurance or bond.

3.1.21. Boundaries.  All of the Improvements at the Property lie wholly within the boundaries and building restriction lines of the Property, and no improvements on adjoining properties encroach upon the Property.  No easements or other encumbrances affecting the Property encroach upon any of the Improvements so as to affect the value, marketability, use or operation of the Property except those which are insured against by the Title Insurance Policy, each of which, whether or not insured against by the Title Insurance Policy, is shown on the Survey.

3.1.22. Leases.  With respect to the Leases, (a) the rent roll attached hereto as Schedule I is true, correct and complete in all material respects and the Property is not subject to any Leases, including any oral Leases, other than the Leases described in Schedule I (other than Tenants' subleases, if any), (b) except as disclosed on Schedule I hereto or as disclosed in any Tenant Estoppel, the Leases identified on Schedule I are in full force and effect and to Borrower's best knowledge, there are no defaults thereunder by any party thereto and there are no conditions that, with the passage of time or the giving of notice, or both, would constitute defaults thereunder, (c) except as disclosed on Schedule I hereto or as disclosed in any Tenant Estoppel, no Rent (excluding security or other deposits except to the extent set forth on Schedule I hereof) has been paid to Borrower more than one (1) month in advance of its due date, (d) except as disclosed on Schedule I hereto or as disclosed in any Tenant Estoppel, all work to be performed by the landlord under each Lease has been performed as required in all material respects and has been accepted by the applicable Tenant, (e) except as disclosed on Schedule I hereto or as disclosed in any Tenant Estoppel, any payments, free rent, partial rent, rebate of rent or other payments, credits, allowances or abatements required to be given by the landlord to any Tenant has already been received by such Tenant, (f) except as disclosed on Schedule I hereto or as disclosed in any Tenant Estoppel, Borrower has no knowledge of any notice of termination of any Lease or default in any material respect under any Lease; (g) Borrower has not presently assigned or pledged any of the Leases, the rents or any interest therein except to Lender; (h) except as specifically disclosed in the Title Insurance Policy, on Schedule I hereto or as disclosed in any Tenant Estoppel, no Tenant or other Person has an option, right of first refusal or offer or any other preferential right to purchase all or any portion of the Property; and (i) except as disclosed in the Title Insurance Policy, on Schedule I hereto or in any Tenant Estoppel, no Tenant has any right or option for additional space in the Improvements.

3.1.23. Filing, Recording and Other Taxes.  All transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes required to be paid under the applicable Legal Requirements in connection with the transfer of the Property to Borrower have been paid or are being paid simultaneously herewith.  All mortgage, mortgage recording, stamp, intangible or other similar taxes required to be paid under the applicable Legal Requirements in

54

connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents, including, without limitation, the Security Instrument, have been paid or are being paid simultaneously herewith.  All taxes and governmental assessments due and owing in respect of the Property have been paid, or an escrow of funds in an amount sufficient to cover such payments has been established under the Loan Documents.

        3.1.24. <u>Single Purpose</u>.  Borrower hereby represents and warrants to, and covenants with, Lender that, since its formation and at all times thereafter, and at all times on and after the date hereof and until such time as the Debt shall be paid in full:

        (a)     The purpose for which Borrower is organized is and shall be limited solely to (i) owning, holding, leasing, transferring, operating and maintaining the Property and all business incidental thereto, (ii) entering into or assuming the obligations of Borrower under this Agreement, (iii) refinancing the Property in connection with a permitted repayment of the Loan, and (iv) transacting any and all lawful business for which Borrower may be organized under its constitutive law that is incidental, necessary or appropriate to accomplish the foregoing.

        (b)     Borrower does not own, and will not own or acquire any material asset or property other than (i) the Property and (ii) incidental personal and intangible property necessary for and used or to be used in connection with the ownership, management or operation of the Property.

        (c)     Borrower does not and will not engage in any business other than the ownership, management and operation of the Property or business incidental thereto.

        (d)     Except for capital contributions and distributions, Borrower is not a party to and will not enter into any arrangement, contract or agreement with any Affiliate of Borrower, except upon terms and conditions that are intrinsically fair, commercially reasonable and substantially similar to those that would be available on an arm's-length basis with third parties not so affiliated with Borrower.

        (e)     Borrower is not liable for and will not incur any Indebtedness other than (i) the Loan, (ii) trade and operational debt, including without limitation Permitted Equipment Financing (collectively, "**<u>Trade Debt</u>**") incurred in the ordinary course of business with trade creditors and equipment financing providers, as applicable, in amounts as are normal and customary under the circumstances, provided that such debt does not exceed the Trade Debt Threshold Amount, is not evidenced by a note and has not (or, in the case of Permitted Equipment Financing, any payment required to be made thereunder is not) been outstanding for more than sixty (60) days (unless the same is subject to good faith dispute by Borrower, in appropriate proceedings therefor, and for which adequate capital reserves have been established in accordance with GAAP), (iii) Capital Expenditures incurred in accordance with <u>Section 4.1.10</u> hereof, and (iv) Taxes and Other Charges.  No Indebtedness other than the Debt may be secured (senior, subordinate or *pari passu*) by the Property (other than Indebtedness, if any, secured by Permitted Encumbrances).

55

(f)     Borrower will not make any payments in advance to third parties other than in the ordinary course of its business or loans to any Person and shall not acquire obligations or securities of its managers, members or any Affiliate of Borrower.

(g)     Borrower is and will intend to remain solvent and its debts and liabilities shall be paid (including, as applicable, shared personnel and overhead expenses) to the extent of its available assets as the same become due (unless the same is subject to good faith dispute by Borrower, in appropriate proceedings therefor, and for which adequate reserves have been established and held by Borrower as required under GAAP), provided, however, that this provision shall not require Guarantor or any other direct or indirect equity owner of Borrower to make any loans or capital contributions to Borrower.

(h)     Borrower will do all things necessary to observe organizational formalities and preserve its separate existence, will continue to be a Delaware limited liability company, and will not, nor will it permit any Affiliate of Borrower to, amend, modify or otherwise change in any material respect Section 9(d) of Borrower's Organizational Documents, nor amend, modify or otherwise change in any material respect any other portion of Borrower's Organizational Documents which adversely affects Borrower's obligations with respect to the Loan without the prior written consent of Lender.   Notwithstanding the foregoing, Borrower may change its organization entity type without prior consent of Lender, provided that Borrower (i) delivers to Lender, at Borrower's cost and expense, (A) following a Securitization, a Rating Agency Confirmation and (B) a new or updated Insolvency Opinion; (ii) at all times complies with the provisions of this Section 3.1.24; (iii) delivers, at Borrower's cost and expense, to Lender the Organizational Documents in form and substance reasonably satisfactory to Lender evidencing such reorganization no later than ten (10) Business Days prior to the effective date of such reorganization, (iv) delivers, at Borrower's cost and expense, such amendments to all financing statements filed in connection with the Loan, as may be reasonably requested by Lender, (v) delivers, at Borrower's cost and expense, to Lender any other document, instrument or certificate that Lender shall reasonably require (including, if applicable, amendments to the Loan Documents); and (vi) pays for all of Lender's reasonable out-of-pocket expense, including but not limited to, Lender's legal fees incurred in connection with the review of such deliveries, which deliveries shall be reasonably acceptable to Lender.

(i)     Borrower will maintain all of its books, records, financial statements and, bank accounts separate from those of any other Person.  Borrower's assets will not be listed as assets on the financial statement of any other Person; provided, however, such assets shall be listed on Borrower's own separate balance sheet and the Property shall be considered a separate operating segment from any Affiliate of the Borrower with discrete financial information available with respect to the Property.  Borrower shall file (or shall cause to be filed) its own tax returns except to the extent it is treated as a "disregarded entity" for tax purposes and is not required to file tax returns under applicable law.  Borrower shall maintain its books, records, resolutions and agreements as official records.

(j)     Borrower does and will intend to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations, provided, however, that this provision shall not be deemed to

require Guarantor or any other direct or indirect equity owner of Borrower to make any loans or capital contributions to Borrower.

(k)  To the fullest extent permitted by law, neither Borrower nor any Affiliate of Borrower will seek the dissolution, winding up, liquidation, consolidation or merger in whole or in part, of Borrower, any sale or other transfer of all or substantially all of its assets or any sale or other transfer outside the ordinary course of business, except for such activities as are expressly permitted pursuant to the Loan Documents.  The requirements of this Section 3.1.24(k) are included in the Organizational Documents of Borrower.

(l)  Borrower will not commingle its assets with those of any other Person and will hold all of its assets in its own name.  Borrower will maintain and account for its assets and liabilities in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets and liabilities from those of any other Person.

(m)  Borrower does not presently and will not guarantee or become obligated for the debts or obligations of any other Person and will not hold itself out as being responsible for the debts or obligations of any other Person.

(n)  If Borrower is a limited partnership, the general partner of Borrower shall be a corporation, limited liability company or business trust which is a Special Purpose Entity owning not less than 0.5% of the equity interests in Borrower and which shall have two (2) Independent Managers (the "**SPE Party**") and which shall comply with the representations, warranties and covenants described in this Section 3.1.24 as if made by the SPE Party, except that the purpose of the SPE Party shall be limited to owning and holding its interest in Borrower and all action incidental, necessary and appropriate to accomplish the foregoing.

(o)  If Borrower is a limited liability company, unless Borrower has two springing members, at least one of its equity owners shall be an SPE Party which shall comply with the representations, warranties and covenants described in this Section 3.1.24 as if made by the SPE Party, except that the purpose of the SPE Party shall be limited to owning and holding its interest in Borrower and all action incidental, necessary and appropriate to accomplish the foregoing.  At any time that Borrower is a limited liability company with two springing members, no equity owner of Borrower (other than Mezzanine Borrower or any Subordinate Mezzanine Borrower) shall be required to be an SPE Party or a Special Purpose Entity.  The requirements of this Section 3.1.24(o) are included in the Organizational Documents of Borrower.

(p)  Intentionally omitted.

(q)  Any overhead expenses that are shared between Borrower and any Affiliate of Borrower, including paying for office space and services performed by any employee of any Affiliate of Borrower shall be allocated fairly and reasonably.

(r)  Borrower will not pledge its assets or properties to secure the debts or obligations of any other Person.

57

(s)     Notwithstanding any other provision of this Agreement or the Organizational Documents of Borrower, Borrower will not, and no member, manager or other Person on behalf of Borrower shall, take any Material Action without the prior unanimous vote of the member(s), the managers, and all Independent Managers of Borrower, provided, however, that the member(s) and the managers of Borrower may not vote on, or authorize the taking of, any Material Action, unless there are at least two (2) Independent Managers then serving in such capacity.  "**Material Action**" means to file any insolvency, or reorganization case or proceeding, to institute proceedings to have Borrower be adjudicated bankrupt or insolvent, to institute proceedings under any applicable insolvency law, to seek any relief under any law relating to relief from debts or the protection of debtors, to consent to the filing or institution of bankruptcy or insolvency proceedings against Borrower, to file a petition seeking, or consent to, reorganization or relief with respect to Borrower under any applicable federal or state law relating to bankruptcy or insolvency, to seek or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian, or any similar official of or for Borrower or a substantial part of its property, to make any assignment for the benefit of creditors of Borrower, to admit in writing Borrower's inability to pay its debts generally as they become due, or to take action in furtherance of any of the foregoing.

(t)     Borrower (i) will be, and at all times will hold itself out to the public as, a legal entity separate and distinct from any other entity (including any Affiliate of Borrower), (ii) shall correct any known misunderstanding regarding its status as a separate entity, (iii) shall conduct business in its own name, (iv) shall not identify itself or any of its Affiliates as a division or department or part of the other and (v) shall maintain and utilize separate stationery, invoices and checks bearing its own name.

(u)     Borrower shall conduct its business so that the assumptions made with respect to Borrower in the Insolvency Opinion shall be true and correct in all respects.  In connection with the foregoing, Borrower hereby covenants and agrees that it will comply with or cause the compliance with, (i) all of the facts and assumptions (whether regarding Borrower or any other Person) set forth in the Insolvency Opinion, (ii) all of the representations, warranties and covenants in this Section 3.1.24, and (iii) all of the Organizational Documents of Borrower.

(v)     Borrower will not permit any Affiliate independent access to its bank accounts.

(w)     Borrower shall pay its own liabilities and expenses, including the salaries of its own employees (if any) from its own funds, and has maintained and shall maintain a sufficient number of employees (if any) in light of its contemplated business operations; provided, however, that this provision shall not be deemed to require Guarantor or any other direct or indirect equity owner of Borrower to make any loans or capital contributions to Borrower.

(x)     Borrower (i) has acted at all times consistent in all material respects with Borrower's Organizational Documents, and (ii) shall comply with Section 9(d) of Borrower's Operating Agreement.

58

3.1.25. <u>Tax Filings</u>.  To the extent required, Borrower has filed (or has obtained effective extensions for filing) all federal, state and local tax returns required to be filed and has paid or made adequate provision for the payment of all federal, state and local taxes, charges and assessments payable by Borrower.  Borrower believes that its tax returns (if any) properly reflect the income and taxes of Borrower for the periods covered thereby, subject only to reasonable adjustments required by the Internal Revenue Service or other applicable tax authority upon audit.

3.1.26. <u>Solvency</u>.  Borrower (a) has not entered into the transaction or any Loan Document with the actual intent to hinder, delay, or defraud any creditor and (b) received reasonably equivalent value in exchange for its obligations under the Loan Documents.  Giving effect to the Loan, the fair saleable value of Borrower's assets exceeds and will, immediately following the making of the Loan, exceed Borrower's total liabilities, including, without limitation, subordinated, unliquidated, disputed and contingent liabilities.  The fair saleable value of Borrower's assets is and will, immediately following the making of the Loan, be greater than Borrower's probable liabilities, including the maximum amount of its contingent liabilities on its debts as such debts become or may become absolute and matured.  Borrower's assets do not and, immediately following the making of the Loan will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted.  Borrower does not intend to, and does not believe that it will, incur debt and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debt and liabilities as they mature (taking into account the timing and amounts of cash to be received by Borrower and the amounts to be payable on or in respect of obligations of Borrower).

3.1.27. <u>Federal Reserve Regulations</u>.  No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulations T, U or X of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulations T, U or X or any other Regulations of such Board of Governors, or for any purposes prohibited by any Legal Requirements or by the terms and conditions of this Agreement or the other Loan Documents.

3.1.28. <u>Organizational Chart</u>.  The organizational chart attached hereto as <u>Schedule III</u>, relating to Borrower and certain Affiliates and other Persons, is true and correct on and as of the Closing Date.

3.1.29. <u>Bank Holding Company</u>.  Borrower is not a "bank holding company" or a direct or indirect subsidiary of a "bank holding company" as defined in the Bank Holding Company Act of 1956, as amended, and Regulation Y thereunder of the Board of Governors of the Federal Reserve System.

3.1.30. <u>No Other Debt</u>.  Borrower has not borrowed or received debt financing (other than permitted pursuant to this Agreement) that has not been heretofore repaid in full.

3.1.31. <u>Investment Company Act</u>.  Borrower is not (a) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (b) a "holding company" or a "subsidiary company" of a

59

"holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 2005, as amended; or (c) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

3.1.32. <u>Intentionally Omitted</u>.

3.1.33. <u>No Bankruptcy Filing</u>.   No petition in bankruptcy has ever been filed against Borrower, Mezzanine Borrower, or Guarantor, and none of Borrower or Guarantor has ever made an assignment for the benefit of creditors or taken advantage of any insolvency act for the benefit of debtors.   None of Borrower, Mezzanine Borrower, or Guarantor is contemplating either the filing of a petition by it under any state or federal bankruptcy or insolvency laws or the liquidation of all or a major portion of Borrower's assets or properties, and Borrower has no knowledge of any Person contemplating the filing of any such petition against Borrower, Mezzanine Borrower, or Guarantor.

3.1.34. <u>Full and Accurate Disclosure</u>.   No information contained in this Agreement, the other Loan Documents, or any written statement or document furnished by or on behalf of Borrower in connection with the Loan or pursuant to the terms of this Agreement or any other Loan Document contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading in light of the circumstances under which they were made.   There is no fact or circumstance presently known to Borrower which has not been disclosed to Lender and which could have a Material Adverse Effect.

3.1.35. <u>Foreign Person</u>.   Borrower is not a "foreign person" within the meaning of Section 1445(f)(3) of the Code.

3.1.36. <u>No Change in Facts or Circumstances; Disclosure</u>.   All information submitted by and on behalf of Borrower to Lender and in all financial statements, rent rolls (including the rent roll attached hereto as <u>Schedule I</u>), reports, certificates and other documents submitted in connection with the Loan or in satisfaction of the terms of this Agreement or the other Loan Documents and all statements of fact made by or on behalf of Borrower in this Agreement or in any other Loan Document, are true, correct and complete in all material respects.   There has been no material adverse change in any condition, fact, circumstance or event that would make any such information or statement of fact inaccurate, incomplete or otherwise misleading in any material respect or that otherwise has or could have a Material Adverse Effect.

3.1.37. <u>Management Agreement</u>.   The Management Agreement is in full force and effect and there is no default thereunder by any party thereto and no event has occurred that, with the passage of time and/or the giving of notice would constitute a default thereunder.   The Management Agreement was entered into on commercially reasonable terms.

3.1.38. <u>Perfection of Accounts</u>.   Borrower hereby represents and warrants to Lender that:

60

(a)     this Agreement, together with the other Loan Documents, create a valid and continuing security interest (as defined in the Uniform Commercial Code) in the Clearing Account and the Cash Management Account in favor of Lender, which security interest is prior to all other Liens, and is enforceable as such against creditors of and purchasers from Borrower;

(b)     other than in connection with the Loan Documents, Borrower has not sold, pledged, transferred or otherwise conveyed the Clearing Account and the Cash Management Account;

(c)     the Clearing Account and the Cash Management Account constitute "deposit accounts" or "securities accounts" within the meaning of the Uniform Commercial Code; and

(d)     the Clearing Account and the Cash Management Account are not in the name of any Person other than Borrower, as pledgor, or Lender, as pledgee.  Borrower has not consented to Clearing Bank or Cash Management Bank complying with instructions with respect to the Clearing Account or the Cash Management Account from any Person other than Lender.

3.1.39. <u>Ground Lease</u>.

(a)     The Ground Lease is in full force and effect and no default has occurred under the Ground Lease by Borrower or, to Borrower's knowledge, by Ground Lessor, and there is no existing condition which, but for the passage of time or the giving of notice, could result in a default under the terms of the Ground Lease.  All Ground Rent has been paid in full and neither Borrower nor Ground Lessor has commenced any action or given or received any notice for the purpose of terminating the Ground Lease.  To Borrower's knowledge, the Ground Lessor under the Ground Lease is not subject to any voluntary or involuntary bankruptcy, reorganization or insolvency proceeding and the applicable leasehold estate under the Ground Lease is not an asset in any voluntary or involuntary bankruptcy, reorganization or insolvency proceeding.

(b)     The Ground Lease or a memorandum thereof has been duly recorded, the Ground Lease permits the interest of the lessee thereunder to be encumbered by the Security Instrument and does not restrict the use of the Property by the lessee under the Ground Lease in a manner that would materially adversely affect the security provided by the Security Instrument, and to Borrower's best knowledge there have not been any modifications, amendments or other changes in the terms of the Ground Lease since recordation of the Ground Lease or a memorandum thereof.

(c)     Borrower's interest in the Ground Lease is not subject to any Lien superior to, or of equal priority with, the Security Instrument.

(d)     Borrower's interest in the Ground Lease is assignable pursuant to the terms of the Ground Lease or estoppel letter received by Lender from Ground Lessor without the consent of Ground Lessor to Lender, the purchaser at any foreclosure sale or the transferee under a deed or assignment in lieu of foreclosure in connection with the foreclosure of the Lien of the Security Instrument or transfer of Borrower's leasehold estate by deed or assignment in lieu of foreclosure (or, if any such consent is required, it has been obtained prior to the Closing Date),

61

subject, nonetheless, to the terms and conditions of the Ground Lease in connection with each of the foregoing.

(e)     If Lender provides notice of the Security Instrument to Ground Lessor in accordance with the requirements of the Ground Lease, (i) the Ground Lease requires Ground Lessor to give notice of any default by Borrower to Lender prior to exercising its remedies set forth in the Ground Lease and (ii) the Ground Lease or estoppel letter received by Lender from Ground Lessor further provides that notice of termination given under the Ground Lease is not effective against Lender unless a copy of such notice has been delivered to Lender in the manner described in the Ground Lease or such estoppel letter.

(f)     Lender is permitted the opportunity (including, where necessary, sufficient time to gain possession of Borrower's interest under the Ground Lease) to cure any default under the Ground Lease which is curable after the receipt of notice of any default before Ground Lessor may terminate the Ground Lease in accordance with the terms of the Ground Lease.

(g)     The Ground Lease has a term which extends not less than thirty (30) years beyond the Maturity Date (including any extensions thereof in accordance with the terms and conditions of this Agreement).

(h)     The Ground Lease requires the Ground Lessor to enter into a new lease upon termination of the Ground Lease for any reason, including rejection of the Ground Lease in a bankruptcy proceeding in accordance with the terms and conditions of the Ground Lease or estoppel letter received by Lender from Ground Lessor.

(i)     Under the terms of the Ground Lease and the Security Instrument, taken together, any related insurance and condemnation proceeds that are paid or awarded with respect to the leasehold estate under the Ground Lease will be applied either to the repair or restoration of all or part of the Property, with Lender having the right to hold and disburse such proceeds as the repair or restoration progresses, or to the payment of the Outstanding Principal Balance, together with any accrued interest thereon, subject, nonetheless, to the terms and conditions of the Ground Lease in connection with each of the foregoing.

(j)     The Ground Lease does not impose any restrictions on subletting that would be viewed as commercially unreasonable by a prudent commercial mortgage lender.

(k)     To Borrower's knowledge, each and every Lease is in compliance in all material respects with any applicable restrictions on subleasing contained within the Ground Lease.

(l)     The provisions of the Ground Lease relating to Index Preferences, the USV Current Preference, Deferred Preferences, Project Cash Flow, Available Project Cash Flow, the USV Financing Plan, and USV Development Budget (each as defined in the Ground Lease) are no longer applicable and are of no further force and effect. Additionally, Section 11.3 (Refinancing of Debt) and Section 27.4 (Security Interest) of the Ground Lease are no longer applicable.

(m)     All obligations under the Development Agreement (as defined in the Ground Lease) have been satisfied in full and all USRC Work (as defined in the Ground Lease) has been completed.

(n)     Borrower has not received (and does not anticipate using) any investment tax credits under Section 38 of the Internal Revenue Code, and no ITC Rent (as defined in the Ground Lease) is payable (or anticipated to be payable) under the Ground Lease.

3.1.40. Prime Lease.

(a)     To Borrower's knowledge, the Prime Lease is in full force and effect and, to Borrower's knowledge, no default has occurred under the Prime Lease by Ground Lessor or by Prime Lease Lessor, and, to Borrower's knowledge, there is no existing condition which, but for the passage of time or the giving of notice, could result in a default under the terms of the Prime Lease.  To Borrower's knowledge, all ground rent under the Prime Lease has been paid in full and neither Ground Lessor nor Prime Lease Lessor has commenced any action or given or received any notice for the purpose of terminating the Prime Lease.  To Borrower's knowledge, the applicable fee estate under the Prime Lease is not an asset in any voluntary or involuntary bankruptcy, reorganization or insolvency proceeding.

(b)     The Prime Lease or a memorandum thereof has been duly recorded, and, to Borrower's best knowledge, there have not been any modifications, amendments or other changes in the terms of the Prime Lease since recordation of the Prime Lease or a memorandum thereof.

(c)     Ground Lessor's interest in the Prime Lease is not subject to any Lien superior to, or of equal priority with, the Security Instrument.

(d)     The Prime Lease requires Prime Lease Lessor to give notice of any default by Ground Lessor to Lender prior to exercising its remedies thereunder in accordance with the terms of the Prime Lease.  The Prime Lease further provides that notice of termination given under the Prime Lease is not effective against Lender unless a copy of such notice has been delivered to Lender.

(e)     If Lender provides notice of the Security Instrument to Prime Lease Lessor in accordance with the requirements of the Prime Lease, (i) the Prime Lease requires Prime Lease Lessor to give notice of any default by Ground Lessor to Lender prior to exercising its remedies thereunder and (ii) the Prime Lease or estoppel letter received by Lender from Prime Lease Lessor further provides that notice of termination given under the Prime Lease is not effective against Lender unless a copy of such notice has been delivered to Lender in the manner described in the Prime Lease or such estoppel letter.

(f)     The Prime Lease has a term which extends not less than thirty (30) years beyond the Maturity Date (including any extensions thereof in accordance with the terms and conditions of this Agreement).

(g)     The Prime Lease provides that in the event of any cancellation, termination or surrender of the Prime Lease, whether voluntary, involuntary or by operation of law prior to the expiration of the Ground Lease, the Ground Lease would continue in full force and Prime Lease Lessor would recognize the Ground Lease and Borrower's rights thereunder and establish direct privity with the same force and effect as if the Ground Lease was originally made from Prime Lease Lessor in favor of Borrower.

3.1.41. <u>Patriot Act</u>.

(a)     None of Borrower or any of its Control Affiliates is a Prohibited Person. To the best of Borrower's knowledge, no other Affiliate of Borrower or any of Borrower's or Borrower's Affiliate's respective brokers or other agents acting or benefiting in any capacity in connection with the Loan, is a Prohibited Person.

(b)     Neither Borrower nor any of Borrower's Control Affiliates, nor, to Borrower's knowledge, any other Affiliate of Borrower, nor any of their respective brokers or other agents acting in any capacity in connection with the Loan, (i) has conducted or will conduct any business or has engaged or will engage in any transaction or dealing with any Prohibited Person, including making or receiving any contribution of funds, goods or services to or for the benefit of any Prohibited Person, (ii) has dealt or will deal in, or otherwise has engaged or will engage in, any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224; or (iii) has engaged or will engage in or has conspired or will conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in the Patriot Act.

(c)     Borrower covenants and agrees to deliver to Lender any certification or other evidence requested from time to time by Lender in its sole discretion, confirming Borrower's compliance with this <u>Section 3.1.41</u>.

3.1.42. <u>Intentionally Omitted</u>.

3.1.43. <u>No Casualty</u>.  The Property has suffered no material Casualty which has not been fully repaired and the cost thereof fully paid.

3.1.44. <u>Purchase Options</u>.  Neither the Property nor any part thereof is subject to any purchase options, rights of first refusal, rights of first offer or other similar rights in favor of any Person.

3.1.45. <u>Use of Property</u>.  The Property consists solely of a retail and office complex and related ancillary operations and is used for no other purpose.

3.1.46. <u>Fiscal Year</u>.  Each Fiscal Year of Borrower commences on January 1.

3.1.47. <u>Material Agreements</u>.  Each of the Material Agreements is in full force and effect, there are no material monetary or other defaults by Borrower thereunder and, to the best knowledge of Borrower, there are no material monetary or other defaults thereunder by any other party thereto.  None of Borrower, any Manager or any other Person acting on Borrower's

behalf has given or received any notice of any material default under any Material Agreement that remains outstanding or in dispute. No Material Agreement has as a party a Control Affiliate of Borrower.

3.1.48. <u>Other Obligations and Liabilities</u>. Borrower has no known liabilities or other obligations that arose or accrued prior to the Closing Date that, either individually or in the aggregate, could have a Material Adverse Effect. Borrower has no known contingent liabilities that could have a Material Adverse Effect.

3.1.49. <u>Illegal Activity</u>. No portion of the Property has been or will be purchased with proceeds of any illegal activity.

3.1.50. <u>Underwriting Representations</u>. Borrower hereby represents with respect to Borrower that:

(a) it has no material judgments or liens of any nature against it except for tax liens not yet due;

(b) it is not involved in any dispute with any taxing authority other than possible tax challenges by Borrower;

(c) it is not now, nor has ever been, party to any material lawsuit, arbitration, summons, or legal proceeding that is still pending or that resulted in a judgment against it or its assets or properties that has not been paid in full;

(d) each amendment and restatement of Borrower's Organizational Documents (if any) has been accomplished in accordance with, and was permitted by, the relevant provisions of said documents prior to its amendment or restatement from time to time; and

(e) each assignment or transfer of limited liability company interests in Borrower by all prior members of Borrower to their successor member and the admission of their successor member as a member of Borrower was accomplished in accordance with, and was permitted by, the applicable limited liability company agreement governing the affairs of Borrower at the time of such assignment or transfer and admission

(f) except as previously disclosed to Lender in writing, with respect to any loan or financing in which any Restricted Party (other than any Restricted Party under subclause (ii) of the definition of "Restricted Party") or any Affiliate thereof has been directly or indirectly obligated for or has, in connection therewith, otherwise provided any guaranty, indemnity or similar surety, none of such loans or financings has ever been (i) more than 30 days in default or (ii) transferred to special servicing.

3.1.51. <u>Subsidiaries</u>. Borrower does not have any subsidiaries.

**Section 3.2.**    Survival of Representations.   The representations and warranties set forth in Section 3.1 hereof shall survive for so long as any amount remains payable to Lender under this Agreement or any of the other Loan Documents.

## IV.    BORROWER COVENANTS

**Section 4.1.**    Borrower Affirmative Covenants.   Borrower hereby covenants and agrees with Lender that:

4.1.1.   Existence; Compliance with Legal Requirements.   Borrower shall do or cause to be done in all material respects all things necessary to preserve, renew and keep in full force and effect its existence, rights, licenses, permits and franchises and comply in all material respects with all Legal Requirements applicable to it and the Property.   There shall never be committed by Borrower and Borrower shall not permit any other Person in occupancy of or involved with the operation or use of the Property to commit any act or omission affording the federal government, any state or local government or any other Governmental Authority the right of forfeiture against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents.   Borrower hereby covenants and agrees not to commit, permit or suffer to exist any act or omission affording such right of forfeiture.   Borrower shall at all times maintain, preserve and protect all franchises and trade names and preserve all of its assets and properties used in the conduct of its business and shall keep the Property in good working order and repair, and from time to time make, or cause to be made, all reasonably necessary repairs, renewals, replacements, betterments and improvements thereto, all as more fully provided in the Security Instrument.   Borrower shall keep the Property insured at all times by financially sound and reputable insurers, to such extent and against such risks, and maintain liability and such other insurance, as is more fully provided in this Agreement.   Borrower shall operate the Property in accordance with the terms and provisions of the O&M Plan in all material respects.   After prior notice to Lender, Borrower, at its sole cost and expense, may contest by appropriate legal proceeding promptly initiated and conducted in good faith and with due diligence, the validity of any Legal Requirement, the applicability of any Legal Requirement to Borrower or the Property or any alleged violation of any Legal Requirement; provided that (a) no Default or Event of Default has occurred and remains outstanding; (b) intentionally omitted; (c) such proceeding shall be permitted under and be conducted in accordance with the provisions of any instrument to which Borrower or the Property is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all applicable statutes, laws and ordinances; (d) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, canceled or lost; (e) Borrower shall promptly upon final determination thereof comply with such Legal Requirement determined to be valid or applicable or cure any violation of such Legal Requirement; (f) such proceeding shall suspend the enforcement of the contested Legal Requirement against Borrower or the Property; (g) Borrower shall furnish such cash or other security as may be required in the proceeding, or as may be reasonably requested by Lender, to ensure compliance with such Legal Requirement, together with all interest and penalties payable in connection therewith; and (h) such contest by Borrower is not in violation of the Ground Lease, the Prime Lease, or any Lease.   Lender may apply any such security or part thereof, as necessary to cause compliance with such Legal Requirement at any time when, in the

66

reasonable judgment of Lender, the validity, applicability or violation of such Legal Requirement is finally established or the Property (or any part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, canceled or lost or there shall be any danger of the Lien of the Security Instrument being primed by any related Lien.

      4.1.2.  <u>Taxes and Other Charges</u>.  Borrower shall pay or cause to be paid all Taxes and Other Charges now or hereafter levied or assessed or imposed against the Property or any part thereof as the same become due and payable; <u>provided</u>, <u>however,</u> Borrower's obligation to directly pay Taxes shall be suspended for so long as Borrower is required to make a Monthly Tax Deposit and otherwise complies with the terms and provisions of <u>Section 6.2</u> hereof. Borrower shall not permit or suffer and shall promptly cause to be paid and discharged any Lien or charge against the Property which is not a Permitted Encumbrance.  After prior notice to Lender, Borrower, at its sole cost and expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any Taxes or Other Charges, <u>provided</u> that (a) no Default or Event of Default has occurred and remains outstanding; (b) intentionally omitted; (c) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower or the Property is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all applicable Legal Requirements; (d) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, canceled or lost; (e) Borrower shall promptly upon final determination thereof pay the amount of any such Taxes or Other Charges, together with all costs, interest and penalties which may be payable in connection therewith; (f) such proceeding shall suspend the collection of such contested Taxes or Other Charges from the Property; (g) Borrower shall furnish such cash or other security as may be required in the proceeding, or as may be reasonably requested by Lender, to ensure the payment of any such Taxes or Other Charges, together with all interest and penalties thereon; and (h) such contest by Borrower is not in violation of the Ground Lease, the Prime Lease, or any Lease.  Lender may pay over, assign or transfer any such security or part thereof to the claimant entitled thereto at any time when, in the reasonable judgment of Lender, the entitlement of such claimant is established or the Property (or any part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, canceled or lost or there shall be any danger of the Lien of the Security Instrument being primed by any related Lien.

      4.1.3.  <u>Litigation</u>.  Borrower shall give prompt notice to Lender of any litigation or governmental proceedings pending or threatened against the Property, Borrower or Guarantor which, if adversely determined, could have a Material Adverse Effect.  Borrower shall cooperate fully with Lender with respect to any proceedings before any court, board or other Governmental Authority which may in any way affect the rights of Lender hereunder or under any of the other Loan Documents and, in connection therewith, permit Lender, at its election, to participate in any such proceedings.

      4.1.4.  <u>Access to Property</u>.  Borrower shall permit agents, representatives and employees of Lender to inspect the Property or any part thereof at reasonable hours upon reasonable advance notice, subject to the rights of Tenants and the provisions of any

67

Management Agreement entered into in accordance with the terms and conditions of this Agreement.

4.1.5.   Further Assurances; Supplemental Mortgage Affidavits.   Borrower shall, at Borrower's sole but reasonable cost and expense:

(a)   furnish to Lender all instruments, documents, boundary surveys, footing or foundation surveys, certificates, plans and specifications, appraisals, title and other insurance reports and agreements, and each and every other document, certificate, agreement and instrument in Borrower's possession or otherwise required to be furnished by Borrower pursuant to the terms of the Loan Documents or which are reasonably requested by Lender in connection therewith;

(b)   cure, or cause to be cured, any defects in the execution and delivery of the Loan Documents;

(c)   execute and deliver, or cause to be executed and delivered, all such documents, instruments, certificates, assignments and other writings and do, or cause to be done, such other acts necessary (i) to correct any omissions in the Loan Documents, (ii) to evidence and more fully describe the collateral at any time securing or intended to secure the Obligations, (iii) to perfect, protect or preserve any Liens created under any of the Loan Documents or (iv) to make any recordings, file any notices, or obtain any consents, as may be necessary or appropriate in connection therewith; and

(d)   do and execute, or cause to be done and executed, all such further lawful and reasonable acts, conveyances and assurances for the better and more effective carrying out of the intents and purposes of this Agreement and the other Loan Documents, as Lender shall reasonably require from time to time.

4.1.6.   Financial Reporting.

(a)   GAAP.   Borrower shall keep and maintain or shall cause to be kept and maintained, in accordance with GAAP (or such other Approved Accounting Method) proper and accurate books, records and accounts reflecting all of the financial affairs of Borrower and all items of income and expense in connection with the operation of the Property.   All financial statements delivered to Lender pursuant to this Section 4.1.6 shall be prepared in accordance with GAAP (or such other Approved Accounting Method) consistently applied.

(b)   Intentionally Omitted.

(c)   Quarterly Reports.   Borrower shall furnish, or cause to be furnished, to Lender on or before sixty (60) days after the end of each calendar quarter (provided, that, the quarterly and year-to-date operating statements required to be delivered pursuant to clause (ii)(B) of this Section 4.1.6(c) for the relevant period ending on December 31st of any calendar year shall be furnished, or cause to be furnished, to Lender on or before ninety (90) days after the end of each calendar year), (i) a rent roll for the subject quarter and a summary setting forth each of the following with respect to the Property for such quarter:  (1) aggregate sales by Tenants under

Leases or other occupants of the Property, both on an actual and on a comparable store basis, (2) rent per square foot payable by each Tenant, and (3) aggregate occupancy of the Property by anchor space and in-line store space as of the last day of such quarter (such rent roll and summary to be accompanied, if a Trigger Period is then continuing, by an Officer's Certificate stating that the same are true, correct and complete in all material respects); (ii) the following items accompanied by an Officer's Certificate stating that such items are true, correct and complete in all material respects and fairly present the financial condition and results of the operations of Borrower and the Property (subject to normal year-end adjustments) as applicable: (A) a balance sheet for Borrower as of the last day of such quarter and (B) quarterly and year-to-date operating statements prepared for such quarter in form reasonably satisfactory to Lender (in addition, such Officer's Certificate or an Officer's Certificate from any other officer of Borrower shall also state that the representations and warranties of Borrower set forth in <u>Section 3.1.24</u> are true and correct in all material respects as of the date of such certificate and that there are no trade payables and operational debt outstanding for more than sixty (60) days) (unless the same are being disputed in good faith and have been properly accounted and/or reserved for with Lender); (iii) copies of any final engineering, environmental or seismic reports prepared for Borrower with respect to the Property and received by Borrower during such calendar quarter; (iv) receipts for the payment of the Taxes required hereunder to be paid during such calendar quarter, and (v) a statement setting forth the amounts on deposit in the Capital Reserve Account and showing the deposits to and disbursements from the Capital Reserve Account during such calendar quarter; <u>provided</u>, <u>however</u>, that Borrower is not required to furnish such receipts for payment of Taxes in the event that such Taxes have been paid by Lender pursuant to <u>Section 6.2</u> hereof.  Notwithstanding anything to the contrary, if a Trigger Period is then continuing, the items in <u>clauses (i)</u> and <u>(ii)</u> above and tenant sales reports (to the extent available) shall be furnished to Lender within thirty (30) days after the end of each calendar month (except for the months of January and the last month of a quarter).

    (d) <u>Annual Reports</u>.  Borrower shall furnish to Lender annually, (i) within eighty-five (85) days following the end of each Fiscal Year of Borrower, a complete unaudited copy of Borrower's annual financial statements covering the Property for such Fiscal Year and containing statements of profit and loss for Borrower and the Property and a balance sheet for Borrower and (ii) within one hundred twenty (120) days following the end of each Fiscal Year of Borrower, a complete copy of Borrower's annual financial statements covering the Property for such Fiscal Year and containing statements of profit and loss for Borrower and the Property and a balance sheet for Borrower which shall be audited by a "Big Four" accounting firm or other firm of independent certified public accountants reasonably acceptable to Lender.  Such statements shall set forth the financial condition and the results of operations for the Property for such Fiscal Year.  The accounting firms of Grant Thorton, Shanholt, Glassman, Klein, Kramer & Co., and Berdon LLP shall be deemed acceptable to Lender for all purposes hereunder; provided, however that such deemed acceptance may be revoked at such time as Lender has a reasonable basis for such revocation.  In addition, Borrower shall simultaneously deliver to Lender a sales report for the Property for the preceding twelve (12) months.  Borrower may, at Borrower's option, request in writing from time to time that Lender waive the requirement that Borrower's annual financial statements be audited and be accompanied by an opinion of a "Big Four" accounting firm or other firm of independent certified public accountants reasonably acceptable to Lender unqualified as to going concern status, and in the event that (i) Lender consents to such

69

request and (ii) Borrower delivers to Lender a Rating Agency Confirmation with respect to such waiver by Lender, Borrower's annual financial statements shall be accompanied by an Officer's Certificate from the chief financial officer of Borrower stating that each such annual financial statement presents fairly the financial condition and the results of operations of Borrower and the Property being reported upon and has been prepared in accordance with GAAP (or such other Approved Accounting Method).

(e)     Supporting Documentation.  Each such financial statement shall be in scope and detail reasonably satisfactory to Lender.

(f)     Access.  Lender shall have the right from time to time with reasonable advance notice to Borrower at all times during normal business hours to examine such books, records and accounts at the office of Borrower or other Person maintaining such books, records and accounts and to make such copies or extracts thereof as Lender shall desire.  After the occurrence of an Event of Default, Borrower shall pay any costs and expenses incurred by Lender to examine Borrower's accounting records with respect to the Property, as Lender shall determine to be necessary or appropriate in the protection of Lender's interest.

(g)     Format of Delivery.  Any reports, statements or other information required to be delivered under this Agreement shall be delivered (i) in paper form, (ii) on a diskette, and (iii) if requested by Lender and within the capabilities of Borrower's data systems without change or modification thereto, in electronic form reasonably acceptable to Lender.

(h)     Annual Budget.  For each Fiscal Year (or portion thereof) during the term of the Loan, Borrower shall submit to Lender an Annual Budget not later than forty-five (45) days after the commencement of such Fiscal Year, which Annual Budget shall set forth, on a month-by-month basis, in reasonable detail, each line item of Borrower's good faith estimate of Gross Rents, Operating Income, Operating Expenses and Capital Expenditures for such period or Fiscal Year.  The Annual Budget shall be submitted to Lender for information only, provided that upon the occurrence of a Trigger Period, Borrower shall submit to Lender, within thirty (30) days after the commencement of such Trigger Period, an Annual Budget conforming to the requirements of this clause (h) and otherwise in form reasonably satisfactory to Lender for the partial year period commencing upon the occurrence of such Trigger Period, and for each Fiscal Year thereafter until the occurrence of a cure of all Trigger Periods, for Lender's reasonable approval (each such Annual Budget, an "**Approved Annual Budget**").  In the event that Lender objects to a proposed Annual Budget submitted by Borrower for Lender's approval, Lender shall advise Borrower of such objections within fifteen (15) days after receipt thereof (and deliver to Borrower a reasonably detailed description of such objections) and Borrower shall promptly revise such Annual Budget and resubmit the same to Lender.  Lender shall advise Borrower of any objections to such revised Annual Budget within ten (10) days after receipt thereof (and deliver to Borrower a reasonably detailed description of such objections) and Borrower shall promptly revise the same in accordance with the process described in this Section 4.1.6(h) until Lender approves such Annual Budget.  Until such time that Lender approves a proposed Annual Budget requiring Lender's approval, the most recent Approved Annual Budget, if any, and if there was no Approved Annual Budget for the prior Fiscal Year, then the monthly expenditures for the 2018 Fiscal Year of Borrower set forth on the schedule delivered to and approved by

70

Lender on or prior to the date hereof and attached to that certain Borrower's Certification, dated as of the date hereof, by Borrower in favor of Lender (the "**2018 Annual Expenditure Schedule**") shall apply and during such period shall be deemed to be the most recent "**Approved Annual Budget**" for all purposes of the Loan Documents; provided that, such Approved Annual Budget or 2018 Annual Expenditure Schedule, as applicable, shall be adjusted to reflect actual increases in Taxes, Insurance Premiums and Other Charges and all other amounts in the 2018 Annual Expenditure Schedule, if applicable, shall be increased or decreased for each full calendar year between 2018 and the calendar year in which the determination is made based on the PPI Index for each such calendar year.   In the event that Borrower must incur an extraordinary operating expense or capital expense not set forth in the applicable Approved Annual Budget or 2018 Annual Expenditure Schedule, as applicable (each, an "**Extraordinary Expense**"), then Borrower shall promptly deliver to Lender a reasonably detailed explanation of such proposed Extraordinary Expense for Lender's approval which approval shall not be unreasonably withheld or delayed.  In no event shall Lender's approval of an Approved Annual Budget be deemed to waive, alter, restrict or otherwise impair Lender's rights and remedies pursuant to the Loan Documents following the occurrence and during the continuance of an Event of Default to apply amounts on deposit in the Clearing Account or Cash Management Account or any other Collateral (as defined in the Cash Management Agreement) or Property to the payment of the Debt in any order, proportion and priority as Lender may determine in its sole and absolute discretion.

(i)     Other Required Information.  Borrower shall furnish to Lender, within five (5) Business Days after request (or as soon thereafter as may be reasonably possible), such further detailed information with respect to the operation of the Property and the financial affairs of Borrower as may be reasonably requested by Lender.

(j)     Reporting Default.  If Borrower fails to provide to Lender the financial statements and other information specified in this Section 4.1.6 within the respective time period specified, then Lender shall have the right to declare a Default and Borrower shall have the notice and cure period set forth in Section 10.1(u) hereof.

4.1.7.   Title to Property.  Borrower shall warrant and defend (a) its title to the Property, subject only to Permitted Encumbrances, and (b) the validity and priority of the Liens of the Security Instrument and the Assignment of Leases on the Property, subject only to Permitted Encumbrances, in each case against the claims of all Persons whomsoever. Borrower shall reimburse Lender for any losses, costs, damages or expenses (including reasonable attorneys' fees and court costs) incurred by Lender if an interest in the Property or any part thereof is claimed by any other Person except as expressly permitted hereunder.

4.1.8.   Estoppel Statement.  (a)  Borrower shall deliver to Lender, within ten (10) days after Lender's request, a statement, duly acknowledged and certified, setting forth (i) the outstanding principal amount of the Loan, (ii) the unpaid principal amount of the Loan, (iii) the rate of interest on the Loan, (iv) the date installments of principal and/or interest were last paid, (v) any offsets or defenses to the payment and performance of the Obligations, if any, and (vi) that this Agreement and the other Loan Documents are valid, legal and binding obligations of Borrower and have not been modified (or, if modified, giving particulars of such

71

modification). In connection with any Transfer (including any pledge) permitted under, and effected in accordance with, the Loan Documents of direct or indirect ownership interests in Borrower to a Person that is not an Affiliate of Borrower, or as otherwise reasonably requested by Borrower, Lender shall deliver to Borrower, within ten (10) days after Borrower's request, a statement, duly acknowledged and certified, setting forth (i) the outstanding principal amount of the Loan, (ii) the unpaid principal amount of the Loan, (iii) the rate of interest on the Loan, (iv) the date installments of principal and/or interest were last paid, (v) any defaults or breaches in Borrower's obligations under the Loan Documents, and (vi) that this Agreement and the other Loan Documents have not been modified (or, if modified, giving particulars of such modification).

(b)       Borrower shall deliver to Lender, within thirty (30) days after Lender's request, an estoppel certificate from each Tenant under any Lease in form and substance reasonably satisfactory to Lender; provided that (i) Borrower shall only be required to use commercially reasonable efforts to obtain an estoppel certificate from any Tenant, (ii) such estoppel certificate may be in the form required under the respective Tenant's Lease, and (iii) after the final Securitization of the Loan, Borrower shall not be required to deliver such estoppel certificate from any Tenant more frequently than once in any calendar year.

(c)       Borrower shall use commercially reasonable efforts to deliver to Lender, within thirty (30) days after Lender's request, an estoppel certificate from each party to any REA in form and substance in the form required under any REA (or, if the applicable REA does not require any such form, in form and substance reasonably satisfactory to Lender), provided that after the final Securitization of the Loan, Borrower shall not be required to deliver such estoppel certificate from any such party to any REA more frequently than once in any calendar year.

4.1.9.   Leases.

(a)       Leases (excluding any extensions or renewals of existing Leases pursuant to options expressly contained therein as to which Borrower has no discretion) executed after the Closing Date shall (i) be on commercially reasonable terms, (ii) provide that such Lease is subordinate to the Security Instrument and the Assignment of Leases and that the Tenant thereunder will attorn to Lender and any purchaser at a foreclosure sale subject to appropriate provisions for non-disturbance to the extent the Tenant is not in default thereunder, (iii) not be with any Affiliate of Borrower, Guarantor or any Manager (provided that (A) Lender's consent shall not be required for Leases of administrative or managerial offices for the Property entered into in accordance with Section 4.2.5 and the other provisions hereof, and (B) Lender shall not unreasonably withhold consent to any other Lease with any such Affiliate), (iv) not contain any option to purchase, any right of first option to purchase, any right of first refusal to purchase, or any other terms which could materially adversely affect Lender's rights under the Loan Documents (provided that, in connection with renewals of Leases existing on the Closing Date, any applicable term that would otherwise breach the requirements set forth in this Section 4.1.9(a) shall be permitted to the extent necessary to implement a renewal term expressly contained in the applicable Lease and with respect to which Borrower has no discretion), and (v) be in writing. Notwithstanding the foregoing or anything herein to the contrary, each and

72

every Lease (including any extensions or renewals of existing Leases) executed after the Closing Date shall be in material compliance with the terms, provisions, and conditions of the Ground Lease and the Prime Lease.

(b)        Borrower (i) shall perform in all material respects and in a commercially reasonable manner the obligations which Borrower is required to perform under the Leases; (ii) shall enforce the obligations to be performed by the Tenants thereunder in a commercially reasonable manner; (iii) shall promptly furnish to Lender (A) any notice of default in any material respect under a Major Lease, (B) any notice of default under a Lease other than a Major Lease which could reasonably be expected to have a Material Adverse Effect, (C) any notice of termination received by Borrower from any Tenant under a Major Lease or, upon Lender's request, any such notice received from any Tenant under any other Lease, (D) any notice given by Borrower regarding default in any material respect under a Major Lease, (E) any notice given by Borrower regarding default under a Lease other than a Major Lease which could reasonably be expected to have a Material Adverse Effect, or (F) any notice of termination given by Borrower to any Tenant under a Major Lease or, upon Lender's request, any such notice given to any Tenant under any other Lease; (iv) shall not collect any Rents for more than one (1) month in advance of the time when the same shall become due (other than bona fide security deposits); (v) shall not further assign or encumber any Lease or the Rents (except as contemplated by the Loan Documents); (vi) may amend in a commercially reasonable manner and in a manner not to cause a Material Adverse Effect (x) the terms, covenants and conditions contained in the Leases other than a Major Lease upon the part of the Tenant thereunder to be observed or performed, and (y) the terms, covenants and conditions contained in a Major Lease, provided that with respect to such amendment which amends any of the material economic terms of such Major Lease the prior consent of Lender to such amendment has been obtained, such consent not to be unreasonably withheld; and (vii) may terminate or accept a surrender of (1) any Lease other than a Major Lease, if by reason of a default by the Tenant thereunder or if otherwise commercially reasonable and provided such termination will not cause a Material Adverse Effect and (2) a Major Lease if by reason of a material uncured default by the Tenant that exists for at least ninety (90) days thereunder (and provided that Borrower provides to Lender prior written notice of its intent to terminate such Major Lease, such termination is commercially reasonable and will not cause a Material Adverse Effect) or otherwise with prior written consent of Lender.  Any action in violation of clause (v), (vi) and (vii) of this Section 4.1.9(b) shall be void at the election of Lender.

(c)        All Major Leases and all extensions or renewals thereof (other than extensions or renewals strictly limited to the implementation of options or rights expressly contained in such Major Lease and with respect to which Borrower has no discretion as to the terms thereof) executed after the Closing Date shall be subject to the prior written consent of Lender, which approval shall not be unreasonably withheld, conditioned or delayed (provided, that with respect to any Major Lease executed after the Closing Date that contains an option or preferential right to purchase all or any portion of the Property, Lender may grant or withhold its consent in its sole and absolute discretion).  Borrower shall pay or cause to be paid to Lender in connection with Lender's review of such Major Leases and all extensions or renewals thereof (other than extensions or renewals strictly limited to the implementation of options or rights expressly contained in such Major Lease and with respect to which Borrower has no discretion

24427924.15

as to the terms thereof), Lender's actual costs reasonably incurred in connection with such review but not to exceed, in the aggregate, One Thousand Five Hundred and No/100 Dollars ($1,500.00) for each such Major Lease or such extension or renewal thereof.  In no event shall Borrower be required to post an expense deposit or enter into a retainer agreement with Lender or Servicer in connection with Borrower's request to enter into such Major Lease or such extension or renewal thereof.

(d)     Intentionally omitted.

(e)     Intentionally omitted.

(f)     At Borrower's request, Lender shall enter into a subordination, non-disturbance and attornment agreement prepared by Borrower and delivered to Lender in the form attached hereto as Schedule IV (each, an "**SNDA**") modified to conform to the parties and other identifying information of the applicable Lease (accompanied by a "blackline" against such form) as to any Lease permitted under the Loan Documents.  Notwithstanding the foregoing, in the event that the applicable tenant and/or Borrower negotiates the form of the SNDA, Borrower shall pay or cause to be paid to Lender, in addition to the foregoing, Lender's actual costs reasonably incurred in connection with such negotiation but not to exceed, in the aggregate, Five Thousand and No/100 Dollars ($5,000.00) for each such SNDA.  In no event shall Borrower be required to post an expense deposit or enter into a retainer agreement with Lender or Servicer in connection with Borrower's request to enter into such SNDA.

(g)     Intentionally omitted.

(h)     Within ten (10) days after Lender's request, Borrower shall furnish to Lender a statement of all Tenant security or other deposits and copies of all Leases not previously delivered to Lender, certified as being true, correct and complete.

(i)     All security deposits of Tenants, whether held in cash or any other form, shall be held in compliance with the Leases and all applicable Legal Requirements.  Any bond or other instrument which Borrower is permitted to hold in lieu of cash security deposits under the applicable Legal Requirements shall be maintained in full force and effect in the full amount of such deposits unless replaced by cash deposits as described above.  Borrower shall, upon request, provide Lender with evidence satisfactory to Lender of Borrower's compliance with the foregoing.

(j)     With regard to any action described in this Section 4.1.9 for which Lender's consent is required, to the extent that the Deemed Approval Requirements are fully satisfied in connection with any Borrower request for Lender consent under this Section and Lender thereafter fails to respond, Lender's approval shall be deemed given with respect to the matter for which approval was requested.

4.1.10. Alterations.  Lender's prior approval shall not be required in connection with any alterations to the Property which (i) would not reasonably be expected to have a Material Adverse Effect or (ii) the cost of which (including any related alteration, improvement or replacement) is not reasonably anticipated to exceed the Alteration Threshold.  Subject to the

74

immediately following sentence, in the event that Lender's approval shall be required in connection with any alterations to the Property, such approval shall not be unreasonably withheld, conditioned or delayed.  Notwithstanding anything herein to the contrary, Lender's prior approval shall be required in connection with any alterations to the Property that are performed during the continuance of any Event of Default, which approval may be granted or withheld in Lender's sole discretion.  Any alteration to the Property shall be (i) done and completed by Borrower in an expeditious and diligent fashion, (ii) done and completed by Borrower in material compliance with all applicable Legal Requirements (including, without limitation, all Legal Requirements applicable to the parking available at the Property to the extent Borrower is responsible for the same pursuant to the Ground Lease or the Prime Lease), and (iii) done and completed by Borrower in compliance with the terms, provisions, and conditions of the Ground Lease and the Prime Lease.  If the total unpaid amounts incurred or to be incurred with respect to such alterations to the Property occurring simultaneously or to terminate any of the alterations and restore the Property to the extent necessary to prevent any Material Adverse Effect, other than Alteration Costs to be paid or reimbursed by any Tenant under such Tenant's Lease (provided that the applicable Lease shall be in full force and effect) (collectively, "**Alterations Costs**") shall at any time exceed the Alteration Threshold, Borrower shall promptly deliver to Lender as security for the payment of such Alteration Costs in excess of the Alteration Threshold and as additional security for Borrower's obligations under the Loan Documents any of the following at Borrower's option:  (W) cash, (X) Letters of Credit, (Y) U.S. Obligations or (Z) other securities acceptable to Lender (provided that, in the case of securities that are not Permitted Investments, following a Securitization, Lender shall have received a Rating Agency Confirmation as to the form and issuer of same such security; provided further, without limiting Borrower's obligation to deliver such security in the amount of such excess in the form of the foregoing (W), (X), (Y) and/or (Z), any Letter of Credit when aggregated with all other Letters of Credit shall not exceed ten percent (10%) of the Outstanding Principal Balance), which may be reduced from time to time at the request of Borrower to an amount equal to the excess of the total unpaid amounts incurred or to be incurred as then estimated by Borrower and reasonably approved by Lender to complete such alterations or to terminate any of the alterations and restore the Property to the extent necessary to prevent any Material Adverse Effect, and, at Lender's option, Lender shall have the right to apply such security from time to time to pay for such alterations or termination and restoration.  Upon substantial completion of any alteration to the Property or termination of any alterations and restoration of the Property which requires Lender's consent, Borrower shall provide evidence satisfactory to Lender that (1) such alteration or termination and restoration was constructed in accordance with all applicable Legal Requirements in all material respects, (2) all contractors, subcontractors, materialmen and professionals who provided work, materials or services in excess of the Work Threshold in connection with such alteration or termination and restoration have been paid in full and have delivered unconditional releases of Liens (unless waived in writing by Lender), and (3) all licenses and permits necessary for the use, operation and occupancy of the Improvements have been issued, provided that, if any such license or permit is temporary in nature, Borrower shall diligently pursue procuring a permanent license or permit from the applicable Governmental Authority unless the failure to hold such license or permit would not reasonably be expected to result in a Material Adverse Effect.  With regard to any action described in this Section 4.1.10 for which Lender's consent is required, to the extent that the Deemed Approval Requirements are fully satisfied in connection with any Borrower request for Lender consent under this Section

and Lender thereafter fails to respond, Lender's approval shall be deemed given with respect to the matter for which approval was requested.

4.1.11. <u>Required Repairs</u>.  Borrower shall perform the repairs at the Property as set forth on <u>Schedule II</u> hereto and repair any roof leaks (if any) (all such repairs are hereinafter referred to as "**Immediate Repairs**") and shall complete each of the Immediate Repairs on or before the respective deadline for each repair set forth on <u>Schedule II</u> hereto (and with respect to any roof leaks, within six (6) months of the Closing Date) (as such deadlines may be extended by Lender in its sole but reasonable discretion). Upon completion of any Immediate Repair, Borrower shall deliver to Lender (A) an Officer's Certificate stating that such Immediate Repair has been completed in a good and workmanlike manner and in accordance with all applicable Legal Requirements, such Officer's Certificate to be accompanied by a copy of any license, permit or other approval by any Governmental Authority required in connection with the Immediate Repairs and (B) such other evidence as Lender shall reasonably request that such Immediate Repair has been completed and each Person that supplied materials or labor in connection with the Immediate Repair has been paid in full.

4.1.12. <u>Material Agreements</u>.  Borrower shall (a) promptly perform and/or observe the covenants, agreements and conditions required to be performed and observed by it under each Material Agreement and Operating Agreement to which it is a party, and do all things necessary to preserve and to keep unimpaired its rights thereunder, (b) promptly notify Lender in writing of the giving of any notice of any material default by any party under any Material Agreement and Operating Agreement of which it is aware and (c) promptly enforce the performance and observance in all material respects of all of the covenants, agreements and conditions required to be performed and/or observed by any other party under each Material Agreement and Operating Agreement to which Borrower is a party in a commercially reasonable manner.

4.1.13. <u>Unfunded Obligations</u>.  Borrower shall promptly perform any Unfunded Obligations in a timely manner.

4.1.14. <u>Costs of Enforcement/Remedying Defaults</u>.  In the event (a) that the Security Instrument is foreclosed in whole or in part or the Note or any other Loan Document is put into the hands of an attorney for collection, suit, action or foreclosure, (b) of the foreclosure of any Lien or mortgage, whether senior or junior to the Security Instrument, in which proceeding Lender is made a party, (c) of the bankruptcy, insolvency, rehabilitation or other similar proceeding in respect of Borrower or Guarantor or an assignment by Borrower or Guarantor for the benefit of its creditors, or (d) Lender shall remedy or attempt to remedy any Event of Default, Borrower shall be chargeable with and agrees to pay all costs and expenses incurred by Lender as a result thereof, including costs of collection and defense (including reasonable attorneys', experts', consultants' and witnesses' fees and disbursements) in connection therewith and in connection with any appellate proceeding or post-judgment action, which shall be due and payable on demand, together with interest at the Default Rate from the date such costs and expenses were incurred to and including the date the reimbursement payment is received by Lender.  All such Indebtedness shall be secured by the Security Instrument.

4.1.15. Business and Operations.   Borrower will continue to engage in the businesses currently conducted by it as and to the extent the same are necessary for the ownership, management and operation of the Property.  Borrower will qualify to do business and will remain in good standing under the laws of each jurisdiction as and to the extent the same are required for the ownership, management and operation of the Property.  Borrower shall at all times cause the Property to be maintained primarily as a retail and office complex.

4.1.16. Station Renovations.   None of the contemplated renovations of the Property will materially impair the utility and operation of the Property or otherwise have a Material Adverse Effect.

4.1.17. Intentionally Omitted.

4.1.18. Handicapped Access.   Borrower covenants and agrees that the Property shall at all times strictly comply in all material respects to the extent applicable with the requirements of the Americans with Disabilities Act of 1990, the Fair Housing Amendments Act of 1988, all federal, state and local laws and ordinances related to handicapped access and all rules, regulations, and orders issued pursuant thereto including, without limitation, the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities.

4.1.19. Recycled Entity.   Borrower hereby represents and warrants to Lender that neither Borrower nor any SPE Entity has, since its formation: (a) failed to be duly formed, validly existing, and in good standing in the jurisdiction of its formation and the State; (b) had any judgments or liens of any nature against it except for (i) tax liens not yet delinquent, (ii) judgments which have been satisfied in full and (iii) liens in connection with any prior loans which have been satisfied in full; (c) failed to comply in all material respects with all laws, regulations, and orders applicable to it or failed to receive all licenses and permits necessary for it to operate; (d) been involved in any dispute with any taxing authority which is unresolved as of the Closing Date or failed to pay all taxes owed prior to the delinquency thereof (or, if later, then with all applicable penalties, interest and other sums due in connection therewith); (e) ever been party to any lawsuit, arbitration, summons, or legal proceeding that is still pending or that resulted in a judgment against it that has not been paid in full; (f) failed to comply with all separateness covenants contained in its organizational documents since its formation; (g) had any material contingent or actual obligations not related to the Property; or (h) except as expressly disclosed to Lender in connection with the closing of the Loan, amended, modified, supplemented, restated, replaced or terminated its organizational documents (or consented to any of the foregoing).

4.1.20. Notice of Certain Events.   Borrower shall promptly notify Lender of, to Borrower's knowledge, any Default or Event of Default, together with a detailed statement of the steps being taken to cure such Default or Event of Default.

4.1.21. Further Assurances; Power of Attorney.   Borrower irrevocably appoints Lender as its true and lawful attorney-in-fact effective upon the occurrence and during the continuation of an Event of Default to do, in its name or otherwise, any and all acts and to execute any and all documents that are necessary for the purpose of exercising and perfecting

77

any and all rights and remedies available to Lender under the Loan Documents, at law and in equity, including, without limitation, such rights and remedies available to Lender pursuant to Section 10.2, Section 10.3, and Section 10.4 (and the above powers granted to Lender are coupled with an interest and shall be irrevocable).

           4.1.22. Taxes on Security.   Borrower shall pay all taxes, charges, filing, registration and recording fees, excises and levies payable with respect to the Note or the Liens created or secured by the Loan Documents, other than income, franchise and doing business taxes imposed on Lender.  If there shall be enacted any law (a) deducting the Loan from the value of the Property for the purpose of taxation, (b) affecting any Lien on the Property, or (c) changing existing laws of taxation of mortgages, deeds of trust, security deeds, or debts secured by real property, or changing the manner of collecting any such taxes, Borrower shall promptly pay to Lender, on demand, all taxes, costs and charges for which Lender is or may be liable as a result thereof; provided, however, that if such payment would be prohibited by law or would render the Loan usurious, then instead of collecting such payment, Lender may declare all amounts owing under the Loan Documents to be immediately due and payable.

           4.1.23. Ground Lease. Without limitation of the other provisions herein (including, without limitation, Section 4.1.12 hereof), Borrower makes the following covenants with respect to the Ground Lease:

           (a)      Borrower shall, at its sole cost and expense, promptly and timely perform and observe in all material respects all terms, covenants and conditions required to be performed and observed by Borrower as lessee under the Ground Lease (including, without limitation, the payment of all Ground Rent).

           (b)      Borrower shall enforce, in all material respects and in a commercially reasonable manner, the terms, covenants and conditions to be performed and observed by Ground Lessor under the Ground Lease.

           (c)      Borrower shall promptly notify Lender of the receipt by Borrower of any written notice from Ground Lessor claiming the occurrence of any default by Borrower under the Ground Lease or the occurrence of any event that, with the giving of notice or passage of time, or both, would constitute a material default by Borrower under the Ground Lease.  Promptly upon its receipt thereof, Borrower shall deliver to Lender a copy of any such written notice from Ground Lessor.

           (d)      Borrower shall promptly notify Lender of the occurrence of any default in any material respect under the Ground Lease by Ground Lessor known to Borrower under the Ground Lease or the occurrence of any event that, with the giving of notice or passage of time, or both, would constitute a material default in any material respect by Ground Lessor under the Ground Lease.  Concurrently with the giving of any notice to Ground Lessor claiming the occurrence of such default or event, Borrower shall deliver a copy thereof to Lender.

           (e)      If Borrower shall be in default under the Ground Lease, then, subject to the terms of the Ground Lease, Borrower shall grant Lender the right (but not the obligation) to cause the applicable default under the Ground Lease to be remedied and otherwise exercise any

78

and all rights of Borrower under the Ground Lease as may be reasonably necessary or desirable to prevent or cure such default; provided that such actions are, in Lender's good faith judgment, reasonably necessary to protect Lender's interest under the Loan Documents.  Subject to the rights of Tenants, Lender shall have the right on notice to Borrower to enter all or any portion of the Property, at such times and in such manner as Lender deems necessary, to prevent or to cure any such default.  If Ground Lessor shall deliver to Lender a copy of any notice of default sent by Ground Lessor to Borrower, such notice shall constitute full protection to Lender for any action taken or not taken by Lender, in good faith, in reliance thereon.

(f)  Subject to the provisions hereof, Borrower shall promptly execute, acknowledge and deliver to Lender such instruments as may reasonably be necessary to permit Lender to cure any default under the Ground Lease or permit Lender to take such other action required to enable Lender to cure or remedy the matter in default and preserve Lender's rights under the Loan Documents with respect to the Property (including, without limitation, the Lien of the Security Instrument and the other Loan Documents).

(g)  The actions or payments of Lender to cure any default by Borrower under the Ground Lease shall not cure or waive, as between Borrower and Lender, the default that occurred under this Agreement by virtue of Borrower's default under the Ground Lease.  All costs and expenses incurred by Lender to cure or attempt to cure any such default shall be paid by Borrower to Lender, upon demand, with interest at the Default Rate from the date such costs and expenses were incurred to and including the date the reimbursement payment is received by Lender.  All such Indebtedness shall be secured by the Security Instrument.

(h)  Intentionally Omitted.

(i)  Borrower shall use reasonable efforts to obtain from Ground Lessor and furnish to Lender within fifteen (15) days after receipt of Lender's request, an estoppel certificate of Ground Lessor stating the date through which Ground Rent has been paid, whether or not there are any defaults under the Ground Lease and specifying the nature of such claimed defaults, if any, and such other matters as Lender may reasonably request; provided that after the final Securitization of any portion of the Loan, Borrower shall not be required to deliver such estoppel certificate from Ground Lessor more frequently than once in any calendar year.

(j)  Without limiting the terms and provisions of Section 4.1.21 hereof, Borrower irrevocably appoints Lender as its true and lawful attorney-in-fact to do, in its name or otherwise, any and all acts and to execute any and all documents that are necessary to preserve any rights of Borrower under or with respect to the Ground Lease, including, without limitation, the right to authorize or otherwise cause or permit the automatic exercise of any option to extend or renew the term of the Ground Lease in accordance with the provisions thereof, or to preserve any rights of Borrower whatsoever in respect of any part of the Ground Lease (and the above powers granted to Lender are coupled with an interest and shall be irrevocable; provided, however, that Lender shall not exercise such powers unless Lender has given Borrower at least five (5) days prior notice of Lender's intention to do so).

(k)     Notwithstanding anything to the contrary contained in this Agreement with respect to the Ground Lease:

(i)     The Lien of the Security Instrument attaches to all of Borrower's rights and remedies at any time arising under or pursuant to Section 365(h) of the U.S. Bankruptcy Code or any other Bankruptcy Law, including, without limitation, all of Borrower's rights, as debtor, to remain in possession of the Property.

(ii)     Borrower shall not, without Lender's consent, elect to treat the Ground Lease as terminated under Section 365(h)(l) of the U.S. Bankruptcy Code or any other Bankruptcy Law.  Any such election made without Lender's prior consent shall be null and void.

(iii)     As security for the Obligations, Borrower unconditionally assigns, transfers and sets over to Lender all of Borrower's rights and claims to the payment of damages arising from any rejection by Ground Lessor under the Bankruptcy Law.  Borrower and Lender shall proceed jointly or in the name of Borrower in respect of any claim, suit, action or proceeding relating to the rejection of the Ground Lease, including, without limitation, the right to file and prosecute any proofs of claim, complaints, motions, applications, notices and other documents in any case in respect of Ground Lessor under the Bankruptcy Law.  This assignment constitutes a present, irrevocable and unconditional assignment of the foregoing rights, claims, and remedies, and shall continue in effect until all of the Debt shall have been satisfied and discharged in full.  Any amounts received by Borrower or Lender as damages arising out of the rejection of the Ground Lease as aforesaid shall be applied to all reasonable out-of-pocket costs and expenses of Lender (including, without limitation, reasonable attorneys' fees and expenses) incurred in connection with the exercise of any of its rights or remedies in accordance with the applicable provisions of this Agreement.

(iv)     If, pursuant to Section 365(h) of the U.S. Bankruptcy Code or any other Bankruptcy Law, Borrower seeks to offset, against the Ground Rent, the amount of any damages caused by the non-performance by Ground Lessor of any of its obligations under the Ground Lease after the rejection by Ground Lessor under the Bankruptcy Law, then Borrower shall not affect any offset of the amounts objected to by Lender.  If Lender has failed to object as aforesaid within ten (10) days after notice from Borrower in accordance with the first sentence of this clause (iv), Borrower may proceed to offset the amounts set forth in Borrower's notice to Ground Lessor and Lender.

(v)     If any action, proceeding, motion or notice shall be commenced or filed in respect of Ground Lessor in connection with any case under the Bankruptcy Law, Borrower and Lender shall cooperatively conduct and control any such action, proceeding, motion or notice with counsel agreed upon between Borrower and Lender in connection with such action, proceeding, motion or notice.  Borrower shall, upon demand, pay to Lender all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees and expenses) incurred by Lender in connection with the cooperative prosecution or conduct of any such action, proceeding, motion or notice.  All such costs and expenses shall be secured by the Lien of the Security Instrument.

80

(vi)     Borrower shall promptly, after obtaining knowledge of such filing, notify Lender of any filing by or against Ground Lessor of a petition under the Bankruptcy Law setting forth any information reasonably available to Borrower as to the date of such filing, the court in which such petition was filed, and the relief sought in such filing.  Borrower shall promptly deliver to Lender any and all notices, summonses, pleadings, applications and other documents received by Borrower in connection with any such petition and any proceedings relating to such petition.

4.1.24. <u>Prime Lease</u>.  Without limitation of the other provisions herein (including, without limitation, <u>Section 4.1.12</u> hereof), Borrower makes the following covenants with respect to the Prime Lease:

(a)     Borrower shall promptly notify Lender of the receipt by Borrower or Ground Lessor of any written notice from Prime Lease Lessor claiming the occurrence of any default by Ground Lessor under the Prime Lease or the occurrence of any event that, with the giving of notice or passage of time, or both, would constitute a material default by Ground Lessor under the Prime Lease.  Promptly upon its receipt thereof, Borrower shall deliver to Lender a copy of any such written notice from Prime Lease Lessor.

(b)     Borrower shall promptly notify Lender of the occurrence of any default in any material respect under the Prime Lease by Prime Lease Lessor known to Borrower or Ground Lessor under the Prime Lease or the occurrence of any event that, with the giving of notice or passage of time, or both, would constitute a material default in any material respect by Prime Lease Lessor under the Prime Lease.  Concurrently with the giving of any notice to Prime Lease Lessor claiming the occurrence of such default or event, Borrower shall deliver to Lender a copy of any notice thereof received by Borrower.

(c)     Subject to the provisions hereof, the Ground Lease and the Prime Lease, Borrower shall promptly execute, acknowledge and deliver to Lender such instruments as may reasonably be necessary to permit Lender to cure any default under the Prime Lease or permit Lender to take such other action required to enable Lender to cure or remedy the matter in default and preserve Lender's rights under the Loan Documents with respect to the Property (including, without limitation, the Lien of the Security Instrument and the other Loan Documents).

(d)     The actions or payments of Lender to cure any default by Ground Lessor under the Prime Lease shall not cure or waive, as between Borrower and Lender, the default that occurred under this Agreement by virtue of Ground Lessor's default under the Ground Lease.  All costs and expenses incurred by Lender to cure or attempt to cure any such default shall be paid by Borrower to Lender, upon demand, with interest at the Default Rate from the date such costs and expenses were incurred to and including the date the reimbursement payment is received by Lender.  All such Indebtedness shall be secured by the Security Instrument.

(e)     Borrower shall (or shall cause Ground Lessor to) use reasonable efforts to obtain from Prime Lease Lessor and furnish to Lender within fifteen (15) days after receipt of Lender's request, an estoppel certificate of Prime Lease Lessor stating the date through which

81

ground rent under the Prime Lease has been paid, whether or not there are any defaults under the Prime Lease and specifying the nature of such claimed defaults, if any, and such other matters as Lender may reasonably request; provided that after the final Securitization of any portion of the Loan, Borrower shall not be required to deliver such estoppel certificate from Prime Lease Lessor more frequently than once in any calendar year.

(f)     Without limiting the terms and provisions of <u>Section 4.1.21</u> hereof, Borrower irrevocably appoints Lender as its true and lawful attorney-in-fact to do, in its name or otherwise, any and all acts and to execute any and all documents that are necessary to preserve any rights of Borrower under or with respect to the Prime Lease, including, without limitation, the right to authorize or otherwise cause or permit the automatic exercise of any option to extend or renew the term of the Prime Lease in accordance with the provisions thereof, or to preserve any rights of Borrower whatsoever in respect of any part of the Prime Lease (and the above powers granted to Lender are coupled with an interest and shall be irrevocable; provided, however, that Lender shall not exercise such powers unless Lender has given Borrower at least five (5) days prior notice of Lender's intention to do so).

(g)     Notwithstanding anything to the contrary contained in this Agreement with respect to the Prime Lease:

(i)     The Lien of the Security Instrument attaches to all of Borrower's rights and remedies at any time arising under or pursuant to Section 365(h) of the U.S. Bankruptcy Code or any other Bankruptcy Law, including, without limitation, all of Borrower's rights, as debtor, to remain in possession of the Property.

(ii)     Borrower shall not, without Lender's consent, elect to treat the Prime Lease as terminated under Section 365(h)(l) of the U.S. Bankruptcy Code or any other Bankruptcy Law.  Any such election made without Lender's prior consent shall be null and void.

(iii)     As security for the Obligations, Borrower unconditionally assigns, transfers and sets over to Lender all of Borrower's rights and claims to the payment of damages arising from any rejection by Prime Lease Lessor under the Bankruptcy Law.  Borrower and Lender shall proceed jointly or in the name of Borrower in respect of any claim, suit, action or proceeding relating to the rejection of the Prime Lease, including, without limitation, the right to file and prosecute any proofs of claim, complaints, motions, applications, notices and other documents in any case in respect of Prime Lease Lessor under the Bankruptcy Law.  This assignment constitutes a present, irrevocable and unconditional assignment of the foregoing rights, claims, and remedies, and shall continue in effect until all of the Debt shall have been satisfied and discharged in full.  Any amounts received by Borrower or Lender as damages arising out of the rejection of the Prime Lease as aforesaid shall be applied to all reasonable out-of-pocket costs and expenses of Lender (including, without limitation, reasonable attorneys' fees and expenses) incurred in connection with the exercise of any of its rights or remedies in accordance with the applicable provisions of this Agreement.

(iv)     If, pursuant to Section 365(h) of the U.S. Bankruptcy Code or any other Bankruptcy Law, Borrower seeks to offset, against the Ground Rent, the amount of any

82

damages caused by the non-performance by Prime Lease Lessor of any of its obligations under the Prime Lease after the rejection by Prime Lease Lessor under the Bankruptcy Law, then Borrower shall not affect any offset of the amounts objected to by Lender.  If Lender has failed to object as aforesaid within ten (10) days after notice from Borrower in accordance with the first sentence of this clause (iv), Borrower may proceed to offset the amounts set forth in Borrower's notice to Prime Lease Lessor and Lender.

(v)     If any action, proceeding, motion or notice shall be commenced or filed in respect of Prime Lease Lessor in connection with any case under the Bankruptcy Law, Borrower and Lender shall cooperatively conduct and control any such action, proceeding, motion or notice with counsel agreed upon between Borrower and Lender in connection with such action, proceeding, motion or notice.  Borrower shall, upon demand, pay to Lender all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees and expenses) incurred by Lender in connection with the cooperative prosecution or conduct of any such action, proceeding, motion or notice.  All such costs and expenses shall be secured by the Lien of the Security Instrument.

(vi)    Borrower shall promptly, after obtaining knowledge of such filing, notify Lender of any filing by or against Prime Lease Lessor of a petition under the Bankruptcy Law setting forth any information reasonably available to Borrower as to the date of such filing, the court in which such petition was filed, and the relief sought in such filing.  Borrower shall promptly deliver to Lender any and all notices, summonses, pleadings, applications and other documents received by Borrower in connection with any such petition and any proceedings relating to such petition.

4.1.25. Patriot Act Compliance.   Borrower will use its good faith and commercially reasonable efforts to comply with the Patriot Act and all applicable requirements of Governmental Authorities relating to terrorism and money laundering.  Lender at Lender's sole cost and expense shall have the right to audit Borrower's compliance with the Patriot Act and all applicable requirements of Governmental Authorities relating to terrorism and money laundering.  In the event that Borrower fails to comply with the Patriot Act or any such requirements of Governmental Authorities, Lender may, at its option, cause Borrower to comply therewith.  All costs and expenses incurred by Lender in connection therewith shall be paid by Borrower to Lender, upon demand, with interest at the Default Rate from the date such costs and expenses were incurred to and including the date the reimbursement payment is received by Lender.  All such Indebtedness shall be secured by the Security Instrument.

**Section 4.2.**     Borrower Negative Covenants.  Borrower covenants and agrees with Lender that:

4.2.1.   Liens.  Borrower shall not create, incur, assume or suffer to exist any Lien on any portion of the Property except for Permitted Encumbrances or as otherwise permitted pursuant to the Loan Documents.

4.2.2.   Dissolution.  Borrower shall not (a) engage in any dissolution, winding up, liquidation or consolidation or merger with or into any other business entity, (b) engage in any

83

business activity not related to the ownership, management and operation of the Property, (c) amend, modify, waive or terminate any Organizational Document or any provision thereof or (d) transfer, lease or sell, in one transaction or any combination of transactions, all or substantially all of the assets or properties of Borrower except to the extent expressly permitted by the Loan Documents, in each case without obtaining the prior consent of Lender.

4.2.3.   Change in Business.  Borrower shall not (a) enter into any line of business, or undertake or participate in any activities, other than the ownership, leasing, management and operation of the Property, or (b) make any material change in the scope or nature of its business objectives, purposes or operations.

4.2.4.   Debt Cancellation.  Borrower shall not cancel or otherwise forgive or release any claim or debt (other than termination of Leases in accordance herewith) owed to Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's business.

4.2.5.   Affiliate Transactions.  Borrower shall not enter into, or be a party to, any transaction with any Affiliate of Borrower or any partner, member, or shareholder, as applicable, of Borrower or any Affiliate of Borrower except in the ordinary course of business and on terms and conditions that are intrinsically fair, commercially reasonable and no less favorable to Borrower or such Affiliate, partner, member or shareholder than those that would be available on an arm's-length basis with an unrelated third party.

4.2.6.   Zoning.   Borrower shall not initiate or consent to any zoning reclassification of any portion of the Property or seek any variance under any existing zoning ordinance (except, subject in all respects to all other terms and provisions of the Loan Documents, to the extent the granting or imposition of such reclassification or variance alone shall not cause a Material Adverse Effect and provided that Borrower shall have provided Lender with (a) not less than thirty (30) days' prior written notice thereof and (b) all applicable documents and a detailed description of such reclassification or variance, including any descriptive information reasonably required for Lender to make an informed decision as to whether Lender's consent to such reclassification or variance is required hereunder) or use or permit the use of any portion of the Property in any manner that could result in such use becoming a non-conforming use under any zoning ordinance or any other applicable land use law, rule or regulation, without the prior consent of Lender.

4.2.7.   Assets.  Borrower shall not purchase or own any asset or property other than the Property and any asset or property necessary for or incidental to the operation of the Property.

4.2.8.   No Joint Assessment.  Borrower shall not suffer, permit or initiate the joint assessment of the Property (a) with any other real property constituting a tax lot separate from the Property, and (b) with any portion of the Property which may be deemed to constitute personal property, or any other action or procedure whereby the Lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to the Property.

4.2.9.  <u>Principal Place of Business</u>.  Borrower shall not change its principal place of business from the address set forth on the first page of this Agreement without first giving Lender thirty (30) days' prior notice.

4.2.10. <u>ERISA</u>.  (a)  Borrower shall not engage in any transaction which would cause any obligation, or any action taken or to be taken, hereunder or under the other Loan Documents (or the exercise by Lender of any of its rights under this Agreement or the other Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**").

(b)  Borrower shall deliver to Lender such certifications or other evidence from time to time throughout the Term, as requested by Lender in its sole discretion, that (i) Borrower is not an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, or a "governmental plan" within the meaning of Section 3(32) of ERISA; (ii) Borrower is not subject to any state statute regulating investments of, or fiduciary obligations with respect to, governmental plans; and (iii) one (1) or more of the following circumstances is true:

(A)  Equity interests in Borrower are publicly offered securities, within the meaning of 29 C.F.R. § 2510.3-101(b)(2);

(B)  Less than twenty-five percent (25%) of each outstanding class of equity interests in Borrower is held by "benefit plan investors" within the meaning of 29 C.F.R. § 2510.3-101(f)(2); or

(C)  Borrower qualifies as an "operating company" or a "real estate operating company" within the meaning of 29 C.F.R. § 2510.3-101(c) or (e).

4.2.11. <u>Material Agreements, Operating Agreements</u>.  Except with respect to Borrower's ability to enter into a Management Agreement pursuant to the terms and conditions of this Agreement, Borrower shall not, without Lender's prior consent:  (a) enter into, surrender or terminate any Material Agreement or Operating Agreement to which it is a party or to which Borrower or the Property is subject (i) unless the other party thereto is in default in any material respect thereunder and the termination of such agreement would be commercially reasonable or (ii) such action would not otherwise have a Material Adverse Effect and would be commercially reasonable, (b) increase or consent to the increase of the amount of any charges under any Material Agreement or Operating Agreement to which it is a party or to which Borrower or the Property is subject, except as provided therein or on an arm's-length basis and commercially reasonable terms; or (c) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under any Material Agreement or Operating Agreement to which it is a party or to which Borrower or the Property is subject in any material respect, except on an arm's-length basis and commercially reasonable terms.

4.2.12. <u>Change of Name, Identity or Structure</u>.  Borrower will not cause or permit any change to be made to its name, identity (including its trade name or names) or, other than in accordance with the terms and conditions of <u>Section 3.1.24(h)</u> hereof, its corporate, partnership

85

or other organizational structure without notifying Lender of such change in writing at least thirty (30) days prior to the effective date of such change and without first obtaining the prior consent of Lender which consent shall not be unreasonably withheld or delayed.  Borrower shall execute and deliver to Lender, prior to or contemporaneously with the effective date of any such change, any financing statement or amendment to financing statement required by Lender to establish or maintain the validity, perfection and priority of the security interests granted by the Loan Documents.  At Lender's request, Borrower shall execute a certificate in form satisfactory to Lender listing each trade name under which Borrower operates or intends to operate the Property, and representing and warranting that Borrower does business under no other trade name with respect to the Property.

4.2.13. <u>Special Purpose</u>.  Without in any way limiting the provisions of this <u>Article IV</u> hereof, Borrower shall not take or permit any action that would result in Borrower not being in compliance with the representations, warranties and covenants set forth in <u>Section 3.1.24</u> hereof.

4.2.14. <u>Prohibited Person</u>.  At all times throughout the Term, including after giving effect to any Transfers permitted pursuant to the Loan Documents, (a) none of the funds or other assets of Borrower, Guarantor, or Mezzanine Borrower shall constitute property of, or shall be beneficially owned, directly or indirectly, by any Prohibited Person, with the result that the investment in Borrower, Guarantor, or Mezzanine Borrower, as applicable (whether directly or indirectly), would be prohibited by law, or the Loan made by Lender would be in violation of law, (b) no Prohibited Person shall have any interest of any nature whatsoever in Borrower, Guarantor, or Mezzanine Borrower, as applicable, with the result that the investment in Borrower, Guarantor, or Mezzanine Borrower, as applicable (whether directly or indirectly), would be prohibited by law or the Loan would be in violation of law, and (c) none of the funds of Borrower, Guarantor, or Mezzanine Borrower, as applicable, shall be derived from any unlawful activity with the result that the investment in Borrower, Guarantor, or Mezzanine Borrower, as applicable (whether directly or indirectly), would be prohibited by law or the Loan would be in violation of law.

4.2.15. <u>Ground Lease</u>.  Without limitation of the other provisions herein (including, without limitation, <u>Section 4.2.11</u> hereof), Borrower makes the following covenants with respect to the Ground Lease:

(a)    Borrower shall not surrender the leasehold estate created by the Ground Lease or terminate or cancel the Ground Lease or modify, change, supplement, alter or amend the Ground Lease, either orally or in writing, and Borrower hereby assigns to Lender, as further security for the payment of the Debt and for the performance and observance of the terms, covenants and conditions of this Agreement, all of the rights, privileges and prerogatives of Borrower, as tenant under the Ground Lease, to surrender the leasehold estate created by the Ground Lease or to terminate, cancel, modify, change, supplement, alter or amend the Ground Lease, and any such surrender of the leasehold estate created by the Ground Lease or termination, cancellation, modification, change, supplement, alteration or amendment of the Ground Lease shall be void and of no force and effect.

86

(b)     Borrower shall not, without prior consent of Lender, subordinate or consent to the subordination of the Ground Lease to any mortgage, security deed, lease or other interest on or in Ground Lessor's interest in all or any part of the Property.

4.2.16. Prime Lease.  Without limitation of the other provisions herein (including, without limitation, Section 4.2.11 hereof), Borrower makes the following covenants with respect to the Prime Lease:

(a)     Borrower shall not, without prior consent of Lender, subordinate or consent to the subordination of the Prime Lease to any mortgage, security deed, lease or other interest on or in Prime Lease Lessor's interest in all or any part of the Property.

4.2.17. Bankruptcy-Related Covenants.

(a)     Borrower shall not, nor shall Borrower cause or permit Guarantor or any Affiliate of Borrower or Guarantor to, seek substantive consolidation in connection with a proceeding under the Bankruptcy Laws involving Borrower.

(b)     Borrower shall not, nor shall Borrower cause or permit Guarantor or any Affiliate of Borrower or Guarantor to, contest, oppose or object to any motion made by Lender to obtain relief from the automatic stay or seek to reinstate the automatic stay in the event of a future proceeding of Borrower under the Bankruptcy Laws.

(c)     Borrower shall not, nor shall Borrower cause or permit Guarantor or any Affiliate of Borrower or Guarantor to, provide, originate, acquire an interest in or solicit (in writing) or accept from Guarantor or any Affiliate of Borrower or Guarantor, any debtor-in-possession financing on behalf of Borrower in the event that Borrower is the subject of a proceeding under the Bankruptcy Laws.

## V.     INSURANCE, CASUALTY AND CONDEMNATION

**Section 5.1.**     Insurance.

(a)     Required Coverages.  Borrower shall obtain and maintain, or cause to be maintained, insurance for Borrower and the Property providing at least the following coverages (which may be obtained or maintained under blanket insurance policies):

(i)     property insurance on the Improvements and personal property insuring against any peril now or hereafter included with the classification "Special Form," Causes of Loss including, without limitation, Wind (including Named Storms) and hail, on a replacement cost basis with no coinsurance (A) in an amount equal to one hundred percent (100%) of the "Replacement Cost," with agreed value or no co-insurance which for purposes of this Agreement shall mean actual replacement value (exclusive of costs of land, excavations, foundations, underground utilities and footings) with a waiver of depreciation; (B) have customary deductibles reasonably acceptable to Lender (but in any event not in excess of $100,000, except as otherwise noted herein and except in the case of windstorm/named storm and earthquake coverage, which shall have deductibles not in excess of 5% of the total insurable

value of the Property) and (C) containing an "Ordinance or Law Coverage" or "Enforcement" endorsement including loss to the undamaged portion, demolition costs and increased cost of construction endorsement in amounts acceptable to Lender if any of the Improvements or the use of the Property shall at any time constitute legal non-conforming structures or uses;

        (ii)     commercial general liability insurance against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Property, such insurance to be on the so-called "occurrence" form with a limit of One Million and No/100 Dollars ($1,000,000.00) per occurrence and Two Million and No/100 Dollars ($2,000,000.00) in the aggregate per location with no deductible or self-insured retention, plus excess or umbrella insurance with a minimum limit of One-Hundred Million and No/100 Dollars ($100,000,000.00) per occurrence and in the aggregate and to cover at least the following hazards: (A) premises and operations; (B) products and completed operations on an "if any" basis; (C) independent contractors; (D) contractual liability for so-called "insured contracts" and, to the extent insurable using an ISO CGL form or its equivalent, the indemnities required in the Loan Documents; and (E) including acts of foreign and domestic terrorism;

        (iii)     loss of rents and/or business interruption insurance with a limit equal to one hundred percent (100%) of the projected annual net operating income plus continuing expenses (including Debt Service) applicable to the Property for a period of eighteen (18) months (A) with loss payable to Lender; (B) covering all risks required to be covered by the insurance provided for in Subsection 5.1(a)(i), (iv)(B), (vi) and (viii)(A) and (C); (C) containing an extended period of indemnity endorsement which provides that after the physical loss to the Improvements and personal property has been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or the expiration of three hundred sixty five  (365) days from the date that the Property is repaired or replaced and operations are resumed, whichever first occurs, and notwithstanding that the Policy may expire prior to the end of such period, and (D) in an amount equal to one hundred percent (100%) of the projected annual net operating income plus continuing expenses (including Debt Service) applicable to the Property on an actual loss sustained basis covering the entire period of restoration (for no less than eighteen (18) months). The limit of such business income insurance shall be determined prior to the date hereof and at least once each year thereafter based on Borrower's reasonable estimate of the annual net operating income plus continuing expenses (including Debt Service) applicable to the Property for the succeeding twelve (12) month period. All proceeds payable pursuant to this subsection shall be held by Lender and shall be applied to the obligations secured by the Loan Documents from time to time due and payable hereunder and under the Note and to the Operating Expenses of the Property; provided, however, that nothing herein contained shall be deemed to relieve Borrower of its obligations to pay the obligations secured by the Loan Documents on the respective dates of payment provided for in the Note and the other Loan Documents except to the extent such amounts are actually paid out of the proceeds of such business income insurance;

        (iv)     at all times during which structural construction, repairs or alterations are being made with respect to the Property, and only if the property and liability coverage forms do not otherwise apply, (A) commercial general liability and excess/umbrella liability insurance covering claims related to repair, construction or restoration being made at the

Property which are not covered by or under the terms or provisions of the above mentioned commercial general liability and excess/umbrella insurance policies; and (B) the insurance provided for in Subsection 5.1(a)(i) above written in a so-called builder's risk coverage form (1) on a non-reporting basis, (2) against all risks insured against pursuant to Subsection 5.1(a)(i) above, (3) including permission to occupy the Property, and (4) with an agreed amount endorsement waiving co-insurance provisions or replacement cost coverage;

(v)     if applicable, workers' compensation, subject to the statutory limits of the State in which the Property is located, and employer's liability insurance with a limit of at least One Million and No/100 Dollars ($1,000,000.00) per accident and per disease per employee, and One Million and No/100 Dollars ($1,000,000.00) for disease;

(vi)     if applicable, comprehensive boiler and machinery insurance in such amounts as are generally available and are generally required by institutional lenders for properties comparable to the Property;

(vii)     if applicable, motor vehicle liability coverage for all owned and non-owned vehicles, including rented and leased vehicles containing minimum limits per occurrence of One Million and No/100 Dollars ($1,000,000.00);

(viii)     as part of the property insurance in clause (i) above or as a separate Policy:

(A)     if the Property is located in seismic zone 3 or 4, earthquake insurance with coverage amounts of not less than the product of the Probable Maximum Loss ("PML") or Scenario Expected Loss ("SEL") (expressed as a percentage) applicable to the Property, as set forth in the seismic report satisfactory to Lender prepared by a seismic engineer or other qualified consultant, multiplied by the replacement cost of the Improvements as such replacement cost may be reasonably estimated by Lender plus business income required in Section 5.1(a)(iii) above, and with a deductible not to exceed the higher of One Hundred Thousand and No/100 Dollars ($100,000.00) or five percent (5%) of the total insured value;

(B)     intentionally omitted;

(C)     if any portion of the Improvements or personal property, if applicable, is currently or at any time in the future located in a federally designated "special flood hazard area", Borrower shall obtain flood hazard insurance in an amount equal to (1) the maximum amount of such insurance available under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994 (the "**Flood Acts**"), as each may be amended, with a deductible not greater than Twenty-Five Thousand and No/100 Dollars ($25,000.00) plus such additional coverage  as may be reasonably required by Lender, on terms consistent with the property coverage required under Subsection (a)(i);

(ix)     the Policy described in clauses (i) and (iii) and, if applicable, (iv) above shall include coverage for loss or damage incurred as a result of an act of terrorism or similar acts of sabotage in amounts and with terms and conditions applicable to the Policies

89

described in clauses (i) and (iii) and, if applicable, (iv) or Borrower shall maintain separate policies providing coverage against loss or damage incurred as a result of acts of terrorism or similar acts of sabotage in amounts and with terms and conditions applicable to the Policies described in clauses (i) and (iii) and, if applicable, (iv) above underlined provided that, in the event the Terrorism Risk Insurance Program Reauthorization Act of 2015 or subsequent statute, reauthorization or extension ("**TRIPRA**") is no longer in effect, provided terrorism coverage is commercially available, Borrower shall be required to purchase terrorism insurance as required herein this clause (ix), provided that Borrower shall not be required to spend more than two (2) times the then-current all-risk insurance premium (such amount shall be based on market rates as reasonably determined by Lender) (the "**TC Cap**") to purchase such insurance, and if the cost of such insurance exceeds the TC Cap, Borrower shall purchase the maximum coverage as may be purchased for the TC Cap; and

(x)     upon sixty (60) days' notice, such higher limits or such other reasonable insurance and in such reasonable amounts as Lender from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for property similar to the Property located in or around the region in which the Property is located.

(b)     Additional Provisions.

(i)     All insurance provided for in Section 5.1(a) shall be obtained under valid and enforceable policies (collectively, the "**Policies**" or in the singular, the "**Policy**"), and shall, except to the extent specifically set forth herein, be subject to the approval of Lender as to insurance companies, amounts, deductibles, loss payees and insureds, such approval not to be unreasonably withheld.

(ii)     Borrower will maintain the insurance coverage described in subsection (a) above with insurance companies authorized or licensed to do business in the State in which the Property is located and having a financial strength and claims rating of (1) "A" or better by S&P, "A2" or better by Moody's (to the extent Moody's rates the Securities and rates the applicable carrier) and "A" or better by Fitch (to the extent Fitch rates the Securities and rates the applicable carrier) (provided, however for a syndicate of insurers through which at least seventy-five percent (75%) of the coverage (if there are four (4) or fewer members of the syndicate) or at least sixty percent (60%) of the coverage (if there are five (5) or more members of the syndicate) is with carriers having a of "A" or better by S&P, "A2" or better by Moody's (to the extent Moody's rates the Securities and rates the applicable carrier) and "A" or better by Fitch (to the extent Fitch rates the Securities and rates the applicable carrier) and the balance of the coverage is, with no carrier below  "BBB" by S&P, "Baa2" or better by Moody's (to the extent Moody's rates the Securities and rates the applicable carrier) and "BBB" or better by Fitch (to the extent Fitch rates the Securities and rates the applicable carrier), and (2) "A:X" or better by A.M. Best).

(iii)     [Reserved].

(iv)     Not less than ten (10) days prior to the expiration dates of the Policies theretofore furnished to Lender pursuant to Subsection 5.1(a), Borrower shall deliver to Lender certificates of insurance evidencing the Policies (and complete copies of such Policies upon issuance) accompanied by evidence satisfactory to Lender of payment of the premiums then due thereunder  (the "**Insurance Premiums**").

(c)     <u>Blanket Policies</u>.     Any blanket insurance Policy remains subject to Lender's approval and Borrower shall provide evidence satisfactory to Lender that the blanket policy provides the same protection as would a separate Policy insuring only the Property in compliance with the provisions of <u>subsection (a)</u> above; *provided*, *further* that, to the extent the Policies required in <u>Section 5.1(a)(ix)</u> are maintained pursuant to a blanket insurance Policy that covers more than one location within a one thousand foot radius of the Property (the "**Radius**"), the limits of such blanket insurance Policy must be sufficient to maintain the coverage as set forth in <u>Section 5.1(a)(ix)</u> for the Property and any and all other locations combined within the Radius that are covered by such blanket policy calculated on a total insured value basis.

(d)     <u>Additional Insured</u>.     All Policies of insurance provided for or contemplated by <u>subsection (a)</u> above shall name Borrower as a named insured and, in the case of liability coverages, except for the Policy referenced in <u>subsection (a)(v)</u> and <u>(vii)</u>, shall name Lender, as additional insured, as its interests may appear, and in the case of property policies, including but not limited to terrorism, rent loss, business interruption, boiler and machinery, flood and earthquake insurance, shall contain a standard non-contributing mortgagee clause and Lender's Loss Payable endorsement in favor of Lender and its successors and/or assigns providing that the loss thereunder shall be payable to Lender and its successor and/or assigns.

(e)     <u>Endorsements</u>.     All Policies of insurance provided for in <u>Section 5.1(a)</u> shall contain clauses or endorsements to the effect that:

(i)     with respect to the property polices, (1) the following shall in no way affect the validity or enforceability of the Policy insofar as Lender is concerned: (A) no act or negligence of Borrower, or other Person named an insured; (B) any foreclosure or similar action; and (C) the failure to comply with the provisions of the Policy which might otherwise result in a forfeiture of the insurance or any part thereof, (2) the property policies shall not be cancelled without at least 30 days' written notice to Lender, except ten (10) days' notice for non-payment of premium and (3) the issuer(s) of the policies shall give written notice to Lender if the issuers elect not to renew the policies prior to its expiration;

(ii)     with respect to the liability policies, if obtainable by Borrower using commercially reasonable efforts, the Policy shall not be materially changed (other than to increase the coverage provided thereby), terminated or canceled without at least (1) ten (10) days' prior written notice for cancellation or termination due to nonpayment and (2) thirty (30) days' prior written notice for cancellation or termination due to all other causes, to Lender and any other party named therein as an additional insured;

(iii)    The Policies shall not include any provision that would make the Lender liable for any Insurance Premiums thereon or subject to any assessments thereunder and that the related issuer(s) waive any related claims to the contrary;

(iv)    Lender shall, at its option and with no obligation to do so, have the right to directly pay Insurance Premiums in order to avoid cancellation, expiration and/or termination of the Policy due to non-payment of Insurance Premiums; and

(v)    Shall contain a waiver of subrogation against Lender, as applicable.

(f)    <u>Remedies</u>.  During the continuance of an Event of Default, or in the event of a Casualty or Condemnation where the Net Proceeds shall be greater than the Restoration Threshold or the costs and expenses to complete the Restoration shall be greater than the Restoration Threshold, complete copies of the Policies shall be provided to Lender upon request. If at any time Lender is not in receipt of written evidence that all insurance required hereunder is in full force and effect, Lender shall have the right, upon notice to Borrower, to take such action as Lender deems necessary to protect its interest in the Property, including, without limitation, upon three (3) days' notice if prior to the date upon which any such coverage will lapse or at any time Lender deems necessary (regardless of prior notice to Borrower) to avoid the lapse of any such coverage, the obtaining of such insurance coverage as Lender in its sole discretion deems appropriate and all premiums incurred by Lender in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Lender within five (5) days after demand and until paid shall be secured by the Security Instrument and shall bear interest at the Default Rate. In the event of foreclosure or transfer in lieu thereof or similar action on or in respect of the Property, all right, title and interest of Borrower in and to the Policies then in force concerning the Property (excluding any interest in the other non-collateral properties covered by any blanket Policy) and all proceeds payable thereunder shall thereupon vest in Lender, the purchaser at such foreclosure or other transferee in the event of such other transfer.

**Section 5.2.**   <u>Casualty and Condemnation</u>.

5.2.1.   <u>Casualty</u>.   If the Property shall sustain a Casualty, Borrower shall give prompt notice of each material Casualty to Lender and shall promptly commence and diligently prosecute to completion the Restoration of the Property in accordance with <u>Section 5.3</u> hereof. Borrower shall pay all costs and expenses of such Restoration whether or not such costs and expenses are covered by insurance.  Lender may, but shall not be obligated to, make proof of loss if not made promptly by Borrower.  In the event of a Casualty where the loss and the applicable Net Proceeds are less than the Restoration Threshold, Borrower may settle and adjust such claim; <u>provided</u> that (a) no Event of Default has occurred and remains outstanding and (b) such adjustment is carried out in a commercially reasonable and timely manner.  In the event of a Casualty where the loss or the applicable Net Proceeds are equal to or greater than the Restoration Threshold or if an Event of Default has occurred and remains outstanding, Borrower may settle and adjust such claim only with the prior consent of Lender (which consent shall not be unreasonably withheld or delayed) and Lender shall have the opportunity to participate, at Borrower's reasonable cost and expense, in any such adjustments.  Notwithstanding any

Casualty, Borrower shall continue to pay the Debt at the time and in the manner provided for in this Agreement, the Note and the other Loan Documents.

           5.2.2.  <u>Condemnation</u>.  Borrower shall provide Lender with copies of any written notice received by Borrower of any actual or threatened Condemnation by any Governmental Authority of all or any part of the Property and shall deliver to Lender a copy of any and all notices or papers served in connection with such Condemnation or related proceedings promptly upon obtaining knowledge thereof (Lender acknowledging that Borrower shall have complied with this covenant with respect to any Condemnation that is not a Material Condemnation if Borrower delivers such written notice to Lender by no later than the end of the calendar quarter in which Borrower first obtained such knowledge).  Borrower may settle and compromise any Material Condemnation only with the prior consent of Lender (which consent shall not be unreasonably withheld or delayed) and Lender shall have the opportunity to participate, at Borrower's reasonable cost and expense, in any applicable litigation or proceeding and settlement discussions in respect thereof and Borrower shall from time to time deliver to Lender all instruments reasonably requested by Lender to permit such participation.  Borrower shall, at its cost and expense, diligently prosecute any such litigations or proceedings, and shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such litigations or proceedings.  Lender is hereby irrevocably appointed to act after the occurrence and during the continuance of an Event of Default as Borrower's attorney-in-fact, coupled with an interest, with exclusive power to collect, receive and retain any Award and to make any compromise or settlement in connection with any Material Condemnation. Notwithstanding any Condemnation, Borrower shall continue to pay the Debt at the time and in the manner provided for in this Agreement, the Note and the other Loan Documents.  If any portion of the Property is taken by any Governmental Authority, Borrower shall promptly commence and diligently prosecute to completion the Restoration of the Property and otherwise comply with the provisions of <u>Section 5.3</u> hereof.  If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the Award or a portion thereof sufficient to pay the Debt in full.

           5.2.3.  <u>Casualty Proceeds</u>.  Notwithstanding the last sentence of <u>Section 5.1(a)(iii)</u> above, and <u>provided</u> that no Event of Default has occurred and remains outstanding, proceeds received by Lender on account of business or rental interruption or other loss of income insurance specified in <u>Section 5.1(a)(iii)</u> above with respect to any Casualty shall be deposited by Lender into the Cash Management Account (in installments from time to time, if applicable) to the extent such proceeds (or a portion thereof) reflects a replacement for lost Rents for the relevant period, as determined by Lender in good faith.  All other such proceeds shall be held by Lender and disbursed in accordance with <u>Section 5.3</u> hereof.

        **Section 5.3.**  <u>Delivery of Net Proceeds</u>.

           5.3.1.  <u>Minor Casualty or Condemnation</u>.  If a Casualty or Condemnation has occurred to the Property and the Net Proceeds shall be less than the Restoration Threshold and the costs and expenses to complete the Restoration shall be less than the Restoration Threshold, the Net Proceeds will be disbursed by Lender to Borrower upon receipt; <u>provided</u> that all of the

conditions set forth in Sections 5.3.2(a) and 5.3.2(i) hereof are met and Borrower delivers an written undertaking to commence and complete the Restoration in an expeditious and diligent fashion and in accordance with all applicable Legal Requirements.  If any Net Proceeds are received by Borrower and may be retained by Borrower pursuant to the terms hereof, such Net Proceeds shall, until completion of the Restoration, be held by Borrower in trust for Lender and shall be segregated from other funds of Borrower to be used to pay for the costs and expenses of Restoration in accordance with the terms hereof.

      5.3.2.   Major Casualty or Condemnation.  (a)  If a Casualty or Condemnation has occurred to the Property and the Net Proceeds are equal to or greater than the Restoration Threshold or the costs and expenses to complete the Restoration are equal to or greater than the Restoration Threshold, Lender shall make the Net Proceeds available for the Restoration, provided that each of the following conditions is satisfied:

      (i)      no Event of Default shall have occurred and remain outstanding;

      (ii)      (A) in the event the Net Proceeds are Insurance Proceeds, less than twenty-five percent (25%) of the total floor area of the Improvements at the Property has been damaged, destroyed or rendered unusable as a result of such Casualty or (B) in the event the Net Proceeds are an Award, less than fifteen percent (15%) of the land constituting the Property is taken, and such land is located along the perimeter or periphery of the Property, and no portion of the Improvements is the subject of the Condemnation;

      (iii)      intentionally omitted;

      (iv)      Leases (including any Leases entered into after the occurrence of such Casualty or Condemnation) requiring payment of annual rent equal to not less than seventy-five percent (75%) of the Gross Rents plus Operating Income received by Borrower during the twelve (12) month period immediately preceding the Casualty or Condemnation shall remain in full force and effect during and after the completion of the Restoration without abatement of rent beyond the time required for Restoration, notwithstanding the occurrence of such Casualty or Condemnation;

      (v)      Borrower shall commence the Restoration as soon as reasonably practicable (but in no event later than sixty (60) days after the occurrence of such Casualty or Condemnation) and shall diligently pursue the same to satisfactory completion;

      (vi)      Lender shall be satisfied that any operating deficits and all scheduled payments under this Agreement and the other Loan Documents (including scheduled payments of principal and interest) will be paid during the period required for Restoration from (A) the Net Proceeds, (B) the Insurance Proceeds of the business or rental interruption or other loss of income insurance specified in Section 5.1(a)(iii) hereof or (C) other funds of Borrower;

      (vii)      Lender shall be satisfied that the Restoration will be completed on or before the earliest to occur of (A) the date that is three (3) months prior to the Maturity Date, (B) the date required for such completion under the terms of the Ground Lease and the Prime Lease, (C) the earliest date required for such completion under the terms of any Major Lease,

(D) the date, if any, required under the applicable Legal Requirements for such completion, or (E) three (3) months prior to the expiration of the insurance coverage specified in Section 5.1(a)(iii) hereof;

(viii)   the Property and the use thereof after the Restoration will be in compliance with and permitted under all applicable Legal Requirements;

(ix)   the Restoration shall be done and completed by Borrower in an expeditious and diligent fashion and in compliance with all applicable Legal Requirements;

(x)   such Casualty or Condemnation, as applicable, does not result in the loss of access to the Property or the Improvements;

(xi)   all Operating Agreements reasonably necessary for the continued operation of the Property in the ordinary course of business shall remain in full force and effect, notwithstanding the occurrence of such Casualty or Condemnation;

(xii)   Borrower shall deliver, or cause to be delivered, to Lender a signed, detailed budget approved in writing by Borrower's architect or engineer stating all of the costs and expenses of completing the Restoration, which budget shall be acceptable to Lender; and

(xiii)   the Net Proceeds, together with any cash or cash equivalent deposited by Borrower with Lender, are sufficient, in Lender's reasonable judgment, to pay for all costs and expenses of the Restoration in full.

(b)   The Net Proceeds shall be paid directly to Lender and held by Lender in an interest-bearing account and, until disbursed in accordance with the provisions of this Section 5.3.2, shall constitute additional security for the Obligations.   The Net Proceeds (including all interest earned thereon) shall be disbursed by Lender to, or as directed by, Borrower from time to time during the course of the Restoration, upon receipt of evidence reasonably satisfactory to Lender that (i) all requirements set forth in Section 5.3.2(a) have been satisfied, (ii) all materials installed and work and labor performed (except to the extent that they are to be paid for out of the requested disbursement) in connection with the Restoration have been paid for in full, and (iii) there exist no notices of pendency, stop orders, mechanic's or materialman's liens or notices of intention to file same, or any other Liens or encumbrances of any nature whatsoever on the Property arising out of the Restoration which have not either been fully bonded by a surety company acceptable to Lender and, following a Securitization, the Rating Agencies, to the satisfaction of Lender and discharged of record or in the alternative fully insured to the satisfaction of Lender by the title insurance company issuing the Title Insurance Policy.

(c)   Borrower shall deliver to Lender copies of all plans and specifications in connection with the Restoration.   With respect to any Restoration where the costs of completion could be expected to exceed the Restoration Threshold, all such plans and specifications shall be subject to the prior approval of Lender and, if reasonably required by Lender, an independent architect or engineer selected by Lender (the "**Casualty Consultant**") such acceptance not to be

95

unreasonably withheld or delayed.  The plans and specifications shall require that the Restoration be completed in a first-class workmanlike manner at least equivalent to the quality and character of the original work in the Improvements so that, upon completion thereof, the Property shall be at least equal in value and general utility to the Property prior to the Casualty or Condemnation, as applicable (it being understood, however, that (i) Borrower shall not be obligated to restore the Property to the precise condition of the Property prior to such Casualty or Condemnation, as applicable, and (ii) in the case of a partial Condemnation, the Restoration shall be done to the extent reasonably practicable after taking into account the consequences of such partial Condemnation; provided that the Property shall be restored, to the extent reasonably practicable, to be of at least equal value and of substantially the same character as prior to the Casualty or Condemnation, as applicable).  Borrower shall restore all Improvements such that when they are fully restored and/or repaired, such Improvements and their contemplated use fully comply with all applicable Legal Requirements.  The identity of the contractors, subcontractors and materialmen engaged in the Restoration, as well as the contracts under which they have been engaged, shall be subject to the prior approval of Lender and the Casualty Consultant, if any.  All reasonable out-of-pocket costs and expenses incurred by Lender in connection with recovering, holding and disbursing the Net Proceeds for the Restoration (including, without limitation, reasonable attorneys' fees and expenses and the Casualty Consultant's fees and disbursements) shall be paid by Borrower.

(d)     In no event shall Lender be obligated to make disbursements of the Net Proceeds in excess of an amount equal to the costs and expenses actually incurred from time to time for work in place as part of the Restoration, as certified by the Casualty Consultant (or, if none, by Borrower) less the Casualty Retainage.  The term "**Casualty Retainage**" shall mean, as to each contractor, subcontractor or materialman engaged in the Restoration, an amount equal to ten percent (10%) of the costs and expenses actually incurred for work in place as part of the Restoration, as certified by the Casualty Consultant (or, if none, by Borrower) until the Restoration has been completed.  The Casualty Retainage shall in no event, and notwithstanding anything to the contrary set forth above in this Section 5.3.2(d), be less than the amount actually held back by Borrower from contractors, subcontractors and materialmen engaged in the Restoration.  The Casualty Retainage shall not be released until the Casualty Consultant (or, if none, Borrower) certifies to Lender that the Restoration has been completed in accordance with the provisions of this Section 5.3.2 and that all approvals necessary for the re-occupancy and use of the Property have been obtained from all applicable Governmental Authorities, and Lender receives evidence reasonably satisfactory to Lender that the costs and expenses of the Restoration have been paid in full or will be paid in full out of the Casualty Retainage; provided, however, that Lender will release the portion of the Casualty Retainage being held with respect to any contractor, subcontractor or materialman engaged in the Restoration as of the date upon which (i) the Casualty Consultant (or, if none, Borrower) certifies to Lender that such contractor, subcontractor or materialman has satisfactorily completed all work and has supplied all materials in accordance with the provisions of the contractor's, subcontractor's or materialman's contract, (ii) such contractor, subcontractor or materialman delivers lien waivers and evidence of payment in full of all sums due to such contractor, subcontractor or materialman as may be reasonably requested by Lender or by the title insurance company issuing the Title Insurance Policy, and (iii) Lender receives an endorsement to the Title Insurance Policy insuring the continued priority of the Lien of the Security Instrument and evidence of payment of any premium payable in

connection with such endorsement.  If required by Lender, the release of any such portion of the Casualty Retainage shall be approved by the surety company, if any, which has issued a payment or performance bond with respect to the applicable contractor, subcontractor or materialman.

(e)     Lender shall not be obligated to make disbursements of the Net Proceeds more frequently than once every calendar month.

(f)     If at any time the Net Proceeds or the undisbursed balance thereof shall not, in the opinion of Lender (in consultation with the Casualty Consultant, if any), be sufficient to pay in full the balance of the costs and expenses which are estimated by Lender (or the Casualty Consultant, if any) to be incurred in connection with the completion of the Restoration, Borrower shall deposit the deficiency (the "**Net Proceeds Deficiency**") with Lender before any further disbursement of the Net Proceeds shall be made.  The Net Proceeds Deficiency deposited with Lender shall be held by Lender and shall be disbursed for costs and expenses actually incurred in connection with the Restoration on the same terms and conditions applicable to the disbursement of the Net Proceeds, and until so disbursed pursuant to this Section 5.3.2 shall constitute additional security for the Obligations.

(g)     The excess, if any, of the Net Proceeds after (i) the Casualty Consultant (or, if none, Borrower) certifies to Lender that the Restoration has been completed in accordance with the provisions of this Section 5.3.2 and (ii) the receipt by Lender of evidence reasonably satisfactory to Lender that all costs and expenses incurred in connection with the Restoration have been paid in full ("**Restoration Completion**") and after Restoration Completion, the remaining balance, if any, of the Net Proceeds Deficiency deposited with Lender, shall be remitted by Lender (A) to Mezzanine Lender; (B) if the Mezzanine Loan is not then outstanding, to Subordinate Mezzanine Lender; and (C) if the Subordinate Mezzanine Loan is not then outstanding, to Borrower, provided in each case that no Event of Default has occurred and remains outstanding.  Notwithstanding the foregoing, in the case of a Condemnation, the amount remitted by Lender to any Person in accordance with this Section 5.3.2(g) shall not in any case exceed the amount of the Net Proceeds Deficiency deposited by Borrower with the balance being applied to the Debt in the manner provided for in Section 5.3.2(h) hereof.

(h)     All Net Proceeds not required (i) to be made available for the Restoration or (ii) to be returned to Borrower as excess Net Proceeds pursuant to Section 5.3.2(g) hereof may be retained and applied by Lender toward the payment of the Debt, whether or not then due and payable, in such order, proportion and priority as Lender in its sole discretion shall deem proper, or, at the discretion of Lender, the same may be paid, either in whole or in part, to Borrower for such purposes as Lender shall approve in its sole discretion.

(i)     Notwithstanding anything to the contrary contained herein or in any other Loan Document, if the Loan is included in a REMIC Trust and, immediately following a release of any portion of the Lien of the Security Instrument following a Casualty or Condemnation (but taking into account any proposed Restoration of the remaining Property), the Loan-to-Value Ratio (or a loan-to-value ratio determined, in Lender's sole discretion, by any commercially reasonable method permitted to a REMIC Trust) based on the value of the Property (after giving effect to such release and Restoration of the remaining Property) (based solely on real property

and excluding personal property and going concern value, if any) is greater than one hundred twenty-five percent (125%), the principal balance of the Loan must be paid down by an amount equal to the least of the following amounts: (i) the Net Proceeds, (ii) the fair market value of the released property at the time of the release, or (iii) an amount such that the Loan-to-Value Ratio (or a loan-to-value ratio determined in Lender's sole discretion, by any commercially reasonable method permitted to a REMIC Trust) (based solely on real property and excluding personal property and going concern value, if any) does not increase after the release, unless Lender receives an opinion of counsel that if such amount is not paid, the applicable Securitization will not fail to maintain its status as a REMIC Trust as a result of the related release of such portion of the Lien of the Security Instrument.  If and to the extent the preceding sentence applies, only such amount of the Net Proceeds, if any, in excess of the amount required to pay down the principal balance of the Loan may be released for purposes of Restoration or released to Borrower as otherwise expressly provided in this Section 5.3.

      5.3.3.  Net Proceeds − Ground Lease. Notwithstanding anything to the contrary contained herein (except for Section 5.3.2(i)) to the extent that there is a Casualty or Condemnation, the provisions set forth in the Ground Lease shall govern the use of Net Proceeds and Borrower's obligations in connection with the applicable Restoration; provided, however, to the extent the compliance by Borrower with the terms and conditions of Sections 5.3.1 and 5.3.2 hereof would not breach the terms and provisions of the Ground Lease, Borrower shall comply with the terms and provisions of Sections 5.3.1 and 5.3.2 hereof, and, provided, further, to the extent Borrower has a consent right with respect to the use and/or application of such Net Proceeds, Borrower shall not grant its consent, approval or waiver with respect to any disbursement of such Net Proceeds as may be requested or required in connection with the terms and provisions of such Ground Lease without first obtaining the written consent, approval, or waiver of Lender (which consent, approval or waiver shall not be unreasonably withheld).

## VI.     RESERVE FUNDS

      **Section 6.1.**    Intentionally Omitted.

      **Section 6.2.**    Tax Funds.

      6.2.1.  Deposits of Tax Funds.     Borrower shall deposit with Lender on the Closing Date the amount set forth on the settlement statement for payment of Taxes.  On each Monthly Payment Date Borrower shall deposit (or cause to be deposited pursuant to the Cash Management Agreement) with the Cash Management Bank an amount equal to one-twelfth (1/12th) of the Taxes (the "**Monthly Tax Deposit**") that Lender estimates will be payable during the next ensuing twelve (12) months in order to accumulate sufficient funds to pay all such Taxes at least thirty (30) days prior to their respective due dates.  Amounts deposited pursuant to this Section 6.2.1 are referred to herein as the "**Tax Funds**" and the account in which such amounts are held by the Cash Management Bank shall hereinafter be referred to as the "**Tax Account**".  If at any time when Borrower is required to make monthly deposits pursuant to this Section 6.2.1, Lender reasonably determines that the Tax Funds will not be sufficient to pay the Taxes at least ten (10) days prior to the respective due dates, Lender shall notify Borrower of such determination and the monthly deposits for Taxes shall be increased by the amount that Lender

estimates is sufficient to make up the deficiency at least ten (10) days prior to the respective due dates for the Taxes <u>provided</u> that if Borrower receives notice of any such deficiency after the date that is ten (10) days prior to the date that Taxes are due, Borrower will deposit such amount within three (3) Business Days after its receipt of such notice; provided further that Lender may require that Borrower make a lump sum deposit to the Tax Account in the amount of the applicable deficiency.

6.2.2.   <u>Release of Tax Funds</u>.  (a)  Lender will apply the Tax Funds to payments of Taxes required to be made by Borrower pursuant to <u>Section 4.1.2</u> hereof and under the Security Instrument.  Borrower shall furnish Lender with all bills, statements and estimates for Taxes at least ten (10) days prior to the date on which such Taxes first become due.  In making any payment relating to Taxes Lender may do so according to any bill, statement or estimate procured from the public office (with respect to Taxes) without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof.  If the amount of the Tax Funds shall exceed the amounts due for Taxes Lender shall, in its sole discretion, return any excess to Borrower or credit such excess in good faith (so as to avoid the unnecessary accumulation of excess funds in the Tax Account) against future payments to be made to the Tax Funds.

(b)      All reasonable out-of-pocket costs and expenses incurred by Lender in connection with holding and disbursing the Tax Funds shall be paid by Borrower.

(c)      Any Tax Funds remaining after the Debt has been paid in full or defeased pursuant to the terms hereof shall be paid (i) to the Mezzanine Lender to be held by Mezzanine Lender pursuant to the Mezzanine Loan Agreement for the same purposes as those described in this <u>Section 6.2</u>, (ii) if the Mezzanine Loan is no longer outstanding, but the Subordinate Mezzanine Loan is outstanding, to Subordinate Mezzanine Lender to be held by Subordinate Mezzanine Lender pursuant to the Subordinate Mezzanine Loan Agreement for the same purposes as those described in this <u>Section 6.2</u>, or (iii) if the Subordinate Mezzanine Loan is no longer outstanding, to Borrower or, at Borrower's election, credited against the Debt simultaneously with the satisfaction of the balance of the Loan.

**Section 6.3.**   <u>Insurance Funds</u>.

6.3.1.   <u>Deposits of Insurance Funds</u>.  On each Monthly Payment Date during which the Property is not insured pursuant to a blanket insurance policy (which policy satisfies the conditions of <u>Section 5.1</u> hereof), Borrower shall deposit (or cause to be deposited pursuant to the Cash Management Agreement) with the Cash Management Bank an amount equal to one-twelfth (1/12th) of the Insurance Premiums (the "**Monthly Insurance Deposit**") that Lender estimates will be payable for the renewal of the coverages afforded by the Policies upon the expiration thereof in order to accumulate sufficient funds to pay all such Insurance Premiums at least thirty (30) days prior to the expiration of Policies.  Amounts deposited pursuant to this <u>Section 6.3.1</u> are referred to herein as the "**Insurance Funds**" and the account in which such amounts are held by the Cash Management Bank shall hereinafter be referred to as the "**Insurance Account**".  If at any time when Borrower is required to make monthly deposits pursuant to this <u>Section 6.3.1</u>, Lender reasonably determines that the Insurance Funds will not be

99

sufficient to pay the Insurance Premiums at least ten (10) days prior to the expiration of the Policies, Lender shall notify Borrower of such determination and the monthly deposits for Insurance Premiums shall be increased by the amount that Lender estimates is sufficient to make up the deficiency at least ten (10) days prior to the expiration of the Policies; provided that if Borrower receives notice of any such deficiency after the date that is ten (10) days prior to the expiration of the Policies, Borrower will deposit such amount within three (3) Business Days after its receipt of such notice.

6.3.2.  Release of Insurance Funds.  (a)  Lender will apply the Insurance Funds to payments of Insurance Premiums for the Policies required to be maintained by Borrower pursuant to Section 5.1 hereof.  Borrower shall furnish Lender with all bills, invoices and statements for Insurance Premiums at least ten (10) days prior to the date on which such Insurance Premiums become due.  In making any payment relating to Insurance Premiums, Lender may do so according to any bill, invoice or statement procured from the insurance company or its agent, without inquiry into the accuracy of such bill, invoice or statement.  If the amount of the Insurance Funds shall exceed the amounts due for Insurance Premiums, Lender shall, in its sole discretion, return any excess to Borrower or credit such excess in good faith (so as to avoid the unnecessary accumulation of excess funds in the Insurance Account) against future payments to be made to the Insurance Funds.

(b)     All reasonable costs and expenses incurred by Lender in connection with holding and disbursing the Insurance Funds shall be paid by Borrower.

(c)     Any Insurance Funds remaining after the Debt has been paid in full or defeased pursuant to the terms hereof shall be paid (i) to the Mezzanine Lender to be held by Mezzanine Lender pursuant to the Mezzanine Loan Agreement for the same purposes as those described in this Section 6.3, (ii) if the Mezzanine Loan is no longer outstanding, but the Subordinate Mezzanine Loan is outstanding, to Subordinate Mezzanine Lender to be held by Subordinate Mezzanine Lender pursuant to the Subordinate Mezzanine Loan Agreement for the same purposes as those described in this Section 6.3, or (iii) if the Subordinate Mezzanine Loan is no longer outstanding, to Borrower or, at Borrower's election, credited against the Debt simultaneously with the satisfaction of the balance of the Loan.

**Section 6.4.**     Intentionally Omitted.

**Section 6.5.**     Lease Termination Funds.

6.5.1.  Deposits of Lease Termination Funds.  Borrower shall pay to Lender for deposit with the Cash Management Bank, or cause to be paid to Lender for deposit with the Cash Management Bank, all amounts paid to Borrower in connection with (i) any modification or amendment of any Lease, but excluding payments of any additional minimum rent, common area maintenance charges payments and other non-lump-sum revenue streams, (ii) any consent (including any consent to an assignment or sublease of any Lease) or waiver by Borrower of any term, condition or provision under any Lease, (iii) any settlement of claims of Borrower against third parties in connection with any Lease, (iv) any rejection, termination, surrender, cancellation or buy-out of any Lease (including in connection with any Bankruptcy Action and including any

payment relating to unamortized tenant improvements and/or leasing commissions), and (v) any other extraordinary event pursuant to which Borrower receives payment (in whatever form) derived from or generated by the use, ownership or operation of the Property not otherwise covered by this Agreement or the Cash Management Agreement (collectively, "**Termination Income Payments**"), in each case, with respect to clauses (i), (ii), (iii), (iv), and (v), net of reasonable, out-of-pocket costs and expenses, if any, incurred by Borrower.  Amounts deposited pursuant to this Section 6.5.1 are referred to herein as the "**Lease Termination Funds**" and the account in which such amounts are held by the Cash Management Bank shall hereinafter be referred to as the "**Lease Termination Reserve Account**".  In connection with any amount required to be paid to Lender for deposit with the Cash Management Bank pursuant to this Section, Borrower shall provide prior notice to Lender of the amount and the nature thereof and otherwise cooperate with Lender to ensure that such amounts are properly accounted for and held as Lease Termination Funds.

6.5.2.  Release of Lease Termination Funds.  (a) Lender shall disburse to Borrower the Lease Termination Funds upon satisfaction by Borrower of each of the following conditions:  (i) Borrower shall submit a request for payment to Lender at least thirty (30) days prior to the date on which Borrower requests such payment be made, which request shall specify the tenant improvement costs and leasing commissions to be paid or reimbursed and state that the Lease Termination Funds requested will be used for all or a portion of the applicable leased space for which such Termination Income Payments were received (unless otherwise approved by Lender), (ii) on the date such request is received by Lender and on the date such payment or reimbursement is to be made, no Default or Event of Default shall have occurred and remain outstanding, (iii) Lender shall have received a true, correct and complete copy of, and, if required pursuant to this Agreement, approved, the Lease in respect of which Borrower is obligated to pay or reimburse certain tenant improvement costs and leasing commissions, which tenant improvement costs and leasing commissions must be related to the applicable leased space for which the Termination Income Payments were received (unless otherwise approved by Lender), (iv) Lender shall have received and, if required pursuant to this Agreement, approved a budget for tenant improvement costs and a schedule of leasing commission payments, (v) Lender shall have received an Officer's Certificate (A) stating that all tenant improvements at the Property to be funded by the requested disbursement have been completed in a good and workmanlike manner and in accordance with all applicable Legal Requirements, such certificate to be accompanied by a copy of any license, permit or other approval required by any Governmental Authority in connection with such tenant improvements or shall affirmatively state that none are required, (B) identifying (1) each Person that supplied materials or labor in connection with the tenant improvements to be funded by the requested disbursement and (2) each Person that provided brokerage services in connection with the leasing commissions to be funded by the requested disbursement, (C) stating that each such Person has been paid in full or will be paid in full upon such disbursement, such certificate to be accompanied by lien waivers (if requested by Lender and the amount of tenant improvements to be funded by the requested disbursement exceeds the Work Threshold; provided, however, that lien waivers shall only be required with respect to work performed by a Tenant only to the extent that such Tenant is required to provide lien waivers under such Tenant's Lease) or other evidence of payment satisfactory to Lender, and (D) stating that the tenant improvement costs and/or leasing commission payments to be funded have not been the subject of a previous disbursement and such funds will be used or have

101

been used for the applicable leased space for which the Termination Income Payments were received (unless otherwise approved by Lender), (vi) at Lender's option, if the amount of tenant improvements to be funded by the requested disbursement exceeds the Work Threshold, a title search for the Property indicating that the Property is free from all liens, claims and other encumbrances not previously approved by Lender, (vii) intentionally omitted, and (viii) Lender shall have received such other evidence as Lender may reasonably request that (A) the tenant improvements at the Property to be funded by the requested disbursement have been completed and are paid for or will be paid for in full upon such disbursement to Borrower and (B) the leasing commissions to be funded by the requested disbursement have been paid for or will be paid for in full upon such disbursement to Borrower.  Lender shall not be required to disburse Lease Termination Funds more frequently than once each calendar month, and each disbursement of the Lease Termination Funds must be in an amount not less than the Minimum Disbursement Amount (or a lesser amount if the total remaining balance of Lease Termination Funds is less than the Minimum Disbursement Amount, in which case only one disbursement of the amount remaining in the Lease Termination Account shall be made).

(b)       All reasonable out-of-pocket costs and expenses incurred by Lender in connection with holding and disbursing the Lease Termination Funds shall be paid by Borrower.

(c)       Any Lease Termination Funds remaining after the Debt has been paid in full or defeased pursuant to the terms hereof shall be paid (i) to the Mezzanine Lender to be held by Mezzanine Lender pursuant to the Mezzanine Loan Agreement for the same purposes as those described in this <u>Section 6.5</u>, (ii) if the Mezzanine Loan is no longer outstanding, but the Subordinate Mezzanine Loan is outstanding, to Subordinate Mezzanine Lender to be held by Subordinate Mezzanine Lender pursuant to the Subordinate Mezzanine Loan Agreement for the same purposes as those described in this <u>Section 6.5</u>, or (iii) if the Subordinate Mezzanine Loan is no longer outstanding, to Borrower or, at Borrower's election, credited against the Debt simultaneously with the satisfaction of the balance of the Loan.

**Section 6.6.**     <u>Intentionally Omitted.</u>

**Section 6.7.**     <u>Excess Cash Flow Funds.</u>

6.7.1.  <u>Deposits of Excess Cash Flow Funds</u>.  During a Trigger Period, Borrower shall deposit (or cause to be deposited pursuant to the Cash Management Agreement) with the Cash Management Bank all Excess Cash Flow in accordance with <u>Section 2.7.2(xiii)</u> hereof. Amounts so deposited shall hereinafter be referred to as the "**Excess Cash Flow Funds**" and the account in which such amounts are held by the Cash Management Bank shall hereinafter be referred to as the "**Excess Cash Flow Account**".

6.7.2.  <u>Release of Excess Cash Flow Funds</u>.

(a)       Excess Cash Flow Funds on deposit in the Excess Cash Flow Account shall be held by Lender as additional security for the Loan. Notwithstanding the foregoing, provided no Event of Default shall have occurred and be continuing, Lender shall disburse Excess Cash Flow Funds on deposit in the Excess Cash Flow Account (a) to pay approved tenant improvement costs and leasing commissions at the Property in accordance with the requirements

set forth in Section 6.5.2(a) hereof, (b) to reimburse Borrower for shortfalls in Operating Expenses in accordance with Section 2.7.2(c) hereof, and (c) without duplication of any amounts disbursed in accordance with Section 6.9.2 hereof, to pay for Capital Expenditures incurred in accordance with an Approved Annual Budget.

(b)     Upon the termination of a Trigger Period and provided that no other Trigger Period shall have occurred and remain outstanding, all funds on deposit in the Excess Cash Flow Account shall be returned to Borrower.

(c)     All reasonable out-of-pocket costs and expenses incurred by Lender in connection with holding and disbursing the Excess Cash Flow Funds shall be paid by Borrower.

(d)     Any Excess Cash Flow Funds remaining after the Debt has been paid in full or defeased pursuant to the terms hereof shall be paid (i) to the Mezzanine Lender to be held by Mezzanine Lender pursuant to the Mezzanine Loan Agreement for the same purposes as those described in this Section 6.7, (ii) if the Mezzanine Loan is no longer outstanding, but the Subordinate Mezzanine Loan is outstanding, to Subordinate Mezzanine Lender to be held by Subordinate Mezzanine Lender pursuant to the Subordinate Mezzanine Loan Agreement for the same purposes as those described in this Section 6.7, or (iii) if the Subordinate Mezzanine Loan is no longer outstanding, to Borrower or, at Borrower's election, credited against the Debt simultaneously with the satisfaction of the balance of the Loan.

**Section 6.8.**     Ground Rent Funds.

6.8.1.   Deposit of Ground Rent Funds.   Borrower shall deposit with Lender on the Closing Date $564,156 for payment of the Ground Rent.   On each Monthly Payment Date beginning with the Monthly Payment Date occurring in June, 2018, Borrower shall deposit (or cause to be deposited pursuant to the Cash Management Agreement) with the Cash Management Bank an amount equal to one-twelfth (1/12th) of the aggregate Ground Rent that Lender estimates will be payable during the next ensuing twelve (12) months in order to accumulate sufficient funds to pay all such Ground Rent at least twenty-one (21) days prior to their respective due dates (collectively, the "**Monthly Ground Rent Deposit**").   Amounts so deposited shall hereinafter be referred to as the "**Ground Rent Funds**" and the account in which such amounts are held by Lender shall hereinafter be referred to as the "**Ground Rent Account**".   If at any time Lender reasonably determines that the Ground Rent Funds will not be sufficient to pay the Ground Rent, Lender shall notify Borrower of such determination and the monthly deposits for Ground Rent shall be increased by the amount that Lender estimates is sufficient to make up the deficiency; provided that if Borrower receives notice of any such deficiency after the date that is ten (10) days prior to the date that the next installment of Ground Rent is due, Borrower will deposit such amount within three (3) Business Days after its receipt of such notice. Ground Rent currently consists of three (3) components: (i) Base Rent (as defined in the Ground Lease), which is payable monthly, (ii) Participation Rent (as defined in the Ground Lease), which is payable annually, and (iii) Index Rent (as defined in the Ground Lease), which is payable annually.

103

6.8.2.   Release of Ground Rent Funds.

(a)      Lender shall apply the Ground Rent Funds to payments of Ground Rent. Borrower shall furnish Lender with all bills, invoices and statements for Ground Rent on the earlier of ten (10) days prior to the date on which such Ground Rent becomes due or within two (2) Business Days of receipt.  In making any payment relating to Ground Rent, Lender may do so according to the Ground Lease or any bill, invoice or statement given by Ground Lessor without inquiry into the accuracy of such bill, invoice or statement or into the validity of any rent, additional rent or other charge thereof.  If the amount of the Ground Rent Funds shall exceed the amounts due for Ground Rent, Lender shall, in its sole discretion, return any excess (except that Lender shall hold two (2) months of Ground Rent payments in escrow throughout the term of the Loan) to Borrower or credit such excess against future payments to be made to the Ground Rent Funds in good faith (so as to avoid the unnecessary accumulation of excess funds in the Ground Rent Account).

(b)      All reasonable out-of-pocket costs and expenses incurred by Lender in connection with holding and disbursing the Ground Rent Funds shall be paid by Borrower.

(c)      Any Ground Rent Funds remaining after the Debt has been paid in full or defeased pursuant to the terms hereof shall be paid (x) to the Mezzanine Lender to be held by Mezzanine Lender pursuant to the Mezzanine Loan Agreement for the same purposes as those described in this Section 6.8, (y) if the Mezzanine Loan is no longer outstanding, but the Subordinate Mezzanine Loan is outstanding, to Subordinate Mezzanine Lender to be held by Subordinate Mezzanine Lender pursuant to the Subordinate Mezzanine Loan Agreement for the same purposes as those described in this Section 6.8, or (z) if the Subordinate Mezzanine Loan is no longer outstanding, to Borrower or, at Borrower's election, credited against the Debt simultaneously with the satisfaction of the balance of the Loan.

Section 6.9.     Capital Reserve Account Funds.

6.9.1.   Deposit of Capital Reserve Account Funds.  Borrower shall deposit with Lender on the Closing Date $57,438 to be held by Lender for disbursement into the Capital Reserve Account in accordance with the requirements of Section 12.7 of the Ground Lease.  On each Monthly Payment Date beginning with the Monthly Payment Date occurring in June, 2018, Borrower shall deposit (or cause to be deposited pursuant to the Cash Management Agreement) with the Cash Management Bank an amount equal to one-twelfth (1/12th) of the aggregate amount that Lender estimates will be required to be deposited into the Capital Reserve Account in the succeeding calendar year in accordance with Section 12.7 of the Ground Lease in order to accumulate sufficient funds to pay all such deposits to the Capital Reserve Account at least twenty-one (21) days prior to their respective due dates (collectively, the "**Monthly Capital Reserve Account Deposit**").  Amounts so deposited shall hereinafter be referred to as the "**Capital Reserve Account Funds**" and the account in which such amounts are held by Lender shall hereinafter be referred to as the "**Capital Reserve Deposit Account**".  If at any time Lender reasonably determines that the Capital Reserve Account Funds will not be sufficient to pay the required deposits to the Capital Reserve Account pursuant to Section 12.7 of the Ground Lease, Lender shall notify Borrower of such determination and the monthly deposits into the

Capital Reserve Deposit Account shall be increased by the amount that Lender estimates is sufficient to make up the deficiency; *provided* that if Borrower receives notice of any such deficiency after the date that is ten (10) days prior to the date that the next deposit into the Capital Reserve Account is due, Borrower will deposit such amount within three (3) Business Days after its receipt of such notice. Borrower hereby covenants and agrees to use any funds on deposit in the Capital Reserve Account to pay for Capital Expenditures as required hereunder and pursuant to the terms and provisions of the Ground Lease. As of April 26, 2018, the amount on deposit in the Capital Reserve Account is $162,713.44.

6.9.2.   Release of Capital Reserve Account Funds.

(a)     Lender shall disburse the Capital Reserve Account Funds into the Capital Reserve Account when required pursuant to Section 12.7 of the Ground Lease. Borrower shall furnish Lender with all bills, invoices and statements for required deposits into the Capital Reserve Account pursuant to Section 12.7 of the Ground Lease on the earlier of ten (10) days prior to the date on which such deposit becomes due or within two (2) Business Days of receipt. In making any disbursement into the Capital Reserve Account, Lender may do so according to the Ground Lease or any bill, invoice or statement given by Ground Lessor without inquiry into the accuracy of such bill, invoice or statement or into the validity of any charge thereof. If the amount of the Capital Reserve Account Funds shall exceed the amounts due for deposit into the Capital Reserve Account, Lender shall, in its sole but reasonable discretion, return any excess to Borrower or credit such excess against future payments to be made to the Capital Reserve Account Funds in good faith (so as to avoid the unnecessary accumulation of excess funds in the Capital Reserve Deposit Account).

(b)     All reasonable out-of-pocket costs and expenses incurred by Lender in connection with holding and disbursing the Capital Reserve Account Funds shall be paid by Borrower.

(c)     Any Capital Reserve Account Funds remaining after the Debt has been paid in full or defeased pursuant to the terms hereof shall be paid (x) to the Mezzanine Lender to be held by Mezzanine Lender pursuant to the Mezzanine Loan Agreement for the same purposes as those described in this Section 6.9, (y) if the Mezzanine Loan is no longer outstanding, but the Subordinate Mezzanine Loan is outstanding, to Subordinate Mezzanine Lender to be held by Subordinate Mezzanine Lender pursuant to the Subordinate Mezzanine Loan Agreement for the same purposes as those described in this Section 6.9, or (z) if the Subordinate Mezzanine Loan is no longer outstanding, to Borrower or, at Borrower's election, credited against the Debt simultaneously with the satisfaction of the balance of the Loan.

**Section 6.10.**   Intentionally Omitted.

**Section 6.11.**   Unfunded Obligations Funds.

6.11.1. Deposits of Unfunded Obligations Funds.  On the Closing Date, Borrower shall deposit with Lender for deposit with the Cash Management Bank an amount equal to $836,851 for Unfunded Obligations. In addition, Borrower shall have the right, but not the obligation, to deposit in the Unfunded Obligations Account an amount equal to any rent which

105

would have been payable by any Tenant under any Lease entered into from and after the Closing Date had Borrower not provided the Tenant thereunder a free rent period during the term of such Lease. Amounts deposited pursuant to this Section 6.11.1 are referred to herein as the "**Unfunded Obligations Funds**" and the account in which such amounts are held by Lender shall hereinafter be referred to as the "**Unfunded Obligations Account**".

6.11.2. Release of Unfunded Obligations Funds.

(a)     Lender shall disburse to Borrower the Unfunded Obligations Funds upon satisfaction by Borrower of each of the following conditions, as applicable:

(i)     Intentionally omitted.

(ii)    For Unfunded TI/LC Amounts: (A) Borrower shall submit a request for payment to Lender at least ten (10) Business Days prior to the date on which Borrower requests such payment be made and specifies the Unfunded TI/LC Amounts to be paid or reimbursed, (B)  Tenant shall have complied with the requirements under the applicable Lease for receipt of such amount and Borrower shall have delivered satisfactory written evidence of such compliance to Lender or, with respect to the Unfunded TI/LC Amounts owed to Amtrak set forth on Schedule V, Lender shall have received an Officer's Certificate from Borrower certifying that such Unfunded TI/LC Amounts have been applied as a credit to Amtrak, together with such other evidence reasonably requested by Lender evidencing the same, (C)  Lender shall have received such other written evidence as Lender may reasonably request that the Unfunded TI/LC Amounts to be funded by the requested disbursement have been completed and are paid for or will be paid for in full upon such disbursement to Borrower.  In addition, subject to Section 6.11.2(a)(v) below and submission by Borrower of a request for payment to Lender at least thirty (30) days prior to the date on which Borrower requests such payment be made, Lender shall disburse to Borrower the balance of the Unfunded TI/LC Amounts with respect to any Tenant upon receipt of written evidence reasonably satisfactory to Lender that all applicable tenant improvements, leasing commissions, and/or tenant allowances have been completed and paid for with respect to such Tenant.

(iii)   For Unfunded Free/Gap Rent Amounts, provided all conditions in Section 6.11.2(a)(v) below are satisfied, on each Monthly Payment Date for a month in which there exists Unfunded Free/Gap Rent Amounts, Lender shall, for each Tenant for which there is an Unfunded Free/Gap Rent Amount in such month, withdraw from the Unfunded Obligations Account and deposit in the Cash Management Account an amount equal the Unfunded Free/Gap Rent Amount for such Tenant in such month.

(iv)    Intentionally Omitted.

(v)     For all Unfunded Obligations, (A) on the date such request is received by Lender and on the date such payment or reimbursement is to be made, no Default or Event of Default shall have occurred and remain outstanding and (B) Lender shall not be required to disburse Unfunded Obligations Funds more frequently than once each calendar month, and each disbursement of the Unfunded Obligations Funds must be in an amount not less than the Minimum Disbursement Amount (or a lesser amount if the total remaining balance of

106

Unfunded Obligations Funds is less than the Minimum Disbursement Amount, in which case only one disbursement of the amount remaining in the Unfunded Obligations Account shall be made).

(b)     All reasonable out-of-pocket costs and expenses incurred by Lender in connection with holding and disbursing the Unfunded Obligations Funds shall be paid by Borrower.

(c)     Any Unfunded Obligations Funds remaining after the Debt has been paid in full or defeased pursuant to the terms hereof shall be paid (i) to the Mezzanine Lender to be held by Mezzanine Lender pursuant to the Mezzanine Loan Agreement for the same purposes as those described in this Section 6.11, (ii) if the Mezzanine Loan is no longer outstanding, but the Subordinate Mezzanine Loan is outstanding, to Subordinate Mezzanine Lender to be held by Subordinate Mezzanine Lender pursuant to the Subordinate Mezzanine Loan Agreement for the same purposes as those described in this Section 6.11 or (iii) if the Subordinate Mezzanine Loan is no longer outstanding, to Borrower or, at Borrower's election, credited against the Debt simultaneously with the satisfaction of the balance of the Loan.

**Section 6.12.**   Reserve Funds.

6.12.1. Security Interest.   Borrower hereby pledges to Lender, and grants a security interest in, any and all monies now or hereafter deposited in the Reserve Funds as additional security for the performance of the Obligations.   Until expended or applied as provided in this Agreement, the Reserve Funds shall constitute additional security for the performance of the Obligations.   Upon the earlier of (i) Lender's acceleration of the Loan or (ii) occurrence of an Enforcement Action, Lender may, in addition to any and all other rights and remedies available to Lender, apply any sums then present in the Reserve Funds to the payment of the Debt in any order, proportion and priority as Lender may determine in its sole and absolute discretion.   Lender shall have no obligation to release any of the Reserve Funds while any Default or Event of Default has occurred and remains outstanding.   Borrower shall not further pledge, assign or grant any security interest in any Reserve Fund or permit any Lien or encumbrance to attach thereto, or any levy to be made thereon, or any UCC-1 Financing Statements, except those naming Lender as the secured party, to be filed with respect thereto.

6.12.2. Investments; Income Taxes.   The Reserve Funds shall be held in accordance with the Cash Management Agreement.   The Reserve Funds shall be held in an Eligible Account and may be invested in Permitted Investments as directed by Lender.   Lender shall not be liable for any loss sustained on the investment of any funds constituting the Reserve Funds so long as the same are held in cash or are invested in Permitted Investments, other than losses sustained as a result of Lender's gross negligence.   In connection with any liquidation and transfer of any amounts then invested in Permitted Investments to the applicable Reserve Account or reinvestment of such amounts in other Permitted Investments as Lender may reasonably determine is necessary to perfect or protect any security interest granted or purported to be granted hereby or to enable Lender to exercise and enforce Lender's rights and remedies hereunder with respect to any Reserve Funds, Borrower shall deposit with Lender an amount equal to the actual losses sustained on such liquidation within one (1) Business Day of such

liquidation, provided that Borrower shall not be obligated to deposit such amount to the extent of losses sustained as a result of Lender's gross negligence. All interest on a Reserve Fund (other than Tax Funds on deposit in the Tax Account and Insurance Funds on deposit in the Insurance Account) shall be added to and become a part thereof. Borrower shall report on its federal, state and local income tax returns all interest or income on the Reserve Funds credited or paid to Borrower as required by applicable Legal Requirements. Any interest accrued on Tax Funds on deposit in the Tax Account and Insurance Funds on deposit in the Insurance Account shall not be required to be remitted either to Borrower or to any Account and may instead be retained by Lender.

6.12.3. <u>Indemnity</u>. Borrower shall indemnify Lender and hold Lender harmless from and against any and all actions, suits, claims, demands, liabilities, losses, damages, obligations and costs and expenses (including reasonable attorneys' fees and expenses) arising from or in any way connected with the Reserve Funds or the performance of the obligations for which the Reserve Funds were established (other than to the extent resulting solely from a breach by Lender of any obligation of Lender with respect to the Reserve Funds contained in the Loan Documents) <u>provided</u>, <u>however</u>, that Borrower shall not be liable for the payment of any of the foregoing to the extent the same arise by reason of the gross negligence or willful misconduct of Lender. Borrower shall assign to Lender all rights and claims Borrower may have against all Persons supplying labor, materials or other services which are to be paid or reimbursed from or secured by the Reserve Funds; <u>provided</u>, <u>however</u>, that Lender may not pursue any such right or claim unless an Event of Default has occurred and remains outstanding.

**Section 6.13.** <u>Provisions Regarding Letters of Credit</u>.

6.13.1. <u>Event of Default</u>. An Event of Default shall occur if Borrower shall fail to make any reimbursement or similar obligation with respect to any Letter of Credit that has been delivered pursuant to this Agreement, or if Borrower shall fail to (i) replace or extend any Letter of Credit prior to the date which is thirty (30) days prior to the expiration thereof or (ii) replace any outstanding Letter of Credit within thirty (30) days if such Letter of Credit fails to meet the requirements set forth in the definition of Letter of Credit. Lender shall not be required to exercise its rights under <u>Section 6.13.4</u> below in order to prevent any such Event of Default from occurring and shall not be liable for any losses due to the insolvency of the issuer of the Letter of Credit as a result of any failure or delay by Lender in the exercise of such rights.

6.13.2. <u>Security for Debt</u>. Each Letter of Credit delivered under this Agreement shall be additional security for the payment of the Debt. Upon the occurrence of an Event of Default, Lender shall have the right, at its option, to draw on any Letter of Credit and to apply all or any part thereof to the payment of the items for which such Letter of Credit was established or to apply each such Letter of Credit to payment of the Debt in such order, proportion or priority as Lender may determine or to hold such proceeds as security for the Debt.

6.13.3. <u>Limitations on Letters of Credit</u>. Notwithstanding anything in this Agreement or any other Loan Document to the contrary, Borrower shall not have any rights to deliver any Letter of Credit pursuant to any provision of this Agreement or any other Loan Document if the aggregate amount of any Letters of Credit delivered to Lender in accordance

108

with this Agreement or any other Loan Document shall exceed ten percent (10%) of the original principal amount of the Loan.  In no event shall the aggregate amount of any Letters of Credit delivered in accordance with this Agreement or any other Loan Document exceed ten percent (10%) of the original principal amount of the Loan.

6.13.4.  Additional Rights of Lender.  In addition to any other right Lender may have to draw upon a Letter of Credit pursuant to the terms and conditions of this Agreement, Lender shall have the additional rights to draw in full any Letter of Credit:  (a) with respect to any evergreen Letter of Credit, if Lender has received a notice from the issuing bank that the Letter of Credit will not be renewed and a substitute Letter of Credit is not provided at least thirty (30) days prior to the date on which the outstanding Letter of Credit is scheduled to expire; (b) with respect to any Letter of Credit with a stated expiration date, if Lender has not received a notice from the issuing bank that it has renewed the Letter of Credit at least thirty (30) days prior to the date on which such Letter of Credit is scheduled to expire or a substitute Letter of Credit is not provided at least thirty (30) days prior to the date on which the outstanding Letter of Credit is scheduled to expire; or (c) if Lender has received notice that the bank issuing the Letter of Credit shall cease to be an Eligible Institution and Borrower has not, within thirty (30) days after notice thereof, obtained a new Letter of Credit from an Eligible Institution.

## VII.   PROPERTY MANAGEMENT

**Section 7.1.**   Management Agreement.  Borrower shall cause the Property to be managed in accordance with the Management Agreement, the separateness provisions set forth in Section 3.1.24 hereof, and in accordance with the terms and provisions of the Ground Lease and the Prime Lease.  Borrower shall (a) diligently perform and observe all of the terms, covenants and conditions of any Management Agreement on the part of Borrower to be performed and observed, (b) promptly notify Lender of any default in any material respect under any Management Agreement of which it is aware, (c) promptly deliver to Lender a copy of each financial statement, business plan, capital expenditures plan, report and estimate received by it under any Management Agreement and (d) promptly enforce the performance and observance in all material respects of all of the terms, covenants and conditions required to be performed and/or observed by the applicable Manager under any Management Agreement, in a commercially reasonable manner.  If Borrower shall default in the performance or observance of any term, covenant or condition of any Management Agreement on the part of Borrower to be performed or observed, then, without limiting Lender's other rights or remedies under this Agreement or the other Loan Documents, and without waiving or releasing Borrower from any of its obligations hereunder or under such Management Agreement, Lender shall have the right, but shall be under no obligation, under the other Loan Documents, to pay any sums and to perform any act as may be appropriate to cause the terms, covenants and conditions of such Management Agreement on the part of Borrower to be performed or observed in all material respects.

**Section 7.2.**   Prohibition Against Termination or Modification.  (a) Borrower shall not, without prior consent of Lender, (i) (A) enter into any property management agreement, or surrender, terminate, cancel, renew or extend any Management Agreement, or (B) modify or amend any Management Agreement in any material respect; (ii) reduce or consent to the reduction of the term of any Management Agreement, (iii) increase or consent to the

increase of the amount of any fees or other charges under any Management Agreement, or (iv) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under, any Management Agreement in any material respect.  In connection with the replacement of any Manager with a Qualified Manager, Borrower shall execute and cause such Qualified Manager to execute an Assignment of Management Agreement in substantially the same form entered into by Borrower, Manager and Lender as of the Closing Date.

(b)     In the event that any Management Agreement expires or is terminated (without limiting any obligation of Borrower to obtain Lender's consent to any termination or modification of any Management Agreement in accordance with the terms and provisions of this Agreement), Borrower shall promptly enter into a Replacement Management Agreement with a Qualified Manager.

(c)     Upon the occurrence and during the continuance of an Event of Default, Borrower shall not exercise any rights, make any decisions, grant any approvals or otherwise take any action under any Management Agreement without the prior consent of Lender, which consent may be granted, conditioned or withheld in Lender's sole discretion.

Section 7.3.   Replacement of Manager.  Lender shall have the right to require Borrower to terminate any Management Agreement and replace the applicable Manager with a Qualified Manager which is not an Affiliate of, but is chosen by, Borrower upon the occurrence of any one or more of the following events:  (a) at any time following the occurrence of and during the continuation of an Event of Default, (b) if such Manager shall be in default in any material respect under the applicable Management Agreement beyond any applicable notice and cure period, (c) if such Manager shall become insolvent or a debtor in any Bankruptcy Action (provided, however, if such Bankruptcy Action was involuntary and not consented to by such Manager, upon the same not being discharged, stayed or dismissed within ninety (90) days), or (d) if at any time such Manager has engaged in gross negligence, fraud, willful misconduct or misappropriation of funds.

Section 7.4.   Matters Concerning Manager.  Without limiting the generality of the terms set forth in Section 7.3 above, if (a) the Debt has been accelerated pursuant to Section 10.1(b) hereof, (b) a Manager shall become insolvent or a debtor in any Bankruptcy Action (provided, however, if such Bankruptcy Action was involuntary and not consented to by Manager, upon the same not being discharged, stayed or dismissed within ninety (90) days) or (c) an event of default occurs under any Management Agreement, Borrower shall, at Lender's request, terminate the applicable Management Agreement and replace the applicable Manager with a Qualified Manager pursuant to a Replacement Management Agreement, it being understood and agreed that the management fee for such Qualified Manager shall not exceed then prevailing market rates.

## VIII.   TRANSFERS

Section 8.1.   Transfers Generally.

(a)     Without the prior consent of Lender, neither Borrower nor any Restricted Party shall do any of the following (each, a "**Transfer**"):   sell, transfer, convey, assign,

110

mortgage, pledge, encumber, alienate, grant a Lien (other than Permitted Encumbrances) on, grant any option with respect to or grant any other interest in the Property, any part thereof or any interest therein (including any legal, beneficial or economic interest in Borrower or any Restricted Party), directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record, other than Permitted Transfers.

(b)     A Transfer shall include (i) an installment sales agreement wherein Borrower agrees to sell the Property or any part thereof for a price to be paid in installments; (ii) an agreement by Borrower leasing all or a substantial part of the Property for other than actual occupancy by a space Tenant thereunder or a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any Leases or any Rents; (iii) if Borrower or any Restricted Party is a corporation, the voluntary or involuntary sale, conveyance or transfer of such corporation's stock (or the stock of any corporation Controlling such corporation) or the creation or issuance of new stock such that such corporation's stock shall be vested in a party or parties who are not now stockholders or any change in the Control of such corporation; (iv) if Borrower or any Restricted Party is a limited or general partnership, joint venture or limited liability company, the change, removal, resignation or addition of a general partner, managing partner, limited partner, joint venturer or member, the voluntary or involuntary transfer of the partnership interest of any general partner, managing partner or limited partner, the creation or issuance of new limited partnership interests, the voluntary or involuntary transfer of the interest of any joint venturer or member or the creation or issuance of new non-managing member interests; (v) if Borrower or any Restricted Party is a trust or nominee trust, the voluntary or involuntary transfer of the legal or beneficial interest in such trust or nominee trust or the creation or issuance of new legal or beneficial interests, and (vi) the incurrence of any property-assessed clean energy loans or similar indebtedness with respect to Borrower and/or the Property, including, without limitation, if such loans or indebtedness are made or otherwise provided by any Governmental Authority and/or secured or repaid (directly or indirectly) by any taxes or similar assessments.

(c)     Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder or under the other Loan Documents in order to declare the Debt immediately due and payable upon a Transfer (other than a Permitted Transfer) without Lender's prior consent.  This provision shall apply to every Transfer regardless of whether voluntary or not, and whether or not Lender has consented to any previous Transfer.

(d)     Lender's consent to one Transfer shall not be deemed to be a waiver of Lender's right to require such consent to any future occurrence of same.  Any Transfer made in contravention of this Section 8.1 shall be null and void and of no force and effect.

(e)     Borrower agrees to bear and shall pay or reimburse Lender on demand for all reasonable out-of-pocket costs and expenses (including, without limitation, reasonable attorneys' fees and expenses, title search costs and title insurance endorsement premiums) incurred by Lender in connection with the review, approval and/or documentation of any proposed Transfer.

(f)     Prior to any release of Guarantor in connection with any Transfer permitted under this Article VIII, one (1) or more Replacement Guarantors shall (i) have assumed all obligations of Guarantor under the Guaranty (together with such changes to the Guaranty as Lender may reasonably require) and the Environmental Indemnity or (ii) have executed a replacement guaranty with respect to the Guaranty and a replacement environmental indemnity in form and substance reasonably satisfactory to Lender.

(g)     Borrower agrees to bear and shall reimburse Lender on demand all reasonable out-of-pocket expenses incurred by Lender in connection with any transaction described in this Article VIII, provided, however, Borrower shall not be required to (i) pay any assumption or transfer fees under any subsection of this Section 8.1, except as may be expressly required under or pursuant to this Article VIII, (ii) post an expense deposit or enter into a retainer agreement with Lender or Servicer, and (iii) pay any other consent, review, processing or other similar fee to Lender or Servicer in connection with any request by Borrower pursuant to such subsections (unless such transaction would result in a change in Control of Borrower (excluding an assumption of the Loan pursuant to Section 8.2 hereof), in which case a fee of 0.25% of the Outstanding Principal Balance may be charged).

**Section 8.2.**     Permitted Property Transfer (Assumption).  (a) No consent to any assumption of the Loan shall occur during the period that is ninety (90) days prior to and ninety (90) days after a Securitization. Thereafter, Lender's consent shall not be unreasonably withheld in connection with a Transfer of all or a portion of the Property and the assumption of the Loan, provided that the following conditions are satisfied:

(i)     Lender shall have received a notice from Borrower requesting Lender's consent (or if such consent is not required in connection with such Transfer and the assumption of the Loan subject to and in accordance with the terms of this Agreement, providing Lender notice of such Transfer and the assumption of the Loan) to such Transfer not less than thirty (30) days prior to the proposed date of such Transfer;

(ii)     no Default or Event of Default shall have occurred and remain outstanding;

(iii)     the proposed transferee ("**Transferee**") shall be a Delaware limited liability company that qualifies as a single purpose, bankruptcy remote entity under criteria established by the Rating Agencies (including, without limitation, criteria applicable to Transferee's SPE Constituent Entities) and satisfies the requirements of Section 4.2.14 hereof;

(iv)     the Organizational Documents of Transferee and Transferee's SPE Constituent Entities shall be reasonably satisfactory to Lender;

(v)     neither any Transferee's Sponsor, Transferee nor any other Person owned, directly or indirectly, or Controlled by Transferee's Sponsors shall have been a debtor in any Bankruptcy Action or taken advantage as a debtor of any Bankruptcy Law or any law for the benefit of debtors within seven (7) years prior to the date of the proposed Transfer (other than, in each case, a Bankruptcy Action that was involuntary and not consented to by such Person, and was discharged, stayed or dismissed within ninety (90) days);

(vi)     neither any Transferee's Sponsor, Transferee nor any other Person owned, directly or indirectly, or Controlled by Transferee's Sponsors shall have defaulted within seven (7) years prior to the date of the proposed Transfer under its obligations with respect to any Indebtedness with a principal amount in excess of $5,000,000 in a manner which is not reasonably acceptable to Lender;

(vii)    there shall be no material litigation or regulatory action pending or threatened against any Transferee's Sponsor, Transferee or any other Person owned, directly or indirectly, or Controlled by Transferee's Sponsors which is not reasonably acceptable to Lender and which, if adversely determined, could have a Material Adverse Effect;

(viii)   unless Transferee is a Permitted Transferee, Transferee and Transferee's Sponsors shall, as of the date of such Transfer, have an aggregate net worth and liquidity reasonably satisfactory to Lender;

(ix)     unless Transferee is a Permitted Transferee, Transferee and Transferee's Sponsors (together with Transferee's proposed property manager) shall be experienced owners and operators of retail properties similar in size, class, use, operation and value as the Property, as evidenced by financial statements and other information reasonably satisfactory to Lender (it being understood and agreed that Lender reserves the right to approve Transferee without approving its proposed property manager);

(x)      if no property management agreement is then in effect, or if a Management Agreement is then in effect and will be terminated as a result of such Transfer, the Property shall be managed by a Qualified Manager in accordance with a Management Agreement (or Replacement Management Agreement, as applicable);

(xi)     Transferee and Transferee's SPE Constituent Entities shall have delivered all agreements, certificates and opinions reasonably required by Lender (including, if applicable, an amendment to Section 3.1.24 hereof to incorporate necessary changes based on differences in the organizational structures of Borrower and Transferee);

(xii)    no Default or Event of Default shall occur as a result of such Transfer;

(xiii)   Transferee shall have assumed all obligations of Borrower under the Loan Documents pursuant to an assumption agreement in form and substance reasonably satisfactory to Lender;

(xiv)    Borrower shall have delivered, at its sole cost and expense, an endorsement to the Title Insurance Policy, as modified by the assumption agreement, as a valid first Lien on the Property and naming Transferee as owner of the Property, which endorsement shall insure that, as of the date of the recording of the assumption agreement, the Property shall not be subject to any Liens other than those contained in the Title Insurance Policy issued on the Closing Date and the Permitted Encumbrances;

113

(xv)    Lender shall have approved a Replacement Guarantor, which approval shall not be unreasonably withheld, and prior to any release of Guarantor, such Replacement Guarantor shall (A) have assumed all obligations of Guarantor under each Guaranty and the Environmental Indemnity or (B) have executed a replacement guaranty with respect to each Guaranty and a replacement environmental indemnity (each, a "**Replacement Recourse Document**") in form and substance substantially similar to the Guaranty (together with such changes to the Guaranty as Lender may reasonably require) and the Environmental Indemnity, respectively;

(xvi)    Borrower or Transferee, at its sole cost and expense, shall have delivered an Insolvency Opinion reflecting such Transfer reasonably acceptable to Lender and, following a Securitization, acceptable to the Rating Agencies;

(xvii)   if required by Lender following a Securitization, Borrower shall have delivered a Rating Agency Confirmation as to such Transfer and the Transferee;

(xviii)  the Transfer shall be permitted under the terms of the Ground Lease and the Prime Lease, and Borrower and Transferee shall have complied with the terms, provisions, and conditions of the Ground Lease and the Prime Lease relating to such Transfer, including, without limitation, payment in full of any transfer fee or similar payment to Ground Lessor or Prime Ground Lessor thereunder;

(xix)    Borrower shall have paid to Lender an assumption fee equal to one percent (1%) of the outstanding principal amount of the Loan;

(xx)     Borrower shall have paid all reasonable out-of-pocket costs and expenses incurred in connection with such Transfer (including reasonable fees and disbursements of Lender's counsel and fees, costs and expenses of the Rating Agencies);

(xxi)    to the extent that the Transfer results in the Transferee (either itself or collectively with its affiliates) owning a 10% or greater equity interest (directly or indirectly) in Borrower, Lender's receipt of the Satisfactory Search Results shall be a condition precedent to such Transfer; and

(xxii)   Borrower shall have provided to Lender evidence reasonably acceptable to Lender that all requirements with respect to the Transfer pursuant to the Mezzanine Loan Documents and the Subordinate Mezzanine Loan Documents have been or are contemporaneously satisfied in full.

**Section 8.3.**    Permitted Transfers of Interests in Borrower.  Notwithstanding the restrictions contained in this Article VIII, the following equity transfers shall be permitted without Lender's consent: (a) a transfer (but not a pledge) by devise or descent or by operation of law upon the death of a Restricted Party or any direct or indirect member, partner or shareholder of a Restricted Party, (b) the transfer (but not the pledge), in one or a series of transactions, of the direct or indirect stock, partnership interests or membership interests (as the case may be) in a Restricted Party, or (c) the sale, transfer or issuance of shares of common stock in any Restricted Party that is a publicly traded entity, provided such shares of common stock are listed on the

114

New York Stock Exchange or another nationally recognized stock exchange (provided, that, the foregoing provisions of clauses (a), (b) and (c) above shall not be deemed to waive, qualify or otherwise limit Borrower's obligation to comply (or to cause the compliance with) the other covenants set forth herein and in the other Loan Documents (including, without limitation, the covenants contained herein relating to ERISA matters)); provided, further, that, with respect to the transfers listed in clauses (a) and/or (b) above, all of the following conditions shall be satisfied: (A) Lender shall receive not less than thirty (30) days prior written notice of such transfers; (B) no such transfers shall result in a change in Control of Guarantor or Affiliated Manager (unless such transfer is due to death of Ashkenazy and Lender shall have approved a Replacement Guarantor, which approval shall not be unreasonably withheld, and such Replacement Guarantor shall (x) have assumed all obligations of Guarantor under the Guaranty and the Environmental Indemnity or (y) have executed a Replacement Recourse Document in form and substance substantially similar to the Guaranty (together with such changes to the Guaranty as Lender may reasonably require) and the Environmental Indemnity, respectively and (z) be reasonably acceptable to Lender); (C) after giving effect to such transfers, (I) Ashkenazy (or any trust established for the benefit of his immediate family members and of which Ashkenazy is trustee) (or his successor as Guarantor reasonably approved by Lender following his death) shall own at least fifty-one percent (51%) of Borrower; (II) intentionally omitted and (III) Ashkenazy and other individuals or entities reasonably approved in writing by Lender shall control the day-to-day operation of the Property; (D) after giving effect to such transfers, the Property shall continue to be managed by Manager or a new Manager approved in accordance with the applicable terms and conditions hereof; (E) such transfers shall be conditioned upon continued compliance with the relevant provisions of Article VII hereof; (F) in the case of (1) the transfer of the management of the Property to a new Affiliated Manager in accordance with the applicable terms and conditions hereof, or (2) the transfer of any equity ownership interests (I) directly in Borrower, or (II) in any Restricted Party whose sole asset is a direct or indirect equity ownership interest in Borrower, such transfers shall be conditioned upon delivery to Lender of a New Non-Consolidation Opinion addressing such transfer if such transfers in this clause (II) are for greater than twenty-five percent (25%) of the direct and indirect ownership interests in any Borrower or result in such transferee owning greater than forty-nine percent (49%) of the direct or indirect ownership interests in any Borrower; (G) such transfers shall be conditioned upon Borrower's ability to, after giving effect to the equity transfer in question (I) remake the representations contained herein relating to ERISA matters (and, upon Lender's request, Borrower shall deliver to Lender an Officer's Certificate containing such updated representations effective as of the date of the consummation of the applicable equity transfer) and (II) continue to comply with the covenants contained herein relating to ERISA matters; (H) to the extent that any transfer results in the transferee (either itself or collectively with its affiliates) owning a 10% or greater equity interest (directly or indirectly) in Borrower, Lender's receipt of the Satisfactory Search Results shall be a condition precedent to such transfer; (I) such transfers shall be permitted pursuant to the terms of any REA, the Ground Lease, and the Prime Lease and Borrower shall have complied with the terms, provisions, and conditions of the Ground Lease and the Prime Lease relating to such transfers, including, without limitation, payment in full of any transfer fee or similar payment to Ground Lessor or Prime Lease Lessor, as applicable, thereunder; and (J) after giving effect to such transfers, the Guarantor Control Condition shall continue to be satisfied.   Upon request from Lender, Borrower shall promptly provide Lender a

revised version of the Organizational Chart delivered to Lender in connection with the Loan reflecting any equity transfer consummated in accordance with this <u>Section 8.3</u>.

        **Section 8.4.**  <u>Property Documents</u>. Notwithstanding anything herein to the contrary, upon Lender's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed, Borrower may enter into any reciprocal easement agreements or utility easements or other similar agreements relating to the use or development of the Property (collectively, "**Property Documents**") and Lender shall execute and deliver any instrument reasonably necessary or appropriate in order to subordinate the Lien of the Security Instrument and the other Loan Documents to the related Property Documents, provided that Lender receives:

        (i)     ten (10) Business Days' prior written notice thereof;

        (ii)    a copy of the applicable instrument, which instrument shall be reasonably acceptable to Lender and shall automatically inure to the benefit of (and burden, if applicable) successors and assigns of Borrower;

        (iii)   a certificate delivered to Lender signed by an authorized officer of Borrower stating that such action and related Property Documents do not impose material obligations on Borrower that are, on balance, materially adverse to Borrower, materially impair the utility and operation of the Property or otherwise have a Material Adverse Effect or violate the terms and provisons of the Ground Lease or the Prime Lease; and

        (iv)   reimbursement of all of Lender's reasonable out-of-pocket costs and expenses incurred in connection with Lender's review of such action and related Property Documents and other information related thereto delivered by Borrower to Lender together with any instrument to be delivered by Lender pursuant to this <u>Section 8.4</u>.

        **Section 8.5.**  <u>Economic Sanctions, Anti-Money Laundering and Transfers</u>. Borrower shall (and shall cause its direct and indirect constituent owners and Affiliates to) (a) at all times comply with the representations and covenants contained in <u>Sections 3.1.41 and 4.1.25</u> such that the same remain true, correct and not violated or breached and (b) not permit a Transfer to occur which is not permitted under this <u>Article VIII</u> and shall cause the ownership and Control requirements specified in this <u>Article VIII</u> to be complied with at all times.  Borrower hereby represents that, other than in connection with the Loan, the Loan Documents and any Permitted Encumbrances, as of the date hereof, there exists no Sale or Pledge of (i) the Property or any part thereof or any legal or beneficial interest therein or (ii) any interest in any Restricted Party.  For purposes of clarification, references in this Agreement and/or the other Loan Documents to "equity ownership interest" or words of similar import shall be deemed to refer to the legal and/or beneficial interests in a Person (as applicable); provided, that, when herein or in the other Loan Documents a specified percentage of the aforesaid "equity ownership interest" (or words of similar import) in a Person is required to be held, the same shall be deemed to refer to both the legal and beneficial interest in such Person.  Notwithstanding anything to the contrary contained herein or in any other Loan Document, in no event shall Borrower or any SPE Party be (I) a Prohibited Entity, (II) Controlled (directly or indirectly) by any Prohibited Entity or (III) more than 49% owned (directly or indirectly) by any Prohibited Entities (whether individually or in the

116

aggregate), unless, in the case of each of the foregoing, Lender's prior written consent is first obtained (which such consent shall be given or withheld in Lender's sole discretion and may be conditioned on, among other things, Lender's receipt of a Rating Agency Confirmation).

**Section 8.6.**   Subordinate Mezzanine Loan.   Provided no Event of Default or Mezzanine Loan Event of Default has occurred and is continuing, upon not less than thirty (30) days' prior written notice to Lender, one or more direct or indirect owners of Mezzanine Borrower (other than any SPE Party) (collectively, "**Subordinate Mezzanine Borrower**") shall be permitted to obtain one (1) additional mezzanine loan (the "**Subordinate Mezzanine Loan**"), which Subordinate Mezzanine Loan shall be secured by direct or indirect interests in Mezzanine Borrower and other customary mezzanine loan collateral, subject to the following conditions and requirements:

(a)    the Subordinate Mezzanine Loan shall be in an amount not to exceed $95,000,000 and shall be junior and subordinate to the Loan and the Mezzanine Loan;

(b)    the terms and conditions of the Subordinate Mezzanine Loan (including the organizational structure of Subordinate Mezzanine Borrower) and the documents evidencing the Subordinate Mezzanine Loan (which documents shall include an interest rate cap agreement in a notional amount that is not less than the outstanding principal balance of the Subordinate Mezzanine Loan if the Subordinate Mezzanine Loan bears a floating rate of interest) (collectively, as each of the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the terms and conditions of this Agreement and the Subordinate Mezzanine Intercreditor Agreement (as defined below), the "**Subordinate Mezzanine Loan Documents**") shall each be reasonably acceptable in all respects to Lender and, following a Securitization, reasonably acceptable to the Rating Agencies;

(c)    the Aggregate Debt Service Coverage Ratio immediately following the closing of the Subordinate Mezzanine Loan shall be equal to or greater than 1.35 to 1.00 (or, following a Securitization, such lower Aggregate Debt Service Coverage Ratio with respect to which Lender shall have received a Rating Agency Confirmation);

(d)    the Aggregate Debt Yield immediately following the closing of the Subordinate Mezzanine Loan based on the aggregate principal balance of the Loan, the Mezzanine Loan, and the Subordinate Mezzanine Loan shall be equal to or greater than 7.00% (or, following a Securitization, such lower Aggregate Debt Yield with respect to which Lender shall have received a Rating Agency Confirmation);

(e)    the loan-to-value ratio, determined in Lender's sole discretion, immediately following the closing of the Subordinate Mezzanine Loan, in which the numerator is equal to the sum of the outstanding principal balance of the Loan, the Mezzanine Loan, and the Subordinate Mezzanine Loan and the denominator is equal to the appraised value of the Property based on an appraisal obtained by and acceptable to Lender shall be no greater than 45%;

(f)    lender under the Subordinate Mezzanine Loan ("**Subordinate Mezzanine Lender**") shall (A) be a Qualified Lender and shall make a representation to Lender that it is a

117

Qualified Lender other than solely as a result of being expressly named in the definition of Qualified Lender or being an entity Controlled by, Controlling or under common Control with any of the entities set forth in the definition of Qualified Lender and (B) not be an Affiliate of Borrower, Mezzanine Borrower, or Subordinate Mezzanine Borrower and Lender shall have received Satisfactory Search Results;

(g)     Subordinate Mezzanine Lender shall enter into an intercreditor agreement with Lender and Mezzanine Lender reasonably satisfactory in all respects to Lender and, following a Securitization, acceptable to the Rating Agencies (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the terms and conditions thereof, the "**Subordinate Mezzanine Intercreditor Agreement**");

(h)     Borrower shall deliver an Additional Insolvency Opinion with respect to the Loan which shall be in form, scope and substance reasonably acceptable in all respects to Lender and, following a Securitization, acceptable to the Rating Agencies;

(i)     Subordinate Mezzanine Borrower shall be structured in a manner such that each of Borrower, Mezzanine Borrower and any SPE Party shall not fail to be a Special Purpose Entity;

(j)     following a Securitization, Borrower shall deliver a Rating Agency Confirmation with respect to the Subordinate Mezzanine Loan to Lender at Borrower's sole cost and expense or, if a Securitization has not occurred, the Subordinate Mezzanine Loan shall be in a form and substance that would be satisfactory to a prudent lender;

(k)     the Subordinate Mezzanine Loan shall be (i) coterminous with the Loan and Mezzanine Loan or prepayable in whole without premium or penalty from and after the Maturity Date (and in no event prepayable, in whole or in part, prior to the Maturity Date) and (ii) shall not contain any payment-in-kind or similar interest accrual features;

(l)     Borrower, Mezzanine Borrower, Subordinate Mezzanine Borrower, Guarantor, Mezzanine Lender, and Subordinate Mezzanine Lender shall execute and deliver or cause to be executed and delivered such amendments or modifications to the Loan Documents as are reasonably necessary in connection with the creation of the Subordinate Mezzanine Loan; and

(m)     Borrower shall reimburse Lender for all costs and expenses incurred by Lender in connection with this <u>Section 8.6</u>, including, without limitation, in connection with negotiating and documenting any amendments or other modifications to the Loan Documents, reviewing the Subordinate Mezzanine Loan Documents and negotiating and documenting the Subordinate Mezzanine Intercreditor Agreement.

## IX.     SALE AND SECURITIZATION OF LOAN

**Section 9.1.**     <u>Sale of Loan and Securitization</u>.  (a) At the request of the holder of the Note and, to the extent not already required to be provided by Borrower under this Agreement, at Lender's expense and subject to the provisions on exculpation set forth herein and

in the other Loan Documents, Borrower shall assist Lender in satisfying the standards applicable to Borrower or the Property which may be reasonably required in the marketplace (including any holder of an interest in the Mezzanine Loan, the Subordinate Mezzanine Loan, or any other loan subordinate to the Loan created or entered into in connection with any structural changes to the Loan, or any mezzanine loan contemplated by Section 9.1 or Section 11.30 hereof), by the applicable Rating Agencies or by any Legal Requirements in connection with the (x) sale or other transfer of the Loan as a whole loan or sale or other transfer of any portion thereof or any interest therein, (y) sale of participation interests in the Loan or (z) securitization of the Loan or any portion thereof or any interest therein in one or more private or public securitizations (the transactions referred to in clauses (x), (y) and (z) shall hereinafter be referred to collectively as "**Secondary Market Transactions**" and the transaction referred to in clause (z) shall hereinafter be referred to as a "**Securitization**"; any certificates, notes or other securities issued in connection with a Securitization are hereinafter referred to as "**Securities**"), including any Exchange Act Filings required in connection with a Securitization, including, without limitation, to:

        (i)      provide updated financial and other information with respect to the Property, Borrower, Guarantor and any Manager (collectively, the "**Updated Information**"), together, if customary, with appropriate verification and/or consents related to the Updated Information through "comfort" letters of auditors of Borrower reasonably acceptable to Lender and the Rating Agencies (provided that such comfort letters shall be required only to the extent that such information is required to be audited pursuant to the terms of this Agreement); provided that any such updated financial information of Guarantor shall be in the form delivered in connection with the closing of the Loan and prepared by an independent certified public accountant reasonably acceptable to Lender (Shanholt, Glassman, Klein, Kramer & Co., Grant Thorton, and Berdon LLP shall be deemed acceptable to Lender for all purposes hereunder; provided, however that such deemed acceptance may be revoked at such time as Lender has a reasonable basis for such revocation);

        (ii)      cause counsel to render opinions, which may be relied upon by Lender, the Rating Agencies and their respective counsel, agents and representatives, as to non-consolidation, or any other opinion customary in Secondary Market Transactions, with respect to the Property, Borrower and Guarantor, which counsel and opinions shall be reasonably satisfactory to Lender and the Rating Agencies;

        (iii)      provide, and cause to be provided, (A) at any time in connection with a Securitization and (B) at any time prior to the one (1) year anniversary of the Closing Date in connection with any Secondary Market Transaction that is not a Securitization, updated representations and warranties made in the Loan Documents and make such representations and warranties with respect to the Property, Borrower, and the Loan Documents as are customarily provided in Secondary Market Transactions and as may be reasonably requested by Lender or the Rating Agencies and consistent in all respects with the facts covered by such representations and warranties as they exist on the date thereof, provided, however, that Borrower shall be entitled to disclose any exceptions to said representations and warranties and the existence of such exceptions shall not constitute a Default or Event of Default under this Agreement unless such disclosed exceptions would independently otherwise cause a Default or Event of Default;

(iv)    execute such amendments to the Loan Documents and Borrower's Organizational Documents as may reasonably be requested by Lender or the Rating Agencies to effect the Secondary Market Transaction, provided, however, that Borrower shall not be required to modify or amend any Loan Document if such modification or amendment would (A) change the interest rate, the stated maturity or the amortization of principal set forth therein (except in connection with the bifurcation of the Loan into two or more components and/or additional separate notes and/or creating additional senior/subordinate note structure(s) which may result in varying fixed interest rates and amortization schedules, but which shall have the same initial weighted average coupon of the original promissory note), (B) change the aggregate outstanding principal balance of the Loan, (C) materially and adversely alter the material restrictions on equity transfers in Borrower or transfers of the Property, (D) materially and adversely alter any material limitations on recourse against Borrower or (E) materially and adversely change any other material obligation, right or privilege of Borrower contained in the Loan Documents.

(v)    if requested by Lender, review any information regarding the Property, Borrower, Mezzanine Borrower, any Manager and the Loan which is contained in the Disclosure Documents; and

(vi)    conduct tours of the Property on notice to Borrower.

(b)    If requested by Lender, Borrower shall provide Lender, promptly upon request, with any financial statements, or financial, statistical or operating information (i) as Lender shall determine to be required pursuant to Regulation AB under the Securities Act or the Exchange Act, or any amendment, modification or replacement thereto or other Legal Requirements in connection with any Disclosure Documents or any filing pursuant to the Exchange Act in connection with a "public" Securitization, or (ii) in the case of a "private" Securitization pursuant to an exemption under Rule 144A or Regulation D under the Securities Act, as Lender shall determine would be necessary to conform to such requirements if the same were deemed to apply to such private Securitization.

(c)    Borrower agrees that Lender may disclose any information relating to Borrower, its Affiliates, the Property or any aspect of the Loan (including information provided by or on behalf of Borrower or any of its Affiliates to Lender) to the parties requesting such information and, if applicable, the Rating Agencies in connection with any Secondary Market Transaction.

(d)    All reasonable out-of-pocket third-party costs and expenses incurred by Borrower and Guarantor (other than Borrower's and Guarantor's legal fees) in connection with Borrower's compliance with Section 9.1(a) (including, without limitation, the fees and expenses of the Rating Agencies) shall be promptly reimbursed by Lender.

**Section 9.2.**    Securitization Indemnification.    (a) Borrower understands that information provided to Lender by Borrower or its agents, counsel or representatives relating to Borrower or the Property may be included in Disclosure Documents in connection with the Securitization and may also be included in filings with the Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended (the "**Securities Act**"), or the Securities and

120

Exchange Act of 1934, as amended (the "**Exchange Act**"), or provided or made available to investors or prospective investors in the Securities, the Rating Agencies, and service providers relating to the Securitization.  In the event that any portion of the Disclosure Document relating to Borrower or the Property is required to be revised prior to the sale of all Securities, Borrower will cooperate with the holder of the Note in updating such portion of the Disclosure Document by providing current information relating to Borrower or the Property as reasonably requested by Lender.

(b)     Subject to the provisions on exculpation set forth herein, Borrower shall provide in connection with each Disclosure Document that Lender has requested Borrower to review an indemnification certificate (in the form attached hereto as Exhibit C) from Borrower and Guarantor (A) certifying that Borrower and Guarantor have examined only those portions of the Disclosure Documents relating to Borrower, the Property, Guarantor, the Mortgage Loan, the Mezzanine Loan, any Affiliate of Borrower or Guarantor, any Manager or any other information related to the foregoing, including without limitation, (i) in the case of the structural and collateral term sheet, the sections entitled "*Executive Summary and Transaction Highlights*," "*Summary of Certificates and Structural Overview – Mortgage Loan Monthly Payments*," "*Summary of Loan Terms*," "*Property Overview*," "*Historical and Underwritten Cash Flows*" "*Market Overview,*" "*Management Overview*" and "*Sponsorship Overview*", and (ii) in the case of the preliminary offering circular and the final offering circular, the sections entitled "*Summary of Offering Circular*", "*Risk Fact*ors", "*Description of the Property*," "*Description of the Tenants and Space Leases,*" "*Description of the Ground Lease,*" "*Description of the Prime Lease,*" "*Description of the Borrower Sponsor, the Borrower, the Guarantor and Related Parties*," "*Description of the Property Manager, the Management Agreement and the Assignment and Subordination of Management Agreement,*" "*Description of the Mortgage Loan*," "*Description of the Mezzanine Loan*," "*Sources and Uses*," "*Annex A – Mortgage Loan Collateral Schedule,*" "*Annex E – Representations and Warranties of Borrower*" and "*Annex F – Borrower Organizational Chart*" (or sections similarly entitled or covering similar subject matter) to the extent such Sections relate to the foregoing and are specifically identified in the indemnification certificate (collectively, the "**Covered Disclosure Information**") and such Sections do not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, (B) indemnifying on a joint and several basis the Lender, any affiliate of Lender, or any affiliate of Citi that has filed any registration statement relating to the Securitization (the "**Registration Statement**") or has acted as the sponsor or depositor in connection with the Securitization, any Affiliate of Lender that acts as an underwriter, placement agent or initial purchaser of the Securities issued in connection with the Securitization, any other underwriters, placement agents or initial purchasers of the Securities issued in connection with the Securitization, and each of their respective directors, officers, partners, employees, representatives, agents and Affiliates, and each Person that controls any such Person within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act (collectively, the "**Securitization Indemnified Parties**") for any losses, claims, damages or liabilities (collectively, the "**Liabilities**") to which any Securitization Indemnified Party may become subject insofar as the Liabilities arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in the Covered Disclosure Information or arise out of or are based upon the omission or alleged omission to state therein a material fact required

121

to be stated in the Covered Disclosure Information or necessary in order to make the statements in the Covered Disclosure Information, in light of the circumstances under which they were made, not misleading and (C) agreeing to reimburse each Securitization Indemnified Party for any legal or other expenses reasonably incurred by such Securitization Indemnified Party, as they are incurred, in connection with investigating or defending the Liabilities; provided, however, that Borrower and Guarantor will be liable in any such case under clauses (B) or (C) above only to the extent that any such Liability arises out of any such untrue statement or omission of material fact made therein in reliance upon and in conformity with (1) the written information relating to Borrower, the Property, Guarantor, any Affiliate of Borrower or Guarantor or any Manager furnished to Lender by or on behalf of Borrower in connection with the underwriting or closing of the Loan or otherwise expressly for use in the Disclosure Document or (2) those portions of the Disclosure Document furnished to and set forth in the indemnification certificate furnished by Borrower and Guarantor pursuant to clause (A) above.  This indemnity agreement will be in addition to any liability which Borrower or Guarantor may otherwise have.  Moreover, the indemnification and reimbursement obligations provided for in clauses (B) and (C) above shall be effective, valid and binding obligations of Borrower whether or not a separate agreement or indemnification certificate described in this Section 9.2(b) with respect to such obligations is provided by Borrower or Guarantor.  Notwithstanding anything to the contrary contained herein, Borrower shall have no liability pursuant to the terms of the foregoing clauses (A), (B) or (C) for any Liabilities resulting from the (i) gross negligence, willful misconduct, illegal acts or fraud of Lender or its agents or (ii) failure by Lender or any third party or their respective agents to comply with the Securities Act, the Exchange Act or any other federal, state or other securities or "blue sky" laws or any regulations thereunder.

(c)     Intentionally omitted.

(d)     Intentionally omitted.

(e)     As promptly as reasonably practicable after receipt by a Securitization Indemnified Party of notice of the commencement of any action, such Securitization Indemnified Party will, if a claim in respect thereof is to be made against the indemnifying party under this Section 9.2, notify the indemnifying party in writing of the commencement thereof, but the omission to so notify the indemnifying party will not relieve the indemnifying party from any liability which the indemnifying party may have to any Securitization Indemnified Party hereunder except to the extent that failure to notify causes material prejudice to the indemnifying party and, provided that the failure to notify shall not relieve such indemnifying party from any liability which it may have to any Securitization Indemnified Party otherwise than under the provisions of this Section 9.2.  In the event that any action is brought against any Securitization Indemnified Party, and it notifies the indemnifying party of the commencement thereof, the indemnifying party will be entitled, jointly with any other indemnifying party, to participate therein and, to the extent that it (or they) may elect by written notice delivered to the Securitization Indemnified Party promptly after receiving the aforesaid notice from such Securitization Indemnified Party, to assume the defense thereof with counsel satisfactory to such Securitization Indemnified Party.    After notice from the indemnifying party to such Securitization Indemnified Party under this Section 9.2 the indemnifying party shall be responsible for any reasonable out-of-pocket legal or other expenses subsequently incurred by

122

such Securitization Indemnified Party in connection with the defense thereof other than reasonable costs of investigation; provided, however, if the defendants in any such action include both the Securitization Indemnified Party and the indemnifying party and the Securitization Indemnified Party shall have reasonably concluded that there are any legal defenses available to it and/or other indemnified parties that are different from or additional to those available to the indemnifying party, the Securitization Indemnified Party or parties shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such action on behalf of such Securitization Indemnified Party or parties.  The indemnifying party shall not be liable for the expenses of more than one such separate counsel unless a Securitization Indemnified Party shall have reasonably concluded that there may be legal defenses available to it that are different from or additional to those available to another Securitization Indemnified Party.

(f)     Without the prior written consent of each Securitization Indemnified Party affected thereby (which consent shall not be unreasonably withheld or delayed), no indemnifying person shall settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which indemnification may be sought hereunder (whether or not such Securitization Indemnified Party is an actual or potential party to such claim, action, suit or proceeding) unless Borrower (A) shall have given reasonable prior notice thereof to each Securitization Indemnified Party that (i) shall have delivered written notice of such claim, action, suit or proceeding to Borrower pursuant to Section 9.2(e) above, or (ii) shall have been specifically named as a defendant to such claim, action, suit or proceeding, and (B) shall have obtained an unconditional release of each such Securitization Indemnified Party by the other parties to such settlement from all Liabilities arising out of or relating to such claim, action, suit or proceeding and such settlement does not require or contain a statement as to, or an admission of, fault, culpability or a failure to act by or on behalf of any Securitization Indemnified Party, without the consent of the Securitization Indemnified Party.  As long as Borrower and Guarantor have complied with their respective obligations to promptly (but no more than 60 days following receipt of a request) defend, indemnify and reimburse hereunder, Borrower shall not be liable for any settlement made by any Securitization Indemnified Party without the consent of Borrower (which consent shall not be unreasonably withheld or delayed).  However, if settled by any Securitization Indemnified Party with the consent of Borrower or if there shall be a final judgment for the plaintiff, the indemnifying person shall indemnify the Securitization Indemnified Party from and against any Liability under above by reason of such settlement or judgment.

(g)     In order to provide for just and equitable contribution in circumstances in which any of the indemnity agreements provided for in Section 9.2 is or are for any reason held to be unenforceable by an Securitization Indemnified Party in respect of any Liabilities (or action in respect thereof) referred to therein which would otherwise be indemnifiable under Section 9.2, the indemnifying party shall contribute to the amount paid or payable by the Securitization Indemnified Party as a result of such Liabilities (or action in respect thereof); provided, however, that no person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation.

(h)     Borrower agrees that the Securitization Indemnified Parties are intended third party beneficiaries under this Section 9.2.

(i)     The liabilities and obligations of Borrower and the Securitization Indemnified Parties under this Section 9.2 shall survive the termination of this Agreement and the satisfaction and discharge of the Debt.

## X.     DEFAULTS

**Section 10.1.**  Event of Default.  Each of the following events shall constitute an event of default hereunder (an "**Event of Default**"):

(a)     (i) subject to Section 2.7.3 hereof, if any monthly Debt Service, or the payment due on the Maturity Date is not paid when due, (ii) subject to Section 2.7.3 hereof, if any monthly deposit of Reserve Funds is not paid when due or (iii) if or any other portion of the Debt is not paid when due and such non-payment under this clause (iii) continues for five (5) days following notice to Borrower that the same is due and payable;

(b)     if any of the Taxes or Other Charges are not paid prior to delinquency during any period when Borrower shall be obligated to pay the same directly pursuant to the terms and provisions of Section 4.1.2 hereof;

(c)     if the Policies are not kept in full force and effect;

(d)     if Borrower commits, permits or suffers a Transfer in violation of the provisions of this Agreement or Article 6 of the Security Instrument;

(e)     if any certification, representation or warranty made by Borrower herein or in any other Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished to Lender shall have been false or misleading in any material respect as of the date such certification, representation or warranty was made;

(f)     (i) if Borrower shall make an assignment for the benefit of creditors or (ii) upon the declaration by Lender that the same constitutes an Event of Default (which declaration may be made by Lender in its sole and absolute discretion), if Guarantor shall make an assignment for the benefit of creditors;

(g)     (i) if Borrower fails or admits its inability to pay debts generally as they become due or (ii) upon the declaration by Lender that the same constitutes an Event of Default (which declaration may be made by Lender in its sole and absolute discretion), if Guarantor fails or admits its inability to pay debts generally as they become due;

(h)     (i) if a receiver, liquidator or trustee shall be appointed for Borrower or if Borrower shall be adjudicated a bankrupt or insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by or against, consented to, or acquiesced in by, Borrower, or if any proceeding for the dissolution or liquidation of Borrower shall be instituted; provided, however,

124

if such appointment, adjudication, petition or proceeding was involuntary and not consented to by Borrower, upon the same not being discharged, stayed or dismissed within ninety (90) days, or (ii) upon the declaration by Lender that the same constitutes an Event of Default (which declaration may be made by Lender in its sole and absolute discretion), if a receiver, liquidator or trustee shall be appointed for Guarantor or if Guarantor shall be adjudicated a bankrupt or insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by or against, consented to, or acquiesced in by, Guarantor, or if any proceeding for the dissolution or liquidation of Guarantor shall be instituted; provided, however, if such appointment, adjudication, petition or proceeding was involuntary and not consented to by Guarantor, upon the same not being discharged, stayed or dismissed within ninety (90) days or if an order for relief is entered;

(i)      if Borrower or Guarantor attempts to assign its rights under this Agreement or any of the other Loan Documents or any interest herein or therein in contravention of the Loan Documents;

(j)      if Borrower shall be in default beyond any applicable cure periods under any agreement (other than the Loan Documents) creating a Lien on the Property or any part thereof that could reasonably be expected to have a Material Adverse Effect, subject to any right of Borrower to contest such Lien as set forth herein;

(k)      with respect to any term, covenant or provision set forth herein which specifically contains a notice requirement or grace period, if Borrower shall be in default under such term, covenant or condition after the giving of such notice or the expiration of such grace period;

(l)      if Borrower shall continue to be in Default under any of the terms, covenants or provisions set forth in Section 9.1, Section 11.29 or Section 11.30 hereof, or fails to cooperate with Lender in connection with a Secondary Market Transaction in accordance with the terms, covenants and provisions set forth in Section 9.1 hereof, for three (3) Business Days after notice to Borrower from Lender of such Default or failure to cooperate;

(m)      if any of the assumptions contained in any Insolvency Opinion is or shall become untrue in any material respect;

(n)      if Borrower breaches in any material respect any representation, warranty or covenant contained in Section 3.1.24 hereof;

(o)      (i) if Borrower shall fail to pay any Ground Rent as and when such Ground Rent is due under the Ground Lease (unless such breach is cured within any applicable cure period provided in the Ground Lease or unconditionally waived in writing by the landlord under the Ground Lease or if sufficient funds are available in the Ground Lease Reserve to pay such Ground Rent when due and Lender fails to apply same in accordance with this Agreement, provided Lender's access to such funds is not constrained in any manner and there exists no Event of Default), or (ii) if there shall occur any breach or default by Borrower, as tenant under the Ground Lease, in the observance or performance of any term, covenant or condition of the Ground Lease on the part of Borrower to be observed or performed;

125

(p)      if Borrower breaches in any material respect any covenant contained in Section 4.2.11 hereof;

(q)      (i) if a breach or default by Borrower under any condition or obligation contained in any Operating Agreement, the continuance of which breach or default could result in a Material Adverse Effect as reasonably determined by Lender, is not cured within any applicable cure period provided therein, (ii) if there occurs any event or condition that gives any party to any Operating Agreement (other than Borrower), the termination or cancellation of which could result in a Material Adverse Effect as reasonably determined by Lender, the right to terminate or cancel such Operating Agreement and such event or condition is not cured within any applicable cure period under such Operating Agreement, or (iii) if any Operating Agreement is terminated or cancelled without Lender's prior consent, the termination of cancellation of which could result in a Material Adverse Effect as reasonably determined by Lender, or (iv) if any of the terms, covenants or conditions of any Operating Agreement shall in any manner be modified, changed, supplemented, altered, or amended without Lender's prior consent, which modification, change, supplementation, alteration or amendment, in each case, could result in a Material Adverse Effect as reasonably determined by Lender;

(r)      if a default in any material respect has occurred and continues beyond any applicable cure period under any Management Agreement and such default permits Manager thereunder to terminate or cancel such Management Agreement unless Borrower shall have replaced such Manager with a Qualified Manager pursuant to a Replacement Management Agreement prior to such termination or cancellation (or, in the case of such a default as to which there is no applicable cure period, within five (5) Business Days after Borrower's receipt of notice of such termination or cancellation);

(s)      if Borrower breaches in any material respect any material covenant contained in Section 4.1.23 hereof or if Borrower breaches any covenant contained in  Section 4.2.15 hereof;

(t)      if there is any prepayment or defeasance of the Mezzanine Loan or Subordinate Mezzanine Loan without the simultaneous prepayment or defeasance of the Loan;

(u)      if Borrower shall continue to be in Default under any of the other terms, covenants or conditions of this Agreement not specified in clauses (a) to (t) above, for ten (10) days after notice to Borrower from Lender, in the case of any Default which can be cured by the payment of a sum of money, or for thirty (30) days after notice from Lender in the case of any other Default; provided, however, that if such non-monetary Default is susceptible of cure but cannot reasonably be cured within such thirty (30) day period and provided, further, that Borrower shall have commenced to cure such Default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended for such time as is reasonably necessary for Borrower in the exercise of due diligence to cure such Default, such additional period not to exceed ninety (90) days; or

(v)      if there shall be Default under any of the other Loan Documents beyond any applicable cure periods contained in such Loan Documents, whether as to Borrower,

126

Guarantor or the Property, or if any other such event shall occur or condition shall exist, if the effect of such event or condition is to accelerate the maturity of any portion of the Debt or to permit Lender to accelerate the maturity of all or any portion of the Debt.

**Section 10.2.**  Remedies.  (a)  Upon the occurrence of an Event of Default (other than an Event of Default described in Section 10.1(f), (g) or (h) above) and at any time thereafter while any such Event of Default is continuing, Lender may, in addition to any other rights or remedies available to it pursuant to this Agreement and the other Loan Documents or at law or in equity, take such action, without notice or demand, that Lender deems advisable to protect and enforce its rights against Borrower and in and to the Property, including, without limitation, declaring the Debt to be immediately due and payable, and Lender may enforce or avail itself of any or all rights or remedies provided in the Loan Documents against Borrower and the Property, including, without limitation, all rights or remedies available at law or in equity; and upon any Event of Default described in Section 10.1(f), (g) or (h) above, the Debt shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained herein or in any other Loan Document to the contrary notwithstanding.

(b)  Upon the occurrence of any Event of Default and at any time thereafter while any Event of Default is continuing, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under this Agreement or any of the other Loan Documents executed and delivered by, or applicable to, Borrower or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any portion of the Debt shall be declared due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or initiated or taken other action for the enforcement of its rights and remedies under any of the Loan Documents with respect to all or any part of the Property.  Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singly, successively, together or otherwise, at such time and in such order as Lender may determine in its sole and absolute discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by law, equity or contract or as set forth herein or in the other Loan Documents. Without limiting the generality of the foregoing, Borrower agrees that, if an Event of Default has occurred and remains outstanding, (i) Lender is not subject to any "one action" or "election of remedies" law or rule, and (ii) all Liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its rights and remedies against the Property and the Security Instrument has been foreclosed, sold and/or otherwise realized upon in satisfaction of the Obligations or the Debt has been paid in full.

(c)  With respect to Borrower and the Property, nothing contained herein or in any other Loan Document shall be construed as requiring Lender to resort to the Property for the satisfaction of any of the Debt in any order, proportion or priority, and Lender may seek satisfaction out of the Property, or any part thereof, in its sole and absolute discretion in respect of the Debt.

(d)  Upon the occurrence of an Event of Default and while any Event of Default is continuing (but without limiting Lender's rights under Section 9.1, Section 11.29 or

127

Section 11.30 hereof), Lender shall have the right from time to time to sever the Note and the other Loan Documents into one or more separate notes, mortgages and other security documents (collectively, the "**Severed Loan Documents**") in such denominations and priority as Lender shall determine in its sole and absolute discretion for purposes of evidencing and enforcing its rights and remedies provided hereunder.  Borrower shall execute and deliver to Lender from time to time, promptly after the request of Lender, a severance agreement and such other documents as Lender shall request in order to effect the severance described in the preceding sentence, all in form and substance reasonably satisfactory to Lender.   Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect the aforesaid severance, Borrower ratifying all that its said attorney shall do by virtue thereof; provided, however, Lender shall not make or execute any such documents under such power until five (5) Business Days after notice has been given to Borrower by Lender of Lender's intent to exercise its rights under such power.  Borrower shall be obligated to pay any costs or expenses incurred in connection with the preparation, execution, recording or filing of the Severed Loan Documents and other matters and documentation in connection therewith.  The Severed Loan Documents shall not contain any representations, warranties or covenants not contained in the Loan Documents and any such representations and warranties contained in the Severed Loan Documents will be given by Borrower only as of the Closing Date.

(e)     Subject to Section 2.7.2(d) hereof, any amounts recovered from the Property or any other collateral for the Loan after the occurrence of an Event of Default may be applied by Lender toward the payment of any principal and/or interest of the Loan and/or any other amounts due under the Loan Documents in such order, proportion and priority as Lender in its sole and absolute discretion shall determine.

**Section 10.3.**  Right to Cure Defaults.  During the continuance of an Event of Default, Lender may, but without any obligation to do so and without notice to or demand on Borrower and without releasing Borrower from any obligation hereunder or under the other Loan Documents or being deemed to have cured such Event of Default or any other Event of Default, make, do or perform any obligation of Borrower hereunder or under the other Loan Documents in such manner and to such extent as Lender may deem necessary.  Lender is authorized to enter upon the Property for such purposes, or appear in, defend, or bring any action or proceeding to protect its interest in the Property for such purposes.  All costs and expenses incurred by Lender in remedying or attempting to remedy such Event of Default or in appearing in, defending, or bringing any action or proceeding shall bear interest at the Default Rate from the date such costs and expenses were incurred to the date reimbursement payment is received by Lender.  All such costs and expenses incurred by Lender, together with interest thereon calculated at the Default Rate, shall be deemed to constitute a portion of the Obligations, shall be secured by the Liens and security interests provided to Lender under the Loan Documents and shall be immediately due and payable upon demand by Lender therefore.

**Section 10.4.**  Remedies Cumulative.  The rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Borrower pursuant to this Agreement or the other Loan Documents, or existing at law or in equity or otherwise.  Lender's rights, powers and remedies

may be pursued singly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's sole and absolute discretion.  No delay or omission to exercise any right, power or remedy accruing upon an Event of Default shall impair any such right, power or remedy or shall be construed as a waiver thereof, but any such right, power or remedy may be exercised from time to time and as often as may be deemed expedient.  A waiver of one Default or Event of Default shall not be construed to be a waiver of any subsequent Default or Event of Default or to impair any right, power or remedy consequent thereon.

## XI.   MISCELLANEOUS

**Section 11.1.**  <u>Successors and Assigns</u>.   This Agreement and all agreements, covenants, representations and warranties in this Agreement, by or on behalf of Borrower, shall inure to the benefit of the legal representatives, successors and assigns of Lender.

**Section 11.2.**  <u>Lender's Discretion</u>.   Whenever pursuant to this Agreement Lender exercises any right given to it to approve or disapprove, or any arrangement or term is to be satisfactory to Lender, the decision of Lender to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory shall (except as is otherwise specifically herein provided) be in the sole discretion of Lender and shall be final and conclusive.  Prior to a Securitization, whenever pursuant to this Agreement the Rating Agencies are given any right to approve or disapprove, or any arrangement or term is to be satisfactory to the Rating Agencies, the decision of Lender to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory, based upon Lender's reasonable determination of Rating Agency criteria, shall be substituted therefor.

**Section 11.3.**  <u>Governing Law</u>.  (a) THE LOAN WAS NEGOTIATED IN THE STATE OF NEW YORK AND MADE BY LENDER AND ACCEPTED BY BORROWER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE LOAN DELIVERED PURSUANT HERETO WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION, AND ENFORCEMENT OF THE LIEN AND SECURITY INTEREST CREATED PURSUANT HERETO AND PURSUANT TO THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE IN WHICH THE PROPERTY IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF ALL

129

LOAN DOCUMENTS AND ALL OF THE OBLIGATIONS ARISING HEREUNDER OR THEREUNDER.  TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER AND LENDER EACH HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS, AND THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(b)     ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE NOTE OR THE OTHER LOAN DOCUMENTS WILL BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND BORROWER AND LENDER EACH WAIVES ANY OBJECTIONS WHICH EACH OF THE SAME MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND EACH OF THE SAME HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.   BORROWER DOES HEREBY DESIGNATE AND APPOINT:

**KRISS & FEUERSTEIN LLP**
**360 LEXINGTON AVENUE**
**NEW YORK, NEW YORK 10017**
**ATTENTION: DAVID KRISS**

AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND NOTICE OF SAID SERVICE MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK.   BORROWER (I) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT (WHICH SUBSTITUTE AGENT SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE AGENT IF ITS AUTHORIZED AGENT IS DISSOLVED OR RENDERED INCAPABLE OF ACCEPTING SERVICE OF PROCESS WITHOUT LEAVING A SUCCESSOR.

Section 11.4.  Modification, Waiver in Writing.  No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement or of any other Loan Document, nor consent to any departure by Borrower therefrom, shall in any event be

effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given.  Except as otherwise expressly provided herein, no notice to or demand on Borrower shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.

Section 11.5.   Delay Not a Waiver.  Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement in, or exercising any right, power, remedy or privilege under, this Agreement or any other Loan Document shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege.  In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement or any other Loan Document, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement or the other Loan Documents, or to declare a default for failure to effect prompt payment of any such other amount.  Lender shall have the right to waive or reduce any time periods that Lender is entitled to under the Loan Documents in its sole and absolute discretion.

Section 11.6.  Notices.  All notices, demands, requests, consents, approvals or other communications (any of the foregoing, a "**Notice**") required, permitted, or desired to be given hereunder shall be in writing (a) sent by facsimile (with answer back acknowledged and with a copy of the same delivered promptly thereafter by one of the means described in clauses (c) or (d) below), (b) intentionally omitted, (c) delivered by hand or (d) delivered by reputable overnight courier addressed to the party to be so notified at its address hereinafter set forth, or to such other address as such party may hereafter specify in accordance with the provisions of this Section 11.6.  Any Notice shall be deemed to have been received:  (i) if sent by facsimile, on the date of sending the facsimile if sent during business hours on a Business Day (otherwise on the next Business Day), (ii) if sent by registered or certified mail, on the date of delivery or the date of the first attempted delivery, in either case on a Business Day (otherwise on the next Business Day), (iii) if delivered by hand, on the date of delivery if delivered during business hours on a Business Day (otherwise on the next Business Day), and (iv) if sent by an overnight commercial courier, on the next Business Day, in each case addressed to the parties as follows:

If to Lender:

Citi Real Estate Funding Inc.
388-390 Greenwich Street
New York, New York 10013
Attention: Ana Rosu Marmann
Facsimile No.: (646) 328-2938

And:

Natixis Real Estate Capital LLC
1251 Avenue of the Americas

131

New York, New York 10020
Attention: Real Estate Administration
Facsimile No.: (212) 891–5777


With a copy to:

Wells Fargo Bank
401 S. Tryon Street, 8th Floor
Charlotte, NC 28202
MAC D1050-084
Attention: Melinda Hayton
Facsimile No.:   (704) 715-0347

And a copy to:

Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, Pennsylvania 19104
Attention: David W. Forti, Esq.
Facsimile No.: (215) 655-2647

And a copy to:

Winston & Strawn LLP
200 Park Avenue
New York, NY 10166-4193
Attention: Brian S. Smetana, Esq.
Facsimile No.: (212) 294-4700

If to Borrower:

Union Station Investco LLC
c/o Ashkenazy Acquisition Corp.
150 East 58th Street
Penthouse
New York, New York 10155
Attention:  Ben Ashkenazy
Facsimile No.:  (212) 213-5713

with a copy to:

> Kriss & Feuerstein LLP
> 360 Lexington Avenue
> New York, New York 10017
> Attention: David Kriss, Esq.
> Facsimile No.:  (646) 454-4160

**Section 11.7.**  <u>Trial by Jury</u>.  BORROWER AND LENDER EACH HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER AND LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.   EACH PARTY IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER.

**Section 11.8.**  <u>Headings</u>.  The Article and/or Section headings and the Table of Contents in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

**Section 11.9.**  <u>Severability</u>.  Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**Section 11.10.** <u>Preferences</u>.  Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the Obligations.  To the extent Borrower makes any payment to Lender, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other Person under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the Obligations or a portion thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.

**Section 11.11.** <u>Waiver of Notice</u>.  Borrower shall not be entitled to any notices of any nature whatsoever from Lender except with respect to matters for which this Agreement or the other Loan Documents specifically and expressly provide for the giving of notice by Lender to Borrower and except with respect to matters for which Borrower is not, pursuant to the applicable Legal Requirements, permitted to waive the giving of notice.  Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which

this Agreement or the other Loan Documents do not specifically and expressly provide for the giving of notice by Lender to Borrower.

Section 11.12. Remedies of Borrower.  In the event that a claim or adjudication is made that Lender or its agents have acted unreasonably or unreasonably delayed acting in any case where, by law or under this Agreement or the other Loan Documents, Lender or such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that neither Lender nor its agents shall be liable for any monetary damages, and Borrower's sole remedy shall be limited to commencing an action seeking injunctive relief or declaratory judgment.  The parties hereto agree that any action or proceeding to determine whether Lender or its agent has acted reasonably shall be determined by an action seeking declaratory judgment.

Section 11.13. Expenses; Indemnity.  (a)  Borrower shall pay or, if Borrower fails to pay, reimburse Lender upon receipt of notice from Lender, for all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees and expenses) incurred by Lender in connection with (i) Borrower's ongoing performance of and compliance with Borrower's agreements and covenants contained in this Agreement and the other Loan Documents on its part to be performed or complied with after the Closing Date, including, without limitation, confirming compliance with environmental and insurance requirements; (ii) Lender's ongoing performance of and compliance with all agreements and covenants contained in this Agreement and the other Loan Documents on its part to be performed or complied with after the Closing Date; (iii) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to this Agreement and the other Loan Documents and any other documents or matters requested or submitted by Borrower (including without limitation relating to Transfers pursuant to Section 8.2 and to zoning reclassifications or variances pursuant to Section 4.2.6); (iv) the filing and recording fees and expenses, title insurance and reasonable out-of-pocket fees and expenses of counsel for providing to Lender all required legal opinions, and other similar expenses incurred, in creating and perfecting the Liens in favor of Lender pursuant to this Agreement and the other Loan Documents; (v) enforcing or preserving any rights in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation or otherwise, in each case against, under or affecting Borrower, this Agreement, any other Loan Document, the Property, or any other security given for the Loan; (vi) enforcing any obligations of, or collecting any payments due from, Borrower or Guarantor under this Agreement or the other Loan Documents or with respect to the Property or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or of any insolvency or bankruptcy proceedings; and (vii) securing Borrower's compliance with any requests made by Lender pursuant to the provisions of this Agreement, including Section 9.1, Section 11.29 or Section 11.30 hereof; provided, however, that Borrower shall not be liable for the payment of any such costs and expenses to the extent the same arise by reason of the gross negligence, illegal acts, fraud or willful misconduct of Lender.  At Lender's discretion, any such costs and expenses due and payable to Lender may be paid to Lender from any amounts in the Clearing Account or the Cash Management Account.

(b)    Borrower shall indemnify, defend and hold harmless each Lender Indemnitee from and against any and all liabilities, obligations, losses, damages, penalties,

134

actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, the reasonable fees and expenses of counsel for any Lender Indemnitee in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not such Lender Indemnitee shall be designated a party thereto), that may be imposed on, incurred by, or asserted against any Lender Indemnitee in any manner relating to or arising out of (i) any breach by Borrower of its obligations under, or any misrepresentation by Borrower contained in, this Agreement or the other Loan Documents, (ii) any misstatement or omission in any report, certificate, financial statement, other agreement, instrument or document or other materials or information provided by or on behalf of Borrower pursuant to this Agreement or any other Loan Document or in connection with the Loan, or (iii) the use or intended use of the proceeds of the Loan (collectively, the "**Indemnified Liabilities**"); provided, however, that Borrower shall not have any obligation to the Lender Indemnitees hereunder to the extent that such Indemnified Liabilities arise from the gross negligence, illegal acts, fraud or willful misconduct of the Lender Indemnitees.  To the extent that the undertaking to indemnify, defend and hold harmless set forth in the preceding sentence may be unenforceable because it violates any law or public policy, Borrower shall pay the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by the Lender Indemnitees.

(c)     Borrower shall pay for or, if Borrower fails to pay, to reimburse Lender for, any fees, reasonable out-of-pocket costs and expenses of any Rating Agency in connection with any consent, approval, waiver or confirmation obtained from such Rating Agency pursuant to the terms and conditions of this Agreement or any other Loan Document and Lender shall be entitled to require payment of such fees, costs and expenses as a condition precedent to the obtaining of any such consent, approval, waiver or confirmation.

**Section 11.14.** Schedules Incorporated.  The Schedules annexed hereto are hereby incorporated herein as a part of this Agreement with the same effect as if set forth in the body hereof.

**Section 11.15.** Offsets, Counterclaims and Defenses.  Any assignee of Lender's interest in and to this Agreement and the other Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to such documents which Borrower may otherwise have against any assignor of such documents, and no such unrelated offset, counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon such documents and any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

**Section 11.16.** No Joint Venture or Partnership.  Borrower and Lender intend that the relationships created hereunder and under the other Loan Documents be solely that of borrower and lender.  Nothing herein or therein is intended to create a joint venture, partnership, tenancy-in-common, or joint tenancy relationship between Borrower and Lender or to grant Lender any interest in the Property other than that of mortgagee, beneficiary or lender.

**Section 11.17.** Publicity.  Except for any "tombstone" in a format typically used by Lender (which "tombstone" shall not include the Loan amount or Interest Rate), all news releases, publicity or advertising by Borrower or its Affiliates, or by Lender or its Affiliates, through any media which refers to the Loan, the Loan Documents, Borrower or any of its Affiliates or Lender or any of its Affiliates shall be subject to the prior approval of Borrower or Lender, as the case may be. Borrower authorizes Lender and its Affiliates to issue press releases, advertisements and other promotional materials in connection with Lender's or its Affiliates' own promotional and marketing activities in connection with a Secondary Market Transaction, and such materials may describe the Loan in general terms or in detail and Lender's participation therein in the Loan. Borrower also authorizes Lender and its Affiliates to disclose any terms of the Loan as may be required in public financial statements released in accordance with Legal Requirements or the requirements of investors.

**Section 11.18.** Waiver of Marshalling of Assets.  To the fullest extent permitted by law, Borrower, for itself and its successors and assigns, waives all rights to a marshalling of the assets of Borrower, Borrower's partners, members and others with interests in Borrower, and of the Property, and agrees not to assert any right under any laws pertaining to the marshalling of assets, the sale in inverse order of alienation, homestead exemption, the administration of estates of decedents, or any other matters whatsoever to defeat, reduce or affect the right of Lender under the Loan Documents to a sale of the Property for the collection of the Debt without any prior or different resort for collection or of the right of Lender to the payment of the Debt out of the net proceeds of the Property in preference to every other claimant whatsoever.

**Section 11.19.** Waiver of Offsets/Defenses/Counterclaims.  Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or its agents or otherwise to offset any obligations to make the payments required by the Loan Documents.  No failure by Lender to perform any of its obligations hereunder shall be a valid defense to, or result in any offset against, any payments which Borrower is obligated to make under any of the Loan Documents.

**Section 11.20.** Conflict; Construction of Documents; Reliance.  In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control.  The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of the Loan Documents and that such Loan Documents shall not be subject to the principle of construing their meaning against the party which drafted same.  Borrower acknowledges and agrees that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan without relying in any manner on any statements, representations or recommendations of Lender or any parent, subsidiary or Affiliate of Lender. Lender shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to it under any of the Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by it or any parent, subsidiary or Affiliate of Lender of any legal, beneficial or economic interest any of them may acquire in Borrower, and Borrower hereby irrevocably waives the right to raise any defense or take any action on the basis of the foregoing with respect to Lender's exercise of any such rights or remedies.  Borrower acknowledges that Lender engages in the business of real estate financings and other real estate

136

transactions and investments which may be viewed as adverse to or competitive with the business of Borrower or its Affiliates.

    **Section 11.21.** Brokers and Financial Advisors.  Borrower hereby represents that it has not dealt with any financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the transactions contemplated by this Agreement.  Borrower shall indemnify, defend and hold Lender harmless from and against any and all liabilities, obligations, losses, damages, claims, costs and expenses of any kind (including Lender's attorneys' fees and expenses) in any way relating to or arising from a claim by any Person that such Person acted on behalf of Borrower or Lender in connection with the transactions contemplated herein.  The provisions of this Section 11.21 shall survive the expiration and termination of this Agreement and the payment of the Debt.

    **Section 11.22.** Exculpation.  Subject to the qualifications below, Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in this Agreement, the Note, the Security Instrument or the other Loan Documents by any action or proceeding wherein a money judgment shall be sought against Borrower, except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon its interest under this Agreement, the Note, the Security Instrument and the other Loan Documents, or in the Property, the Rents, or any other collateral given to Lender pursuant to the Loan Documents; provided, however, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Borrower only to the extent of Borrower's interest in the Property, in the Rents, and in any other collateral given to Lender, and Lender, by accepting this Agreement, the Note, the Security Instrument and the other Loan Documents, agrees that it shall not sue for, seek, or demand any deficiency judgment against Borrower in any such action or proceeding under or by reason of or under or in connection with this Agreement, the Note, the Security Instrument or the other Loan Documents.  The provisions of this Section 11.22 shall not, however, (a) constitute a waiver, release or impairment of any obligation evidenced or secured by any of the Loan Documents; (b) impair the right of Lender to name Borrower as a party defendant in any action or suit for foreclosure and sale under the Security Instrument (subject, however, to the aforesaid limitation on Lender's right to sue for, seek or demand a deficiency or other monetary judgment against Borrower except as expressly permitted hereunder); (c) affect the validity or enforceability of any guaranty or indemnity made in connection with the Loan or any of the rights and remedies of Lender thereunder (subject, however, to any exculpatory or non-recourse provisions contained in such guaranty); (d) impair the right of Lender to obtain the appointment of a receiver; (e) impair the enforcement of the Assignment of Leases (subject, however, to any exculpatory or non-recourse provisions contained in such Assignment of Leases or incorporated therein by reference); (f) constitute a prohibition against Lender to seek a deficiency judgment against Borrower in order to fully realize the security granted by the Security Instrument or to commence any other appropriate action or proceeding in order for Lender to exercise its rights and remedies against the Property, the Rents or any other collateral given to Lender pursuant to the Loan Documents; or (g) constitute a waiver of the right of Lender to enforce the liability and obligation of Borrower, by money judgment or otherwise, to the extent of any actual loss, actual damage, cost, expense, actual liability, claim or other actual obligation incurred by Lender (including attorneys' fees and

137

costs reasonably incurred) arising out of or in connection with, and Borrower shall be personally liable for, the following but specifically excluding any special or punitive damages unless such special or punitive damages are imposed on Lender by a third-party (all such liability and obligation of Borrower for any or all of the following being referred to herein as the "**Borrower's Recourse Liabilities**"):

        (i)     fraud or intentional material misrepresentation in writing by Borrower, Guarantor or any Affiliate of Borrower or Guarantor in connection with the Loan;

        (ii)    the gross negligence or willful misconduct by, or at the direction of, Borrower, Guarantor or any Affiliate of Borrower or Guarantor in connection with the Loan;

        (iii)   intentional material physical waste by Borrower, Guarantor or any Affiliate of Borrower or Guarantor at the Property;

        (iv)   the removal or disposal by Borrower, Guarantor or any Affiliate of Borrower or Guarantor of any portion of the Property after an Event of Default other than in the ordinary course of owning and operating the Property with respect to portions of the Property that are either being replaced or that is no longer necessary in connection with the operation of the Property, provided that such removal or disposal will not (i) have a Material Adverse Effect, (ii) impair the utility or operation of the Property or (iii) result in a reduction or abatement of, or right of offset against, the Rents under any Lease in respect of the Property;

        (v)    the misappropriation, conversion, or intentional misapplication by Borrower in violation of the Loan Documents of (A) any Insurance Proceeds paid by reason of any Casualty and received by Borrower or any Affiliate of Borrower or paid at the direction of Borrower, (B) any Awards or other amounts received by Borrower or any Affiliate of Borrower or paid at the direction of Borrower in connection with a Condemnation of all or a portion of the Property, or (C) any Rents received by or on behalf of Borrower or any Affiliate of Borrower;

        (vi)   any security deposits, advance deposits or any other deposits collected with respect to the Property and received by or on behalf of Borrower which are not delivered to Lender upon a foreclosure of the Property or action in lieu thereof, except to the extent any such security deposits, advance deposits or any other deposits were (x) applied in accordance with the terms and conditions of the applicable Leases, (y) returned to third-party tenants or other depositors in accordance with the terms and conditions of the applicable Leases or (z) applied as otherwise required by law or court order, in each case prior to the occurrence of the Event of Default that gave rise to such foreclosure or action in lieu thereof;

        (vii)  failure to pay Taxes, charges for labor or materials or Other Charges that can create Liens on any portion of the Property and/or failure to pay Insurance Premiums in accordance with the terms and provisions hereof (but only to the extent there is sufficient cash flow from the Property to pay Taxes, charges for labor or materials or Other Charges that can create Liens on any portion of the Property and Insurance Premiums after the payment of Debt Service; provided, that no liability shall exist under this clause (vii) with respect to failure to pay Taxes or Insurance Premiums if sufficient funds are available in the Tax Account or the Insurance Account, respectively, to pay such Taxes or Insurance Premiums, as

138

respectively, when due and Lender fails to apply same in accordance with this Agreement, provided Lender's access to such funds is not constrained in any manner and there exists no Event of Default; it being further understood, that nothing contained herein shall require the payment of capital contributions from any direct or indirect owner of equity in Borrower));

     (viii)   Borrower's indemnification of Lender set forth in <u>Section 9.2</u> hereof;

     (ix)   any damage or destruction to the Property caused by the intentional wrongful acts or omissions of, or at the direction of, Borrower, Guarantor or any Affiliate of Borrower or Guarantor;

     (x)   the payment of fees or other amounts by Borrower to any of its Affiliates in violation of the Loan Documents;

     (xi)   the seizure or forfeiture of the Property, or any portion thereof, or Borrower's interest therein, resulting from criminal wrongdoing by Borrower, Guarantor or any Affiliate of Borrower or Guarantor;

     (xii)   a breach by Borrower of its obligation to maintain its status as a single purpose entity as required by, and in accordance with the terms and provisions of, this Agreement and the other Loan Documents (including without limitation <u>Section 3.1.24</u> hereof, but excluding Borrower's obligations to remain solvent and adequately capitalized as set forth in <u>Section 3.1.24(g)</u> and <u>(j)</u> respectively);

     (xiii)   Borrower's or Guarantor's breach in any material respect of any representation set forth in <u>Sections 3.1.9</u>, <u>3.1.10</u>, <u>3.1.23</u>, <u>3.1.48</u> or <u>3.1.50</u> relating to acts or omissions occurring on or prior to the Closing Date;

     (xiv)   if any litigation or other legal proceeding related to the Debt filed by Borrower, Guarantor or any Affiliate or Borrower or Guarantor was brought in bad faith or was intended solely to delay, oppose, impede, obstruct, hinder, enjoin or otherwise interfere with or frustrate the efforts of Lender to exercise any right and remedies available to Lender as provided herein and in the other Loan Documents;

     (xv)   Borrower's failure to obtain Lender's prior consent to any Indebtedness or voluntary Lien encumbering the Property or any part thereof or interest therein in violation of this Agreement;

     (xvi)   any amounts owed by Borrower to any Tenant for coupon reimbursements or for reconciliations for any prior calendar year pursuant to any Lease;

     (xvii)   Borrower's breach in any material respect of the representation set forth in <u>Section 3.1.39</u> hereof that all Ground Rent then due and payable by the tenant under the Ground Lease has been paid in full as of the date of this Agreement; and

(xviii)  any amendment or modification of the Ground Lease or the Prime Lease (to the extent Borrower has an approval right over such amendment or modification to the Prime Lease) without Lender's prior written consent.

Notwithstanding anything to the contrary in this Agreement, the Note or any of the other Loan Documents, (A) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b) or 1111(b) or any other provisions of the U.S. Bankruptcy Code or any other Bankruptcy Law to file a claim for the full amount of the Debt or to require that all collateral shall continue to secure all of the Obligations in accordance with the Loan Documents, and (B) the Debt shall be fully recourse to Borrower in the event that any of the following occurs (each, a "**Springing Recourse Event**"):   (1) Borrower files a voluntary petition under the Bankruptcy Law; (2) an Affiliate, officer, director, or representative which Controls Borrower files, or joins in the filing of, an involuntary petition against Borrower under the Bankruptcy Law other than an involuntary petition filed by or at the direction of Lender, or solicits or causes to be solicited petitioning creditors for any involuntary petition against Borrower from any Person; (3) Borrower files an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it by any other Person under the Bankruptcy Law other than Lender or any affiliate of Lender, or solicits or causes to be solicited petitioning creditors for any involuntary petition against Borrower from any Person; (4) any Affiliate, officer, director, or representative which Controls Borrower consents to or acquiesces in or joins in an application for the appointment of a custodian, receiver, trustee, or examiner for Borrower or any portion of the Property other than in connection with a request or action commenced by Lender or its affiliate; (5) Borrower makes an assignment for the benefit of creditors, or admits, in writing or in any action or proceeding, its insolvency or inability to pay its debts as they become due, which admission is used as evidence of Borrower's insolvency in connection with an involuntary petition under the U.S. Bankruptcy Code or any other Bankruptcy Law by a Person other than Lender and such statement was either (i) not true or correct when made or (ii) was made by Borrower to such Person to promote or encourage such Person to file an involuntary petition under the U.S. Bankruptcy Code or any other Bankruptcy Law, and specifically excluding in any event any admissions to Lender or any Servicer that (x) Borrower cannot pay its Operating Expenses including its Debt Service payment due in respect of the Loan or (y) Borrower cannot refinance the Loan on the Maturity Date; (6) (i) Borrower fails to maintain its status as a single purpose entity as required by, and in accordance with, the terms and provisions of, this Agreement and the other Loan Documents (including without limitation Section 3.1.24 hereof, but excluding Borrower's obligations to remain solvent and adequately capitalized as set forth in Section 3.1.24(g) and (j) respectively) and (ii) a court of competent jurisdiction over Lender's objection orders a substantive consolidation of Borrower's assets in a bankruptcy or insolvency proceeding of an Affiliate of Borrower; (7) Borrower's failure to obtain Lender's prior consent to any Transfer except to the extent expressly permitted by this Agreement or the Security Instrument; provided that (i) if the violation results solely from a failure to provide any required notice, an Insolvency Opinion, any other deliveries (including payment of fees) or copies of instruments and/or Organizational Documents related to such Transfer (and but for such failure to provide such item(s), such Transfer would otherwise be a Permitted Transfer), no such liability shall arise under this clause (7) if Borrower promptly provides such notice, Insolvency Opinion or other deliveries (including payment of fees) or copies of instruments and/or Organizational Documents related to such Transfer within ten (10)

140

Business Days after Lender's written request therefor and (ii) no liability shall arise under this clause (7) to the extent that Borrower fails to obtain Lender's prior consent to the Transfer (to the extent such consent is required under this Agreement or the Security Instrument) of any indirect equity interest in Borrower (not to exceed twenty percent (20%) of the equity interests in Borrower at the time of such Transfer) which does not result in a change in Control of Borrower and Borrower promptly provides to Lender all information reasonably requested by Lender with respect to such Transfer within ten (10) Business Days after Lender's written request therefor (it being understood and agreed that such Transfer shall be an Event of Default); or (8) if all or any material portion of the Ground Lease is terminated by or on behalf of Borrower or by Ground Lessor as a result of a default thereunder by Borrower without Lender's prior written consent.

**Section 11.23.** Prior Agreements.  This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written, are superseded by the terms of this Agreement and the other Loan Documents.

**Section 11.24.** Servicer.  (a) At the option of Lender, the Loan may be serviced by servicers (individually or collectively, "**Servicer**") selected by Lender and Lender may delegate all or any portion of its responsibilities under this Agreement and the other Loan Documents to Servicer pursuant to a servicing agreement (the "**Servicing Agreement**") between Lender and Servicer.  Borrower shall be responsible for (i) any reasonable out-of-pocket expenses of Servicer (including, without limitation, attorneys' fees and disbursements) in connection with any release of the Property, any prepayment, defeasance, assumption, amendment or modification of the Loan, any documents or matters requested by Borrower, and (ii) all actual out-of-pocket costs and expenses and all fees of Lender and Servicer, operating advisor and Trustee, and all other actual expenses of the Securitization Vehicle, in each case resulting from Defaults and reasonably imminent Defaults by Borrower, the Loan going into special servicing or requests by Borrower (including enforcement expenses and any liquidation fees, workout fees, special servicing fees, operating advisor consulting fees or any other similar fees and interest payable on advances made by the Servicer or the Trustee with respect to delinquent Debt Service payments or expenses of curing Borrower's Defaults under the Loan Documents, and any expenses paid by Servicer or a trustee in respect of the protection and preservation of the Property, such as payment of taxes and insurance premiums), and the costs of all property inspections and/or appraisals (or any updates to any existing inspection or appraisal) that Servicer may be required to obtain due to a request by Borrower or the occurrence of a Default or reasonably imminent Default; provided, however, that such costs and expenses shall exclude (1) those costs or expenses which are customarily borne by a servicer or trustee without reimbursement from a securitization trust and (2) any cost or expense which is incurred as a result of the gross negligence or willful misconduct of Servicer, special servicer, Trustee or certificate administrator.

(b)      Upon notice thereof from Lender, Servicer shall have the right to exercise all rights of Lender and enforce all obligations of Borrower and Guarantor pursuant to the provisions of this Agreement and the other Loan Documents.

(c)      Provided Borrower shall have been given notice of Servicer's address by Lender, Borrower shall deliver, or cause to be delivered, to Servicer duplicate originals of all notices and other documents and instruments which Borrower or Guarantor may or shall be required to deliver to Lender pursuant to this Agreement and the other Loan Documents (and no delivery of such notices or other documents and instruments by Borrower or Guarantor shall be of any force or effect unless delivered to Lender and Servicer as provided above).  Lender shall provide, or cause Servicer to provide, to Borrower the address and contact information for the Servicer promptly after the engagement of Servicer; provided the failure to provide such notice shall not constitute a default hereunder.

**Section 11.25.** Intentionally Omitted.

**Section 11.26.** Creation of Security Interest.  Notwithstanding any other provision set forth in this Agreement, the Note, the Security Instrument or any of the other Loan Documents, Lender may at any time grant a security interest in all or any portion of its rights under this Agreement, the Note, the Security Instrument or any of the other Loan Documents (including, without limitation, the payments owing to it) (a) to any Federal Reserve Bank in accordance with Regulation A of the Board of Governors of the Federal Reserve System or to the central reserve bank or similar authority of any other country to secure any obligation of Lender or its Affiliates to such bank or similar authority or (b) to secure any borrowing by Lender or its Affiliates from any company that purchases or funds financial assets by issuing commercial paper.

**Section 11.27.** Intentionally Omitted.

**Section 11.28.** Set-Off.   In addition to any other rights and remedies of Lender provided by the Loan Documents and by law, Lender shall have the right, without prior notice to Borrower, any such notice being expressly waived by Borrower to the extent permitted by applicable law, upon any amount becoming due and payable by Borrower hereunder or under the other Loan Documents (whether at the stated maturity, by acceleration or otherwise) to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by Lender or any Affiliate of Lender to or for the credit or the account of Borrower.  Lender agrees to promptly notify Borrower after any such set-off and application made by Lender; provided that the failure to give such notice shall not affect the validity of such set-off and application.

**Section 11.29.** Component Notes; Adjustment of Loan.   Without in any way limiting Lender's other rights under this Agreement or any other Loan Document (including Lender's rights under Section 9.1 and Section 11.30 hereof), Lender shall have the right, at any time and in its sole and absolute discretion, to require Borrower to execute and deliver new component notes (including senior and junior notes) to replace the original note or modify the original note to reflect multiple components of the Loan, which notes or components may be paid in such order of priority as may be designated by Lender, provided that (a) the aggregate principal amount of such component notes shall, on the date created, equal the Outstanding

Principal Balance immediately prior to the creation of such component notes, (b) the weighted average interest rate of all such component notes shall, on the date created, equal the interest rate which was applicable to the Loan immediately prior to the creation of such component notes and shall continue to equal such interest rate (except that such weighted average interest rate may subsequently change due to involuntary prepayments or if an Event of Default, Mezzanine Loan Event of Default, or Subordinate Mezzanine Loan Event of Default shall occur), (c) the scheduled debt service payments on all such component notes shall, on the date created, equal the scheduled debt service payments under the Loan immediately prior to the creation of such component notes, and (d) the creation of such component notes shall not result in there being more than one (1) Servicer at any time that is entitled to collect, or to which Borrower is obligated to pay, any payments due in respect of such component notes, and Borrower's obligation to make payments from time to time of any amounts in respect of any such component notes shall be satisfied in each case to the extent that Borrower makes a single aggregate payment of such amounts to such Servicer in accordance with the terms and conditions of the Loan Documents, and (e) the other material terms and provisions of the Loan, the Mezzanine Loan, and the Subordinate Mezzanine Loan remain unchanged.  Borrower, at its reasonable cost and expense, shall cooperate with all reasonable requests of Lender in order to establish the component notes and shall execute and deliver, and cause to be executed and delivered, such documents as shall reasonably be required by Lender or any Rating Agency in connection therewith, all in form and substance reasonably satisfactory to Lender and, if applicable, satisfactory to such Rating Agency (including, without limitation, the severance of security documents).  Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents reasonably necessary to establish the component notes as described in this <u>Section 11.29</u>, Borrower ratifying all that its said attorney shall do by virtue thereof; <u>provided</u>, <u>however</u>, Lender shall not make or execute any such documents under such power until three (3) Business Days after notice has been given to Borrower by Lender of Lender's intent to exercise its rights under such power.  Lender shall pay all costs and expenses in connection with the creation of the component notes and all requirements relating thereto.  Lender shall provide, or cause Servicer to provide, to Borrower the identity of each holder of any new or additional notes promptly after any assignment or other transfer of any such additional note; <u>provided</u> the failure to provide such notice shall not constitute a default hereunder.

**Section 11.30.** New Mezzanine Loan.  Without in any way limiting Lender's other rights under this Agreement or any other Loan Document (including Lender's rights under <u>Section 9.1</u> and <u>Section 11.29</u> hereof), Lender shall have the right (the "**New Mezzanine Option**") at any time, in its sole and absolute discretion, to divide the Loan into two parts:  a mortgage loan (the "**Mortgage Loan**") and one or more mezzanine loans (each individually, a "**New Mezzanine Loan**") which will be senior in priority to the Mezzanine Loan.  In effectuating the foregoing, Lender (in its capacity as the lender under the New Mezzanine Loans, "**New Mezzanine Lender**") will make one or more mezzanine loans to newly formed single purpose, bankruptcy remote entities that own, directly or indirectly, all of the legal, beneficial and economic interests in Borrower (each individually, a "**New Mezzanine Borrower**") in the amount of the related New Mezzanine Loan; each New Mezzanine Borrower will contribute the amount of its New Mezzanine Loan and the proceeds of any junior New Mezzanine Loan contributed to such New Mezzanine Borrower by its immediately junior New Mezzanine

143

Borrower to Borrower (Borrower, in its capacity as the borrower under the Mortgage Loan, "**Mortgage Borrower**") or to its immediately senior New Mezzanine Borrower, as applicable; and Mortgage Borrower will apply the contribution to pay down the Loan to the amount of the Mortgage Loan.  Borrower shall, and shall cause all such affiliates of Borrower to, conduct all such actions in accordance with the separateness provisions of Section 3.1.24 hereof.   In connection with the New Mezzanine Option:

(a)    Lender shall have the right to establish different interest rates and debt service payments for the Mortgage Loan and the New Mezzanine Loans and to require the payment of the Mortgage Loan and the New Mezzanine Loans in such order of priority as may be designated by Lender; provided, that (i) the aggregate principal amount of the Mortgage Loan and the New Mezzanine Loans shall equal the Outstanding Principal Balance immediately prior to the creation of the Mortgage Loan and the New Mezzanine Loans, (ii) the weighted average interest rate of the Mortgage Loan and the New Mezzanine Loans shall, on the date created, equal the interest rate which was applicable to the Loan immediately prior to creation of the Mortgage Loan and the New Mezzanine Loans and (iii) the scheduled debt service payments on the Mortgage Loan and the New Mezzanine Loans shall, on the date created, equal the scheduled debt service payments under the Loan immediately prior to creation of the Mortgage Loan and the New Mezzanine Loans.

(b)    Each New Mezzanine Borrower shall be a newly formed single purpose, bankruptcy remote entity under the criteria established by the Rating Agencies and shall own directly one hundred percent (100%) of the legal, beneficial and economic interests in Mortgage Borrower or its immediately senior New Mezzanine Borrower, as applicable.  The security for any New Mezzanine Loan shall include a pledge by the related New Mezzanine Borrower of one hundred percent (100%) of the direct ownership interests in Mortgage Borrower or its immediately senior New Mezzanine Borrower, as applicable.

(c)    Borrower, as Mortgage Borrower, and New Mezzanine Borrowers shall cooperate with all reasonable requests of Lender in order to convert the Loan into the Mortgage Loan and the New Mezzanine Loans and shall execute and deliver, and cause to be executed and delivered, such documents as shall reasonably be required by Lender or any Rating Agency in connection therewith, all in form and substance reasonably satisfactory to Lender and, if applicable, satisfactory to such Rating Agency (including, without limitation, the delivery of bankruptcy non consolidation opinions and the modification of organizational documents and loan documents).  Each of Borrower, Mortgage Borrower and New Mezzanine Borrowers hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to convert the Loan as described in this Section 11.30, each of Borrower, as Mortgage Borrower, and New Mezzanine Borrowers ratifying all that its said attorney shall do by virtue thereof; provided, however, Lender shall not make or execute any such documents under such power until three (3) days after notice has been given to Borrower by Lender of Lender's intent to exercise its rights under such power.

(d)    All reasonable out-of-pocket costs and expenses incurred by Borrower in excess of Seventy-Five Thousand and No/100 Dollars ($75,000.00) connection with Borrower's

complying with requests made under this <u>Section 11.30</u> shall be paid by Lender; provided, however, that the foregoing shall not require Lender to pay or reimburse Borrower for any costs and expenses that Borrower would otherwise be required to pay or reimburse Lender under any other provision of this Agreement in the event that Lender had not exercised the New Mezzanine Option.

**Section 11.31.** <u>Approvals; Third Parties; Conditions</u>.    (a) All approval rights retained or exercised by Lender with respect to any Leases, contracts, plans, studies and other matters are solely to facilitate Lender's credit underwriting, and shall not be deemed or construed as a determination that Lender has passed on the adequacy thereof for any other purpose and may not be relied upon by Borrower or any other Person.

(b)    This Agreement and the other Loan Documents are for the sole and exclusive use of Borrower and Lender and may not be enforced, nor relied upon, by any other Person.  Nothing contained in this Agreement or the other Loan Documents shall be deemed to confer upon any Person other than Borrower and Lender any right to insist upon or to enforce the performance or observance of any of the terms, covenants and conditions contained herein or therein.    All conditions to the obligations of Lender hereunder or under the other Loan Documents are imposed solely and exclusively for the benefit of Lender and no other Person shall have standing to require satisfaction of such conditions or be entitled to assume that Lender will refuse to make the Loan (or, if applicable, make any advances) or otherwise perform or satisfy such obligations in the absence of strict compliance with any or all of such conditions and no other Person shall under any circumstances be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Lender at any time in Lender's sole and absolute discretion.

**Section 11.32.** <u>Limitation on Liability of Lender's Officers, Employees, etc</u>.  Any obligation or liability whatsoever of Lender which may arise at any time under this Agreement or any other Loan Document shall be satisfied, if at all, out of Lender's interest in the Property only.  No such obligation or liability shall be personally binding upon, nor shall resort for the enforcement thereof be had to, any other asset or property of Lender or the asset or property of any of Lender's shareholders, directors, officers, employees or agents, regardless of whether such obligation or liability is in the nature of contract, tort or otherwise.

**Section 11.33.** <u>Certain Additional Rights of Lender (VCOC)</u>.  Notwithstanding anything to the contrary contained in this Agreement, Lender shall have:

(a)    the right to routinely consult with and advise but not bind Borrower's management regarding the significant business activities and business and financial developments of Borrower; <u>provided</u>, <u>however</u>, that such consultations shall not include discussions of environmental compliance programs or disposal of Hazardous Substances.  Consultation meetings may occur on a regular basis (but no more frequently than quarterly) with Lender having the right to call special meetings at any reasonable times upon reasonable notice;

(b)    the right, in accordance with the terms of this Agreement, to examine the books and records of Borrower at any reasonable times upon reasonable notice;

145

(c)     the right, in accordance with the terms of this Agreement, including, without limitation, Section 4.1.6 hereof, to receive quarterly and yearend financial reports; and

(d)     the right, without restricting any other rights of Lender under this Agreement (including any similar right), to approve any acquisition by Borrower of any other significant property (other than (i) personal property for the day to day operation of the Property and (ii) subject to and in accordance with Section 2.6 hereof).

The rights described above in this Section 11.33 may be exercised by any entity which owns, directly or indirectly, and Controls substantially all of the interests in Lender.

**Section 11.34.** Intercreditor Agreement.     Lender, Mezzanine Lender and Subordinate Mezzanine Lender are, may, or will be parties to the Intercreditor Agreement memorializing their relative rights and obligations with respect to the Loan, the Mezzanine Loan, the Subordinate Mezzanine Loan, Borrower, Mezzanine Borrower, Subordinate Mezzanine Borrower, the Property and the collateral for the Mezzanine Loan and Subordinate Mezzanine Loan.  Borrower hereby acknowledges and agrees that (i) the Intercreditor Agreement is intended solely for the benefit of Lender, the Mezzanine Lender and the Subordinate Mezzanine Lender and (ii) Borrower, the Mezzanine Borrower and the Subordinate Mezzanine Borrower are not intended third-party beneficiaries of any of the provisions therein and shall not be entitled to rely on the provisions contained therein.  Lender, Mezzanine Lender and Subordinate Mezzanine Lender shall have no obligation to disclose to Borrower the contents of the Intercreditor Agreement.  Borrower's obligations hereunder are independent of the Intercreditor Agreement and remain unmodified by the terms and provisions thereof.

**Section 11.35.** Agent.

(a)     Citi (or an Affiliate of Citi) shall act as administrative agent for itself and the Co-Lenders (together with any successor administrative agent, the "**Agent**") pursuant to this Section.  Citi, by execution hereof, hereby accepts such appointment as Agent.  Borrower acknowledges that Citi, as Agent, shall have the sole and exclusive authority to execute and perform this Agreement and each Loan Document on behalf of itself, as a Lender and as agent for itself and the Co-Lenders subject to the terms of the Co-Lending Agreement.  Subject to the terms and conditions of the Co-Lending Agreement, each Lender acknowledges that Citi, as Agent, shall retain the exclusive right to grant approvals and give consents with respect to all matters requiring Lender's approval or consent hereunder. Except as otherwise expressly provided herein, Borrower shall have no obligation to recognize or deal directly with any Co-Lender, and no Co-Lender shall have any right to deal directly with Borrower with respect to the rights, benefits and obligations of Borrower under this Agreement, the Loan Documents or any one or more documents or instruments in respect thereof.  Borrower may rely conclusively on the actions of Citi as Agent to bind Citi and the Co-Lenders, notwithstanding that the particular action in question may, pursuant to this Agreement or the Co-Lending Agreement be subject to the consent or direction of some or all of the Co-Lenders. Citi may resign as Agent of the Co-Lenders, in its sole discretion, or if required to by the Co-Lenders in accordance with the term of the Co-Lending Agreement, in each case without the consent of but upon prior written notice to

146

Borrower.  Upon any such resignation, a successor Agent shall be determined pursuant to the terms of the Co-Lending Agreement.  The term Agent shall mean any successor Agent.

(b)     Notwithstanding any provision to the contrary in this Agreement, the Agent shall not have any duties or responsibilities to Borrower except those expressly set forth herein and no covenants, functions, responsibilities, duties, obligations or liabilities of Agent shall be implied by or inferred from this Agreement or any other Loan Document, or otherwise exist against Agent.

(c)     Except to the extent its obligations hereunder and its interest in the Loan have been assigned pursuant to one or more Assignments and Assumption, Citi, as Agent, shall have the same rights and powers under this Agreement as any other Co-Lender and may exercise the same as though it were not Agent, respectively.  The term "Co-Lender" or "Co-Lenders" (as defined in Section 11.36) shall, unless otherwise expressly indicated, include Citi in its individual capacity.  Citi and the other Co-Lenders and their respective Affiliates may accept deposits from, lend money to, act as trustee under indentures of, and generally engage in any kind of business with, Borrower, or any Affiliate of Borrower and any Person who may do business with or own securities of Borrower or any Affiliate of Borrower, all as if they were not serving in such capacities hereunder and without any duty to account therefor to each other.

(d)     If required by any Co-Lender, Borrower hereby agrees to execute supplemental notes in the principal amount of such Co-Lender's *pro rata* share of the Loan substantially in the form of the Note, and such supplemental note shall (i) be payable to order of such Co-Lender, (ii) be dated as of the Closing Date, and (iii) mature on the Maturity Date.  Such supplemental note shall provide that it evidences a portion of the existing Indebtedness hereunder and under the Note and not any new or additional Indebtedness of Borrower; provided that the aggregate principal amount of the Note and the supplemental notes shall, on the date created, equal the Outstanding Principal Balance immediately prior to the creation of such supplemental notes and the weighted average interest rate of the Note and any supplemental notes shall, on the date created, equal the interest rate which was applicable to the Loan immediately prior to the creation of such supplemental notes.  The term "Note" as used in this Agreement and in all the other Loan Documents shall include all such supplemental notes.

(e)     Agent, shall maintain at its domestic lending office or at such other location as Agent, shall designate in writing to each Co-Lender and Borrower a copy of each Assignment and Assumption delivered to and accepted by it and a register for the recordation of the names and addresses of the Co-Lenders, the amount of each Co-Lender's proportionate share of the Loan and the name and address of each Co-Lender's agent for service of process (the "**Register**").  The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and Borrower, Agent, and the Co-Lenders shall treat each person or entity whose name is recorded in the Register as a Co-Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection and copying by Borrower or any Co-Lender during normal business hours upon reasonable prior notice to the Agent.  A Co-Lender may change its address and its agent for service of process upon written notice to Citi, as Agent, which notice shall only be effective upon actual receipt by Agent, which receipt will be acknowledged by Agent upon request.

Notwithstanding the foregoing, immediately upon the closing of the first Securitization of all or any portion of the Loan, Citi (or any other Person then acting as Agent hereunder) shall be immediately deemed to have resigned as the Agent hereunder and the trustee of such first Securitization of all or any portion of the Loan shall be automatically appointed as the Agent hereunder (without any requirement of any consent by, or notice to, Borrower); provided that if such first securitization does not include Note A-1, then immediately upon the closing of the first securitization including the Note A-1 ("**Citi Securitization**") such trustee of such first Securitization (or any other Person then acting as Agent hereunder) shall be immediately deemed to have resigned as the Agent hereunder the trustee of such Citi Securitization shall be automatically appointed as the Agent hereunder (without any requirement of any consent by, or notice to, Borrower).

**Section 11.36.** Syndication.

(a)      Sale of Loan, Co-Lenders, Participations and Servicing.

(i)      Lender and any Co-Lender may, at their option, without Borrower's consent (but with notice to Borrower), sell with novation all or any part of their right, title and interest in, and to, and under the Loan (the "**Syndication**"), to one or more additional lenders (each a "**Co-Lender**").  Each additional Co-Lender shall enter into an assignment and assumption agreement (the "**Assignment and Assumption**") assigning a portion of Lender's or Co-Lender's rights and obligations under the Loan, and pursuant to which the additional Co-Lender accepts such assignment and assumes the assigned obligations.  From and after the effective date specified in the Assignment and Assumption (A) each Co-Lender shall be a party hereto and to each Loan Document to the extent of the applicable percentage or percentages set forth in the Assignment and Assumption and, except as specified otherwise herein, shall succeed to the rights and obligations of Lender and the Co-Lenders hereunder and thereunder in respect of the Loan, and (B) Lender, as lender and each Co-Lender, as applicable, shall, to the extent such rights and obligations have been assigned by it pursuant to such Assignment and Assumption, relinquish its rights and be released from its obligations hereunder and under the Loan Documents.

(ii)      The liabilities of Lender and each of the Co-Lenders shall be several and not joint, and Lender's and each Co-Lender's obligations to Borrower under this Agreement shall be reduced by the amount of each such Assignment and Assumption.  Neither Lender nor any Co-Lender shall be responsible for the obligations of any other Co-Lender. Lender and each Co-Lender shall be liable to Borrower only for their respective proportionate shares of the Loan.

(iii)      Borrower agrees that it shall, in connection with any sale of all or any portion of the Loan, whether in whole or to an additional Co-Lender or Participant, within ten (10) Business Days after requested by Agent, furnish Agent with the certificates required under Sections 4.1.8 hereof and such other information as reasonably requested by any additional Co-Lender or Participant in performing its due diligence in connection with its purchase of an interest in the Loan.

148

(iv)      Notwithstanding anything herein to the contrary, any financial institution or other entity may be sold a participation interest in the Loan by Lender or any Co-Lender without Borrower's consent (such financial institution or entity, a "**Participant**").  No Participant shall have any rights under this Agreement, the Note or any of the Loan Documents and the Participant's rights in respect of such participation shall be solely against Lender or Co-Lender, as the case may be, as set forth in the participation agreement executed by and between Lender or Co-Lender, as the case may be, and such Participant.  Borrower may rely conclusively on the actions of Citi as Agent to bind Lender and any Participant, notwithstanding that the particular action in question may, pursuant to this Agreement or any participation agreement be subject to the consent or direction of some or all of the Participants.  No participation shall relieve Lender or Co-Lender, as the case may be, from its obligations hereunder or under the Note or the Loan Documents and Lender or Co- Lender, as the case may be, shall remain solely responsible for the performance of its obligations hereunder.

(v)      Notwithstanding any other provision set forth in this Agreement, Lender or any Co-Lender may at any time create a security interest in all or any portion of its rights under this Agreement (including, without limitation, amounts owing to it in favor of any Federal Reserve Bank in accordance with Regulation A of the Board of Governors of the Federal Reserve System).

(b)      <u>Cooperation in Syndication</u>.

(i)      Each of Borrower and Guarantor agrees to reasonably assist Lender in completing a Syndication satisfactory to Lender.  Such assistance shall include (i) direct contact between senior management and advisors of Borrower and Guarantor and the proposed Co-Lenders, (ii) assistance in the preparation of a confidential information memorandum and other marketing materials to be used in connection with the Syndication, (iii) the hosting, with Lender, of one or more meetings of prospective Co-Lenders or with the Rating Agencies, (iv) the delivery of appraisals satisfactory to Lender if required, and (v) working with Lender to procure a rating for the Loan by the Rating Agencies.

(ii)      Subject to the terms and conditions of the Co-Lending Agreement, Citi shall manage all aspects of the Syndication of the Loan, including decisions as to the selection of institutions to be approached and when they will be approached, when their commitments will be accepted, which institutions will participate, the allocations of the commitments among the Co-Lenders and the amount and distribution of fees among the Co-Lenders.  To assist Lender in its Syndication efforts, each of Borrower and Guarantor agrees promptly to prepare and provide to Lender all information with respect to Borrower, Mezzanine Borrower, Manager, Guarantor and the Property (or any portion thereof) contemplated hereby, including all financial information and projections (the "**Projections**"), as Lender may reasonably request in connection with the Syndication of the Loan; provided, however, that Guarantor financial statements will only be disclosed in connection with a Syndication subject to a non-disclosure agreement.  Each of Borrower and Guarantor hereby represents and covenants that (i) all information other than the Projections (the "**Information**") that has been or will be made available to Lender by Borrower, Guarantor or any of their representatives is or will be, when furnished, complete and correct in all material respects and does not or will not, when

149

furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made and (ii) the Projections that have been or will be made available to Lender by Borrower, Guarantor or any of their representatives have been or will be prepared in good faith based upon reasonable assumptions.  Each of Borrower and Guarantor understands that in arranging and syndicating the Loan, Lender, the Co-Lenders and, if applicable, the Rating Agencies, may use and rely on the Information and Projections without independent verification thereof.

(iii)    If required in connection with the Syndication, each of Borrower and Guarantor hereby agrees to:

(A)    amend the Loan Documents to give Lender the right, at Borrower's sole cost and expense, to have the Property reappraised on an annual basis;

(B)    deliver updated financial and operating statements and other information reasonably required by Lender to facilitate the Syndication;

(C)    deliver reliance letters reasonably satisfactory to Lender with respect to the environmental assessments and reports delivered to Lender prior to the Closing Date, which will run to Lender, any Co-Lender and their respective successors and assigns;

(D)    execute modifications to the Loan Documents required by the Co- Lenders, provided that such modification will not (except as set forth in clause (E) below), change any material or economic terms of the Loan Documents, or otherwise materially increase the obligations or materially decrease the rights of Borrower and Guarantor pursuant to the Loan Documents; and

(E)    if Lender elects, in its sole discretion, prior to or upon a Syndication, to split the Loan into two or more parts, or the Note into multiple component notes or tranches which may have different interest rates, principal amounts, payment priorities and maturities, Borrower and Guarantor agrees to cooperate with Lender in connection with the foregoing and to execute the required modifications and amendments to the Note, this Agreement and the Loan Documents and to provide opinions necessary to effectuate the same. Such Notes or components may be assigned different interest rates, so long as the initial weighted average of such interest rates does not exceed the applicable Interest Rate (except following an Event of Default or any principal payments received on the Loan).

Borrower shall be responsible for payments of its legal fees incurred in connection with compliance with the requests made under this Section 11.36, but not the legal fees of Lender or any Co-Lender.

(c)    Limitation of Liability.  No claim may be made by Borrower, or any other Person against Agent, Lender or any Co-Lenders or the Affiliates, directors, officers, employees, attorneys or agent of any of such Persons for any special, indirect, consequential or punitive damages in respect of any claim for breach of contract or any other theory of liability arising out

150

of or related to the transactions contemplated by this Agreement or any act, omission or event occurring in connection therewith; and Borrower hereby waives, releases and agrees not to sue upon any claim for any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(d)     No Joint Venture.   Notwithstanding anything to the contrary herein contained, neither Agent, Lender nor any Co-Lender by entering into this Agreement or by taking any action pursuant hereto, will be deemed a partner or joint venturer with Borrower.

(e)     Voting Rights of Co-Lenders.   Borrower acknowledges that the Co-Lending Agreement may contain provisions which require that amendments, waivers, extensions, modifications, and other decisions with respect to the Loan Documents shall require the approval of all or a number of the Co-Lenders holding in the aggregate a specified percentage of the Loan or any one or more Co-Lenders that are specifically affected by such amendment, waiver, extension, modification or other decision.

(f)     Notwithstanding anything herein to the contrary, Lender shall pay the reasonable and out-of-pocket fees and expenses of Borrower with respect to Borrower's compliance with this Section 11.36; provided, that, Borrower shall be responsible for the payment of Borrower's legal fees with respect to compliance with the terms of this Section 11.36.

**[NO FURTHER TEXT ON THIS PAGE]**

151

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**LENDER:**

**CITI REAL ESTATE FUNDING INC.**, a New York corporation

By: _____

Name:     Ana Rosu Marmann
Title:       Authorized Signatory

[Signature Page to Loan Agreement]

**NATIXIS REAL ESTATE CAPITAL LLC**, a
Delaware limited liability company

By: _____
     Name:    Christopher C. Colon
     Title:     Vice President

By: _____
     Name:    **Gavin Elwes**
     Title:     **Managing Director**

[Signature Page to Loan Agreement]

**BORROWER:**

**UNION STATION INVESTCO LLC**, a Delaware
limited liability company

By: _____

Name:  Ben Ashkenazy

Title:  Authorized Signatory

[Signature Page to Loan Agreement]