# EXHIBIT 2

**MEZZANINE LOAN AGREEMENT**


Dated as of May 8, 2018


Between


**UNION STATION SOLE MEMBER LLC**, as Borrower


and


**KOOKMIN BANK CO., LTD., AS TRUSTEE OF KTB CRE DEBT FUND NO. 8**, as Lender

# TABLE OF CONTENTS

**Page**

I.    DEFINITIONS; PRINCIPLES OF CONSTRUCTION ................................................... 2

    **Section 1.1.**  Definitions................................................................................. 2

    **Section 1.2.**  Principles of Construction.......................................................... 30

II.    THE LOAN.......................................................................................................... 30

    **Section 2.1.**  The Loan. ................................................................................. 30

        2.1.1.    Agreement to Lend and Borrow ........................................ 31

        2.1.2.    Single Disbursement to Borrower...................................... 31

        2.1.3.    The Note ........................................................................... 31

        2.1.4.    Use of Proceeds ................................................................ 31

    **Section 2.2.**  Interest Rate. ........................................................................... 31

        2.2.1.    Interest Rate ..................................................................... 31

        2.2.2.    Default Rate ..................................................................... 31

        2.2.3.    Interest Calculation .......................................................... 31

        2.2.4.    Usury Savings .................................................................. 31

        2.2.5.    EEA Financial Institutions ............................................... 32

    **Section 2.3.**  Loan Payments......................................................................... 32

        2.3.1.    Payment Before Maturity Date ......................................... 32

        2.3.2.    Intentionally Omitted........................................................ 32

        2.3.3.    Payment on Maturity Date ................................................ 32

        2.3.4.    Late Payment Charge ........................................................ 32

        2.3.5.    Method and Place of Payment .......................................... 33

    **Section 2.4.**  Prepayments. ........................................................................... 33

        2.4.1.    Voluntary Prepayments...................................................... 33

        2.4.2.    Liquidation Event; Mandatory Prepayments ..................... 34

        2.4.3.    Prepayments After Default ................................................ 34

    **Section 2.5.**  Defeasance. ............................................................................. 35

        2.5.1.    Conditions to Defeasance .................................................. 35

        2.5.2.    Defeasance Collateral Account.......................................... 36

        2.5.3.    Successor Borrower .......................................................... 37

# TABLE OF CONTENTS
(continued)

Page

Section 2.6.   Release of Collateral. ................................................................... 37

Section 2.7.   Mortgage Loan Cash Management; Establishment of Certain
               Accounts. .................................................................................. 38

III.   REPRESENTATIONS AND WARRANTIES .................................................. 38

Section 3.1.   Borrower Representations ......................................................... 38

       3.1.1.     Organization ................................................................. 39

       3.1.2.     Proceedings ................................................................. 39

       3.1.3.     No Conflicts ................................................................. 39

       3.1.4.     Litigation ..................................................................... 40

       3.1.5.     Agreements ................................................................. 40

       3.1.6.     Consents ...................................................................... 40

       3.1.7.     Title .............................................................................. 40

       3.1.8.     No Plan Assets ............................................................ 41

       3.1.9.     Compliance ................................................................. 41

       3.1.10.    Financial Information .................................................. 42

       3.1.11.    Condemnation ............................................................ 42

       3.1.12.    Easements; Utilities and Public Access ..................... 42

       3.1.13.    Separate Lots ............................................................... 42

       3.1.14.    Assessments ................................................................. 42

       3.1.15.    Enforceability .............................................................. 42

       3.1.16.    No Prior Assignments ................................................. 43

       3.1.17.    Insurance ...................................................................... 43

       3.1.18.    Licenses ....................................................................... 43

       3.1.19.    Flood Zone .................................................................. 43

       3.1.20.    Physical Condition ...................................................... 43

       3.1.21.    Boundaries ................................................................... 44

       3.1.22.    Leases ........................................................................... 44

       3.1.23.    Filing, Recording and Other Taxes ............................ 44

       3.1.24.    Single Purpose ............................................................ 45

       3.1.25.    Tax Filings ................................................................... 48

       3.1.26.    Solvency ...................................................................... 48

       3.1.27.    Federal Reserve Regulations ...................................... 49

# TABLE OF CONTENTS
### (continued)

**Page**

3.1.28. Organizational Chart................................................................ 49

3.1.29. Bank Holding Company ........................................................... 49

3.1.30. No Other Debt ........................................................................ 49

3.1.31. Investment Company Act ......................................................... 49

3.1.32. Intentionally Omitted. .............................................................. 49

3.1.33. No Bankruptcy Filing .............................................................. 49

3.1.34. Full and Accurate Disclosure ................................................... 50

3.1.35. Foreign Person ........................................................................ 50

3.1.36. No Change in Facts or Circumstances; Disclosure .................... 50

3.1.37. Management Agreement ........................................................... 50

3.1.38. Intentionally Omitted .............................................................. 50

3.1.39. Ground Lease .......................................................................... 50

3.1.40. Prime Lease............................................................................. 52

3.1.41. Patriot Act. ............................................................................. 53

3.1.42. Intentionally Omitted .............................................................. 53

3.1.43. No Casualty ............................................................................ 53

3.1.44. Purchase Options ..................................................................... 54

3.1.45. Use of Property ....................................................................... 54

3.1.46. Fiscal Year .............................................................................. 54

3.1.47. Material Agreements................................................................ 54

3.1.48. Other Obligations and Liabilities............................................. 54

3.1.49. Illegal Activity ....................................................................... 54

3.1.50. Underwriting Representations .................................................. 54

3.1.51. Contractual Obligations ........................................................... 55

3.1.52. Mortgage Loan Representations and Warranties ....................... 55

3.1.53. Subsidiaries ............................................................................ 55

Section 3.2.   Survival of Representations ............................................ 55

IV.   BORROWER COVENANTS ................................................................ 55

Section 4.1.   Borrower Affirmative Covenants .................................... 55

4.1.1.   Existence; Compliance with Legal Requirements .................. 55

4.1.2.   Taxes and Other Charges ....................................................... 56

4.1.3.   Litigation ............................................................................... 57

# TABLE OF CONTENTS
### (continued)

**Page**

| | | |
|---|---|---|
| 4.1.4. | Access to Property | 57 |
| 4.1.5. | Further Assurances; Supplemental Mortgage Affidavits | 57 |
| 4.1.6. | Financial Reporting | 58 |
| 4.1.7. | Title to Property | 61 |
| 4.1.8. | Estoppel Statement | 61 |
| 4.1.9. | Leases | 62 |
| 4.1.10. | Alterations | 64 |
| 4.1.11. | Required Repairs | 66 |
| 4.1.12. | Material Agreements | 66 |
| 4.1.13. | Unfunded Obligations | 66 |
| 4.1.14. | Costs of Enforcement/Remedying Defaults | 66 |
| 4.1.15. | Business and Operations | 67 |
| 4.1.16. | Station Renovations | 67 |
| 4.1.17. | Intentionally Omitted | 67 |
| 4.1.18. | Handicapped Access | 67 |
| 4.1.19. | Recycled Entity | 67 |
| 4.1.20. | Notice of Certain Events | 67 |
| 4.1.21. | Further Assurances; Power of Attorney | 68 |
| 4.1.22. | Taxes on Security | 68 |
| 4.1.23. | Ground Lease | 68 |
| 4.1.24. | Prime Lease | 71 |
| 4.1.25. | Patriot Act Compliance | 74 |
| 4.1.26. | Mortgage Borrower Covenants | 74 |
| 4.1.27. | Curing | 74 |
| 4.1.28. | Special Distributions | 74 |
| 4.1.29. | Net Liquidation Proceeds After Debt Service | 74 |
| **Section 4.2.** | Borrower Negative Covenants | 75 |
| 4.2.1. | Liens | 75 |
| 4.2.2. | Dissolution | 75 |
| 4.2.3. | Change in Business | 75 |
| 4.2.4. | Debt Cancellation | 75 |
| 4.2.5. | Affiliate Transactions | 75 |

# TABLE OF CONTENTS
### (continued)

**Page**

| | | | |
|---|---|---|---|
| | 4.2.6. | Zoning | 75 |
| | 4.2.7. | Assets | 76 |
| | 4.2.8. | No Joint Assessment | 76 |
| | 4.2.9. | Principal Place of Business | 76 |
| | 4.2.10. | ERISA | 76 |
| | 4.2.11. | Material Agreements, Operating Agreements | 77 |
| | 4.2.12. | Change of Name, Identity or Structure | 77 |
| | 4.2.13. | Special Purpose | 77 |
| | 4.2.14. | Prohibited Person | 77 |
| | 4.2.15. | Ground Lease | 78 |
| | 4.2.16. | Prime Lease | 78 |
| | 4.2.17. | Bankruptcy-Related Covenants | 78 |
| | 4.2.18. | No Contractual Obligations | 79 |
| | 4.2.19. | Limitations on Distributions | 79 |
| | 4.2.20. | Limitations on Securities Issuances | 79 |
| V. | INSURANCE, CASUALTY AND CONDEMNATION | | 79 |
| | **Section 5.1.** | Insurance | 79 |
| | **Section 5.2.** | Casualty and Condemnation. | 80 |
| | 5.2.1. | Casualty | 80 |
| | 5.2.2. | Condemnation | 80 |
| | 5.2.3. | Casualty Proceeds | 81 |
| VI. | RESERVE FUNDS | | 81 |
| | **Section 6.1.** | Reserve Funds. | 81 |
| | **Section 6.2.** | Reserve Funds Generally. | 82 |
| | 6.2.1. | Security Interest | 82 |
| | 6.2.2. | Investments; Income Taxes | 82 |
| | **Section 6.3.** | Provisions Regarding Letters of Credit | 83 |
| | 6.3.1. | Event of Default | 83 |
| | 6.3.2. | Security for Debt | 83 |
| | 6.3.3. | Limitations on Letters of Credit | 83 |
| | 6.3.4. | Additional Rights of Lender | 84 |

# TABLE OF CONTENTS
## (continued)

**Page**

VII.   PROPERTY MANAGEMENT ............................................................................ 84

    **Section 7.1.**   Management Agreement ..................................................... 84

    **Section 7.2.**   Prohibition Against Termination or Modification .................. 84

    **Section 7.3.**   Replacement of Manager ................................................... 85

    **Section 7.4.**   Matters Concerning Manager .............................................. 85

VIII.  TRANSFERS ................................................................................................ 85

    **Section 8.1.**   Transfers Generally ........................................................... 85

    **Section 8.2.**   Permitted Property Transfer (Assumption) ......................... 87

    **Section 8.3.**   Permitted Transfers of Interests in Borrower ..................... 89

    **Section 8.4.**   Property Documents ........................................................... 91

    **Section 8.5.**   Economic Sanctions, Anti-Money Laundering and Transfers ................. 91

    **Section 8.6.**   Subordinate Mezzanine Loan .............................................. 91

IX.    SALE AND SECURITIZATION OF LOAN .................................................... 93

    **Section 9.1.**   Sale of Loan and Securitization ......................................... 93

    **Section 9.2.**   Securitization Indemnification ........................................... 95

X.     DEFAULTS ................................................................................................... 99

    **Section 10.1.** Event of Default ................................................................ 99

    **Section 10.2.** Remedies ........................................................................... 102

    **Section 10.3.** Right to Cure Defaults ....................................................... 103

    **Section 10.4.** Remedies Cumulative ........................................................ 104

XI.    MISCELLANEOUS ....................................................................................... 104

    **Section 11.1.** Successors and Assigns ..................................................... 104

    **Section 11.2.** Lender's Discretion ........................................................... 104

    **Section 11.3.** Governing Law .................................................................. 104

    **Section 11.4.** Modification, Waiver in Writing ........................................ 106

    **Section 11.5.** Delay Not a Waiver ........................................................... 106

    **Section 11.6.** Notices .............................................................................. 106

    **Section 11.7.** Trial by Jury ..................................................................... 108

    **Section 11.8.** Headings ........................................................................... 108

    **Section 11.9.** Severability ....................................................................... 108

    **Section 11.10.** Preferences ...................................................................... 108

    **Section 11.11.** Waiver of Notice ............................................................. 108

# TABLE OF CONTENTS
## (continued)

**Page**

**Section 11.12.** Remedies of Borrower ........................................................................... 109

**Section 11.13.** Expenses; Indemnity ............................................................................. 109

**Section 11.14.** Schedules Incorporated ......................................................................... 110

**Section 11.15.** Offsets, Counterclaims and Defenses .................................................. 110

**Section 11.16.** No Joint Venture or Partnership ............................................................ 110

**Section 11.17.** Publicity ................................................................................................ 110

**Section 11.18.** Waiver of Marshalling of Assets .......................................................... 111

**Section 11.19.** Waiver of Offsets/Defenses/Counterclaims........................................... 111

**Section 11.20.** Conflict; Construction of Documents; Reliance ................................... 111

**Section 11.21.** Brokers and Financial Advisors ............................................................ 112

**Section 11.22.** Exculpation ........................................................................................... 112

**Section 11.23.** Prior Agreements .................................................................................. 116

**Section 11.24.** Servicer ................................................................................................. 117

**Section 11.25.** Intentionally Omitted ............................................................................ 117

**Section 11.26.** Creation of Security Interest ................................................................. 117

**Section 11.27.** Intentionally Omitted. ........................................................................... 118

**Section 11.28.** Set-Off.................................................................................................... 118

**Section 11.29.** Component Notes; Adjustment of Loan ................................................ 118

**Section 11.30.** New Mezzanine Loan ............................................................................ 119

**Section 11.31.** Approvals; Third Parties; Conditions ................................................... 120

**Section 11.32.** Limitation on Liability of Lender's Officers, Employees, etc .............. 121

**Section 11.33.** Certain Additional Rights of Lender (VCOC)....................................... 121

**Section 11.34.** Intercreditor Agreement ........................................................................ 121

**Section 11.35.** Intentionally Omitted. ........................................................................... 122

**Section 11.36.** Syndication. ........................................................................................... 122

**Section 11.37.** Additional Provisions............................................................................ 125

**Section 11.38.** Prepayment Fee**................................................................................... 127

SCHEDULES

Schedule I        –    Rent Roll

## TABLE OF CONTENTS
(continued)

**Page**

Schedule II          –    Immediate Repairs

Schedule III         –    Organizational Chart

Schedule IV          -    Permitted Fund Manager


Exhibit A            –    Description of Ground Lease

Exhibit B            –    Description of Prime Lease

## MEZZANINE LOAN AGREEMENT

**THIS MEZZANINE LOAN AGREEMENT**, is dated and entered into as of May 8, 2018 (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "**Agreement**"), between **KOOKMIN BANK CO., LTD., AS TRUSTEE OF KTB CRE DEBT FUND NO. 8**, having an address at 13FL, KTB Bldg, 66 Yeouidaero, Yeongdeungpo-gu, Seoul 07325, Korea (together with its successors and assigns, "**Lender**") and **UNION STATION SOLE MEMBER LLC**, a Delaware limited liability company having an address at c/o Ashkenazy Acquisition Corp., 150 East 58th Street, Penthouse, New York, New York 10155 (together with its permitted successors and assigns, collectively "**Borrower**").

All capitalized terms used herein shall have the respective meanings set forth in Article I hereof.

## W I T N E S S E T H:

**WHEREAS**, Citi Real Estate Funding Inc. and Natixis Real Estate Capital LLC (together with each of their respective successors and assigns, collectively, "**Mortgage Lender**"), is making a certain mortgage loan in the original principal amount of $330,000,000 (the "**Mortgage Loan**") to Union Station Investco LLC, a Delaware limited liability company ("**Mortgage Borrower**") pursuant to that certain Loan Agreement, dated as of the date hereof, by and between Mortgage Borrower and Mortgage Lender (as amended, supplemented or otherwise modified from time to time, the "**Mortgage Loan Agreement**"), and secured by, among other things, that certain first priority Leasehold Deed of Trust, Security Agreement, Assignment of Leases and Rents, Financing Statement and Fixture Filing, by the Mortgage Borrower in favor of Mortgage Lender (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Security Instrument**"), pursuant to which Mortgage Borrower has granted to Mortgage Lender a first priority security interest on, among other things, the real property and other collateral as more fully described in the Security Instrument;

**WHEREAS**, Borrower is the legal and beneficial owner of one hundred percent (100%) of the limited liability company interests in Mortgage Borrower;

**WHEREAS**, Borrower desires to obtain the Loan from Lender;

**WHEREAS**, as a condition precedent to the obligation of Lender to make the Loan to Borrower, Borrower has entered into that certain Pledge and Security Agreement dated as of the date hereof, in favor of Lender (as amended, supplemented or otherwise modified from time to time, the "**Pledge Agreement**"), pursuant to which Borrower has granted to Lender a first priority security interest in the Collateral (as hereinafter defined) as collateral security for the Debt (as hereinafter defined); and

**WHEREAS**, subject to and in accordance with the terms and conditions of this Agreement and the other Loan Documents and based upon the representations, warranties, covenants and undertakings of Borrower herein and therein contained, Lender is willing to make the Loan to Borrower.

NOW, **THEREFORE**, in consideration of the covenants set forth in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree, represent and warrant as follows:

## I.        DEFINITIONS; PRINCIPLES OF CONSTRUCTION

**Section 1.1.**    Definitions.  For all purposes of this Agreement, except as otherwise expressly provided:

"**2018 Annual Expenditure Schedule**" shall have the meaning set forth in Section 4.1.6(h) hereof.

"**Accounts**" shall mean any account now or hereafter established by this Agreement or the other Loan Documents (including, without limitation, any Reserve Funds).

"**Affiliate**" shall mean, as to any Person, any other Person that (i) directly or indirectly, owns ten percent (10%) or more of the legal, beneficial or economic interests in such Person, (ii) is in Control of, is Controlled by or is under common ownership or Control with such Person, (iii) is a director or officer of such Person or of an Affiliate of such Person and/or (iv) is the spouse, issue or parent of such Person or of an Affiliate of such Person.

"**Affiliated Manager**" shall mean any Manager that is an Affiliate of Borrower, Mortgage Borrower, Subordinate Mezzanine Borrower, or Guarantor.

"**Aggregate Debt Service Coverage Ratio**" shall mean the ratio calculated by Lender on a monthly basis of (i) Underwritable Cash Flow to (ii) the aggregate amount of Debt Service, Mortgage Loan Debt Service, and Subordinate Mezzanine Debt Service, if any, for the twelve (12) month period immediately preceding the date of calculation; provided, that the foregoing shall be calculated by Lender (A) based upon the actual amount of debt service which would be due for such period, and (B) assuming that the Loan, the Mortgage Loan, and the Subordinate Mezzanine Loan, if any, had been in place for the entirety of said period.

"**Aggregate Debt Yield**" shall mean, as of any date of calculation, a ratio conveyed as a percentage in which: (i) the numerator is the Underwritable Cash Flow; and (ii) the denominator is the then outstanding aggregate principal balance of the Loan, the Mortgage Loan, and the Subordinate Mezzanine Loan.

"**Agreement**" shall have the meaning set forth in the introductory paragraph hereto.

"**ALTA**" shall mean American Land Title Association or any successor thereto.

"**Alteration Costs**" shall have the meaning set forth in Section 4.1.10 hereof.

"**Alteration Threshold**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Annual Budget**" shall mean the operating and capital budget for the Property prepared by Mortgage Borrower in accordance with Section 4.1.6(h) hereof for the applicable period or Fiscal Year.

"**Appraisal**" shall mean an appraisal of the Property in its then "as is" condition, prepared not more than ninety (90) days prior to the Closing Date (or other relevant date with respect to an updated Appraisal or an Appraisal) by a member of the American Institute of Real Estate Appraisers selected by Lender, which appraisal (i) shall meet the minimum appraisal standards for national banks promulgated by the Comptroller of the Currency pursuant to Title XI of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, as amended (FIRREA), and (ii) otherwise shall be in form and substance satisfactory to Lender in its reasonable discretion.

"**Approved Accounting Method**" shall mean GAAP, federal tax basis accounting (consistently applied) or such other method of accounting, consistently applied, as may be reasonably acceptable to Lender.

"**Approved Annual Budget**" shall have the meaning set forth in Section 4.1.6(h) hereof.

"**Ashkenazy**" shall mean Ben Ashkenazy, an individual.

"**Assignment and Assumption**" shall have the meaning set forth in Section 11.36 hereof.

"**Assignment of Leases**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Award**" shall mean any compensation paid by any Governmental Authority in connection with a Condemnation.

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"**Bail-In Legislation**" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"**Bankruptcy Action**" shall mean, with respect to any Person, (i) such Person filing a voluntary petition under the Bankruptcy Law; (ii) the filing of an involuntary petition against such Person under the Bankruptcy Law, which involuntary petition is not discharged, stayed or dismissed within sixty (60) days; (iii) such Person filing an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other Person under the Bankruptcy Law, or soliciting or causing to be solicited petitioning creditors for an involuntary petition from any Person; (iv) such Person consenting to or acquiescing in or joining in an

3

application for the appointment of a custodian, receiver, trustee, or examiner for such Person or any portion of the Property or the Collateral; or (v) such Person making an assignment for the benefit of creditors, or admitting, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due.

"**Bankruptcy Law**" shall mean the U.S. Bankruptcy Code, any other federal, state or foreign bankruptcy or insolvency law and any comparable foreign laws relating to bankruptcy, insolvency or creditors' rights.

"**Borrower**" shall have the meaning set forth in the introductory paragraph hereto.

"**Borrower's Operating Agreement**" shall mean that certain Second Amended and Restated Limited Liability Company Agreement of Borrower, dated as of the date hereof, among Ashkenazy Union Station Holdings LLC, a Delaware limited liability company, as the Member (as defined therein) and the independent managers named therein each as an Independent Manager (as defined therein), as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the terms and provisions hereof.

"**Borrower Party**" means Borrower, Mortgage Borrower, Subordinate Mezzanine Borrower, Affiliates of Borrower, Mortgage Borrower, Subordinate Mezzanine Borrower, and the respective direct or indirect officers, directors, employees, members, partners, and principals of any of the foregoing.

"**Borrower's Recourse Liabilities**" shall have the meaning set forth in Section 11.22 hereof.

"**Business Day**" shall mean any day other than a Saturday, a Sunday or a legal holiday on which national banks are not open for general business in (i) the State of New York, (ii) the state where the corporate trust office of the Trustee is located, (iii) the state where the servicing offices of the Servicer are located, or (iv) the state where the Cash Management Bank's offices are located.

"**Capital Expenditures**" shall mean, for any period, the amounts expended for items capitalized under GAAP (including expenditures for replacements, building improvements, major repairs, alterations, tenant improvements and leasing commissions).

"**Casualty**" shall mean any casualty, damage or injury, by fire or otherwise, to the Property or any part thereof.

"**Citi**" shall mean Citi Real Estate Funding Inc., a New York corporation.

"**Closing Date**" shall mean the date hereof.

"**Co-Lender**" shall have the meaning set forth in Section 11.36 hereof.

4

"**Co-Lending Agreement**" shall mean any co-lending agreement entered into between KTB, individually as a Co-Lender and as agent and the other Co-Lenders, as the same may be further supplemented modified, amended or restated.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended and as it may be further amended from time to time, any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"**Collateral**" shall mean the "Collateral" as such term is defined in the Pledge Agreement and shall also include all amounts on deposit in any Account and any and all other property or collateral in which Lender is granted a security interest under any of the Loan Documents, in each case whether existing on the date hereof or hereafter pledged or assigned to Lender.

"**Condemnation**" shall mean a temporary or permanent taking by any Governmental Authority as the result or in lieu or in anticipation of the exercise of the right of condemnation or eminent domain, of all or any part of the Property, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade affecting the Property or any part thereof.

"**Contractual Obligation**" shall mean as to any Person, any provision of any security issued by such Person or of any agreement, instrument or undertaking to which such Person is a party or by which it or any of its property is bound, or any provision of the foregoing.

"**Control**" means (a) the ownership, directly or indirectly, of fifty percent (50%) or more of the equity interests in a Person, (b) the right to receive at least fifty percent (50%) of any distributions from such entity or (c) the possession, directly or indirectly, of the power to direct or cause the direction of the management, policies or activities of a Person, whether through ownership of voting securities, by contract or operation of law or otherwise, and the terms "**Controlled**" and "**Controlling**" shall have correlative meanings.

"**Control Affiliate**" shall mean, as to any Person, any other Person that is in Control of, is Controlled by or is under common ownership or Control with such Person.

"**Covered Disclosure Information**" shall have the meaning set forth in Section 9.2(b) hereof.

"**Crowdfunded Person**" means a Person capitalized primarily by monetary contributions (A) of less than $35,000 each from more than 35 investors who are individuals and (B) which are funded primarily (I) in reliance upon Regulation Crowdfunding promulgated by the Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended and/or (II) through internet-mediated registries, platforms or similar portals, mail-order subscriptions, benefit events and/or other similar methods.

"**DBRS**" means DBRS, Inc., and its successor-in-interest.

"**Debt**" shall mean the Outstanding Principal Balance, together with all interest accrued and unpaid thereon, any applicable Prepayment Fee and all other sums due to Lender in respect of the Loan under the Note, this Agreement or any other Loan Document.

"**Debt Service**" shall mean, with respect to any particular period of time, the aggregate amount of scheduled principal and interest payments due and payable under the Note and this Agreement.

"**Deemed Approval Requirements**" shall mean, with respect to any matter, that Lender shall not withhold its consent or disapproval to any such action for more than five (5) Business Days after Second Notice for approval thereof has been delivered by Borrower, accompanied by the applicable documents and a detailed description of the request including any descriptive information reasonably required for Lender to make an informed decision for which approval is sought, provided that (i) Borrower has submitted a request ("**Initial Notice**") for Lender's approval in an envelope labeled "Priority" and delivered to Lender by overnight delivery and otherwise in accordance with the provisions of Section 11.6 and which request stated at the top of the first page in bold lettering **"LENDER'S RESPONSE IS REQUIRED WITHIN TEN (10) BUSINESS DAYS OF RECEIPT OF THIS NOTICE PURSUANT TO THE TERMS OF A LOAN AGREEMENT BETWEEN THE UNDERSIGNED AND LENDER;"** (ii) Lender shall have failed to respond to the Initial Notice within the aforesaid time-frame; (iii) Borrower has submitted a second request ("**Second Notice**") for Lender's approval in an envelope labeled "Priority" and delivered to Lender by overnight delivery and otherwise in accordance with the provisions of Section 11.6 and which request stated at the top of the first page in bold lettering **"LENDER'S RESPONSE IS REQUIRED WITHIN FIVE (5) BUSINESS DAYS OF RECEIPT OF THIS NOTICE PURSUANT TO THE TERMS OF A LOAN AGREEMENT BETWEEN THE UNDERSIGNED AND LENDER;"** and (iv) Lender shall have failed to respond to the Second Notice within the aforesaid time-frame. In the event that Lender fails to make a reasonable request for more information or to either approve such request or disapprove such request (such disapproval stating the reasons for such disapproval) for more than five (5) Business Days after receipt of the Second Notice, the action that was the subject of said request shall be deemed approved.

"**Default**" shall mean the occurrence of any event hereunder or under any other Loan Document which, but for the giving of notice or passage of time, or both, would be an Event of Default.

"**Default Rate**" shall mean, with respect to the Loan, a rate per annum equal to the lesser of (i) the Maximum Legal Rate or (ii) the greater of (A) one percent (1%) above the Prime Rate or (B) five percent (5%) above the Interest Rate.

"**Defeasance Collateral**" shall mean, in connection with the Defeasance Event, U.S. Obligations which provide payments (i) on or prior to, but as close as possible to, the Business Day immediately preceding all scheduled Monthly Payment Dates up to and including payment in full of the Loan on the Open Prepayment Commencement Date and other scheduled payment dates, if any, under the Note after the Defeasance Date upon which payments are required under the Note and this Agreement, and (ii) in amounts equal to the scheduled payments due on such Monthly

Payment Dates up to and including the payment in full of the Loan on the Open Prepayment Commencement Date or other scheduled payment dates under the Note and this Agreement (including, without limitation, scheduled payments of principal, interest, servicing fees (if any), and any other amounts due under the Loan Documents on such Monthly Payment Dates or other scheduled payment dates) (such scheduled payments, collectively, the "**Scheduled Defeasance Payments**").

"**Defeasance Collateral Account**" shall have the meaning set forth in Section 2.5.2 hereof.

"**Defeasance Date**" shall have the meaning set forth in Section 2.5.1(a) hereof.

"**Defeasance Event**" shall have the meaning set forth in Section 2.5.1 hereof.

"**Defeasance Expiration Date**" shall mean the date that is two (2) years from the "startup day" within the meaning of Section 860G(a)(9) of the Code for the REMIC Trust established in connection with the last Securitization involving any portion of the Loan.

"**Defeasance Security Agreement**" shall mean a pledge and security agreement in form and substance that would be satisfactory to a prudent lender pursuant to which Borrower grants Lender a perfected, first-priority security interest in the Defeasance Collateral Account and the Defeasance Collateral.

"**Disclosure Document(s)**" shall mean any written materials used or provided to any prospective investors and/or Rating Agencies in connection with any public offering or private placement of Securities in a Securitization, including, without limitation, a prospectus, prospectus supplement, private placement memorandum, offering memorandum, offering circular, term sheet, road show presentation materials or other offering documents, marketing materials or information provided to prospective investors, and Exchange Act Filings and information therein, in each case in preliminary or final form and including any amendments, supplements, exhibits, annexes and other attachments thereto in connection with a Securitization and designated as a "Disclosure Document" by Lender in its sole and absolute discretion.

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

7

"**Eligibility Requirements**" shall mean, with respect to any Person, that such Person (i) has total assets (in name or under management or advisement) in excess of $1,000,000,000 and (except with respect to a pension advisory firm, asset manager or similar fiduciary) capital/statutory surplus or shareholder's equity of at least $400,000,000 and (ii) is regularly engaged in the business of making or owning (or, in the case of a pension advisory firm or similar fiduciary, regularly engaged in managing investments in) commercial real estate loans (including mezzanine loans to direct or indirect owners of commercial properties, which loans are secured by pledges of direct or indirect ownership interests in the owners of such commercial properties) or operating commercial properties.

"**Eligible Account**" shall mean a separate and identifiable account from all other funds held by the holding institution that is either (i) an account or accounts (or subaccounts thereof) maintained with a federal or state-chartered depository institution or trust company which complies with the definition of Eligible Institution or (ii) a segregated trust account or accounts (or subaccounts thereof) maintained with a federal or state chartered depository institution or trust company acting in its fiduciary capacity that has a Moody's rating of at least "Baa3" and that, in the case of a state chartered depository institution or trust company is subject to regulations substantially similar to 12 C.F.R. § 9.10(b), having in either case a combined capital and surplus of at least $50,000,000 and subject to supervision or examination by federal and state authority. An Eligible Account shall not be evidenced by a certificate of deposit, passbook or other instrument.

"**Eligible Institution**" shall mean (a) a depository institution or trust company insured by the Federal Deposit Insurance Corporation (i) the short term unsecured debt obligations or commercial paper of which are rated at least "A-1+" (or its equivalent) from each of the Rating Agencies (in the case of accounts in which funds are held for thirty (30) days or less) and (ii) the long term unsecured debt obligations of which are rated at least "A+" (or its equivalent) from each of the Rating Agencies (in the case of accounts in which funds are held for more than thirty (30) days) or (b) such other depository institution otherwise approved by the Rating Agencies from time-to-time.

"**Enforcement Action**" shall mean any initiation by Lender of foreclosure proceedings, exercise of a power of sale, or proceedings for the appointment of a receiver (or the initiation by Lender of any judicial action in respect of the Note as a predicate to any such proceedings or exercise of a power of sale).  For avoidance of doubt, a filing of a complaint in a court of competent jurisdiction, or a delivery of notice of foreclosure by power of sale in accordance with applicable law, or an application for appointment of a receiver in accordance with applicable law, or the filing of an executed notice of default in the real property records, shall each independently constitute an Enforcement Action even if there is a subsequent delay.  In addition, an "Enforcement Action" shall be deemed to have occurred, without any need for further action by Lender or any other party, immediately upon the occurrence of any of the following: (x) the Maturity Date (unless Lender fails to initiate any of the foregoing actions within thirty (30) days thereafter), (y) any Bankruptcy Action in respect of Borrower, Mortgage Borrower or Guarantor, or (z) any affirmative or collusive action by Borrower, Mortgage Borrower, Guarantor, any Affiliate, officer, director or representative of Borrower that controls Borrower, the holder of any

8

Subordinate Mezzanine Loan, or any other party to stay, hinder or delay Lender's ability to initiate an Enforcement Action.

"**Environmental Indemnity**" shall mean that certain Environmental Indemnity Agreement (Mezzanine Loan), dated as of the Closing Date, executed by Borrower and Guarantor in connection with the Loan for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**ERISA**" shall have the meaning set forth in Section 4.2.10 hereof.

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"**Event of Default**" shall have the meaning set forth in Section 10.1 hereof.

"**Exchange Act**" shall have the meaning set forth in Section 9.2(a) hereof.

"**Exchange Act Filing**" shall mean a filing pursuant to the Exchange Act in connection with or relating to a Securitization.

"**Executive Order**" shall mean an Executive Order of the President of the United States of America.

"**Extraordinary Expense**" shall have the meaning set forth in Section 4.1.6(h) hereof.

"**Fiscal Year**" shall mean each twelve (12) month period commencing on January 1 and ending on December 31 during each year of the Term.

"**Fitch**" shall mean Fitch, Inc.

"**Flood Acts**" shall have the meaning set forth in Section 5.1(a)(viii)(C) hereof.

"**GAAP**" shall mean generally accepted accounting principles, consistently applied, in effect from time to time, as set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the accounting profession), or in such other statements by such entity as may be in general use by significant segments of the U.S. accounting profession.

"**Government List**" shall mean, collectively, (i) the Specially Designated Nationals and Blocked Persons Lists maintained by OFAC, (ii) any other list of terrorists, terrorist organizations or narcotics traffickers maintained pursuant to any of the Rules and Regulations of OFAC, and (iii) any similar lists maintained by the United States Department of State, the United

States Department of Commerce or any other Governmental Authority or pursuant to any Executive Order.

"**Governmental Authority**" shall mean any court, agency, board, bureau, commission, department, office or other authority of any nature whatsoever of any governmental unit (foreign, federal, state, county, district, municipal, city or otherwise) whether now or hereafter in existence.

"**Grantor Trust**" shall mean a grantor trust under Subpart E of Part 1 of Subchapter J of the Code.

"**Gross Rents**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Ground Lease**" shall mean that certain Sublease Agreement, by and between Ground Lessor, as landlord, and Borrower, as tenant, dated as of October 31, 1985, as assigned to Borrower, and as the same has been amended as set forth on Exhibit A, and as may be further amended, restated, supplemented or otherwise modified from time to time in accordance with the terms hereof.

"**Ground Lessor**" shall mean Union Station Redevelopment Corp., a District of Columbia nonprofit corporation, together with its successors and assigns.

"**Ground Rent**" shall mean any rent, additional rent or other charge payable by the tenant under the Ground Lease.

"**Guarantor**" shall mean (a) Ashkenazy and/or (b) if the context requires, a Replacement Guarantor that has assumed all obligations of Guarantor under any Guaranty or Environmental Indemnity in accordance with the terms and conditions of this Agreement, the Recourse Guaranty and any other Loan Documents (or, as the case may be, has delivered one or more Replacement Recourse Documents in accordance with the terms and conditions hereof).

"**Guarantor Control Condition**" shall mean a condition which shall be deemed satisfied if Borrower is Controlled (under clause (c) of the definition of Control) (directly or indirectly) by one or more Guarantors.

"**Guaranty**" shall mean, individually or collectively as the context requires, the Recourse Guaranty or any other guaranty or indemnity (other than the Environmental Indemnity or any replacement thereof) provided by Guarantor to Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Hazardous Substances**" shall have the meaning set forth in the Environmental Indemnity.

"**Immediate Repairs**" shall have the meaning set forth in Section 4.1.11 hereof.

"**Improvements**" shall have the meaning set forth in the granting clause of the Security Instrument.

24498846.11

"**Indebtedness**" shall mean, for any Person, without duplication: (i) all indebtedness or liability of such Person (including, without limitation, for borrowed money, for amounts drawn under a letter of credit, or for deferred purchase price of property or services (including trade obligations) for which such Person or its assets is liable), (ii) all unfunded amounts under a loan agreement, letter of credit, or other credit facility for which such Person would be liable if such amounts were advanced thereunder, (iii) all amounts required to be paid by such Person pursuant to any agreement to purchase, to provide funds for payment, to supply funds, or to invest in any Person, (iv) all indebtedness or liabilities guaranteed by such Person, directly or indirectly, (v) all obligations under leases that constitute capital leases for which such Person is liable, (vi) all obligations of such Person under interest rate swaps, caps, floors, collars and other interest hedge agreements, in each case whether such Person is liable contingently or otherwise, as obligor, guarantor or otherwise, or in respect of which obligations such Person otherwise assures any other Person against loss, and (vii) any property-assessed clean energy loans or similar indebtedness, including, without limitation, if such loans or indebtedness are made or otherwise provided by any Governmental Authority and/or secured or repaid (directly or indirectly) by any taxes or similar assessments.

"**Indemnified Liabilities**" shall have the meaning set forth in Section 11.13(b) hereof.

"**Independent Manager**" shall mean an individual who has at least three (3) years of prior experience as an independent director, independent manager or independent member and who is provided by CT Corporation, Corporation Service Company, National Registered Agents, Inc., Wilmington Trust Company, Stewart Management Company, Lord Securities Corporation or, if none of those companies is then providing professional Independent Managers, another nationally-recognized company reasonably approved by Lender, in each case that is not an Affiliate of Borrower and that provides professional Independent Managers and other corporate services in the ordinary course of its business, and which individual is duly appointed as an Independent Manager and is not, and has never been, and will not while serving as Independent Manager, be, any of the following:

       (a)    a member, partner, equity holder, manager, director, officer or employee of Borrower, Mortgage Borrower, Subordinate Mezzanine Borrower, or any of their respective equity holders or Affiliates (other than as an Independent Manager or Special Member (as defined in Borrower's Operating Agreement) of Borrower or an Affiliate of Borrower that is not in the direct chain of ownership of Borrower and that is required by a creditor to be a single-purpose bankruptcy-remote entity, provided that such Independent Manager is employed by a company that routinely provides professional Independent Managers or managers in the ordinary course of its business);

       (b)    a creditor, supplier or service provider (including provider of professional services) to Borrower, Mortgage Borrower, Subordinate Mezzanine Borrower, or any of their equity holders or Affiliates (other than a nationally-recognized company that routinely provides professional Independent Managers and other corporate services to Borrower, Mortgage Borrower, Subordinate Mezzanine Borrower, or any of their respective Affiliates in the ordinary course of their businesses);

(c)     a family member of any such member, partner, equity holder, manager, director, officer, employee, creditor, supplier or service provider; or

(d)     a Person that Controls any of <u>(a)</u>, <u>(b)</u> or <u>(c)</u> above.

The same natural person may not serve as an Independent Manager of Borrower, Mortgage Borrower, or Subordinate Mezzanine Borrower.

"<u>**Information**</u>" shall have the meaning set forth in <u>Section 11.36(b)(ii)</u> hereof.

"<u>**Initial Notice**</u>" shall have the meaning set forth in the definition of "Deemed Approval Requirements" in <u>Section 1.1</u> hereof.

"<u>**Insolvency Opinion**</u>" shall mean, as the context may require, (i) that certain bankruptcy non-consolidation opinion letter, dated the Closing Date, rendered by O'Halloran Ryan PLLC in connection with the Loan or (ii) any other bankruptcy non-consolidation opinion delivered to Lender in connection with the Loan (including any bankruptcy non-consolidation opinion delivered to Lender subsequent to the closing of the Loan in accordance with the Loan Documents).

"<u>**Insurance Premiums**</u>" shall have the meaning set forth in the Mortgage Loan Agreement.

"<u>**Intercreditor Agreement**</u>" shall mean, individually or collectively, as the context requires, the Mezzanine Intercreditor Agreement and the Subordinate Mezzanine Intercreditor Agreement, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"<u>**Interest Period**</u>" shall mean, with respect to any Monthly Payment Date, the period beginning on (and including) the ninth (9th) day of each calendar month during the term of the Loan and ending on (and including) the eighth (8th) day of the succeeding calendar month; <u>provided</u>, <u>however</u>, that the initial Interest Period shall begin on (and include) the Closing Date and shall end on (and include) the eighth (8th) day of the calendar month succeeding the Closing Date.

"<u>**Interest Rate**</u>" shall mean 5.8000%.

"<u>**IRS Code**</u>" shall mean the Internal Revenue Code of 1986, as amended from time to time or any successor statute.

"<u>**JLL Management Agreement**</u>" shall mean that certain Master Retail Management Agreement dated as of June 5, 2007, by and between JLL and certain affiliates of Borrower, among others, as the same has been amended from time to time.

"<u>**JLL**</u>" shall mean Jones Lang LaSalle Americas, Inc., a Maryland corporation.

"**KTB**" shall mean Kookmin Bank Co., Ltd., as trustee of KTB CRE Debt Fund No. 8, a Korean investment trust.

"**Lease**" shall mean any lease, sublease, subsublease, letting, license (including, without limitation the New Tradition License Agreement), concession or other agreement (whether now or hereafter in effect) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of any space in the Property, and every modification, amendment or other agreement relating to such lease, sublease, subsublease, letting, license, concession or other agreement and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto; provided, however, notwithstanding anything to the contrary in the Security Instrument, for purposes of this Agreement, the term Lease shall exclude the Ground Lease and the Prime Lease.

"**Legal Requirements**" shall mean all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees, demands and injunctions of Governmental Authorities affecting the Loan, any Secondary Market Transactions with respect to the Loan, Borrower, Mortgage Borrower, Guarantor, the Collateral, or the Property or any part thereof or the ownership, construction, alteration, use, management or operation of the Property or any part thereof, whether now or hereafter enacted and in force, including, without limitation, zoning and land use laws and the Americans with Disabilities Act of 1990, and all permits, licenses and authorizations and regulations relating thereto.

"**Lender**" shall have the meaning set forth in the introductory paragraph hereto.

"**Lender Indemnitees**" shall mean (i) Lender and any designee of Lender, (ii) any Affiliate of Lender that has filed any registration statement relating to a Securitization or has acted as the sponsor or depositor in connection with such Securitization, (iii) any Affiliate of Lender that acts as an underwriter, placement agent or initial purchaser in connection with a Securitization, (iv) any other co-underwriters, co-placement agents or co-initial purchasers in connection with a Securitization, (v) each Person who controls (within the meaning of Section 15 of the Exchange Act) any Person described in any of the foregoing clauses, (vi) any Person who is or will have been involved in the origination of the Loan, (vii) any Person who is or will have been involved in the servicing of the Loan, (viii) any Person in whose name the Lien created by the Pledge Agreement and the other Loan Documents are or will be filed, (ix) any Person who may hold or acquire or will have held a full or partial interest in the Loan (including, but not limited to, investors or prospective investors in the Securities, as well as custodians, trustees and other fiduciaries who hold or have held a full or partial interest in the Loan evidenced for the benefit of third parties), (x) any Person who holds or acquires or will have held a participation or other full or partial interest in the Loan, whether during the Term or as a part of or following a foreclosure of the Loan, (xi) any successors by merger, consolidation or acquisition of all or a substantial portion of Lender's assets and business and (xii) the respective officers, directors, shareholders, partners, members, employees, agents, representatives, contractors, subcontractors, Affiliates, participants, successors and assigns of any Person described in any of the foregoing clauses.

"**Letter of Credit**" shall mean an irrevocable, unconditional, transferable (without payment of any transfer fee), clean sight draft letter of credit reasonably acceptable to Lender and,

13

following a Securitization, acceptable to the Rating Agencies (either an evergreen letter of credit or one which does not expire until at least thirty (30) days after (i) the Stated Maturity Date or (ii) such earlier date as such Letter of Credit is no longer required pursuant to the terms of this Agreement and the other Loan Documents) in favor of Lender and entitling Lender to draw thereon in New York, New York based solely on a statement purportedly executed by an officer of Lender stating that it has the right to draw thereon, issued by a domestic Eligible Institution or the U.S. agency or branch of a foreign Eligible Institution.  If at any time the bank issuing any such Letter of Credit shall cease to be an Eligible Institution, Lender shall have the right immediately to draw down the same in full and hold the proceeds of such draw in accordance with the applicable provisions of this Agreement.

"**Lien**" shall mean any mortgage, deed of trust, deed to secure debt, indemnity deed of trust, lien (statutory or otherwise), pledge, hypothecation, assignment, security interest, easement, restrictive covenant, preference, or any other encumbrance, charge or transfer of, or any agreement to enter into or create any of the foregoing affecting all or any portion of the Property or the Collateral or any interest therein, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialman's and other similar liens and encumbrances.

"**Liquidation Event**" shall have the meaning set forth in Section 2.4.2 hereof.

"**Loan**" shall mean the loan in the original principal amount of One Hundred Million and No/100 Dollars ($100,000,000.00) made by Lender to Borrower pursuant to this Agreement.

"**Loan Documents**" shall mean, collectively, this Agreement, the Note, the Pledge Agreement, the Guaranty, the Environmental Indemnity, the Subordination of Management Agreement, the Post-Closing Agreement, and all other documents, agreements, certificates and instruments now or hereafter executed and/or delivered in connection with the Loan.

"**Major Lease**" shall mean any Lease which (i) either individually or when taken together with (A) any other Lease with the same Tenant and (B) any other Lease for contiguous space with an Affiliate of such Tenant, and assuming the exercise of all expansion rights exercisable prior to the Stated Maturity Date contained in such Lease or Leases, covers or is expected to cover more than (x) if for office use, twenty-five thousand (25,000) square feet at the Property or (y) if for any other use, ten thousand (10,000) square feet at the Property, (ii) either individually or when taken together with any other Lease with the same Tenant accounts for ten percent (10%) or more of the total gross income for the Property, (iii) contains an option or preferential right to purchase all or any portion of the Property, (iv) is with an Affiliate of Borrower, Mortgage Borrower, Guarantor or any Manager (but not including any management office demising space not in excess of one thousand (1,000) square feet) as Tenant, or (v) is entered into during the continuance of an Event of Default.

"**Management Agreement**" shall mean, collectively, (i) the JLL Management Agreement, or (ii) any other management agreement executed and delivered by Mortgage

14

Borrower in accordance with the terms and provisions hereof pursuant to which a Manager manages the Property, provided that any such management agreement shall be a management agreement with a Qualified Manager and shall be in form and substance reasonably acceptable to Lender; provided, that, Lender, at its option following a Securitization, may require that Borrower shall have obtained a Rating Agency Confirmation from the Rating Agencies.

"**Manager**" shall mean (i) JLL or (ii) if the context requires, a Qualified Manager that manages the Property in accordance with the terms and provisions of this Agreement and the other Loan Documents pursuant to a Management Agreement or Replacement Management Agreement, as the case may be.

"**Material Action**" shall have the meaning set forth in Section 3.1.24(s).

"**Material Adverse Effect**" shall mean any material adverse effect upon (i) the business operations, economic performance, assets, condition (financial or otherwise), equity, contingent liabilities, prospects, material agreements or results of operations of Borrower, Mortgage Borrower, the Collateral, or the Property, (ii) the ability of Borrower, Mortgage Borrower, or Guarantor to perform its obligations under any Loan Document or Mortgage Loan Document, as applicable, to which it is a party or any Major Lease, the Ground Lease or the Prime Lease, (iii) the enforceability or validity of any Loan Document, the perfection or priority of any Lien created under any Loan Document or the rights, interests and remedies of Lender under any Loan Document or (iv) the value, use or operation of the Property or the Collateral or the cash flows from the Property.

"**Material Agreements**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Material Condemnation**" shall mean a Condemnation (a) in which more than fifteen percent (15%) of the land constituting the Property is taken, (b) in which any land taken is located on any portion of the Property other than along the perimeter or periphery thereof, (c) in which any portion of the Improvements is taken, (d) the proffered Award for which, or the anticipated amount of any settlement or compromise of which, exceeds one percent (1%) of the original principal amount of the Loan, or (e) which results in the amount of parking at the Property not being in compliance with Legal Requirements, the REA and each Major Lease.

"**Maturity Date**" shall mean the date on which the final payment of principal of the Note becomes due and payable as therein or herein provided, whether at the Stated Maturity Date, by declaration of acceleration, or otherwise.

"**Maximum Legal Rate**" shall mean the maximum non-usurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the Indebtedness evidenced by the Note and as provided for herein or in the other Loan Documents, under the laws of such Governmental Authorities whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the Loan.

"**Mezzanine Intercreditor Agreement**" shall mean that certain Intercreditor Agreement, dated as of the date hereof, among Lender and Mortgage Lender, as such agreement

15

may be amended, modified, replaced and/or otherwise changed from time to time, and which agreement (as the same may be modified, replaced, restated and/or otherwise changed from time to time) may be on such terms as Lender and Mortgage Lender agree in their respective sole discretion.

"**Monthly Debt Service Payment Amount**" shall mean, with respect to each Monthly Payment Date, a payment equal to the amount of interest which has accrued during the preceding Interest Period computed at the Interest Rate.

"**Monthly Payment Date**" shall mean the ninth (9th) day of every calendar month occurring during the Term commencing with June 9, 2018.

"**Moody's**" shall mean Moody's Investors Service, Inc.

"**Mortgage Borrower**" shall have the meaning set forth in the Recitals hereof.

"**Mortgage Borrower Operating Agreement**" shall mean the "Borrower's Operating Agreement" as defined in the Mortgage Loan Documents.

"**Mortgage Lender**" shall have the meaning set forth in the Recitals hereof.

"**Mortgage Loan**" shall have the meaning set forth in the Recitals hereof.

"**Mortgage Loan Agreement**" shall have the meaning set forth in the Recitals hereof.

"**Mortgage Loan Cash Management Accounts**" shall mean, collectively, the Clearing Account and the Cash Management Account (as each such term is defined in the Mortgage Loan Agreement).

"**Mortgage Loan Cash Management Provisions**" shall mean the terms and conditions of the Mortgage Loan Documents relating to cash management (including, without limitation, those relating to the Clearing Account, the Clearing Account Agreement, the Cash Management Account, and the Cash Management Agreement (as each such term is defined in the Mortgage Loan Agreement)).

"**Mortgage Loan Debt Service**" shall mean, with respect to any particular period of time, the aggregate amount of scheduled principal and interest payments due and payable under the Mortgage Loan Documents.

"**Mortgage Loan Documents**" shall mean the documents evidencing or securing the Mortgage Loan, as any of the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the Intercreditor Agreement.

"**Mortgage Loan Event of Default**" shall mean an "Event of Default" as defined in the Mortgage Loan Documents.

16

"**Mortgage Loan Reserve Funds**" shall mean the "Reserve Funds" as defined in the Mortgage Loan Agreement.

"**Mortgage Loan Restoration Provisions**" shall mean the terms and conditions of the Mortgage Loan Agreement relating to Restoration in connection with a Casualty and/or Condemnation to the Property.

"**Natixis**" shall mean Natixis Real Estate Capital LLC, a Delaware limited liability company.

"**Net Liquidation Proceeds After Debt Service**" shall mean, with respect to any Liquidation Event, all amounts paid to or received by or on behalf of Mortgage Borrower in connection with such Liquidation Event, including, without limitation, proceeds of any sale, refinancing or other disposition or liquidation, less (i) Lender's and/or Mortgage Lender's reasonable out-of-pocket costs incurred in connection with the recovery thereof, (ii) in the case of a casualty or condemnation, the out-of-pocket costs incurred by Mortgage Borrower in connection with a Restoration of all or any portion of a Property made in accordance with the Mortgage Loan Documents, (iii) amounts required or permitted to be deducted therefrom, and amounts paid, pursuant to the Mortgage Loan Documents to Mortgage Lender, (iv) in the case of a foreclosure sale, disposition or transfer of a Property in connection with realization thereon following a Mortgage Loan Event of Default, such reasonable and customary out-of-pocket costs and expenses of sale or other disposition (including reasonable attorneys' fees and brokerage commissions), (v) in the case of a foreclosure sale, such out-of-pocket costs and expenses incurred by Mortgage Lender under the Mortgage Loan Documents as Mortgage Lender shall be entitled to receive reimbursement for under the terms of the Mortgage Loan Documents, (vi) in the case of a refinancing of the Mortgage Loan, such out-of-pocket costs and expenses (including reasonable attorneys' fees) of such refinancing as shall be reasonably approved by Mortgage Lender, and (vii) the amount of any prepayments required pursuant to the Mortgage Loan Documents and/or the Loan Documents, in connection with any such Liquidation Event.

"**Net Proceeds**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**New Mezzanine Borrower**" shall have the meaning set forth in Section 11.30 hereof.

"**New Mezzanine Lender**" shall have the meaning set forth in Section 11.30 hereof.

"**New Mezzanine Loan**" shall have the meaning set forth in the Section 11.30 hereof.

"**New Mezzanine Option**" shall have the meaning set forth in Section 11.30 hereof.

"**New Tradition License Agreement**" shall mean that certain License Agreement, dated as of November 13, 2017, between Borrower, as licensor, and New Tradition Outdoor LLC, as licensee, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Note**" shall mean that certain Promissory Note (Mezzanine Loan) of even date herewith in the principal amount of $100,000,000, made by Borrower in favor of Lender, as the same may be amended, restated, replaced, extended, renewed, supplemented, severed, split, or otherwise modified from time to time.

"**Notice**" shall have the meaning set forth in Section 11.6 hereof.

"**O&M Plan**" shall mean that certain Asbestos Operations & Maintenance Plan, dated April 27, 2018 prepared by EBI Consulting, with respect to the Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Obligations**" shall mean, collectively, Borrower's obligations for the payment of the Debt and the performance of the Other Obligations.

"**OFAC**" shall mean the Office of Foreign Assets Control or, if the context requires, any successor Governmental Authority.

"**Officer's Certificate**" shall mean a certificate delivered to Lender by Borrower which is signed by an authorized officer of Borrower.

"**Open Prepayment Commencement Date**" shall mean the Monthly Payment Date occurring six (6) Monthly Payment Dates prior to the Stated Maturity Date.

"**Operating Agreement**" shall mean each of the REA and any other covenants, restrictions or agreements of record and of a material nature relating to the construction, operation or use of the Property.

"**Operating Expenses**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Operating Income**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Organizational Documents**" shall mean, as to any Person, the organizational or governing documents of such Person, including the certificate of incorporation and by-laws with respect to a corporation; the certificate of formation or organization and operating agreement with respect to a limited liability company; and the certificate of limited partnership and partnership agreement with respect to a limited partnership.

"**Other Charges**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Other Obligations**" shall mean:  (i) all obligations of Borrower contained in this Agreement, the Note or any other Loan Document, and (ii) all obligations of Borrower contained in any renewal, extension, amendment, restatement, modification, consolidation, change of, or substitution or replacement for all or any part of this Agreement, the Note or any other Loan Document, excluding, in each case, Borrower's obligation for the payment of the Debt.

18

"**Outstanding Principal Balance**" shall mean, as of any date, the outstanding principal balance of the Loan.

"**Par Prepayment Date**" shall mean May 8, 2025.

"**Patriot Act**" shall mean, collectively, (i) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (USA PATRIOT ACT) of 2001, as the same was restored and amended by Uniting and Strengthening America by Fulfilling Rights and Ensuring Effective Discipline Over Monitoring Act (USA FREEDOM Act) of 2015, (ii) all statutes, orders, rules and regulations of the United States government and its various executive departments, agencies and offices related to applicable anti-money laundering laws, rules and regulations and (iii) any amendment, extension, replacement or other modification of any of the foregoing from time to time and any corresponding provisions of future laws.

"**Permitted Encumbrances**" shall mean, collectively, (i) the Liens and security interests created by the Loan Documents and the Mortgage Loan Documents, (ii) all Liens, encumbrances and other matters expressly set forth on Schedule A or Schedule B of the Title Insurance Policy, (iii) Liens, if any, for Taxes or Other Charges imposed by any Governmental Authority not yet due or delinquent, (iv) such other title and survey exceptions as Lender has approved or may approve in writing in Lender's sole discretion (including those items shown on the Survey delivered by Borrower to Lender prior to the Closing Date), (v) Property Documents entered into in accordance with Section 8.4 hereof, (vi) rights of existing and future Tenants as tenants only pursuant to written Leases entered into in conformity with the provisions of the Loan Documents and the Mortgage Loan Documents, (vii) mechanics', materialmen's or similar Liens, if any, and Liens for delinquent taxes or impositions, in each case only if such Liens are being contested in accordance with the terms of the Loan Documents, or are discharged within sixty (60) days of their filing, and (viii) Liens with respect to Permitted Equipment Financing.

"**Permitted Equipment Financing**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Permitted Fund Manager**" shall mean any Person that on the date of determination is not subject to a case under the Bankruptcy Code or a Prohibited Person and is either (i) one of the entities listed on Schedule IV attached hereto or any other nationally-recognized manager of investment funds investing in debt or equity interests relating to commercial real estate, or (ii) an entity that is a Qualified Lender pursuant to clauses (vii)(A), (B), (C) or (D) of the definition thereof, in each case which are investing through a fund or funds with aggregate committed capital under management of at least $400,000,000.

"**Permitted Investments**" shall mean "permitted investments" as then defined and required by the Rating Agencies.

"**Permitted Release Date**" shall mean the third (3rd) anniversary of the Closing Date.

19

"**Permitted Transfer**" shall mean any of the following:  (i)  any Lease of space in the Improvements to Tenants in accordance with the terms and provisions of Section 4.1.9 hereof and Section 4.1.9 of the Mortgage Loan Agreement, (ii) any Transfer permitted without Lender's prior consent in accordance with the terms and provisions of Section 8.3 hereof, and (iii) a pledge by Subordinate Mezzanine Borrower of direct or indirect interests in Borrower and other collateral pursuant to the applicable Subordinate Mezzanine Loan Documents in connection with the Subordinate Mezzanine Loan, and a foreclosure or transfer in lieu of foreclosure of any such interest or collateral pursuant to any exercise of remedies under the applicable Subordinate Mezzanine Loan Documents (with respect to each pledge, foreclosure or transfer in lieu) in accordance with the Intercreditor Agreement, this Agreement and the other Loan Documents.

"**Permitted Transferee**" shall mean (i) Guarantor, (ii) any trust directly or indirectly owned and Controlled by Guarantor for the benefit of Guarantor, Guarantor's spouse and/or Guarantor's children, (iii) an entity that is (x) any one of (a) a pension fund or plan that owns (1) at least $750,000,000 in real estate assets or (2) at least $750,000,000 in assets, provided that in the case of such pension fund or plan it is managed by an entity that controls at least $750,000,000 in real estate assets, (b) a pension fund or plan advisor that immediately prior to the transfer controls at least $750,000,000 in real estate assets and is acting on behalf of a party that satisfies clause (a) above, (c) a U.S. insurance company with a net worth of at least $250,000,000 and that controls at least $750,000,000 in real estate assets, (d) a U.S. banking corporation with combined capital and surplus of at least $250,000,000 and that controls at least $750,000,000 in real estate assets, (e) intentionally omitted, (f) any entity that owns or operates comparable retail buildings in central business districts of major metropolitan markets in the United States totaling at least 3,000,000 square feet, has a net worth of at least $250,000,000 and controls at least $750,000,000 in real estate assets, or (g) any government entity or plan, real estate company or investment fund that has a net worth of at least $250,000,000 and that either controls at least $750,000,000 in real estate assets or is managed by an entity that controls at least $750,000,000 in real estate assets and (y) approved by Lender (the consent of the Lender shall not to be unreasonably withheld, conditioned or delayed).  Each of the thresholds contained in this definition shall be exclusive of the Property.

"**Person**" shall mean any individual, corporation, partnership, limited liability company, joint venture, estate, trust, unincorporated association, any other entity, any Governmental Authority and any fiduciary acting in such capacity on behalf of any of the foregoing.

"**Pledge Agreement**" shall have the meaning set forth in the Recitals hereof.

"**Pledged Company Interests**" shall have the meaning set forth in the Pledge Agreement.

"**Policies**" or "**Policy**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**PPI Index**" shall mean, as of any date, the most recent Producer Price Index (all Commodities) as published by the U.S. Department of Labor, Bureau of Labor Statistics, or any substitute index hereafter adopted by the U.S. Department of Labor.

"**Prepayment Date**" shall mean the date on which the Loan is prepaid in accordance with the terms hereof.

"**Prepayment Fee**" shall mean (i) three percent (3%) of the principal balance of the Note if prepaid after the Par Prepayment Date but on or prior to the day immediately preceding the sixth (6th) Monthly Payment Date occurring after the Par Prepayment Date, (ii) two and one-half percent (2.5%) of the principal balance of the Note if prepaid on or after the sixth Monthly Payment Date occurring after the Par Prepayment Date but on or prior to the day immediately preceding the first anniversary of the Par Prepayment Date, (iii) two percent (2%) of the principal balance of the Note if prepaid on or after the first anniversary of the Par Prepayment Date but on or prior to the day immediately preceding the eighteenth (18th) Monthly Payment Date occurring after the Par Prepayment Date, (iv) one and one-half percent (1.5%) of the principal balance of the Note if prepaid on or after the eighteenth (18th) Monthly Payment Date occurring after the Par Prepayment Date but on or prior to the day immediately preceding the second anniversary of the Par Prepayment Date, (v) one-half percent (0.5%) of the principal balance of the Note if prepaid on or after the second anniversary of the Par Prepayment Date but on or prior to the day immediately preceding the Open Prepayment Commencement Date, and (vi) zero percent (0%) if prepaid after the Open Prepayment Commencement Date.

"**Prime Lease**" shall mean that certain Sublease Agreement, by and between Prime Lease Lessor, as landlord, and Ground Lessor, as tenant, dated as of October 31, 1985, as the same has been amended as set forth on Exhibit B and as may be further amended, restated, supplemented or otherwise modified from time to time in accordance with the terms hereof.

"**Prime Lease Lessor**" shall mean the United States of America, acting through the Federal Railroad Administrator, together with its successors and assigns.

"**Prime Rate**" shall mean the rate of interest published in The Wall Street Journal from time to time as the "**Prime Rate**." If The Wall Street Journal ceases to publish the "**Prime Rate**," the Lender shall select an equivalent publication that publishes such "**Prime Rate**," and if such "**Prime Rates**" are no longer generally published or are limited, regulated or administered by a governmental or quasi-governmental body, then Lender shall select a comparable interest rate index.

"**Prohibited Entity**" means any Person which (i) is a statutory trust or similar Person, (ii) owns a direct or indirect interest in Borrower, Mortgage Borrower, the Collateral, or the Property through a tenancy-in-common or other similar form of ownership interest and/or (iii) is a Crowdfunded Person.

"**Prohibited Person**" shall mean any Person:

(i)      listed in the Annex to, or is otherwise subject to the prohibitions of, Executive Order No. 13224 on Terrorist Financing, effective September 24,

21

2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism or any other similar prohibitions contained in the rules and regulations of OFAC or in any enabling legislation or other Executive Orders;

(ii) that is owned or Controlled by, or acting for or on behalf of, any Person that is listed in the Annex to, or is otherwise subject to the prohibitions of, Executive Order No. 13224;

(iii) with whom Lender is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering law, including Executive Order No. 13224;

(iv) who commits, threatens, conspires to commit or supports "terrorism" as defined in Executive Order No. 13224;

(v) that is named as a "specially designated national and blocked person" on the most current list published by OFAC at its official website or at any replacement website or other replacement official publication of such list;

(vi) that is subject to trade restrictions under United States law, including, without limitation, the Patriot Act, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder;

(vii) that is listed on any Government List; or

(viii) who is an Affiliate of any Person that is described by or that satisfies any of clauses (i) through (vii) above.

"**Projections**" shall have the meaning set forth in Section 11.36 hereof.

"**Property**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Property Documents**" shall have the meaning set forth in Section 8.4 hereof.

"**Qualified Lender**" shall mean (i) Citi, (ii) any affiliate of Citi, (iii) Natixis, (iv) any affiliate of Natixis, (v) KTB, (vi) any affiliate of KTB, or (vii) one or more of the following:

(A) a real estate investment trust, bank, saving and loan association, investment bank, insurance company, trust company, commercial credit corporation, pension plan, pension fund or pension advisory firm, mutual fund, government entity or plan, provided that any such Person referred to in this clause (vii)(A) satisfies the Eligibility Requirements;

22

(B)      an investment company, money management firm or "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act or an institutional "accredited investor" within the meaning of Regulation D under the Securities Act, provided that any such Person referred to in this clause (vii)(B) satisfies the Eligibility Requirements;

(C)      an institution substantially similar to any of the foregoing entities described in clause (vii)(A), (vii)(B) or (vii)(E) that satisfies the Eligibility Requirements;

(D)      any entity Controlled by, Controlling or under common Control with any of the entities described in clause (vii)(A), (vii)(B) or (vii)(C) above or clause (vii)(E) below; or

(E)      an investment fund, limited liability company, limited partnership or general partnership where a Permitted Fund Manager acts as general partner, managing member or fund manager and at least fifty percent (50%) of the equity interests in such investment vehicle are owned, directly or indirectly, by one or more of the following: a Qualified Lender under clause (vii)(A), (vii)(B), (vii)(C) or (vii)(D) above, an institutional "accredited investor", within the meaning of Regulation D promulgated under the Securities Act, and/or a "qualified institutional buyer" or both within the meaning of Rule 144A promulgated under the Exchange Act, provided such institutional "accredited investors" or "qualified institutional buyers" that are used to satisfy the fifty percent (50%) test set forth above in this clause (vii)(E) satisfy the financial tests in clause (i) of the definition of Eligibility Requirements.

"**Qualified Manager**" shall mean (i) JLL, (ii) a management company that is an Affiliate of Borrower and is Controlled by Ashkenazy, or (iii) a reputable and experienced manager (which may be an Affiliate of Borrower) which, in the reasonable judgment of Lender, possesses experience in managing properties similar in location, size, class, use and operation of the Property (it being understood and agreed that any entity that owns or operates comparable retail buildings in central business districts of major metropolitan markets in the United States totaling at least 3,000,000 square feet shall be deemed to satisfy such experience requirement); provided, that, in each case, (a) following a Securitization, Borrower shall have obtained a Rating Agency Confirmation, (b) if such Person is an Affiliate of Borrower, a new bankruptcy non-consolidation opinion reasonably acceptable to Lender in its reasonable discretion and, following a Securitization, acceptable to the Rating Agencies in their respective sole discretion, and (c) such Person's management of the Property must be permitted pursuant to the terms and provisions of the Ground Lease and the Prime Lease.

"**Rating Agencies**" shall mean, prior to the first Securitization of the Loan, each of S&P, Moody's, Fitch, Morningstar Credit Ratings, LLC and DBRS, or any other nationally-recognized statistical rating agency which has been designated by Lender and, after the first Securitization of the Loan, shall mean any of the foregoing that has rated any of the Securities.

"**Rating Agency Confirmation**" shall mean, collectively, a written affirmation from each of the Rating Agencies that the rating of the Securities (or any class thereof) by such

Rating Agency immediately prior to the occurrence of the event with respect to which such Rating Agency Confirmation is sought will not be qualified, downgraded or withdrawn as a result of the occurrence of such event, which affirmation may be granted or withheld in such Rating Agency's sole and absolute discretion.  For the purposes of this Agreement and the other Loan Documents, if any Rating Agency shall waive, decline or refuse to review or otherwise engage any request for a Rating Agency Confirmation hereunder or under the other Loan Documents (hereinafter, a "**RA Consent**"), such RA Consent shall be deemed to eliminate, for such request only, the condition that a Rating Agency Confirmation by such Rating Agency (only) be obtained for purposes of this Agreement or the other Loan Documents, as applicable; provided, however, if Lender does not have a separate and independent approval right with respect to such event set forth herein or in the other Loan Documents, as applicable, then the term "**Rating Agency Confirmation**" shall be deemed instead to require the approval of Lender based on its good faith determination.  For purposes of clarity, any such waiver, declination or refusal to review or otherwise engage in any request for a Rating Agency Confirmation hereunder or under the other Loan Documents shall not be deemed a waiver, declination or refusal to review or otherwise engage in any subsequent request for a Rating Agency Confirmation hereunder or under the other Loan Documents, and the condition for Rating Agency Confirmation pursuant to this Agreement and the other Loan Documents for any subsequent request shall apply regardless of any previous waiver, declination or refusal to review or otherwise engage in such prior request.

"**REA**" shall mean, individually and/or collectively (as the context requires), any reciprocal easement, material easement agreement, or any other similar agreement affecting the Property (or any portion thereof) (if any), any amendment, restatement, replacement or other modification thereof, any future reciprocal easement or similar agreement affecting the Property (or any portion thereof) entered into in accordance with the applicable terms and conditions hereof and any amendment, restatement, replacement or other modification thereof.

"**Recourse Guaranty**" shall mean that certain Guaranty of Recourse Obligations (Mezzanine Loan), dated as of the Closing Date, executed by Guarantor in connection with the Loan for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Registration Statement**" shall have the meaning set forth in Section 9.2(b) hereof.

"**Regulation AB**" shall mean Regulation AB under the Securities Act and the Exchange Act, as such regulation may be amended from time to time.

"**REMIC Trust**" shall mean a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code that holds the Note or any interest therein.

"**Rents**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Replacement Guarantor**" shall mean one or more substitute guarantors that each (i) has a net worth of not less than Five Hundred Million Dollars ($500,000,000) as determined by Lender in its reasonable discretion and liquidity (including up to Five Million Dollars ($5,000,000.00) of availability under unrestricted lines of credit) of Twenty Million Dollars

($20,000,000) in each case, exclusive of the Property, (ii) is not a Prohibited Person, (iii) is not subject to a Bankruptcy Action and (iv) is otherwise reasonably acceptable to Lender.

"**Replacement Management Agreement**" shall mean, collectively, either (i) a management agreement with a Qualified Manager substantially in the same form and substance as the Management Agreement that it is replacing, or (ii) a management agreement with a Qualified Manager, which management agreement shall be in form and substance reasonably acceptable to Lender; provided, that, with respect to this <u>clause (ii)</u>, Lender, at its option following a Securitization, may require that Borrower shall have obtained a Rating Agency Confirmation from the Rating Agencies, and a Subordination of Management Agreement.

"**Replacement Recourse Documents**" shall have the meaning set forth in <u>Section 8.3</u> hereof.

"**Reserve Accounts**" shall mean any reserve or escrow account established by this Agreement or the other Loan Documents (including, without limitation, the accounts into which the Substitute Reserve funds (if any) are deposited).

"**Reserve Funds**" shall mean any reserve or escrow funds established by this Agreement or the other Loan Documents (including, without limitation, the funds on deposit in any Substitute Reserve).

"**Restoration**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Restoration Threshold**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Restricted Party**" shall mean, collectively, (i) Borrower, Mortgage Borrower, and Guarantor, and (ii) any shareholder, partner, member, non-member manager or any other direct or indirect legal or beneficial owner of, Borrower, Mortgage Borrower, Guarantor or any non-member manager.

"**S&P**" shall mean Standard & Poor's Ratings Services.

"**Satisfactory Search Results**" shall mean the results of Lender's customary "know your customer", credit history check, litigation, lien, bankruptcy, judgment and other similar searches with respect to the applicable transferee and its applicable affiliates, in each case, (i) revealing no matters which would have a Material Adverse Effect and (ii) yielding results which are otherwise acceptable to Lender in its reasonable discretion.  Borrower shall pay all of Lender's costs, fees and expenses in connection with the foregoing and, notwithstanding the forgoing, no such search results shall constitute "Satisfactory Search Results" until such costs, fees and expenses are paid in full.

"**Scheduled Defeasance Payments**" shall have the meaning set forth in the definition of the term "Defeasance Collateral".

25

"**Secondary Market Transactions**" shall have the meaning set forth in Section 9.1(a) hereof.

"**Second Notice**" shall have the meaning set forth in the definition of "Deemed Approval Requirements" in Section 1.1 hereof.

"**Securities**" shall have the meaning set forth in Section 9.1(a) hereof.

"**Securities Act**" shall have the meaning set forth in Section 9.2(a) hereof.

"**Securitization**" shall have the meaning set forth in Section 9.1(a) hereof.

"**Securitization Indemnified Parties**" shall have the meaning set forth in Section 9.2(b) hereof.

"**Securitization Vehicle**" means each REMIC Trust or a Grantor Trust into which all or a portion of the Loan has been transferred.

"**Security Instrument**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Servicer**" shall have the meaning set forth in Section 11.24(a) hereof.

"**Servicing Agreement**" shall have the meaning set forth in Section 11.24(a) hereof.

"**Severed Loan Documents**" shall have the meaning set forth in Section 10.2(d) hereof.

"**SPE Party**" shall have the meaning set forth in Section 3.1.24(n) hereof.

"**Special Purpose Entity**" shall mean a Person which (i) complies with the provisions of Section 3.1.24 or (ii) otherwise qualifies as a single-purpose, bankruptcy-remote entity under criteria established by the Rating Agencies.

"**Springing Recourse Event**" shall have the meaning set forth in Section 11.22 hereof.

"**State**" shall mean the State or Commonwealth in which the Property or the Collateral or any part of the foregoing is located.

"**Stated Maturity Date**" shall mean May 9, 2028; provided, however, that, in the event Lender changes the Monthly Payment Date in accordance with this Agreement, the Stated Maturity Date shall also be deemed to have been changed such that the Stated Maturity Date and the Monthly Payment Date shall occur on the same calendar day and, if requested by Lender, Borrower shall promptly execute an amendment to this Agreement to evidence such change.

"**Subordinate Mezzanine Borrower**" shall have the meaning set forth in Section 8.6 hereof.

"**Subordinate Mezzanine Debt Service**" shall mean, with respect to any particular period of time, the aggregate amount of scheduled principal and interest payments due and payable under the Subordinate Mezzanine Loan Documents.

"**Subordinate Mezzanine Event of Default**" shall mean a default by Subordinate Mezzanine Borrower under any Subordinate Mezzanine Loan Document beyond any applicable notice and cure period.

"**Subordinate Mezzanine Intercreditor Agreement**" shall have the meaning set forth in Section 8.6(g) hereof.

"**Subordinate Mezzanine Lender**" shall have the meaning set forth in Section 8.6(f) hereof.

"**Subordinate Mezzanine Loan**" shall have the meaning set forth in Section 8.6 hereof.

"**Subordinate Mezzanine Loan Documents**" shall have the meaning set forth in Section 8.6(b) hereof.

"**Subordinate Mezzanine Loan Event of Default**" shall mean an "Event of Default" as defined in the Subordinate Mezzanine Loan Documents.

"**Subordinate Mezzanine Reserve Funds**" shall mean any reserve or escrow fund established under the Subordinate Mezzanine Loan.

"**Subordination of Management Agreement**" shall mean that certain Subordination of Management Agreement and Management Fees, dated as of the Closing Date, among Lender, Borrower, Mortgage Borrower, and Manager, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Substitute Cash Management Accounts**" shall have the meaning set forth in Section 2.7(b) hereof.

"**Substitute Reserves**" shall have the meaning set forth in Section 6.1 hereof.

"**Successor Borrower**" shall have the meaning set forth in Section 2.5.3 hereof.

"**Survey**" shall mean a current land survey for the Property, certified to the title insurance company and Lender and its successors and assigns, in form and substance satisfactory to Lender and prepared by a professional and properly licensed land surveyor satisfactory to Lender in accordance with the most current Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys together with the surveyor's seal affixed to the Survey and a certification from the surveyor in form and substance acceptable to Lender.

"**Syndication**" shall have the meaning set forth in Section 11.36 hereof.

"**Taxes**" shall mean all real estate and personal property taxes, assessments, water rates or sewer rents, payments to Governmental Authorities in lieu of taxes, now or hereafter levied or assessed or imposed against the Property or any part thereof, together with all interest and penalties thereon.

"**Tenant**" shall mean any Person obligated by contract or otherwise to pay monies (including a percentage of gross income, revenue or profits) under any Lease now or hereafter affecting all or any part of the Property.

"**Tenant Estoppel**" shall mean each estoppel certificate from a Tenant in connection with the Loan delivered to Lender on or prior to the Closing Date.

"**Term**" shall mean the term of the Loan.

"**Title Insurance Policy**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Trade Debt**" shall have the meaning set forth in Section 3.1.24(e) hereof.

"**Trade Debt Threshold Amount**" shall mean an amount not to exceed two percent (2%) of the outstanding principal balance of the Loan.

"**Transfer**" shall have the meaning set forth in Section 8.1(a) hereof.

"**Transferee**" shall have the meaning set forth in Section 8.2(a)(iii) hereof

"**Transferee's SPE Constituent Entity**" shall mean, with respect to any Transferee, the entity that qualifies as a single purpose, bankruptcy remote entity under criteria established by the Rating Agencies that is (i) the general partner of such Transferee, if such Transferee is a limited partnership, or (ii) the managing member of such Transferee, if such Transferee is a multi-member limited liability company.

"**Transferee's Sponsors**" shall mean, with respect to any Transferee, such Transferee's shareholders, general partners or managing members that, directly or indirectly, (i) own fifty percent (50%) or more of the legal, beneficial and economic interests in such Transferee and (ii) are in Control of such Transferee.

"**Treasury Note Rate**" shall mean, at the time of the prepayment, as applicable, the rate of interest per annum equal to the yield to maturity (converted by Lender to the equivalent monthly yield using Lender's then system of conversion) of the United States Treasury obligations selected by the holder of the Note having maturity dates closest to, but not exceeding, the remaining term to the Stated Maturity Date.

"**Trigger Period**" shall have the meaning set forth in the Mortgage Loan Agreement.

28

"**Trustee**" shall mean any trustee of a Securitization Vehicle.

"**UCC**" or "**Uniform Commercial Code**" shall mean the Uniform Commercial Code as in effect in States in which perfection of a security interest in the Collateral or the Accounts, as applicable, is made.

"**Unfunded Obligations**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Underwritable Cash Flow**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Updated Information**" shall have the meaning set forth in Section 9.1(a)(i) hereof.

"**U.S. Bankruptcy Code**" shall mean Title 11 of the United States Code entitled "**Bankruptcy**", as amended from time to time, and any successor statute or statutes and all rules and regulations from time to time promulgated thereunder.

"**U.S. Obligations**" shall mean (i) direct full faith and credit obligations of the United States of America that are not subject to prepayment, call or early redemption or (ii) to the extent acceptable to the Rating Agencies, other "government securities" within the meaning of Section 2(a)(16) of the Investment Company Act of 1940, as amended.

"**Waived Cash Management Accounts**" shall have the meaning set forth in Section 2.7(b) hereof.

"**Waived Cash Management Provisions**" shall have the meaning set forth in Section 2.7(b) hereof.

"**Waived Reserve Funds**" shall have the meaning set forth in Section 6. hereof.

"**Waived Restoration Provisions**" shall have the meaning set forth in Section 5.2.3 hereof.

"**Work Threshold**" shall mean Three Hundred Thousand and No/100 Dollars ($300,000.00).

"**Write-Down and Conversion Powers**" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

"**Yield Maintenance Premium**" shall mean an amount equal to the excess, if any, of (a) the present value (determined using a discount rate equal to the Treasury Note Rate at such time) of all scheduled payments of principal and interest payable in respect of the principal amount

29

of the Loan being prepaid through the Open Prepayment Commencement Date over (b) the principal amount of the Loan being prepaid.

   **Section 1.2.** <u>Principles of Construction</u>.  All references to sections and schedules are to sections and schedules in or to this Agreement unless otherwise specified.  All uses of the word "including" shall mean "including, without limitation," unless the context shall indicate otherwise.  Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.

   With respect to references to the Mortgage Loan Documents (including without limitation terms defined by cross-reference to the Mortgage Loan Documents), such references shall refer to the Mortgage Loan Documents as in effect on the Closing Date (and any such defined terms shall have the definitions set forth in the Mortgage Loan Documents as of the Closing Date) and no amendments, restatements, replacements, supplements, waivers or other modifications to or of the Mortgage Loan Documents shall have the effect of changing such references (including without limitation any such definitions) for the purposes of this Agreement unless Lender hereafter agrees in writing that such references have been revised.

   Notwithstanding anything stated herein to the contrary, any provisions in this Agreement cross-referencing or incorporating by reference provisions of the Mortgage Loan Documents shall be effective notwithstanding the termination of the Mortgage Loan Documents by payment in full of the Mortgage Loan or otherwise.

   To the extent that any terms, provisions or definitions of any Mortgage Loan Documents that are incorporated herein by reference are incorporated into the Mortgage Loan Documents by reference to any other document or instrument, such terms, provisions or definitions that are incorporated herein by reference shall at all times be deemed to incorporate each such term, provision and definition of the applicable other document or instrument as the same is set forth in such other document or instrument as of the Closing Date, without regard to any amendments, restatements, replacements, supplements, waivers or other modifications to or of such other document or instrument occurring after the Closing Date unless Lender hereafter agrees in writing that such terms, provisions or definitions have been revised.

   The words "Borrower shall cause" or "Borrower shall not permit" (or words of similar meaning) shall mean "Borrower shall and/or shall cause Mortgage Borrower to" or "Borrower shall not or shall not permit Mortgage Borrower to", as the case may be, to so act or not to so act, as applicable

## II.  THE LOAN

   **Section 2.1.** <u>The Loan</u>.

<div align="center">30</div>

2.1.1.   <u>Agreement to Lend and Borrow</u>.   Subject to and upon the terms and conditions set forth herein, Lender shall make the Loan to Borrower and Borrower shall accept the Loan from Lender on the Closing Date.

2.1.2.   <u>Single Disbursement to Borrower</u>.   Borrower shall receive only one (1) borrowing hereunder in respect of the Loan and any amount borrowed and repaid hereunder in respect of the Loan may not be reborrowed.

2.1.3.   <u>The Note</u>.  The Loan shall be evidenced by the Note and shall be repaid in accordance with the terms of this Agreement and the Note.

2.1.4.   <u>Use of Proceeds</u>.  Borrower shall use the proceeds of the Loan to, (a) pay costs and expenses incurred in connection with the closing of the Loan, as approved by Lender, (b) make an equity contribution to Mortgage Borrower in order to cause the Mortgage Borrower to use such amounts for any use permitted pursuant to Section 2.1.4 of the Mortgage Loan Agreement to the extent necessary, and (c) after payment of the amounts specified in clauses (a) through (b) above, distribute the balance of the proceeds, if any, to Borrower.

**Section 2.2.**   <u>Interest Rate</u>.

2.2.1.   <u>Interest Rate</u>.  Interest on the Outstanding Principal Balance shall accrue and be payable from the Closing Date up to and including the end of the last Interest Period related to the Maturity Date at the Interest Rate.

2.2.2.   <u>Default Rate</u>.  In the event that, and for so long as, any Event of Default has occurred and remains outstanding, the Outstanding Principal Balance and, to the extent permitted by law, overdue interest in respect of the Loan, shall accrue interest at the Default Rate, calculated from the date such payment was due without regard to any grace or cure periods contained herein.

2.2.3.   <u>Interest Calculation</u>.  Interest on the Outstanding Principal Balance shall be calculated by multiplying (a) the actual number of days in the period for which the calculation is being made by (b) a daily rate based on a three hundred sixty (360) day year (that is, the Interest Rate or the Default Rate, as then applicable, expressed as an annual rate divided by 360) by (c) the Outstanding Principal Balance.

2.2.4.   <u>Usury Savings</u>.  This Agreement and the other Loan Documents are subject to the express condition that at no time shall Borrower be required or obligated to pay interest on the principal balance of the Loan at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate.  If by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of the Maximum Legal Rate, the Interest Rate or the Default Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal (without penalty or premium) and not on account of the interest due hereunder.  All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the sums due under the Loan shall, to the extent permitted by the applicable Legal Requirements, be amortized, prorated, allocated, and spread throughout the full

stated Term until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

2.2.5.   <u>EEA Financial Institutions</u>.   Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any of the following Persons, Borrower, each Restricted Party and Lender acknowledge that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by (i) the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and (ii) the effects of any Bail-In Action on any such liability, including, if applicable (A) a reduction in full or in part or cancellation of any such liability; (B) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; and/or (C) the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

**Section 2.3.**   <u>Loan Payments</u>.

2.3.1.   <u>Payment Before Maturity Date</u>.   Borrower shall make a payment to Lender of interest only on the Closing Date for the initial Interest Period.  Borrower shall make a payment to Lender equal to the Monthly Debt Service Payment Amount on the Monthly Payment Date occurring in June, 2018, and on each Monthly Payment Date thereafter to and including the Maturity Date.

2.3.2.   <u>Intentionally Omitted</u>.

2.3.3.   <u>Payment on Maturity Date</u>.   Borrower shall pay to Lender on the Maturity Date the Outstanding Principal Balance, all interest which has accrued or would accrue through and including the last day of the Interest Period related to the Maturity Date and all other amounts due hereunder and under the Note and the other Loan Documents.

2.3.4.   <u>Late Payment Charge</u>.   If any principal, interest or any other sum due under the Loan Documents (except the Outstanding Principal Balance due and payable on the Stated Maturity Date or such earlier date by reason of an Event of Default for which the Loan has been accelerated) is not paid by Borrower on or before the expiration of any applicable grace or cure period, Borrower shall pay to Lender upon demand a one-time charge in an amount equal to the lesser of (a) five percent (5%) of such unpaid sum or (b) the maximum amount permitted by applicable law in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment. Any such amount shall be secured by the Pledge Agreement and the other Loan Documents to the extent permitted by applicable law.  Notwithstanding the foregoing, no late payment charge shall

be applicable to any payments with respect to which interest is accruing at the Default Rate, provided that to the extent Borrower fails to pay any late payment charge when due, the unpaid amount of such late payment charge shall accrue interest at the Default Rate.

2.3.5.   Method and Place of Payment.

(a)     Except as otherwise specifically provided herein, all payments and prepayments under this Agreement, the Note and the other Loan Documents shall be made to Lender not later than 3:00 P.M., New York City time, on the date when due and shall be made in lawful money of the United States of America in immediately available funds at Lender's office or as otherwise directed by Lender, and any funds received by Lender after such time shall, for all purposes hereof, be deemed to have been paid on the next succeeding Business Day. Notwithstanding the foregoing, the payment made to Lender upon maturity of the Loan shall be made not later than 3:00 P.M. CST.

(b)     Whenever any payment to be made hereunder or under any other Loan Document shall be stated to be due on a day which is not a Business Day, the due date thereof shall be deemed to be the immediately succeeding Business Day (notwithstanding such adjustment of due dates, Borrower shall not be entitled to any deduction of interest due under this Agreement, the Note or any of the other Loan Documents).

(c)     All payments required to be made by Borrower hereunder or under the Note or the other Loan Documents shall be made irrespective of, and without deduction for, any setoff, claim or counterclaim and shall be made irrespective of any defense thereto.

**Section 2.4.**   Prepayments.

2.4.1.   Voluntary Prepayments.   Except as otherwise provided herein, Borrower shall not have the right to prepay the Loan in whole or in part.   Subject to Sections 2.4.2 and 2.4.3 hereof, on or after the Par Prepayment Date, Borrower may, at its option, prepay the Debt in whole, but not in part, on any Business Day provided that (a) Borrower has given Lender prior written notice of such prepayment not less than seven (7) Business Days prior to the date of such prepayment (which notice shall specify the proposed Prepayment Date), and (b) such prepayment is accompanied by (i) the Prepayment Fee (if applicable), (ii) all interest which would have accrued on the principal amount of the Loan to be prepaid through and including the last day of the Interest Period related to the Monthly Payment Date next occurring following the date of such prepayment (or, if such prepayment occurs on a Monthly Payment Date, through and including the last day of the Interest Period related to such Monthly Payment Date), and (iii) all other sums due and payable under this Agreement, the Note, and the other Loan Documents.   If a notice of prepayment is given by Borrower to Lender pursuant to this Section 2.4.1 and such notice is rescinded by Borrower on or prior to the proposed Prepayment Date, Borrower shall promptly pay all of Lender's actual out-of-pocket customary and reasonable costs and expenses incurred in connection with such rescinded prepayment.   Borrower hereby acknowledges and agrees that Lender's acceptance of a prepayment, whether or not such prepayment is later rescinded by Borrower, does not operate as or constitute a waiver of the provisions of this Section 2.4 with respect to any future prepayments of the Loan.

33

2.4.2.   <u>Liquidation Event; Mandatory Prepayments</u>.

(a)      In the event of (i) any Casualty to all or any portion of the Property, (ii) any Condemnation of all or any portion of the Property, (iii) a sale or pledge of all or any portion of the Property in connection with, or as a result of, a foreclosure proceeding, (iv) any refinancing of the Property or the Mortgage Loan, or (v) the receipt by Mortgage Borrower of any excess proceeds realized under its owner's title insurance policy after application of such proceeds by Mortgage Borrower to cure any title defect (each, a "**<u>Liquidation Event</u>**"), Borrower shall cause the related Net Liquidation Proceeds After Debt Service to be paid directly to Lender. On each date on which Lender actually receives a distribution of Net Liquidation Proceeds After Debt Service, one hundred percent (100%) of such amount shall be applied to the Outstanding Principal Balance or, in Lender's discretion, other amounts due under the Loan, together with payment of the greater of (i) any applicable Prepayment Fee, and (ii) any applicable Yield Maintenance Premium (except in connection with a Casualty or a Condemnation). Any amounts of Net Liquidation Proceeds After Debt Service in excess of the Debt shall be paid by Lender to Borrower. Once Borrower has knowledge that a Liquidation Event has occurred, Borrower shall, or shall cause Mortgage Borrower, to promptly deliver written notice of such Liquidation Event to Lender. Borrower shall be deemed to have knowledge of (i) a foreclosure sale on the date notice of such foreclosure sale is given and (ii) a refinancing of all or any portion of the Property on the date on which a commitment for such refinancing has been entered into. The provisions of this <u>Section 2.4.2</u> shall not be construed to contravene in any manner the restrictions and other provisions regarding refinancing of the Mortgage Loan or the sale or pledge of the Property (or any portion thereof) set forth in this Agreement, the other Loan Documents and the Mortgage Loan Documents.

(b)      Borrower shall notify Lender of any Liquidation Event not later than three (3) Business Days following the first date on which Borrower has knowledge of such event. Borrower shall be deemed to have knowledge of (i) a sale (other than a foreclosure sale) of all or any portion of the Property on the date on which a contract of sale for such sale is entered into, and a foreclosure sale, on the date notice of such foreclosure sale is given, and (ii) a refinancing of all or any portion of the Property, on the date on which a commitment for such refinancing has been entered into.  The provisions of this <u>Section 2.4.2</u> shall not be construed to contravene in any manner the restrictions and other provisions regarding refinancing of the Mortgage Loan or Transfer of the Property set forth in this Agreement, the other Loan Documents and the Mortgage Loan Documents.

2.4.3.   <u>Prepayments After Default</u>.  If, during the continuance of any Event of Default, prepayment of all or any part of the Debt is tendered by Borrower (which tender Lender may reject to the extent permitted by the applicable Legal Requirements), a purchaser at foreclosure or any other Person, Borrower, such purchaser at foreclosure or other Person shall pay, in addition to the principal amount of the Loan to be prepaid, (a) an amount equal to the greater of (i) any applicable Prepayment Fee, and (ii) any applicable Yield Maintenance Premium, (b) all interest which would have accrued on the principal amount of the Loan to be prepaid through and including the last day of the Interest Period related to the Monthly Payment Date next occurring following the date of such prepayment (or, if such prepayment occurs on a Monthly Payment Date,

34

through and including the last day of the Interest Period related to such Monthly Payment Date), and (c) all other sums due and payable under the Loan Documents.

Section 2.5.    Defeasance.

2.5.1.   Conditions to Defeasance.   So long as no Event of Default or Mortgage Loan Event of Default has occurred and remains outstanding, Borrower shall have the right at any time after the earlier of the Defeasance Expiration Date and the Permitted Release Date and prior to the Open Prepayment Commencement Date to voluntarily defease the entire Loan and obtain a release of the Lien of the Pledge Agreement (a "**Defeasance Event**"), so long as Borrower simultaneously defeases the entire Mortgage Loan in accordance with the requirements of the Mortgage Loan Agreement and subject to the satisfaction of the following conditions precedent:

(a)    Borrower shall provide Lender not less than thirty (30) days' prior notice (or such shorter period of time if permitted by Lender in its sole discretion) specifying a Business Day (the "**Defeasance Date**") on which the Defeasance Event is to occur;

(b)    Borrower shall pay to Lender (i) the Monthly Debt Service Payment Amount due on the Defeasance Date and (ii) all other sums due and payable under this Agreement, the Note and the other Loan Documents;

(c)    Borrower shall deposit the applicable Defeasance Collateral into the Defeasance Collateral Account and otherwise comply with the provisions of Sections 2.5.2 and 2.5.3 hereof;

(d)    Intentionally Omitted.

(e)    Borrower shall execute and deliver to Lender a Defeasance Security Agreement in respect of the Defeasance Collateral Account and the Defeasance Collateral;

(f)    Borrower shall deliver to Lender an opinion of counsel for Borrower that is standard in commercial lending transactions and subject only to customary qualifications, assumptions and exceptions opining, among other things, that (i) Borrower has legally and validly transferred and assigned the Defeasance Collateral and all rights and obligations under the Note to Successor Borrower, (ii) Lender has a legal and valid perfected first-priority security interest in the Defeasance Collateral Account and the Defeasance Collateral, (iii) if a Securitization has occurred, the Securitization Vehicle formed in connection with such Securitization will not fail to maintain its status as a Securitization Vehicle as a result of the Defeasance Event, (iv) the Defeasance Event will not result in a deemed exchange for purposes of the Code and will not adversely affect the status of the Note as indebtedness for federal income tax purposes, and (v) the delivery of the Defeasance Collateral and the grant of a security interest in the Defeasance Collateral Account and the Defeasance Collateral to Lender shall not constitute an avoidable preference under Section 547 of the U.S. Bankruptcy Code or any other Bankruptcy Law;

(g)    If required by the Rating Agencies following a Securitization, Borrower shall deliver to Lender a bankruptcy non-consolidation opinion with respect to Successor Borrower reasonably acceptable to Lender and acceptable to the Rating Agencies in their sole discretion;

35

(h)     Following a Securitization, Borrower shall deliver to Lender a Rating Agency Confirmation as to the Defeasance Event;

(i)     Borrower shall deliver a certificate of a "big four" or other nationally recognized public accounting firm acceptable to Lender certifying that the Defeasance Collateral will generate amounts equal to or greater than the applicable Scheduled Defeasance Payment on or prior to each corresponding Monthly Payment Date or other scheduled payment date.  The public accounting firms of Grant Thorton, Shanholt, Glassman, Klein, Kramer & Co., and Berdon LLP are preapproved by Lender for such purpose; provided, however, that such preapproval may be revoked by Lender if Lender has a reasonable basis for such revocation;

(j)     Borrower shall deliver such other certificates, opinions, documents and instruments as Lender may reasonably request;

(k)     Borrower shall deliver an Officer's Certificate certifying that the requirements set forth in this Section 2.5 have been satisfied; and

(l)     Borrower shall pay all reasonable out-of-pocket costs and expenses incurred by Lender in connection with the Defeasance Event or otherwise required to accomplish the agreements set forth in this Section 2.5 hereof, including (i) reasonable attorneys' fees and expenses, (ii) the fees and reasonable out-of-pocket costs and expenses of the Rating Agencies, (iii) any revenue, documentary stamp or intangible taxes or any other tax or charge due in connection with the transfer of the Note, and (iv) the reasonable out-of-pocket costs and expenses of Servicer and any Trustee.  Simultaneously with the notice described in Section 2.5.1(a) above, Borrower shall deliver to Lender an amount reasonably determined by Lender to be sufficient to pay such fees, costs and expenses, which amount may be used by Lender to pay such fees, costs and expenses if a proposed Defeasance Event does not occur.

2.5.2.   Defeasance Collateral Account.  On or before the date on which Borrower delivers the Defeasance Collateral, Borrower shall open at an Eligible Institution the defeasance collateral account (the "**Defeasance Collateral Account**") which shall at all times be an Eligible Account.  Each of the U.S. Obligations that constitutes a part of the Defeasance Collateral shall be duly endorsed by the holder thereof as directed by Lender or accompanied by a written instrument of transfer in form and substance that would be satisfactory to a prudent lender (including, without limitation, such instruments as may be required by the Eligible Institution at which the Defeasance Collateral Account is to be maintained to effectuate book-entry transfers and pledges through the book-entry facilities of such Eligible Institution) in order to perfect, upon the delivery of the Defeasance Collateral, a first-priority security interest therein in favor of Lender in conformity with all applicable Legal Requirements governing the granting of such security interest.  The Defeasance Collateral Account shall contain only (a) the Defeasance Collateral and (b) cash from principal and interest paid on the Defeasance Collateral or other cash proceeds thereof.  Pursuant to the Defeasance Security Agreement or other appropriate agreement or instrument, Borrower or Successor Borrower, as applicable, shall authorize and direct that all payments received from and all proceeds of the Defeasance Collateral be made or paid directly to the Cash Management Account (unless otherwise directed by Lender) and applied to satisfy the Debt Service and, if applicable, other payment Obligations of Borrower under the Note.  Borrower or Successor

36

Borrower, as applicable, shall be the owner of the Defeasance Collateral Account and shall report all income accrued on the Defeasance Collateral for federal, state and local income tax purposes in its income tax return.  Borrower or Successor Borrower, as applicable, shall prepay all fees, costs and expenses associated with opening and maintaining the Defeasance Collateral Account. Lender shall not in any way be liable by reason of any insufficiency in the Defeasance Collateral Account.  Upon payment in full of the Debt, any Defeasance Collateral and cash from principal and interest paid on the Defeasance Collateral or other cash proceeds thereof thereafter remaining in the Defeasance Collateral Account shall be paid to or at the direction of Borrower.

2.5.3.   Successor Borrower.   In connection with a Defeasance Event, Borrower shall establish a successor entity designated by Borrower and reasonably approved by Lender (in each case, a "**Successor Borrower**") which (a) shall be a Special Purpose Entity and (b) following a Securitization, shall be approved by the Rating Agencies.  Any Successor Borrower may, at Borrower's option, be an Affiliate of Borrower unless the Rating Agencies (following a Securitization) shall require otherwise.  Borrower shall transfer and assign all rights and Obligations under and to the Note, and the Defeasance Security Agreement, together with the Defeasance Collateral, to such Successor Borrower.  Such Successor Borrower shall assume the Obligations under the Note and the Defeasance Security Agreement and Borrower shall be relieved of its Obligations under such documents.  Borrower shall pay a minimum of One Thousand and No/100 Dollars ($1,000) to any Successor Borrower as consideration for assuming the Obligations under the Note and the Defeasance Security Agreement.  Borrower shall pay all fees and reasonable out-of-pocket costs and expenses incurred by Lender and the Rating Agencies in connection therewith.

**Section 2.6.**   Release of Collateral.

(a)   Except as set forth in Section 2.5 and this Section 2.6, no repayment, prepayment or defeasance of all or any portion of the Loan shall cause, give rise to a right to require, or otherwise result in, the release of the Lien of the Pledge Agreement on the Collateral.

(b)   If Borrower has elected to defease the Loan and the requirements of Section 2.5 and this Section 2.6 have been fully satisfied, the Collateral shall be released from the Lien of the Pledge Agreement and the Defeasance Collateral Account and the Defeasance Collateral, pledged pursuant to the Defeasance Security Agreement, shall be the sole source of collateral securing the Note.

(c)   Upon defeasance of the Loan or payment in full of all principal and interest due on the Loan and all other amounts due and payable under the Loan Documents in accordance with the terms and provisions of the Loan Documents and not less than thirty (30) days' prior written notice (or such shorter period of time if permitted by Lender in its sole discretion) and at the sole but reasonable cost and expense of Borrower, Lender shall release the Lien of the Pledge Agreement.

(d)   In connection with the release of the Pledge Agreement, Borrower shall submit to Lender, concurrently with the notice under Section 2.5.1(a), a release of Lien (and the related Loan Documents) for the Collateral for execution by Lender.  Such release shall be in a

37

form appropriate in the jurisdiction in which the Collateral is located and that would be satisfactory to a prudent lender and contains standard provisions, if any, protecting the rights of the releasing lender. In addition, Borrower shall provide all other certificates, documents and instruments Lender reasonably requires to be delivered by Borrower in connection with such release, together with an Officer's Certificate certifying that such documentation (i) is in compliance with all applicable Legal Requirements, and (ii) will effect such release in accordance with the terms of this Agreement.

**Section 2.7.** <u>Mortgage Loan Cash Management; Establishment of Certain Accounts</u>.

(a) Borrower shall cause Mortgage Borrower to comply with the Mortgage Loan Cash Management Provisions and not, without Lender's prior written consent, amend, restate, replace and/or otherwise modify the same. If requested by Lender, Borrower will promptly provide evidence reasonably acceptable to Lender of its compliance with the foregoing.

(b) Notwithstanding anything to the contrary contained in this Agreement, if at any time and for any reason the Mortgage Loan Cash Management Accounts are no longer being maintained and/or the Mortgage Loan Cash Management Provisions cease to exist or are reduced, waived or modified in any material respect (in each case, including, without limitation, due to any waiver, amendment or refinance) (such accounts, the "**Waived Cash Management Accounts**" and such provisions, the "**Waived Cash Management Provisions**"), to the extent permitted to do so pursuant to the Mortgage Loan Documents (if applicable), Borrower shall promptly (i) notify Lender of the same and establish and maintain with Lender and for the benefit of Lender in replacement and substitution thereof, substitute accounts (the "**Substitute Cash Management Accounts**"), which Substitute Cash Management Accounts shall be subject to all of the same terms and conditions applicable under the Mortgage Loan Documents, (ii) execute any amendments to this Agreement and/or the Loan Documents implementing the Waived Cash Management Provisions as may be required by Lender (provided such amendments do not materially increase the obligations of Borrower hereunder except to implement provisions that are substantially similar to the provisions set forth in the Mortgage Loan Agreement relating to the same) and shall cause Mortgage Borrower to acknowledge and agree to the same and (iii) deposit in the Substitute Cash Management Accounts (or shall cause Mortgage Borrower to so deposit) any funds remaining in the equivalent Waived Cash Management Accounts. In the event that the Mortgage Lender subsequently reinstates all or any Waived Cash Management Accounts, then the Lender shall, at no cost to Lender, cooperate to transfer such Substitute Cash Management Accounts to the Mortgage Lender, and Borrower shall no longer be required to deposit funds into such Substitute Cash Management Accounts until such time as any such Waived Cash Management Accounts subsequently exists.

## III.   REPRESENTATIONS AND WARRANTIES

**Section 3.1.** <u>Borrower Representations</u>. Borrower represents and warrants to Lender that:

38

3.1.1.  <u>Organization</u>.

(a)  Borrower is duly organized, validly existing and in good standing with full power and authority to own its assets and conduct its business, and is duly qualified and in good standing in all jurisdictions in which the ownership or leasing of its property or the conduct of its business requires such qualification (except where the failure to be so qualified would not have a Material Adverse Effect) and Borrower has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the other Loan Documents by it, and has the power and authority to execute, deliver and perform under this Agreement, the other Loan Documents and all the transactions contemplated hereby and thereby.

(b)  Borrower's exact legal name is correctly set forth in the first paragraph of this Agreement.  Borrower is an organization of the type specified in the first paragraph of this Agreement.  Borrower is incorporated or organized under the laws of the state specified in the first paragraph of this Agreement.  Borrower's principal place of business and chief executive office, and the place where Borrower keeps its books and records not otherwise kept at the Property, including recorded data of any kind or nature, regardless of the medium of recording, including software, writings, plans, specifications and schematics, has been for the preceding four (4) months (or, if less than four (4) months, the entire period of the existence of Borrower) and will continue to be the address of Borrower set forth in the first paragraph of this Agreement (unless Borrower notifies Lender in writing at least thirty (30) days prior to the date of such change).  Borrower's organizational identification number assigned by the state of its organization is 4254873.  The federal tax identification number applicable to Borrower is 20-8205408.

(c)  Borrower has the power and authority and the requisite ownership interests in Mortgage Borrower to control the actions of Mortgage Borrower, and upon the realization of the Collateral, Lender or any other party succeeding to Borrower's interest in the Collateral would have such control.  Without limiting the foregoing, Borrower has sufficient control over Mortgage Borrower to cause Mortgage Borrower to (i) take any action on Mortgage Borrower's part required by the Loan Documents and (ii) refrain from taking any action prohibited by the Loan Documents.

3.1.2.  <u>Proceedings</u>.  This Agreement and the other Loan Documents have been duly authorized, executed and delivered by or on behalf of Borrower and constitute legal, valid and binding obligations of Borrower, enforceable against Borrower in accordance with their respective terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether such enforcement is sought in a proceeding in equity or at law).

3.1.3.  <u>No Conflicts</u>.  The execution, delivery and performance of this Agreement and the other Loan Documents by Borrower will not conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any Lien, charge or encumbrance (other than pursuant to the Loan Documents) upon any asset or property of Borrower pursuant to the terms of any indenture, mortgage, deed of trust, loan agreement, partnership agreement, management agreement or other agreement or instrument to which Borrower is a party or by which any of Borrower's assets or properties is subject, nor will

39

such action result in any violation of the provisions of any Legal Requirements of any Governmental Authority having jurisdiction over Borrower or any of Borrower's assets or properties.

3.1.4.  <u>Litigation</u>.  There is no action, suit, proceeding or investigation pending or, to Borrower's knowledge, threatened against Borrower, Mortgage Borrower, Guarantor, or Manager in any court or by or before any other Governmental Authority that could have a Material Adverse Effect.  To Borrower's knowledge, there is no action, suit, proceeding or investigation pending or threatened against the Property or the Collateral in any court or by or before any other Governmental Authority that could have a Material Adverse Effect.

3.1.5.  <u>Agreements</u>.  Neither Mortgage Borrower nor Borrower is a party to any agreement or instrument or subject to any restriction which could materially and adversely affect Mortgage Borrower, Borrower, the Collateral or the Property, or Borrower's or Mortgage Borrower's business, assets or properties, operations or condition (financial or otherwise).  Neither Mortgage Borrower nor Borrower is in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any Permitted Encumbrance or any other agreement or instrument to which it is a party or by which Mortgage Borrower, Borrower, the Collateral or the Property is bound.  Neither Mortgage Borrower nor Borrower has any material financial obligation (contingent or otherwise) under any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which Mortgage Borrower or Borrower is a party or by which Mortgage Borrower, Borrower, the Collateral, or the Property is otherwise bound, other than (a) obligations incurred in the ordinary course of the operation of the Property and ownership of the Collateral as permitted under Section 3.1.24(e) hereof and (b) obligations under the Mortgage Loan Documents and the Loan Documents.

3.1.6.  <u>Consents</u>.  Each consent, approval, authorization, order, registration or qualification of or with any court or any other Governmental Authority required for the execution, delivery and performance by Borrower of this Agreement and the other Loan Documents has been obtained and is in full force and effect.

3.1.7.  <u>Title</u>.

(a)  Mortgage Borrower has good, indefeasible and insurable leasehold title to the real property comprising the Property and good title to the balance of the Property, in each case, free and clear of all Liens whatsoever except the Permitted Encumbrances.  The Security Instrument, together with any Uniform Commercial Code financing statements required to be filed in connection therewith, when properly recorded in the appropriate records, will create (i) a valid, perfected first-priority lien on the Property, subject only to Permitted Encumbrances, and (ii) perfected security interests in and to, and perfected collateral assignments of, all personalty (including the Leases), all in accordance with the terms thereof, in each case subject only to the Permitted Encumbrances.  To Borrower's best knowledge, other than Permitted Encumbrances, there are no claims for payment or mechanic's, materialman's or other similar liens or claims which have been filed for work, labor or materials affecting the Property which are or may become Liens prior to, or of equal priority with, the Lien of the Security Instrument and the other Mortgage

40

Loan Documents.  In Borrower's reasonable opinion, none of the Permitted Encumbrances (nor any unrecorded document relating to any REA, the Ground Lease or the Prime Lease), individually or in the aggregate, materially interfere with the benefits of the security intended to be provided by the Security Instrument and the other Loan Documents, materially and adversely affect the value of the Property, impair the use or operation of the Property or impair Mortgage Borrower's ability to perform its obligations under the Mortgage Loan Documents in a timely manner.

(b)     Borrower is the record and beneficial owner of, and has good title to, the Collateral, free and clear of all Liens whatsoever, except the Permitted Encumbrances.  The Pledge Agreement, together with the UCC financing statements relating to the Collateral, when properly filed in the appropriate records, will create a valid, perfected security interest in and to the Collateral, all in accordance with the terms thereof for which a Lien can be perfected by filing a UCC financing statement.  Borrower's delivery to Lender of the original certificates evidencing the Pledged Company Interests creates a valid and perfected first-priority security interest in the Pledged Company Interests. No creditor of Borrower other than Lender has in its possession any certificates or other documents that constitute or evidence the Collateral or the possession of which would be required to perfect a security interest in the Collateral. The Pledged Company Interests have been duly authorized and validly issued and are not subject to any options to purchase or similar rights of any Person.

3.1.8.  <u>No Plan Assets</u>.   As of the Closing Date and throughout the Term, (a) neither Mortgage Borrower nor Borrower sponsors, is obligated to contribute to or is itself or will be an "employee benefit plan," as defined in Section 3(3) of ERISA, subject to Title I of ERISA or Section 4975 of the Code, (b) none of the assets of Mortgage Borrower or Borrower constitutes or will constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3-101, as modified by Section 3(42) of ERISA, (c) none of Mortgage Borrower or Borrower is or will be a "governmental plan" within the meaning of Section 3(32) of ERISA, and (d) transactions by or with Mortgage Borrower and Borrower are not and will not be subject to any state statute, rule or regulation regulating investments of, or fiduciary obligations with respect to, "governmental plans" within the meaning of Section 3(32) of ERISA which is similar to the provisions of Section 406 of ERISA or Section 4975 of the Code and which prohibit or otherwise restrict the transactions contemplated by this Agreement (including, but not limited to, the exercise by Lender of any of its rights under the Loan Documents).

3.1.9.  <u>Compliance</u>.  Borrower, Mortgage Borrower and the Property and the use thereof comply in all material respects with all applicable Legal Requirements, including, without limitation, building and zoning ordinances and codes.  In the event that all or any part of the Improvements are destroyed or damaged, said Improvements can be legally reconstructed to their condition prior to such damage or destruction, and thereafter exist for the same use without violating any zoning or other ordinances applicable thereto and without the necessity of obtaining any variances or special permits.  No legal proceedings are pending or, to the knowledge of Borrower, threatened with respect to the zoning of the Property.  Neither the zoning nor any other right to construct, use or operate the Property is in any way dependent upon or related to any property other than the Property.  Neither Borrower nor Mortgage Borrower is in default or violation of any order, regulation, writ, injunction, decree or demand of any Governmental Authority, the violation of which could have a Material Adverse Effect.  There has not been

committed by Borrower, Mortgage Borrower, or to Borrower's knowledge any other Person in occupancy of or involved with the operation or use of the Property, the Collateral, any act or omission affording the federal government, any state or local government or any other Governmental Authority the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's Obligations under any of the Loan Documents or Mortgage Borrower's obligations under any of the Mortgage Loan Documents.

3.1.10. <u>Financial Information</u>.  All financial data, including, without limitation, the statements of cash flow and income and operating expense, that have been delivered to Lender in connection with the Loan and the Collateral (i) are true, correct and complete in all material respects, (ii) accurately represent the financial condition of Mortgage Borrower, the Collateral, and the Property, as applicable, as of the date of such reports in all material respects, and (iii) have been prepared in accordance with an Approved Accounting Method throughout the periods covered, except as disclosed therein.  Borrower does not have any contingent liabilities, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments that are known to Borrower and that could have a Material Adverse Effect.  Since the date of such financial statements, there has been no material adverse change in the financial condition, operation or business of Mortgage Borrower, Borrower, the Collateral or the Property from that set forth in said financial statements.

3.1.11. <u>Condemnation</u>.  No Condemnation or other similar proceeding has been commenced or, has been threatened or, to Borrower's knowledge, is contemplated with respect to all or any portion of the Property or for the relocation of roadways providing access to the Property.

3.1.12. <u>Easements; Utilities and Public Access</u>.  The Property has rights of access to public ways and is served by water, sewer, sanitary sewer and storm drain facilities adequate to service the Property for its intended uses.  All public utilities necessary or convenient to the continued use and enjoyment of the Property are located either in the public right-of-way abutting the Property (which are connected so as to serve the Property without passing over any other property) or in recorded easements serving the Property and such easements are set forth in and insured by the Title Insurance Policy.  All roads necessary for the use of the Property for its current purposes have been completed and dedicated to public use and accepted by all applicable Governmental Authorities.

3.1.13. <u>Separate Lots</u>.  The Property is comprised of one (1) or more parcels which constitute a separate tax lot or lots and does not constitute a portion of any other tax lot not a part of the Property.

3.1.14. <u>Assessments</u>.  Except as disclosed in the Title Insurance Policy delivered as of the Closing Date, to Borrower's knowledge, there are no pending or proposed special or other assessments for public improvements or otherwise affecting the Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments.

3.1.15. <u>Enforceability</u>.  None of the Loan Documents or Mortgage Loan Documents are subject to any right of rescission, set-off, counterclaim or defense by Borrower, Mortgage Borrower, or Guarantor, including the defense of usury, nor would the operation of any

<div align="center">42</div>

of the terms of the Loan Documents or the Mortgage Loan Documents, or the exercise of any right thereunder, render the Loan Documents or the Mortgage Loan Documents unenforceable (subject only to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and, as to enforceability, to principles of equity), and neither Borrower, Mortgage Borrower, nor Guarantor has asserted any right of rescission, set-off, counterclaim or defense with respect thereto.

3.1.16. No Prior Assignments.  No Person other than Mortgage Lender has any interest in or assignment of the Leases or any portion of the Rents due and payable or to become due and payable thereunder.  There are no assignments, hypothecations or pledges of the Collateral except as created by the Pledge Agreement

3.1.17. Insurance.   Borrower has obtained and has delivered (or has caused Mortgage Borrower to obtain and deliver) to Lender original certificates evidencing the Policies (and, to the extent requested by Lender, complete copies thereof), with all premiums prepaid thereunder, reflecting the insurance coverages, amounts and other requirements set forth in this Agreement and the Mortgage Loan Agreement.  No claims have been made under any of the Policies, and no Person, including Borrower and Mortgage Borrower, has done, by act or omission, anything which would impair the coverage of any of the Policies.

3.1.18. Licenses.   To Borrower's knowledge, all approvals, authorizations, certifications, licenses and permits, including, without limitation, certificates of completion and occupancy, required by any Governmental Authority or otherwise necessary for the legal ownership, use, occupancy and operation of the Property in the manner in which the Property is currently being owned, used, occupied and operated have been obtained by or on behalf of Mortgage Borrower and are in full force and effect, except to the extent the failure by Mortgage Borrower to obtain the same or maintain the same in full force and effect would not have a Material Adverse Effect.

3.1.19. Flood Zone.  None of the Improvements on the Property is located in an area identified by the Federal Emergency Management Agency as a special flood hazard area (or, if so located, the flood insurance required pursuant to Section 5.1(a)(viii)(C) is in full force and effect with respect to the Property).

3.1.20. Physical Condition.   Subject to any matters disclosed in the Physical Condition Report, (i) to Borrower's knowledge, the Property, including, without limitation, all buildings, improvements, parking facilities, sidewalks, storm drainage systems, roofs, plumbing systems, HVAC systems, fire protection systems, electrical systems, equipment, elevators, exterior sidings and doors, landscaping, irrigation systems and all structural components, are in good condition, order and repair in all material respects; and (ii) there exists no structural or other material defects or damages in the Property, whether latent or otherwise.  Neither Borrower nor Mortgage Borrower has received notice from any insurance company or bonding company of any defects or inadequacies in the Property, or any part thereof, which would adversely affect the insurability of the same or cause the imposition of extraordinary premiums or charges thereon or any termination or threatened termination of any policy of insurance or bond.

3.1.21. <u>Boundaries</u>.  All of the Improvements at the Property lie wholly within the boundaries and building restriction lines of the Property, and no improvements on adjoining properties encroach upon the Property.  No easements or other encumbrances affecting the Property encroach upon any of the Improvements so as to affect the value, marketability, use or operation of the Property except those which are insured against by the Title Insurance Policy, each of which, whether or not insured against by the Title Insurance Policy, is shown on the Survey.

3.1.22. <u>Leases</u>.  With respect to the Leases, (a) the rent roll attached hereto as <u>Schedule I</u> is true, correct and complete in all material respects and the Property is not subject to any Leases, including any oral Leases, other than the Leases described in <u>Schedule I</u> (other than Tenants' subleases, if any), (b) except as disclosed on <u>Schedule I</u> hereto or as disclosed in any Tenant Estoppel, the Leases identified on <u>Schedule I</u> are in full force and effect and to Borrower's best knowledge, there are no defaults thereunder by any party thereto and there are no conditions that, with the passage of time or the giving of notice, or both, would constitute defaults thereunder, (c) except as disclosed on <u>Schedule I</u> hereto or as disclosed in any Tenant Estoppel, no Rent (excluding security or other deposits except to the extent set forth on <u>Schedule I</u> hereof) has been paid to Mortgage Borrower more than one (1) month in advance of its due date, (d) except as disclosed on <u>Schedule I</u> hereto or as disclosed in any Tenant Estoppel, all work to be performed by the landlord under each Lease has been performed as required in all material respects and has been accepted by the applicable Tenant, (e) except as disclosed on <u>Schedule I</u> hereto or as disclosed in any Tenant Estoppel, any payments, free rent, partial rent, rebate of rent or other payments, credits, allowances or abatements required to be given by the landlord to any Tenant has already been received by such Tenant, (f) except as disclosed on <u>Schedule I</u> hereto or as disclosed in any Tenant Estoppel, Borrower has no knowledge of any notice of termination of any Lease or default in any material respect under any Lease; (g) Mortgage Borrower has not presently assigned or pledged any of the Leases, the rents or any interest therein except to Mortgage Lender pursuant to the Mortgage Loan Documents; (h) except as specifically disclosed in the Title Insurance Policy, on <u>Schedule I</u> hereto or as disclosed in any Tenant Estoppel, no Tenant or other Person has an option, right of first refusal or offer or any other preferential right to purchase all or any portion of the Property; and (i) except as disclosed in the Title Insurance Policy, on <u>Schedule I</u> hereto or in any Tenant Estoppel, no Tenant has any right or option for additional space in the Improvements.

3.1.23. <u>Filing, Recording and Other Taxes</u>.  All transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes required to be paid under the applicable Legal Requirements in connection with the transfer of the Property to Mortgage Borrower have been paid or are being paid simultaneously herewith.  All mortgage, mortgage recording, stamp, intangible or other similar taxes required to be paid under the applicable Legal Requirements in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents, including, without limitation, the Pledge Agreement and the delivery and filing of any UCC financing statements to be filed on the Closing Date in respect of the Collateral, have been paid or are being paid simultaneously herewith.  All taxes and governmental assessments due and owing in respect of the Property and the Collateral have been paid, or an escrow of funds in an amount sufficient to cover such payments has been established under the Mortgage Loan Documents.

3.1.24. <u>Single Purpose</u>.  Borrower hereby represents and warrants to, and covenants with, Lender that, since its formation and at all times thereafter, and at all times on and after the date hereof and until such time as the Debt shall be paid in full:

(a)     The purpose for which Borrower is organized is and shall be limited solely to (i) owning the Collateral and all business incidental thereto, (ii) entering into or assuming the obligations of Borrower under this Agreement, (iii) refinancing the Collateral in connection with a permitted repayment of the Loan, and (iv) transacting any and all lawful business for which Borrower may be organized under its constitutive law that is incidental, necessary or appropriate to accomplish the foregoing.

(b)     Borrower does not own, and will not own or acquire any material asset or property other than the Collateral.

(c)     Borrower does not and will not engage in any business other than the ownership of the Collateral or business incidental thereto.

(d)     Except for capital contributions and distributions, Borrower is not a party to and will not enter into any arrangement, contract or agreement with any Affiliate of Borrower or Mortgage Borrower, except upon terms and conditions that are intrinsically fair, commercially reasonable and substantially similar to those that would be available on an arm's-length basis with third parties not so affiliated with Borrower or Mortgage Borrower.

(e)     Borrower is not liable for and will not incur any Indebtedness other than (i) the Loan, (ii) trade and operational debt (collectively, "**Trade Debt**") incurred in the ordinary course of business with trade creditors and equipment financing providers, as applicable, in amounts as are normal and customary under the circumstances, provided that such debt does not exceed the Trade Debt Threshold Amount, is not evidenced by a note and has not been outstanding for more than sixty (60) days (unless the same is subject to good faith dispute by Borrower, in appropriate proceedings therefor, and for which adequate capital reserves have been established in accordance with GAAP), (iii) intentionally omitted, and (iv) Taxes and Other Charges.  No Indebtedness other than the Debt may be secured (senior, subordinate or *pari passu*) by the Collateral.

(f)     Borrower will not make any payments in advance to third parties other than in the ordinary course of its business or loans to any Person and shall not acquire obligations or securities of its managers, members or any Affiliate of Borrower (except for Mortgage Borrower).

(g)     Borrower is and will intend to remain solvent and its debts and liabilities shall be paid (including, as applicable, shared personnel and overhead expenses) to the extent of its available assets as the same become due (unless the same is subject to good faith dispute by Borrower, in appropriate proceedings therefor, and for which adequate reserves have been established and held by Borrower as required under GAAP), <u>provided</u>, <u>however</u>, that this provision shall not require Guarantor or any other direct or indirect equity owner of Borrower to make any loans or capital contributions to Borrower.

(h)     Borrower will do all things necessary to observe organizational formalities and preserve its separate existence, will continue to be a Delaware limited liability company, and will not, nor will it permit any Affiliate of Borrower to, amend, modify or otherwise change in any material respect Section 9(d) of Borrower's Organizational Documents, nor amend, modify or otherwise change in any material respect any other portion of Borrower's Organizational Documents which adversely affects Borrower's obligations with respect to the Loan without the prior written consent of Lender.   Notwithstanding the foregoing, Borrower may change its organization entity type without prior consent of Lender, provided that Borrower (i) delivers to Lender, at Borrower's cost and expense, (A) following a Securitization, a Rating Agency Confirmation and (B) a new or updated Insolvency Opinion; (ii) at all times complies with the provisions of this Section 3.1.24; (iii) delivers, at Borrower's cost and expense, to Lender the Organizational Documents in form and substance reasonably satisfactory to Lender evidencing such reorganization no later than ten (10) Business Days prior to the effective date of such reorganization, (iv) delivers, at Borrower's cost and expense, such amendments to all financing statements filed in connection with the Loan, as may be reasonably requested by Lender, (v) delivers, at Borrower's cost and expense, to Lender any other document, instrument or certificate that Lender shall reasonably require (including, if applicable, amendments to the Loan Documents); and (vi) pays for all of Lender's reasonable out-of-pocket expense, including but not limited to, Lender's legal fees incurred in connection with the review of such deliveries, which deliveries shall be reasonably acceptable to Lender.

(i)     Borrower will maintain all of its books, records, financial statements and, bank accounts separate from those of any other Person.  Borrower's assets will not be listed as assets on the financial statement of any other Person; provided, however, such assets shall be listed on Borrower's own separate balance sheet and the Property shall be considered a separate operating segment from any Affiliate of the Borrower with discrete financial information available with respect to the Property and the Collateral.  Borrower shall file (or shall cause to be filed) its own tax returns except to the extent it is treated as a "disregarded entity" for tax purposes and is not required to file tax returns under applicable law.  Borrower shall maintain its books, records, resolutions and agreements as official records.

(j)     Borrower does and will intend to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations, provided, however, that this provision shall not be deemed to require Guarantor or any other direct or indirect equity owner of Borrower to make any loans or capital contributions to Borrower.

(k)     To the fullest extent permitted by law, neither Borrower nor any Affiliate of Borrower will seek the dissolution, winding up, liquidation, consolidation or merger in whole or in part, of Borrower, any sale or other transfer of all or substantially all of its assets or any sale or other transfer outside the ordinary course of business, except for such activities as are expressly permitted pursuant to the Loan Documents.  The requirements of this Section 3.1.24(k) are included in the Organizational Documents of Borrower.

(l)     Borrower will not commingle its assets with those of any other Person and will hold all of its assets in its own name.  Borrower will maintain and account for its assets and

liabilities in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets and liabilities from those of any other Person.

(m)     Borrower does not presently and will not guarantee or become obligated for the debts or obligations of any other Person and will not hold itself out as being responsible for the debts or obligations of any other Person.

(n)     If Borrower is a limited partnership, the general partner of Borrower shall be a corporation, limited liability company or business trust which is a Special Purpose Entity owning not less than 0.5% of the equity interests in Borrower and which shall have two (2) Independent Managers (the "**SPE Party**") and which shall comply with the representations, warranties and covenants described in this Section 3.1.24 as if made by the SPE Party, except that the purpose of the SPE Party shall be limited to owning and holding its interest in Borrower and all action incidental, necessary and appropriate to accomplish the foregoing.

(o)     If Borrower is a limited liability company, unless Borrower has two springing members, at least one of its equity owners shall be an SPE Party which shall comply with the representations, warranties and covenants described in this Section 3.1.24 as if made by the SPE Party, except that the purpose of the SPE Party shall be limited to owning and holding its interest in Borrower and all action incidental, necessary and appropriate to accomplish the foregoing.  At any time that Borrower is a limited liability company with two springing members, no equity owner of Borrower (other than any Subordinate Mezzanine Borrower) shall be required to be an SPE Party or a Special Purpose Entity.  The requirements of this Section 3.1.24(o) are included in the Organizational Documents of Borrower.

(p)     Intentionally omitted.

(q)     Any overhead expenses that are shared between Borrower and any Affiliate of Borrower, including paying for office space and services performed by any employee of any Affiliate of Borrower shall be allocated fairly and reasonably.

(r)     Borrower will not pledge its assets or properties to secure the debts or obligations of any other Person.

(s)     Notwithstanding any other provision of this Agreement or the Organizational Documents of Borrower, Borrower will not, and no member, manager or other Person on behalf of Borrower shall, take any Material Action without the prior unanimous vote of the member(s), the managers, and all Independent Managers of Borrower, provided, however, that the member(s) and the managers of Borrower may not vote on, or authorize the taking of, any Material Action, unless there are at least two (2) Independent Managers then serving in such capacity.  "**Material Action**" means to file any insolvency, or reorganization case or proceeding, to institute proceedings to have Borrower be adjudicated bankrupt or insolvent, to institute proceedings under any applicable insolvency law, to seek any relief under any law relating to relief from debts or the protection of debtors, to consent to the filing or institution of bankruptcy or insolvency proceedings against Borrower, to file a petition seeking, or consent to, reorganization or relief with respect to Borrower under any applicable federal or state law relating to bankruptcy or insolvency, to seek or consent to the appointment of a receiver, liquidator, assignee, trustee,

47

sequestrator, custodian, or any similar official of or for Borrower or a substantial part of its property, to make any assignment for the benefit of creditors of Borrower, to admit in writing Borrower's inability to pay its debts generally as they become due, or to take action in furtherance of any of the foregoing.

(t)     Borrower (i) will be, and at all times will hold itself out to the public as, a legal entity separate and distinct from any other entity (including any Affiliate of Borrower), (ii) shall correct any known misunderstanding regarding its status as a separate entity, (iii) shall conduct business in its own name, (iv) shall not identify itself or any of its Affiliates as a division or department or part of the other and (v) shall maintain and utilize separate stationery, invoices and checks bearing its own name.

(u)     Borrower shall conduct its business so that the assumptions made with respect to Borrower in the Insolvency Opinion shall be true and correct in all respects.   In connection with the foregoing, Borrower hereby covenants and agrees that it will comply with or cause the compliance with, (i) all of the facts and assumptions (whether regarding Borrower or any other Person) set forth in the Insolvency Opinion, (ii) all of the representations, warranties and covenants in this Section 3.1.24, and (iii) all of the Organizational Documents of Borrower.

(v)     Borrower will not permit any Affiliate independent access to its bank accounts.

(w)     Borrower shall pay its own liabilities and expenses, including the salaries of its own employees (if any) from its own funds, and has maintained and shall maintain a sufficient number of employees (if any) in light of its contemplated business operations; provided, however, that this provision shall not be deemed to require Guarantor or any other direct or indirect equity owner of Borrower to make any loans or capital contributions to Borrower.

(x)     Borrower (i) has acted at all times consistent in all material respects with Borrower's Organizational Documents, and (ii) shall comply with Section 9(d) of Borrower's Operating Agreement.

(y)     Borrower shall at all times cause Mortgage Borrower to comply with the terms and conditions of Section 3.1.24 of the Mortgage Loan Agreement (it being agreed that this provision shall survive the repayment in full of the Mortgage Loan).

3.1.25. Tax Filings.   To the extent required, Borrower has filed (or has obtained effective extensions for filing) all federal, state and local tax returns required to be filed and has paid or made adequate provision for the payment of all federal, state and local taxes, charges and assessments payable by Borrower.   Borrower believes that its tax returns (if any) properly reflect the income and taxes of Borrower for the periods covered thereby, subject only to reasonable adjustments required by the Internal Revenue Service or other applicable tax authority upon audit.

3.1.26. Solvency.   Borrower (a) has not entered into the transaction or any Loan Document with the actual intent to hinder, delay, or defraud any creditor and (b) received reasonably equivalent value in exchange for its obligations under the Loan Documents.  Giving effect to the Loan, the fair saleable value of Borrower's assets exceeds and will, immediately

48

following the making of the Loan, exceed Borrower's total liabilities, including, without limitation, subordinated, unliquidated, disputed and contingent liabilities. The fair saleable value of Borrower's assets is and will, immediately following the making of the Loan, be greater than Borrower's probable liabilities, including the maximum amount of its contingent liabilities on its debts as such debts become or may become absolute and matured. Borrower's assets do not and, immediately following the making of the Loan will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted. Neither Borrower nor Mortgage Borrower intends to, nor believes that it will, incur debt and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debt and liabilities as they mature (taking into account the timing and amounts of cash to be received by Borrower and Mortgage Borrower and the amounts to be payable on or in respect of obligations of Borrower).

3.1.27. <u>Federal Reserve Regulations</u>.  No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulations T, U or X of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulations T, U or X or any other Regulations of such Board of Governors, or for any purposes prohibited by any Legal Requirements or by the terms and conditions of this Agreement or the other Loan Documents.

3.1.28. <u>Organizational Chart</u>.  The organizational chart attached hereto as <u>Schedule III</u>, relating to Borrower, Mortgage Borrower, and certain Affiliates and other Persons, is true and correct on and as of the Closing Date.

3.1.29. <u>Bank Holding Company</u>.  Borrower is not a "bank holding company" or a direct or indirect subsidiary of a "bank holding company" as defined in the Bank Holding Company Act of 1956, as amended, and Regulation Y thereunder of the Board of Governors of the Federal Reserve System.

3.1.30. <u>No Other Debt</u>.  Borrower has not borrowed or received debt financing (other than permitted pursuant to this Agreement) that has not been heretofore repaid in full.

3.1.31. <u>Investment Company Act</u>.  Borrower is not (a) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (b) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 2005, as amended; or (c) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

3.1.32. <u>Intentionally Omitted</u>.

3.1.33. <u>No Bankruptcy Filing</u>.  No petition in bankruptcy has ever been filed against Borrower, Mortgage Borrower, or Guarantor, and none of Borrower, Mortgage Borrower or Guarantor has ever made an assignment for the benefit of creditors or taken advantage of any insolvency act for the benefit of debtors.  None of Borrower, Mortgage Borrower, or Guarantor is contemplating either the filing of a petition by it under any state or federal bankruptcy or insolvency laws or the liquidation of all or a major portion of Borrower's or Mortgage Borrower's

49

assets or properties, and Borrower has no knowledge of any Person contemplating the filing of any such petition against Borrower, Mortgage Borrower, or Guarantor.

3.1.34. <u>Full and Accurate Disclosure</u>.  No information contained in this Agreement, the other Loan Documents, or any written statement or document furnished by or on behalf of Borrower or Mortgage Borrower in connection with the Loan or pursuant to the terms of this Agreement or any other Loan Document contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading in light of the circumstances under which they were made.  There is no fact or circumstance presently known to Borrower which has not been disclosed to Lender and which could have a Material Adverse Effect.

3.1.35. <u>Foreign Person</u>.  Borrower is not a "foreign person" within the meaning of Section 1445(f)(3) of the Code.

3.1.36. <u>No Change in Facts or Circumstances; Disclosure</u>.  All information submitted by and on behalf of Borrower and Mortgage Borrower to Lender and in all financial statements, rent rolls (including the rent roll attached hereto as <u>Schedule I</u>), reports, certificates and other documents submitted in connection with the Loan or in satisfaction of the terms of this Agreement or the other Loan Documents and all statements of fact made by or on behalf of Borrower in this Agreement or in any other Loan Document, are true, correct and complete in all material respects.  There has been no material adverse change in any condition, fact, circumstance or event that would make any such information or statement of fact inaccurate, incomplete or otherwise misleading in any material respect or that otherwise has or could have a Material Adverse Effect.

3.1.37. <u>Management Agreement</u>.  The Management Agreement is in full force and effect and there is no default thereunder by any party thereto and no event has occurred that, with the passage of time and/or the giving of notice would constitute a default thereunder.  The Management Agreement was entered into on commercially reasonable terms.

3.1.38. <u>Intentionally Omitted</u>.

3.1.39. <u>Ground Lease</u>.

(a)     The Ground Lease is in full force and effect and no default has occurred under the Ground Lease by Mortgage Borrower or, to Borrower's knowledge, by Ground Lessor, and there is no existing condition which, but for the passage of time or the giving of notice, could result in a default under the terms of the Ground Lease.  All Ground Rent has been paid in full and neither Mortgage Borrower nor Ground Lessor has commenced any action or given or received any notice for the purpose of terminating the Ground Lease.  To Borrower's knowledge, the Ground Lessor under the Ground Lease is not subject to any voluntary or involuntary bankruptcy, reorganization or insolvency proceeding and the applicable leasehold estate under the Ground Lease is not an asset in any voluntary or involuntary bankruptcy, reorganization or insolvency proceeding.

50

(b)     The Ground Lease or a memorandum thereof has been duly recorded, the Ground Lease permits the interest of the lessee thereunder to be encumbered by the Security Instrument and does not restrict the use of the Property by the lessee under the Ground Lease in a manner that would materially adversely affect the security provided by the Security Instrument, and to Borrower's best knowledge there have not been any modifications, amendments or other changes in the terms of the Ground Lease since recordation of the Ground Lease or a memorandum thereof.

(c)     Mortgage Borrower's interest in the Ground Lease is not subject to any Lien superior to, or of equal priority with, the Security Instrument.

(d)     Mortgage Borrower's interest in the Ground Lease is assignable pursuant to the terms of the Ground Lease or estoppel letter received by Mortgage Lender from Ground Lessor without the consent of Ground Lessor to Mortgage Lender, the purchaser at any foreclosure sale or the transferee under a deed or assignment in lieu of foreclosure in connection with the foreclosure of the Lien of the Security Instrument or transfer of Mortgage Borrower's leasehold estate by deed or assignment in lieu of foreclosure (or, if any such consent is required, it has been obtained prior to the Closing Date), subject, nonetheless, to the terms and conditions of the Ground Lease in connection with each of the foregoing.

(e)     If Lender provides notice of the Pledge Agreement to Ground Lessor in accordance with the requirements of the Ground Lease and the estoppel letter received by Lender from Ground Lessor, (i) the Ground Lease and the estoppel letter received by Lender from Ground Lessor requires Ground Lessor to give notice of any default by Mortgage Borrower to Lender prior to exercising its remedies set forth in the Ground Lease and (ii) the Ground Lease or estoppel letter received by Lender from Ground Lessor further provides that notice of termination given under the Ground Lease is not effective against Lender unless a copy of such notice has been delivered to Lender in the manner described in the Ground Lease or such estoppel letter.

(f)     Pursuant to the estoppel letter received by Lender from Ground Lessor, Lender is permitted the opportunity (including, where necessary, sufficient time to gain possession of Borrower's interest under the Ground Lease) to cure any default under the Ground Lease which is curable after the receipt of notice of any default before Ground Lessor may terminate the Ground Lease in accordance with the terms of the Ground Lease.

(g)     The Ground Lease has a term which extends not less than thirty (30) years beyond the Maturity Date (including any extensions thereof in accordance with the terms and conditions of this Agreement).

(h)     The Ground Lease and the estoppel letter provided by Ground Lessor to Lender requires the Ground Lessor to enter into a new lease upon termination of the Ground Lease in accordance with the terms and conditions of the Ground Lease or estoppel letter received by Lender from Ground Lessor.

(i)     Under the terms of the Ground Lease and the Security Instrument, taken together, any related insurance and condemnation proceeds that are paid or awarded with respect to the leasehold estate under the Ground Lease will be applied either to the repair or restoration of

51

all or part of the Property, with Mortgage Lender having the right to hold and disburse such proceeds as the repair or restoration progresses, or to the payment of the outstanding principal balance of the Mortgage Loan, together with any accrued interest thereon, subject, nonetheless, to the terms and conditions of the Ground Lease in connection with each of the foregoing.

(j)     The Ground Lease does not impose any restrictions on subletting that would be viewed as commercially unreasonable by a prudent commercial mortgage lender.

(k)     To Borrower's knowledge, each and every Lease is in compliance in all material respects with any applicable restrictions on subleasing contained within the Ground Lease.

(l)     The provisions of the Ground Lease relating to Index Preferences, the USV Current Preference, Deferred Preferences, Project Cash Flow, Available Project Cash Flow, the USV Financing Plan, and USV Development Budget (each as defined in the Ground Lease) are no longer applicable and are of no further force and effect. Additionally, Section 11.3 (Refinancing of Debt) and Section 27.4 (Security Interest) of the Ground Lease are no longer applicable.

(m)     All obligations under the Development Agreement (as defined in the Ground Lease) have been satisfied in full and all USRC Work (as defined in the Ground Lease) has been completed.

(n)     Mortgage Borrower has not received (and does not anticipate using) any investment tax credits under Section 38 of the Internal Revenue Code, and no ITC Rent (as defined in the Ground Lease) is payable (or anticipated to be payable) under the Ground Lease.

3.1.40. <u>Prime Lease</u>.

(a)     To Borrower's knowledge, the Prime Lease is in full force and effect and, to Borrower's knowledge, no default has occurred under the Prime Lease by Ground Lessor or by Prime Lease Lessor, and, to Borrower's knowledge, there is no existing condition which, but for the passage of time or the giving of notice, could result in a default under the terms of the Prime Lease. To Borrower's knowledge, all ground rent under the Prime Lease has been paid in full and neither Ground Lessor nor Prime Lease Lessor has commenced any action or given or received any notice for the purpose of terminating the Prime Lease. To Borrower's knowledge, the applicable fee estate under the Prime Lease is not an asset in any voluntary or involuntary bankruptcy, reorganization or insolvency proceeding.

(b)     The Prime Lease or a memorandum thereof has been duly recorded, and, to Borrower's best knowledge, there have not been any modifications, amendments or other changes in the terms of the Prime Lease since recordation of the Prime Lease or a memorandum thereof.

(c)     Ground Lessor's interest in the Prime Lease is not subject to any Lien superior to, or of equal priority with, the Security Instrument.

(d)     The Prime Lease requires Prime Lease Lessor to give notice of any default by Ground Lessor to Mortgage Lender prior to exercising its remedies thereunder in accordance

52

with the terms of the Prime Lease. The Prime Lease further provides that notice of termination given under the Prime Lease is not effective against Mortgage Lender unless a copy of such notice has been delivered to Mortgage Lender.

(e)     Intentionally Omitted.

(f)     The Prime Lease has a term which extends not less than thirty (30) years beyond the Maturity Date (including any extensions thereof in accordance with the terms and conditions of this Agreement).

(g)     The Prime Lease provides that in the event of any cancellation, termination or surrender of the Prime Lease, whether voluntary, involuntary or by operation of law prior to the expiration of the Ground Lease, the Ground Lease would continue in full force and Prime Lease Lessor would recognize the Ground Lease and Mortgage Borrower's rights thereunder and establish direct privity with the same force and effect as if the Ground Lease was originally made from Prime Lease Lessor in favor of Mortgage Borrower.

3.1.41. <u>Patriot Act</u>.

(a)     None of Borrower, Mortgage Borrower, or any of its Control Affiliates is a Prohibited Person. To the best of Borrower's knowledge, no other Affiliate of Borrower or Mortgage Borrower or any of Borrower's, Mortgage Borrower's or Borrower's Affiliate's respective brokers or other agents acting or benefiting in any capacity in connection with the Loan, is a Prohibited Person.

(b)     Neither Borrower, Mortgage Borrower, nor any of Borrower's Control Affiliates, nor, to Borrower's knowledge, any other Affiliate of Borrower or Mortgage Borrower, nor any of their respective brokers or other agents acting in any capacity in connection with the Loan or the Mortgage Loan, (i) has conducted or will conduct any business or has engaged or will engage in any transaction or dealing with any Prohibited Person, including making or receiving any contribution of funds, goods or services to or for the benefit of any Prohibited Person, (ii) has dealt or will deal in, or otherwise has engaged or will engage in, any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224; or (iii) has engaged or will engage in or has conspired or will conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in the Patriot Act.

(c)     Borrower covenants and agrees to deliver to Lender any certification or other evidence requested from time to time by Lender in its sole discretion, confirming Borrower's compliance with this <u>Section 3.1.41</u>.

3.1.42. <u>Intentionally Omitted</u>.

3.1.43. <u>No Casualty</u>. The Property has suffered no material Casualty which has not been fully repaired and the cost thereof fully paid.

3.1.44. <u>Purchase Options</u>.  Neither the Property nor any part thereof is subject to any purchase options, rights of first refusal, rights of first offer or other similar rights in favor of any Person.

3.1.45. <u>Use of Property</u>.  The Property consists solely of a retail and office complex and related ancillary operations and is used for no other purpose.

3.1.46. <u>Fiscal Year</u>.  Each Fiscal Year of Borrower commences on January 1.

3.1.47. <u>Material Agreements</u>.  Each of the Material Agreements is in full force and effect, there are no material monetary or other defaults by Mortgage Borrower thereunder and, to the best knowledge of Borrower, there are no material monetary or other defaults thereunder by any other party thereto.  None of Mortgage Borrower, any Manager or any other Person acting on Mortgage Borrower's behalf has given or received any notice of any material default under any Material Agreement that remains outstanding or in dispute.  No Material Agreement has as a party a Control Affiliate of Borrower or Mortgage Borrower.

3.1.48. <u>Other Obligations and Liabilities</u>.  Neither Borrower nor Mortgage Borrower has any known liabilities or other obligations that arose or accrued prior to the Closing Date that, either individually or in the aggregate, could have a Material Adverse Effect.  Neither Borrower nor Mortgage Borrower has any known contingent liabilities that could have a Material Adverse Effect.

3.1.49. <u>Illegal Activity</u>.  No portion of the Property has been or will be purchased with proceeds of any illegal activity.

3.1.50. <u>Underwriting Representations</u>.  Borrower hereby represents with respect to Borrower and Mortgage Borrower that:

(a)     neither Borrower nor Mortgage Borrower has material judgments or liens of any nature against it except for tax liens not yet due;

(b)     neither Borrower nor Mortgage Borrower is involved in any dispute with any taxing authority other than possible tax challenges by Mortgage Borrower;

(c)     neither Borrower nor Mortgage Borrower is now, nor has ever been, party to any material lawsuit, arbitration, summons, or legal proceeding that is still pending or that resulted in a judgment against it or its assets or properties that has not been paid in full;

(d)     each amendment and restatement of Borrower's and Mortgage Borrower's Organizational Documents (if any) has been accomplished in accordance with, and was permitted by, the relevant provisions of said documents prior to its amendment or restatement from time to time; and

(e)     each assignment or transfer of limited liability company interests in Borrower or Mortgage Borrower all prior members of Borrower or Mortgage Borrower to their successor member and the admission of their successor member as a member of Borrower or

Mortgage Borrower was accomplished in accordance with, and was permitted by, the applicable limited liability company agreement governing the affairs of Borrower or Mortgage Borrower at the time of such assignment or transfer and admission

(f)        except as previously disclosed to Lender in writing, with respect to any loan or financing in which any Restricted Party (other than any Restricted Party under subclause (ii) of the definition of "Restricted Party") or any Affiliate thereof has been directly or indirectly obligated for or has, in connection therewith, otherwise provided any guaranty, indemnity or similar surety, none of such loans or financings has ever been (i) more than 30 days in default or (ii) transferred to special servicing.

3.1.51. <u>Contractual Obligations</u>.   Other than the Loan Documents, the organizational documents of Borrower, and the organizational documents of Mortgage Borrower, as of the date of this Agreement, Borrower is not subject to any Contractual Obligations and has not entered into any agreement, instrument or undertaking by which it or its assets are bound, or has incurred any Indebtedness, except for Contractual Obligations or liabilities (not material in the aggregate) that are incidental to its activities as a member of Mortgage Borrower.

3.1.52. <u>Mortgage Loan Representations and Warranties</u>. All of the representations and warranties contained in the Mortgage Loan Documents are (a) true and correct in all respects and (b) hereby incorporated into this Agreement and deemed made hereunder as and when made thereunder and shall remain incorporated without regard to any waiver, amendment or other modification thereof by the Mortgage Lender or to whether the related Mortgage Loan Document has been repaid or otherwise terminated, unless otherwise consented to in writing by Lender.

3.1.53. <u>Subsidiaries</u>. Borrower does not have any subsidiaries other than Mortgage Borrower.

**Section 3.2.**    <u>Survival of Representations</u>.  The representations and warranties set forth in <u>Section 3.1</u> hereof shall survive for so long as any amount remains payable to Lender under this Agreement or any of the other Loan Documents.

## IV.    BORROWER COVENANTS

**Section 4.1.**    <u>Borrower Affirmative Covenants</u>.  Borrower hereby covenants and agrees with Lender that:

4.1.1.   <u>Existence; Compliance with Legal Requirements</u>.  Borrower shall, and shall cause Mortgage Borrower to, do or cause to be done in all material respects all things necessary to preserve, renew and keep in full force and effect its existence, rights, licenses, permits and franchises and comply in all material respects with all Legal Requirements applicable to it and the Property.  There shall never be committed by Borrower nor Mortgage Borrower and Borrower shall not permit Mortgage Borrower nor any other Person in occupancy of or involved with the operation or use of the Property to commit any act or omission affording the federal government, any state or local government or any other Governmental Authority the right of forfeiture against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents or Mortgage Borrower's obligations under any of the Mortgage

55

Loan Documents.  Borrower hereby covenants and agrees not to commit, permit or suffer to exist or to permit Mortgage Borrower to commit, permit or suffer to exist any act or omission affording such right of forfeiture.  Borrower shall and shall cause Mortgage Borrower to at all times maintain, preserve and protect all franchises and trade names and preserve all of its assets and properties used in the conduct of its business and shall keep the Property in good working order and repair, and from time to time make, or cause to be made, all reasonably necessary repairs, renewals, replacements, betterments and improvements thereto, all as more fully provided in the Security Instrument.  Borrower shall cause Mortgage Borrower to keep the Property insured at all times by financially sound and reputable insurers, to such extent and against such risks, and maintain liability and such other insurance, as is more fully provided in this Agreement.  Borrower shall cause Mortgage Borrower to operate the Property in accordance with the terms and provisions of the O&M Plan in all material respects.  After prior notice to Lender, Borrower, at its sole cost and expense, may contest or permit Mortgage Borrower to consent by appropriate legal proceeding promptly initiated and conducted in good faith and with due diligence, the validity of any Legal Requirement, the applicability of any Legal Requirement to Borrower, Mortgage Borrower, the Collateral, or the Property or any alleged violation of any Legal Requirement; provided that (a) no Default or Event of Default has occurred and remains outstanding; (b) intentionally omitted; (c) such proceeding shall be permitted under and be conducted in accordance with the provisions of any instrument to which Borrower, Mortgage Borrower, the Collateral, or the Property is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all applicable statutes, laws and ordinances; (d) neither the Property, the Collateral, nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, canceled or lost; (e) Borrower shall or shall cause Mortgage Borrower to promptly upon final determination thereof comply with such Legal Requirement determined to be valid or applicable or cure any violation of such Legal Requirement; (f) such proceeding shall suspend the enforcement of the contested Legal Requirement against Borrower, Mortgage Borrower, the Collateral or the Property; (g) Borrower shall furnish such cash or other security as may be required in the proceeding, or as may be reasonably requested by Lender, to ensure compliance with such Legal Requirement, together with all interest and penalties payable in connection therewith; provided, that to the extent that Mortgage Borrower is required to and does provide such security contemplated by this clause (g) to Mortgage Lender under the Mortgage Loan Agreement, then Borrower shall be relieved of its obligation to deposit such security pursuant to this Section 4.4.1; and (h) such contest by Borrower or Mortgage Borrower is not in violation of the Ground Lease, the Prime Lease, or any Lease.  Lender may apply any such security or part thereof, as necessary to cause compliance with such Legal Requirement at any time when, in the reasonable judgment of Lender, the validity, applicability or violation of such Legal Requirement is finally established or the Property or the Collateral (or any part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, canceled or lost or there shall be any danger of the Lien of the Security Instrument or the Pledge Agreement being primed by any related Lien.

      4.1.2.  Taxes and Other Charges.  Borrower shall or shall cause Mortgage Borrower to pay or cause to be paid all Taxes and Other Charges now or hereafter levied or assessed or imposed against the Property, the Collateral or any part thereof as the same become due and payable; provided, however, Borrower's obligation to directly pay Taxes allocable to the Property shall be suspended for so long as Mortgage Borrower is required to post a reserve for the same and otherwise complies with the terms and provisions of Section 6.2 of the Mortgage Loan

Agreement.  Borrower shall not permit or suffer or permit Mortgage Borrower to permit or suffer and shall promptly cause to be paid and discharged any Lien or charge against the Property or the Collateral which is not a Permitted Encumbrance.  After prior notice to Lender, Borrower, at its sole cost and expense, may contest or may permit Mortgage Borrower to consent by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any Taxes or Other Charges, provided that (a) no Default or Event of Default has occurred and remains outstanding; (b) intentionally omitted; (c) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower, Mortgage Borrower, the Collateral or the Property is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all applicable Legal Requirements; (d) neither the Property, the Collateral, nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, canceled or lost; (e) Borrower shall promptly upon final determination thereof pay or cause Mortgage Borrower to pay the amount of any such Taxes or Other Charges, together with all costs, interest and penalties which may be payable in connection therewith; (f) such proceeding shall suspend the collection of such contested Taxes or Other Charges from the Property or the Collateral, as applicable; (g) Borrower shall furnish such cash or other security as may be required in the proceeding, or as may be reasonably requested by Lender, to ensure the payment of any such Taxes or Other Charges, together with all interest and penalties thereon; provided, that to the extent that Mortgage Borrower is required to and does provide each security contemplated by this clause (g) to Mortgage Lender under the Mortgage Loan Agreement, then Borrower shall be relieved of its obligation to deposit such security pursuant to this Section 4.1.2; and (h) such contest by Borrower or Mortgage Borrower is not in violation of the Ground Lease, the Prime Lease, or any Lease.  Lender may pay over, assign or transfer any such security or part thereof to the claimant entitled thereto at any time when, in the reasonable judgment of Lender, the entitlement of such claimant is established or the Property or the Collateral (or any part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, canceled or lost or there shall be any danger of the Lien of the Security Instrument or the Pledge Agreement being primed by any related Lien.

> 4.1.3.  Litigation.  Borrower shall give prompt notice to Lender of any litigation or governmental proceedings pending or threatened against the Property, the Collateral, Mortgage Borrower, Borrower or Guarantor which, if adversely determined, could have a Material Adverse Effect.  Borrower shall cooperate fully with Lender with respect to any proceedings before any court, board or other Governmental Authority which may in any way affect the rights of Lender hereunder or under any of the other Loan Documents and, in connection therewith, permit Lender, at its election, to participate in any such proceedings.

> 4.1.4.  Access to Property.  Borrower shall cause Mortgage Borrower to permit agents, representatives and employees of Lender to inspect the Property or any part thereof at reasonable hours upon reasonable advance notice, subject to the rights of Tenants and the provisions of any Management Agreement entered into in accordance with the terms and conditions of this Agreement and the Mortgage Loan Agreement.

> 4.1.5.  Further Assurances; Supplemental Mortgage Affidavits.  Borrower shall, at Borrower's sole but reasonable cost and expense:

57

(a)    furnish to Lender all instruments, documents, boundary surveys, footing or foundation surveys, certificates, plans and specifications, appraisals, title and other insurance reports and agreements, and each and every other document, certificate, agreement and instrument in Borrower's possession or otherwise required to be furnished by Borrower pursuant to the terms of the Loan Documents or which are reasonably requested by Lender in connection therewith;

(b)    cure, or cause to be cured, any defects in the execution and delivery of the Loan Documents;

(c)    execute and deliver, or cause to be executed and delivered, all such documents, instruments, certificates, assignments and other writings and do, or cause to be done, such other acts necessary (i) to correct any omissions in the Loan Documents, (ii) to evidence and more fully describe the collateral at any time securing or intended to secure the Obligations, (iii) to perfect, protect or preserve any Liens created under any of the Loan Documents or (iv) to make any recordings, file any notices, or obtain any consents, as may be necessary or appropriate in connection therewith; and

(d)    do and execute, or cause to be done and executed, all such further lawful and reasonable acts, conveyances and assurances for the better and more effective carrying out of the intents and purposes of this Agreement and the other Loan Documents, as Lender shall reasonably require from time to time.

4.1.6.   <u>Financial Reporting</u>.

(a)    <u>GAAP</u>.  Borrower shall and shall cause Mortgage Borrower to keep and maintain or shall cause to be kept and maintained, in accordance with GAAP (or such other Approved Accounting Method) proper and accurate books, records and accounts reflecting all of the financial affairs of Borrower and Mortgage Borrower and all items of income and expense in connection with the operation of the Property and the ownership of the Collateral.  All financial statements delivered to Lender pursuant to this <u>Section 4.1.6</u> shall be prepared in accordance with GAAP (or such other Approved Accounting Method) consistently applied.

(b)    <u>Intentionally Omitted</u>.

(c)    <u>Quarterly Reports</u>.  Borrower shall furnish, or cause to be furnished, to Lender on or before sixty (60) days after the end of each calendar quarter (provided, that, the quarterly and year-to-date operating statements required to be delivered pursuant to clause (ii)(B) of this <u>Section 4.1.6(c)</u> for the relevant period ending on December 31st of any calendar year shall be furnished, or cause to be furnished, to Lender on or before ninety (90) days after the end of each calendar year), (i) a rent roll for the subject quarter and a summary setting forth each of the following with respect to the Property for such quarter:  (1) aggregate sales by Tenants under Leases or other occupants of the Property, both on an actual and on a comparable store basis, (2) rent per square foot payable by each Tenant, and (3) aggregate occupancy of the Property by anchor space and in-line store space as of the last day of such quarter (such rent roll and summary to be accompanied, if a Trigger Period is then continuing, by an Officer's Certificate stating that the same are true, correct and complete in all material respects); (ii) the following items accompanied by an Officer's Certificate stating that such items are true, correct and complete in

all material respects and fairly present the financial condition and results of the operations of Borrower, Mortgage Borrower, the Collateral, and the Property (subject to normal year-end adjustments) as applicable:  (A) a balance sheet for Borrower and Mortgage Borrower as of the last day of such quarter and (B) quarterly and year-to-date operating statements prepared for such quarter in form reasonably satisfactory to Lender (in addition, such Officer's Certificate or an Officer's Certificate from any other officer of Borrower shall also state that the representations and warranties of Borrower set forth in Section 3.1.24 and the representations of Mortgage Borrower set forth in Section 3.1.24 of the Mortgage Loan Agreement are true and correct in all material respects as of the date of such certificate and that there are no trade payables and operational debt outstanding for more than sixty (60) days) (unless the same are being disputed in good faith and have been properly accounted and/or reserved for with Lender); (iii) copies of any final engineering, environmental or seismic reports prepared for Mortgage Borrower with respect to the Property and received by Mortgage Borrower during such calendar quarter; and (iv) receipts for the payment of the Taxes required hereunder to be paid during such calendar quarter; provided, however, that Borrower is not required to furnish (or cause Mortgage Borrower to furnish) such receipts for payment of Taxes in the event that such Taxes have been paid by Mortgage Lender pursuant to Section 6.2 of the Mortgage Loan Agreement.  Notwithstanding anything to the contrary, if a Trigger Period is then continuing, the items in clauses (i) and (ii) above and tenant sales reports (to the extent available) shall be furnished to Lender within thirty (30) days after the end of each calendar month (except for the months of January and the last month of a quarter).

(d)     Annual Reports.  Borrower shall furnish, or cause to be furnished, to Lender annually, (i) within eighty-five (85) days following the end of each Fiscal Year of Borrower, a complete unaudited copy of Borrower's and Mortgage Borrower's annual financial statements covering the Property and the Collateral for such Fiscal Year and containing statements of profit and loss for Borrower, Mortgage Borrower, the Collateral, and the Property and a balance sheet for Borrower and Mortgage Borrower and (ii) within one hundred twenty (120) days following the end of each Fiscal Year of Borrower, a complete copy of Borrower's and Mortgage Borrower's annual financial statements covering the Property for such Fiscal Year and containing statements of profit and loss for Borrower, Mortgage Borrower, the Collateral, and the Property and a balance sheet for Borrower and Mortgage Borrower which shall be audited by a "Big Four" accounting firm or other firm of independent certified public accountants reasonably acceptable to Lender. Such statements shall set forth the financial condition and the results of operations for the Property and the Collateral for such Fiscal Year.  The accounting firms of Grant Thorton, Shanholt, Glassman, Klein, Kramer & Co., and Berdon LLP shall be deemed acceptable to Lender for all purposes hereunder; provided, however that such deemed acceptance may be revoked at such time as Lender has a reasonable basis for such revocation.  In addition, Borrower shall simultaneously deliver to Lender a sales report for the Property for the preceding twelve (12) months.  Borrower may, at Borrower's option, request in writing from time to time that Lender waive the requirement that Borrower's and Mortgage Borrower's annual financial statements be audited and be accompanied by an opinion of a "Big Four" accounting firm or other firm of independent certified public accountants reasonably acceptable to Lender unqualified as to going concern status, and in the event that (i) Lender consents to such request and (ii) Borrower delivers to Lender a Rating Agency Confirmation with respect to such waiver by Lender, Borrower's annual financial statements shall be accompanied by an Officer's Certificate from the chief financial officer of Borrower stating that each such annual financial statement presents fairly the financial condition

59

and the results of operations of Borrower, Mortgage Borrower, the Collateral, and the Property being reported upon and has been prepared in accordance with GAAP (or such other Approved Accounting Method).

(e)    Supporting Documentation. Each such financial statement shall be in scope and detail reasonably satisfactory to Lender.

(f)    Access. Lender shall have the right from time to time with reasonable advance notice to Borrower at all times during normal business hours to examine such books, records and accounts at the office of Borrower, Mortgage Borrower, or other Person maintaining such books, records and accounts and to make such copies or extracts thereof as Lender shall desire. After the occurrence of an Event of Default, Borrower shall pay any costs and expenses incurred by Lender to examine Borrower's and Mortgage Borrower's accounting records with respect to the Property and the Collateral, as Lender shall determine to be necessary or appropriate in the protection of Lender's interest.

(g)    Format of Delivery. Any reports, statements or other information required to be delivered under this Agreement shall be delivered (i) in paper form, (ii) on a diskette, and (iii) if requested by Lender and within the capabilities of Borrower's data systems without change or modification thereto, in electronic form reasonably acceptable to Lender.

(h)    Annual Budget. For each Fiscal Year (or portion thereof) during the term of the Loan, Borrower shall submit or shall cause Mortgage Borrower to submit to Lender an Annual Budget not later than forty-five (45) days after the commencement of such Fiscal Year, which Annual Budget shall set forth, on a month-by-month basis, in reasonable detail, each line item of Mortgage Borrower's good faith estimate of Gross Rents, Operating Income, Operating Expenses and Capital Expenditures for such period or Fiscal Year. The Annual Budget shall be submitted to Lender for information only, provided that upon the occurrence of a Trigger Period, Borrower shall submit or shall cause Mortgage Borrower to submit to Lender, within thirty (30) days after the commencement of such Trigger Period, an Annual Budget conforming to the requirements of this clause (h) and otherwise in form reasonably satisfactory to Lender for the partial year period commencing upon the occurrence of such Trigger Period, and for each Fiscal Year thereafter until the occurrence of a cure of all Trigger Periods, for Lender's reasonable approval (each such Annual Budget, an "**Approved Annual Budget**"). In the event that Lender objects to a proposed Annual Budget submitted by Borrower or Mortgage Borrower for Lender's approval, Lender shall advise Borrower of such objections within fifteen (15) days after receipt thereof (and deliver to Borrower a reasonably detailed description of such objections) and Borrower shall or shall cause Mortgage Borrower to promptly revise such Annual Budget and resubmit the same to Lender. Lender shall advise Borrower of any objections to such revised Annual Budget within ten (10) days after receipt thereof (and deliver to Borrower a reasonably detailed description of such objections) and Borrower shall or shall cause Mortgage Borrower to promptly revise the same in accordance with the process described in this Section 4.1.6(h) until Lender approves such Annual Budget. Until such time that Lender approves a proposed Annual Budget requiring Lender's approval, the most recent Approved Annual Budget, if any, and if there was no Approved Annual Budget for the prior Fiscal Year, then the monthly expenditures for the 2018 Fiscal Year of Borrower set forth on the schedule delivered to and approved by Lender on or

60

prior to the date hereof and attached to that certain Mezzanine Borrower's Certification, dated as of the date hereof, by Borrower in favor of Lender (the "**2018 Annual Expenditure Schedule**") shall apply and during such period shall be deemed to be the most recent "**Approved Annual Budget**" for all purposes of the Loan Documents; provided that, such Approved Annual Budget or 2018 Annual Expenditure Schedule, as applicable, shall be adjusted to reflect actual increases in Taxes, Insurance Premiums and Other Charges and all other amounts in the 2018 Annual Expenditure Schedule, if applicable, shall be increased or decreased for each full calendar year between 2018 and the calendar year in which the determination is made based on the PPI Index for each such calendar year.  In the event that Mortgage Borrower must incur an extraordinary operating expense or capital expense not set forth in the applicable Approved Annual Budget or 2018 Annual Expenditure Schedule, as applicable (each, an "**Extraordinary Expense**"), then Borrower shall promptly deliver or cause Mortgage Borrower to promptly deliver to Lender a reasonably detailed explanation of such proposed Extraordinary Expense for Lender's approval which approval shall not be unreasonably withheld or delayed.  In no event shall Lender's approval of an Approved Annual Budget be deemed to waive, alter, restrict or otherwise impair Lender's rights and remedies pursuant to the Loan Documents following the occurrence and during the continuance of an Event of Default to apply amounts on deposit in any Reserve Account or any other Collateral to the payment of the Debt in any order, proportion and priority as Lender may determine in its sole and absolute discretion.

(i)     Other Required Information.   Borrower shall furnish, or cause to be furnished, to Lender, within five (5) Business Days after request (or as soon thereafter as may be reasonably possible), such further detailed information with respect to the operation of the Property and the financial affairs of Borrower or Mortgage Borrower as may be reasonably requested by Lender.

(j)     Reporting Default.   If Borrower fails to provide or cause to be provided to Lender the financial statements and other information specified in this Section 4.1.6 within the respective time period specified, then Lender shall have the right to declare a Default and Borrower shall have the notice and cure period set forth in Section 10.1(u) hereof.

4.1.7.   Title to Property.   Borrower shall (i) cause Mortgage Borrower to warrant and defend (a) its title to the Property, subject only to Permitted Encumbrances, and (b) the validity and priority of the Liens of the Security Instrument and the Assignment of Leases on the Property, subject only to Permitted Encumbrances, in each case against the claims of all Persons whomsoever and (ii) warrant and defend (a) its title to the Collateral, subject only to Permitted Encumbrances, and (b) the validity and priority of the Lien of the Pledge Agreement on the Collateral, subject only to Permitted Encumbrances, against the claims of all Persons whomsoever. Borrower shall or shall cause Mortgage Borrower to reimburse Lender for any losses, costs, damages or expenses (including reasonable attorneys' fees and court costs) incurred by Lender if an interest in the Property or the Collateral or any part thereof is claimed by any other Person except as expressly permitted hereunder.

4.1.8.   Estoppel Statement.   (a)  Borrower shall deliver to Lender, within ten (10) days after Lender's request, a statement, duly acknowledged and certified, setting forth (i) the outstanding principal amount of the Loan and the Mortgage Loan, (ii) the unpaid principal amount

of the Loan and the Mortgage Loan, (iii) the rate of interest on the Loan and the Mortgage Loan, (iv) the date installments of principal and/or interest were last paid on the Loan and the Mortgage Loan, (v) any offsets or defenses to the payment and performance of the Obligations or offsets of defenses to Mortgage Borrower's payment and performance of its obligations under the Mortgage Loan Documents, if any, and (vi) that this Agreement and the other Loan Documents are valid, legal and binding obligations of Borrower and have not been modified (or, if modified, giving particulars of such modification) and that the Mortgage Loan Agreement and the other Mortgage Loan Documents are valid, legal and binding obligations of Mortgage Borrower and have not been modified (or, if modified, giving particulars of such modification).   In connection with any Transfer (including any pledge) permitted under, and effected in accordance with, the Loan Documents of direct or indirect ownership interests in Borrower to a Person that is not an Affiliate of Borrower, or as otherwise reasonably requested by Borrower, Lender shall deliver to Borrower, within ten (10) days after Borrower's request, a statement, duly acknowledged and certified, setting forth (i) the outstanding principal amount of the Loan, (ii) the unpaid principal amount of the Loan, (iii) the rate of interest on the Loan, (iv) the date installments of principal and/or interest were last paid, (v) any defaults or breaches in Borrower's obligations under the Loan Documents, and (vi) that this Agreement and the other Loan Documents have not been modified (or, if modified, giving particulars of such modification).

(b)     Borrower shall cause Mortgage Borrower to deliver to Lender, within thirty (30) days after Lender's request, an estoppel certificate from each Tenant under any Lease in form and substance reasonably satisfactory to Lender; provided that (i) Borrower shall only be required to cause Mortgage Borrower to use commercially reasonable efforts to obtain an estoppel certificate from any Tenant, (ii) such estoppel certificate may be in the form required under the respective Tenant's Lease, and (iii) Mortgage Borrower shall not be required to deliver such estoppel certificate from any Tenant more frequently than once in any calendar year.

(c)     Borrower shall cause Mortgage Borrower to use commercially reasonable efforts to deliver to Lender, within thirty (30) days after Lender's request, an estoppel certificate from each party to any REA in form and substance in the form required under any REA (or, if the applicable REA does not require any such form, in form and substance reasonably satisfactory to Lender), provided that Mortgage Borrower shall not be required to deliver such estoppel certificate from any such party to any REA more frequently than once in any calendar year.

4.1.9.   Leases.

(a)     Leases (excluding any extensions or renewals of existing Leases pursuant to options expressly contained therein as to which Mortgage Borrower has no discretion) executed after the Closing Date shall (i) be on commercially reasonable terms, (ii) provide that such Lease is subordinate to the Security Instrument and the Assignment of Leases and that the Tenant thereunder will attorn to Mortgage Lender and any purchaser at a foreclosure sale subject to appropriate provisions for non-disturbance to the extent the Tenant is not in default thereunder, (iii) not be with any Affiliate of Borrower, Mortgage Borrower, Guarantor or any Manager (provided that (A) Lender's consent shall not be required for Leases of administrative or managerial offices for the Property entered into in accordance with Section 4.2.5 and the other provisions hereof, and (B) Lender shall not unreasonably withhold consent to any other Lease with

62

any such Affiliate), (iv) not contain any option to purchase, any right of first option to purchase, any right of first refusal to purchase, or any other terms which could materially adversely affect Lender's rights under the Loan Documents or Mortgage Lender's rights under the Mortgage Loan Documents (provided that, in connection with renewals of Leases existing on the Closing Date, any applicable term that would otherwise breach the requirements set forth in this Section 4.1.9(a) shall be permitted to the extent necessary to implement a renewal term expressly contained in the applicable Lease and with respect to which Borrower has no discretion), and (v) be in writing. Notwithstanding the foregoing or anything herein to the contrary, each and every Lease (including any extensions or renewals of existing Leases) executed after the Closing Date shall be in material compliance with the terms, provisions, and conditions of the Ground Lease and the Prime Lease.

(b)     Borrower shall cause Mortgage Borrower to (i) perform in all material respects and in a commercially reasonable manner the obligations which Borrower is required to perform under the Leases; (ii) enforce the obligations to be performed by the Tenants thereunder in a commercially reasonable manner; (iii) promptly furnish to Lender (A) any notice of default in any material respect under a Major Lease, (B) any notice of default under a Lease other than a Major Lease which could reasonably be expected to have a Material Adverse Effect, (C) any notice of termination received by Mortgage Borrower from any Tenant under a Major Lease or, upon Lender's request, any such notice received from any Tenant under any other Lease, (D) any notice given by Mortgage Borrower regarding default in any material respect under a Major Lease, (E) any notice given by Mortgage Borrower regarding default under a Lease other than a Major Lease which could reasonably be expected to have a Material Adverse Effect, or (F) any notice of termination given by Mortgage Borrower to any Tenant under a Major Lease or, upon Lender's request, any such notice given to any Tenant under any other Lease; (iv) not collect any Rents for more than one (1) month in advance of the time when the same shall become due (other than bona fide security deposits); (v) not further assign or encumber any Lease or the Rents (except as contemplated by the Mortgage Loan Documents); (vi) be permitted to amend in a commercially reasonable manner and in a manner not to cause a Material Adverse Effect (x) the terms, covenants and conditions contained in the Leases other than a Major Lease upon the part of the Tenant thereunder to be observed or performed, and (y) the terms, covenants and conditions contained in a Major Lease, provided that with respect to such amendment which amends any of the material economic terms of such Major Lease the prior consent of Lender to such amendment has been obtained, such consent not to be unreasonably withheld; and (vii) be permitted to terminate or accept a surrender of (1) any Lease other than a Major Lease, if by reason of a default by the Tenant thereunder or if otherwise commercially reasonable and provided such termination will not cause a Material Adverse Effect and (2) a Major Lease if by reason of a material uncured default by the Tenant that exists for at least ninety (90) days thereunder (and provided that Borrower causes Mortgage Borrower to provide to Lender prior written notice of its intent to terminate such Major Lease, such termination is commercially reasonable and will not cause a Material Adverse Effect) or otherwise with prior written consent of Lender.  Any action in violation of clause (v), (vi) and (vii) of this Section 4.1.9(b) shall be void at the election of Lender.

(c)     All Major Leases and all extensions or renewals thereof (other than extensions or renewals strictly limited to the implementation of options or rights expressly contained in such Major Lease and with respect to which Mortgage Borrower has no discretion as to the terms thereof) executed after the Closing Date shall be subject to the prior written consent

63

of Lender, which approval shall not be unreasonably withheld, conditioned or delayed (provided, that with respect to any Major Lease executed after the Closing Date that contains an option or preferential right to purchase all or any portion of the Property, Lender may grant or withhold its consent in its sole and absolute discretion).  Borrower shall or shall cause Mortgage Borrower to pay or cause to be paid to Lender in connection with Lender's review of such Major Leases and all extensions or renewals thereof (other than extensions or renewals strictly limited to the implementation of options or rights expressly contained in such Major Lease and with respect to which Borrower has no discretion as to the terms thereof), Lender's actual costs reasonably incurred in connection with such review but not to exceed, in the aggregate, One Thousand Five Hundred and No/100 Dollars ($1,500.00) for each such Major Lease or such extension or renewal thereof.  In no event shall Borrower be required to post an expense deposit or enter into a retainer agreement with Lender or Servicer in connection with Borrower's or Mortgage Borrower's request to enter into such Major Lease or such extension or renewal thereof.

        (d)      Intentionally omitted.

        (e)      Intentionally omitted.

        (f)      Intentionally omitted.

        (g)      Intentionally omitted.

        (h)      Within ten (10) days after Lender's request, Borrower shall or shall cause Mortgage Borrower to furnish to Lender a statement of all Tenant security or other deposits and copies of all Leases not previously delivered to Lender, certified as being true, correct and complete.

        (i)      All security deposits of Tenants, whether held in cash or any other form, shall be held in compliance with the Leases and all applicable Legal Requirements.  Any bond or other instrument which Mortgage Borrower is permitted to hold in lieu of cash security deposits under the applicable Legal Requirements shall be maintained in full force and effect in the full amount of such deposits unless replaced by cash deposits as described above.  Borrower shall or shall cause Mortgage Borrower to, upon request, provide Lender with evidence satisfactory to Lender of Mortgage Borrower's compliance with the foregoing.

        (j)      With regard to any action described in this Section 4.1.9 for which Lender's consent is required, to the extent that the Deemed Approval Requirements are fully satisfied in connection with any Borrower request for Lender consent under this Section and Lender thereafter fails to respond, Lender's approval shall be deemed given with respect to the matter for which approval was requested.

        4.1.10.  Alterations.  Lender's prior approval shall not be required in connection with any alterations to the Property which (i) would not reasonably be expected to have a Material Adverse Effect or (ii) the cost of which (including any related alteration, improvement or replacement) is not reasonably anticipated to exceed the Alteration Threshold.  Subject to the immediately following sentence, in the event that Lender's approval shall be required in connection with any alterations to the Property, such approval shall not be unreasonably withheld,

<div align="center">64</div>

conditioned or delayed.  Notwithstanding anything herein to the contrary, Lender's prior approval shall be required in connection with any alterations to the Property that are performed during the continuance of any Event of Default, which approval may be granted or withheld in Lender's sole discretion.  Any alteration to the Property shall be (i) done and completed by Mortgage Borrower in an expeditious and diligent fashion, (ii) done and completed by Mortgage Borrower in material compliance with all applicable Legal Requirements (including, without limitation, all Legal Requirements applicable to the parking available at the Property to the extent Borrower is responsible for the same pursuant to the Ground Lease or the Prime Lease), and (iii) done and completed by Mortgage Borrower in compliance with the terms, provisions, and conditions of the Ground Lease and the Prime Lease.  If the total unpaid amounts incurred or to be incurred with respect to such alterations to the Property occurring simultaneously or to terminate any of the alterations and restore the Property to the extent necessary to prevent any Material Adverse Effect, other than Alteration Costs to be paid or reimbursed by any Tenant under such Tenant's Lease (provided that the applicable Lease shall be in full force and effect) (collectively, "**Alterations Costs**") shall at any time exceed the Alteration Threshold, Borrower shall promptly deliver to Lender as security for the payment of such Alteration Costs in excess of the Alteration Threshold and as additional security for Borrower's obligations under the Loan Documents any of the following at Borrower's option (provided, that to the extent that Mortgage Borrower is required to and does provide such security contemplated by this Section 4.1.10 to Mortgage Lender under the Mortgage Loan Agreement, then Borrower shall be relieve of its obligation to deposit such security pursuant to this Section 4.1.10): (W) cash, (X) Letters of Credit, (Y) U.S. Obligations or (Z) other securities acceptable to Lender (provided that, in the case of securities that are not Permitted Investments, following a Securitization, Lender shall have received a Rating Agency Confirmation as to the form and issuer of same such security; provided further, without limiting Borrower's obligation to deliver such security in the amount of such excess in the form of the foregoing (W), (X), (Y) and/or (Z), any Letter of Credit when aggregated with all other Letters of Credit shall not exceed ten percent (10%) of the Outstanding Principal Balance), which may be reduced from time to time at the request of Borrower to an amount equal to the excess of the total unpaid amounts incurred or to be incurred as then estimated by Mortgage Borrower and reasonably approved by Lender to complete such alterations or to terminate any of the alterations and restore the Property to the extent necessary to prevent any Material Adverse Effect, and, at Lender's option, Lender shall have the right to apply such security from time to time to pay for such alterations or termination and restoration.  Upon substantial completion of any alteration to the Property or termination of any alterations and restoration of the Property which requires Lender's consent, Borrower shall or shall cause Mortgage Borrower to provide evidence satisfactory to Lender that (1) such alteration or termination and restoration was constructed in accordance with all applicable Legal Requirements in all material respects, (2) all contractors, subcontractors, materialmen and professionals who provided work, materials or services in excess of the Work Threshold in connection with such alteration or termination and restoration have been paid in full and have delivered unconditional releases of Liens (unless waived in writing by Lender), and (3) all licenses and permits necessary for the use, operation and occupancy of the Improvements have been issued, provided that, if any such license or permit is temporary in nature, Borrower shall cause Mortgage Borrower to diligently pursue procuring a permanent license or permit from the applicable Governmental Authority unless the failure to hold such license or permit would not reasonably be expected to result in a Material Adverse Effect.  With regard to any action described in this Section 4.1.10 for which Lender's consent is required, to the extent that the Deemed Approval

Requirements are fully satisfied in connection with any Borrower request for Lender consent under this Section and Lender thereafter fails to respond, Lender's approval shall be deemed given with respect to the matter for which approval was requested.

4.1.11. Required Repairs. Borrower shall cause Mortgage Borrower to perform the repairs at the Property as set forth on Schedule II hereto and to repair any roof leaks (if any) (all such repairs are hereinafter referred to as "**Immediate Repairs**") and shall cause Mortgage Borrower to complete each of the Immediate Repairs on or before the respective deadline for each repair set forth on Schedule II hereto (and with respect to any roof leaks, within six (6) months of the Closing Date) (as such deadlines may be extended by Lender in its sole but reasonable discretion). Upon completion of any Immediate Repair, Borrower shall deliver to Lender (A) an Officer's Certificate stating that such Immediate Repair has been completed in a good and workmanlike manner and in accordance with all applicable Legal Requirements, such Officer's Certificate to be accompanied by a copy of any license, permit or other approval by any Governmental Authority required in connection with the Immediate Repairs and (B) such other evidence as Lender shall reasonably request that such Immediate Repair has been completed and each Person that supplied materials or labor in connection with the Immediate Repair has been paid in full.

4.1.12. Material Agreements. Borrower shall cause Mortgage Borrower to (a) promptly perform and/or observe the covenants, agreements and conditions required to be performed and observed by it under each Material Agreement and Operating Agreement to which it is a party, and do all things necessary to preserve and to keep unimpaired its rights thereunder, (b) promptly notify Lender in writing of the giving of any notice of any material default by any party under any Material Agreement and Operating Agreement of which it is aware and (c) promptly enforce the performance and observance in all material respects of all of the covenants, agreements and conditions required to be performed and/or observed by any other party under each Material Agreement and Operating Agreement to which Mortgage Borrower is a party in a commercially reasonable manner.

4.1.13. Unfunded Obligations. Borrower shall cause Mortgage Borrower to promptly perform any Unfunded Obligations in a timely manner.

4.1.14. Costs of Enforcement/Remedying Defaults. In the event (a) that the Pledge Agreement or the Security Instrument is foreclosed in whole or in part or the Note or any other Loan Document or Mortgage Loan Documents is put into the hands of an attorney for collection, suit, action or foreclosure, (b) of the foreclosure of any Lien, pledge, collateral assignment or mortgage, whether senior or junior to the Security Instrument or the Pledge Agreement, in which proceeding Lender is made a party, (c) of the bankruptcy, insolvency, rehabilitation or other similar proceeding in respect of Borrower, Mortgage Borrower, or Guarantor or an assignment by Borrower, Mortgage Borrower or Guarantor for the benefit of its creditors, or (d) Lender shall remedy or attempt to remedy any Event of Default, Borrower shall be chargeable with and agrees to pay all costs and expenses incurred by Lender as a result thereof, including costs of collection and defense (including reasonable attorneys', experts', consultants' and witnesses' fees and disbursements) in connection therewith and in connection with any appellate proceeding or post-judgment action, which shall be due and payable on demand, together with interest at the Default

66

Rate from the date such costs and expenses were incurred to and including the date the reimbursement payment is received by Lender.  All such Indebtedness shall be secured by the Pledge Agreement.

4.1.15. <u>Business and Operations</u>.  Borrower will and will cause Mortgage Borrower to continue to engage in the businesses currently conducted by Borrower and Mortgage Borrower as and to the extent the same are necessary for the ownership, management and operation of the Property and the ownership of the Collateral.  Borrower will and will cause Mortgage Borrower to qualify to do business and will remain in good standing under the laws of each jurisdiction as and to the extent the same are required for the ownership, management and operation of the Property.  Borrower shall cause Mortgage Borrower to at all times cause the Property to be maintained primarily as a retail and office complex.

4.1.16. <u>Station Renovations</u>.  None of the contemplated renovations of the Property will materially impair the value of the Collateral or the utility and operation of the Property or otherwise have a Material Adverse Effect.

4.1.17. <u>Intentionally Omitted</u>.

4.1.18. <u>Handicapped Access</u>.  Borrower covenants and agrees that the Property shall at all times strictly comply in all material respects to the extent applicable with the requirements of the Americans with Disabilities Act of 1990, the Fair Housing Amendments Act of 1988, all federal, state and local laws and ordinances related to handicapped access and all rules, regulations, and orders issued pursuant thereto including, without limitation, the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities.

4.1.19. <u>Recycled Entity</u>.  Borrower hereby represents and warrants to Lender that neither Borrower, Mortgage Borrower, nor any SPE Entity has, since its formation: (a) failed to be duly formed, validly existing, and in good standing in the jurisdiction of its formation and the State; (b) had any judgments or liens of any nature against it except for (i) tax liens not yet delinquent, (ii) judgments which have been satisfied in full and (iii) liens in connection with any prior loans which have been satisfied in full; (c) failed to comply in all material respects with all laws, regulations, and orders applicable to it or failed to receive all licenses and permits necessary for it to operate; (d) been involved in any dispute with any taxing authority which is unresolved as of the Closing Date or failed to pay all taxes owed prior to the delinquency thereof (or, if later, then with all applicable penalties, interest and other sums due in connection therewith); (e) ever been party to any lawsuit, arbitration, summons, or legal proceeding that is still pending or that resulted in a judgment against it that has not been paid in full; (f) failed to comply with all separateness covenants contained in its organizational documents since its formation; (g) had any material contingent or actual obligations not related to the Property or the Collateral; or (h) except as expressly disclosed to Lender in connection with the closing of the Loan, amended, modified, supplemented, restated, replaced or terminated its organizational documents (or consented to any of the foregoing).

4.1.20. <u>Notice of Certain Events</u>.  Borrower shall promptly notify Lender of, to Borrower's knowledge, (a) any Default or Event of Default, together with a detailed statement of

the steps being taken to cure such Default or Event of Default or (b) any Mortgage Loan Event of Default, together with a detailed statement of the steps being taken to cure such Mortgage Loan Event of Default.

4.1.21. Further Assurances; Power of Attorney.  Borrower irrevocably appoints Lender as its true and lawful attorney-in-fact effective upon the occurrence and during the continuation of an Event of Default to do, in its name or otherwise, any and all acts and to execute any and all documents that are necessary for the purpose of exercising and perfecting any and all rights and remedies available to Lender under the Loan Documents, at law and in equity, including, without limitation, such rights and remedies available to Lender pursuant to Section 10.2, Section 10.3, and Section 10.4 (and the above powers granted to Lender are coupled with an interest and shall be irrevocable).

4.1.22. Taxes on Security.  Borrower shall pay all taxes, charges, filing, registration and recording fees, excises and levies payable with respect to the Note or the Liens created or secured by the Loan Documents, other than income, franchise and doing business taxes imposed on Lender.  If there shall be enacted any law (a) deducting the Loan from the value of the Collateral for the purpose of taxation, (b) affecting any Lien on the Collateral, or (c) changing existing laws of taxation of mortgages, deeds of trust, security deeds, or debts secured by real property, or changing the manner of collecting any such taxes, Borrower shall promptly pay to Lender, on demand, all taxes, costs and charges for which Lender is or may be liable as a result thereof; provided, however, that if such payment would be prohibited by law or would render the Loan usurious, then instead of collecting such payment, Lender may declare all amounts owing under the Loan Documents to be immediately due and payable.

4.1.23. Ground Lease. Without limitation of the other provisions herein (including, without limitation, Section 4.1.12 hereof), Borrower makes the following covenants with respect to the Ground Lease:

(a)      Borrower shall cause Mortgage Borrower to, at its sole cost and expense, promptly and timely perform and observe in all material respects all terms, covenants and conditions required to be performed and observed by Mortgage Borrower as lessee under the Ground Lease (including, without limitation, the payment of all Ground Rent).

(b)      Borrower shall cause Mortgage Borrower to enforce, in all material respects and in a commercially reasonable manner, the terms, covenants and conditions to be performed and observed by Ground Lessor under the Ground Lease.

(c)      Borrower shall or shall cause Mortgage Borrower to promptly notify Lender of the receipt by Mortgage Borrower of any written notice from Ground Lessor claiming the occurrence of any default by Mortgage Borrower under the Ground Lease or the occurrence of any event that, with the giving of notice or passage of time, or both, would constitute a material default by Mortgage Borrower under the Ground Lease.  Promptly upon its receipt thereof, Borrower shall or shall cause Mortgage Borrower to deliver to Lender a copy of any such written notice from Ground Lessor.

68

(d)     Borrower shall or shall cause Mortgage Borrower to promptly notify Lender of the occurrence of any default in any material respect under the Ground Lease by Ground Lessor known to Mortgage Borrower under the Ground Lease or the occurrence of any event that, with the giving of notice or passage of time, or both, would constitute a material default in any material respect by Ground Lessor under the Ground Lease.  Concurrently with the giving of any notice to Ground Lessor claiming the occurrence of such default or event, Borrower shall or shall cause Mortgage Borrower to deliver a copy thereof to Lender.

(e)     If Mortgage Borrower shall be in default under the Ground Lease, then, subject to the terms of the Ground Lease, Borrower shall cause Mortgage Borrower to grant Lender the right (but not the obligation) to cause the applicable default under the Ground Lease to be remedied and otherwise exercise any and all rights of Mortgage Borrower under the Ground Lease as may be reasonably necessary or desirable to prevent or cure such default; provided that such actions are, in Lender's good faith judgment, reasonably necessary to protect Lender's interest under the Loan Documents.  Subject to the rights of Tenants, Lender shall have the right on notice to Borrower to enter all or any portion of the Property, at such times and in such manner as Lender deems necessary, to prevent or to cure any such default.  If Ground Lessor shall deliver to Lender a copy of any notice of default sent by Ground Lessor to Mortgage Borrower, such notice shall constitute full protection to Lender for any action taken or not taken by Lender, in good faith, in reliance thereon.

(f)     Subject to the provisions hereof, Borrower shall or shall cause Mortgage Borrower to promptly execute, acknowledge and deliver to Lender such instruments as may reasonably be necessary to permit Lender to cure any default under the Ground Lease or permit Lender to take such other action required to enable Lender to cure or remedy the matter in default and preserve Lender's rights under the Loan Documents with respect to the Property and the Collateral (including, without limitation, the Lien of the Pledge Agreement and the other Loan Documents).

(g)     The actions or payments of Lender to cure any default by Mortgage Borrower under the Ground Lease shall not cure or waive, as between Borrower and Lender, the default that occurred under this Agreement by virtue of Mortgage Borrower's default under the Ground Lease.  All costs and expenses incurred by Lender to cure or attempt to cure any such default shall be paid by Borrower to Lender, upon demand, with interest at the Default Rate from the date such costs and expenses were incurred to and including the date the reimbursement payment is received by Lender.  All such Indebtedness shall be secured by the Pledge Agreement.

(h)     Intentionally Omitted.

(i)     Borrower shall cause Mortgage Borrower to use reasonable efforts to obtain from Ground Lessor and furnish to Lender within fifteen (15) days after receipt of Lender's request, an estoppel certificate of Ground Lessor stating the date through which Ground Rent has been paid, whether or not there are any defaults under the Ground Lease and specifying the nature of such claimed defaults, if any, and such other matters as Lender may reasonably request; provided that Borrower shall not be required to deliver such estoppel certificate from Ground Lessor more frequently than once in any calendar year.

(j)      Without limiting the terms and provisions of <u>Section 4.1.21</u> hereof, Borrower irrevocably appoints Lender as its true and lawful attorney-in-fact to do, in its name or otherwise, any and all acts and to execute any and all documents that are necessary to preserve any rights of Mortgage Borrower under or with respect to the Ground Lease, including, without limitation, the right to authorize or otherwise cause or permit the automatic exercise of any option to extend or renew the term of the Ground Lease in accordance with the provisions thereof, or to preserve any rights of Mortgage Borrower whatsoever in respect of any part of the Ground Lease (and the above powers granted to Lender are coupled with an interest and shall be irrevocable; provided, however, that Lender shall not exercise such powers unless Lender has given Borrower at least five (5) days prior notice of Lender's intention to do so).

(k)      Notwithstanding anything to the contrary contained in this Agreement with respect to the Ground Lease:

(i)      The Lien of the Security Instrument attaches to all of Mortgage Borrower's rights and remedies at any time arising under or pursuant to Section 365(h) of the U.S. Bankruptcy Code or any other Bankruptcy Law, including, without limitation, all of Mortgage Borrower's rights, as debtor, to remain in possession of the Property.

(ii)      Borrower shall not, and shall not permit Mortgage Borrower to, without Lender's consent, elect to treat the Ground Lease as terminated under Section 365(h)(l) of the U.S. Bankruptcy Code or any other Bankruptcy Law.  Any such election made without Lender's prior consent shall be null and void.

(iii)      As security for the Obligations, subject to the rights of Mortgage Lender under the Mortgage Loan Documents, Borrower unconditionally assigns, transfers and sets over to Lender, and shall cause Mortgage Borrower to unconditionally assign, transfer and set over to Lender, all of Mortgage Borrower's rights and claims to the payment of damages arising from any rejection by Ground Lessor under the Bankruptcy Law. Subject to the rights of Mortgage Lender under the Mortgage Loan Documents, Lender and Mortgage Borrower shall proceed jointly or in the name of Mortgage Borrower in respect of any claim, suit, action or proceeding relating to the rejection of the Ground Lease, including, without limitation, the right to file and prosecute any proofs of claim, complaints, motions, applications, notices and other documents in any case in respect of Ground Lessor under the Bankruptcy Law.  This assignment constitutes a present, irrevocable and unconditional assignment of the foregoing rights, claims, and remedies, and shall continue in effect until all of the Debt shall have been satisfied and discharged in full. Subject to the rights of Mortgage Lender under the Mortgage Loan Documents, any amounts received by Lender or Mortgage Borrower as damages arising out of the rejection of the Ground Lease as aforesaid shall be applied to all reasonable out-of-pocket costs and expenses of Lender (including, without limitation, reasonable attorneys' fees and expenses) incurred in connection with the exercise of any of its rights or remedies in accordance with the applicable provisions of this Agreement.

(iv)      If, pursuant to Section 365(h) of the U.S. Bankruptcy Code or any other Bankruptcy Law, Mortgage Borrower seeks to offset, against the Ground Rent, the amount of any damages caused by the non-performance by Ground Lessor of any of its obligations under

70

the Ground Lease after the rejection by Ground Lessor under the Bankruptcy Law, then Borrower shall not permit Mortgage Borrower to affect any offset of the amounts objected to by Lender.  If Lender has failed to object as aforesaid within ten (10) days after notice from Borrower in accordance with the first sentence of this clause (iv), Borrower may proceed to permit Mortgage Borrower to offset the amounts set forth in Mortgage Borrower's notice to Ground Lessor and Lender.

(v)     If any action, proceeding, motion or notice shall be commenced or filed in respect of Ground Lessor in connection with any case under the Bankruptcy Law, subject to the rights of Mortgage Lender under the Mortgage Loan Documents, Lender and Mortgage Borrower shall cooperatively conduct and control any such action, proceeding, motion or notice with counsel agreed upon between Mortgage Borrower and Lender in connection with such action, proceeding, motion or notice.  Borrower shall, upon demand, pay to Lender all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees and expenses) incurred by Lender in connection with the cooperative prosecution or conduct of any such action, proceeding, motion or notice.  All such costs and expenses shall be secured by the Lien of the Pledge Agreement.

(vi)    Borrower shall and shall cause Mortgage Borrower to promptly, after obtaining knowledge of such filing, notify Lender of any filing by or against Ground Lessor of a petition under the Bankruptcy Law setting forth any information reasonably available to Borrower or Mortgage Borrower as to the date of such filing, the court in which such petition was filed, and the relief sought in such filing.  Borrower shall and shall cause Mortgage Borrower to promptly deliver to Lender any and all notices, summonses, pleadings, applications and other documents received by Borrower or Mortgage Borrower in connection with any such petition and any proceedings relating to such petition.

4.1.24. <u>Prime Lease</u>.  Without limitation of the other provisions herein (including, without limitation, <u>Section 4.1.12</u> hereof), Borrower makes the following covenants with respect to the Prime Lease:

(a)     Borrower shall or shall cause Mortgage Borrower to, promptly notify Lender of the receipt by Borrower or Ground Lessor of any written notice from Prime Lease Lessor claiming the occurrence of any default by Ground Lessor under the Prime Lease or the occurrence of any event that, with the giving of notice or passage of time, or both, would constitute a material default by Ground Lessor under the Prime Lease.  Promptly upon its receipt thereof, Borrower shall or shall cause Mortgage Borrower to deliver to Lender a copy of any such written notice from Prime Lease Lessor.

(b)     Borrower shall or shall cause Mortgage Borrower to promptly notify Lender of the occurrence of any default in any material respect under the Prime Lease by Prime Lease Lessor known to Borrower, Mortgage Borrower, or Ground Lessor under the Prime Lease or the occurrence of any event that, with the giving of notice or passage of time, or both, would constitute a material default in any material respect by Prime Lease Lessor under the Prime Lease.  Concurrently with the giving of any notice to Prime Lease Lessor claiming the occurrence of such default or event, Borrower shall or shall cause Mortgage Borrower to deliver to Lender a copy of any notice thereof received by Borrower or Mortgage Borrower.

71

(c)     Subject to the provisions hereof, the Ground Lease and the Prime Lease, Borrower shall or shall cause Mortgage Borrower to promptly execute, acknowledge and deliver to Lender such instruments as may reasonably be necessary to permit Lender to cure any default under the Prime Lease or permit Lender to take such other action required to enable Lender to cure or remedy the matter in default and preserve Lender's rights under the Loan Documents with respect to the Property (including, without limitation, the Lien of the Pledge Agreement and the other Loan Documents).

(d)     The actions or payments of Lender to cure any default by Ground Lessor under the Prime Lease shall not cure or waive, as between Borrower and Lender, the default that occurred under this Agreement by virtue of Ground Lessor's default under the Ground Lease.  All costs and expenses incurred by Lender to cure or attempt to cure any such default shall be paid by Borrower to Lender, upon demand, with interest at the Default Rate from the date such costs and expenses were incurred to and including the date the reimbursement payment is received by Lender.  All such Indebtedness shall be secured by the Pledge Agreement.

(e)     Borrower shall (or shall cause Mortgage Borrower or Ground Lessor to) use reasonable efforts to obtain from Prime Lease Lessor and furnish to Lender within fifteen (15) days after receipt of Lender's request, an estoppel certificate of Prime Lease Lessor stating the date through which ground rent under the Prime Lease has been paid, whether or not there are any defaults under the Prime Lease and specifying the nature of such claimed defaults, if any, and such other matters as Lender may reasonably request; provided that Borrower shall not be required to deliver such estoppel certificate from Prime Lease Lessor more frequently than once in any calendar year.

(f)     Without limiting the terms and provisions of Section 4.1.21 hereof, Borrower irrevocably appoints Lender as its true and lawful attorney-in-fact to do, in its name or otherwise, any and all acts and to execute any and all documents that are necessary to preserve any rights of Mortgage Borrower under or with respect to the Prime Lease, including, without limitation, the right to authorize or otherwise cause or permit the automatic exercise of any option to extend or renew the term of the Prime Lease in accordance with the provisions thereof, or to preserve any rights of Mortgage Borrower whatsoever in respect of any part of the Prime Lease (and the above powers granted to Lender are coupled with an interest and shall be irrevocable; provided, however, that Lender shall not exercise such powers unless Lender has given Borrower at least five (5) days prior notice of Lender's intention to do so).

(g)     Notwithstanding anything to the contrary contained in this Agreement with respect to the Prime Lease:

(i)     The Lien of the Security Instrument attaches to all of Mortgage Borrower's rights and remedies at any time arising under or pursuant to Section 365(h) of the U.S. Bankruptcy Code or any other Bankruptcy Law, including, without limitation, all of Mortgage Borrower's rights, as debtor, to remain in possession of the Property.

(ii)     Borrower shall not, and shall not permit Mortgage Borrower to, without Lender's consent, elect to treat the Prime Lease as terminated under Section 365(h)(l) of

72

the U.S. Bankruptcy Code or any other Bankruptcy Law.  Any such election made without Lender's prior consent shall be null and void.

      (iii)    As security for the Obligations, subject to the rights of Mortgage Lender under the Mortgage Loan Documents, Borrower unconditionally assigns, transfers and sets over to Lender, and shall cause Mortgage Borrower to unconditionally assign, transfer and set over to Lender, all of Mortgage Borrower's claims to the payment of damages arising from any rejection by Prime Lease Lessor under the Bankruptcy Law.  Subject to the rights of Mortgage Lender under the Mortgage Loan Documents, Lender and Mortgage Borrower shall proceed jointly or in the name of Borrower in respect of any claim, suit, action or proceeding relating to the rejection of the Prime Lease, including, without limitation, the right to file and prosecute any proofs of claim, complaints, motions, applications, notices and other documents in any case in respect of Prime Lease Lessor under the Bankruptcy Law.  This assignment constitutes a present, irrevocable and unconditional assignment of the foregoing rights, claims, and remedies, and shall continue in effect until all of the Debt shall have been satisfied and discharged in full.  Subject to the rights of Mortgage Lender under the Mortgage Loan Documents, any amounts received by Lender or Mortgage Borrower as damages arising out of the rejection of the Prime Lease as aforesaid shall be applied to all reasonable out-of-pocket costs and expenses of Lender (including, without limitation, reasonable attorneys' fees and expenses) incurred in connection with the exercise of any of its rights or remedies in accordance with the applicable provisions of this Agreement.

      (iv)    If, pursuant to Section 365(h) of the U.S. Bankruptcy Code or any other Bankruptcy Law, Mortgage Borrower seeks to offset, against the Ground Rent, the amount of any damages caused by the non-performance by Prime Lease Lessor of any of its obligations under the Prime Lease after the rejection by Prime Lease Lessor under the Bankruptcy Law, then Borrower shall not permit Mortgage Borrower to affect any offset of the amounts objected to by Lender.  If Lender has failed to object as aforesaid within ten (10) days after notice from Borrower in accordance with the first sentence of this clause (iv), Borrower may proceed to permit Mortgage Borrower to offset the amounts set forth in Mortgage Borrower's notice to Prime Lease Lessor and Lender.

      (v)    If any action, proceeding, motion or notice shall be commenced or filed in respect of Prime Lease Lessor in connection with any case under the Bankruptcy Law, subject to the rights of Mortgage Lender under the Mortgage Loan Documents, Lender and Mortgage Borrower shall cooperatively conduct and control any such action, proceeding, motion or notice with counsel agreed upon between Mortgage Borrower and Lender in connection with such action, proceeding, motion or notice.  Borrower shall, upon demand, pay to Lender all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees and expenses) incurred by Lender in connection with the cooperative prosecution or conduct of any such action, proceeding, motion or notice.  All such costs and expenses shall be secured by the Lien of the Pledge Agreement.

      (vi)    Borrower shall and shall cause Mortgage Borrower to promptly, after obtaining knowledge of such filing, notify Lender of any filing by or against Prime Lease Lessor of a petition under the Bankruptcy Law setting forth any information reasonably available to Borrower or Mortgage Borrower as to the date of such filing, the court in which such petition

was filed, and the relief sought in such filing.  Borrower shall and shall cause Mortgage Borrower to promptly deliver to Lender any and all notices, summonses, pleadings, applications and other documents received by Borrower or Mortgage Borrower in connection with any such petition and any proceedings relating to such petition.

      4.1.25. <u>Patriot Act Compliance</u>.  Borrower will and will cause Mortgage Borrower to, in each case, use its good faith and commercially reasonable efforts to comply with the Patriot Act and all applicable requirements of Governmental Authorities relating to terrorism and money laundering.  Lender at Lender's sole cost and expense shall have the right to audit Borrower's and Mortgage Borrower's compliance with the Patriot Act and all applicable requirements of Governmental Authorities relating to terrorism and money laundering.  In the event that Borrower or Mortgage Borrower fails to comply with the Patriot Act or any such requirements of Governmental Authorities, Lender may, at its option, cause Borrower and Mortgage Borrower to comply therewith.  All costs and expenses incurred by Lender in connection therewith shall be paid by Borrower to Lender, upon demand, with interest at the Default Rate from the date such costs and expenses were incurred to and including the date the reimbursement payment is received by Lender.  All such Indebtedness shall be secured by the Pledge Agreement.

      4.1.26. <u>Mortgage Borrower Covenants.</u> Unless otherwise consented to in writing by Lender, Borrower shall cause Mortgage Borrower to comply with and not to breach any covenants and agreements contained in the Mortgage Loan Documents.

      4.1.27. <u>Curing</u>. Subject to and to the extent permitted by the Mortgage Loan Documents, Lender shall have the right, but shall not have the obligation, to exercise Borrower's rights, if any, under the Mortgage Borrower Operating Agreement, to cause Mortgage Borrower (a) to cure a Mortgage Loan Event of Default and (b) to satisfy any liens, claims or judgments against the Property (or any portion thereof), unless Borrower or Mortgage Borrower shall be diligently pursuing remedies to cure to Lender's reasonable satisfaction. Borrower shall reimburse Lender on demand for any and all out-of-pocket costs incurred by Lender in connection with the foregoing and Borrower shall use its best efforts to cooperate with Lender to effectuate the exercise of Lender's rights under this <u>Section 4.1.27</u>.

      4.1.28. <u>Special Distributions</u>.  By no later than each date on which amounts are required to be disbursed to Lender pursuant to the terms of the Mortgage Loan Documents or are required to be paid to Lender pursuant to the terms of any of the Loan Documents, Borrower shall exercise its rights under the Mortgage Borrower Operating Agreement to cause Mortgage Borrower to make to Borrower a distribution of all funds in Mortgage Borrower's possession or control up to the aggregate amount required to be so disbursed to Lender on such date.

      4.1.29. <u>Net Liquidation Proceeds After Debt Service</u>.  Borrower shall cooperate with Lender in obtaining for Lender, in accordance with the relevant provisions of this Agreement, the benefits of any Net Liquidation Proceeds After Debt Service, and Lender shall be reimbursed for any reasonable out-of-pocket expenses incurred in connection therewith (including reasonable attorneys' fees and disbursements and the reasonable expense of any appraisal obtained by Lender in case of a Liquidation Event that is a Casualty or Condemnation).

<div align="center">74</div>

**Section 4.2.**   <u>Borrower Negative Covenants</u>.   Borrower covenants and agrees with Lender that:

4.2.1.   <u>Liens</u>.   Borrower shall not create, incur, assume or suffer to exist any Lien on any portion of the Collateral except for Permitted Encumbrances or as otherwise permitted pursuant to the Loan Documents.   Borrower shall not permit Mortgage Borrower to create, incur, assume or suffer to exist any Lien on any portion of the Property except for Permitted Encumbrances or as otherwise permitted pursuant to the Mortgage Loan Documents.

4.2.2.   <u>Dissolution</u>.   Borrower shall not and shall not permit Mortgage Borrower to (a) engage in any dissolution, winding up, liquidation or consolidation or merger with or into any other business entity, (b) engage in any business activity not related to the ownership, management and operation of the Property or the Collateral, as applicable, (c) amend, modify, waive or terminate any Organizational Document or any provision thereof or (d) transfer, lease or sell, in one transaction or any combination of transactions, all or substantially all of the assets or properties of Borrower or Mortgage Borrower except to the extent expressly permitted by the Loan Documents and the Mortgage Loan Documents, in each case without obtaining the prior consent of Lender.

4.2.3.   <u>Change in Business</u>.   Borrower shall not (a) enter into any line of business, or undertake or participate in any activities, other than the ownership of the Collateral, or (b) make any material change in the scope or nature of its business objectives, purposes or operations. Borrower shall not permit Mortgage Borrower to (a) enter into any line of business, or undertake or participate in any activities, other than the ownership, leasing, management and operation of the Property, or (b) make any material change in the scope or nature of its business objectives, purposes or operations.

4.2.4.   <u>Debt Cancellation</u>.   Borrower shall not and shall not permit Mortgage Borrower to cancel or otherwise forgive or release any claim or debt (other than termination of Leases in accordance herewith) owed to Borrower or Mortgage Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's or Mortgage Borrower's business.

4.2.5.   <u>Affiliate Transactions</u>.   Borrower shall not and shall not permit Mortgage Borrower to enter into, or be a party to, any transaction with any Affiliate of Borrower or Mortgage Borrower or any partner, member, or shareholder, as applicable, of Borrower or Mortgage Borrower or any Affiliate of Borrower or Mortgage Borrower except in the ordinary course of business and on terms and conditions that are intrinsically fair, commercially reasonable and no less favorable to Borrower or such Affiliate, partner, member or shareholder than those that would be available on an arm's-length basis with an unrelated third party.

4.2.6.   <u>Zoning</u>.   Borrower shall not and shall not permit Mortgage Borrower to initiate or consent to any zoning reclassification of any portion of the Property or seek any variance under any existing zoning ordinance (except, subject in all respects to all other terms and provisions of the Loan Documents, to the extent the granting or imposition of such reclassification or variance alone shall not cause a Material Adverse Effect and <u>provided</u> that Borrower shall have

75

provided Lender with (a) not less than thirty (30) days' prior written notice thereof and (b) all applicable documents and a detailed description of such reclassification or variance, including any descriptive information reasonably required for Lender to make an informed decision as to whether Lender's consent to such reclassification or variance is required hereunder) or use or permit the use of any portion of the Property in any manner that could result in such use becoming a non-conforming use under any zoning ordinance or any other applicable land use law, rule or regulation, without the prior consent of Lender.

4.2.7.  <u>Assets</u>.  Borrower shall not purchase or own any asset or property other than the Collateral and any asset or property necessary for or incidental to the ownership of the Collateral.  Borrower shall not permit Mortgage Borrower to purchase or own any asset or property other than the Property and any asset or property necessary for or incidental to the operation of the Property.

4.2.8.  <u>No Joint Assessment</u>.  Borrower shall not and shall not permit Mortgage Borrower to suffer, permit or initiate the joint assessment of the Property (a) with any other real property constituting a tax lot separate from the Property, and (b) with any portion of the Property which may be deemed to constitute personal property, or any other action or procedure whereby the Lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to the Property.

4.2.9.  <u>Principal Place of Business</u>.  Borrower shall not and shall not permit Mortgage Borrower to change its principal place of business from the address set forth on the first page of this Agreement without first giving Lender thirty (30) days' prior notice.

4.2.10. <u>ERISA</u>.  (a)  Borrower shall not and shall not permit Mortgage Borrower to engage in any transaction which would cause any obligation, or any action taken or to be taken, hereunder or under the other Loan Documents or the Mortgage Loan Documents (or the exercise by Lender or Mortgage Lender of any of their respective rights under this Agreement or the other Loan Documents or the Mortgage Loan Agreement or the other Mortgage Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under the Employee Retirement Income Security Act of 1974, as amended ("**<u>ERISA</u>**").

(b)      Borrower shall deliver to Lender such certifications or other evidence from time to time throughout the Term, as requested by Lender in its sole discretion, that (i)  Borrower is not an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, or a "governmental plan" within the meaning of Section 3(32) of ERISA; (ii) Borrower is not subject to any state statute regulating investments of, or fiduciary obligations with respect to, governmental plans; and (iii) one (1) or more of the following circumstances is true:

(A)      Equity interests in Borrower are publicly offered securities, within the meaning of 29 C.F.R. § 2510.3-101(b)(2);

(B)      Less than twenty-five percent (25%) of each outstanding class of equity interests in Borrower is held by "benefit plan investors" within the meaning of 29 C.F.R. § 2510.3-101(f)(2); or

<div align="center">76</div>

(C)     Borrower qualifies as an "operating company" or a "real estate operating company" within the meaning of 29 C.F.R. § 2510.3-101(c) or (e).

4.2.11. <u>Material Agreements, Operating Agreements</u>.   Except with respect to Mortgage Borrower's ability to enter into a Management Agreement pursuant to the terms and conditions of this Agreement, Borrower shall not, without Lender's prior consent, permit Mortgage Borrower to:   (a) enter into, surrender or terminate any Material Agreement or Operating Agreement to which it is a party or to which Mortgage Borrower or the Property is subject (i) unless the other party thereto is in default in any material respect thereunder and the termination of such agreement would be commercially reasonable or (ii) such action would not otherwise have a Material Adverse Effect and would be commercially reasonable, (b) increase or consent to the increase of the amount of any charges under any Material Agreement or Operating Agreement to which it is a party or to which Mortgage Borrower or the Property is subject, except as provided therein or on an arm's-length basis and commercially reasonable terms; or (c) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under any Material Agreement or Operating Agreement to which it is a party or to which Mortgage Borrower or the Property is subject in any material respect, except on an arm's-length basis and commercially reasonable terms.

4.2.12. <u>Change of Name, Identity or Structure</u>.   Borrower will not and will not permit Mortgage Borrower to cause or permit any change to be made to its name, identity (including its trade name or names) or, other than in accordance with the terms and conditions of <u>Section 3.1.24(h)</u> hereof, its corporate, partnership or other organizational structure without notifying Lender of such change in writing at least thirty (30) days prior to the effective date of such change and without first obtaining the prior consent of Lender which consent shall not be unreasonably withheld or delayed.   Borrower shall and shall cause Mortgage Borrower to execute and deliver to Lender, prior to or contemporaneously with the effective date of any such change, any financing statement or amendment to financing statement required by Lender to establish or maintain the validity, perfection and priority of the security interests granted by the Loan Documents.   At Lender's request, Borrower shall execute a certificate in form satisfactory to Lender listing each trade name under which Mortgage Borrower operates or intends to operate the Property, and representing and warranting that Mortgage Borrower does business under no other trade name with respect to the Property.

4.2.13. Special Purpose.   Without in any way limiting the provisions of this <u>Article IV</u> hereof, Borrower shall not (i) take or permit any action that would result in Borrower not being in compliance with the representations, warranties and covenants set forth in <u>Section 3.1.24</u> hereof or (ii) permit Mortgage Borrower to take or permit any action that would result in Mortgage Borrower not being in compliance with the representations, warranties and covenants set forth in Section 3.1.24 of the Mortgage Loan Agreement.

4.2.14. <u>Prohibited Person</u>.   At all times throughout the Term, including after giving effect to any Transfers permitted pursuant to the Loan Documents, (a) none of the funds or other assets of Borrower, Guarantor, or Mortgage Borrower shall constitute property of, or shall be beneficially owned, directly or indirectly, by any Prohibited Person, with the result that the investment in Borrower, Guarantor, or Mortgage Borrower, as applicable (whether directly or

<div align="center">77</div>

indirectly), would be prohibited by law, or the Loan made by Lender would be in violation of law, (b) no Prohibited Person shall have any interest of any nature whatsoever in Borrower, Guarantor, or Mortgage Borrower, as applicable, with the result that the investment in Borrower, Guarantor, or Mortgage Borrower, as applicable (whether directly or indirectly), would be prohibited by law or the Loan would be in violation of law, and (c) none of the funds of Borrower, Guarantor, or Mortgage Borrower, as applicable, shall be derived from any unlawful activity with the result that the investment in Borrower, Guarantor, or Mortgage Borrower, as applicable (whether directly or indirectly), would be prohibited by law or the Loan would be in violation of law.

4.2.15. <u>Ground Lease</u>.  Without limitation of the other provisions herein (including, without limitation, <u>Section 4.2.11</u> hereof), Borrower makes the following covenants with respect to the Ground Lease:

(a)      Borrower shall not permit Mortgage Borrower to surrender the leasehold estate created by the Ground Lease or terminate or cancel the Ground Lease or modify, change, supplement, alter or amend the Ground Lease, either orally or in writing, and, subject to the terms of the Mortgage Loan Documents, Borrower hereby covenants to cause Mortgage Borrower to assign to Lender, as further security for the payment of the Debt and for the performance and observance of the terms, covenants and conditions of this Agreement, all of the rights, privileges and prerogatives of Mortgage Borrower, as tenant under the Ground Lease, to surrender the leasehold estate created by the Ground Lease or to terminate, cancel, modify, change, supplement, alter or amend the Ground Lease, and any such surrender of the leasehold estate created by the Ground Lease or termination, cancellation, modification, change, supplement, alteration or amendment of the Ground Lease shall be void and of no force and effect.

(b)      Borrower shall not, without prior consent of Lender, permit Mortgage Borrower to subordinate or consent to the subordination of the Ground Lease to any mortgage, security deed, lease or other interest on or in Ground Lessor's interest in all or any part of the Property.

4.2.16. <u>Prime Lease</u>.  Without limitation of the other provisions herein (including, without limitation, <u>Section 4.2.11</u> hereof), Borrower makes the following covenants with respect to the Prime Lease:

(a)      Borrower shall not, without prior consent of Lender, subordinate or consent to the subordination (or permit Mortgage Borrower to subordinate or consent to the subordination) of the Prime Lease to any mortgage, security deed, lease or other interest on or in Prime Lease Lessor's interest in all or any part of the Property.

4.2.17. <u>Bankruptcy-Related Covenants</u>.

(a)      Borrower shall not, nor shall Borrower cause or permit Mortgage Borrower Guarantor or any Affiliate of Borrower, Mortgage Borrower, or Guarantor to, seek substantive consolidation in connection with a proceeding under the Bankruptcy Laws involving Borrower or Mortgage Borrower.

78

(b)     Borrower shall not, nor shall Borrower cause or permit Mortgage Borrower or Guarantor or any Affiliate of Borrower, Mortgage Borrower, or Guarantor to, contest, oppose or object to any motion made by Lender to obtain relief from the automatic stay or seek to reinstate the automatic stay in the event of a future proceeding of Borrower or Mortgage Borrower under the Bankruptcy Laws.

(c)     Borrower shall not, nor shall Borrower cause or permit Mortgage Borrower or Guarantor or any Affiliate of Borrower, Mortgage Borrower, or Guarantor to, provide, originate, acquire an interest in or solicit (in writing) or accept from Guarantor or any Affiliate of Borrower, Mortgage Borrower, or Guarantor, any debtor-in-possession financing on behalf of Borrower or Mortgage Borrower in the event that Borrower or Mortgage Borrower is the subject of a proceeding under the Bankruptcy Laws.

4.2.18. No Contractual Obligations. Other than the Loan Documents and the organizational documents of Mortgage Borrower, neither Borrower nor any of its assets shall be subject to any Contractual Obligations, and Borrower shall not enter into any agreement, instrument or undertaking by which it or its assets are bound, except for such liabilities, not material in the aggregate, that are incidental to its activities as sole member of Mortgage Borrower.

4.2.19. Limitations on Distributions. Subject to Section 4.1.28 hereof, following the occurrence and during the continuance of an Event of Default, Borrower shall not make any distributions to its members. If any distributions shall be received by Borrower after the occurrence and during the continuance of an Event of Default, Borrower shall hold, or shall cause the same to be held, in trust for the benefit of Lender.

4.2.20. Limitations on Securities Issuances. Other than pursuant to the terms and conditions of Section 8.6 and Section 11.30 of this Agreement and of the Mortgage Loan Agreement, without the prior written consent of Lender, neither Borrower nor Mortgage Borrower shall issue any limited partnership interests or limited liability company interests or other securities other than those that have been issued as of the date hereof.

## V.     INSURANCE, CASUALTY AND CONDEMNATION

**Section 5.1.**     Insurance. Borrower shall cause Mortgage Borrower to (a) maintain at all times during the term of the Loan the Policies required under the Mortgage Loan Agreement, and (b) otherwise satisfy all covenants related thereto as provided in the Mortgage Loan Agreement. Borrower shall (and shall cause Mortgage Borrower to) cause Lender to be named as certificate holder on all property policies and as an additional insured on all liability policies, and Lender shall be entitled to such notice, document delivery and consent rights afforded Mortgage Lender under the applicable terms and conditions of the Mortgage Loan Agreement relating to the Policies as may be designated by Lender. Borrower shall not (and shall cause Mortgage Borrower to not) permit the Policies to be canceled without at least thirty (30) days' prior notice to Lender. Borrower shall (and shall cause Mortgage Borrower to) provide Lender with evidence of all such insurance required hereunder and with the other related notices required under the Mortgage Loan Documents, in each case, on or before the date on which Mortgage Borrower is required to provide the same to Mortgage Lender. If at any time Lender believes it is not in receipt of written evidence

79

that the Policies are in full force and effect, Lender shall have the right, after five (5) days written notice to Borrower (unless there is ten (10) days or less on the Policies, in which instance no written notice to Borrower is required), to take such action as Lender deems necessary to protect its interest in the Property, including, without limitation, the obtaining of such insurance coverage as Lender in its sole discretion deems appropriate, and all expenses incurred by Lender in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Lender upon demand and until paid shall be secured by the Loan Documents and shall bear interest at the Default Rate.

**Section 5.2.**    Casualty and Condemnation.

5.2.1.    Casualty. If the Property shall sustain a Casualty, Borrower shall give prompt notice of each material Casualty to Lender and shall cause Mortgage Borrower to promptly commence and diligently prosecute to completion the Restoration of the Property in accordance with Section 5.3 of the Mortgage Loan Agreement. Borrower shall cause Mortgage Borrower to pay all costs and expenses of such Restoration whether or not such costs and expenses are covered by insurance. Subject to the rights of Mortgage Lender under the Mortgage Loan Documents, Lender may, but shall not be obligated, to make proof of loss if not made promptly by Borrower or Mortgage Borrower. In the event of a Casualty where the loss and the applicable Net Proceeds are less than the Restoration Threshold, Borrower may, and may permit Mortgage Borrower to, settle and adjust such claim; provided that (a) no Event of Default has occurred and remains outstanding and (b) such adjustment is carried out in a commercially reasonable and timely manner. In addition, subject to the rights of Mortgage Lender under the Mortgage Loan Documents, in the event of a Casualty where the loss or the applicable Net Proceeds is equal to or greater than the Restoration Threshold or if an Event of Default has occurred and remains outstanding, Borrower may (or may permit Mortgage Borrower to) settle and adjust such claim only with the prior consent of Lender (which consent shall not be unreasonably withheld or delayed) and Lender shall have the opportunity to participate, at Borrower's reasonable cost and expense, in any such adjustments. Notwithstanding any Casualty, Borrower shall continue to pay the Debt at the time and in the manner provided for in this Agreement, the Note and the other Loan Documents.

5.2.2.    Condemnation. Borrower shall provide Lender with copies of any written notice received by Borrower or Mortgage Borrower of any actual or threatened Condemnation by any Governmental Authority of all or any part of the Property and shall deliver to Lender a copy of any and all notices or papers served in connection with such Condemnation or related proceedings promptly upon obtaining knowledge thereof (Lender acknowledging that Borrower shall have complied with this covenant with respect to any Condemnation that is not a Material Condemnation if Borrower delivers or causes Mortgage Borrower to deliver such written notice to Lender by no later than the end of the calendar quarter in which Borrower or Mortgage Borrower first obtained such knowledge). Borrower may settle and compromise or may permit Mortgage Borrower to settle and compromise any Material Condemnation only with the prior consent of Lender (which consent shall not be unreasonably withheld or delayed) and Lender shall have the opportunity to participate, at Borrower's reasonable cost and expense, in any applicable litigation or proceeding and settlement discussions in respect thereof and Borrower shall from time to time deliver or shall cause Mortgage Borrower from time to time to deliver to Lender all instruments

80

reasonably requested by Lender to permit such participation. Borrower shall, at its cost and expense, diligently prosecute or cause Mortgage Borrower to diligently prosecute any such litigations or proceedings, and shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such litigations or proceedings. Subject to the rights of Mortgage Lender under the Mortgage Loan Documents, Lender is hereby irrevocably appointed to act after the occurrence and during the continuance of an Event of Default as Borrower's attorney-in-fact, coupled with an interest, with exclusive power to collect, receive and retain any Award and to make any compromise or settlement in connection with any Material Condemnation. Notwithstanding any Condemnation, Borrower shall continue to pay the Debt at the time and in the manner provided for in this Agreement, the Note and the other Loan Documents and the Debt shall not be reduced until any Net Liquidation Proceeds After Debt Service shall have been actually received and applied by Lender, after the deduction of expenses of collection, to the reduction or discharge of the Debt. Lender shall not be limited to the interest paid on the Award by any Governmental Authority, but shall be entitled to receive out of the Net Liquidation Proceeds After Debt Service interest at the rate or rates provided herein or in the Note. If any portion of the Property is taken by any Governmental Authority, Borrower shall cause Mortgage Borrower to promptly commence and diligently prosecute to completion the Restoration of the Property and otherwise comply with the provisions of Section 5.3 of the Mortgage Loan Agreement. Subject to the rights of Mortgage Lender under the Mortgage Loan Documents, if the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the Award or a portion thereof sufficient to pay the Debt in full.

       5.2.3.  <u>Casualty Proceeds</u>. Borrower shall cause Mortgage Borrower to deliver to Lender all reports, plans, specifications, documents and other materials that are delivered to Mortgage Lender under the Mortgage Loan Agreement in connection with the Restoration of the Property after a Casualty or Condemnation. Borrower shall cause Mortgage Borrower to comply with the terms and conditions of the Mortgage Loan Documents relating to Restoration. Notwithstanding anything to the contrary contained in this Agreement, if at any time and for any reason the Mortgage Loan Restoration Provisions cease to exist or are waived or modified in any material respect (in each case, including, without limitation, due to any waiver, amendment or refinance) (such provisions, the "**Waived Restoration Provisions**"), to the extent permitted to do so pursuant to the Mortgage Loan Documents (if applicable), Borrower shall promptly (i) notify Lender of the same, (ii) execute any amendments to this Agreement and/or the Loan Documents implementing the Waived Restoration Provisions as may be required by Lender (provided such amendments are substantially similar to the provisions set forth in the Mortgage Loan Agreement relating to the same) and shall cause Mortgage Borrower to acknowledge and agree to the same and (iii) remit to Lender (and shall cause Mortgage Borrower to remit to Lender) any Net Proceeds related to the Waived Restoration Provisions.

## VI.      RESERVE FUNDS

      **Section 6.1.**   <u>Reserve Funds.</u>

<div align="center">81</div>

(a)      Borrower shall cause Mortgage Borrower to deposit and maintain each of the Mortgage Loan Reserve Funds as required under the Mortgage Loan Documents and to perform and comply with all the terms and provisions relating thereto. If requested by Lender, Borrower will promptly provide evidence reasonably acceptable to Lender of compliance with the foregoing.

(b)      Notwithstanding anything to the contrary contained in this Agreement, if at any time and for any reason the Mortgage Loan Reserve Funds are no longer being maintained and/or are reduced, waived or modified in any material respect (in each case, including, without limitation, due to any waiver, amendment or refinance) (such Mortgage Loan Reserve Funds, the "**Waived Reserve Funds**"), Borrower shall promptly (i) notify Lender of the same and establish and maintain with Lender and for the benefit of Lender reserves in replacement and substitution thereof (the "**Substitute Reserves**"), which Substitute Reserves shall be subject to all of the same terms and conditions applicable under the Mortgage Loan Documents, (ii) execute any amendments to this Agreement and/or the Loan Documents relating to the Substitute Reserves required by Lender (provided such amendments do not materially increase the obligations of Borrower hereunder except to implement provisions that are substantially similar to the provisions set forth in the Mortgage Loan Agreement relating to the same) and shall cause Mortgage Borrower to acknowledge and agree to the same, and (iii) deposit in such Substitute Reserves (or cause Mortgage Borrower to so deposit) any Mortgage Loan Reserve Funds remaining in the Waived Reserve Funds.  In the event that the Mortgage Lender subsequently reinstates all or any Waived Reserve Funds, then the Lender shall, at no cost to Lender, cooperate to transfer such Substitute Reserves to the Mortgage Lender, and Borrower shall no longer be required to deposit funds into such Substitute Reserves until such time as any such Waived Reserve Funds subsequently exists.

**Section 6.2.**   Reserve Funds Generally.

6.2.1.   Security Interest.  Borrower hereby pledges to Lender, and grants a security interest in, any and all monies now or hereafter deposited in the Reserve Funds as additional security for the performance of the Obligations.  Until expended or applied as provided in this Agreement, the Reserve Funds shall constitute additional security for the performance of the Obligations.  Upon the earlier of (i) Lender's acceleration of the Loan or (ii) occurrence of an Enforcement Action, Lender may, in addition to any and all other rights and remedies available to Lender, apply any sums then present in the Reserve Funds to the payment of the Debt in any order, proportion and priority as Lender may determine in its sole and absolute discretion.  Lender shall have no obligation to release any of the Reserve Funds while any Default or Event of Default has occurred and remains outstanding.  Borrower shall not further pledge, assign or grant any security interest in any Reserve Fund or permit any Lien or encumbrance to attach thereto, or any levy to be made thereon, or any UCC-1 Financing Statements, except those naming Lender as the secured party, to be filed with respect thereto.

6.2.2.   Investments; Income Taxes.  The Reserve Funds shall be held in Lender's name and may be commingled with Lender's own funds at financial institutions selected by Lender in its sole discretion.  The Reserve Funds shall be held in an Eligible Account and may be invested in Permitted Investments as directed by Lender.  Lender shall not be liable for any loss sustained on the investment of any funds constituting the Reserve Funds so long as the same are held in cash

or are invested in Permitted Investments, other than losses sustained as a result of Lender's gross negligence.  In connection with any liquidation and transfer of any amounts then invested in Permitted Investments to the applicable Reserve Account or reinvestment of such amounts in other Permitted Investments as Lender may reasonably determine is necessary to perfect or protect any security interest granted or purported to be granted hereby or to enable Lender to exercise and enforce Lender's rights and remedies hereunder with respect to any Reserve Funds, Borrower shall deposit with Lender an amount equal to the actual losses sustained on such liquidation within one (1) Business Day of such liquidation, provided that Borrower shall not be obligated to deposit such amount to the extent of losses sustained as a result of Lender's gross negligence.  All interest on a Reserve Fund (other than Tax Funds on deposit in the Tax Account and Insurance Funds on deposit in the Insurance Account) shall be added to and become a part thereof.  Borrower shall report on its federal, state and local income tax returns all interest or income on the Reserve Funds credited or paid to Borrower as required by applicable Legal Requirements.  Any interest accrued on Tax Funds on deposit in the Tax Account and Insurance Funds on deposit in the Insurance Account shall not be required to be remitted either to Borrower or to any Account and may instead be retained by Lender.

### Section 6.3. Provisions Regarding Letters of Credit.

6.3.1. <u>Event of Default</u>.  An Event of Default shall occur if Borrower shall fail to make any reimbursement or similar obligation with respect to any Letter of Credit that has been delivered pursuant to this Agreement, or if Borrower shall fail to (i) replace or extend any Letter of Credit prior to the date which is thirty (30) days prior to the expiration thereof or (ii) replace any outstanding Letter of Credit within thirty (30) days if such Letter of Credit fails to meet the requirements set forth in the definition of Letter of Credit.  Lender shall not be required to exercise its rights under <u>Section 6.3.4</u> below in order to prevent any such Event of Default from occurring and shall not be liable for any losses due to the insolvency of the issuer of the Letter of Credit as a result of any failure or delay by Lender in the exercise of such rights.

6.3.2. <u>Security for Debt</u>.  Each Letter of Credit delivered under this Agreement shall be additional security for the payment of the Debt.  Upon the occurrence of an Event of Default, Lender shall have the right, at its option, to draw on any Letter of Credit and to apply all or any part thereof to the payment of the items for which such Letter of Credit was established or to apply each such Letter of Credit to payment of the Debt in such order, proportion or priority as Lender may determine or to hold such proceeds as security for the Debt.

6.3.3. <u>Limitations on Letters of Credit</u>.  Notwithstanding anything in this Agreement or any other Loan Document to the contrary, Borrower shall not have any rights to deliver any Letter of Credit pursuant to any provision of this Agreement or any other Loan Document if the aggregate amount of any Letters of Credit delivered to Lender in accordance with this Agreement or any other Loan Document shall exceed ten percent (10%) of the original principal amount of the Loan.  In no event shall the aggregate amount of any Letters of Credit delivered in accordance with this Agreement or any other Loan Document exceed ten percent (10%) of the original principal amount of the Loan.

6.3.4.   <u>Additional Rights of Lender</u>.   In addition to any other right Lender may have to draw upon a Letter of Credit pursuant to the terms and conditions of this Agreement, Lender shall have the additional rights to draw in full any Letter of Credit:  (a) with respect to any evergreen Letter of Credit, if Lender has received a notice from the issuing bank that the Letter of Credit will not be renewed and a substitute Letter of Credit is not provided at least thirty (30) days prior to the date on which the outstanding Letter of Credit is scheduled to expire; (b) with respect to any Letter of Credit with a stated expiration date, if Lender has not received a notice from the issuing bank that it has renewed the Letter of Credit at least thirty (30) days prior to the date on which such Letter of Credit is scheduled to expire or a substitute Letter of Credit is not provided at least thirty (30) days prior to the date on which the outstanding Letter of Credit is scheduled to expire; or (c) if Lender has received notice that the bank issuing the Letter of Credit shall cease to be an Eligible Institution and Borrower has not, within thirty (30) days after notice thereof, obtained a new Letter of Credit from an Eligible Institution.

## VII.   PROPERTY MANAGEMENT

**Section 7.1.**   <u>Management Agreement</u>.   Borrower shall cause Mortgage Borrower to cause the Property to be managed in accordance with the Management Agreement, the separateness provisions set forth in <u>Section 3.1.24</u> hereof and Section 3.1.24 of the Mortgage Loan Agreement, and in accordance with the terms and provisions of the Ground Lease and the Prime Lease.  Borrower shall cause Mortgage Borrower to (a) diligently perform and observe all of the terms, covenants and conditions of any Management Agreement on the part of Mortgage Borrower to be performed and observed, (b) promptly notify Lender of any default in any material respect under any Management Agreement of which it is aware, (c) promptly deliver to Lender a copy of each financial statement, business plan, capital expenditures plan, report and estimate received by it under any Management Agreement and (d) promptly enforce the performance and observance in all material respects of all of the terms, covenants and conditions required to be performed and/or observed by the applicable Manager under any Management Agreement, in a commercially reasonable manner.  If Mortgage Borrower shall default in the performance or observance of any term, covenant or condition of any Management Agreement on the part of Mortgage Borrower to be performed or observed, then, without limiting Lender's other rights or remedies under this Agreement or the other Loan Documents, and without waiving or releasing Borrower from any of its obligations hereunder or Mortgage Borrower from any of its obligation under such Management Agreement, Lender shall have the right, but shall be under no obligation, under the other Loan Documents, to pay any sums and to perform any act as may be appropriate to cause the terms, covenants and conditions of such Management Agreement on the part of Mortgage Borrower to be performed or observed in all material respects.

**Section 7.2.**   <u>Prohibition Against Termination or Modification</u>.   (a) Borrower shall not, without prior consent of Lender, permit Mortgage Borrower to (i) (A) enter into any property management agreement, or surrender, terminate, cancel, renew or extend any Management Agreement, or (B) modify or amend any Management Agreement in any material respect; (ii) reduce or consent to the reduction of the term of any Management Agreement, (iii) increase or consent to the increase of the amount of any fees or other charges under any Management Agreement, or (iv) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under, any Management Agreement in any material

84

respect.  In connection with the replacement of any Manager with a Qualified Manager, Borrower shall execute and cause such Qualified Manager to execute a Subordination of Management Agreement in substantially the same form as the Subordination of Management Agreement entered into by Borrower, Mortgage Borrower, Manager and Lender as of the Closing Date.

(b)     In the event that any Management Agreement expires or is terminated (without limiting any obligation of Borrower to obtain Lender's consent to any termination or modification of any Management Agreement in accordance with the terms and provisions of this Agreement), Borrower shall cause Mortgage Borrower to promptly enter into a Replacement Management Agreement with a Qualified Manager.

(c)     Upon the occurrence and during the continuance of an Event of Default, Borrower shall not permit Mortgage Borrower to exercise any rights, make any decisions, grant any approvals or otherwise take any action under any Management Agreement without the prior consent of Lender, which consent may be granted, conditioned or withheld in Lender's sole discretion.

**Section 7.3.**    Replacement of Manager.  Subject to the rights of Mortgage Lender under the Mortgage Loan Documents, Lender shall have the right to require Borrower to require Mortgage Borrower to terminate any Management Agreement and replace the applicable Manager with a Qualified Manager which is not an Affiliate of, but is chosen by, Borrower or Mortgage Borrower upon the occurrence of any one or more of the following events:  (a) at any time following the occurrence of and during the continuation of an Event of Default, (b) if such Manager shall be in default in any material respect under the applicable Management Agreement beyond any applicable notice and cure period, (c) if such Manager shall become insolvent or a debtor in any Bankruptcy Action (provided, however, if such Bankruptcy Action was involuntary and not consented to by such Manager, upon the same not being discharged, stayed or dismissed within ninety (90) days), or (d) if at any time such Manager has engaged in gross negligence, fraud, willful misconduct or misappropriation of funds.

**Section 7.4.**    Matters Concerning Manager.  Without limiting the generality of the terms set forth in Section 7.3 above, if (a) the Debt has been accelerated pursuant to Section 10.1(b) hereof, (b) a Manager shall become insolvent or a debtor in any Bankruptcy Action (provided, however, if such Bankruptcy Action was involuntary and not consented to by Manager, upon the same not being discharged, stayed or dismissed within ninety (90) days) or (c) an event of default occurs under any Management Agreement, subject to the rights of Mortgage Lender under the Mortgage Loan Documents, Borrower shall, at Lender's request, cause Mortgage Borrower to terminate the applicable Management Agreement and replace the applicable Manager with a Qualified Manager pursuant to a Replacement Management Agreement, it being understood and agreed that the management fee for such Qualified Manager shall not exceed then prevailing market rates.

## VIII.   TRANSFERS

**Section 8.1.**    Transfers Generally.

(a)      Without the prior consent of Lender, neither Borrower, Mortgage Borrower, nor any Restricted Party shall do any of the following (each, a "**Transfer**"): sell, transfer, convey, assign, mortgage, pledge, encumber, alienate, grant a Lien (other than Permitted Encumbrances) on, grant any option with respect to or grant any other interest in the Property or the Collateral, any part thereof or any interest therein (including any legal, beneficial or economic interest in Borrower, Mortgage Borrower or any Restricted Party), directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record, other than Permitted Transfers.

(b)      A Transfer shall include (i) an installment sales agreement wherein Borrower or Mortgage Borrower agrees to sell the Property, any part thereof or any interest therein, for a price to be paid in installments or wherein Borrower agrees to sell the Collateral or any part thereof for a price to be paid in installments; (ii) an agreement by Borrower or Mortgage Borrower leasing all or a substantial part of the Property for other than actual occupancy by a space Tenant thereunder or a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's or Mortgage Borrower's right, title and interest in and to any Leases or any Rents; (iii) if Borrower, Mortgage Borrower, or any Restricted Party is a corporation, the voluntary or involuntary sale, conveyance or transfer of such corporation's stock (or the stock of any corporation Controlling such corporation) or the creation or issuance of new stock such that such corporation's stock shall be vested in a party or parties who are not now stockholders or any change in the Control of such corporation; (iv) if Borrower, Mortgage Borrower, or any Restricted Party is a limited or general partnership, joint venture or limited liability company, the change, removal, resignation or addition of a general partner, managing partner, limited partner, joint venturer or member, the voluntary or involuntary transfer of the partnership interest of any general partner, managing partner or limited partner, the creation or issuance of new limited partnership interests, the voluntary or involuntary transfer of the interest of any joint venturer or member or the creation or issuance of new non-managing member interests; (v) if Borrower, Mortgage Borrower, or any Restricted Party is a trust or nominee trust, the voluntary or involuntary transfer of the legal or beneficial interest in such trust or nominee trust or the creation or issuance of new legal or beneficial interests, and (vi) the incurrence of any property-assessed clean energy loans or similar indebtedness with respect to Borrower, Mortgage Borrower, and/or the Property, including, without limitation, if such loans or indebtedness are made or otherwise provided by any Governmental Authority and/or secured or repaid (directly or indirectly) by any taxes or similar assessments.

(c)      Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder or under the other Loan Documents in order to declare the Debt immediately due and payable upon a Transfer (other than a Permitted Transfer) without Lender's prior consent.  This provision shall apply to every Transfer regardless of whether voluntary or not, and whether or not Lender has consented to any previous Transfer.

(d)      Lender's consent to one Transfer shall not be deemed to be a waiver of Lender's right to require such consent to any future occurrence of same.  Any Transfer made in contravention of this <u>Section 8.1</u> shall be null and void and of no force and effect.

<div align="center">86</div>

(e)     Borrower agrees to bear and shall pay or reimburse Lender on demand for all reasonable out-of-pocket costs and expenses (including, without limitation, reasonable attorneys' fees and expenses, title search costs and title insurance endorsement premiums) incurred by Lender in connection with the review, approval and/or documentation of any proposed Transfer.

(f)     Prior to any release of Guarantor in connection with any Transfer permitted under this <u>Article VIII</u>, one (1) or more Replacement Guarantors shall (i) have assumed all obligations of Guarantor under the Guaranty (together with such changes to the Guaranty as Lender may reasonably require) and the Environmental Indemnity or (ii) have executed a replacement guaranty with respect to the Guaranty and a replacement environmental indemnity in form and substance reasonably satisfactory to Lender.

(g)     Borrower agrees to bear and shall reimburse Lender on demand all reasonable out-of-pocket expenses incurred by Lender in connection with any transaction described in this <u>Article VIII</u>, <u>provided</u>, <u>however</u>, Borrower shall not be required to (i) pay any assumption or transfer fees under any subsection of this <u>Section 8.1</u>, except as may be expressly required under or pursuant to this <u>Article VIII</u>, (ii) post an expense deposit or enter into a retainer agreement with Lender or Servicer, and (iii) pay any other consent, review, processing or other similar fee to Lender or Servicer in connection with any request by Borrower pursuant to such subsections (unless such transaction would result in a change in Control of Borrower, in which case a fee of 0.25% of the Outstanding Principal Balance may be charged).

**Section 8.2.**     <u>Permitted Property Transfer (Assumption)</u>.  (a)  No consent to any assumption of the Loan shall occur during the period that is ninety (90) days prior to and ninety (90) days after a Securitization of the Mortgage Loan.  Thereafter, Lender's consent shall not be unreasonably withheld in connection with a Transfer of all or a portion of the Property and the assumption of the Loan, <u>provided</u> that the following conditions are satisfied:

(i)     Lender shall have received a notice from Borrower requesting Lender's consent (or if such consent is not required in connection with such Transfer and the assumption of the Loan subject to and in accordance with the terms of this Agreement, providing Lender notice of such Transfer and the assumption of the Loan) to such Transfer not less than thirty (30) days prior to the proposed date of such Transfer;

(ii)     no Default or Event of Default shall have occurred and remain outstanding;

(iii)     the proposed transferee ("**Transferee**") shall be a Delaware limited liability company that qualifies as a single purpose, bankruptcy remote entity under criteria established by the Rating Agencies (including, without limitation, criteria applicable to Transferee's SPE Constituent Entities) and satisfies the requirements of <u>Section 4.2.14</u> hereof;

(iv)     the Organizational Documents of Transferee and Transferee's SPE Constituent Entities shall be reasonably satisfactory to Lender;

(v)     neither any Transferee's Sponsor, Transferee nor any other Person owned, directly or indirectly, or Controlled by Transferee's Sponsors shall have been a debtor in

87

any Bankruptcy Action or taken advantage as a debtor of any Bankruptcy Law or any law for the benefit of debtors within seven (7) years prior to the date of the proposed Transfer (other than, in each case, a Bankruptcy Action that was involuntary and not consented to by such Person, and was discharged, stayed or dismissed within ninety (90) days);

(vi)     neither any Transferee's Sponsor, Transferee nor any other Person owned, directly or indirectly, or Controlled by Transferee's Sponsors shall have defaulted within seven (7) years prior to the date of the proposed Transfer under its obligations with respect to any Indebtedness with a principal amount in excess of $5,000,000 in a manner which is not reasonably acceptable to Lender and which, if adversely determined, could have a Material Adverse Effect;

(vii)    there shall be no material litigation or regulatory action pending or threatened against any Transferee's Sponsor, Transferee or any other Person owned, directly or indirectly, or Controlled by Transferee's Sponsors which is not reasonably acceptable to Lender;

(viii)   unless Transferee is a Permitted Transferee, Transferee and Transferee's Sponsors shall, as of the date of such Transfer, have an aggregate net worth and liquidity reasonably satisfactory to Lender;

(ix)     unless Transferee is a Permitted Transferee, Transferee and Transferee's Sponsors (together with Transferee's proposed property manager) shall be experienced owners and operators of retail properties similar in size, class, use, operation and value as the Property, as evidenced by financial statements and other information reasonably satisfactory to Lender (it being understood and agreed that Lender reserves the right to approve Transferee without approving its proposed property manager);

(x)      if no property management agreement is then in effect, or if a Management Agreement is then in effect and will be terminated as a result of such Transfer, the Property shall be managed by a Qualified Manager in accordance with a Management Agreement (or Replacement Management Agreement, as applicable);

(xi)     Transferee and Transferee's SPE Constituent Entities shall have delivered all agreements, certificates and opinions reasonably required by Lender (including, if applicable, an amendment to Section 3.1.24 hereof to incorporate necessary changes based on differences in the organizational structures of Borrower and Transferee);

(xii)    no Default or Event of Default shall occur as a result of such Transfer;

(xiii)   Transferee shall have assumed all obligations of Borrower under the Loan Documents pursuant to an assumption agreement in form and substance reasonably satisfactory to Lender;

(xiv)    Borrower shall have delivered, at its sole cost and expense, (i) an Owner's policy of title insurance insuring a valid first Lien on the Property and naming Transferee as owner of the Property, which Owner's policy of title insurance shall insure that, as of the date of the recording of the assumption agreement, the Property shall not be subject to any Liens other

88

than those contained in the Owner's policy of title insurance issued on the Closing Date and the Permitted Encumbrances (ii) a title search, (iii) a mezzanine endorsement, and (iv) a UCC insurance policy;

(xv)    Lender shall have approved a Replacement Guarantor, which approval shall not be unreasonably withheld, and prior to any release of Guarantor, such Replacement Guarantor shall (A) have assumed all obligations of Guarantor under each Guaranty and the Environmental Indemnity or (B) have executed a replacement guaranty with respect to each Guaranty and a replacement environmental indemnity (each, a "**Replacement Recourse Document**") in form and substance substantially similar to the Guaranty (together with such changes to the Guaranty as Lender may reasonably require) and the Environmental Indemnity, respectively;

(xvi)    Borrower or Transferee, at its sole cost and expense, shall have delivered an Insolvency Opinion reflecting such Transfer reasonably acceptable to Lender and, following a Securitization, acceptable to the Rating Agencies;

(xvii)   if required by Lender following a Securitization, Borrower shall have delivered a Rating Agency Confirmation as to such Transfer and the Transferee;

(xviii)  the Transfer shall be permitted under the terms of the Ground Lease and the Prime Lease, and Borrower, Mortgage Borrower, and Transferee shall have complied with the terms, provisions, and conditions of the Ground Lease and the Prime Lease relating to such Transfer, including, without limitation, payment in full of any transfer fee or similar payment to Ground Lessor or Prime Ground Lessor thereunder;

(xix)    Borrower shall have paid to Lender an assumption fee equal to one percent (1%) of the outstanding principal amount of the Loan;

(xx)    Borrower shall have paid all reasonable out-of-pocket costs and expenses incurred in connection with such Transfer (including reasonable fees and disbursements of Lender's counsel and fees, costs and expenses of the Rating Agencies);

(xxi)    to the extent that the Transfer results in the Transferee (either itself or collectively with its affiliates) owning a 10% or greater equity interest (directly or indirectly) in Borrower, Lender's receipt of the Satisfactory Search Results shall be a condition precedent to such Transfer; and

(xxii)  Borrower shall have provided to Lender evidence reasonably acceptable to Lender that all requirements with respect to the Transfer pursuant to the Mortgage Loan Documents and the Subordinate Mezzanine Loan Documents have been or are contemporaneously satisfied in full.

**Section 8.3.**    Permitted Transfers of Interests in Borrower.  Notwithstanding the restrictions contained in this Article VIII, the following equity transfers shall be permitted without Lender's consent: (a) a transfer (but not a pledge) by devise or descent or by operation of law upon the death of a Restricted Party or any direct or indirect member, partner or shareholder of a

89

Restricted Party, (b) the transfer (but not the pledge), in one or a series of transactions, of the direct or indirect stock, partnership interests or membership interests (as the case may be) in a Restricted Party, or (c) the sale, transfer or issuance of shares of common stock in any Restricted Party that is a publicly traded entity, provided such shares of common stock are listed on the New York Stock Exchange or another nationally recognized stock exchange (provided, that, the foregoing provisions of clauses (a), (b) and (c) above shall not be deemed to waive, qualify or otherwise limit Borrower's obligation to comply (or to cause the compliance with) the other covenants set forth herein and in the other Loan Documents (including, without limitation, the covenants contained herein relating to ERISA matters)); provided, further, that, with respect to the transfers listed in clauses (a) and/or (b) above, all of the following conditions shall be satisfied: (A) Lender shall receive not less than thirty (30) days prior written notice of such transfers; (B) no such transfers shall result in a change in Control of Guarantor or Affiliated Manager (unless such transfer is due to death of Ashkenazy and Lender shall have approved a Replacement Guarantor, which approval shall not be unreasonably withheld, and such Replacement Guarantor shall (x) have assumed all obligations of Guarantor under the Guaranty and the Environmental Indemnity or (y) have executed a replacement guaranty with respect to each Guaranty and a replacement environmental indemnity (each a "**Replacement Recourse Document**") in form and substance substantially similar to the Guaranty (together with such changes to the Guaranty as Lender may reasonably require) and the Environmental Indemnity, respectively and (z) be reasonably acceptable to Lender); (C) after giving effect to such transfers, (I) Ashkenazy (or any trust established for the benefit of his immediate family members and of which Ashkenazy is trustee) (or his successor as Guarantor reasonably approved by Lender following his death) shall own at least fifty-one percent (51%) of Borrower and Mortgage Borrower; (II) intentionally omitted and (III) Ashkenazy and other individuals or entities reasonably approved in writing by Lender shall control the day-to-day operation of the Property; (D) after giving effect to such transfers, the Property shall continue to be managed by Manager or a new Manager approved in accordance with the applicable terms and conditions hereof; (E) such transfers shall be conditioned upon continued compliance with the relevant provisions of Article VII hereof; (F) in the case of (1) the transfer of the management of the Property to a new Affiliated Manager in accordance with the applicable terms and conditions hereof, or (2) the transfer of any equity ownership interests (I) directly in Borrower, or (II) in any Restricted Party whose sole asset is a direct or indirect equity ownership interest in Borrower, such transfers shall be conditioned upon delivery to Lender of a New Non-Consolidation Opinion addressing such transfer if such transfers in this clause (II) are for greater than twenty-five percent (25%) of the direct and indirect ownership interests in any Borrower or result in such transferee owning greater than forty-nine percent (49%) of the direct or indirect ownership interests in any Borrower; (G) such transfers shall be conditioned upon Borrower's ability to, after giving effect to the equity transfer in question (I) remake the representations contained herein relating to ERISA matters (and, upon Lender's request, Borrower shall deliver to Lender an Officer's Certificate containing such updated representations effective as of the date of the consummation of the applicable equity transfer) and (II) continue to comply with the covenants contained herein relating to ERISA matters; (H) to the extent that any transfer results in the transferee (either itself or collectively with its affiliates) owning a 10% or greater equity interest (directly or indirectly) in Borrower, Lender's receipt of the Satisfactory Search Results shall be a condition precedent to such transfer; (I) such transfers shall be permitted pursuant to the terms of any REA, the Ground Lease, and the Prime Lease and Borrower and Mortgage Borrower shall have complied with the terms, provisions, and conditions of the Ground Lease and the Prime Lease relating to such

90

transfers, including, without limitation, payment in full of any transfer fee or similar payment to Ground Lessor or Prime Lease Lessor, as applicable, thereunder; and (J) after giving effect to such transfers, the Guarantor Control Condition shall continue to be satisfied.   Upon request from Lender, Borrower shall promptly provide Lender a revised version of the Organizational Chart delivered to Lender in connection with the Loan reflecting any equity transfer consummated in accordance with this <u>Section 8.3</u>. Notwithstanding anything to the contrary contained herein, the transfer of a direct ownership interest in Mortgage Borrower shall be prohibited.

        **Section 8.4.**   <u>Property Documents</u>. Notwithstanding anything herein to the contrary, upon Lender's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed, Borrower may permit Mortgage Borrower to enter into any reciprocal easement agreements or utility easements or other similar agreements relating to the use or development of the Property (collectively, "**Property Documents**"), provided that in each case such action and Property Documents shall not impose material obligations on Mortgage Borrower that are, on balance, materially adverse to Mortgage Borrower, materially impair the utility and operation of the Property or otherwise have a Material Adverse Effect or violate the terms and provisions of the Ground Lease or the Prime Lease; and

        **Section 8.5.**   <u>Economic Sanctions, Anti-Money Laundering and Transfers</u>. Borrower shall (and shall cause its direct and indirect constituent owners and Affiliates to) (a) at all times comply with the representations and covenants contained in <u>Sections 3.1.41 and 4.1.25</u> such that the same remain true, correct and not violated or breached and (b) not permit a Transfer to occur which is not permitted under this <u>Article VIII</u> and shall cause the ownership and Control requirements specified in this <u>Article VIII</u> to be complied with at all times.   Borrower hereby represents that, other than in connection with the Loan, the Loan Documents and any Permitted Encumbrances, as of the date hereof, there exists no Sale or Pledge of (i) the Property, the Collateral, or any part thereof or any legal or beneficial interest therein or (ii) any interest in Mortgage Borrower or any Restricted Party.   For purposes of clarification, references in this Agreement and/or the other Loan Documents to "equity ownership interest" or words of similar import shall be deemed to refer to the legal and/or beneficial interests in a Person (as applicable); provided, that, when herein or in the other Loan Documents a specified percentage of the aforesaid "equity ownership interest" (or words of similar import) in a Person is required to be held, the same shall be deemed to refer to both the legal and beneficial interest in such Person. Notwithstanding anything to the contrary contained herein or in any other Loan Document, in no event shall Borrower, Mortgage Borrower or any SPE Party be (I) a Prohibited Entity, (II) Controlled (directly or indirectly) by any Prohibited Entity or (III) more than 49% owned (directly or indirectly) by any Prohibited Entities (whether individually or in the aggregate), unless, in the case of each of the foregoing, Lender's prior written consent is first obtained (which such consent shall be given or withheld in Lender's sole discretion and may be conditioned on, among other things, Lender's receipt of a Rating Agency Confirmation).

        **Section 8.6.**   <u>Subordinate Mezzanine Loan</u>.   Provided no Event of Default or Mortgage Loan Event of Default has occurred and is continuing, upon not less than thirty (30) days' prior written notice to Lender, one or more direct or indirect owners of Borrower (other than any SPE Party) (collectively, "**Subordinate Mezzanine Borrower**") shall be permitted to obtain one (1) additional mezzanine loan (the "**Subordinate Mezzanine Loan**"), which Subordinate

<div align="center">91</div>

Mezzanine Loan shall be secured by direct or indirect interests in Borrower and other customary mezzanine loan collateral, subject to the following conditions and requirements:

(a)     the Subordinate Mezzanine Loan shall be in an amount not to exceed $95,000,000 and shall be junior and subordinate to the Loan and the Mortgage Loan;

(b)     the terms and conditions of the Subordinate Mezzanine Loan (including the organizational structure of Subordinate Mezzanine Borrower) and the documents evidencing the Subordinate Mezzanine Loan (which documents shall include an interest rate cap agreement in a notional amount that is not less than the outstanding principal balance of the Subordinate Mezzanine Loan if the Subordinate Mezzanine Loan bears a floating rate of interest) (collectively, as each of the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the terms and conditions of this Agreement, the Mortgage Loan Agreement, and the Subordinate Mezzanine Intercreditor Agreement (as defined below), the "**Subordinate Mezzanine Loan Documents**") shall each be reasonably acceptable in all respects to Lender and, following a Securitization, reasonably acceptable to the Rating Agencies;

(c)     the Aggregate Debt Service Coverage Ratio immediately following the closing of the Subordinate Mezzanine Loan shall be equal to or greater than 1.35 to 1.00 (or, following a Securitization, such lower Aggregate Debt Service Coverage Ratio with respect to which Lender shall have received a Rating Agency Confirmation);

(d)     the Aggregate Debt Yield immediately following the closing of the Subordinate Mezzanine Loan based on the aggregate principal balance of the Loan, the Mortgage Loan, and the Subordinate Mezzanine Loan shall be equal to or greater than 7.00% (or, following a Securitization, such lower Aggregate Debt Yield with respect to which Lender shall have received a Rating Agency Confirmation);

(e)     the loan-to-value ratio, determined in Lender's sole discretion, immediately following the closing of the Subordinate Mezzanine Loan, in which the numerator is equal to the sum of the outstanding principal balance of the Loan, the Mortgage Loan, and the Subordinate Mezzanine Loan and the denominator is equal to the appraised value of the Property based on an appraisal obtained by and acceptable to Lender shall be no greater than 45%;

(f)     lender under the Subordinate Mezzanine Loan ("**Subordinate Mezzanine Lender**") shall (A) be a Qualified Lender and shall make a representation to Lender that it is a Qualified Lender other than solely as a result of being expressly named in the definition of Qualified Lender or being an entity Controlled by, Controlling or under common Control with any of the entities set forth in the definition of Qualified Lender and (B) not be an Affiliate of Borrower, Mortgage Borrower, or Subordinate Mezzanine Borrower and Lender shall have received Satisfactory Search Results;

(g)     Subordinate Mezzanine Lender shall enter into an intercreditor agreement with Lender and Mortgage Lender reasonably satisfactory in all respects to Lender and, following a Securitization, acceptable to the Rating Agencies (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the terms and conditions thereof, the "**Subordinate Mezzanine Intercreditor Agreement**");

92

(h)     Borrower shall deliver an Additional Insolvency Opinion with respect to the Loan which shall be in form, scope and substance reasonably acceptable in all respects to Lender and, following a Securitization, acceptable to the Rating Agencies;

(i)     Subordinate Mezzanine Borrower shall be structured in a manner such that each of Borrower, Mortgage Borrower and any SPE Party shall not fail to be a Special Purpose Entity;

(j)     following a Securitization, Borrower shall deliver a Rating Agency Confirmation with respect to the Subordinate Mezzanine Loan to Lender at Borrower's sole cost and expense or, if a Securitization has not occurred, the Subordinate Mezzanine Loan shall be in a form and substance that would be satisfactory to a prudent lender;

(k)     the Subordinate Mezzanine Loan shall be (i) coterminous with the Loan and Mortgage Loan or prepayable in whole without premium or penalty from and after the Maturity Date (and in no event prepayable, in whole or in part, prior to the Maturity Date) and (ii) shall not contain any payment-in-kind or similar interest accrual features;

(l)     Borrower, Mortgage Borrower, Subordinate Mezzanine Borrower, Guarantor, Mortgage Lender, and Subordinate Mezzanine Lender shall execute and deliver or cause to be executed and delivered such amendments or modifications to the Loan Documents as are reasonably necessary in connection with the creation of the Subordinate Mezzanine Loan;

(m)     Borrower shall reimburse Lender for all costs and expenses incurred by Lender in connection with this Section 8.6, including, without limitation, in connection with negotiating and documenting any amendments or other modifications to the Loan Documents, reviewing the Subordinate Mezzanine Loan Documents and negotiating and documenting the Subordinate Mezzanine Intercreditor Agreement; and

(n)     Borrower shall have delivered to Lender evidence reasonably satisfactory to Lender that Mortgage Borrower has complied with all of the terms and conditions set forth in Section 8.6 of the Mortgage Loan Agreement.

## IX.   SALE AND SECURITIZATION OF LOAN

**Section 9.1.**   Sale of Loan and Securitization.  (a)  At the request of the holder of the Note and, to the extent not already required to be provided by Borrower under this Agreement, at Lender's expense and subject to the provisions on exculpation set forth herein and in the other Loan Documents, Borrower shall assist Lender in satisfying the standards applicable to Borrower or the Property which may be reasonably required in the marketplace (including any holder of an interest in the Subordinate Mezzanine Loan or any other loan subordinate to the Loan created or entered into in connection with any structural changes to the Loan, or any mezzanine loan contemplated by Section 9.1 or Section 11.30 hereof), by the applicable Rating Agencies or by any Legal Requirements in connection with the (x) sale or other transfer of the Loan as a whole loan or sale or other transfer of any portion thereof or any interest therein, (y) sale of participation interests in the Loan or (z) securitization of the Loan or any portion thereof or any interest therein in one or more private or public securitizations (including a collateralized debt obligation (CDO)

93

or collateralized loan obligation (CLO) securitization) (the transactions referred to in <u>clauses (x)</u>, <u>(y)</u> and <u>(z)</u> shall hereinafter be referred to collectively as "**Secondary Market Transactions**" and the transaction referred to in <u>clause (z)</u> shall hereinafter be referred to as a "**Securitization**"; any certificates, notes or other securities issued in connection with a Securitization are hereinafter referred to as "**Securities**"), including any Exchange Act Filings required in connection with a Securitization, including, without limitation, to:

(i)     provide updated financial and other information with respect to the Property, the Collateral, Borrower, Mortgage Borrower, Guarantor and any Manager (collectively, the "**Updated Information**"), together, if customary, with appropriate verification and/or consents related to the Updated Information through "comfort" letters of auditors of Borrower reasonably acceptable to Lender and the Rating Agencies (provided that such comfort letters shall be required only to the extent that such information is required to be audited pursuant to the terms of this Agreement); provided that any such updated financial information of Guarantor shall be in the form delivered in connection with the closing of the Loan and prepared by an independent certified public accountant reasonably acceptable to Lender (Shanholt, Glassman, Klein, Kramer & Co., Grant Thorton, and Berdon LLP shall be deemed acceptable to Lender for all purposes hereunder; provided, however that such deemed acceptance may be revoked at such time as Lender has a reasonable basis for such revocation);

(ii)     cause counsel to render opinions, which may be relied upon by Lender, the Rating Agencies and their respective counsel, agents and representatives, as to non-consolidation, or any other opinion customary in Secondary Market Transactions, with respect to the Property, the Collateral, Mortgage Borrower, Borrower and Guarantor, which counsel and opinions shall be reasonably satisfactory to Lender and the Rating Agencies;

(iii)     provide, and cause to be provided, (A) at any time in connection with a Securitization and (B) at any time prior to the one (1) year anniversary of the Closing Date in connection with any Secondary Market Transaction that is not a Securitization, updated representations and warranties made in the Loan Documents and make such representations and warranties with respect to the Property, the Collateral, Mortgage Borrower, Borrower, and the Loan Documents as are customarily provided in Secondary Market Transactions and as may be reasonably requested by Lender or the Rating Agencies and consistent in all respects with the facts covered by such representations and warranties as they exist on the date thereof, <u>provided</u>, <u>however</u>, that Borrower shall be entitled to disclose any exceptions to said representations and warranties and the existence of such exceptions shall not constitute a Default or Event of Default under this Agreement unless such disclosed exceptions would independently otherwise cause a Default or Event of Default;

(iv)     execute such amendments to the Loan Documents and Borrower's Organizational Documents as may reasonably be requested by Lender or the Rating Agencies to effect the Secondary Market Transaction, <u>provided</u>, <u>however</u>, that Borrower shall not be required to modify or amend any Loan Document if such modification or amendment would (A) change the interest rate, the stated maturity or the amortization of principal set forth therein (except in connection with the bifurcation of the Loan into two or more components and/or additional separate notes and/or creating additional senior/subordinate note structure(s) which may result in

varying fixed interest rates and amortization schedules, but which shall have the same initial weighted average coupon of the original promissory note), (B) change the aggregate outstanding principal balance of the Loan, (C) materially and adversely alter the material restrictions on equity transfers in Borrower or Mortgage Borrower or transfers of the Property or the Collateral, (D) materially and adversely alter any material limitations on recourse against Borrower or (E) materially and adversely change any other material obligation, right or privilege of Borrower contained in the Loan Documents.

(v) if requested by Lender, review any information regarding the Property, the Collateral, Mortgage Borrower, Borrower, any Manager and the Loan which is contained in the Disclosure Documents; and

(vi) conduct tours of the Property on notice to Borrower.

(b) If requested by Lender, Borrower shall provide Lender, promptly upon request, with any financial statements, or financial, statistical or operating information (i) as Lender shall determine to be required pursuant to Regulation AB under the Securities Act or the Exchange Act, or any amendment, modification or replacement thereto or other Legal Requirements in connection with any Disclosure Documents or any filing pursuant to the Exchange Act in connection with a "public" Securitization, or (ii) in the case of a "private" Securitization pursuant to an exemption under Rule 144A or Regulation D under the Securities Act, as Lender shall determine would be necessary to conform to such requirements if the same were deemed to apply to such private Securitization.

(c) Borrower agrees that Lender may disclose any information relating to Borrower, Mortgage Borrower, their respective Affiliates, the Collateral, the Property or any aspect of the Loan (including information provided by or on behalf of Borrower or any of its Affiliates to Lender) to the parties requesting such information and, if applicable, the Rating Agencies in connection with any Secondary Market Transaction.

(d) All reasonable out-of-pocket third-party costs and expenses incurred by Borrower and Guarantor (other than Borrower's and Guarantor's legal fees) in connection with Borrower's compliance with Section 9.1(a) (including, without limitation, the fees and expenses of the Rating Agencies) shall be promptly reimbursed by Lender.

**Section 9.2.** <u>Securitization Indemnification</u>. (a) Borrower understands that information provided to Lender by Borrower or its agents, counsel or representatives relating to Borrower, Mortgage Borrower, the Collateral, or the Property may be included in Disclosure Documents in connection with the Securitization and may also be included in filings with the Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended (the "**Securities Act**"), or the Securities and Exchange Act of 1934, as amended (the "**Exchange Act**"), or provided or made available to investors or prospective investors in the Securities, the Rating Agencies, and service providers relating to the Securitization. In the event that any portion of the Disclosure Document relating to Borrower, Mortgage Borrower, the Collateral, or the Property is required to be revised prior to the sale of all Securities, Borrower will cooperate with the holder of the Note in updating such portion of the Disclosure Document by providing current information

95

relating to Borrower, Mortgage Borrower, the Collateral or the Property as reasonably requested by Lender.

(b)     Subject to the provisions on exculpation set forth herein, Borrower shall provide in connection with each Disclosure Document that Lender has requested Borrower to review an indemnification certificate from Borrower and Guarantor (A) certifying that Borrower and Guarantor have examined only those portions of the Disclosure Documents relating to Borrower, Mortgage Borrower, the Collateral, the Property, Guarantor, the Mortgage Loan, the Loan, any Affiliate of Borrower, Mortgage Borrower or Guarantor, any Manager or any other information related to the foregoing, including without limitation, (i) in the case of the structural and collateral term sheet, the sections entitled "*Executive Summary and Transaction Highlights*," "*Summary of Certificates and Structural Overview – Mortgage Loan Monthly Payments*," "*Summary of Loan Terms*," "*Property Overview*," "*Historical and Underwritten Cash Flows*" "*Market Overview*," "*Management Overview*" and "*Sponsorship Overview*", and (ii) in the case of the preliminary offering circular and the final offering circular, the sections entitled "*Summary of Offering Circular*", "*Risk Factors*," "*Description of the Property*," "*Description of the Tenants and Space Leases,*" "*Description of the Ground Lease,*" "*Description of the Prime Lease,*" "*Description of the Borrower Sponsor, the Borrower, the Guarantor and Related Parties*," "*Description of the Property Manager, the Management Agreement and the Assignment and Subordination of Management Agreement,*" "*Description of the Mortgage Loan*," "*Description of the Mezzanine Loan*," "*Sources and Uses*," "*Annex A – Mortgage Loan Collateral Schedule,*" "*Annex E – Representations and Warranties of Borrower*" and "*Annex F – Borrower Organizational Chart*" (or sections similarly entitled or covering similar subject matter) to the extent such Sections relate to the foregoing and are specifically identified in the indemnification certificate (collectively, the "**Covered Disclosure Information**") and such Sections do not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, (B) indemnifying on a joint and several basis the Lender or any affiliate of Lender that has filed any registration statement relating to the Securitization (the "**Registration Statement**") or has acted as the sponsor or depositor in connection with the Securitization, any Affiliate of Lender that acts as an underwriter, placement agent or initial purchaser of the Securities issued in connection with the Securitization, any other underwriters, placement agents or initial purchasers of the Securities issued in connection with the Securitization, and each of their respective directors, officers, partners, employees, representatives, agents and Affiliates, and each Person that controls any such Person within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act (collectively, the "**Securitization Indemnified Parties**") for any losses, claims, damages or liabilities (collectively, the "**Liabilities**") to which any Securitization Indemnified Party may become subject insofar as the Liabilities arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in the Covered Disclosure Information or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated in the Covered Disclosure Information or necessary in order to make the statements in the Covered Disclosure Information, in light of the circumstances under which they were made, not misleading and (C) agreeing to reimburse each Securitization Indemnified Party for any legal or other expenses reasonably incurred by such Securitization Indemnified Party, as they are incurred, in connection with investigating or defending the Liabilities; provided, however, that Borrower and Guarantor will be liable in any such case under

96

clauses (B) or (C) above only to the extent that any such Liability arises out of any such untrue statement or omission of material fact made therein in reliance upon and in conformity with (1) the written information relating to Borrower, Mortgage Borrower, the Collateral, the Property, Guarantor, any Affiliate of Borrower, Mortgage Borrower, or Guarantor or any Manager furnished to Lender by or on behalf of Borrower in connection with the underwriting or closing of the Loan or otherwise expressly for use in the Disclosure Document or (2) those portions of the Disclosure Document furnished to and set forth in the indemnification certificate furnished by Borrower and Guarantor pursuant to clause (A) above.  This indemnity agreement will be in addition to any liability which Borrower or Guarantor may otherwise have.  Moreover, the indemnification and reimbursement obligations provided for in clauses (B) and (C) above shall be effective, valid and binding obligations of Borrower whether or not a separate agreement or indemnification certificate described in this Section 9.2(b) with respect to such obligations is provided by Borrower or Guarantor.  Notwithstanding anything to the contrary contained herein, Borrower shall have no liability pursuant to the terms of the foregoing clauses (A), (B) or (C) for any Liabilities resulting from the (i) gross negligence, willful misconduct, illegal acts or fraud of Lender or its agents or (ii) failure by Lender or any third party or their respective agents to comply with the Securities Act, the Exchange Act or any other federal, state or other securities or "blue sky" laws or any regulations thereunder.

(c)     Intentionally omitted.

(d)     Intentionally omitted.

(e)     As promptly as reasonably practicable after receipt by a Securitization Indemnified Party of notice of the commencement of any action, such Securitization Indemnified Party will, if a claim in respect thereof is to be made against the indemnifying party under this Section 9.2, notify the indemnifying party in writing of the commencement thereof, but the omission to so notify the indemnifying party will not relieve the indemnifying party from any liability which the indemnifying party may have to any Securitization Indemnified Party hereunder except to the extent that failure to notify causes material prejudice to the indemnifying party and, provided that the failure to notify shall not relieve such indemnifying party from any liability which it may have to any Securitization Indemnified Party otherwise than under the provisions of this Section 9.2.  In the event that any action is brought against any Securitization Indemnified Party, and it notifies the indemnifying party of the commencement thereof, the indemnifying party will be entitled, jointly with any other indemnifying party, to participate therein and, to the extent that it (or they) may elect by written notice delivered to the Securitization Indemnified Party promptly after receiving the aforesaid notice from such Securitization Indemnified Party, to assume the defense thereof with counsel satisfactory to such Securitization Indemnified Party.  After notice from the indemnifying party to such Securitization Indemnified Party under this Section 9.2 the indemnifying party shall be responsible for any reasonable out-of-pocket legal or other expenses subsequently incurred by such Securitization Indemnified Party in connection with the defense thereof other than reasonable costs of investigation; provided, however, if the defendants in any such action include both the Securitization Indemnified Party and the indemnifying party and the Securitization Indemnified Party shall have reasonably concluded that there are any legal defenses available to it and/or other indemnified parties that are different from or additional to those available to the indemnifying party, the Securitization Indemnified Party or parties shall have the

97

right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such action on behalf of such Securitization Indemnified Party or parties. The indemnifying party shall not be liable for the expenses of more than one such separate counsel unless a Securitization Indemnified Party shall have reasonably concluded that there may be legal defenses available to it that are different from or additional to those available to another Securitization Indemnified Party.

(f)     Without the prior written consent of each Securitization Indemnified Party affected thereby (which consent shall not be unreasonably withheld or delayed), no indemnifying person shall settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which indemnification may be sought hereunder (whether or not such Securitization Indemnified Party is an actual or potential party to such claim, action, suit or proceeding) unless Borrower (A) shall have given reasonable prior notice thereof to each Securitization Indemnified Party that (i) shall have delivered written notice of such claim, action, suit or proceeding to Borrower pursuant to Section 9.2(e) above, or (ii) shall have been specifically named as a defendant to such claim, action, suit or proceeding, and (B) shall have obtained an unconditional release of each such Securitization Indemnified Party by the other parties to such settlement from all Liabilities arising out of or relating to such claim, action, suit or proceeding and such settlement does not require or contain a statement as to, or an admission of, fault, culpability or a failure to act by or on behalf of any Securitization Indemnified Party, without the consent of the Securitization Indemnified Party. As long as Borrower and Guarantor have complied with their respective obligations to promptly (but no more than 60 days following receipt of a request) defend, indemnify and reimburse hereunder, Borrower shall not be liable for any settlement made by any Securitization Indemnified Party without the consent of Borrower (which consent shall not be unreasonably withheld or delayed). However, if settled by any Securitization Indemnified Party with the consent of Borrower or if there shall be a final judgment for the plaintiff, the indemnifying person shall indemnify the Securitization Indemnified Party from and against any Liability under above by reason of such settlement or judgment.

(g)     In order to provide for just and equitable contribution in circumstances in which any of the indemnity agreements provided for in Section 9.2 is or are for any reason held to be unenforceable by an Securitization Indemnified Party in respect of any Liabilities (or action in respect thereof) referred to therein which would otherwise be indemnifiable under Section 9.2, the indemnifying party shall contribute to the amount paid or payable by the Securitization Indemnified Party as a result of such Liabilities (or action in respect thereof); provided, however, that no person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation.

(h)     Borrower agrees that the Securitization Indemnified Parties are intended third party beneficiaries under this Section 9.2.

(i)     The liabilities and obligations of Borrower and the Securitization Indemnified Parties under this Section 9.2 shall survive the termination of this Agreement and the satisfaction and discharge of the Debt.

# X.    DEFAULTS

**Section 10.1.**  Event of Default.  Each of the following events shall constitute an event of default hereunder (an "**Event of Default**"):

(a)    (i) if any monthly Debt Service, or the payment due on the Maturity Date is not paid when due, (ii) if any monthly deposit of Reserve Funds is not paid when due or (iii) if or any other portion of the Debt is not paid when due and such non-payment under this clause (iii) continues for five (5) days following notice to Borrower that the same is due and payable;

(b)    if any of the Taxes or Other Charges are not paid prior to delinquency during any period when Borrower shall be obligated to pay or cause Mortgage Borrower to pay the same directly pursuant to the terms and provisions of Section 4.1.2 hereof;

(c)    if the Policies are not kept in full force and effect;

(d)    if Borrower commits, permits or suffers a Transfer in violation of the provisions of this Agreement;

(e)    if any certification, representation or warranty made by Borrower herein (including any representation or warranty of Mortgage Borrower that is incorporated herein by reference pursuant to Section 3.1.52 hereof and made by Borrower hereunder) or in any other Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished to Lender shall have been false or misleading in any material respect as of the date such certification, representation or warranty was made;

(f)    (i) if Borrower or Mortgage Borrower shall make an assignment for the benefit of creditors or (ii) upon the declaration by Lender that the same constitutes an Event of Default (which declaration may be made by Lender in its sole and absolute discretion), if Guarantor shall make an assignment for the benefit of creditors;

(g)    (i) if Borrower or Mortgage Borrower fails or admits its inability to pay debts generally as they become due or (ii) upon the declaration by Lender that the same constitutes an Event of Default (which declaration may be made by Lender in its sole and absolute discretion), if Guarantor fails or admits its inability to pay debts generally as they become due;

(h)    (i) if a receiver, liquidator or trustee shall be appointed for Borrower or Mortgage Borrower or if Borrower or Mortgage Borrower shall be adjudicated a bankrupt or insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by or against, consented to, or acquiesced in by, Borrower or Mortgage Borrower, or if any proceeding for the dissolution or liquidation of Borrower or Mortgage Borrower shall be instituted; provided, however, if such appointment, adjudication, petition or proceeding was involuntary and not consented to by Borrower or Mortgage Borrower, upon the same not being discharged, stayed or dismissed within ninety (90) days, or (ii) upon the declaration by Lender that the same constitutes an Event of Default (which declaration may be made by Lender in its sole and absolute discretion), if a receiver, liquidator or trustee shall be appointed for Guarantor or if Guarantor shall be adjudicated

a bankrupt or insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by or against, consented to, or acquiesced in by, Guarantor, or if any proceeding for the dissolution or liquidation of Guarantor shall be instituted; provided, however, if such appointment, adjudication, petition or proceeding was involuntary and not consented to by Guarantor, upon the same not being discharged, stayed or dismissed within ninety (90) days or if an order for relief is entered;

(i)     if Borrower or Guarantor attempts to assign its rights under this Agreement or any of the other Loan Documents or any interest herein or therein in contravention of the Loan Documents;

(j)     if Borrower shall be in default beyond any applicable cure periods under any agreement (other than the Loan Documents) creating a Lien on the Collateral or any part thereof that could reasonably be expected to have a Material Adverse Effect, subject to any right of Borrower to contest such Lien as set forth herein;

(k)     with respect to any term, covenant or provision set forth herein which specifically contains a notice requirement or grace period, if Borrower shall be in default under such term, covenant or condition after the giving of such notice or the expiration of such grace period;

(l)     if Borrower shall continue to be in Default under any of the terms, covenants or provisions set forth in Section 9.1, Section 11.29 or Section 11.30 hereof, or fails to cooperate with Lender in connection with a Secondary Market Transaction in accordance with the terms, covenants and provisions set forth in Section 9.1 hereof, for three (3) Business Days after notice to Borrower from Lender of such Default or failure to cooperate;

(m)     if any of the assumptions contained in any Insolvency Opinion is or shall become untrue in any material respect;

(n)     if Borrower breaches in any material respect any representation, warranty or covenant contained in Section 3.1.24 hereof;

(o)     (i) if Mortgage Borrower shall fail to pay any Ground Rent as and when such Ground Rent is due under the Ground Lease (unless such breach is cured within any applicable cure period provided in the Ground Lease or unconditionally waived in writing by the landlord under the Ground Lease or if sufficient funds are available in the Mortgage Loan Reserve Funds to pay such Ground Rent when due and Mortgage Lender fails to apply same in accordance with the Mortgage Loan Agreement, provided Mortgage Lender's access to such funds is not constrained in any manner and there exists no Mortgage Loan Event of Default), or (ii) if there shall occur any breach or default by Mortgage Borrower, as tenant under the Ground Lease, in the observance or performance of any term, covenant or condition of the Ground Lease on the part of Mortgage Borrower to be observed or performed;

(p)     if Borrower breaches in any material respect any covenant contained in Section 4.2.11 hereof;

100

(q)     (i) if a breach or default by Borrower or Mortgage Borrower under any condition or obligation contained in any Operating Agreement, the continuance of which breach or default could result in a Material Adverse Effect as reasonably determined by Lender, is not cured within any applicable cure period provided therein, (ii) if there occurs any event or condition that gives any party to any Operating Agreement (other than Mortgage Borrower), the termination or cancellation of which could result in a Material Adverse Effect as reasonably determined by Lender, the right to terminate or cancel such Operating Agreement and such event or condition is not cured within any applicable cure period under such Operating Agreement, or (iii) if any Operating Agreement is terminated or cancelled without Lender's prior consent, the termination of cancellation of which could result in a Material Adverse Effect as reasonably determined by Lender, or (iv) if any of the terms, covenants or conditions of any Operating Agreement shall in any manner be modified, changed, supplemented, altered, or amended without Lender's prior consent, which modification, change, supplementation, alteration or amendment, in each case, could result in a Material Adverse Effect as reasonably determined by Lender;

(r)     if a default in any material respect has occurred and continues beyond any applicable cure period under any Management Agreement and such default permits Manager thereunder to terminate or cancel such Management Agreement unless Borrower shall have caused Mortgage Borrower to replace such Manager with a Qualified Manager pursuant to a Replacement Management Agreement prior to such termination or cancellation (or, in the case of such a default as to which there is no applicable cure period, within five (5) Business Days after Borrower's receipt of notice of such termination or cancellation);

(s)     if Borrower breaches in any material respect any material covenant contained in Section 4.1.23 hereof or if Borrower breaches any covenant contained in  Section 4.2.15 hereof;

(t)     if there is any prepayment or defeasance of the Subordinate Mezzanine Loan without the simultaneous prepayment or defeasance of the Loan;

(u)     if Borrower shall continue to be in Default under any of the other terms, covenants or conditions of this Agreement not specified in clauses (a) to (t) above, for ten (10) days after notice to Borrower from Lender, in the case of any Default which can be cured by the payment of a sum of money, or for thirty (30) days after notice from Lender in the case of any other Default; provided, however, that if such non-monetary Default is susceptible of cure but cannot reasonably be cured within such thirty (30) day period and provided, further, that Borrower shall have commenced to cure such Default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended for such time as is reasonably necessary for Borrower in the exercise of due diligence to cure such Default, such additional period not to exceed ninety (90) days;

(v)     if there shall be Default under any of the other Loan Documents beyond any applicable cure periods contained in such Loan Documents (including, without limitation, any violation or breach of any representation, warranty or covenant in Section 5(b) or 5(d) of the Pledge Agreement), whether as to Borrower, Mortgage Borrower, the Collateral, Guarantor or the Property, or if any other such event shall occur or condition shall exist, if the effect of such event

101

or condition is to accelerate the maturity of any portion of the Debt or to permit Lender to accelerate the maturity of all or any portion of the Debt;

(w) if a Mortgage Loan Event of Default shall occur;

(x) if Lender no longer has a perfected first priority lien on the Collateral; or

(y) if Mortgage Borrower enters into or otherwise suffers or permits any amendment, waiver, supplement, termination, extension, renewal, replacement or other modification of any Mortgage Loan Document, Material Agreement, or Lease without the prior written consent of Lender except to the extent expressly permitted by this Agreement, to the extent that such consent was required to be obtained hereunder.

**Section 10.2.** Remedies. (a) Upon the occurrence of an Event of Default (other than an Event of Default described in Section 10.1(f), (g) or (h) above) and at any time thereafter while any such Event of Default is continuing, Lender may, in addition to any other rights or remedies available to it pursuant to this Agreement and the other Loan Documents or at law or in equity, take such action, without notice or demand, that Lender deems advisable to protect and enforce its rights against Borrower and in and to the Collateral, including, without limitation, declaring the Debt to be immediately due and payable, and Lender may enforce or avail itself of any or all rights or remedies provided in the Loan Documents and may exercise the rights and remedies of a secured party under the UCC against Borrower and the Collateral, including, without limitation, all rights or remedies available at law or in equity; and upon any Event of Default described in Section 10.1(f), (g) or (h) above, the Debt shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained herein or in any other Loan Document to the contrary notwithstanding.

(b) Upon the occurrence of any Event of Default and at any time thereafter while any Event of Default is continuing, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under this Agreement or any of the other Loan Documents executed and delivered by, or applicable to, Borrower or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any portion of the Debt shall be declared due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or initiated or taken other action for the enforcement of its rights and remedies under any of the Loan Documents with respect to all or any part of the Collateral. Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singly, successively, together or otherwise, at such time and in such order as Lender may determine in its sole and absolute discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by law, equity or contract or as set forth herein or in the other Loan Documents. Without limiting the generality of the foregoing, Borrower agrees that, if an Event of Default has occurred and remains outstanding, (i) Lender is not subject to any "one action" or "election of remedies" law or rule, and (ii) all Liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its rights and remedies against the Collateral and the

Pledge Agreement has been foreclosed, sold and/or otherwise realized upon in satisfaction of the Obligations or the Debt has been paid in full.

(c)     With respect to Borrower and the Collateral, nothing contained herein or in any other Loan Document shall be construed as requiring Lender to resort to the Collateral for the satisfaction of any of the Debt in any order, proportion or priority, and Lender may seek satisfaction out of the Collateral, or any part thereof, in its sole and absolute discretion in respect of the Debt.

(d)     Upon the occurrence of an Event of Default and while any Event of Default is continuing (but without limiting Lender's rights under Section 9.1, Section 11.29 or Section 11.30 hereof), Lender shall have the right from time to time to sever the Note and the other Loan Documents into one or more separate notes, mortgages, pledges, and other security documents (collectively, the "**Severed Loan Documents**") in such denominations and priority as Lender shall determine in its sole and absolute discretion for purposes of evidencing and enforcing its rights and remedies provided hereunder.  Borrower shall execute and deliver to Lender from time to time, promptly after the request of Lender, a severance agreement and such other documents as Lender shall request in order to effect the severance described in the preceding sentence, all in form and substance reasonably satisfactory to Lender.  Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect the aforesaid severance, Borrower ratifying all that its said attorney shall do by virtue thereof; provided, however, Lender shall not make or execute any such documents under such power until five (5) Business Days after notice has been given to Borrower by Lender of Lender's intent to exercise its rights under such power.  Borrower shall be obligated to pay any costs or expenses incurred in connection with the preparation, execution, recording or filing of the Severed Loan Documents and other matters and documentation in connection therewith.  The Severed Loan Documents shall not contain any representations, warranties or covenants not contained in the Loan Documents and any such representations and warranties contained in the Severed Loan Documents will be given by Borrower only as of the Closing Date.

(e)     Any amounts recovered from the Collateral or any other collateral for the Loan after the occurrence of an Event of Default may be applied by Lender toward the payment of any principal and/or interest of the Loan and/or any other amounts due under the Loan Documents in such order, proportion and priority as Lender in its sole and absolute discretion shall determine.

**Section 10.3.**  Right to Cure Defaults.  During the continuance of an Event of Default, Lender may, but without any obligation to do so and without notice to or demand on Borrower and without releasing Borrower from any obligation hereunder or under the other Loan Documents or being deemed to have cured such Event of Default or any other Event of Default, make, do or perform any obligation of Borrower hereunder or under the other Loan Documents in such manner and to such extent as Lender may deem necessary.  Lender is authorized to appear in, defend, or bring any action or proceeding to protect its interest in the Collateral for such purposes.  All costs and expenses incurred by Lender in remedying or attempting to remedy such Event of Default or in appearing in, defending, or bringing any action or proceeding shall bear

interest at the Default Rate from the date such costs and expenses were incurred to the date reimbursement payment is received by Lender.  All such costs and expenses incurred by Lender, together with interest thereon calculated at the Default Rate and any applicable Prepayment Fee, shall be deemed to constitute a portion of the Obligations, shall be secured by the Liens and security interests provided to Lender under the Loan Documents and shall be immediately due and payable upon demand by Lender therefore.

Section 10.4.  <u>Remedies Cumulative</u>.  The rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Borrower pursuant to this Agreement or the other Loan Documents, or existing at law or in equity or otherwise.  Lender's rights, powers and remedies may be pursued singly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's sole and absolute discretion.  No delay or omission to exercise any right, power or remedy accruing upon an Event of Default shall impair any such right, power or remedy or shall be construed as a waiver thereof, but any such right, power or remedy may be exercised from time to time and as often as may be deemed expedient.  A waiver of one Default or Event of Default shall not be construed to be a waiver of any subsequent Default or Event of Default or to impair any right, power or remedy consequent thereon.

## XI.    MISCELLANEOUS

Section 11.1.  <u>Successors and Assigns</u>.   This Agreement and all agreements, covenants, representations and warranties in this Agreement, by or on behalf of Borrower, shall inure to the benefit of the legal representatives, successors and assigns of Lender.

Section 11.2.  <u>Lender's Discretion</u>.  Whenever pursuant to this Agreement Lender exercises any right given to it to approve or disapprove, or any arrangement or term is to be satisfactory to Lender, the decision of Lender to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory shall (except as is otherwise specifically herein provided) be in the sole discretion of Lender and shall be final and conclusive.  Prior to a Securitization, whenever pursuant to this Agreement the Rating Agencies are given any right to approve or disapprove, or any arrangement or term is to be satisfactory to the Rating Agencies, the decision of Lender to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory, based upon Lender's reasonable determination of Rating Agency criteria, shall be substituted therefor.

Section 11.3.  <u>Governing Law</u>.  (a) THE LOAN WAS NEGOTIATED IN THE STATE OF NEW YORK AND MADE BY LENDER AND ACCEPTED BY BORROWER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE LOAN DELIVERED PURSUANT HERETO WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY,

104

AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION, AND ENFORCEMENT OF THE LIEN AND SECURITY INTEREST CREATED PURSUANT HERETO AND PURSUANT TO THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE IN WHICH THE COLLATERAL IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS AND ALL OF THE OBLIGATIONS ARISING HEREUNDER OR THEREUNDER.  TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER AND LENDER EACH HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS, AND THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(b)     ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE NOTE OR THE OTHER LOAN DOCUMENTS WILL BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND BORROWER AND LENDER EACH WAIVES ANY OBJECTIONS WHICH EACH OF THE SAME MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND EACH OF THE SAME HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.  BORROWER DOES HEREBY DESIGNATE AND APPOINT:

**KRISS & FEUERSTEIN LLP**
**360 LEXINGTON AVENUE**
**NEW YORK, NEW YORK 10017**
**ATTENTION: DAVID KRISS**

AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND NOTICE OF SAID SERVICE MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK.  BORROWER (I) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE

105

A SUBSTITUTE AUTHORIZED AGENT (WHICH SUBSTITUTE AGENT SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE AGENT IF ITS AUTHORIZED AGENT IS DISSOLVED OR RENDERED INCAPABLE OF ACCEPTING SERVICE OF PROCESS WITHOUT LEAVING A SUCCESSOR.

> **Section 11.4.**  <u>Modification, Waiver in Writing</u>.  No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement or of any other Loan Document, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given.  Except as otherwise expressly provided herein, no notice to or demand on Borrower shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.

> **Section 11.5.**  <u>Delay Not a Waiver</u>.  Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement in, or exercising any right, power, remedy or privilege under, this Agreement or any other Loan Document shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege.  In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement or any other Loan Document, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement or the other Loan Documents, or to declare a default for failure to effect prompt payment of any such other amount.  Lender shall have the right to waive or reduce any time periods that Lender is entitled to under the Loan Documents in its sole and absolute discretion.

> **Section 11.6.**  <u>Notices</u>.  All notices, demands, requests, consents, approvals or other communications (any of the foregoing, a "**Notice**") required, permitted, or desired to be given hereunder shall be in writing (a) sent by facsimile (with answer back acknowledged and with a copy of the same delivered promptly thereafter by one of the means described in <u>clauses  (c)</u> or <u>(d)</u> below), (b) intentionally omitted, (c) delivered by hand or (d) delivered by reputable overnight courier addressed to the party to be so notified at its address hereinafter set forth, or to such other address as such party may hereafter specify in accordance with the provisions of this <u>Section 11.6</u>. Any Notice shall be deemed to have been received:  (i) if sent by facsimile, on the date of sending the facsimile if sent during business hours on a Business Day (otherwise on the next Business Day), (ii) if sent by registered or certified mail, on the date of delivery or the date of the first attempted delivery, in either case on a Business Day (otherwise on the next Business Day), (iii) if delivered by hand, on the date of delivery if delivered during business hours on a Business Day (otherwise on the next Business Day), and (iv) if sent by an overnight commercial courier, on the next Business Day, in each case addressed to the parties as follows:

> > If to Lender:

> > > KTB CRE Debt Fund No. 8
> > > c/o KTB Asset Management Co., Ltd.

<div align="center">106</div>

13FL, KTB Bldg, 66 Yeouidaero
Yeongdeungpo-gu, Seoul 07325, Korea
Attention: Jaesang Eum
Telephone No.: 82-2-788-8461
Facsimile No.: 82-2-788-8647
Email: jaesang.eum@i-ktb.com

and to:

Kookmin Bank Co., Ltd.
10th fl, Sewoo Bldg, 115, Yeouigongwon-ro
Youngdeungpo-gu, Seoul, Korea 07241
Attention: Jean Moon
Tel: +822-2073-5188/5183
Email: aco.kbg@kbfg.com

With a copy to:

Rexmark Holdings LLC
295 Madison Avenue
Suite 1200
New York, NY 10017
Attention: Michael Rebibo
Facsimile No.: (212) 208-0967

And a copy to:

K&L Gates LLP
599 Lexington Avenue
New York, New York 10022
Attention: Henry Shin, Esq.
Facsimile No.: (212) 536-3901

If to Borrower:

Union Station Sole Member LLC
c/o Ashkenazy Acquisition Corp.
150 East 58th Street
Penthouse
New York, New York 10155
Attention:  Ben Ashkenazy
Facsimile No.:  (212) 213-5713

with a copy to:

> Kriss & Feuerstein LLP
> 360 Lexington Avenue
> New York, New York 10017
> Attention: David Kriss, Esq.
> Facsimile No.:  (646) 454-4160

**Section 11.7.**  <u>Trial by Jury</u>.  BORROWER AND LENDER EACH HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER AND LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.  EACH PARTY IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER.

**Section 11.8.**  <u>Headings</u>.  The Article and/or Section headings and the Table of Contents in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

**Section 11.9.**  <u>Severability</u>.  Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**Section 11.10.** <u>Preferences</u>.  Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the Obligations.  To the extent Borrower makes any payment to Lender, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other Person under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the Obligations or a portion thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.

**Section 11.11.** <u>Waiver of Notice</u>.  Borrower shall not be entitled to any notices of any nature whatsoever from Lender except with respect to matters for which this Agreement or the other Loan Documents specifically and expressly provide for the giving of notice by Lender to Borrower and except with respect to matters for which Borrower is not, pursuant to the applicable Legal Requirements, permitted to waive the giving of notice.  Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Agreement

<div align="center">108</div>

or the other Loan Documents do not specifically and expressly provide for the giving of notice by Lender to Borrower.

**Section 11.12.** Remedies of Borrower.  In the event that a claim or adjudication is made that Lender or its agents have acted unreasonably or unreasonably delayed acting in any case where, by law or under this Agreement or the other Loan Documents, Lender or such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that neither Lender nor its agents shall be liable for any monetary damages, and Borrower's sole remedy shall be limited to commencing an action seeking injunctive relief or declaratory judgment.  The parties hereto agree that any action or proceeding to determine whether Lender or its agent has acted reasonably shall be determined by an action seeking declaratory judgment.

**Section 11.13.** Expenses; Indemnity.  (a)  Borrower shall pay or, if Borrower fails to pay, reimburse Lender upon receipt of notice from Lender, for all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees and expenses) incurred by Lender in connection with (i) Borrower's ongoing performance of and compliance with Borrower's agreements and covenants contained in this Agreement and the other Loan Documents on its part to be performed or complied with after the Closing Date, including, without limitation, confirming compliance with environmental and insurance requirements; (ii) Lender's ongoing performance of and compliance with all agreements and covenants contained in this Agreement and the other Loan Documents on its part to be performed or complied with after the Closing Date; (iii) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to this Agreement and the other Loan Documents and any other documents or matters requested or submitted by Borrower (including without limitation relating to zoning reclassifications or variances pursuant to Section 4.2.6); (iv) the filing and recording fees and expenses, title insurance and reasonable out-of-pocket fees and expenses of counsel for providing to Lender all required legal opinions, and other similar expenses incurred, in creating and perfecting the Liens in favor of Lender pursuant to this Agreement and the other Loan Documents; (v) enforcing or preserving any rights in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation or otherwise, in each case against, under or affecting Borrower, Mortgage Borrower, this Agreement, any other Loan Document, the Collateral, or any other security given for the Loan; (vi) enforcing any obligations of, or collecting any payments due from, Borrower or Guarantor under this Agreement or the other Loan Documents or with respect to the Property or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or of any insolvency or bankruptcy proceedings; and (vii) securing Borrower's compliance with any requests made by Lender pursuant to the provisions of this Agreement, including Section 9.1, Section 11.29 or Section 11.30 hereof; provided, however, that Borrower shall not be liable for the payment of any such costs and expenses to the extent the same arise by reason of the gross negligence, illegal acts, fraud or willful misconduct of Lender.  At Lender's discretion, any such costs and expenses due and payable to Lender may be paid to Lender from any amounts in the Reserve Funds.

(b)  Borrower shall indemnify, defend and hold harmless each Lender Indemnitee from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever

109

(including, without limitation, the reasonable fees and expenses of counsel for any Lender Indemnitee in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not such Lender Indemnitee shall be designated a party thereto), that may be imposed on, incurred by, or asserted against any Lender Indemnitee in any manner relating to or arising out of (i) any breach by Borrower of its obligations under, or any misrepresentation by Borrower contained in, this Agreement or the other Loan Documents, (ii) any misstatement or omission in any report, certificate, financial statement, other agreement, instrument or document or other materials or information provided by or on behalf of Borrower pursuant to this Agreement or any other Loan Document or in connection with the Loan, or (iii) the use or intended use of the proceeds of the Loan (collectively, the "**Indemnified Liabilities**"); provided, however, that Borrower shall not have any obligation to the Lender Indemnitees hereunder to the extent that such Indemnified Liabilities arise from the gross negligence, illegal acts, fraud or willful misconduct of the Lender Indemnitees.  To the extent that the undertaking to indemnify, defend and hold harmless set forth in the preceding sentence may be unenforceable because it violates any law or public policy, Borrower shall pay the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by the Lender Indemnitees.

(c)     Borrower shall pay for or, if Borrower fails to pay, to reimburse Lender for, any fees, reasonable out-of-pocket costs and expenses of any Rating Agency in connection with any consent, approval, waiver or confirmation obtained from such Rating Agency pursuant to the terms and conditions of this Agreement or any other Loan Document and Lender shall be entitled to require payment of such fees, costs and expenses as a condition precedent to the obtaining of any such consent, approval, waiver or confirmation.

**Section 11.14.** Schedules Incorporated.  The Schedules annexed hereto are hereby incorporated herein as a part of this Agreement with the same effect as if set forth in the body hereof.

**Section 11.15.** Offsets, Counterclaims and Defenses.  Any assignee of Lender's interest in and to this Agreement and the other Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to such documents which Borrower may otherwise have against any assignor of such documents, and no such unrelated offset, counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon such documents and any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

**Section 11.16.** No Joint Venture or Partnership.  Borrower and Lender intend that the relationships created hereunder and under the other Loan Documents be solely that of borrower and lender.  Nothing herein or therein is intended to create a joint venture, partnership, tenancy-in-common, or joint tenancy relationship between Borrower and Lender or to grant Lender any interest in the Collateral other than that of secured party, beneficiary or lender.

**Section 11.17.** Publicity.  Except for (i) any "tombstone" in a format typically used by Lender or (ii) a press release issued outside the United States (which "tombstone" or press

110

release shall not include the Loan or Mortgage Loan amount or Interest Rate but may state the aggregate amount of mezzanine debt (without providing a breakdown of specific loan amounts) that Lender or its Affiliates has invested with Ashkenazy Acquisition Corp. in 2018), all news releases, publicity or advertising by Borrower or its Affiliates, or by Lender or its Affiliates, through any media which refers to the Loan, the Loan Documents, Borrower or any of its Affiliates or Lender or any of its Affiliates shall be subject to the prior approval of Borrower or Lender, as the case may be. Borrower authorizes Lender and its Affiliates to issue press releases, advertisements and other promotional materials in connection with Lender's or its Affiliates' own promotional and marketing activities, including in connection with a Secondary Market Transaction, and such materials may describe the Loan in general terms or in detail and Lender's participation therein in the Loan.  Borrower also authorizes Lender and its Affiliates to disclose any terms of the Loan as may be required in public financial statements released in accordance with Legal Requirements or the requirements of investors.

       **Section 11.18.** Waiver of Marshalling of Assets.  To the fullest extent permitted by law, Borrower, for itself and its successors and assigns, waives all rights to a marshalling of the assets of Borrower, Borrower's partners, members and others with interests in Borrower, and of the Collateral, and agrees not to assert any right under any laws pertaining to the marshalling of assets, the sale in inverse order of alienation, homestead exemption, the administration of estates of decedents, or any other matters whatsoever to defeat, reduce or affect the right of Lender under the Loan Documents to a sale of the Property for the collection of the Debt without any prior or different resort for collection or of the right of Lender to the payment of the Debt out of the net proceeds of the Property in preference to every other claimant whatsoever.

       **Section 11.19.** Waiver of Offsets/Defenses/Counterclaims.  Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or its agents or otherwise to offset any obligations to make the payments required by the Loan Documents.  No failure by Lender to perform any of its obligations hereunder shall be a valid defense to, or result in any offset against, any payments which Borrower is obligated to make under any of the Loan Documents.

       **Section 11.20.** Conflict; Construction of Documents; Reliance.  In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control.  The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of the Loan Documents and that such Loan Documents shall not be subject to the principle of construing their meaning against the party which drafted same.  Borrower acknowledges and agrees that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan without relying in any manner on any statements, representations or recommendations of Lender or any parent, subsidiary or Affiliate of Lender.  Lender shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to it under any of the Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by it or any parent, subsidiary or Affiliate of Lender of any legal, beneficial or economic interest any of them may acquire in Borrower, and Borrower hereby irrevocably waives the right to raise any defense or take any action on the basis of the foregoing with respect to Lender's exercise of any such rights or remedies.  Borrower acknowledges that Lender engages

in the business of real estate financings and other real estate transactions and investments which may be viewed as adverse to or competitive with the business of Borrower or its Affiliates.

      **Section 11.21.** <u>Brokers and Financial Advisors</u>.  Borrower hereby represents that it has not dealt with any financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the transactions contemplated by this Agreement.  Borrower shall indemnify, defend and hold Lender harmless from and against any and all liabilities, obligations, losses, damages, claims, costs and expenses of any kind (including Lender's attorneys' fees and expenses) in any way relating to or arising from a claim by any Person that such Person acted on behalf of Borrower or Lender in connection with the transactions contemplated herein.  The provisions of this <u>Section 11.21</u> shall survive the expiration and termination of this Agreement and the payment of the Debt.

      **Section 11.22.** <u>Exculpation</u>.  Subject to the qualifications below, Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in this Agreement, the Note, the Pledge Agreement or the other Loan Documents by any action or proceeding wherein a money judgment shall be sought against Borrower, except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon its interest under this Agreement, the Note, the Pledge Agreement and the other Loan Documents, or in the Collateral, or any other collateral given to Lender pursuant to the Loan Documents; <u>provided</u>, <u>however</u>, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Borrower only to the extent of Borrower's interest in the Collateral, and in any other collateral given to Lender, and Lender, by accepting this Agreement, the Note, the Pledge Agreement and the other Loan Documents, agrees that it shall not sue for, seek, or demand any deficiency judgment against Borrower in any such action or proceeding under or by reason of or under or in connection with this Agreement, the Note, the Pledge Agreement or the other Loan Documents.  The provisions of this <u>Section 11.22</u> shall not, however, (a) constitute a waiver, release or impairment of any obligation evidenced or secured by any of the Loan Documents; (b) impair the right of Lender to name Borrower as a party defendant in any action or suit for foreclosure and sale under the Pledge Agreement (subject, however, to the aforesaid limitation on Lender's right to sue for, seek or demand a deficiency or other monetary judgment against Borrower except as expressly permitted hereunder); (c) affect the validity or enforceability of any guaranty or indemnity made in connection with the Loan or any of the rights and remedies of Lender thereunder (subject, however, to any exculpatory or non-recourse provisions contained in such guaranty); (d) impair the right of Lender to obtain the appointment of a receiver; (e) intentionally omitted; (f) constitute a prohibition against Lender to seek a deficiency judgment against Borrower in order to fully realize the security granted by the Pledge Agreement or to commence any other appropriate action or proceeding in order for Lender to exercise its rights and remedies against the Collateral or any other collateral given to Lender pursuant to the Loan Documents; or (g) constitute a waiver of the right of Lender to enforce the liability and obligation of Borrower, by money judgment or otherwise, to the extent of any actual loss, actual damage, cost, expense, actual liability, claim or other actual obligation incurred by Lender (including attorneys' fees and costs reasonably incurred) arising out of or in connection with, and Borrower shall be personally liable for, the following but specifically excluding any special or punitive damages unless such special or punitive damages are imposed on Lender by a third-party (all such

<div align="center">112</div>

liability and obligation of Borrower for any or all of the following being referred to herein as the "**Borrower's Recourse Liabilities**"):

        (i)    fraud or intentional material misrepresentation in writing by Borrower, Mortgage Borrower, Guarantor or any Affiliate of Borrower, Mortgage Borrower, or Guarantor in connection with the Loan;

        (ii)    the gross negligence or willful misconduct by, or at the direction of, Borrower, Mortgage Borrower, Guarantor or any Affiliate of Borrower, Mortgage Borrower, or Guarantor in connection with the Loan;

        (iii)    intentional material physical waste by Borrower, Mortgage Borrower, Guarantor or any Affiliate of Borrower, Mortgage Borrower, or Guarantor at the Property;

        (iv)    the removal or disposal by Borrower, Guarantor or any Affiliate of Borrower or Guarantor of any portion of the Property after an Event of Default other than in the ordinary course of owning and operating the Property with respect to portions of the Property that are either being replaced or that is no longer necessary in connection with the operation of the Property or the Collateral, <u>provided</u> that such removal or disposal will not (i) have a Material Adverse Effect, (ii) impair the utility or operation of the Property or (iii) result in a reduction or abatement of, or right of offset against, the Rents under any Lease in respect of the Property;

        (v)    the misappropriation, conversion, or intentional misapplication by Borrower or Mortgage Borrower in violation of the Loan Documents of (A) any Insurance Proceeds paid by reason of any Casualty and received by Borrower or Mortgage Borrower or any Affiliate of Borrower or Mortgage Borrower or paid at the direction of Borrower or Mortgage Borrower, (B) any Awards or other amounts received by Borrower or Mortgage Borrower or any Affiliate of Borrower or Mortgage Borrower or paid at the direction of Borrower or Mortgage Borrower in connection with a Condemnation of all or a portion of the Property, or (C) any Rents received by or on behalf of Borrower or Mortgage Borrower or any Affiliate of Borrower or Mortgage Borrower; or (D) the misappropriation, misapplication or conversion by Borrower any Net Liquidation Proceeds After Debt Service or any distributions or other payments made in respect of any part of the Property or the Collateral;

        (vi)    any security deposits, advance deposits or any other deposits collected with respect to the Property and received by or on behalf of Mortgage Borrower which are not delivered to Mortgage Lender upon a foreclosure of the Property or action in lieu thereof, except to the extent any such security deposits, advance deposits or any other deposits were (x) applied in accordance with the terms and conditions of the applicable Leases, (y) returned to third-party tenants or other depositors in accordance with the terms and conditions of the applicable Leases or (z) applied as otherwise required by law or court order, in each case prior to the occurrence of the Mortgage Loan Event of Default that gave rise to such foreclosure or action in lieu thereof;

        (vii)    failure to pay or cause to be paid Taxes, charges for labor or materials or Other Charges that can create Liens on any portion of the Property or the Collateral

<div align="center">113</div>

and/or failure to pay or cause to be paid Insurance Premiums in accordance with the terms and provisions hereof (but only to the extent there is sufficient cash flow from the Property to pay Taxes, charges for labor or materials or Other Charges that can create Liens on any portion of the Property or the Collateral and Insurance Premiums after the payment of Debt Service; provided, that no liability shall exist under this clause (vii) with respect to failure to pay Taxes or Insurance Premiums if sufficient funds are available in the Mortgage Loan Reserve Funds, to pay such Taxes or Insurance Premiums, as respectively, when due and Mortgage Lender fails to apply same in accordance with the Mortgage Loan Agreement, provided Mortgage Lender's access to such funds is not constrained in any manner and there exists no Mortgage Loan Event of Default; it being further understood, that nothing contained herein shall require the payment of capital contributions from any direct or indirect owner of equity in Borrower));

(viii)   Borrower's indemnification of Lender set forth in Section 9.2 hereof;

(ix)   any damage or destruction to the Property caused by the intentional wrongful acts or omissions of, or at the direction of, Borrower, Mortgage Borrower, Guarantor or any Affiliate of Borrower or Guarantor;

(x)   the payment of fees or other amounts by Borrower or Mortgage Borrower to any of its Affiliates in violation of the Loan Documents;

(xi)   the seizure or forfeiture of the Property or the Collateral, or any portion thereof, or Borrower's or Mortgage Borrower's interest therein, as applicable, resulting from criminal wrongdoing by Borrower, Mortgage Borrower, Guarantor or any Affiliate of Borrower, Mortgage Borrower, or Guarantor;

(xii)   (i) a breach by Borrower of its obligation to maintain its status as a single purpose entity as required by, and in accordance with the terms and provisions of, this Agreement and the other Loan Documents (including without limitation Section 3.1.24 hereof, but excluding Borrower's obligations to remain solvent and adequately capitalized as set forth in Section 3.1.24(g) and (j) respectively) or (ii) a breach by Mortgage Borrower of its obligation to maintain its status as a single purpose entity as required by, and in accordance with the terms and provisions of, the Mortgage Loan Agreement and the other Mortgage Loan Documents (including without limitation Section 3.1.24 of the Mortgage Loan Agreement, but excluding Borrower's obligations to remain solvent and adequately capitalized as set forth in Section 3.1.24(g) and (j) of the Mortgage Loan Agreement, respectively;

(xiii)   Borrower's or Guarantor's breach in any material respect of any representation set forth in Sections 3.1.9, 3.1.10, 3.1.23, 3.1.48 or 3.1.50 relating to acts or omissions occurring on or prior to the Closing Date or Mortgage Borrower's breach in any material respect of any representation set forth in Sections 3.1.9, 3.1.10, 3.1.23, 3.1.48 or 3.1.50 of the Mortgage Loan Agreement relating to acts or omissions occurring on or prior to the Closing Date;

(xiv)   if any litigation or other legal proceeding related to the Debt or the Mortgage Loan filed by Borrower, Mortgage Borrower, Guarantor or any Affiliate or Borrower, Mortgage Borrower, or Guarantor was brought in bad faith or was intended solely to delay, oppose,

114

impede, obstruct, hinder, enjoin or otherwise interfere with or frustrate the efforts of Lender or Mortgage Lender to exercise any right and remedies available to Lender or Mortgage Lender as provided herein and in the other Loan Documents and in the Mortgage Loan Agreement and the other Mortgage Loan Documents, as applicable;

(xv)    Borrower's or Mortgage Borrower's failure to obtain Lender's prior consent to any Indebtedness or voluntary Lien encumbering the Property or the Collateral or any part thereof or interest therein in violation of this Agreement or the Mortgage Loan Agreement;

(xvi)    any amounts owed by Mortgage Borrower to any Tenant for coupon reimbursements or for reconciliations for any prior calendar year pursuant to any Lease;

(xvii)    Borrower's breach in any material respect of the representation set forth in Section 3.1.39 hereof that all Ground Rent then due and payable by the tenant under the Ground Lease has been paid in full as of the date of this Agreement;

(xviii)    any amendment or modification of the Ground Lease or the Prime Lease (to the extent Borrower or Mortgage Borrower has an approval right over such amendment or modification to the Prime Lease) without Lender's prior written consent;

(xix)    intentionally omitted;

(xx)    any violation or breach of any representation, warranty or covenant in Section 5(b) or 5(d) of the Pledge Agreement; and/or

(xxi)    the failure by Borrower or any Affiliate or Borrower to pay over to Lender the proceeds of any owner's policy of title insurance insuring Mortgage Borrower that it receives.

Notwithstanding anything to the contrary in this Agreement, the Note or any of the other Loan Documents, (A) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b) or 1111(b) or any other provisions of the U.S. Bankruptcy Code or any other Bankruptcy Law to file a claim for the full amount of the Debt or to require that all collateral shall continue to secure all of the Obligations in accordance with the Loan Documents, and (B) the Debt shall be fully recourse to Borrower in the event that any of the following occurs (each, a "**Springing Recourse Event**"):  (1) Borrower or Mortgage Borrower files a voluntary petition under the Bankruptcy Law; (2) an Affiliate, officer, director, or representative which Controls Borrower or Mortgage Borrower files, or joins in the filing of, an involuntary petition against Borrower or Mortgage Borrower under the Bankruptcy Law other than an involuntary petition filed by or at the direction of Lender, or solicits or causes to be solicited petitioning creditors for any involuntary petition against Borrower from any Person; (3) Borrower or Mortgage Borrower files an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it by any other Person under the Bankruptcy Law other than Lender or any affiliate of Lender, or solicits or causes to be solicited petitioning creditors for any involuntary petition against Borrower or Mortgage Borrower from any Person; (4) any Affiliate, officer, director, or representative which Controls Borrower or Mortgage Borrower consents to or acquiesces in or joins in an application for the appointment of a custodian, receiver, trustee, or

115

examiner for Borrower or Mortgage Borrower or any portion of the Property or the Collateral other than in connection with a request or action commenced by Lender or its affiliate; (5) Borrower or Mortgage Borrower makes an assignment for the benefit of creditors, or admits, in writing or in any action or proceeding, its insolvency or inability to pay its debts as they become due, which admission is used as evidence of Borrower's or Mortgage Borrower's insolvency in connection with an involuntary petition under the U.S. Bankruptcy Code or any other Bankruptcy Law by a Person other than Lender and such statement was either (i) not true or correct when made or (ii) was made by Borrower or Mortgage Borrower to such Person to promote or encourage such Person to file an involuntary petition under the U.S. Bankruptcy Code or any other Bankruptcy Law, and specifically excluding in any event any admissions to Lender or any Servicer that (x) Borrower cannot pay its Operating Expenses including its Debt Service payment due in respect of the Loan or (y) Borrower cannot refinance the Loan on the Maturity Date; (6)(i) Borrower or Mortgage Borrower fails to maintain its status as a single purpose entity as required by, and in accordance with, the terms and provisions of, this Agreement and the other Loan Documents or the Mortgage Loan Agreement and the other Mortgage Loan Documents, as applicable (including without limitation Section 3.1.24 hereof and Section 3.1.24 of the Mortgage Loan Agreement, as applicable, but excluding Borrower's and Mortgage Borrower's obligations to remain solvent and adequately capitalized as set forth in Section 3.1.24(g) and (j) hereof and of the Mortgage Loan Agreement, respectively) and (ii) a court of competent jurisdiction over Lender's objection orders a substantive consolidation of Borrower's or Mortgage Borrower's assets in a bankruptcy or insolvency proceeding of an Affiliate of Borrower or Mortgage Borrower; (7) Borrower's failure to obtain Lender's prior consent to any Transfer except to the extent expressly permitted by this Agreement or the Pledge Agreement; provided that (i) if the violation results solely from a failure to provide any required notice, an Insolvency Opinion, any other deliveries (including payment of fees) or copies of instruments and/or Organizational Documents related to such Transfer (and but for such failure to provide such item(s), such Transfer would otherwise be a Permitted Transfer), no such liability shall arise under this clause (7) if Borrower promptly provides such notice, Insolvency Opinion or other deliveries (including payment of fees) or copies of instruments and/or Organizational Documents related to such Transfer within ten (10) Business Days after Lender's written request therefor and (ii) no liability shall arise under this clause (7) to the extent that Borrower fails to obtain Lender's prior consent to the Transfer (to the extent such consent is required under this Agreement or the Security Instrument) of any indirect equity interest in Borrower (not to exceed twenty percent (20%) of the equity interests in Borrower at the time of such Transfer) which does not result in a change in Control of Borrower and Borrower promptly provides to Lender all information reasonably requested by Lender with respect to such Transfer within ten (10) Business Days after Lender's written request therefor (it being understood and agreed that such Transfer shall be an Event of Default); or (8) if all or any material portion of the Ground Lease is terminated by or on behalf of Borrower or by Ground Lessor as a result of a default thereunder by Borrower without Lender's prior written consent.

      **Section 11.23.** Prior Agreements.  This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written, are superseded by the terms of this Agreement and the other Loan Documents.

<div align="center">116</div>

**Section 11.24.** Servicer.  (a)  At the option of Lender, the Loan may be serviced by servicers (individually or collectively, "**Servicer**") selected by Lender and Lender may delegate all or any portion of its responsibilities under this Agreement and the other Loan Documents to Servicer pursuant to a servicing agreement (the "**Servicing Agreement**") between Lender and Servicer.  Borrower shall be responsible for (i)  any reasonable out-of-pocket expenses of Servicer (including, without limitation, attorneys' fees and disbursements) in connection with any release of the Property, any prepayment, defeasance, assumption, amendment or modification of the Loan, any documents or matters requested by Borrower, and (ii) all actual out-of-pocket costs and expenses and all fees of Lender and Servicer, operating advisor and Trustee, and all other actual expenses of the Securitization Vehicle, in each case resulting from Defaults and reasonably imminent Defaults by Borrower, the Loan going into special servicing or requests by Borrower (including enforcement expenses and any liquidation fees, workout fees, special servicing fees, operating advisor consulting fees or any other similar fees and interest payable on advances made by the Servicer or the Trustee with respect to delinquent Debt Service payments or expenses of curing Borrower's Defaults under the Loan Documents, and any expenses paid by Servicer or a trustee in respect of the protection and preservation of the Property, such as payment of taxes and insurance premiums), and the costs of all property inspections and/or appraisals (or any updates to any existing inspection or appraisal) that Servicer may be required to obtain due to a request by Borrower or the occurrence of a Default or reasonably imminent Default; provided, however, that such costs and expenses shall exclude (1) those costs or expenses which are customarily borne by a servicer or trustee without reimbursement from a securitization trust and (2) any cost or expense which is incurred as a result of the gross negligence or willful misconduct of Servicer, special servicer, Trustee or certificate administrator.

(b)     Upon notice thereof from Lender, Servicer shall have the right to exercise all rights of Lender and enforce all obligations of Borrower and Guarantor pursuant to the provisions of this Agreement and the other Loan Documents.

(c)     Provided Borrower shall have been given notice of Servicer's address by Lender, Borrower shall deliver, or cause to be delivered, to Servicer duplicate originals of all notices and other documents and instruments which Borrower or Guarantor may or shall be required to deliver to Lender pursuant to this Agreement and the other Loan Documents (and no delivery of such notices or other documents and instruments by Borrower or Guarantor shall be of any force or effect unless delivered to Lender and Servicer as provided above).  Lender shall provide, or cause Servicer to provide, to Borrower the address and contact information for the Servicer promptly after the engagement of Servicer; provided the failure to provide such notice shall not constitute a default hereunder.

**Section 11.25.** Intentionally Omitted.

**Section 11.26.** Creation of Security Interest.  Notwithstanding any other provision set forth in this Agreement, the Note, the Pledge Agreement or any of the other Loan Documents, Lender may at any time grant a security interest in all or any portion of its rights under this Agreement, the Note, the Pledge Agreement or any of the other Loan Documents (including, without limitation, the payments owing to it) (a) to any Federal Reserve Bank in accordance with Regulation A of the Board of Governors of the Federal Reserve System or to the central reserve

117

bank or similar authority of any other country to secure any obligation of Lender or its Affiliates to such bank or similar authority or (b) to secure any borrowing by Lender or its Affiliates from any company that purchases or funds financial assets by issuing commercial paper.

Section 11.27. Intentionally Omitted.

Section 11.28. Set-Off.  In addition to any other rights and remedies of Lender provided by the Loan Documents and by law, Lender shall have the right, without prior notice to Borrower, any such notice being expressly waived by Borrower to the extent permitted by applicable law, upon any amount becoming due and payable by Borrower hereunder or under the other Loan Documents (whether at the stated maturity, by acceleration or otherwise) to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by Lender or any Affiliate of Lender to or for the credit or the account of Borrower.  Lender agrees to promptly notify Borrower after any such set-off and application made by Lender; provided that the failure to give such notice shall not affect the validity of such set-off and application.

Section 11.29. Component Notes; Adjustment of Loan.  Without in any way limiting Lender's other rights under this Agreement or any other Loan Document (including Lender's rights under Section 9.1 and Section 11.30 hereof), Lender shall have the right, at any time and in its sole and absolute discretion, to require Borrower to execute and deliver new component notes (including senior and junior notes) to replace the original note or modify the original note to reflect multiple components of the Loan, which notes or components may be paid in such order of priority as may be designated by Lender, provided that (a) the aggregate principal amount of such component notes shall, on the date created, equal the Outstanding Principal Balance immediately prior to the creation of such component notes, (b) the weighted average interest rate of all such component notes shall, on the date created, equal the interest rate which was applicable to the Loan immediately prior to the creation of such component notes and shall continue to equal such interest rate (except that such weighted average interest rate may subsequently change due to involuntary prepayments or if an Event of Default, Mortgage Loan Event of Default, or Subordinate Mezzanine Loan Event of Default shall occur), (c) the scheduled debt service payments on all such component notes shall, on the date created, equal the scheduled debt service payments under the Loan immediately prior to the creation of such component notes, and (d) the creation of such component notes shall not result in there being more than one (1) Servicer at any time that is entitled to collect, or to which Borrower is obligated to pay, any payments due in respect of such component notes, and Borrower's obligation to make payments from time to time of any amounts in respect of any such component notes shall be satisfied in each case to the extent that Borrower makes a single aggregate payment of such amounts to such Servicer in accordance with the terms and conditions of the Loan Documents, and (e) the other material terms and provisions of the Loan, the Mortgage Loan, and the Subordinate Mezzanine Loan remain unchanged.  Borrower, at its reasonable cost and expense, shall cooperate with all reasonable requests of Lender in order to establish the component notes and shall execute and deliver, and cause to be executed and delivered, such documents as shall reasonably be required by Lender or any Rating Agency in connection therewith, all in form and substance reasonably

118

satisfactory to Lender and, if applicable, satisfactory to such Rating Agency (including, without limitation, the severance of security documents).  Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents reasonably necessary to establish the component notes as described in this Section 11.29, Borrower ratifying all that its said attorney shall do by virtue thereof; provided, however, Lender shall not make or execute any such documents under such power until three (3) Business Days after notice has been given to Borrower by Lender of Lender's intent to exercise its rights under such power.  Lender shall pay all costs and expenses in connection with the creation of the component notes and all requirements relating thereto.  Lender shall provide, or cause Servicer to provide, to Borrower the identity of each holder of any new or additional notes promptly after any assignment or other transfer of any such additional note; provided the failure to provide such notice shall not constitute a default hereunder.

Section 11.30. New Mezzanine Loan. Without in any way limiting Lender's other rights under this Agreement or any other Loan Document (including Lender's rights under Section 9.1 and Section 11.29 hereof), Lender shall have the right (the "**New Mezzanine Option**") at any time, in its sole and absolute discretion, to divide the Loan into one or more mezzanine loans (each individually, a "**New Mezzanine Loan**").  In effectuating the foregoing, Lender will make one or more mezzanine loans to newly formed single purpose, bankruptcy remote entities that own, directly or indirectly, all of the legal, beneficial and economic interests in Borrower (each individually, a "**New Mezzanine Borrower**") in the amount of the related New Mezzanine Loan; each New Mezzanine Borrower will contribute the amount of its New Mezzanine Loan and the proceeds of any junior New Mezzanine Loan contributed to such New Mezzanine Borrower by its immediately junior New Mezzanine Borrower to Borrower or to its immediately senior New Mezzanine Borrower, as applicable; and Borrower will apply the contribution to pay down the Loan.  Borrower shall, and shall cause all such affiliates of Borrower to, conduct all such actions in accordance with the separateness provisions of Section 3.1.24 hereof.  In connection with the New Mezzanine Option:

(a)     Lender shall have the right to establish different interest rates and debt service payments for the New Mezzanine Loans and to require the payment of the New Mezzanine Loans in such order of priority as may be designated by Lender; provided, that (i) the aggregate principal amount of the New Mezzanine Loans shall equal the Outstanding Principal Balance immediately prior to the creation of the New Mezzanine Loans, (ii) the weighted average interest rate of the New Mezzanine Loans shall, on the date created, equal the interest rate which was applicable to the Loan immediately prior to creation of the New Mezzanine Loans and (iii) the scheduled debt service payments on the New Mezzanine Loans shall, on the date created, equal the scheduled debt service payments under the Loan immediately prior to creation of the New Mezzanine Loans.

(b)     Each New Mezzanine Borrower shall be a newly formed single purpose, bankruptcy remote entity under the criteria established by the Rating Agencies and shall own directly one hundred percent (100%) of the legal, beneficial and economic interests in Mortgage Borrower or its immediately senior New Mezzanine Borrower, as applicable.  The security for any New Mezzanine Loan shall include a pledge by the related New Mezzanine Borrower of one

119

hundred percent (100%) of the direct ownership interests in Borrower or its immediately senior New Mezzanine Borrower, as applicable.

(c)     Borrower and New Mezzanine Borrowers shall cooperate with all reasonable requests of Lender in order to convert the Loan into the New Mezzanine Loans and shall execute and deliver, and cause to be executed and delivered, such documents as shall reasonably be required by Lender or any Rating Agency in connection therewith, all in form and substance reasonably satisfactory to Lender and, if applicable, satisfactory to such Rating Agency (including, without limitation, the delivery of bankruptcy non consolidation opinions and the modification of organizational documents and loan documents). Each of Borrower and New Mezzanine Borrowers hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to convert the Loan as described in this <u>Section 11.30</u>, each of Borrower and New Mezzanine Borrowers ratifying all that its said attorney shall do by virtue thereof; provided, however, Lender shall not make or execute any such documents under such power until three (3) days after notice has been given to Borrower by Lender of Lender's intent to exercise its rights under such power.

(d)     All reasonable out-of-pocket costs and expenses incurred by Borrower in excess of Seventy-Five Thousand and No/100 Dollars ($75,000.00) connection with Borrower's complying with requests made under this <u>Section 11.30</u> shall be paid by Lender; provided, however, that the foregoing shall not require Lender to pay or reimburse Borrower for any costs and expenses that Borrower would otherwise be required to pay or reimburse Lender under any other provision of this Agreement in the event that Lender had not exercised the New Mezzanine Option.

**Section 11.31.** <u>Approvals; Third Parties; Conditions</u>.     (a) All approval rights retained or exercised by Lender with respect to any Leases, contracts, plans, studies and other matters are solely to facilitate Lender's credit underwriting, and shall not be deemed or construed as a determination that Lender has passed on the adequacy thereof for any other purpose and may not be relied upon by Borrower or any other Person.

(b)     This Agreement and the other Loan Documents are for the sole and exclusive use of Borrower and Lender and may not be enforced, nor relied upon, by any other Person.  Nothing contained in this Agreement or the other Loan Documents shall be deemed to confer upon any Person other than Borrower and Lender any right to insist upon or to enforce the performance or observance of any of the terms, covenants and conditions contained herein or therein.  All conditions to the obligations of Lender hereunder or under the other Loan Documents are imposed solely and exclusively for the benefit of Lender and no other Person shall have standing to require satisfaction of such conditions or be entitled to assume that Lender will refuse to make the Loan (or, if applicable, make any advances) or otherwise perform or satisfy such obligations in the absence of strict compliance with any or all of such conditions and no other Person shall under any circumstances be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Lender at any time in Lender's sole and absolute discretion.

120

**Section 11.32.** <u>Limitation on Liability of Lender's Officers, Employees, etc</u>.  Any obligation or liability whatsoever of Lender which may arise at any time under this Agreement or any other Loan Document shall be satisfied, if at all, out of Lender's interest in the Collateral only. No such obligation or liability shall be personally binding upon, nor shall resort for the enforcement thereof be had to, any other asset or property of Lender or the asset or property of any of Lender's shareholders, directors, officers, employees or agents, regardless of whether such obligation or liability is in the nature of contract, tort or otherwise.

**Section 11.33.** <u>Certain Additional Rights of Lender (VCOC)</u>.  Notwithstanding anything to the contrary contained in this Agreement, Lender shall have:

(a)      the right to routinely consult with and advise but not bind Borrower's and Mortgage Borrower's management regarding the significant business activities and business and financial developments of Borrower and Mortgage Borrower; <u>provided</u>, <u>however</u>, that such consultations shall not include discussions of environmental compliance programs or disposal of Hazardous Substances.  Consultation meetings may occur on a regular basis (but no more frequently than quarterly) with Lender having the right to call special meetings at any reasonable times upon reasonable notice;

(b)      the right, in accordance with the terms of this Agreement, to examine the books and records of Borrower and Mortgage Borrower at any reasonable times upon reasonable notice;

(c)      the right, in accordance with the terms of this Agreement, including, without limitation, <u>Section 4.1.6</u> hereof, to receive quarterly and yearend financial reports; and

(d)      the right, without restricting any other rights of Lender under this Agreement (including any similar right), to approve any acquisition by Borrower or Mortgage Borrower of any other significant property (other than (i) personal property for the day to day operation of the Property and (ii) subject to and in accordance with <u>Section 2.6</u> hereof).

The rights described above in this <u>Section 11.33</u> may be exercised by any entity which owns, directly or indirectly, and Controls substantially all of the interests in Lender.

**Section 11.34.** <u>Intercreditor Agreement</u>.      Lender, Mortgage Lender and Subordinate Mezzanine Lender are, may, or will be parties to the Intercreditor Agreement memorializing their relative rights and obligations with respect to the Loan, the Mortgage Loan, the Subordinate Mezzanine Loan, Borrower, Mortgage Borrower, Subordinate Mezzanine Borrower, the Property, the Collateral, and the collateral for the Subordinate Mezzanine Loan. Borrower hereby acknowledges and agrees that (i) the Intercreditor Agreement is intended solely for the benefit of Lender, the Mortgage Lender and the Subordinate Mezzanine Lender and (ii) Borrower, the Mortgage Borrower and the Subordinate Mezzanine Borrower are not intended third-party beneficiaries of any of the provisions therein and shall not be entitled to rely on the provisions contained therein.  Lender, Mortgage Lender and Subordinate Mezzanine Lender shall have no obligation to disclose to Borrower the contents of the Intercreditor Agreement. Borrower's obligations hereunder are independent of the Intercreditor Agreement and remain unmodified by the terms and provisions thereof.

**Section 11.35.** Intentionally Omitted.

**Section 11.36.** Syndication.

(a)        Sale of Loan, Co-Lenders, Participations and Servicing.

(i)        Lender may, at its option, without Borrower's consent (but with notice to Borrower), sell with novation all or any part of their right, title and interest in, and to, and under the Loan (the "**Syndication**"), to one or more additional lenders (each a "**Co-Lender**"). Each additional Co-Lender shall enter into an assignment and assumption agreement (the "**Assignment and Assumption**") assigning a portion of Lender's or Co-Lender's rights and obligations under the Loan, and pursuant to which the additional Co-Lender accepts such assignment and assumes the assigned obligations.  From and after the effective date specified in the Assignment and Assumption (A) each Co-Lender shall be a party hereto and to each Loan Document to the extent of the applicable percentage or percentages set forth in the Assignment and Assumption and, except as specified otherwise herein, shall succeed to the rights and obligations of Lender and the Co-Lenders hereunder and thereunder in respect of the Loan, and (B) Lender, as lender and each Co-Lender, as applicable, shall, to the extent such rights and obligations have been assigned by it pursuant to such Assignment and Assumption, relinquish its rights and be released from its obligations hereunder and under the Loan Documents.

(ii)        The liabilities of Lender and each of the Co-Lenders shall be several and not joint, and Lender's and each Co-Lender's obligations to Borrower under this Agreement shall be reduced by the amount of each such Assignment and Assumption.  Neither Lender nor any Co-Lender shall be responsible for the obligations of any other Co-Lender.  Lender and each Co-Lender shall be liable to Borrower only for their respective proportionate shares of the Loan.

(iii)        Borrower agrees that it shall, in connection with any sale of all or any portion of the Loan, whether in whole or to an additional Co-Lender or Participant, within ten (10) Business Days after requested by Lender, furnish Lender with the certificates required under Sections 4.1.8 hereof and such other information as reasonably requested by any additional Co-Lender or Participant in performing its due diligence in connection with its purchase of an interest in the Loan.

(iv)        Notwithstanding anything herein to the contrary, any financial institution or other entity may be sold a participation interest in the Loan by Lender or any Co-Lender without Borrower's consent (such financial institution or entity, a "**Participant**").  No Participant shall have any rights under this Agreement, the Note or any of the Loan Documents and the Participant's rights in respect of such participation shall be solely against Lender or Co-Lender, as the case may be, as set forth in the participation agreement executed by and between Lender or Co-Lender, as the case may be, and such Participant.  Borrower may rely conclusively on the actions of KTB as agent to bind Lender and any Participant, notwithstanding that the particular action in question may, pursuant to this Agreement or any participation agreement be subject to the consent or direction of some or all of the Participants.  No participation shall relieve Lender or Co-Lender, as the case may be, from its obligations hereunder or under the Note or the

Loan Documents and Lender or Co-Lender, as the case may be, shall remain solely responsible for the performance of its obligations hereunder.

(v)     Notwithstanding any other provision set forth in this Agreement, Lender or any Co-Lender may at any time create a security interest in all or any portion of its rights under this Agreement (including, without limitation, amounts owing to it in favor of any Federal Reserve Bank in accordance with Regulation A of the Board of Governors of the Federal Reserve System).

(b)     <u>Cooperation in Syndication</u>.

(i)     Each of Borrower and Guarantor agrees to reasonably assist Lender in completing a Syndication satisfactory to Lender.  Such assistance shall include (i) direct contact between senior management and advisors of Borrower and Guarantor and the proposed Co-Lenders, (ii) assistance in the preparation of a confidential information memorandum and other marketing materials to be used in connection with the Syndication, (iii) the hosting, with Lender, of one or more meetings of prospective Co-Lenders or with the Rating Agencies, (iv) the delivery of appraisals satisfactory to Lender if required, and (v) working with Lender to procure a rating for the Loan by the Rating Agencies.

(ii)     Lender shall manage all aspects of the Syndication of the Loan, including decisions as to the selection of institutions to be approached and when they will be approached, when their commitments will be accepted, which institutions will participate, the allocations of the commitments among the Co-Lenders and the amount and distribution of fees among the Co-Lenders.  To assist Lender in its Syndication efforts, each of Borrower and Guarantor agrees promptly to prepare and provide to Lender all information with respect to Borrower, Mortgage Borrower, Manager, Guarantor, the Collateral, and the Property (or any portion thereof) contemplated hereby, including all financial information and projections (the "**<u>Projections</u>**"), as Lender may reasonably request in connection with the Syndication of the Loan; provided, however, that Guarantor financial statements will only be disclosed in connection with a Syndication subject to a non-disclosure agreement.  Each of Borrower and Guarantor hereby represents and covenants that (i) all information other than the Projections (the "**<u>Information</u>**") that has been or will be made available to Lender by Borrower, Guarantor or any of their representatives is or will be, when furnished, complete and correct in all material respects and does not or will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made and (ii) the Projections that have been or will be made available to Lender by Borrower, Guarantor or any of their representatives have been or will be prepared in good faith based upon reasonable assumptions.  Each of Borrower and Guarantor understands that in arranging and syndicating the Loan, Lender, the Co-Lenders and, if applicable, the Rating Agencies, may use and rely on the Information and Projections without independent verification thereof.

(iii)     If required in connection with the Syndication, each of Borrower and Guarantor hereby agrees to:

123

(A)     amend the Loan Documents to give Lender the right, at Borrower's sole cost and expense, to have the Property reappraised on an annual basis;

(B)     deliver updated financial and operating statements and other information reasonably required by Lender to facilitate the Syndication;

(C)     deliver reliance letters reasonably satisfactory to Lender with respect to the environmental assessments and reports delivered to Lender prior to the Closing Date, which will run to Lender, any Co-Lender and their respective successors and assigns;

(D)     execute modifications to the Loan Documents required by the Co- Lenders, provided that such modification will not (except as set forth in clause (E) below), change any material or economic terms of the Loan Documents, or otherwise materially increase the obligations or materially decrease the rights of Borrower and Guarantor pursuant to the Loan Documents; and

(E)     if Lender elects, in its sole discretion, prior to or upon a Syndication, to split the Loan into two or more parts, or the Note into multiple component notes or tranches which may have different interest rates, principal amounts, payment priorities and maturities, Borrower and Guarantor agrees to cooperate with Lender in connection with the foregoing and to execute the required modifications and amendments to the Note, this Agreement and the Loan Documents and to provide opinions necessary to effectuate the same.  Such Notes or components may be assigned different interest rates, so long as the initial weighted average of such interest rates does not exceed the applicable Interest Rate (except following an Event of Default or any principal payments received on the Loan).

Borrower shall be responsible for payments of its legal fees incurred in connection with compliance with the requests made under this <u>Section 11.36</u>, but not the legal fees of Lender or any Co-Lender.

(c)     <u>Limitation of Liability</u>.  No claim may be made by Borrower, or any other Person against Lender or any Co-Lenders or the Affiliates, directors, officers, employees, attorneys or agent of any of such Persons for any special, indirect, consequential or punitive damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement or any act, omission or event occurring in connection therewith; and Borrower hereby waives, releases and agrees not to sue upon any claim for any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(d)     <u>No Joint Venture</u>.   Notwithstanding anything to the contrary herein contained, neither Lender nor any Co-Lender by entering into this Agreement or by taking any action pursuant hereto, will be deemed a partner or joint venturer with Borrower.

(e)     <u>Voting Rights of Co-Lenders</u>.  Borrower acknowledges that the Co-Lending Agreement may contain provisions which require that amendments, waivers, extensions, modifications, and other decisions with respect to the Loan Documents shall require the approval of all or a number of the Co-Lenders holding in the aggregate a specified percentage of the Loan

124

or any one or more Co-Lenders that are specifically affected by such amendment, waiver, extension, modification or other decision.

(f)     Notwithstanding anything herein to the contrary, Lender shall pay the reasonable and out-of-pocket fees and expenses of Borrower with respect to Borrower's compliance with this Section 11.36; provided, that, Borrower shall be responsible for the payment of Borrower's legal fees with respect to compliance with the terms of this Section 11.36.

**Section 11.37.** Additional Provisions. Notwithstanding anything to the contrary contained herein, Borrower hereby agrees as follows:

(a)     Borrower hereby unconditionally and irrevocably waives all rights, defenses and claims that Borrower may have based on the fact that certain terms and provisions of the Mortgage Loan Agreement, including without limitation certain definitions set forth in Section 1.1 of the Mortgage Loan Agreement, are incorporated into this Agreement by reference.

(b)     In connection with the exercise of its rights as set forth in the Loan Documents, Lender shall have the right at any time to discuss the Property, the Mortgage Loan, the Collateral, the Loan or any other matter directly with Mortgage Lender or Mortgage Lender's consultants, agents or representatives without notice to or permission from Borrower, Guarantor or any other Person, nor shall Lender have any obligation to disclose such discussions or the contents thereof with Borrower, Guarantor or any other Person.

(c)     If any action, proposed action or other decision is consented to or approved by Mortgage Lender, such consent or approval shall not be binding or controlling on Lender. Borrower hereby acknowledges and agrees that (i) the risks of Mortgage Lender in making the Mortgage Loan are different from the risks of Lender in making the Loan, (ii) in determining whether to grant, deny, withhold or condition any requested consent or approval Mortgage Lender and Lender may reasonably reach different conclusions, and (iii) Lender has an absolute independent right to grant, deny, withhold or condition any requested consent or approval under this Agreement or any other Loan Document based on its own point of view.  Furthermore, the denial by Lender of a requested consent or approval under this Agreement or any other Loan Document shall not create any liability or other obligation of Lender if the denial of such consent or approval results directly or indirectly in a default under the Mortgage Loan, and Borrower hereby waives any claim of liability against Lender arising from any such denial.

(d)     Borrower and Lender hereby acknowledge and agree that, as to any clauses or provisions contained in this Agreement or any of the other Loan Documents to the effect that (i) Borrower shall cause Mortgage Borrower to act or to refrain from acting in any manner or (ii) Borrower shall cause to occur or not to occur, or otherwise be obligated in any manner with respect to, any matters pertaining to Mortgage Borrower or the Property, or (iii) other similar effect, such clause or provision, in each case, is intended to mean, and shall be construed as meaning, that Borrower has undertaken to act and is obligated to act only in Borrower's capacity as the sole member of Mortgage Borrower (which Mortgage Borrower, in turn, is the owner of the ground leasehold estate in the Property) but not directly with respect to Mortgage Borrower or the Property

125

or in any other manner which would violate any of the covenants contained in Section 3.1.24 hereof or other similar covenants contained in Borrower's Organizational Documents.

(e)     Without obtaining the prior written consent of Lender, except with respect to amendments or modifications required pursuant to Sections 11.29 and 11.30 of the Mortgage Loan Agreement, Borrower shall not cause or permit Mortgage Borrower to (i) enter into or be bound by any Mortgage Loan Documents after the date hereof or enter into or otherwise suffer or permit any amendment, waiver, supplement, termination or other modification of any of the Mortgage Loan Documents, including, without limitation, the Mortgage Loan Cash Management Provisions (other than ministerial or de minimis modifications, which do not affect any of the economic terms therein or change any rights or obligations of the parties thereunder), (ii) grant to Mortgage Lender any consent or waiver, or (iii) exercise any remedy available to Mortgage Borrower under the Mortgage Loan Documents or any right or election under the Mortgage Loan Documents.  Borrower shall cause Mortgage Borrower to provide Lender with a copy of any amendment, waiver, supplement, termination or other modification to the Mortgage Loan Documents within five (5) Business Days after the execution thereof.  Without obtaining the prior written consent of Lender, Borrower shall not cause or permit Mortgage Borrower to amend or modify the Organizational Documents of Mortgage Borrower in any respect which would (i) limit distributions to be made to Borrower, (ii) limit cure rights of Borrower, (iii) modify the special purpose entity requirements set forth therein or (iv) would in any other respect have any Material Adverse Effect.

(f)     Borrower shall, or shall cause Mortgage Borrower to: (i) pay all principal, interest and other sums required to be paid by Mortgage Borrower under and pursuant to the provisions of the Mortgage Loan Documents; (ii) diligently perform and observe all of the terms, covenants and conditions of the Mortgage Loan Documents on the part of any Mortgage Borrower to be performed and observed, unless such performance or observance shall be waived in writing by Mortgage Lender; (iii) promptly notify Lender of the giving of any notice by Mortgage Lender to Mortgage Borrower of any default by Mortgage Borrower in the performance or observance of any of the terms, covenants or conditions of the Mortgage Loan Documents on the part of Mortgage Borrower to be performed or observed and deliver to Lender a true copy of each such notice (including electronically transmitted items); and (iv) deliver a true, correct and complete copy of all material notices, demands, requests or material correspondence (including electronically transmitted items) given or received by Mortgage Borrower or Guarantor to or from Mortgage Lender or its agent.  Without limiting the foregoing, Borrower shall cause Mortgage Borrower to fund all reserves required to be funded pursuant to the Mortgage Loan Documents.

(g)     Borrower hereby grants to Lender and its designees the right to enter upon the Property (or any portion thereof) (subject to the rights of Tenants) at any time following the occurrence and during the continuance of any default under the Mortgage Loan Documents, for the purpose of taking any such action or to appear in, defend or bring any action or proceeding to protect Lender's interest in the Collateral.  Lender may take such action as Lender deems reasonably necessary or desirable to carry out the intents and purposes of this Section (including communicating with Mortgage Lender with respect to any Mortgage Loan defaults), without consent from Borrower or Mortgage Borrower, but with prior reasonable notice.  Lender shall have no obligation to complete any cure or attempted cure undertaken or commenced by Lender.  All

126

sums so paid and the costs and expenses incurred by Lender in exercising rights under this Section (including, without limitation, reasonable attorneys' and other professional fees), with interest at the Default Rate, for the period from the date of demand by Lender to Borrower for such payments to the date of payment to Lender, shall constitute a portion of the Debt, shall be secured by the Pledge Agreement and shall be due and payable to Lender within five (5) Business Days following demand therefor.

(h)     If Lender shall receive a copy of any notice of default under the Mortgage Loan Documents sent by Mortgage Lender, such notice shall constitute full protection to Lender for any action taken or omitted to be taken by Lender, in good faith, in reliance thereon, except to the extent such action or omission is deemed to be fraudulent or willful misconduct.  As a material inducement to Lender's making the Loan, Borrower hereby absolutely and unconditionally releases and waives all claims against Lender arising out of Lender's exercise of its rights and remedies provided in this Section, except for Lender's gross negligence or willful misconduct.

(i)     Lender shall have the right at any time to acquire all or any portion of the Mortgage Loan or any interest in any holder of, or participant in, the Mortgage Loan without notice or consent of Borrower or any other Borrower Party, in which event Lender shall have and may exercise all rights of Mortgage Lender thereunder (to the extent of its interest), including the right (i) to declare that the Mortgage Loan is in default in accordance with the terms of the Mortgage Loan Agreement and (ii) to accelerate the Mortgage Loan indebtedness, in accordance with the terms of the Mortgage Loan Agreement and (iii) to pursue all remedies against any obligor under the Mortgage Loan Documents.  In addition, Borrower hereby expressly agree that any claims, counterclaims, defenses, offsets, deductions or reductions of any kind which Mortgage Borrower or any other Person may have against Mortgage Lender relating to or arising out of the Mortgage Loan (other than of a continuing nature) shall be the personal obligation of Mortgage Lender, and in no event shall Mortgage Borrower be entitled to bring, pursue or raise any such claims, counterclaims, defenses, offsets, deductions or reductions against any unaffiliated successor and/or assign of Lender or any Affiliate of Lender or any other Person as the successor holder of the Mortgage Loan or any interest therein for any causes on or prior to the date such Lender or Person acquires such interest in the Mortgage Loan, provided that Mortgage Borrower may seek specific performance of its contractual rights under the Mortgage Loan Documents.

**Section 11.38.** Prepayment Fee**.**  Borrower acknowledges that (a) Lender is making the Loan in consideration of the receipt by Lender of all interest and other benefits intended to be conferred by the Loan Documents, and (b) if payments of principal are made to Lender prior to the regularly scheduled due date for such payment, for any reason whatsoever, including as a result of Lender's acceleration of the Loan after an Event of Default, by operation of law or otherwise, Lender will not receive all such interest and other benefits and may, in addition, incur costs.  For these reasons, and to induce Lender to make the Loan, Borrower expressly waives any right or privilege to prepay the Loan except as otherwise may be specifically permitted herein and agrees that, except as expressly provided herein, all prepayments, if any, will be accompanied by the Prepayment Fee (if any).  Such Prepayment Fee (if any) shall be required whether payment is made by Borrower, by a Person on behalf of Borrower, or by the purchaser at any foreclosure sale, and may be included in any bid by Lender at such sale.  Borrower further acknowledges that (A) it is a knowledgeable real estate developer or investor, (B) it fully understands the effect of the

provisions of this <u>Section 11.38</u>, as well as the other provisions of the Loan Documents, (C) the making of the Loan by Lender at the Interest Rate and other terms set forth in the Loan Documents are sufficient consideration for Borrower's obligation to pay a Prepayment Fee (if required), and (D) Lender would not make the Loan on the terms set forth herein without the inclusion of such provisions.  Borrower also acknowledges that the provisions of this Agreement limiting the right of prepayment and providing for the payment of the Prepayment Fee and other charges specified herein were independently negotiated and bargained for, and constitute a specific material part of the consideration given by Borrower to Lender for the making of the Loan except as expressly permitted hereunder.

**[NO FURTHER TEXT ON THIS PAGE]**

128

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**LENDER**:

**KOOKMIN BANK CO., LTD**, in its capacity as the trustee of KTB CRE Debt Fund No. 8, a Korean investment Trust

By: _____
Name: Jean Moon
Title:  Manager of Custody Business Dept.

[Signature Page to Mezzanine Loan Agreement]

**BORROWER**:

**UNION STATION SOLE MEMBER LLC**, a
Delaware limited liability company

By: _____
    Name:  Ben Ashkenazy
    Title:  Authorized Signatory

[Signature Page to Mezzanine Loan Agreement]