# EXHIBIT 7

KTB CRE DEBT FUND NO. 8, A KOREAN INVESTMENT TRUST
c/o Rexmark Holdings LLC
295 Madison Avenue, Suite 1200
New York, New York 10017

May 13, 2022

**<u>VIA HAND DELIVERY, FAX AND EMAIL</u>**

Union Station Sole Member LLC
c/o Ashkenazy Acquisition Corp.
600 Madison Ave., 15th Floor
New York, New York 10022
Attention: Ben Ashkenazy

Kriss & Feuerstein LLP
360 Lexington Avenue
New York, New York 10017
Attention: David Kriss, Esq.
E-mail: dkriss@kandfllp.com
Fax: 646-454-4166

**NOTICE OF DISPOSITION OF COLLATERAL VIA A PUBLIC FORECLOSURE SALE
UNDER ARTICLE 9 OF THE UNIFORM COMMERCIAL CODE
AND RESERVATION OF RIGHTS**

| | | |
|---|---|---|
| Re: | Borrower: | Union Station Sole Member, LLC, a Delaware limited liability company ("<u>Borrower</u>") |
| | Loan Description: | Mezzanine loan in the original principal amount of $100,000,000 (the "<u>Loan</u>") made by Kookmin Bank Co., LTD., as Trustee of KTB CRE Debt Fund No.8, a Korean investment trust ("<u>Lender</u>"), to Borrower, as evidenced, *inter alia,* by the Mezzanine Loan Agreement dated as of May 8, 2018, as modified by that certain First Modification of Mezzanine Loan Agreement and Forbearance dated as of July 8, 2020 (as amended, modified and/or restated from time to time, the "<u>Loan Agreement</u>"), and certain other Loan Documents |
| | Collateral: | 100% of the limited liability company membership interests in Union Station Investco LLC, a Delaware limited liability company, together with certain rights and property representing, relating to, or arising from such membership interests, all as more fully described in that certain Pledge and Security Agreement dated as of May 8, 2018 (collectively, the "<u>Collateral</u>") |

'May 13, 2022
Page 2

Dear Sirs:

Reference is made to the captioned Loan and Loan Documents, including that certain Pledge and Security Agreement, dated as of May 18, 2018, as made by Borrower in favor of Lender (the "Pledge Agreement"). Lender is the holder of the Note and owner of the Loan, which is further evidenced and governed by the Loan Agreement. Capitalized terms used but not defined in this notice have the meanings given to them in the Loan Agreement.

Please be advised that Lender has begun exercising its remedies under the terms of the Note, the Pledge Agreement and other Loan Documents. Such remedies include, without limitation, the intended disposition of the Collateral via a public foreclosure sale under Article 9 of the Uniform Commercial Code (the "Foreclosure Sale") that is scheduled for **June 14, 2022 at 11:00 a.m. Eastern time**. To that end, we refer you to the enclosed UCC Public Sale Notice with respect to the Collateral, which is incorporated herein by this reference. We will undertake to provide you with as-published copies of the UCC Public Sale Notice shortly after publication. Also enclosed is a copy of the intended Terms of Sale and the exhibits relating thereto. Borrower is entitled to an accounting of the unpaid indebtedness under the Loan Documents. As of May 13, 2022 (the "Calculation Date"), there was and continues to be at least $137,897,420.00 of unpaid indebtedness due and owing to Lender that is secured by the Collateral, consisting of: (a) $100,000,000.00 of outstanding, unpaid principal; (b) accrued unpaid regular interest of $12,325,000.00; (c) accrued unpaid interest at the Default Rate of $10,625,000.00; and (d) a Yield Maintenance Premium of $14,947,420.00. The current estimate of reimbursable costs and expenses incurred as a result of Borrower's default under the Loan Agreement is $2,000,000.00 (together with all interest, fees, costs and expenses from and after the Calculation Date and any all other amounts due and owing to Lender that are secured by the Loan Documents, collectively, the "Secured Indebtedness").

Lender may now, or at any time in the future, accept a partial payment with respect to the Loan. Such acceptance or any other subsequent communications between Lender and Borrower should not be treated as (1) an acquiescence in, or waiver of, any Default or Event of Default or any other provisions of the Loan Documents; (2) entitling Borrower, or any other Person to any type of suspension, continuation, or termination of the Foreclosure Sale; (3) binding Lender to any other possible action, including future acceptance of partial payments; or (4) constituting a course of dealing.

Without limiting the generality of the preceding paragraph, the specification herein of an Event of Default, or the notice of the intended Foreclosure Sale, shall not waive, modify, or otherwise limit in any manner whatsoever any of Lender's rights, powers, or remedies with respect to any other Default or Event of Default that may exist as of the date of this notice or hereafter, and Lender hereby reserves all rights, powers, and remedies available to it under the Loan Documents and applicable law and in equity, including, without limitation, the Collateral, whether against Borrower, Guarantor, or any other Person, and/or against any of their respective property. Any waiver, modification, or other limitation by Lender of its rights, powers, or remedies shall not be effective unless in writing duly executed by an authorized representative of Lender, and no Person liable for payment of any part of the Secured Indebtedness (whether that is the Borrower, Guarantor, or any other Person), shall be entitled to rely upon any oral statements made or purported to be made by or on behalf of Lender regarding refraining from

744852934.8

May 13, 2022
Page 3

exercising any of Lender's rights, powers, or remedies under the Loan Documents, applicable law or in equity.

Borrower and other obligated parties may be liable for any indebtedness which shall remain after such sale to the extent permitted by applicable law and the Loan Documents.

Please direct any inquiries regarding the Loan to Michael Rebibo of Rexmark Holdings LLC, which is acting as agent on behalf of Lender at (212) 575-0047 or Mrebibo@rexmark.com.

Very truly yours,

KTB CRE Debt Fund No. 8, a Korean investment trust

By: Rexmark Holdings LLC, its authorized representative

By: _____
Name:  Michael Rebibo
Title:   Managing Principal

Enclosures
cc (each with all Enclosures)

Ben Ashkenazy
995 5th Avenue, 14th Floor
New York, New York 10028
**VIA Hand Delivery by Messenger**

Union Station Investco LLC
c/o Ashkenazy Acquisition Corp.
600 Madison Ave., 15th Floor
New York, NY 10022-1761
**VIA Hand Delivery by Messenger**

KTB CRE Debt Fund No. 8
c/o Daol Asset Management Co., Ltd.
28FL, Post Tower, 60 Yeouinaru-ro
Yeongdeungpo-gu, Seoul 07328, Korea
Attention: Jaesang Eum
**VIA E-mail: jaesang.eum@i-ktb.com**

Kookmin Bank Co. Ltd.
10.fl, Sewoo Bldg., 115, Yeouigongwon-ro
Yeongdeungpo-gu, Seoul, Korea 07241
Attn: Jean Moon
**VIA E-mail: aco.kbg@kbfg.com**

May 13, 2022
Page 4

Mayer Brown LLP
1221 Avenue of Americas
New York, New York 10022
Attention: David M. Stewart, Esq.
**VIA E-mail: dstewart@mayerbrown.com**

## UCC PUBLIC SALE NOTICE

PLEASE TAKE NOTICE THAT Kookmin Bank Co., Ltd., as trustee of KTB CRE Debt Fund No.8, a Korean investment trust ("Secured Party"), will offer for sale at public auction all right, title, and interest of Union Station Sole Member LLC, a Delaware limited liability company (the "Debtor"), in one hundred percent (100%) of the limited liability company membership interests (the "Membership Interests") in Union Station Investco LLC, a Delaware limited liability company (the "Pledged Entity"), whose principal asset was formerly the leasehold interest in the real property commonly known as Washington Union Station, which is located at 40-50 Massachusetts Avenue, NE, Washington, District of Columbia 20002 (the "Property"), which title to the leasehold interest has vested in the National Railroad Passenger Corporation ("Amtrak") by the Declaration of Taking filed by Amtrak in the United States District Court for the District of Columbia on April 14, 2022, Case 1:22:-cv-01043 (the "Taking"), together with certain rights and property representing, relating to, or arising from the Membership Interests (collectively, the "Collateral").

Based upon information provided by Debtor and its affiliates, it is the understanding of Secured Party (but without any recourse to, or representation or warranty of any kind by Secured Party as to the accuracy or completeness) that: (i) the Collateral constitutes the principal asset of Debtor; (ii) the Collateral secures payment of a mezzanine loan in the original amount of $100,000,000 made by Secured Party to Debtor (the "Mezzanine Loan"), for which events of default have occurred, are continuing and all indebtedness due thereunder has been accelerated by Secured Party; (iii) the Pledged Entity is the borrower under a loan (the "Mortgage Loan") in the original principal amount of $330,000,000 that is or, due to the Taking, was formerly, secured by a first priority mortgage on the Property; (iv) the Property is a transportation hub consisting of approximately 417,981 square feet of gross leasable area and is commonly known as Washington Union Station; and (v) the Mezzanine Loan and the Mortgage Loan each have a scheduled maturity date of May 9, 2028. The Collateral also is subject to the governing documents of the Pledged Entity (including its operating agreement).

In compliance with New York Uniform Commercial Code Section 9-610 (the "UCC"), the sale of the Collateral (the "Sale") has been scheduled to take place on **June 14, 2022 at 11:00 a.m. Eastern Time** (the "Auction Date"). The Sale will be conducted on the Auction Date on the front steps of the New York County Supreme Court Building, located at 60 Centre Street, New York, NY 10007, and at the offices of Mayer Brown LLP, located at 1221 Avenue of the Americas, 12th Floor, New York, New York 10020-1001, and also will be broadcast for remote participation via a virtual videoconference. The URL address and password to attend the auction virtually will be provided to all registered participants.

The Collateral is being offered as a single lot, "as-is, where-is", with no express or implied warranties, representations, statements or conditions of any kind made by the Secured Party or any person acting for or on behalf of the Secured Party, without any recourse whatsoever to the Secured Party or any other person acting for or on behalf of the Secured Party and each bidder must make its own inquiry regarding the Collateral. The Secured Party reserves the right to (i) credit bid; (ii) set a minimum reserve price; (iii) reject all bids (including without limitation any bid that it deems to have been made by a bidder that is unable to satisfy the requirements imposed by the Secured Party upon prospective bidders in connection with the sale or to whom in the Secured Party's sole judgment a sale may not lawfully be made) and terminate or adjourn the sale to another time, without further publication or notice; (iv) accept a lower bid if the bid is on terms Secured Party determines is more favorable to Secured Party or is from a bidder that, in Secured Party's determination, offers a more certain likelihood of execution; (v) sell the Collateral at a subsequent public or private sale; and (vi) impose any other commercially reasonable conditions upon the sale of the Collateral as the Secured Party may deem proper. All bids (other than credit bids of Secured Party) must be for cash with no financing conditions and the successful bidder must deliver immediately available good funds (1) for the Required Deposit (as defined in the Terms of Sale) on the date of the Sale, and (2) for the balance

of the purchase price for the Collateral on the closing date prescribed by the Terms of Sale. The winning bidder must pay all transfer taxes, stamp duties and similar taxes incurred in connection with the purchase of the Collateral.

PLEASE TAKE NOTICE that there are specific requirements for any potential bidder in connection with obtaining information, bidding on the Collateral and purchasing the Collateral (collectively, the "Requirements"), including without limitation: each prospective bidder (other than the Secured Party or its affiliate) will be required to represent in writing to the Secured Party that such bidder (i) is acquiring the Collateral for investment purposes, solely for the purchaser's own account and not with a view to distribution or resale of the Collateral; (ii) has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of investment and has sufficient financial means to afford the risk of investment in the Collateral; (iii) will not resell or otherwise hypothecate the Collateral without a valid registration under applicable federal or state laws, including, without limitation, the Securities Act of 1933, as amended (the "Securities Act"), or an available exemption therefrom; provided that the Secured Party reserves the right to verify that each certificate for the limited liability company interests to be sold bears a legend substantially to the effect that such interests have not been registered under the Securities Act and to impose such other limitations or conditions in connection with the sale of the Collateral as the Secured Party deems necessary or advisable in order to comply with the Securities Act or any other applicable law; (iv) will purchase the Collateral in compliance with all applicable federal and state laws; (v) will comply with the requirements applicable to the sale of the Collateral as set forth in Section 5 of the Intercreditor Agreement dated as of May 8, 2018 (as amended, modified, restated or supplemented from time to time, the "ICA"), including, but not limited to, that such bidder must be a "Qualified Transferee" and deliver, or cause to be delivered, to the "Senior Lender", all agreements and documentation as required under the ICA in connection with a "Realization Event", including, without limitation, the "Third Party Agreements" from a "Supplemental Third Party Obligor" (as such terms are defined in the ICA); (vi) will comply with the Pledged Entity's governing documents and the documents governing the Loan Documents; and (vii) will comply with the other qualifications and requirements (including but not limited to the Terms of Sale for Public Auction relating to the sale of the Collateral (the "Terms of Sale")). **Meeting any requirements of the foregoing shall be at the sole responsibility, risk, cost, and expense of a prospective bidder**.

An online data site for the Sale is available at: https://rimarketplace.com/listing/469/-100-million-mezzanine-loan-ucc-public-sale (the "Datasite"), which will include certain information that Secured Party possesses concerning the Pledged Entity, the ICA, the Mortgage Loan, the Mezzanine Loan, and the Property (collectively, the "Disclosed Materials"), as well as the Terms of Sale. Access to such information will be conditioned, at a minimum, upon execution of a confidentiality agreement that can be found on the Datasite. To participate in the auction, prospective bidders must confirm their ability to satisfy the Requirements in the manner described in the Terms of Sale, and following such confirmation, such qualified participants will be provided a URL and password enabling access to the video conference for the Sale. No information provided, whether in the Datasite or otherwise, shall constitute a representation or warranty of any kind with respect to such information, the Collateral or the Sale. Participants are encouraged to review all Disclosed Materials and perform such due diligence as they deem necessary in advance of the Sale.

Questions may be directed to David Dorros at +1 202-463-1364 or Dave.Dorros@cushwake.com, Sean Hayes at +1 202-266-1166 or Sean.Hayes@cushwake.com, and Chris McGlone at +1 202-266-1171 or Chris.McGlone@cushwake.com.

## TERMS OF SALE FOR PUBLIC AUCTION

### 100% OF THE MEMBERSHIP INTERESTS IN UNION STATION INVESTCO LLC

A public sale (the "Sale") of all right, title, and interest of Union Station Sole Member LLC, a Delaware limited liability company (the "Debtor"), in one hundred percent (100%) of the membership interests (as more fully described below, the "Collateral") in Union Station Investco LLC, a Delaware limited liability company (the "Pledged Entity"), whose principal asset was formerly the leasehold interest in the real property commonly known as Washington Union Station, which is located at 40-50 Massachusetts Avenue, NE, Washington, District of Columbia 20002 (the "Property"), which title to the leasehold interest has vested in the National Railroad Passenger Corporation ("Amtrak") by the Declaration of Taking filed by Amtrak in the United States District Court for the District of Columbia on April 14, 2022, Case 1:22:-cv-01043 (the "Taking"), will be held in accordance with Section 9-610 of the Uniform Commercial Code in effect in the State of New York (the "UCC") at **11:00 a.m. Eastern Time on June 14, 2022** at an auction conducted on the front steps of the New York County Supreme Court Building, located at 60 Centre Street, New York, NY 10007, and at the offices of Mayer Brown LLP, located at 1221 Avenue of the Americas, 12th Floor, New York, New York 10020-1001, and also will be broadcast for remote participation via a virtual videoconference.

Based upon information provided by Debtor and its affiliates, it is the understanding of Kookmin Bank Co., Ltd., as trustee of KTB CRE Debt Fund No.8 ("Secured Party") (but without any recourse to, or representation or warranty of any kind by Secured Party as to the accuracy or completeness) that: (i) the Collateral constitutes the principal asset of Debtor; (ii) the Collateral secures payment of a mezzanine loan in the original amount of $100,000,000 made by Secured Party to Debtor (the "Mezzanine Loan"), for which events of default have occurred, are continuing and all indebtedness due thereunder has been accelerated by Secured Party; (iii) the Pledged Entity is the borrower under a loan (the "Mortgage Loan") in the original principal amount of $330,000,000 that is or, due to the Taking, was formerly, secured by a first priority mortgage on the Property; (iv) the Property is a transportation hub consisting of approximately 417,981 square feet of gross leasable area; and (v) the Mezzanine Loan and the Mortgage Loan each have a scheduled maturity date of May 9, 2028. The relationship between Secured Party and the lenders under the Mortgage Loan and the Mezzanine Loan also is governed by a certain intercreditor agreement dated as of May 8, 2018 (the "Intercreditor Agreement"). The Collateral also is subject to the governing documents of the Pledged Entity (including its operating agreement).

The terms of sale (these "Terms of Sale") are as follows:

1.      Definitions.   Capitalized terms used in these Terms of Sale shall have the definitions ascribed to them as set forth in Exhibit A attached hereto.

2.      Time and Location of Sale.   The Sale will commence **at 11:00 a.m. Eastern Time on June 14, 2022**.  The Sale will be conducted on the front steps of the New York County Supreme Court Building, located at 60 Centre Street, New York, NY 10007, and at the offices of Mayer Brown LLP, located at 1221 Avenue of the Americas, 12th Floor, New York, New York 10020-1001, and also will be broadcast for remote participation via a virtual videoconference. The URL address and

password for the online video conference will be provided to all confirmed participants that have properly registered pursuant to these Terms of Sale.

3.      Qualification to Participate in Public Sale.  Only Qualified Participants (and their agents and representatives disclosed in a Participation Statement, as such terms  is more particularly defined below) may participate in the Sale.  A "Qualified Participant" is an entity that satisfies the following conditions precedent to participation:

        3.1      Each prospective bidder must be registered with Secured Party's advisor, Cushman & Wakefield, through submission of (i) a statement in the form attached as Exhibit B hereto (a "Participation Statement") and (ii) an Internal Revenue Service form W-9.  Such Participation Statement, both of which must be sent via email to: David Dorros, Vice Chairman, at Dave.Dorros@cushwake.com; Sean Hayes, Managing Director, at Sean.Hayes@cushwake.com; and Chris McGlone, Managing Director, Cushman & Wakefield, at Chris.McGlone@cushwake.com, so as to be received prior to 5:00 p.m. Eastern Time on June 7, 2022.  Secured Party shall be entitled to seek additional information from any prospective bidder to confirm the information set forth in its Participation Statement, and the failure to provide such confirmatory information shall constitute permissible grounds for Secured Party to disqualify such prospective bidder.

        3.2      Each prospective bidder must demonstrate, to Secured Party's satisfaction, prior to 5:00 p.m. Eastern time on June 7, 2022, its financial ability to tender the purchase price for the Collateral and to meet the requirements of the Intercreditor Agreement, including that such bidder is a Qualified Transferee (as that term is understood in the context of the Intercreditor Agreement) and that such bidder will deliver, or cause to be delivered, to the "Senior Lender", as applicable, all agreements and documentation as required under the Intercreditor Agreement in connection with a "Realization Event", including, without limitation, a substitute "Third Party Agreement" from a "Supplemental Third Party Obligor", as contemplated by the Intercreditor Agreement (as such terms are defined in the Intercreditor Agreement).  Without limiting the generality of the foregoing, if a prospective bidder is a special purpose entity or an entity with creditworthiness that is, in Secured Party's sole and absolute judgment, insufficient to support the requirements herein, Secured Party reserves the right to require, prior to 5:00 p.m. Eastern time on June 7, 2022, additional credit support in the form of a guaranty by a creditworthy affiliate of such prospective bidder or other appropriate credit support.

        3.3      Each prospective bidder must provide to the Secured Party, prior to 5:00 p.m. Eastern time on June 7, 2022, evidence reasonably satisfactory to the Secured Party that: (i) such bidder will constitute, as of the date of the Sale, a Qualified Transferee (as described above) should such bidder be the Selected Participant or the Back-Up Bidder (as such terms are defined below), which evidence may consist of a letter or other authenticated statement from the Senior Lender to such effect (as such terms are defined in the Intercreditor Agreement), and (ii) such bidder will be able to satisfy the other requirements of the Intercreditor Agreement as of the date of the Sale.

The foregoing requirements shall not apply to Secured Party or its affiliates, each of which is stipulated to be a Qualified Participant.

4.      The Collateral.

4.1     Subject to the last sentence of this Section 4.1, Secured Party will provide to prospective bidders, upon the execution of a confidentiality agreement available from Cushman & Wakefield, online access to copies of certain information that Secured Party possesses concerning the Debtor and the Collateral, including copies of the applicable agreements and other documents evidencing or relating to the Debt and certain other related documents and information in Secured Party's possession.  Such information will include copies of the Mortgage Loan Documents and the Mezzanine Loan Documents (collectively, the "Loan Documents"), as well as the Co-Lender Documents and the Taking Documents, for informational purposes only.  The sale of the Collateral is not a sale of the Mezzanine Loan, and does not include any rights under any of the Mezzanine Loan Documents or any guaranty or indemnity delivered in connection therewith.   Such information is provided solely as a courtesy to prospective bidders, and Secured Party makes no representations or warranties as to its accuracy or completeness.  Notwithstanding anything to the contrary set forth herein, Secured Party, in its sole and absolute discretion, may (but shall not be required to) expressly condition the online access of any prospective bidder to any such information upon such prospective bidder, in addition to its execution and delivery of such a confidentiality agreement, first providing its complete and executed Participation Statement and any additional information, including any information regarding its financial ability to tender the purchase price for the Collateral, as reasonably requested by Secured Party.

4.2     The Pledged Interests are deemed to be securities and have not been registered under the Securities Act of 1933 (the "Securities Act").  Thus, while the Sale will be conducted as a public sale under the UCC, it will be a private sale for the purposes of applicable securities laws.  Because of this, the Selected Participant, as part (but not in limitation) of its agreements and undertakings pursuant to its Participation Statement, will confirm that the Pledged Interests will not be further sold, assigned, pledged, disposed of, hypothecated or otherwise transferred without the prior registration in accordance with the Securities Act and the securities laws of all other applicable jurisdictions, unless an exemption from such registration is available.  The Collateral will be appropriately conveyed pursuant to a Transfer Statement, which will bear an appropriate legend to the effect that the Collateral may not be sold or transferred without registration under the Securities Act and the securities laws of all other applicable jurisdictions or the availability of a valid exemption from such registration.

4.3     The Secured Party makes no guarantee, representation or warranty (including, without limitation, any representation or warranty of merchantability or fitness, title, possession, quiet enjoyment or the like), express or implied, including, without limitation, as to: the existence or nonexistence of other liens or liabilities; the quantity, quality, condition or description of the Collateral, the value of the Collateral, the Debtor's direct or indirect right in or title to the Collateral or the Property, or the Pledged Entity's direct or indirect rights in or title to the Property.  The transfer will be made without recourse and without representation or warranty by the Secured Party, and subject to all defenses by the Secured Party and all liabilities affecting the Pledged Entity, including, without limitation, the Mortgage Loan.

4.4     Prospective bidders are hereby advised that: (i) although Secured Party will provide online access to certain information regarding the Collateral, there is no assurance that Secured Party does not have other information, including information that it is contractually or legally prohibited from providing to potential bidders due to restrictions in confidentiality agreements or

otherwise; and (ii) specific conditions pertain to a Selected Participant's acquisition of the Collateral pursuant to the Loan Documents, and satisfaction of such conditions will be the sole responsibility of the Selected Participant.

4.5     Specifically, but without limiting the generality of the foregoing Section 4.4, in order to acquire the Collateral, any Selected Participant must be a "Qualified Transferee" as such term is defined in the Intercreditor Agreement, and the successful bidder must satisfy all of the applicable requirements of the Intercreditor Agreement, including Section 6 thereof and including replacing the Third Party Obligor with a Supplemental Third Party Obligor (as such terms are defined in the Intercreditor Agreement).    Secured Party will deliver to Mortgage Lender all reasonable requests from prospective bidders seeking pre-qualification from Mortgage Lender that such bidder qualifies as a Qualified Transferee.    Meeting any requirements of the Intercreditor Agreement (including, without limitation, as to required Qualified Transferee status and required replacement of the Third Party Obligor) shall be the sole responsibility, and at the sole risk, cost, and expense, of a prospective bidder.    Without limiting the generality of the foregoing, prospective bidders are advised that failure to meet such requirements may result in a default under the Intercreditor Agreement and/or the inability of an otherwise successful bidder to purchase the Collateral (or to succeed to all of the rights and interests of the such ownership of the Collateral).

5.    Method of Public Sale.

5.1     The Sale shall be conducted by auction.  Subject to Secured Party's rights described in Section 5.2, Secured Party shall sell the Collateral for cash to the Qualified Participant posting the highest and best bid.  The Collateral will be sold as a single unit, and shall not be divided or sold in separate units.  Minimum bidding increments will be $100,000 or such other amount as Secured Party may announce at the auction.  Secured Party will be permitted to bid at the public sale and may credit bid all or any portion of the outstanding balance of the amounts due under the Mezzanine Loan Documents (collectively, the "Debt").  For information purposes only, and as the Debt continues to increase through the continuing accrual of interest at the Default Rate and of additional late payment charges and the incurrence of additional expenses by Secured Party, the estimated minimum amount of the Debt that Secured Party presently may credit bid at the auction will be at least $137,897,420 of (together with all unpaid, accrued default interest and subject to taking into account any intervening payments made by such date on the Debt).  The auction shall conclude when Secured Party has selected a bid from a Qualified Participant, and such Qualified Participant executes and delivers a Memorandum of Sale in the form attached as Exhibit C at the time the bid is accepted (such selected Qualified Participant being hereinafter referred to as the "Selected Participant").  The foregoing notwithstanding, Secured Party shall not be required to execute a Memorandum of Sale if it is the Selected Participant.

5.2     Secured Party reserves the right to: (i) accept a lower bid at the auction, if the bid is on terms Secured Party determines more favorable to Secured Party, or is from a bidder that, in Secured Party's determination, offers a more certain likelihood of execution (for example, without limitation, from a bidder that already has provided evidence satisfactory to Secured Party that it is a Qualified Transferee); (ii) reject any bid if Secured Party determines that such bid was made by a participant that is reasonably likely not to be able to satisfy the conditions to be a Qualified Participant hereunder; (iii) postpone the Sale, including by announcement at the time and place

fixed for the Sale, to a future date and time as Secured Party may deem proper; (iv) continue the Sale at a future date and time as Secured Party may deem proper; and (v) terminate the Sale prior to consummation thereof.

5.3     As a condition of being selected, the Selected Participant will be required to deposit with a national business unit of a reputable title company or other escrow agent designated by Secured Party (the "Escrow Agent"), by wire transfer within one business day of the date of the Sale, an amount equal to ten percent (10%) of its winning bid (the "Required Deposit"), in immediately available federal funds.  However, if Secured Party is the Selected Participant, then no deposit shall be required.  The Required Deposit shall be non-refundable, and Secured Party shall be entitled to retain the Required Deposit as liquidated damages if the Selected Participant does not consummate its acquisition of the Collateral on the terms and conditions herein contained for any reason whatsoever (including, without limitation, the failure of the Selected Participant to re-confirm its status as a Qualified Transferee to the satisfaction of Secured Party), time being of the essence.  By submitting a bid, a Qualified Participant shall be deemed to have agreed that Secured Party's damages will be difficult to ascertain if it becomes the Selected Participant and fails to consummate the acquisition of the Collateral, and the Required Deposit represents reasonable liquidated damages for such failure.

5.4     Secured Party reserves the right to designate one or more back-up bidders (each, a "Back-Up Bidder") based on the bids and terms offered at the Sale.  If the Selected Participant fails to meet its obligations to acquire the Collateral on the terms and conditions herein contained, Secured Party shall have no obligation to sell the Collateral to such Selected Participant, and Secured Party may (but shall not be required to) elect to sell the Collateral to the Back-Up Bidder. In such case, the Back-Up Bidder shall have five calendar days after Secured Party notifies it of such decision to elect whether or not to acquire the Collateral, and if the Back-Up Bidder desires to acquire the Collateral, it shall evidence the same by executing a Memorandum of Sale and depositing the Required Deposit with the Escrow Agent on or before the conclusion of such five calendar day period, at which point the Back-Up Bidder shall have all rights and obligations of the Selected Participant (provided, however, to the extent any time periods pertaining to the acquisition of the Collateral relate to the date of the public sale, such time periods shall instead be determined from the date such Back-Up Bidder delivers the Memorandum of Sale and Required Deposit).  If a Back-Up Bidder has not delivered the Memorandum of Sale and Required Deposit by the end of such five calendar day period, then such Back-Up Bidder shall have no right to acquire the Collateral, and Secured Party may attempt to sell the Collateral to another Back-Up Bidder in the manner stated above.  In no event shall Secured Party's sale of the Collateral to a Back-Up Bidder entitle a Selected Participant or other Back-Up Bidder to a return of the Required Deposit.  However, Secured Party shall apply the Required Deposit in reduction of the Debt in any manner it determines in its sole and absolute discretion and as authorized by the Mezzanine Loan Documents.

6.     Consummation of Sale.

6.1     The Selected Participant shall pay the full amount of its bid as the purchase price for the Collateral, after deduction for the Required Deposit, by wire transfer of immediately available federal funds, no later than 3:00 p.m. Eastern Time on the fifth business day after the

date of the auction, time being of the essence. The sale of the Collateral will be consummated immediately upon receipt of such payment by Secured Party. If the Selected Participant is the Secured Party, then the foregoing requirements will not apply, and the purchase price shall be paid by applying the Debt (or the portion thereof that Secured Party credit bid at the auction) against the purchase price.

6.2     Debtor's right, title and interest in the Collateral will be conveyed by an appropriate transfer statement (the "Transfer Statement"), pursuant to Section 9-619(a) of the UCC and in the form attached as Exhibit D, without recourse and without representations or warranties of any kind or nature whatsoever, and subject to all defenses and liabilities. In addition, the Selected Participant shall execute and deliver all necessary documents required pursuant to the Loan Documents and the Intercreditor Agreement and any additional certificates and documents relating to the sale, in form and substance satisfactory to Secured Party and the lenders and servicers of the Mortgage Loan.

6.3     It shall be the sole responsibility of the Selected Participant, and not that of Secured Party, to ensure that the Selected Participant acquires the Collateral in conformance with the terms of all applicable governing documents, including without limitation, the Loan Documents, the Intercreditor Agreement, and the Pledged Entity's operating agreement. Without limiting the scope and intent of the foregoing, it shall be the sole responsibility of the Selected Participant, and not that of Secured Party, to obtain a new membership interest certificate evidencing the transfer of ownership of the Pledged Interests to the Selected Participant. Secured Party, pursuant to its rights under the Pledge Agreement and Intercreditor Agreement, may cooperate with the Selected Participant to obtain the issuance of such certificate.

6.4     If the Selected Participant does not consummate its acquisition of the Collateral in the time and manner required hereby, and if Secured Party, for whatever reason, elects not (or is unable) to proceed as set forth in Section 5.4 (including without limitation, in the event a designated Back-Up Bidder refuses or is unable to proceed to so acquire the Collateral), time being of the essence, Secured Party may offer to sell the Collateral to another Qualified Participant in order of highest bids made at the public sale, but subject to Secured Party's rights pursuant to Section 5.2, in each case without advertising or conducting a supplemental public sale.

6.5     In the event Secured Party is unable, for any reason, to consummate the sale of the Collateral to the Selected Participant or to a Back-Up Bidder (in the event Secured Party is proceeding pursuant to Section 5.4), Secured Party's sole obligation to the Selected Participant or such Back-Up Bidder, as the case may be, shall be the return of the Required Deposit, without interest.

7.     Modification of Terms. Secured Party reserves the right to amend, modify, supplement, restate or otherwise alter these Terms of Sale by announcement made prior to or at the time of the public sale.

## EXHIBIT A
## DEFINITIONS

"Amtrak" is defined in the preamble hereof.

"Collateral" means and includes all of the Debtor's right, title and interest in and to the Pledged Collateral and all Proceeds thereof, as such terms are defined in the Pledge Agreement.

"Back-Up Bidder" is defined in Section 5.4

 "Debt" is defined in Section 5.1.

"Debtor" is defined in the preamble hereof.

"Escrow Agent" is defined in Section 5.3.

"Guarantor" means Ben Ashkenazy, an individual.

 "Intercreditor Agreement" is defined in the preamble hereof

"Loan Documents"  is defined in Section 4.1.

"Memorandum of Sale" is defined in Section 5.1.

"Mezzanine Loan" is defined in the preamble hereof

"Mezzanine Loan Agreement" means that Mezzanine Loan Agreement dated as of May 8, 2018 by and between Secured Party and Debtor

"Mezzanine Loan Documents" means those documents, instruments and other agreements identified on Exhibit E as pertaining to the Mezzanine Loan attached hereto.

"Mortgage Loan Documents" means those documents, instruments and other agreements identified on Exhibit E as pertaining to the Mortgage Loan attached hereto.

"Mortgage Loan" is defined in the preamble hereof

 "Pledged Entity" is defined in the preamble hereof.

"Pledged Interests" means, collectively, Debtor's 100% limited liability company membership in the Pledged Entity, together with the certificates (if any) evidencing the same.

"Participation Statement" is defined in Section 3.1.

744852937.9

"Pledge Agreement" means the Pledge and Security Agreement, dated as of May 8, 2018, between Debtor, as pledgor, and Secured Party, as mezzanine lender.

"Proceeds" means (i) Debtor's share, right, title and interest in and to all distributions, monies, fees, payments, compensations and proceeds now or hereafter becoming due and payable to Debtor or Pledged Entity with respect to the Pledged Interests whether payable as profits, distributions, asset distributions, repayment of loans or capital or otherwise and including all "proceeds" as such term is defined in Section 9-102(a)(64) of the UCC; (ii) all contract rights, general intangibles, claims, powers, privileges, benefits and remedies of Borrower relating to the foregoing; and (iii) all cash or non-cash proceeds of any of the foregoing.

"Property" is defined in the preamble hereof.

"Qualified Participant" is defined in Section 3.

"Qualified Transferee" is defined in the Intercreditor Agreement.

"Required Deposit" is defined in Section 5.3.

"Sale" is defined in the preamble hereof.

"Secured Party" is defined in the preamble hereof.

"Selected Participant" is defined in Section 5.1.

"Senior Lender" means the lender pursuant to the Mortgage Loan.

"Terms of Sale" is defined in the preamble hereof.

"Transfer Statement" is defined in Section 6.2.

"UCC" is defined in the preamble hereof.

# EXHIBIT B
## PARTICIPATION STATEMENT

**Name of Prospective Bidder:** _____

**Contact Information:** _____

_____

_____

**Tel:** _____

**Email:** _____

This Participation Statement is submitted pursuant to the Terms of Sale governing the public sale described in the notice attached hereto. Capitalized terms used but not otherwise defined in this Participation Statement shall have the meaning set forth in the Terms of Sale. The undersigned prospective bidder ("Bidder") covenants, agrees and certifies to Kookmin Bank Co., Ltd., as trustee for KTB CRE Debt Fund No.8, a Korean investment trust ("Secured Party"), as follows:

1.    Bidder is submitting this Participation Statement with the intention of participating in the public sale referenced in the notice attached hereto, with the understanding that Secured Party and its consultants, brokers, agents, counsel and advisors are relying on the truth, accuracy and completeness of the information provided herein and on Bidder's covenants and agreements made herein in order for Secured Party to confirm that Bidder is qualified to so participate in conformance with all applicable laws, regulations, contracts and agreements pertaining to such public sale.

2.    Bidder has received the Terms of Sale and all exhibits and schedules thereto, and fully understands and accepts the terms, conditions and provisions set forth therein.

3.    Bidder hereby certifies that: (a) if it is the Selected Participant, Bidder will be acquiring the Collateral for investment purposes, solely for Bidder's own account and not with a view to distribution or resale within the meaning of Section 2(a)(11) of the Securities Act; (b) Bidder is an accredited investor within the meaning of the applicable securities laws; (c) Bidder has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of investment and has sufficient financial means to afford the risk of investment in the Collateral; (d) Bidder will not resell or otherwise hypothecate the Pledged Interests without a valid registration the securities laws of all applicable jurisdictions, including, without limitation, the Securities Act, or an available exemption therefrom. The cost, expense and risk of satisfying any of the foregoing requirements shall be solely the responsibility of Bidder. Upon Secured Party's request, Bidder will provide evidence reasonably demonstrating that, if it is the Selected Participant, Bidder will be able to purchase the Collateral in compliance with the securities laws of all applicable jurisdictions.

4.      Bidder is not a Prohibited Person within the meaning ascribed to such term in the Intercreditor Agreement, nor is Bidder an entity that would violate the borrower representations and covenants contained in Section 3 of the Mezzanine Loan Agreement.  Upon Secured Party's request, Bidder will provide evidence reasonably demonstrating the same.

5.      Bidder has received copies of the Loan Documents.  If Bidder is the Selected Participant, Bidder shall consummate its acquisition of the Collateral in full compliance with such terms, conditions and provisions, and agrees that such compliance shall be the sole responsibility of Bidder and not that of Secured Party.  Without limiting the scope or effect of the foregoing, Bidder represents, warrants and certifies to Secured Party that (a) Bidder is a Qualified Transferee (within the meaning of the Intercreditor Agreement), and (b) _____ is an individual or entity that meets the criteria of a Supplemental Third Party Obligor (within the meaning of the Intercreditor Agreement), and if Bidder is the Selected Participant, such individual or entity will be irrevocably committed to execute any necessary substitute Third Party Agreements (within the meaning of the Intercreditor Agreement) and otherwise satisfy the obligations of a Supplemental Third Party Obligor under the Intercreditor Agreement, which are conditions to the sale of the Collateral.  The cost, expense and risk of satisfying any of the foregoing requirements shall be solely the responsibility of Bidder.  Upon Secured Party's request, Bidder will provide evidence reasonably demonstrating that, if it is the Selected Participant, Bidder will be able to purchase the Collateral in compliance with the foregoing.

6.      Bidder received copies of the operating agreement and other organic and organizational documentation relating to the Pledged Interests to its satisfaction, and agrees that if it is the Selected Participant, it will be solely responsible to comply with any and all requirements thereunder relating to the acquisition of the Collateral.

7.      Bidder acknowledges and agrees that if Bidder is the Selected Participant, Bidder will have made such investigations to become familiar with all aspects of the Collateral in a manner to make an informed decision to acquire the same.  Bidder acknowledges that that neither Secured Party nor any of its representatives, agents, employees, brokers, attorneys or other advisors have given any written or oral representations or warranties or other statements relating to the Collateral, and Bidder's decision to purchase the Collateral will be based solely on Bidder's own due diligence review and independent evaluation of the Collateral.  Bidder is a sophisticated purchaser, with experience in owning and holding assets and investments in the nature of the Collateral.  Bidder is familiar with the risks associated with acquisitions of mezzanine loan collateral, which involve purchases based on limited information, disclosures and representations and warranties.  Bidder recognizes the special nature of the transaction that is the subject of the Terms of Sale and this Participation Statement, understands and is freely taking all risks involved in connection with the transaction and acknowledges that the nature and risks are reflected in the amount bid by Bidder. No representative, agent, employee, broker, attorney or other advisor of Secured Party has been authorized to make, and Bidder has not relied on, any statements, representations or warranties relating to the Collateral.  If Bidder is the Selected Participant, Bidder will not be relying on any continued actions or efforts on the part of Secured Party or Secured Party's representatives, agents, employees, brokers, attorneys or other advisors with respect to the Collateral.  After the date on which the sale of the Collateral is consummated, Secured Party will retain no further interest in

744852937.9

such Collateral, and will owe no ongoing duty to Bidder.  Secured Party has not guaranteed and does not guarantee the condition, performance, rate of return, value or yield of the Collateral.

8.     Bidder acknowledges that the following individuals are entitled to participate in the public sale on behalf of Bidder, and none other:

Name: _____          Email: _____
Company: _____          Tel: _____


Name: _____          Email: _____
Company: _____          Tel: _____

*[attach a schedule if more individuals need to be identified]*

9.     In addition to all rights and remedies of Secured Party set forth in the Terms of Sale or available at law or in equity, Bidder shall indemnify, hold harmless and defend Secured Party and Secured Party's directors, officers, investors, representatives, agents, employees, brokers, attorneys and other advisors (the "Indemnified Parties") for, from and against any and all claims, causes of actions, damages, demands, legal proceedings, costs, damages and other liabilities suffered by the Indemnified Parties (or any of them) resulting from any breach of Bidder's representations, warranties, certifications, covenants and agreements in this Participation Statement or resulting from a breach of any of the Terms of Sale.


_____

By: _____
Name: _____
Title: _____

**EXHIBIT C**
**MEMORANDUM OF SALE**

In reference to the public sale described in the attached notice, and the Terms of Sale governing the same, the undersigned covenants and agrees that it is the Selected Participant and is bound and obligated to purchase the Collateral for the purchase price of _____ AND 00/100 DOLLARS ($_____.00) Dollars, and hereby promises and agrees to comply with the forgoing Terms of Sale and the Participation Statement executed and delivered by the undersigned in connection with such public sale, the term of which are incorporated by reference hereby.

Dated: June [__], 2022

_____

SELECTED PARTICIPANT

By: _____
Name: _____
Title: _____

In reference to the public sale described in the attached notice, and the Terms of Sale governing the same, the undersigned confirms receipt of the sum of _____ MILLION _____ HUNDRED THOUSAND AND 00/100 DOLLARS ($_____) as the Required Deposit referenced in said Terms of Sale.

Dated: June [__], 2022

_____

ESCROW AGENT

By: _____
Name: _____
Title: _____

*[ATTACH NOTICE OF SALE]*

744852937.9

## EXHIBIT D
### TRANSFER STATEMENT

THE SECURITY TRANSFERRED BY VIRTUE OF THIS TRANSFER STATEMENT HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933 OR UNDER THE SECURITIES OR BLUE SKY LAWS OF ANY SATE. THE HOLDER OF SUCH SECURITY, BY ITS ACCEPTANCE OF THIS TRANSFER STATEMENT, REAFFIRMS ITS PRIOR REPRESENTATIONS IN ITS PARTICIPATION STATEMENT THAT IT IS ACQUIRING SUCH SECURITY FOR INVESTMENT AND NOT WITH A VIEW TO ANY SALE OR DISTRIBUTION THEREOF. ANY TRANSFER OF SUCH SECURITY OR ANY LIMITED LIABILITY COMPANY INTEREST REPRESENTED THEREBY IS SUBJECT TO THE TERMS, RESTRICTIONS, AND CONDITIONS OF THE LIMITED LIABILITY COMPANY AGREEMENT OF LINCOLN STREET MEZZ II, LLC.

Pursuant to the provisions of Section 9-619 of the Uniform Commercial Code as adopted and in effect in the State of New York, Kookmin Bank Co., Ltd., as trustee of KTB CRE Debt Fund No.8, a Korean Investment trust ("Secured Party"), a secured party under that certain Pledge and Security Agreement dated as of May 8, 2018, with Union Station Sole Member, LLC, a Delaware limited liability company with ("Debtor"), hereby states as follows:

1.     Debtor has defaulted in connection with an obligation secured by the collateral described on Schedule 1 attached hereto (collectively, the "Collateral").

2.     Secured Party has exercised its post-default remedies with respect to the Collateral.

3.     That, by reason of said exercise, _____ ("Transferee") has acquired the rights of the Debtor in the Collateral, without recourse and without representations or warranties of any kind or nature whatsoever, whether relating to title, possession, quiet enjoyment, or the like or otherwise, and subject to all defenses and liabilities.

4.     The following are the names and addresses of the aforementioned parties:

| | |
|---|---|
| **Debtor**: | Union Station Sole Member LLC |
| **Address**: | c/o Ashkenazy Acquisition Corp. |
| | 600 Madison Ave., 15th Floor |
| | New York, New York 10022 |
| | Attention: Ben Ashkenazy |

**Secured Party**:  KTB CRE Debt Fund No.8
**Address**:  c/o Daol Asset Management Co., Ltd.
28FL, Post Tower,
60 Yeouinaru-ro, Yeongdeungpo-gu
Seoul 07328, Korea
Attention: Jaesang Eum


**Transferee**: _____, a _____
**Address**: _____
_____
_____

Executed as of June [ ], 2022

<u>SCHEDULE 1</u>

## DESCRIPTION OF COLLATERAL

"Collateral" shall collectively include all of the Debtor's right, title and interest in and to the following, and all other collateral pledged by Debtor to Secured Party pursuant to the Mezzanine Loan Documents.  All capitalized term used but not defined herein shall have the meanings given to them in the Pledge and Security Agreement dated as of May 8, 2018 by and between Secured Party and Debtor:

(a)     All Pledged Company Interests, including, without limitation, the status as a member of Mortgage Borrower and all economic, voting and managerial rights and powers of Pledgor in Mortgage Borrower:

(b)     All securities, moneys or property representing dividends or interest on any of the Pledged Company Interests, or representing a distribution in respect of the Pledged Company Interests, or resulting from a split-up, revision, reclassification, or other like change of the Pledged Company Interests or otherwise received in exchange therefor, and any subscription warrants, rights or options issued to the holders of, or otherwise in respect of, the Pledged Company Interests;

(c)     All right, title and interest of Pledgor in, to and under any policy of insurance payable by reason of loss or damage to the Pledged Company Interests and any other Collateral;

(d)     All "accounts", "general intangibles", "instruments", and "investment property" (in each case as defined in the Code) constituting or relating to the foregoing; and

(e)     All Proceeds of any of the foregoing property of Borrower (including, without limitation, any proceeds of insurance thereon, all "accounts", "general intangibles", "instruments" and "investment property", in each case as defined in the Code, constituting or relating to the foregoing).

## EXHIBIT E
## MORTGAGE LOAN DOCUMENTS
### (All documents are dated as of May 8, 2018, unless otherwise indicated)

The following list of Mortgage Loan Documents is based on information and belief; no assurance is given as to its completeness.

1.   Loan Agreement by and between Pledged Entity and Senior Lender

2.   First Modification of Loan Agreement and Forbearance dated as of July 8, 2020 by and among Pledged Entity, Guarantor, and Wilmington Trust, National Association

3.   Promissory Note A-1 in the original principal amount of $205,000,000.00 made and given by Pledged Entity to Citi Real Estate Funding Inc.

4.   Promissory Note A-2 in the original principal amount of $125,000,000.00 made and given by Pledged Entity to Natixis Real Estate Capital LLC

5.   Leasehold Mortgage, Security Agreement, Assignment of Leases and Rents, Financing Statement and Fixture Filing by Pledged Entity for the benefit of Senior Lender

6.   Assignment of Leases and Rents by Pledged Entity for the benefit of Senior Lender

7.   Guaranty of Recourse Obligations by Guarantor for the benefit of Senior Lender

8.   Environmental Indemnity Agreement by Pledged Entity and Guarantor for the benefit of Senior Lender

9.   Assignment of Management Agreement and Subordination of Management Fees by Pledged Entity to Senior Lender and consented and agreed to by Ashkenazy Acquisition Corporation and Jones LangLaSalle Americas, Inc. ("Manager")

10.  Cash Management Agreement by and between Pledged Entity and Senior Lender

11.  Deposit Account Control Agreement by and among Borrower, Senior Lender, and Wells Fargo Bank, National Association

12.  Borrower's Certification by Pledged Entity for the benefit of Senior Lender

13.  Mortgage Loan Cooperation Agreement by Borrower and Guarantor for the benefit of Senior Lender

14.  Post-Closing Obligations Agreement by and between Senior Lender and Pledged Entity and acknowledged and agreed to by Secured Party and Debtor

744852937.9

15.    UCC-1 Financing Statement naming Pledged Entity, as debtor, and Senior Lender, as secured party, filed with Washington, D.C.'s recorder's office

16.    Assignment and Assumption Agreement (Promissory Note A-1 and Promissory Note A-2) dated as of January 5, 2022 between Wilmington Trust, National Association, as Trustee on behalf of the holders of US 2018-USDC, Commercial Mortgage Pass-through Certificates, Series 2018-USDC ("Assignor"), as assignor, and Secured Party, as assignee

17.    Assignment of Leasehold Deed of Trust, Security Agreement, Assignment of Leases, Financing Statement and Fixture Filing dated as of January 5, 2022 by Assignor to Secured Party

18.    Assignment of Assignment of Leases and Rents dated as of January 5, 2022 by Assignor to Secured Party

19.    Allonge to Promissory Note A-1 dated as of January 5, 2022 in the original principal amount of $205,000,000.00 given by Assignor to Secured Party

20.    Allonge to Promissory Note A-2 dated as of January 5, 2022 in the original principal amount of $125,000,000.00 given by Assignor to Secured Party

21.    UCC-3 Financing Statement Amendment naming Secured Party as secured party, filed with Washington, D.C.'s recorder's office

## **MEZZANINE LOAN DOCUMENTS**

**(All documents are dated as of May 8, 2018, unless otherwise indicated)**

The following list of Mortgage Loan Documents is based on information and belief; no assurance is given as to its completeness.

1. Mezzanine Loan Agreement

2. First Modification of Mezzanine Loan Agreement and Forbearance dated as of July 8, 2020 by and among Debtor, Guarantor, and Secured Party

3. Mezzanine Promissory Note in the original principal amount of $100,000,000.00 made and given by Debtor to Secured Party

4. Guaranty of Recourse Obligations (Mezzanine Loan) by Guarantor for the benefit of Secured Party

5. Environmental Indemnity Agreement (Mezzanine Loan) by Debtor and Guarantor for the benefit of Secured Party

6. Pledge Agreement and Security Agreement by Debtor for the benefit of Secured Party

7. Acknowledgment and Consent executed by Pledged Entity

8. Instruction to Register Pledge addressed to Pledged Entity by Debtor and Secured Party

9. Confirmation Statement and Instruction Agreement executed by Debtor and Secured Party

10. Subordination of Management Agreement and Management Fees among Debtor, Pledged Entity, Secured Party, Ashkenazy Acquisition Corporation, and Manager

11. Mezzanine Borrower's Certification by and between Secured Party and Debtor and acknowledged and agreed to by Senior Lender and Pledged Entity

12. Mezzanine Post-Closing Obligations Agreement by and between Secured Party and Debtor and acknowledged and agreed to by Senior Lender and Pledged Entity

13. UCC-1 Financing Statement naming Debtor, as debtor, and Secured Party, as secured party, filed with the Secretary of State of the State of Delaware

14. Certificate for Limited Liability Company Interests in Pledged Entity

15. Mezzanine Eagle 9 UCC Insurance Policy issued by Fidelity National Title Insurance Company

**CO-LENDER DOCUMENTS:**

1.      Intercreditor Agreement among Senior Lender and Secured Party dated as of May 8, 2018.

**TAKING DOCUMENTS:**

1.      Complaint for Condemnation and Request for Possession filed by Amtrak in the
        United States District Court for the District of Columbia on April 14, 2022

2.      Declaration of Taking filed by Amtrak in the United States District Court for the
        District of Columbia on April 14, 2022