IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK) | * | |
| | * | CIVIL ACTION NO. 1:22-CV-01043 |
| PLAINTIFF, | * | |
| v. | * | |
| SUBLEASE INTEREST OBTAINED PURSUANT TO AN ASSIGNMENT AND ASSUMPTION OF LEASEHOLD INTEREST, et al. | * | |
| | * | |
| DEFENDANTS. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

**NATIONAL RAILROAD PASSENGER CORPORATION'S
MEMORANDUM IN SUPPORT OF ITS MOTION FOR
<u>IMMEDIATE POSSESSION OF THE SUBJECT PROPERTY INTEREST</u>**

Plaintiff National Railroad Passenger Corporation ("Amtrak"), by and through undersigned counsel, hereby submits this Memorandum in Support of its Motion for Immediate Possession of the Subject Property Interest, and in support thereof, states as follows:

## I.     INTRODUCTION

Amtrak filed this condemnation proceeding to acquire a leasehold interest (the "Subject Property Interest") in property located at 50 Massachusetts Ave. NE, Washington, D.C. 20002, known as Washington Union Station ("WUS" or "Station"). Once Amtrak filed its Declaration of Taking and deposited $250 million with the Court, title to the Subject Property Interest vested in Amtrak. 49 U.S.C. § 24311(b)(2). As condemnor, Amtrak then had the immediate right to possess the Subject Property Interest. Amtrak now seeks to effectuate its right to possession. It has become increasingly clear that an imminent transfer of possession is necessary given the present disputes between the Defendants as to who may hire and fire property managers, collect rents, and

otherwise perform the myriad duties that come with possession of the Subject Property Interest. Immediate possession would also allow Amtrak to move ahead expeditiously with critical projects that are needed at the Station. *See generally* Complaint ¶¶ 31–52 (Dkt. No. 1). Accordingly, Amtrak respectfully requests that the Court enter an order providing for the orderly transfer of possession to Amtrak.

The legal standard is clear. The Court must award possession to Amtrak unless "some undue hardship to the present landowner or occupant might warrant some *temporal gap* between the filing of the declaration of taking and the owners' surrender of possession." *United States v. 74.57 Acres of Land, More or Less*, No. Civ. A. 12-0239, 2012 WL 1231933, at *2 (S.D. Ala. Apr. 11, 2012) (emphasis added). As discussed below, courts have long applied this standard to the transfer of possession in eminent domain proceedings under the Declaration of Taking Act ("DTA"). And because the "quick-take" condemnation procedure set forth in Amtrak's condemnation statute mirrors the DTA, the rule for both is the same. *Compare* 40 U.S.C. § 3114(d), *with* 49 U.S.C. § 24311(b)(2)(A). As applied here, that rule warrants an immediate transfer of possession, because the Defendants cannot demonstrate any undue hardship, much less one sufficient to delay transfer of possession.

Even if Amtrak were required to satisfy the traditional test for preliminary injunctions, the result would be the same.[1] Amtrak is likely to succeed on the merits of condemnation, and the equities as well as public policy favor awarding possession to Amtrak. Acquiring the Subject Property Interest is undoubtedly "necessary" under 49 U.S.C. § 24311(a)(1)(A) because the acquisition has a significant connection to Amtrak's goals in providing intercity passenger rail transportation. And awarding possession to Amtrak benefits the public: Amtrak is the only party

---

[1] The undue hardship standard is the proper standard to apply here. The preliminary injunction standard only applies in the absence of a quick-take procedure. *See E. Tenn. Nat. Gas Co. v. Sage*, 361 F.3d 808, 823–27 (4th Cir. 2004).

2

to this proceeding operating pursuant to a statutory mandate to serve the public interest. Because title to the Subject Property Interest has already vested in Amtrak, it, more than any other party, has the best interests of the Station in mind. Particularly where there is a battle for control between and among the various Defendants, awarding possession to Amtrak is the best approach to ensure stability both during the litigation of this matter and for the long term. Transferring possession would also allow Amtrak to move ahead with long-delayed and critically-needed infrastructure projects at the Station.

For these reasons and those set forth below, this Court should determine that Amtrak is entitled to immediate possession of the Subject Property Interest.

**II. ARGUMENT**

**A. Amtrak Is Entitled to Immediate Possession Under 49 U.S.C. § 24311(b)(2).**

Because Amtrak rarely initiates eminent domain actions, and because the transfer of possession is often negotiated, scant law exists regarding possession under the applicable condemnation statute, 49 U.S.C. § 24311(b)(2). The statute conferring Amtrak's eminent domain authority, however, mirrors the "quick-take" condemnation procedure granted to the United States Government in 40 U.S.C. § 3114 *et seq.*, the DTA. And courts have uniformly settled on a legal standard to award possession under that analogous law: They do so immediately, absent "undue hardship" to the defendant, which itself (if present) merely *delays* a transfer of possession for a short period. *See E. Tenn. Nat. Gas Co.*, 361 F.3d at 825; *United States ex rel. Tenn. Valley Auth. v. Temp. Right to Enter Upon Land in Meigs Cnty. Tennessee*, 397 F. Supp. 3d 1111, 1114 (E.D. Tenn. 2019) (hereinafter "*Meigs Cnty.*"); *74.57 Acres of Land, More or Less*, 2012 WL 1231933, at *2; *United States v. 6,576.27 Acres of Land, More or Less, in McLean Cnty., N.D.*, 77 F. Supp. 244, 246 (D.N.D. 1948).

3

### 1. The DTA's Undue Hardship Test Applies to Possession Under Amtrak's Condemnation Statute.

The substantive requirements to initiate a condemnation action under the DTA and 49 U.S.C. § 24311(b) are the same: The condemning parties must file a Declaration of Taking containing: (1) a statement of the public use for which the interest is taken; (2) a description of the property sufficient to identify it; (3) a statement of the estate or interest in the property taken; (4) a plan showing the land or interest taken; and (5) a statement of the amount of money estimated by the acquiring authority to be just compensation for the land or interest taken. *Compare* 40 U.S.C. § 3114(a)(1)–(5), *with* 49 U.S.C. §24311(b)(1)(A)–(E).[2]

Thereafter, upon filing the Declaration of Taking and depositing the estimated just compensation amount into the court's registry, the following events occur by operation of law under both statutes: (1) title to the interest specified in the declaration vests in the condemning body (49 U.S.C. § 24311(b)(2), 40 U.S.C. § 3114(b)(1)); (2) the land is condemned and taken for the condemning body's use (49 U.S.C. § 24311(b)(1), 40 U.S.C. § 3114(b)(2)); (3) the right to just compensation for the land vests in the persons entitled to the compensation (49 U.S.C. § 24311(b)(1), 40 U.S.C. § 3114(b)(3)); and (4) the court is empowered to determine the time by which, and the terms under which, possession is transferred (49 U.S.C. § 24311(b)(2)(A); 40 U.S.C. § 3114(d)).

---

[2] The DTA requires that, for land acquired outside the District of Columbia, the Declaration must be "signed by the authority empowered by law to acquire the land described in the petition." 40 U.S.C. § 3114(a). No similar requirement exists in Amtrak's condemnation statute. *See* 49 U.S.C. § 24311(b)(1) (specifying the requisite contents of the Declaration, but not specifying by whom it should be signed). The Declaration of Taking filed by Amtrak in this case meets all the statutory requirements set forth in 49 U.S.C. § 24311(b)(1). While Defendants suggest otherwise, *see* Kookmin Answer at 41 (Dkt No. 35), they cite only the DTA's inapplicable signatory requirement.

For the DTA, the Supreme Court has clarified that, upon the deposit of funds, "[t]itle and *right to possession* thereupon vest *immediately* in [the condemning authority]." *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 5 (1984) (emphasis added); *United States v. Miller*, 317 U.S. 369, 381 (1943) (noting that one of the primary purposes of the DTA was to provide a procedure "to give the [condemning authority] *immediate possession* of the property" (emphasis added)). This reading is consistent with the statutory text. In the DTA, Congress defined the courts' role after a declaration of taking has been filed, specifying that courts may "fix the time within which, and the terms on which, the parties in possession shall be required to surrender possession to the petitioner." 40 U.S.C. § 3114(d). Congress therefore did not provide courts with authority to decide *whether* possession may be transferred, only *when* and *how*.

The same is true of Amtrak's condemnation statute. As with the DTA, Congress did not provide courts with discretion to decide *whether* to award possession, but only to decide "the time by which, and the terms under which, possession of the property is given to Amtrak." 49 U.S.C. § 24311(b)(2)(A). It is a well-settled canon of statutory interpretation that the same language used across statutes addressing related subject matters should be construed similarly. *See, e.g., Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 530–37 (2015). Indeed, the use of "the same language in two statutes having similar purposes" creates a "presum[ption] that Congress intended that text to have the same meaning in both statutes." *Smith v. City of Jackson*, 544 U.S. 228, 233 (2005). That is especially true where Congress did *not* include analogous quick-take language in all other eminent domain statutes, but specifically did so in Amtrak's statute. *See E. Tenn. Nat. Gas Co.*, 361 F.3d at 822 (explaining that the Natural Gas Act lacks quick-take provisions like those in the DTA). It necessarily follows that, upon compliance

5

with the filing and deposit requirements of 49 U.S.C. § 24311, title and *the right to possession* of a condemned property vest in Amtrak prior to final judgment—just as they do under the DTA.

### 2. Under the Undue Hardship Test, Amtrak Is Entitled to Immediate Possession.

Under the undue hardship test, district courts have limited discretion over the transfer of possession to the condemnor. Specifically, they may "examine the equities of the matter to evaluate whether some undue hardship to the present landowner or occupant might warrant some *temporal gap* between the filing of the declaration of taking and the owners' surrender of possession." *74.57 Acres of Land, More or Less*, 2012 WL 1231933, at *2 (emphasis added). "Although the district court fixes the time and any terms of the possession, the government *takes possession of the condemned property as a matter of course*, unless the landowner or occupant demonstrates some undue hardship that warrants a delay." *E. Tennessee Nat. Gas Co.*, 361 F.3d at 825 (emphasis added); *see also Meigs Cty.* 397 F. Supp. 3d at 1114 (noting that § 3114(d) "affords the Court some limited discretionary administrative power over how and precisely when the Government may possess the property, [but] ultimate possession . . . is inevitable").

The type of hardship necessary for a court to delay an award of possession to a condemnor was best described in *United States v. 6,576.27 Acres of Land, More or Less, in McLean County, North Dakota*, 77 F. Supp. 244, 246 (D.N.D. 1948). There, the United States Government condemned thousands of acres of farmland in connection with the construction of a dam on the Missouri River. *Id.* at 244. The court issued an *ex parte* order providing that possession of the property should be delivered to the Government within 30 days. *Id.* at 245. The day before the 30-day period had run, the affected landowners moved the court to delay the Government's possession. *Id.* The court considered the "time and terms of possession" wording of the DTA under the "facts and circumstances" of the case and found:

6

> a possessory order . . . which provided that possession must be given to the Government . . . at the beginning of or during the seeding season, might very well work hardship and therefore injustice to the farm families who are currently residing upon and have been operating the lands in question and who have commenced or are about to commence their seeding operations. The order, according to the record, was served upon them only a matter of a few days prior to the date for possession. In the very nature of things, it would be difficult, if not impossible, for such farm families to move by the date fixed in the order, much less for them to acquire other farm lands so that they could make their livelihood during the year 1948.

*Id.* at 246. Accordingly, the court amended its prior order to permit the owners to reside upon and operate the land already taken, just for the 1948 farming season, in exchange for rental payments. *Id.* at 248.

That sort of undue hardship is wholly absent in this case. Defendants do not have a seasonal business akin to farming; they are real estate developers and banks. They are therefore much more akin to the typical condemnee, who cannot forestall a transfer of possession but instead can seek relief under 49 U.S.C. § 24311(b)(2)(B), which permits the court to decide in due course "the disposition of outstanding charges related to the property." *Cf. Meigs Cnty.*, 397 F. Supp. 3d at 1115 (noting that the condemnee could not forestall a transfer of possession, but "[i]f and when such a hardship should arise," could "seek relief pursuant to 40 U.S.C.A. § 3114(d)," the analogous provision of the DTA).

Accordingly, this Court should determine that Amtrak is entitled to immediate possession of the Subject Property Interest, with further proceedings to be held at a later date as to the "disposition of outstanding charges related to the property." 49 U.S.C. § 24311(b)(2)(B).

### B. Amtrak Is Also Entitled to Possession Under the Preliminary Injunction Standard.

Amtrak's position is that the traditional preliminary injunction standard does not apply, but were it to be applied here, Amtrak is also entitled to possession under that standard. *See Winter*

*v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Amtrak can establish "that four factors, taken together, warrant relief: [(1)] likely success on the merits, [(2)] likely irreparable harm in the absence of preliminary relief, [(3)] a balance of the equities in its favor, and [(4)] accord with the public interest." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (quotation marks omitted).

### 1. Amtrak is Likely to Succeed on the Merits.

For the reasons set forth above, Amtrak is likely to succeed in its entitlement to possession under 49 U.S.C. § 24311(b)(2). Amtrak has established its entitlement to possession under that statute, which is the statutory standard for possession. That is all Amtrak needs to show as to the merits, given that the only "relief" sought in this motion is possession.

That said, Amtrak is also likely to succeed on the ultimate condemnation action as well. Defendants' only objections and defenses to the merits of the condemnation action are those stated in their answers. *See* Fed. R. Civ. P. 71.1(e)(3). Kookmin Bank's Answer raises five primary objections to Amtrak's condemnation of the Subject Property Interest. *See* Kookmin Answer at 2–7 (Dkt. No. 35). Both USI Answers largely mirror the Bank's objections. *See* USI-Bank Answer (Dkt. No. 36); USI-nonBank Answer (Dkt. No. 38). Each of these five objections lacks merit.

First, Defendants object that Amtrak did not engage in extended negotiations prior to filing for condemnation, and thus condemnation is somehow improper. *See* Kookmin Answer at 5–6, 40; *see also* USI-Bank Answer at 16; USI-nonBank Answer at 5. This is wrong on the facts and the law. On the facts, it is wrong because Amtrak did attempt to acquire the property before bringing suit, but Defendants would not agree with Amtrak on the purchase price. Initially, Amtrak invited USI to participate in the appraisal and on-site inspection of WUS on January 28, 2022, *see* Exhibit 1 to Declaration of Lindsay Harrison ("Harrison Declaration"), but USI refused

8

the invitation, *see* Exhibit 2 to Harrison Declaration. Amtrak then proceeded with the appraisal, which was conducted by an independent appraiser. Following the appraisal, Amtrak conveyed an offer to USI of $250 million dollars for the Subject Property Interest and emphasized that "[t]ime is of the essence." *See* Exhibit 3 to Harrison Declaration. USI did not accept the offer and made no counter-offer. Even today, Defendants take issue with Amtrak's valuation of the property, proof that the parties could not agree on the purchase price. *See* Kookmin Answer at 5–6, 25; *see also* USI-Bank Answer at 17; USI-nonBank Answer at 5. Thus, Defendants are wrong on the facts.

They are also wrong in arguing that the law requires any more than what Amtrak did here. Congress did not set forth a pre-suit negotiation requirement of the type urged by the Defendants—and including such a requirement now would be inconsistent with the plain text of the statute. *See United States v. 1.04 Acres of Land, More or Less, Situate in Cameron Cnty., Tex.*, 538 F. Supp. 2d 995, 1008–09 (S.D. Tex. 2008) (declining to impose a negotiation requirement where statute allowed for condemnation to proceed if condemnor was "unable for any reason to obtain [an interest in land] by purchase," language similar to that provided in Amtrak's condemnation statute (alteration in original) (quotation marks omitted)). Instead, Congress provided for condemnation where Amtrak cannot "acquire the interest in the property by contract" or "agree with the owner on the purchase price for the interest." 49 U.S.C. § 24311(a)(2). Defendants do not dispute that there was no agreement as to the purchase price—which is all Amtrak needs to establish under 49 U.S.C. § 24311(a)(2)(B). Thus, this Court should conclude that Amtrak is likely to prevail against Defendants' objection concerning pre-suit negotiations.

Second, Defendants object that the Secretary of Transportation did not request Amtrak to use eminent domain powers so that the Secretary could "design and build an intermodal

9

transportation terminal" at the Station. *See* Kookmin Answer at 37; *see also* USI-nonBank Answer at 16. Defendants argue that the *only* way Amtrak can condemn property at WUS is pursuant to Section 24311(a)(1)(B), and because Amtrak did not act at the Secretary's request here, the condemnation action cannot proceed. This assertion misreads a clearly written statute. Section 24311(a)(1) allows Amtrak to use its eminent domain powers when "necessary for intercity rail transportation" *or* when the Secretary makes a request related to WUS in connection with the Secretary's duty to build an "intermodal transportation terminal" at the Station. The use of the disjunctive 'or' in subparts (A) or (B) allows Amtrak to act under either subsection. And while subpart (A) does carve out certain exceptions where Amtrak's authority is restricted—for property of a rail carrier, a political subdivision of a State, or a government authority—it does *not* carve out property at WUS. Accordingly, the only natural reading is not that subpart (A) applies everywhere in the country except at WUS, but rather that subpart (B) creates a second and alternative basis for an eminent domain action regarding the Station—namely where a property interest at WUS devoted solely to intermodal transportation usage could be acquired by Amtrak even if *not* necessary for intercity rail passenger transportation. Indeed, Judge Cooper has previously applied subsection (A) to a taking of land in connection with WUS's Master Plan. *See Nat'l R.R. Passenger Corp. (Amtrak) v. 3.44 Acres More or Less of Land & Bldg. located at 900 2nd Street NE, Washington, DC 20002–3557*, 266 F. Supp. 3d 63, 65–66 (D.D.C. 2017) (hereinafter "*900 2nd Street NE*") (approving Amtrak's condemnation of property intended to rehabilitate and expand WUS under § 24311(a)(1)'s "intercity rail passenger transportation" provision (quotation marks omitted)).

Third, the Defendants object to the amount of compensation. *See* Kookmin Answer at 25; *see also* USI-Bank Answer at 17; USI-nonBank Answer at 5. But the amount of compensation is

10

not relevant to Amtrak's likelihood of success on the taking. Federal courts widely recognize that the just compensation deposit is merely an estimate of the value of the property interest at issue, and a disagreement regarding that estimate (which is certain to be present in every condemnation action) cannot be used as a basis to deny the condemning authority immediate possession. *Nat'l R.R. Passenger Corp. v. Penn Cent. Corp.*, No. 89 C 1631, 1989 WL 51406, at *2 (N.D. Ill. May 11, 1989) ("Deposit of inadequate compensation is not ordinarily a basis for delaying condemnation."). Furthermore, like the DTA, the Amtrak condemnation statute provides that if the deposit ultimately proves to be less than the actual value, then the condemnee is to be paid additional compensation with interest for the difference between the amount deposited and the actual value. *See* 49 U.S.C. §§ 24311(b)(3) & (4); *see also United States v. 53 1/4 Acres of Land, More or Less in Borough of Brooklyn*, 176 F.2d 255, 258 (2d Cir. 1949) (explaining that while the purpose of the deposit "is to give the government possession at once and to give the owner immediate payment either in full or to the extent of the estimated value deposited," the DTA also provides for additional payments with interest if the deposit turns out to be less than the actual value). A dispute over the amount of compensation therefore has no bearing on Amtrak's likelihood of success.

Fourth, the Defendants object that Amtrak could make do with a lesser interest in order to accomplish its goals, and thus the Subject Property Interest is not really "necessary." *See* Kookmin Answer at 25; *see also* USI-Bank Answer at 16; USI-nonBank Answer at 3. This objection gets the standard wrong. To qualify as "necessary" under Section 24311(a)(1)(A), Amtrak need only show that the Subject Property Interest has "a 'significant relationship' with Amtrak's provision of intercity rail passenger transportation." *900 2nd Street NE*, 266 F. Supp. 3d at 69. In the *900 2nd Street NE* case, which dealt with a condemnation adjacent to WUS, Judge Cooper explained

that the "relevant question" was whether the taking has "some direct nexus to Amtrak's goals." *Id.* This standard requires a showing more stringent than mere "usefulness" but "more lenient than absolute, last-resort need"—in other words, there is no requirement that Amtrak establish that the property is "indispensable." *Id.* at 69–70 (internal quotation marks omitted). Nor is there a requirement that Amtrak condemn property in the least burdensome way. *See id.* at 73 (rejecting argument that taking was not necessary because Amtrak could have negotiated for a lease or easement instead). "The upshot is that Amtrak may condemn property only if it has a significant connection to its goal of providing intercity passenger rail transportation." *Id.* at 72. If the property has such a connection, the taking is "necessary" and the court "is not in a position to assess" whether a lesser property interest would be sufficient to accomplish Amtrak's goals. *Id.* at 73.

Here, Amtrak is likely to succeed in demonstrating that the Subject Property Interest has a significant relationship to Amtrak's goals.[3] To pick an example that is a matter of public record, the Subbasement Project is one of the reasons Amtrak seeks to acquire the Subject Property Interest. That Project is needed to preserve the structural integrity of the Station. *See* Complaint ¶¶ 32–39. It has an obvious and direct nexus to numerous of Amtrak's goals. And possession of the Subject Property Interest will allow Amtrak to move forward with the Project. This and other

---

[3] Amtrak's statutory goals are numerous. *See* Complaint ¶ 57. "Public convenience and necessity require that Amtrak, to the extent its budget allows, provide modern cost-efficient, and energy-efficient intercity rail passenger transportation throughout the United States." 49 U.S.C. § 24101(a)(1). In doing so, Amtrak must "use its best business judgment" to "maximize the Federal investments" including, "controlling or reducing …operating costs" and "providing economic benefits to the communities it serves." 49 U.S.C. § 24101(c)(1)(E) & (F). Further, Amtrak is statutorily commanded to "carry out strategies to achieve immediately maximum productivity and efficiency," to "improve generally the performance of Amtrak," and to "coordinate the uses of the Northeast Corridor, particularly intercity and commuter rail passenger transportation." *See* 49 U.S.C. § 24101(c)(3), (8) & (11). As the statutory language makes clear, Amtrak must exercise business judgment as to these duties, including how to "maximize the use of its resources, including... real property." 49 U.S.C. § 24101(c)(12). Amtrak must also act to "minimize Government subsidies." 49 U.S.C. § 24101(c)(2).

reasons for the taking are discussed *infra* in the section dealing with irreparable harm. They reflect that the Subject Property Interest has a "significant connection" to Amtrak's goals in providing intercity passenger rail transportation.

For these reasons, the Court may also reject Defendants' objection that Amtrak has economic motives to condemn the Subject Property Interest. *See* Kookmin Answer at 25; *see also* USI-Bank Answer at 16; USI-nonBank Answer at 3.[4] In *900 2nd Street NE*, Judge Cooper rejected the condemnee's similar claim that Amtrak had "ulterior motives" and thus the taking should be considered invalid. There, as here, the condemnee argued that Amtrak's goal was to benefit financially from the condemnation action. But, as Judge Cooper explained, even if Amtrak had many motivations, including economic ones, the relevant property *also* had a clear nexus with Amtrak's transportation-related goals. And "the mere consideration of economic factors cannot defeat an otherwise valid taking." *Id*. at 73.

Finally, Defendants object that if the Subject Property Interest was necessary, Amtrak should have acted sooner. *See* Kookmin Answer at 32–33. As Amtrak understands it, Defendants argue that since Amtrak did not previously use its authority to acquire the Subject Property Interest, it cannot do so now because the property must not *truly* be necessary. This estoppel-like argument is completely atextual, and Amtrak knows of no case law that would support it. In fact, 49 U.S.C. § 24311(a)(l) expressly contemplates that Amtrak can make decisions about the timing of a taking by considering both its needs and resources. Moreover, in *900 2nd Street NE,* Judge Cooper expressly rejected the argument that Amtrak's condemnation of an office building, in

---

[4] Defendants suggest that Amtrak should not have been allowed to pursue condemnation because the COVID-19 pandemic temporarily depressed certain retail business, and thus property valuations. Defendants can point to no authority that would support any such limitation on Amtrak's statutory authority.

13

which it had long been a tenant, was invalid because alternatives to condemnation were purportedly not sufficiently explored. 266 F. Supp. 3d at 73. Consequently, Amtrak not having previously sought to condemn the Subject Property Interest cannot restrict Amtrak's ability to do so today.

Accordingly, Amtrak is likely to succeed in its condemnation action.

### 2. Absence of Possession Risks Irreparable Harm, and the Balance of Equities and Public Interest Favors Awarding Possession to Amtrak.

Amtrak initiated this condemnation action to facilitate necessary repair and improvement work at the Station and effectively manage the operations of the Station now and in the future. *See generally* Complaint ¶¶ 31–52. In their Answers, the various Defendants do not appear to contest—nor could they—that Amtrak wants to complete the Subbasement Project and the Concourse Modernization Project set forth in the Complaint as necessary improvements. While Defendants argue that Amtrak does not "need" ownership of the Subject Property Interest to complete these projects, they do not argue that these projects are undesirable ones that Amtrak should not undertake. Indeed, the Northeast Corridor Commission, authorized by Congress in the Passenger Rail Investment and Improvement Act of 2008, has stressed the critical nature of the Subbasement Project:

> The Subbasement Reconstruction project will replace the bridging structure at the north portal of the First Street Tunnel spans rail tracks over a back of house station area (known as the Subbasement). ***The structure is in a state of disrepair and requires replacement.*** The critical SOGR Project will replace the structurally deficient beams, girders and columns with a new structural support system. The track slab will be replaced and railroad infrastructure will be replaced in kind.

(emphasis added).[5] "Collapse of the [s]ubbasement would have significant impacts to not only the

---

[5] Northeast Corridor Commission, Washington Union Station: Subbasement Program (last updated Oct. 2021), http://nec-commission.com/project/wus-subbasement/ (last updated Oct. 2021).

NEC but the entire eastern rail network."[6] Moreover, the effects of delayed improvements and repairs are irreparable in the sense that congestion and safety problems cannot be compensated financially. *See Nw. Pipeline Corp. v. The 20' x 1,430' Pipeline Right of Way Easement x 1560' Temp. Staging Area*, 197 F. Supp. 2d 1241, 1246 (E.D. Wash. 2002) (finding similar harms to be irreparable). There should be no further delay in these important projects.

Further, the disputes between the Defendants are many. Two different law firms purport to represent USI in this case. At one point, the Bank threatened to terminate the Station's manager, which forced Amtrak to seek emergency relief, which then prompted the Bank to withdraw that termination threat. Within weeks, the Bank has filed a new motion seeking to change the status quo at the Station by either entering a new management agreement with the existing manager or contracting with a new one, and the Defendants continue to escalate allegations in briefing on this request. All of these developments demonstrate instability risk in the Station's operations. Yet there is more. Most recently, on July 1, 2022, Kookmin Bank Co., Ltd. filed suit against Defendant Ben Ashkenazy in the New York Supreme Court alleging breach of the loan documents and seeking recourse against Ashkenazy under a guaranty. *See* Exhibit 4 to Harrison Declaration. This new complaint seeks a determination as to who, among the Defendants, have rights in the Subject Property Interest—seemingly the same issue those parties have asked this Court to consider. *See id.* ¶¶ 25, 33–53, 64.

If the Court does not grant Amtrak possession, there will be continued instability at the Station, presenting operational and safety risks both small and large. The more mundane risks include tenants not knowing who to call for internal or external maintenance issues such as trash handling, wet floor signs/maintenance, repairs, escalator and elevator service, lightbulb

---

[6]     *Id.*

replacements, standard plumbing, HVAC, sidewalk and lawn care, or other issues with fixtures or equipment. The very serious risks include misunderstanding who is responsible in emergency situations such as security breaches, in the handling of life and safety requirements, water pipe bursts, electrical wiring malfunctions, gas leaks, power outages, or major structural damage to the property. This instability makes the Station vulnerable to serious public harm. *See* Handera Declaration ¶ 10 (Dkt. No. 41-3). And that is all in addition to the ways this instability will continue to delay and disrupt the important train-related work projects described in Amtrak's Complaint. *See* Complaint ¶¶ 31–52. These issues do not simply affect Amtrak—they pose serious risks and challenges to the thousands of members of the public who traverse and rely on Union Station. Accodringly, these rationales for transferring possession speak both to the balance of harms and to the public interest.

Meanwhile, awarding possession to Amtrak poses little risk of harm. Maintaining stability and moving forward with critical infrastructure projects at the Station is in Amtrak's interest more than it is any other party in this case because title in the Subject Property Interest has already vested in Amtrak. Furthermore, Amtrak knows the Station well, having operated passenger rail service at the Station since Amtrak's began operations in 1971. And unlike every other party, Amtrak operates pursuant to a statutory mandate to act in the public interest. *See generally* 49 U.S.C. § 24101. Any harm Defendants might experience is purely pecuniary, while awarding Amtrak possession avoids potentially irreparable harm from an unstable management situation during the pendency of this case. Finally, if the Court awards possession to Amtrak and later decides that the taking is somehow invalid, Defendants have protection: Amtrak has already deposited $250 million dollars with the Court, which in the unlikely event that possession needs to be reversed, can be used to reimburse the Defendants for any damages

Accordingly, the balance and public interest clearly favor awarding possession to Amtrak. Neither Amtrak nor the public should have to bear the obvious costs and concerns that delay in granting possession will cause.

### III. CONCLUSION

This Court should determine that Amtrak has the right to immediate possession and that immediate possession of the Subject Property Interest should be granted to Amtrak, with further proceedings to be held as to the "disposition of outstanding charges related to the property," 49 U.S.C. § 24311(b)(2)(B), including as to the rent proceeds that were collected after title transferred to Amtrak, and as to any outstanding issues related to Amtrak's authority to take the Subject Property Interest and the amount of just compensation.

Respectfully submitted,

COUNSEL FOR PLAINTIFF NATIONAL RAILROAD
PASSENGER CORPORATION


/Patricia McHugh Lambert
Patricia McHugh Lambert, US DC Bar ID MD0008
Kambon R. Williams, US DC Bar ID MD29872
PESSIN KATZ LAW, P.A.
901 Dulaney Valley Road, Suite 500
Towson, MD  21204
Telephone: 410-938-8800
Fax: 410-832-5650
plambert@pklaw.com
kwilliams@pklaw.com


/Lindsay C. Harrison
Lindsay C. Harrison, DC Bar #977407
Jessica Ring Amunson, DC Bar #497223
JENNER & BLOCK, LLP
1099 New York Avenue, NW, Suite 900
Washington, D.C. 20001-4412

             Telephone: 202-639-6000
             Fax: 202-639-6066
             lharrison@jenner.com
             jamunson@jenner.com