CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 2    Case 1:22-cv-01043-APM   Document 72-6   Filed 07/08/22   Page 1 of 25   RECEIVED NYSCEF: 07/01/2022

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---------------------------------------------------------------- X

KOOKMIN BANK CO., LTD., in its capacity as        :
Trustee of KTB CRE DEBT FUND NO. 8, a
Korean Investment Trust, by its agent in Korea     :
DAOL FUND MANAGEMENT CO. and by its
Agent in United States, REXMARK HOLDINGS   :      Index No. _____
LLC d/b/a REXMARK

                                        :

                Plaintiff,

                                        :

    -against-                             :       **COMPLAINT**

BEN ASHKENAZY,                        :

                Defendant.                  :

---------------------------------------------------------------- X

Plaintiff Kookmin Bank Co., Ltd., in its capacity as trustee ("Trustee" or "Kookmin") of

KTB CRE Debt Fund No. 8, a Korean Investment Trust ("Trust"), by its agent on behalf of Trust

in Korea, Daol Fund Management Co. ("Daol Fund") and by its agent on behalf of Trust in United

States, Rexmark Holdings LLC d/b/a Rexmark ("Rexmark," together with Trustee, Trust, and Daol

Fund, "Lender"), by and through its undersigned counsel, as and for its complaint against

Defendant Ben Ashkenazy ("Ashkenazy" or "Guarantor"), alleges as follows:

## NATURE OF THE CASE

1.      This case arises from two loans made for the ground lease of Washington Union

Station ("Union Station"). These loans, which have been in default since May 2020, now exceed

$560 million in due and unpaid debt. To induce the lender to make these loans, Ashkenazy

executed guaranties of certain recourse obligations of the borrower. Certain conduct by the

borrower or Ashkenazy triggers springing recourse, which requires the borrower and Ashkenazy

to pay the entire debt. Other conduct by the borrower or Ashkenazy triggers the borrower's

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

recourse liabilities, which requires the borrower and Ashkenazy to pay actual loss or damage incurred by Lender arising out of such conduct. Under the guaranties, Ashkenazy is personally liable for all recourse obligations of the borrower.

2. Ashkenazy's continued interference with Lender's rights under the loan documents and his active involvement in thwarting Lender's rights through false representations to the court and third parties, among other misconduct, have triggered both the springing recourse and recourse liabilities provisions in the guaranties. Ashkenazy owes Lender the full amount due under the two loans—an amount exceeding $560 million as of the date of this filing—and actual damages sustained by Lender as a result of Ashkenazy's misconduct.

## PARTIES

3. Kookmin is a South Korean bank serving as the Trustee of KTB CRE Debt Fund No. 8 (i.e. the Trust), a South Korean investment trust. The Trust's agent in South Korea is Daol Fund. The Trust's agent in United States is Rexmark, which oversees the day-to-day management of the loans. Rexmark is a limited liability company organized and existing under the laws of New York, located at 295 Madison Avenue, Suite 1200, New York, New York 10017. Rexmark, the Trustee, Trust, and Daol Fund are referred to collectively as Lender. Lender is the holder of two loans made in 2018, a mortgage loan and a mezzanine loan, over the leasehold interest in Union Station.

4. Upon information and belief, Ashkenazy is an individual residing in New York, New York. Ashkenazy is the Guarantor of both the senior and mezzanine loans over the leasehold interest in Union Station.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

5.      Non-party Union Station Investco, LLC ("USI"), a Delaware limited liability company, holds the leasehold interest in Union Station.  Ashkenazy was USI's manager until replaced in May 2022.

6.      Non-party Union Station Sole Member, LLC ("USSM"), a Delaware limited liability company, previously held 100% of the ownership interests in USI.  As further explained below, on June 14, 2022, after USSM defaulted under the mezzanine loan, Lender foreclosed on USSM's membership interests in USI through a properly noticed Uniform Commercial Code ("UCC") foreclosure sale.  Both USI and USSM are affiliated with the Ashkenazy Acquisition Corporation ("AAC"), a sophisticated real-estate investment firm in which Ashkenazy serves as the CEO and Chairman.

7.      Non-party National Railroad Passenger Corporation ("Amtrak") filed a declaration of taking on the leasehold interest in Union Station held by USI on April 14, 2022.  This purported taking is being separately challenged in a case brought before the United States District Court for the District of Columbia.  *See National Railroad Passenger Corp. ("Amtrak") v. Sublease Interest Pertaining to Described Leasehold Interests at Washington Union Station, et al.*, 1:22-cv-01043-APM (D.D.C.).

## JURISDICTION AND VENUE

8.      Jurisdiction and venue are proper before this Court under New York Civil Practice Law and Rules 301 and 501 because Ashkenazy is a resident of New York and the contractual provisions fix venue in New York County.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 2    Case 1:22-cv-01043-APM    Document 72-6    Filed 07/08/22    Page 4 of 25    RECEIVED NYSCEF: 07/01/2022

## STATEMENT OF FACTS

### *The Loan Agreements*

9.      Lender holds two loans made in 2018 for the leasehold interest in Union Station—a mortgage loan and a mezzanine loan.

10.     The mortgage loan is a $330 million loan made to USI by Citi Real Estate Funding, Inc. and Natixis Real Estate Capital LLC (together, the "Original Mortgage Lender"), which was secured by USI's leasehold interest in Union Station (the "Mortgage Loan"). The Mortgage Loan is evidenced by, among other documents, that certain Mortgage Loan Agreement between USI and the Original Mortgage Lender, dated as of May 8, 2018 (as amended, modified, restated, and/or replaced from time to time, the "Mortgage Loan Agreement").

11.     In or around May 2020, USI defaulted under the Mortgage Loan.

12.     As a result of USI's failure to cure its default, on November 19, 2021, the Original Mortgage Lender noticed a foreclosure sale under the Mortgage Loan.

13.     In January 2022, Lender purchased the Mortgage Loan for approximately $358 million and assumed the rights and obligations of the Original Mortgage Lender under the Mortgage Loan Agreement.

14.     The mezzanine loan is a loan made in the principal amount of $100 million by Lender to USSM directly (the "Mezz Loan"), which was secured by USSM's 100% ownership interest in USI. The terms of USSM's pledge of its ownership interest in USI to Lender are set forth in that certain Mezzanine Loan Agreement, dated May 8, 2018 (the "Mezz Loan Agreement") and a Pledge and Security Agreement, dated May 8, 2018 (the "Pledge Agreement," and together with the Mezz Loan Agreement, the Mortgage Loan Agreement, and all other documents executed in connection with the Mezz Loan and the Mortgage Loan, the "Loan Documents").

4

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

15.     In or around May 2020, USSM defaulted under the Mezz Loan.

16.     The parties agreed to a forbearance period in which the Lender did not take action against USSM and thereafter Lender extended millions of dollars in protective advances to provide USSM an opportunity to bring the Mezz Loan back into good standing.

17.     Nevertheless, USSM failed to make additional payments on the Mezz Loan.

18.     On November 12, 2021, in response to USSM's continued default under the Mezz Loan, Lender accelerated the Mezz Loan.

19.     On November 22, 2021, Lender noticed a UCC foreclosure sale of the Mezz Loan to be held on January 4, 2022.

20.     After purchasing the Mortgage Loan, Lender cancelled both of the pending foreclosure sales, even though USI and USSM continued to be in default.

21.     Based on USSM's continuing default, Lender planned to re-notice the foreclosure on the Mezz Loan and begin marketing the interest.

22.     Upon information and belief, Ashkenazy told Amtrak about Lender's plans to foreclose on the Mezz Loan in order to frustrate and delay the foreclosure and induce Amtrak to act in a way that would help Ashkenazy avoid the consequences of the continuing defaults under the Loan Documents.  As Ashkenazy hoped, Amtrak filed its declaration of taking and has sided with Ashkenazy in his plans to frustrate Lender's rights.

23.     On May 13, 2022, Lender noticed a second UCC foreclosure sale of the Mezz Loan to be held on June 14, 2022.

24.     The UCC foreclosure sale proceeded at public auction after being marketed by Cushman & Wakefield.  Over 100 confidentiality agreements were approved leading up to the

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

sale.  At the foreclosure sale, Lender was the highest bidder, purchasing USSM's membership interests in USI for $140,535,334.53.

25.     USSM, therefore, no longer has any rights or interest in Union Station.  Lender owns all of the membership interests in USI and has operational control in the management of Union Station.

26.     In sum, Lender has directly loaned USSM $100 million and purchased the Mortgage Loan for $358 million.  In addition, Lender has made millions of dollars in protective advances.  These outlays are in addition to the costs of enforcement, regular and default interest, and fees that have accrued under the two loans.  Lender is owed more than $420 million in connection with the Mortgage Loan alone.  Borrower currently owes Lender more than $560 million.

### *Recourse Obligations*

27.     In connection with both the Mortgage Loan and the Mezz Loan, Ashkenazy unconditionally guaranteed payment and performance of certain guaranteed obligations, including the recourse obligations of the borrower.[1]  The provisions of the Guaranty of Recourse Obligations, dated as of May 8, 2018, between Ashkenazy and Original Mortgage Lender (the "Mortgage Guaranty") and the provisions of the Guaranty of Recourse Obligations (Mezzanine Loan), dated as of May 8, 2018, between Ashkenazy and Lender (the "Mezz Guaranty") are substantially similar and, therefore, are referred to collectively as the "Guaranty."

28.     Neither the Mortgage Loan nor the Mezz Loan is a recourse loan unless a recourse trigger event occurs.  If a recourse event does occur, Lender can seek a money judgment against

---

[1]     Each of the guaranties refer to its respective "Borrower"—either USI under the Mortgage Loan or USSM under the Mezz Loan.  For purposes of this complaint, the term "Borrower" is used throughout.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

Borrower and Ashkenazy. Section 11.22 of the Mortgage Loan Agreement and Mezz Loan Agreement (together, the "Loan Agreements") describes the two types of recourse trigger events: the Springing Recourse Event and the Borrower's Recourse Liabilities.

29. Upon the occurrence of a Springing Recourse Event, the Mortgage Loan and Mezz Loan become fully recourse, and Lender may seek a money judgment against Borrower and/or Ashkenazy for the full amount due under the Mortgage Loan and the Mezz Loan.

30. Specifically, "the Debt shall be fully recourse to Borrower in the event that . . . any Affiliate, officer, director, or representative which Controls Borrower consents to or acquiesces in or joins in an application for the appointment of a custodian, receiver, trustee, or examiner for Borrower or any portion of the Property other than in connection with a request or action commenced by Lender or its affiliate." (Mortgage Loan Agreement at § 11.22, the "Custodian Provision"; *see also* Mezz Loan Agreement at § 11.22).

31. In addition, upon the occurrence of the Borrower's Recourse Liabilities, Lender may seek a money judgment against Borrower and/or Guarantor for "actual loss, damage, cost, [or] expense . . . incurred by Lender (including attorneys' fees and costs reasonably incurred) arising out of or in connection with" the recourse event, such as:

    a. "fraud or intentional material misrepresentation in writing by Borrower, Guarantor or any Affiliate . . . in connection with the Loan" (Mortgage Loan Agreement at § 11.22(i), the "Misrepresentation Provision"; *see also* Mezz Loan Agreement at § 11.22(i));

    b. "the gross negligence or willful misconduct by, or at the direction of, Borrower, Guarantor or any Affiliate . . . in connection with the Loan" (*id.* at § 11.22(ii), the "Direction Provision"; *see also* Mezz Loan Agreement at § 11.22(ii));

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

c. "if any litigation or other legal proceeding related to the Debt filed by Borrower, Guarantor or any Affiliate . . . was intended solely to delay, oppose, impede, obstruct, hinder, enjoin or otherwise interfere with or frustrate the efforts of Lender to exercise any right and remedies available to Lender as provided herein and in the other Loan Documents" (*id.* at § 11.22(xiv), the "Obstruction Provision"; *see also* Mezz Loan Agreement at § 11.22(xiv)).

32.    Under the Guaranty, Ashkenazy "hereby irrevocably and unconditionally covenants and agrees that it is liable, subject to the terms hereof, for the Guaranteed Obligations as a primary obligor." (Guaranty at § 1.1). "Guaranteed Obligations" is further defined as "Borrower's Recourse Liabilities and [] from and after the date that any Springing Recourse Event occurs, payment of the entire Debt." (*Id.* at § 1.1(a)).

### *Borrower Triggers Springing Recourse*

33.    By hiding behind a veil of purported "status quo," Ashkenazy has wrongfully arrogated to himself the control and management rights of Union Station that rightfully belong to Lender.  After  Borrower's default, Lender properly exercised various rights and remedies provided under the Loan Documents to protect its interest in the collateral, including conducting a foreclosure sale on USSM's equity interests in USI.  Ashkenazy, therefore, has no remaining interest in Union Station.

34.    Yet, Ashkenazy is still in the operating seat, directing the property management through its agent, Jones Lang Lasalle Americas, Inc. "(JLL"), that served as the property manager for Union Station.  Ashkenazy's improper control of Lender's possessory rights over Union Station triggers the Custodian Provision under the Loan Agreements, creating  a Springing Recourse Event and personal liability for Ashkenazy as the Guarantor.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)      INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 2      Case 1:22-cv-01043-APM   Document 72-6   Filed 07/08/22   Page 9 of 25      RECEIVED NYSCEF: 07/01/2022

35.     Pursuant to Lender's rights and remedies under the Loan Documents, on April 28, 2022, Lender terminated JLL.  JLL had a Master Management Agreement with AAC when Ashkenazy served as the manager for USI.

36.     On May 13, 2022, Lender exercised its rights under the Pledge Agreement to replace Ashkenazy as manager of USI.  William Henrich was appointed as the new independent manager of USI.

37.     USI, under Henrich's direction, intended to engage a new property management firm to ensure that the property manager took direction from USI, not from Ashkenazy or AAC. Henrich worked with JLL and Cushman & Wakefield ("Cushman") to ensure a seamless transition—until Ashkenazy interfered.

38.     Upon learning of USI's plan to replace JLL, Ashkenazy coordinated with Amtrak and JLL to block, hinder, and frustrate Lender's exercise of its rights and remedies.  Amtrak moved for an order to enjoin any defendant in the eminent-domain proceeding from terminating JLL as the property manager of Union Station during the pendency of the proceeding.

39.     USI, under Henrich's direction, had already retained counsel to defend its position in the eminent-domain proceeding.

40.     However, Ashkenazy retained separate counsel and falsely represented that ArentFox Schiff LLP ("ArentFox") and Kasowitz Benson Torres LLP ("Kasowitz") represented both USSM and USI.  Ashkenazy hired ArentFox and Kasowitz in contravention of Lender's exercise of rights to replace Ashkenazy as manager.

41.     A Springing Recourse Event occurred on or about May 20, 2022, when ArentFox and Kasowitz informed Amtrak's counsel that Borrower would "consent to preserve the status quo of Union Station management" as a response to Amtrak's motion to enjoin the termination of JLL.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

NYSCEF DOC. NO. 2
Case 1:22-cv-01043-APM   Document 72-6   Filed 07/08/22   Page 10 of 25

INDEX NO. UNASSIGNED

RECEIVED NYSCEF: 07/01/2022

42.    This communication at the direction of Ashkenazy's counsel triggered the Custodian Provision, which makes the Debt fully recourse if Ashkenazy "consents to or acquiesces in or joins in an application for the appointment of a custodian . . . other than in connection with a request or action commenced by Lender or its affiliate."

43.    Lender had already terminated JLL at this point, and Ashkenazy's consent to Amtrak's request that JLL remain as property manager in violation of Lender's proper exercise of rights constitutes Ashkenazy's intent to appoint an alternate custodian to manage the property.

44.    Lender subsequently rescinded its notice to terminate JLL, and USI (through Henrich) joined with Lender in agreeing not to take action to replace or terminate JLL without further order from the Court.

45.    However, Ashkenazy has continued to interfere with Lender's ability to control and manage Union Station.  On June 24, 2022, Lender filed an Emergency Motion for Approval of Contract with Property Manager in the eminent-domain proceeding ("Emergency Motion").

46.    Lender's emergency motion was necessary because Ashkenazy's counsel repeatedly demanded that Lender continue to fund Union Station's operations *through* Ashkenazy as if Lender never foreclosed on USSM's membership interests in USI.  Ashkenazy no longer has any role in Union Station because he no longer serves as USI's manager and USSM no longer owns any membership interest in USI.

47.    Lender's emergency motion asked the court to direct JLL to enter into a property management agreement with USI or Lender directly—rather than continue to rely on a Master Management Agreement with AAC who was no longer involved in the property—or allow Lender to contract with a separate property management firm, i.e. Cushman.

10

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

48.     Lender reached out to JLL directly to ask for a JLL-controlled account in which Lender could send the requested funds to pay the obligations due and payable related to Union Station's management and operation. JLL never responded to this request. Upon information and belief, Ashkenazy directed JLL to not work with Lender to secure funding for Union Station unless Lender agreed to fund through AAC.

49.     In response to Lender's emergency motion, on June 26, 2022, Ashkenazy's counsel filed a letter (later rejected by the court), representing that JLL continued to manage Union Station "pursuant to an existing management contract" and that the status quo has been retained ("June 26 Letter").

50.     The June 26 Letter further evidences Ashkenazy's challenge to Lender's right to appoint a custodian to manage Union Station, thereby "consent[ing] to or acquiesce[ing] in" a re-appointment of JLL as the property manager against Lender's rightful exercise of rights under the Loan Documents.

51.     Lender subsequently moved to have the court in the eminent-domain proceeding schedule a hearing on its emergency motion.

52.     On June 30, 2022, Ashkenazy's counsel reiterated the position taken in the June 26 Letter, filing a Limited Opposition to Lender's Request to Schedule Hearing ("Limited Opposition").

53.     Ashkenazy's consent to Amtrak's request, the June 26 Letter, and the Limited Opposition are a takeover by Ashkenazy of Lender's management rights over Union Station made under the pretext of maintaining the "status quo." Ashkenazy's misconduct triggers a Springing Recourse Event under the Custodian Provision, creating personal liability for Ashkenazy for the entire debt owed on the loans.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

### *Borrower Triggers Recourse Liabilities*

54.     The Recourse Liabilities were tripped by Borrower in at least 3 ways:  through intentional material misrepresentations; willful misconduct; and obstruction of Lender's proper exercise of its rights under the Loan Documents.

55.     Since Lender enforced its rights under the Loan Documents and Amtrak filed its eminent-domain proceeding, Ashkenazy has repeatedly triggered multiple Recourse Liabilities. Each of these events requires Borrower and Ashkenazy to pay any actual loss or damage Lender incurs as a result of the misconduct.

56.     The Loan Agreements list the various Recourse Liabilities, which include the Misrepresentation, Direction, and Obstruction Provisions.

57.     Pursuant to the Misrepresentation Provision, Guarantor cannot make an "intentional material misrepresentation in writing . . . in connection with the Loan." (Mortgage Loan Agreement at § 11.22(i); Mezz Loan Agreement at § 11.22(i)).

58.     Ashkenazy triggered the Misrepresentation Provision by the following actions:

a.     On or around May 19, 2022, Ashkenazy directed ArentFox and Kasowitz, purportedly representing USSM and USI, to file a written answer to Amtrak's complaint for condemnation.  At that time, Lender had already exercised its rights under the Loan Documents to replace Ashkenazy as manager of USI, so Ashkenazy did not have authority to direct a filing on USI's behalf.  The filing of the answer— and the misrepresentations made therein regarding the legal representation of USI—were an intentional material misrepresentation because Ashkenazy knew he did not have authority.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

Case 1:22-cv-01043-APM   Document 72-6   Filed 07/08/22   Page 13 of 25

b.  On or around May 20, 2022, Kasowitz wrote to the duly appointed counsel for USI that had been retained by Henrich, alleging that the answer filed at Henrich's direction was "invalid." Kasowitz improperly demanded counsel to withdraw their appearance, continuing to misrepresent that Kasowitz and ArentFox represented USI's interests in the eminent-domain proceeding.

c.  On or around May 20, 2022, Joe Press, Chief Operating Officer of AAC, wrote an email to Borrower's landlord, Union Station Redevelopment Corporation ("USRC"). In the email, Press wrote that "any effort to commandeer control is invalid," that Ashkenazy continued as manager, and that Lender was "not authorized to act on USI's behalf." AAC is a highly sophisticated, well counseled real estate firm with extensive experience with commercial mortgage and mezzanine loans. Given Lender's proper exercise of rights, Press knew or should have known these written statements were material misrepresentations.

d.  The written statement sent by ArentFox and Kasowitz on May 20, 2022, to inform Amtrak that it consented to maintaining the status quo of property management—the same trigger for Springing Recourse—also materially misrepresented that Ashkenazy could speak on USI's behalf.

e.  On June 3, 2022, ArentFox and Kasowitz filed a motion to strike the answer properly filed on USI's behalf at the direction of Henrich. The motion to strike directly challenges Henrich's authority and Lender's exercise of rights under the Loan Documents, containing numerous misrepresentations, such as:

i.  "[B]oth the Mortgage Lender and Kookmin unreasonably withheld consent to the Investment under the Loan Documents and refused to allow the

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

transaction to proceed" when Kookmin had no ownership interest in the Mortgage Loan at the time of the purported Investment and could not have withheld consent;

ii. "Lender has interfered with Owners' ability to lease space in Union Station to prospective tenants by instructing brokers and others not to negotiate or speak with Owners" and "met with existing Union Station tenants . . . about leasing space inside Union Station" when Lender had the right to consent to all leases given Borrower's default;

iii. "Lender wrongfully asserted complete control over Union Station and its management" when Lender properly exercised its rights under the Loan Documents;

iv. Lender did not have the authority to appoint Henrich as manager, and Henrich, therefore, did not have the authority to retain counsel for USI when Lender and Henrich acted properly under the Loan Documents. Ashkenazy argues that the replacement of USI's manager "had no effect" when Lender properly exercised its rights under the Loan Documents.

f. With Ashkenazy's motion to strike, Joe Press submitted a declaration as the Chief Operating Officer of AAC. The declaration misrepresented that AAC is still an affiliate of USI when USI's interests were transferred to Lender after the foreclosure sale. In addition, Press made material misrepresentations used as support in the motion to strike, including:

i. The allegation that Lender "unreasonably withheld consent" on the Investment;

14

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

ii.  The allegation that "Lender began to interfere with Owners' operation of the Station"; and

iii.  The allegation that Lender interfered with prospective and existing tenants.

g.  The foreclosure sale occurred on June 14, 2022, and Lender was the highest bidder, purchasing USSM's interest in USI.   After the foreclosure sale concluded, Ashkenazy has made numerous written misrepresentations alleging that the foreclosure sale was invalid and had no effect on the ownership of USI.

i.  On June 23, 2022, Ashkenazy's counsel sent a letter to Lender's counsel, arguing that the "purported foreclosure merely shuffled papers among your client's entities" and that Ashkenazy "dispute[s] the validity" of the foreclosure on the Mezz Loan.   These misstatements are directly contradicted by the Loan Documents that provide Lender certain rights and remedies, including foreclosure, upon USSM's default.

ii.  On June 24, 2022, Ashkenazy's counsel filed a reply in further support of its motion to strike, reiterating the same material misrepresentations from its other filings.  In addition, Ashkenazy claimed that the foreclosure sale had "no effect given the pendency of this action" when nothing in the Loan Documents precluded Lender from foreclosing on the Mezz Loan after USSM's default.

h.  On July 1, 2022, Ashkenazy's counsel sent a letter to Lender's counsel, demanding that Lender fund the property's operating expenses as it had done pre-foreclosure and stating that Lender "had no right to use its control of the lockbox unlawfully to attempt to seize control of the operations of Union Station."   Contrary to these

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

misstatements, Lender has exercised its rightful control over the property management given its ownership of USI post-foreclosure. Lender continues to pay the operating expenses at Union Station contrary to Ashkenazy's representations otherwise.

59.     Ashkenazy's written misrepresentations triggered the Recourse Liabilities under the Loan Agreements and Guaranty. Ashkenazy has no interest in Union Station since Lender properly removed him as USI's manager and foreclosed on USSM's equity interests, but Ashkenazy continues to demand that JLL follow its directives.

60.     In response of Ashkenazy's continued interference and obstruction, on June 24, 2022, Lender filed its Emergency Motion and filed a request for a hearing on the issue. Apart from the legal fees, Lender has been prevented from taking over the management and control of Union Station, causing lost opportunities with prospective tenants and cash flow issues.

61.     But not everything was written. Ashkenazy's statements and directives that were not reduced to writing do not trigger the Misrepresentation Provision, instead implicating the Direction Provision under the Loan Agreements.

62.     Under the Direction Provision, Guarantor cannot direct or act with "gross negligence or willful misconduct . . . in connection with the Loan." (Mortgage Loan Agreement at § 11.22(ii); Mezz Loan Agreement at § 11.22(ii)).

63.     Ashkenazy triggered the Direction Provision by:

a.  Upon information and belief, directing its agent and contract party, JLL, to not contract with Henrich or Lender to enter into a new property management agreement;

16

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

b.  Upon information and belief, blocking the amendment of the existing property management agreement to bring JLL into a direct contractual relationship with USI or Lender;

c.  Upon information and belief, directing its agent and contract party, JLL, to withhold financial documentation from Lender that Lender needs to fund the operations at Union Station;

    i.  Specifically, JLL notified Lender that despite Ashkenazy's representations to the court, bills are not being paid at Union Station and services are in jeopardy of being interrupted.  When Lender asked for documentation and copies of the relevant bills, JLL informed Lender that it was not allowed to provide documents to Lender at the direction of Ashkenazy.

d.  Upon information and belief, directing third parties, including tenants and vendors, to report to Ashkenazy as the manager for USI, and not Henrich or Lender;

e.  Upon information and belief, providing JLL conflicting information, direction, and instructions regarding who controls the property management at Union Station; and

f.  Upon information and belief, directing its agents, including JLL, to withhold financial information, property information, and other books and records from Henrich and Lender.

64.  Under the purported "status quo," JLL is not operating under an enforceable management agreement because neither Ashkenazy nor AAC have an interest in Union Station anymore.  The Master Management Agreement is ineffective to cover JLL's work at Union Station because neither USI nor Lender are the parties contracting with JLL in that agreement.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Ashkenazy's misguided directives constitute willful misconduct or, at the very least, gross negligence.

65.    Similar to Ashkenazy's material misrepresentations, Ashkenazy's misconduct triggered the Recourse Liabilities under the Loan Agreements and Guaranty.

66.    Finally, under the Obstruction Provision, Guarantor cannot bring any "legal proceeding . . . intended solely to delay, oppose, impede, obstruct, hinder, enjoin or otherwise interfere with or frustrate the efforts of Lender to exercise any right and remedies available to Lender as provided herein and in the other Loan Documents." (Mortgage Loan Agreement at § 11.22(xiv); Mezz Loan Agreement at § 11.22(xiv)).

67.    Under the Loan Agreements, Borrower may "settle and compromise any Material Condemnation only with the prior consent of the Lender" and "shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such litigations or proceedings." (Mortgage Loan Agreement at § 5.2.2; *see also* Mezz Loan at § 5.2.2).

68.    Accordingly, pre-foreclosure on the Mezz Loan, Borrower had to involve and work with Lender in an eminent-domain proceeding—such as the one brought by Amtrak. Given that both of the loans were in default, the Loan Agreements also automatically appoint Lender as the attorney-in-fact for Borrower. (*Id.*).

69.    The Pledge Agreement gave Lender the additional rights, upon default of the Mezz Loan, to act as if Lender "were the sole and absolute owner" of the pledged ownership interest in USI; to register the USI's interests in Lender's name; and to act as attorney-in-fact for Borrower beyond the eminent-domain proceeding. (*See* Pledge Agreement at §§ 9(a); 8(a); 13).

70.    Borrower, however, ignored Lender's exercise of rights and remedies provided under the Loan Agreements and the Pledge Agreement. At the direction of Ashkenazy, counsel

18

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.
18 of 25

filed an answer in the eminent domain proceeding purportedly on behalf of USSM and USI and in direct contravention of the answer filed by Henrich.

71.     The answer and other court documents filed in the eminent-domain proceeding at the direction of Ashkenazy were designed to obstruct, hinder, interfere, or otherwise frustrate Lender's efforts to exercise its rights and remedies to protect its collateral:

    a.     On or around May 19, 2022, Ashkenazy directed counsel purportedly representing USSM and USI to file an answer without Lender's consent or involvement.  The answer ignores Lender's proper exercise of rights under the Loan Documents, representing that Ashkenazy retains an interest in Union Station.

    b.     On June 3, 2022, Ashkenazy's counsel filed a motion to strike the answer directed to be filed on behalf of USI by Henrich.  It its motion to strike and supporting papers, Ashkenazy directly challenges Lender's exercise of rights under the Pledge Agreement and other Loan Documents.

72.     Upon information and belief, Ashkenazy worked with Amtrak in deciding when to bring the eminent-domain proceeding.  Ashkenazy advised Amtrak about a potential foreclosure given USI and USSM's continued defaults, which allowed Amtrak to file its declaration of taking before Lender exercised its contractual rights.  Ashkenazy's involvement directly obstructed and hindered Lender's efforts to exercise its remedies provided by the Loan Documents.

73.     In the documents filed in the eminent-domain proceeding, Ashkenazy has opposed Lender's exercise of rights based on Borrower's default under the Loan Agreements, hindered and interfered with Lender's rightful position to control and manage Union Station, and obstructed Lender from exercising its rights and remedies under the Pledge Agreement and other Loan

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

Documents. Ashkenazy's misconduct puts the ground lease of Union Station at risk, threatening Lender with damages in the hundreds of millions of dollars.

74.    These filings, written statements, and oral directives by Ashkenazy violated multiple Recourse Liabilities events, triggering Borrower's obligations to pay actual costs and damages accrued from the violations, including all associated legal fees and costs.

## AS AND FOR THE FIRST CAUSE OF ACTION
### (*Breach of Contract – Springing Recourse*)

75.    Lender repeats and realleges paragraphs 1 through 74 as if fully restated herein.

76.    The Guaranty is a valid and enforceable contract made between Ashkenazy and Lender.

77.    Lender has performed all of its obligations under the Guaranty and underlying Loan Documents.

78.    Ashkenazy's interference with Lender's proper exercise of its rights under the Loan Documents to terminate JLL as property manager of Union Station or contract with JLL directly triggered the Custodian Provision of the Springing Recourse Event.

79.    Under the Custodian Provision of the Loan Agreements, Ashkenazy cannot "consent[] to or acquiesce[] in or join[] in an application for the appointment of a custodian . . . other than in connection with a request or action commenced by Lender or its affiliate." (Mortgage Loan Agreement at § 11.22; Mezz Loan Agreement at § 11.22).

80.    Ashkenazy triggered this Springing Recourse Event by:

a.    Directing Ashkenazy's counsel to inform Amtrak that Borrower would "consent to preserve the status quo of Union Station management," thereby acquiescing to an alternate property manager that Lender had not requested;

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

NYSCEF DOC. NO. 2

INDEX NO. UNASSIGNED

RECEIVED NYSCEF: 07/01/2022

Case 1:22-cv-01043-APM   Document 72-6   Filed 07/08/22   Page 21 of 25

b. Submitting the June 26 Letter, which indicated Ashkenazy's challenge to contract directly with JLL or seek another property manager; and

c. Filing the Limited Opposition to further entrench Ashkenazy against Lender in the appointment of property management of Union Station.

81. By the Springing Recourse Event, Borrower and Ashkenazy become fully liable for the debt owed on the Mortgage Loan and Mezz Loan, respectively.

82. Under the Guaranty, Ashkenazy is personally liable as a primary obligor.

83. Ashkenazy has thus far refused to pay its obligations, thereby breaching the obligations contained in the Guaranty.

84. Accordingly, Ashkenazy is personally liable for the full debt owed on the two loans, amounting to over $560 million.

## AS AND FOR THE SECOND CAUSE OF ACTION
### (*Breach of Contract – Recourse Liabilities*)

85. Lender repeats and realleges paragraphs 1 through 84 as if fully restated herein.

86. The Guaranty is a valid and enforceable contract made between Ashkenazy and Lender.

87. Lender has performed all of its obligations under the Guaranty and underlying Loan Documents.

88. Under the Misrepresentation Provision, Guarantor cannot make an "intentional material misrepresentation in writing . . . in connection with the Loan." (Mortgage Loan Agreement at § 11.22(i); Mezz Loan Agreement at § 11.22(i)).

89. Ashkenazy triggered the Misrepresentation Provision by:

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

a. The written answer filed by ArentFox and Kasowitz purportedly on behalf of USSM and USI;

b. The letter written to the counsel properly retained by Henrich on behalf of USI demanding that they withdraw their appearance;

c. The email written by Press to USRC, alleging that Lender's proper exercise of rights under the Loan Documents was "invalid" and that Ashkenazy was still the manager;

d. The written statement consenting to Amtrak's request to maintain the status quo in property management;

e. The motion to strike containing misrepresentations regarding Lender's actions, Lender's rights, and the replacement of USI's manager;

f. Press's declaration submitted with the motion to strike providing support for the motion's misrepresentations;

g. The letter written to counsel challenging the validity of the foreclosure on the Mezz Loan;

h. The reply filed in further support of the motion to strike, reiterating the misrepresentations made in the motion and challenging the validity and effect of the foreclosure sale; and

i. The letter written to counsel alleging that Lender had no right to control the operating expenses at Union Station.

90.     Under the Direction Provision, Guarantor cannot direct or act with "gross negligence or willful misconduct . . . in connection with the Loan." (Mortgage Loan Agreement at § 11.22(ii); Mezz Loan Agreement at § 11.22(ii)).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

91. Ashkenazy triggered the Direction Provision by:

    a. Directing its agent and contract party, JLL to not contract with USI, through Henrich, or Lender directly;

    b. Blocking the amendment of the existing property management agreement to bring JLL into a direct contractual relationship with USI or Lender;

    c. Directing JLL to withhold financial information and other books and records from Lender that Lender needed to fund obligations at Union Station;

    d. Directing third parties, including tenants and vendors, to report to Ashkenazy as manager of USI, not Henrich; and

    e. Directing its agents to withhold property information and books and records from Henrich and Lender.

92. Under the Obstruction Provision, Guarantor cannot bring any "legal proceeding . . . intended solely to delay, oppose, impede, obstruct, hinder, enjoin or otherwise interfere with or frustrate the efforts of Lender to exercise any right and remedies available to Lender as provided herein and in the other Loan Documents." (Mortgage Loan Agreement at § 11.22(xiv); Mezz Loan Agreement at § 11.22(xiv)).

93. Ashkenazy triggered the Obstruction Provision by:

    a. Directing Ashkenazy's counsel to file an answer purportedly on behalf of USI, obstructing and hindering Lender's exercise of rights under the Loan Documents replacing Ashkenazy as manager;

    b. Directing Ashkenazy's counsel to file a motion to strike the answer directed to be filed on behalf of USI by Henrich and challenging Lender's exercise of rights under the Pledge Agreement and other Loan Documents; and

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

  c. Coordinating with Amtrak to bring the eminent-domain proceeding before Lender could exercise its rights under the Loan Documents.

94. By triggering the Recourse Liabilities, Borrower and Ashkenazy are liable for any actual loss, damages, or costs associated with the recourse event, including the costs and expenses related to associated attorneys' fees.

95. Under the Guaranty, Ashkenazy is personally liable as a primary obligor.

96. Ashkenazy has thus far refused to pay its obligations, thereby breaching the obligations contained in the Guaranty.

97. Lender has suffered opportunity costs associated with Ashkenazy's interference with Lender's rightful management and control over Union Station and accrued attorneys' costs and fees in connection with enforcing Lender's rights. Ashkenazy's misconduct has also put the ground lease at Union Station at risk. Lender has suffered damages, in an amount to be determined at trial, but no less than in the multiple of tens of millions of dollars.

**WHEREFORE,** Lender respectfully requests judgment on its causes of action as follows:

  a. On its first cause of action, awarding damages in the amount of the Debt on the loan, currently calculated at more than $560 million;

  b. On its second cause of action, awarding damages for lost opportunity costs and attorneys' fees and costs in relation to the Recourse Liabilities in an amount to be determined at trial, but no less than $50 million; and

  c. For such other and further relief as this Court may deem just and proper.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Dated: New York, New York
       July 1, 2022

MORRISON COHEN LLP

By: _/s/ Y. David Scharf_____
      Y. David Scharf
      Amber R. Will
      909 Third Avenue
      New York, New York 10022
      (212) 735-8600

*Attorneys for Plaintiff Kookmin Bank Co., Ltd., in its capacity as Trustee of KTB CRE Debt Fund No. 8, a Korean Investment Trust, by its agent in Korea, Daol Fund Management Co., and by its agent in United States, Rexmark Holdings, LLC d/b/a Rexmark*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.