## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK) | * | |
| | * | CIVIL ACTION NO. 1:22-CV-01043 |
| PLAINTIFF, | * | |
| v. | * | |
| | * | |
| SUBLEASE INTEREST OBTAINED PURSUANT TO AN ASSIGNMENT AND ASSUMPTION OF LEASEHOLD INTEREST, et al. | * | |
| | * | |
| DEFENDANTS. | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### REPLY IN FURTHER SUPPORT OF
### NATIONAL RAILROAD PASSENGER CORPORATION'S
### MOTION FOR IMMEDIATE POSSESSION OF
### THE SUBJECT PROPERTY INTEREST

Since Amtrak deposited $250 million with this Court, Amtrak has been vested with title ownership of the Subject Property Interest—but does not have possession.  Now is the time to join title and possession.

Defendants[1] argue that possession should not be transferred now.  This ignores the applicable test.  When Congress vested Amtrak with authority to condemn property, it provided for a quick transfer of possession.  It did so using the same language and structure as in the Declaration of Taking Act ("DTA"), where possession of condemned property *must* be transferred upon motion unless the condemnee can show undue hardship necessitating a delay.[2]  Defendants have made no showing of undue hardship, so possession must be transferred.

---

[1]     We refer to Kookmin Bank, USI, and USSM collectively as "the Defendants."
[2]     All capitalized terms have the same meaning as in Amtrak's Memorandum in Support of its Motion for Immediate Possession of the Subject Property Interest (ECF No. 72-1).

Here, possession also *should* be transferred now.  Without possession, Amtrak cannot move forward with critical safety and customer improvement projects, including the Subbasement Project and the Concourse Modernization Project.  Without possession, the property will remain in limbo indefinitely, with the owner (Amtrak) unable to do any of the things that owners typically can do.  Defendants do not dispute that these important projects highlighted in Amtrak's Complaint have been delayed for years, nor do they dispute that they are needed.  Due to their critical nature, these projects should not be delayed any further.  Possession should now be awarded to serve the public interest in safe and effective interstate rail transportation.

Defendants seek to rewrite Amtrak's condemnation statute by arguing that, before deciding possession, this Court must resolve all other issues they allege could be part of the case. Defendants are wrong:  at this stage, under 49 U.S.C. § 24311(b)(2)(A), the Court does not consider anything but possession.  Rather, just like under the DTA, if Amtrak has met its quick-take requirements, 49 U.S.C. § 24311(b)(2)(A), then the Court must award possession to Amtrak unless Defendants demonstrate an undue hardship that justifies a delay.  Yet none of the Defendants even attempt to demonstrate such a hardship.  They do not argue they would suffer any irreversible harm if Amtrak takes possession and moves forward with safety projects and improvements.  Because the undue hardship test applies, possession must be transferred.

Defendants tacitly acknowledge this, which is why they spend most of their oppositions arguing about an entirely different test applicable to preliminary injunctions.  That test does not apply here, just as it does not apply in cases under the DTA.  And even if it did apply, Amtrak would meet it.

Accordingly, Amtrak respectfully asks this Court to award Amtrak immediate possession.

## I.     AMTRAK IS ENTITLED TO IMMEDIATE POSSESSION UNDER 49 U.S.C. § 24311(b)(2).

### A. Amtrak Has Been Granted Quick-Take Powers by Congress.

49 U.S.C. § 24311(b) and the DTA are strikingly similar in their phrasing and structure. To avoid this staringly obvious fact, Defendants argue that Congress could not have meant what it said.  They are mistaken.

Defendants accept that Amtrak has quick-take powers under 49 U.S.C. § 24311(b).  (ECF No. 83 at 9).  To sidestep that statute's application here, they argue, first, that there is no precedent applying § 24311(b) to grant Amtrak possession and thus the required analysis for the Court to apply is unknown.  (ECF No. 83 at 36).  But the three cases they cite involving Amtrak's condemnation statute do not refute Amtrak's right to possession here: in those cases, Amtrak either waited to take possession, or the parties agreed to transfer possession to Amtrak.  None of those cases support Defendants' position that Amtrak must wait until the lawsuit is over to receive possession of the property it now owns.

Second, Defendants' position that transferring possession now is unprecedented ignores the ample precedent under the DTA. Rather than engage with the undue hardship test well defined in case law, Defendants seek to distinguish the DTA on the grounds that Amtrak is not the federal government. That argument ignores that the language and structure of the two statutes are the same, and Defendants have no response to the canon of statutory interpretation that language used across statutes addressing related subject matters should be construed the same.  (ECF No. 72-1 at 5-6).  Likewise, Defendants do not dispute that Amtrak's statute is more similar to the DTA than the Natural Gas Act ("NGA"):  Amtrak's statute provides quick-take provisions, while the NGA does not, because Congress concluded that intercity rail transportation condemnations warranted urgency.  (ECF No. 72-1 at 5 (citing *E. Tenn. Nat. Gas Co. v. Sage*, 361 F.3d 808, 822 (4th Cir.

3

2004)).  The choice to structure Amtrak's authority like the DTA—and not like the NGA—is a Congressional choice presumed to be intentional, *see Department of Homeland Security v. MacLean*, 574 U.S. 383, 391 (2015)—something, again, to which Defendants have no answer.

Because Defendants cannot dispute these points, they claim Amtrak's condemnation statute must be construed differently because the federal government "commits itself to pay the full amount of any eventual condemnation award." (ECF No. 83 at 4, 38).  But this is no distinction at all: "commitment" in the DTA is made through a provision for a deficiency judgment—which Congress also provided for in Amtrak's condemnation statute.  *Compare* 40 U.S.C. § 3114(c)(3) (stating that a "[d]eficiency judgment" is to be rendered against the government if the amount awarded is more than the amount deposited), *with* 49 U.S.C. § 24311(b)(4) ("If the [compensation] award is more than the amount received, the court shall enter judgment against Amtrak for the deficiency.").[3]  The two statutes provide identical protection; in each, condemnees are entitled to a deficiency judgment with interest.  The statutory text and structure demonstrate, once again, that Congress intended the two statutes to be construed similarly.

Accordingly, so long as Amtrak has met the statutory requirements for quick-take possession, possession must be awarded.

**B. Amtrak Has Met the Prerequisites for the Exercise of its Quick-Take Powers.**

Amtrak has met the simple and straightforward requirements for the use of its congressionally granted powers: It has filed an appropriate declaration of taking and has deposited $250 million (the amount of its appraisal) with the Court.  Defendants' arguments to the contrary

---

[3] Furthermore, the premise of Defendants' argument is incorrect:  The federal government's resources are not infinite either, which is why the DTA cautions the government not to file a condemnation action unless it is believed that the "ultimate award probably will be within any limits Congress prescribes on the price to be paid."  40 U.S.C. § 3115(a).

stray from the statutory text and must be disregarded.

### 1. There Is No Separate Requirement to Prove Financial Solvency Apart from the Declaration of Taking and Deposit, Which Amtrak Has Satisfied.

Defendants seek to engraft additional requirements upon the Declaration of Taking, arguing: (1) that it should have been signed by a different individual; and (2) that Amtrak must plead and prove that it has financial resources to pay what *Defendants* claim is the "fair market value" of the Subject Property Interest. Defendants admit that Amtrak's statute does not require a particular individual to sign Amtrak's Declaration (ECF No. 83 at 40). Neither does any statutory nor pleading requirement mandate Amtrak produce proof as to its financial resources in its Declaration of Taking.

Defendants argue that the introductory phrase of Section 24311(a)(1) that reads, "[t]o the extent financial resources are available," should be read to require proof. But that phrase cannot do what Defendants want. The language appears in the section concerning Amtrak's "General [A]uthority" and means only that if Amtrak wishes to "acquire" property by eminent domain, it must pay for it. *See* 49 U.S.C. § 24311(a). It does not mean that a court must assess Amtrak's financial solvency before transferring possession. Such interpretation is inconsistent with the statutory text, structure, and purpose of 49 U.S.C. § 24311.

First, Congress drafted Amtrak's condemnation statute with clear predicates for a transfer of title and possession—and those do not include any "proof" requirement related to Amtrak's ability to pay a final judgment. In § 24311(b)(1), Congress stated what Amtrak must do to obtain title: initiate a civil action, file a declaration of taking, and deposit "an amount of money *estimated in the declaration to be just compensation*" with the court. Then, in § 24311(b)(2), Congress stated that *when the declaration is filed and the deposit is* made, title transfers to Amtrak and the court determines the terms and conditions for awarding possession. Neither subsection contains a

requirement that the court determine what financial resources are available to pay a final judgment. If Congress intended such a requirement, it would have included it in 49 U.S.C. § 24311(b), where it included the other predicates to a transfer of possession. It did not. And "[j]ust as Congress' choice of words is presumed to be deliberate, so too are its structural choices." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013).

Second, Congress structured Amtrak's condemnation proceedings so that just compensation is determined at the *end*, when judgment is awarded, not at inception. *See* 49 U.S.C. § 24311(b)(3) ("After a hearing, the court shall make a finding on the amount that is just compensation for the interest in the property and enter judgment awarding that amount and interest on it."). Defendants' reading would reverse that, requiring the Court decide at the outset whether Amtrak could pay a final judgment. That is not the statute Congress wrote.

Third, Congress acknowledged that the amount Amtrak deposits with the court at the outset of the case may be less than ultimately needed. That is precisely why it provides that the condemnee receive interest at six percent (6%), "computed on the amount of the award less the amount deposited in the court from the date of taking to the date of payment." *Id.* Congress's purpose is clear: allow Amtrak to use quick-take procedures to secure possession, while also protecting the condemnee's interest in fair compensation. Providing interest—which over a multi-year litigation can be substantial—deters Amtrak from depositing an intentionally low amount. Amtrak deposited the amount of its appraisal—an appropriate deposit for the Subject Project Interest, notwithstanding the self-interested assertions of Mr. Rebibo.[4]

---

[4]     Despite its artful phrasing to suggest so, Mr. Rebibo's Declaration does not establish that the value of the Subject Property Interest is greater than $250 million—or that Amtrak knew it was. He says the Bank purchased the "Mortgage Loan" for $358 million, but states that the Bank paid this amount "to protect its position"—not that it was based on any determination of appraised value of the Station (ECF No. 83-10 at ¶ 15). And the newspaper article Mr. Rebibo references valuing

Accordingly, this Court need not evaluate what "financial resources are available" to transfer possession. Amtrak has filed the requisite Declaration of Taking and deposited the amount estimated in the declaration as just compensation, so possession should be transferred now. Defendants have all the protection they need: if the final judgment proves to be larger than the amount deposited, they will either receive that amount *with interest* on the difference,[5] or if the taking is found to be without authority, the condemnation will be reversed.

### 2. The Court Should Not Postpone the Transfer of Possession to Resolve Defendants' Objections to Amtrak's Authority for the Ultimate Taking.

Defendants next argue that the Court should delay deciding possession until their objections to the taking are resolved. (ECF No. 83 at 38-39). But the cases they cite for that proposition support Amtrak—they show that the narrow circumstances needed to delay a transfer of possession under the DTA's test are not present here.

*Catlin v. United States*, 324 U.S. 229 (1945), set the rule: A condemnee may challenge the validity of a taking after possession has been awarded. *Id.* at 243. And *Loughran v. United States*, 317 F.2d 896 (D.C. Cir. 1963), sets the exception: only in the rare circumstance where the condemnee would have no remedy to undo the taking does the court assess validity at the same

---

Washington Union Station at more than $800 million, (*Id.* ¶ 14), describes an S&P report stating that: "Our estimate of long-term sustainable value is 70.8% lower than the [unnamed] appraiser's valuation"—a number remarkably close to Amtrak's $250 million appraisal. Kevin Sun, *Ashkenazy's D.C. Union Station Loan in Default after Missing Deferred Payment*, The Real Deal (May 20, 2021 2:00 P.M.), https://therealdeal.com/2021/05/20/ashkenazys-d-c-union-station-loan-in-default-after-missing-deferred-payment/. Finally, while Mr. Rebibo claims he told Amtrak about a recent appraisal "at more than $700 million," (ECF No. 83-10 ¶ 14), he does not say that he actually provided this appraisal to Amtrak.

[5]    Amtrak's ability to pay should not be in doubt, as evidenced by Amtrak's publicly available audited financial statements, *National Railroad Passenger Corporation and Subsidiaries (Amtrak) Consolidated Financial Statements, Years Ended September 30, 2021 and 2020* (2021), https://bit.ly/3RDCGWv. *See also Federal Grants to Amtrak*, U.S. Dep't of Transp., Fed. R.R. Admin., https://railroads.dot.gov/grants-loans/directed-grant-programs/federal-grants-amtrak (last updated Mar. 31, 2022).

time it decides possession. *Id*. at 898.  In *Loughran*, the property was to be transferred to the IMF, which is immune from judicial process.  *Id.*; *see also WMATA v. One Parcel of Land in the District of Columbia Vestry of Rock Creek Parish*, 514 F.2d 1350, 1351-52 (D.C. Cir. 1975) (per curiam) (allowing interlocutory appeal where taking was only to drill borings during a 30-day period that would have long ended if review were delayed after possession was transferred).  The exception is thus narrow:  possession may only be delayed "if special circumstances make it impossible to undo an improper taking by appeal after final disposition of the entire proceeding."  15B Charles Alan Wright et al., *Federal Practice & Procedure* § 3914.33 (2d ed. 1992).  That is not this case, and Defendants do not claim it is.  Here, possession may be awarded to Amtrak while the rest of the condemnation case is litigated.

### C.  Defendants Have Not Shown Undue Hardship.

Because Amtrak's quick-take provisions are analogous to those in the DTA, Amtrak must be awarded possession unless the Defendants demonstrate some "undue hardship" of the type that would require a temporal gap before awarding Amtrak possession. *See United States v. 74.57 Acres of Land, More or Less*, No. Civ. A. 12-0239, 2012 WL 1231933, at *2 (S.D. Ala. Apr. 11, 2012).  Defendants never attempt to show that they meet this test.

While not directly addressing the undue hardship test, Defendants, nevertheless, clam that possession should not be awarded because: (1) USI would suffer the loss of a property interest; and (2) the Bank would lose "its consent rights with respect to management of Union Station." (ECF No. 83 at 23-24).  These harms are experienced by *every* owner of property subject to condemnation and *every* lienholder on condemned property, so they cannot prevent possession from transferring.  *See E. Tenn. Nat. Gas Co. v. Sage*, 361 F.3d 808, 829 (4th Cir. 2004) ("[I]n view of the liability of all property to condemnation for the common good, loss to the owner of

nontransferable values deriving from his unique need for property or idiosyncratic attachment to it … is properly treated as part of the burden of common citizenship." (quoting *Kimball Laundry Co. v. United States*, 338 U.S. 1, 5 (1949) (ellipsis in original))).  Indeed, Amtrak now holds title to the Subject Property Interest, so if it is undue hardship to deprive a property owner of possession, then *Amtrak* is experiencing the harm of being deprived possession of *its* property. Because Defendants have not shown undue hardship, possession should be transferred.

## II.    EVEN UNDER THE PRELIMINARY INJUNCTION STANDARD, AMTRAK IS ENTITLED TO POSSESSION.

Defendants argue that Amtrak must meet the standard for a mandatory injunction for possession to transfer.  But Amtrak does not seek an injunction.  Rather, it seeks possession of property to which it already holds title.  The standard for that transfer was prescribed by Congress, and it would be antithetical for this Court to apply a traditional preliminary injunction standard instead.  But even if the Court were to consider Amtrak's right to possession under the preliminary injunction standard, a transfer of possession would be warranted.

If this Court applies the preliminary injunction analysis, it must reject Defendants position that Amtrak seeks a "mandatory injunction" subject to a heightened burden when plaintiffs seek to change the status quo via injunction.  There is no *status quo ante* that Amtrak is trying to change: Amtrak now has title to the Subject Property Interest; the Bank has taken control of USI from Ashkenazy--and neither granting *nor denying* Amtrak possession would maintain the *status quo ante*.

### A.  Amtrak is Likely to Succeed on the Merits.

Defendants try to distract the Court from applying the DTA standard with a laundry list of points challenging the merits of the condemnation itself.  As stated above, these are not relevant to deciding possession.  And if considered in a preliminary injunction analysis, they must be

rejected.

    **1.  Request from DOT**.  Defendants argue that Amtrak can only condemn the Subject Property Interest pursuant to a specific request from the Department of Transportation under 49 U.S.C. § 24311(a)(1)(B). They have no response to Amtrak's arguments that reading the statute this way ignores the statute's use of the disjunctive "or" in § 24311(a)(1), which provides Amtrak has separate authority under § 24311(a)(1)(A) that can also be used here. (ECF No. 72-1 at 9-10).  Indeed, they hedge, not even asserting that their own reading is right, claiming only that the statute is "far from clear." (ECF No. 83 at 26).

    In addition, Defendants' argument ignores the statute's legislative design. Section 24311(a)(1) contains two subparts, each granting condemnation authority. Section 24311(a)(1)(A) focuses on Amtrak, giving it condemnation power to achieve its broad legislative mandate of providing intercity rail passenger transportation.  (*See also* ECF No. 72-1 at 12 n.3 discussing statutory provisions setting forth Amtrak's Congressionally-directed mission).  Section 24311(a)(1)(B) focuses on the Secretary of Transportation's "duty" to build an *intermodal* transportation terminal at Washington Union Station, giving the Secretary independent authority to request that Amtrak acquire property through condemnation for *that* purpose.  Congress thus devised a condemnation statute that both facilitates Amtrak's ability to pursue its mission *and* enables the Secretary of Transportation to call upon Amtrak for assistance.  By including both § 24311(a)(1)(A) and § 24311(a)(1)(B), Congress was expanding, rather than limiting, Amtrak's power of eminent domain, including specifically at Washington Union Station.

    **2. Financial Resources**.  Defendants argue that Amtrak cannot take the Subject Property Interest without sufficient financial resources.  As previously explained, this is not a threshold requirement for possession, and in any case, Amtrak has adequate resources to pay just

compensation—with interest, if needed.

**3. Necessity**. Defendants do not contest Amtrak's need to complete the Subbasement Project or the Concourse Modernization Project, nor do they argue that such projects lack the requisite relationship to intercity rail passenger transportation. Rather, they suggest the Subject Property Interest is not "necessary" for assorted other reasons.

*First*, Defendants contend that Amtrak may only acquire the Subject Property Interest as a last resort to completing these projects—an argument rejected by Judge Cooper in *National Railroad Passenger Corp. (Amtrak) v. 3.44 Acres More or Less of Land and Building located at 900[0] 2nd Street NE, Washington, DC 20002–3557*, 266 F. Supp. 3d 63 (D.D.C. 2017) ("*3.44 Acres More or Less*"). The legal standard for necessity in a condemnation action is that the property must have a "significant relationship" with Amtrak's provision of intercity rail passenger transportation, *not* "absolute, last-resort need." *Id.* at 69-70. Judge Cooper had it right.

*Second*, Defendants argue that Amtrak must now come forward with *evidence* of necessity, complaining that Amtrak has "refused to provide any response to reasonable discovery requests." (ECF No. 83 at 28). This repeated mantra is disingenuous. Before a Rule 26(f) conference, Amtrak has no obligation to produce discovery. *See Am. Action Network, Inc. v. Cater Am., LLC*, 983 F. Supp. 2d 112, 126-27 (D.D.C. 2013). Amtrak's "refusal" to respond to discovery that the Defendants know is premature proves nothing. In any event, Defendants are well familiar with the Subbasement Project and the Concourse Modernization Project—and they do not even dispute that both projects are necessary for the Station's future, a fact confirmed by the Northeast Corridor Commission. (ECF No. 1 ¶ 32 n.20, ¶ 44 n.29).

*Third*, Defendants argue that Amtrak cannot exercise its eminent domain rights because it has not done so in the last fifty years. This point is absurd: there is no statute of limitations on

11

exercising statutory powers.  That Amtrak did not "need" property fifty years ago has no relevance to whether it needs it today.  Neither the Subbasement Project nor the Concourse Modernization Project were contemplated fifty years ago.  As needs and circumstances change, Amtrak makes decisions about property it deems necessary to acquire.  That Congress has not separately passed legislation to give Amtrak control of Washington Union Station (ECF No. 83 at 7-8) is also entirely beside the point:  Congress did not need to do so because it provided Amtrak with condemnation authority, putting Amtrak in the best position to decide when and how it should be used.

*Fourth*, Defendants (who claim not to understand the details of these projects) also contend that Amtrak does not need the entirety of the Subject Property Interest for these projects. This goes too far. Amtrak does not need to demonstrate how it will use every square foot of a property interest for intercity rail passenger transportation.  In *3.44 Acres More or Less*, Judge Cooper rejected the argument that Amtrak might have obtained a lesser interest, such as an easement pre-suit, making a taking not "necessary." 266 F. Supp. 3d at 73.  Where securing something less than the full interest "would not afford Amtrak the necessary flexibility as it continued to expand Union Station," the possibility of a securing a lesser interest "does not undermine the soundness of Amtrak's conclusion or its compliance with § 24311." *Id.*  Here, Amtrak has explained that it will need to place equipment and/or facilities into areas of the Station not currently subleased by Amtrak in order to complete these critical projects and that ownership of the Subject Property Interest would give Amtrak better control over the Station's operations.  That is precisely the sort of "necessary flexibility" that suffices under the statute.

4. **Efforts to Acquire Before Filing Condemnation.**  Defendants also argue that Amtrak's taking is not valid because Amtrak did not take a series of undefined "substantial action[s]" to obtain a property deal before filing suit.  Defendants admit that "[t]he statute does

12

not enumerate what steps or activities are required," but then argue that those steps—whatever they are—must be "substantial."  (ECF No. 83 at 9; *see also* ECF No. 82 at 4 (discussing need for "bona fide negotiations" (quotation marks omitted))).

The Court should reject Defendants' effort to impose an extra-textual "substantial action" requirement or additional showing as to negotiations, which would make condemnation well-nigh impossible.  The Bank and USI admit that Ashkenazy could not accept a $250 million offer (ECF No. 83 at 13), meaning that any negotiations would have been wholly futile.  Moreover, the provisions of 49 U.S.C. § 24311(a)(2) are disjunctive—Amtrak must show that it cannot acquire the interest "by contract" *or* cannot agree with the owner on the purchase price; Amtrak does not have to prove both.  Additional delay to conduct fruitless negotiations are not needed when the parties cannot agree on a price.  *See United States v. 6.584 Acres of Land, More or Less, Hidalgo Cty., Texas*, 533 F. Supp. 3d 482, 499-500 (S.D. Tex. 2021) (holding that, while the government was required to engage in negotiations, it was "sufficient that negotiations proceed far enough to indicate that an agreement is impossible, and, *where it is apparent that the parties cannot agree on the amount to be paid*, a formal effort to agree is not necessary" (quoting *United States v. 1.04 Acres of Land, More or Less, Situate in Cameron Cnty.*, 538 F. Supp. 2d 995, 1012 (S.D. Tex. 2008) (emphasis added))).

Amtrak did exactly what its statute required, and the party then having ownership, USI, refused an invitation to participate in an appraisal walk-through of the Station (ECF No. 72-4), never made a counteroffer to Amtrak (ECF No. 1 ¶¶ 69-72), and never provided Amtrak with any of the additional information requested by Amtrak's offer letter (ECF No. 72-5).  Accordingly, there was nothing left for Amtrak to do but initiate condemnation.

**B.  Amtrak's Lack of Possession Risks Irreparable Harm, and the Balance of Equities and Public Interest Favors Awarding Possession to Amtrak.**

The Northeast Corridor Commission has concluded that completion of the Subbasement Project is "critical" to the Station and that a delay of the state of good repair project would be dangerous. (ECF No. 1 ¶¶ 32, 35, 44; ECF No. 72-1 at 14-15).  Defendants do not dispute this. Nor do Defendants contradict (much less even address) Amtrak's argument that delayed improvements and repairs are irreparable because congestion and safety problems cannot be compensated financially.

Even if the burden of proving irreparable harm rested upon Amtrak, which it does not, Defendants' admissions demonstrate that balancing the harms favors Amtrak. As Mr. Rebibo acknowledges in his Declaration (ECF No. 83-10 ¶ 30), there are no contracts and no permits that allow these projects to move forward.  This is precisely the point: without possession, Amtrak has been, and will continue to be, unable to move forward to make final plans; to obtain necessary approvals and permits; to begin the procurement process for engineers, architects, and contractors for completion of the projects; to apply for grants or financing (to the extent Amtrak determines that this is desirable); and to begin to address the on-site station problems.

The cases cited by the Defendants do not address a situation remotely like in this case.  In *National Parks Conservation Ass'n v. Semonite*, 282 F. Supp. 3d 284 (D.D.C. 2017), the plaintiffs sought to enjoin, rather than complete, a construction project that had not yet begun.  Likewise, in *Fisheries Survival Fund v. Jewell*, 236 F. Supp. 3d 332 (D.D.C. 2017), the plaintiffs sought to halt the sale of land that would, years later, be used to construct a wind energy facility. In both cases, deferring judicial relief until later in the proceedings would have no effect, either way, on the relevant project.  Here, the opposite is true:  delay *will* prevent Amtrak from proceeding with important safety projects, while transferring possession now will facilitate those projects.  Amtrak

should not have to continue to delay these needed projects or risk the dangers that this delay brings. (*See* ECF No. 72-1 at 14-15).

Defendants offer that there is ample time for the projects to be completed and that no harm could possibly come from waiting.  Amtrak wishes the future could be so sure.  The Northeast Commission Report mentions the possibility of a collapse of the Station's subbasement without prompt repair. (ECF No. 72-1 at 14-15 & n.5).  Passengers are being inconvenienced daily and significantly hindered in their traveling needs due to the limited concourse space.

Finally, USI asserts that it "has a constitutional interest in not being deprived of its property without payment of just compensation or irrevocable assurance of payment of that compensation." (ECF No. 83 at 34).  This argument is a red herring.  Amtrak agrees, as the law provides, that parties with an interest in the Subject Property Interest are entitled to payment of just compensation as determined by this Court's final judgment.  But that compensation need not be paid before a transfer of possession, as the DTA cases demonstrate.

## III.    CONCLUSION

The Court should grant Amtrak immediate possession.

Respectfully submitted,

COUNSEL FOR PLAINTIFF NATIONAL RAILROAD
PASSENGER CORPORATION

Dated: October 24, 2022

/Patricia McHugh Lambert
Patricia McHugh Lambert, US DC Bar ID MD0008
Kambon R. Williams, US DC Bar ID MD29872
PESSIN KATZ LAW, P.A.
901 Dulaney Valley Road, Suite 500
Towson, MD  21204
Telephone: 410-938-8800
Fax: 410-832-5650
plambert@pklaw.com

15

kwilliams@pklaw.com


/Lindsay C. Harrison
Lindsay C. Harrison, DC Bar #977407
Jessica Ring Amunson, DC Bar #497223
JENNER & BLOCK, LLP
1099 New York Avenue, NW, Suite 900
Washington, D.C. 20001-4412
Telephone: 202-639-6000
Fax: 202-639-6066
lharrison@jenner.com
jamunson@jenner.com