**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---------------------------------------------------------------- X

NATIONAL RAILROAD PASSENGER
CORPORATION (AMTRAK),

        Plaintiff,                                No. 1:22-cv-01043(APM)

        v.

SUBLEASE INTEREST PERTAINING TO
DESCRIBED LEASEHOLD INTERESTS
AT WASHINGTON UNION STATION, et al.

        Defendants.

---------------------------------------------------------------- X

**LENDER'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
IN OPPOSITION TO AMTRAK'S MOTION FOR IMMEDIATE POSSESSION**

MORRISON COHEN LLP
Y. David Scharf
Brett Dockwell
Kristin T. Roy
Latisha V. Thompson
Amber R. Will
Mahnoor Misbah
*Admitted pro hac vice*
909 Third Avenue
New York, New York 10022
(212) 735-8600

HOLLAND & KNIGHT LLP
Paul J. Kiernan
Louis J. Rouleau
800 17th Street N.W.
Suite 1100
Washington, D.C. 20006
(202) 663-7276

*Attorneys for Defendant Kookmin
Bank Co., Ltd.*

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES .................................................................................................iii

FINDINGS OF FACT...................................................................................................... 2

   A.   Amtrak Seeks Possession of a Leasehold Position Created by the
United States. .......................................................................................... 2

   B.   Amtrak's Claimed Need for Immediate Possession is Pretextual......................... 6

      a.   Both the Subbasement and Concourse Modernization Projects
are Years Away From Construction. ............................................................... 6

      b.   USI has Cooperated With Amtrak Requests Regarding Projects,
Has Not Been the Cause for Improper Delay, and is Not an Impediment........ 9

      c.   Amtrak Lease Allows Amtrak To Proceed With Projects.............................. 11

   C.   Amtrak's Requests Raised for the First Time at the Hearing can be
Accomplished Without Changing Possession of the Leasehold Interest............. 12

   D.   Amtrak's Plans for Possession Would Fundamentally Alter
Use of Historic Station and Would Decimate the Value of the Property. ........... 14

   E.   WUS's Governance Structure Resembles Other Stations With Amtrak............. 17

   F.   Amtrak is Unprepared To Take Possession. ....................................................... 18

   G.   Amtrak's Offer To Purchase Sought To Capitalize on a
"Unique Opportunity."................................................................................. 19

CONCLUSIONS OF LAW ......................................................................................... 22

   I.   Amtrak has not Demonstrated an Immediate Need for Possession
Prior to a Ruling on Whether Amtrak has Authority To Condemn Leasehold
Interest........................................................................................................ 22

CONCLUSION.......................................................................................................... 236

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Empresas Calbevision, S.A.B. de C.V. v. JPMorgan Chase Bank N.A.*,
  680 F. Supp. 2d 625 (S.D.N.Y. 2010), *aff'd and remanded*, 381 Fed. Appx.
  117 (2d Cir. 2010) ................................................................................................. 25

Nat'l R.R. Passenger Corp. v. 3.44 Acres More or Less of Land & Bldg. located
  at 900 2nd St. NE, Washington, DC 20002-3557, 266 F. Supp. 3d 63, 69
  (D.D.C. 2017) ........................................................................................................ 23

*Pantaja v. Martinez*,
  567 F. Supp. 3d 76 (D.D.C. 2021), *aff'd*, 21-7118, 2022 U.S. App. LEXIS
  7977 (D.C. Cir. Mar. 25, 2022) ............................................................................. 23

*Patriot-BSP City Ctr. II v. U.S. Bank Nat. Ass'n*,
  715 F. Supp. 2d 91 (D.D.C. 2010) ......................................................................... 25

**Statutes**

40 U.S.C. § 101 ............................................................................................................ 3

40 U.S.C. § 811 ............................................................................................................ 3

40 U.S.C. § 815 ............................................................................................................ 4

40 U.S.C. § 6901 .......................................................................................................... 3

40 U.S.C. § 6903 .......................................................................................................... 4

49 U.S.C. § 24311 ................................................................................................. 23, 24

Legislative History of the Union Station Redevelopment Act of 1981: P.L. 97-
  125, 95 Stat. 1667, December 29, 1981 (1981) ................................................... 3, 6

**Other Authorities**

Amtrak, MAJOR PROGRAMS: Company Improved Management of New Acela
  Program, but Additional Delays and Cost Increases are Likely,
  https://amtrakoig.gov/sites/default/files/reports/OIG-A-2023-
  013%20%28REDACTED%29_v2.pdf (last visited on Oct. 10, 2023) ................... 14

Ashkenazy Acquisition, South Station Boston,
  http://www.aacrealty.com/portfolio/south-station-boston (last visited Oct. 10,
  2023) ...................................................................................................................... 18

U.S. Department of Transportation, Center for Innovative Finance Support,
https://www.fhwa.dot.gov/ipd/project_profiles/ny_moynihan_train_hall.aspx
(last visited Oct. 10, 2023) .........................................................................................................18

Amtrak is seeking immediate possession of Union Station Investco's ("USI") leasehold interest at Washington Union Station ("WUS" or the "Station") (the "Leasehold Interest")—an interest that was created by the United States at Congressional direction, that was awarded to a private developer by the United States 40 years ago, and that the United States explicitly withheld from Amtrak. What was already an unprecedented taking has been strained a step further as Amtrak demands the transfer of possession before the Court has adjudicated the validity of the defenses to condemnation, including that Amtrak is without authority to take this property and that Amtrak did not meet the statutory requirements for the exercise of eminent domain. There is no reported precedent for a court granting possession to Amtrak absent the consent of the owner when the owner is challenging Amtrak's authority.[1] Based on updated research, there also appears to be no precedent for Amtrak exercising eminent domain to acquire an interest in a federal property or in a contract established by the Federal Government for the operation of property that the Government owns.

The record developed during discovery and at the evidentiary hearing puts the lie to the dramatic allegations of the Complaint and Amtrak's motion about the alleged need for unprecedented immediate possession. The Leasehold Interest has been in existence for almost 40 years without impeding Amtrak's mission. The Station's projects that Amtrak alleges require immediate possession to implement are in fact planned, designed, and being implemented on the understanding that USI's Leasehold Interest remains in place. Union Station Redevelopment Corporation ("USRC") confirmed that the Leasehold Interest is not "the problem"; Amtrak's CEO conceded that USI as Amtrak's landlord is not "the problem." Amtrak has not even asserted that USI has breached its lease. Far from needing the Leasehold Interest for provision of passenger rail service

---

[1] *See* Joint Opposition to Motion for Immediate Possession (ECF Doc. No. 83 at 36).

within the meaning of its limited statutory authority, Amtrak filed suit because it would like to be the master tenant of the Station. That is a status that Amtrak has coveted for years but that Congress denied it 40 years ago and neither the United States nor USRC invited it to assume.

The record developed through discovery and presented at the hearing makes clear that, if granted immediate possession, Amtrak would seek to implement changes to the Station that would decimate its value, materially harm USI's and Lender's interests, be inconsistent with Congressional direction about this federal property, and harm the community that patronizes and supports the Station.[2] Lender and USI face the risk of irreparable harm if Amtrak is allowed to start modifying the operation and mission of the Station before its entitlement to take is even determined, and it would be an unfair burden on Lender and USI to be asked to step aside and then possibly step back in after Amtrak has made the changes it has now proposed.

Even assuming that Amtrak will eventually be found to have the statutory authority to take the Leasehold Interest, the record demonstrates that Amtrak will not suffer any harm by USI continuing possession until that determination is made. Because it is not likely that Amtrak will ultimately prevail that it has the authority and has exercised it consistently with the statute, it should not be granted immediate possession of the Leasehold Interest.

## FINDINGS OF FACT

### A.  Amtrak Seeks Possession of a Leasehold Position Created by the United States

1.      Amtrak seeks to acquire "the property interest that USI obtained from USVII [Union Station Venture II, LLC] by an Assignment and Assumption of Leasehold Interest made as of

---

[2] "Lender" refers to Defendant Kookmin Bank Co., Ltd., individually ("Kookmin") and in its capacity as trustee ("Trustee") of KTB CRE Debt Fund No. 8, a Korean Investment Trust (the "Trust"), by its agent on behalf of the Trust in Korea, Daol Management Co. ("Daol"), and by its agent on behalf of the Trust in the United States, Rexmark Holdings LLC d/b/a "Rexmark."

January 25, 2007." (ECF Doc. No. 4, at 3, Ex. 1.) USI remains in current possession of the Lease-hold Interest. (Lender's Ex. 12.)

2. The Leasehold Interest was created by federal action. In 1981, Congress passed the Union Station Redevelopment Act, then-codified at 40 U.S.C. § 811 et seq. (the "Act").[3] The Act reflected Congress's decision about how and by whom the Station was to be owned, developed, and operated. Congress voted to transfer responsibility for the Station to the Department of Transportation ("DOT"). Congress further directed the Secretary of Transportation to provide for the rehabilitation and redevelopment of the Union Station complex as a multiple-use transportation terminal and as a commercial complex, in accordance with the following goals:

> (a) Preservation of the exterior façade and other historically and architecturally significant features of the Union Station building;
>
> (b) Restoration and operation of a portion of the historic Union Station building as a rail passenger station, together with holding facilities for charter, transit, and intercity buses in the Union Station complex;
>
> (c) Commercial development of the Union Station complex that will, to the extent possible, financially support the continued operation and maintenance of such complex; and
>
> (d) Withdrawal by the Federal Government from any active role in the operation and management of the Union Station complex as soon as practical and at the least possible expense consistent with the goals set forth in subsections (a) through (c) of this section.[4]

Congress authorized the Secretary of Transportation to enter into contracts with developers for the rehabilitation and redevelopment of Union Station and agreements regarding the acquisition,

---

[3] The current Act is codified at 40 U.S.C. § 6901, et seq.

[4] Union Station Redevelopment Act of 1981, 40 U.S.C. § 812, Pub. L. 97–125, §3(3), Dec. 29, 1981, 95 Stat. 1668. This quoted section was repealed during a 2002 recodification but, as noted in the 2002 legislation itself, the repealer concerned "obsolete, superfluous, and superseded provisions," and the recodification "makes no substantive change in existing law and may not be construed as making a substantive change in existing law." Note preceding 40 U.S.C. § 101. In any event, the Leasehold Interest was created under these provisions long before the repealer.

conveyance, or lease of the property. 40 U.S.C. § 815. The Secretary was further authorized to "enter into such other agreements and contracts, except any agreement or contract to sell property rights at the Union Station complex, with such persons, corporations, financial institutions, Federal, regional, or local agencies, or the Architect of the Capitol as the Secretary of Transportation deems necessary or desirable to carry out the purposes of this subtitle," with any such agreement being "made assignable to a selected developer or developers of the Union Station complex." 40 U.S.C. § 815(d), now codified at 40 U.S.C. § 6903.

3.      Pursuant to these statutory directives, the parties entered into interlocking leases dated as of October 31, 1985: (1) DOT leased Union Station to USRC (Lender's Ex. 8, the "DOT-USRC Lease"); and (2) USRC subleased to Union Station Venture Ltd ("USV") (Lender's Ex. 17). As the leases recite, the Secretary of Transportation chose USV as the developer-tenant and created the structure that included the Leasehold Interest. (Lender's Ex. 8 at 2; Lender's Ex. 17 at 1-2.) The United States directed USRC to enter into the lease with USV, with the sublease attached as an exhibit to the DOT-USRC Lease. (Lender's Ex. 8 at 14, § 7.1(c), and referenced Ex. J.)

4.      The United States directed that, when the renovated Station reopened, "USRC shall, through its sublease with USV, authorize USV to use the Project, and to permit the Project to be used, only as a multiple use passenger rail station and commercial complex and for related purposes." (Lender's Ex. 8 at 24, § 11.1.) The lease required USV to "maintain and operate the retail portion of the Project primarily for retail uses." (*Id.* at 26, § 11.3(c)(ii).) The United States, as owner and prime landlord, maintained control over the lesser interests and estates derived from its

4

ownership and the DOT-USRC Lease. (*See, e.g.*, *id.* at 57 (USRC cannot sell or assign its lease interest or estate without prior written consent of the FRA).)[5]

5.      The DOT-USRC Lease also required USRC to direct USV to enter into the Amtrak Train Station Lease for space to be leased by Amtrak for its rail and rail passenger operations: "On or before January 31, 1986, USRC shall obtain a binding commitment from Amtrak to enter into a lease agreement with USV pursuant to which Amtrak will lease a portion of the Project for use in Amtrak's rail and rail passenger operations." (Lender's Ex. 8, § 8.2.) The required terms for the Amtrak Train Station Lease were set forth in the USRC-USV sublease and specifically referenced in the DOT-USRC Lease. (*Id.*)[6]

6.      Under the lease structure authorized by Congress and directed by the Secretary of Transportation, Amtrak was intended to be a space tenant (subtenant) at the Station, not the operator or developer. It is worth noting that during the hearings preceding the Act, Amtrak asked Congress to put Amtrak in charge as the master tenant and developer—a position that Congress rejected when it put the Secretary of Transportation in charge of Union Station and authorized the Secretary to implement the redevelopment.[7]

---

[5] The United States reserved to itself the right to enter into a lease directly with Amtrak so the lease would come between DOT and USRC in the stack of leases, but, in that event, the terms of the USRC and USV leases would nevertheless remain in place and USV would continue to have its right to quiet enjoyment. (Lender's Ex. 17 at 58, § 20.5.) The United States has never exercised this right, but the existence of the right undermines Amtrak's assertion that it has the unilateral right using eminent domain to remake the lease structure established by the Federal Government.

[6] Not only did the structure created by DOT limit Amtrak's space in the Station, but at that time DOT even limited the uses to which Amtrak could purpose the space. (*See, e.g.*, Lender's Ex. 4 at 37-38, 50-52 (Amtrak prohibited from using its space for retail stores "or any other revenue producing purpose whatsoever other than the provision of railroad transportation services").)

[7] M.L. Clark Tyler, Amtrak's Group Vice President, testified before the Senate's Subcommittee on Surface Transportation in support of the position that "one needs a lead player to deal with and as few Government players as one can assemble":

> I think that in terms of Amtrak's own view, we are equipped to be that
> lead player, and can, indeed, assemble what it takes . . . . Amtrak offered last

**B. Amtrak's Claimed Need for Immediate Possession is Pretextual**

    **a. Both the Subbasement and Concourse Modernization Projects are Years Away From Construction.**

7.    While the Complaint alleges that Amtrak "needs the Subject Property Interest in order to accomplish the Subbasement Project" (ECF Doc. No. 1 at ¶ 32) and implement the Concourse Modernization Project (*id.* at ¶ 45), and the motion for immediate possession includes the same points (ECF Doc. No. 72-1 at 1-2), the record shows that these projects have been planned and are being pursued with the Leasehold Interest remaining in USI's ownership and that USI's ownership has not adversely affected Amtrak's ability to proceed.

8.    Both the Subbasement and Concourse Modernization Projects anticipated having Amtrak in the subtenant position throughout the projects' executions. (Gardner Tr. 108:13-15, 22-25; Kostura Dep. Des. 11:3-12:13.) The internal status reports for both projects did not assume Amtrak had possession of the Leasehold Interest. (Kostura Dep. Des. 121:8-10 (referring to Lender's Ex. 2).)

9.    For its part, USRC "anticipated the current lease structure" would be in place to accomplish the Subbasement and Concourse Modernization Projects. (Swaim-Staley Tr. 244:13-

---

summer to assume managerial responsibility for maintaining the building and that offer still stands. Amtrak, representing the interest of the users of the building, the District of Columbia, and the Federal government, would seek a private developer to undertake commercial development of the unused portions of the building . . . . As the major tenant with established real estate experience, Amtrak believes that it is in the best position to bring about the successful transportation and commercial development at Washington Union Station.

Legislative History of the Union Station Redevelopment Act of 1981: P.L. 97-125, 95 Stat. 1667, December 29, 1981 (1981), Hearing Before the Subcommittee on Surface Transportation of the Committee on Commerce, Science, and Transportation, U.S. Senate, First Session on Repair and Future of Union Station, April 30, 1981, Serial No. 97-31, at 8 (testimony of M.L. Clark Tyler); *Id.* at 12-13 (written statement of Tyler).

20.) Indeed, USRC has not advocated for a change to the leasehold and governance structure from the 1980s Congressional design. (Swaim-Staley Tr. 264:18-22.) The governance structure for the Station "had been established with the approval of Congress and USDOT, with these entities working together, which allows for a variety of stakeholders . . . and it was simply the structure that had been set up and has been operating since the late 1980s, where you have USDOT, then FRA, USRC, the developer, Amtrak." (Swaim-Staley Tr. 220:19-221:2.)

10.     The Subbasement Project provides for the "[r]eplacement of existing degraded bridging structure within the First St. tunnel to a state of good repair" and includes the relocation of subbasement utilities to facilitate that repair work. (Lender's Ex. 3 at 5.) The Subbasement Project was created in approximately 2013 after USRC "discovered that there were serious issues with the supporting structures for the track bed that were located within the subbasement." (Swaim-Staley Tr. 224:1-15.)

11.     The Concourse Modernization Project includes the "[r]enovation and expansion of Claytor Concourse [to] increase passenger space and provide new amenities including restrooms, expanded Metropolitan Lounge, seating and boarding gates." (Lender's Ex. 3 at 5.) The Concourse Modernization Project was a "major emphasis" in the 2nd Century Plan, having been planned since 2012. (Swaim-Staley Tr. 225:14-19.)

12.     There is nothing structurally in the USRC-USI lease that prevented Amtrak from doing the work on the Concourse Modernization Project. (Swaim-Staley Tr. 228:5-11.)

13.     Amtrak must obtain approval from the Federal Railroad Administration ("FRA") as the authority having jurisdiction (the "AHJ") in order to build the Subbasement and Concourse Modernization Projects. (Gardner Tr. 62:17-18; Swaim-Staley Tr. 218:7-9.) Once the project

design is approved from a code standpoint, the AHJ can issue a building permit. (Swaim-Staley Tr. 218:3-20.)

14.     As of April 23, 2023, Amtrak's internal status report indicated that the Subbasement Project Utility Relocation project (part of the Subbasement Project) was only 5% complete and remained in the "Planning" phase. (Lender's Ex. 2, at 1; Gardner Tr. 132:13-15.) As of May 31, 2023, Amtrak's Gretchen Kostura confirmed that the internal status report accurately reflected the current status of the project. (Kostura Dep. Des. 85:8-17.)

15.     The same status report indicated that the Subbasement Structural Replacement project (also part of the Subbasement Project) was only 15% complete and remained in the "Planning" phase. (Lender's Ex. 2, at 11; Gardner Tr. 134:11-13.) During discovery and as of May 31, 2023, Amtrak confirmed that the internal status report accurately reflected the current status of the project. (Kostura Dep. Des. 100:18-20.)

16.     The construction for the Subbasement Project (what USRC referred to as the "Trackbed") was listed as "significantly delayed" as of May 25, 2022, with the "Final Design" marked "Not Started." (Lender's Ex. 28 at 3, lines 55-58.)

17.     Stephen Gardner, Amtrak's CEO, conceded that Amtrak has yet to secure bids for construction of the Subbasement Structural Replacement part of the project and that construction is "not even scheduled to be shovel ready until after August of '24." (Gardner Tr. 136:2-11.)

18.     Designs for the Concourse Modernization Project were submitted for review in 2018, but the AHJ rejected the designs because they were "insufficient to determine whether or not [the project] was buildable." (Swaim-Staley Tr. 227:13-19.) Obtaining "a building permit is . . . the first hurdle to get through, so it didn't get that far." (Swaim-Staley Tr. 244:1-4.)

19.     In 2020, FRA requested USRC to take over the design work on the project. (Gardner Tr. 126:19-21; Swaim-Staley Tr. 228:1-4.) Amtrak then reclaimed responsibility for delivering the project in August 2021, which required the project to restart. (Gardner Tr. 126:22-24.)

20.     Beverley Swaim-Staley, CEO of USRC at the time the condemnation lawsuit was filed, confirmed that the Concourse Modernization Project "was still waiting upon decisions about the project delivery method" in 2022, meaning that it was still "in a predesign phase." (Swaim-Staley Tr. 236:16-21.) Amtrak had yet to submit a design to the AHJ for approval. (Swaim-Staley Tr. 227:2-8.) Amtrak's lack of a design for the Concourse Modernization Project "was so frustrating" because it prevented the stakeholders, including USRC, from proceeding with the project. (Swaim-Staley Tr. 254:13-15.)

21.     In project-tracking spreadsheets maintained by FRA, all of the Concourse Modernization Project work stalled in the "Pre-Design" task with "Project Execution" tasks "Not Started" as of May 25, 2022. (Lender's Ex. 28 at 4, lines 1-14, 20-26.)

22.     As of April 23, 2023, Amtrak's internal status report indicated that the Concourse Modernization Project was only 10% complete and remained in the "Planning" phase. (Lender's Ex. 2 at 4.) The earliest construction date for the "Main Claytor Concourse Refurbishment" is slated for January 30, 2025. (*Id.* at 5.)

>    **b. USI has Cooperated With Amtrak Requests Regarding Projects, Has Not Been the Cause for Improper Delay, and is Not an Impediment.**

23.     During the process for project approval, "[t]he first step would have been meeting building codes, and then both USRC and USI would have had an opportunity—would have needed to approve the project before it proceeded." (Swaim-Staley Tr. 256:20-23.) "There are certain aspects of the various projects that require collaboration with USI, but there is not [] anything that [Amtrak is] unable to do as a result of USI." (Swaim-Staley Tr. 299:6-9.)

9

24.     Although Gardner said that Amtrak wanted to "take that layer of sort of interlude between USRC and Amtrak by getting control of the lease of the head house so that [Amtrak] would have a direct relationship with USRC" (Gardner Tr. 57:22-25), the record belies the assertion that the Leasehold Interest creates a "layer" that affects the relationship between USRC and Amtrak. Dennis Newman sits on the USRC Board as the Amtrak representative and routinely communicates with USRC. (Newman Tr. 193:11-12.) Swaim-Staley confirmed that Amtrak and USRC "worked together on many, many projects from signage, wayfinding, to the major projects like the concourse." (Swaim-Staley Tr. 221:5-8.) With regard to the Concourse Modernization Project, Amtrak and USRC were meeting weekly along with USI—not through USI as a layered communication. (Swaim-Staley Tr. 228:14.)

25.     Internal Amtrak documents detail how USRC and Amtrak itself have been the source of delays. (Lender's Ex. 1 at 6 (attributing five "roadblocks to project implementation" to USRC); Lender's Ex. 3 at 11 (noting Amtrak updated design "despite very little advancement in the project by USRC"); *id.* at 14 (blaming USRC for the lack of "adequate project management resources to deliver the project"); Lender's Ex. 28 at 1-2, 4 (listing Amtrak as "Responsible Party" for items with "Action Needed" under "Status").)

26.     Amtrak does not "blam[e] USI for not giving it approvals." (Gardner Tr. 63:5-7.)

27.     Amtrak has not issued a default notice to USI for not fulfilling its lease obligations regarding construction or the projects. (Barry Tr. 305:8-14.)

28.     According to the weekly project tracker sheets maintained by the FRA, there were no projects listed as of May 25, 2022, that required USI approval to move forward. (Swaim-Staley Tr. 233:3-4; Lender's Ex. 28.)

29.     Since taking over USI management in June 2022, Lender has worked collaboratively with all the stakeholders, including Amtrak. (Rebibo Tr. 278:20-25.) USI has not "objected to, delayed, or otherwise impeded Amtrak's ability to proceed" with either the Subbasement or Concourse Modernization Projects. (Barry Tr. 300:14-17; 302:2-4.) All requests that had been brought to USI's attention by Amtrak had been approved since Lender took over USI management. (Rebibo Tr. 279:11-17.) "[T]here's been no discussion with Rexmark and Amtrak where there's been an impediment to getting any work done." (Rebibo Tr. 290:17-20.)

30.     For example, Amtrak expected to "tie in the fire life safety systems constructed by the Track 22 Reconstruction Project to WUS building systems" after transfer of possession because the fire pump system was not part of Amtrak's subleased area. (JX 4 at 18; Rebibo Tr. 299:17-21.) But after Lender took over USI management, USI worked with Amtrak to move forward with the project under the current leasing structure. (Rebibo Tr. 279:5-10; 299:22-25 ("[N]o more than a five-minute conversation, where we provided [Amtrak] with approval to do that.").)[8]

31.     USI has also worked with Amtrak to relocate some of Amtrak's security back-of-house in the basement. (Rebibo Tr. 279:5-10; 300:1-4.)

### c.  Amtrak Lease Allows Amtrak To Proceed With Projects

32.     Nothing in the Leasehold Interest structure prevents Amtrak from moving forward with the Subbasement and Concourse Modernization Projects. (Swaim-Staley Tr. 227:9-12; 228:5-8; Rebibo Tr. 290:11-15.)

33.     The Amtrak sublease allows Amtrak to take additional space for its projects or expansion, which Amtrak has successfully done in the past. (Gardner Tr. 138:7-14; Rebibo Tr.

---

[8] Although Gardner testified that "Track 22 is essentially complete" at the hearing (Gardner Tr. 105:11), it became evident after the hearing that Amtrak has yet to submit aspects of the fire alarm work and associated drawings to the AHJ for review and approval, preventing the project from moving forward.

299:10-13; Lender's Ex. 7 at 1(D).) Section 2.2 of the Amtrak sublease explicitly provides that Amtrak can lease additional premises in the West and East Concourses for Amtrak's use. (Lender's Ex. 4 at § 2.2.)

34.     Amtrak "could take whatever space they need to complete their projects, and they just have to pay whatever the fair market share is for that." (Rebibo Tr. 302:10-17; *see also* Swaim-Staley Tr. 226:9-13.)

35.     In 2004, Amtrak and USV entered into an amendment to provide Amtrak additional space for a pedestrian accessway. (Lender's Ex. 7 at 1(D).)

36.     As recently as 2017, Amtrak and USI entered into a Concourse Agreement to allow Amtrak to create additional restrooms at the other end of the concourse. (Lender's Ex. 22.) USI terminated an existing commercial tenant lease years prior to the expiration of that tenant's lease so that Amtrak could use the space for new bathrooms that Amtrak wanted to create. (Barry Tr. 336:10-18.)

37.     Neither Amtrak nor USRC has asked USI to restructure the Amtrak sublease to accommodate any needs Amtrak has for future development. (Rebibo Tr. 305:2-7.)

**C. Amtrak's New Requests Can Also Be Addressed Without Changing Possession of the Leasehold Interest**

38.     Although not identified in the Complaint (ECF Doc. No. 1), the motion for immediate possession (ECF Doc. No. 72-1), or the materials submitted to Amtrak's Board prior to condemnation (JX 1, 2, 3, 6), new "projects" were raised by Amtrak at the evidentiary hearing as a basis for immediate possession. (Gardner Tr. 87:23-89:22.) These items include: creating temporary seating and waiting areas for passengers, including specifically designed ticketed passenger waiting areas (*id.* at 88:1-2; 89:3-6); moving Amtrak's Red Cap service to the front of the Station (*id.* at 88:3-6); adding customer service representatives throughout the Station (*id.* at 88:7-8);

adding temporary signage to help guide passengers (*id.* at 88:9-10); and adding ten officers to Amtrak's police force (*id.* at 88:19-20). None of these "projects" provide a basis for the immediate transfer of possession of the Leasehold Interest.

39.     Although Gardner stated that Amtrak wants to implement these actions "in advance of the holiday period" (Gardner Tr. 87:23-25), he acknowledged that Amtrak has not even asked USI about doing any of these projects (Gardner Tr. 142:5-9; 142:22-143:1; Rebibo Tr. 290:25-291:8; 324:7-19).

40.     USI has had "ambassadors" in place since 2022, who direct people and act in a similar capacity to what Amtrak considers customer service representatives. (Rebibo Tr. 292:21-293:2.) On the day after the evidentiary hearing, Amtrak stationed its own customer representatives in the Main Hall (outside its demised premises) without prior notice to USI. USI nevertheless advised Amtrak that it would not object to that activity.

41.     Amtrak has not discussed with USI wanting additional Amtrak police or positioning police in the historic area. (Rebibo Tr. 290:21-24.) Since taking over USI management, Lender has increased the number and hours of the professional security consultants that are in charge of the security for the majority of the Station. (Rebibo Tr. 292:20-21; Barry Tr. 323:24-324:4.)

42.     Following discovery and immediately before the scheduled hearing, Amtrak came forward with a schematic plan for what it would do if it controlled the Station. (Pl. Ex 10.) For any empty retail and food and beverage spaces, instead of marketing those leases, Amtrak would use those spaces for non-commercial railroad purposes. (Gardner Tr. 88:14-16; Pl. Ex. 10.).

43.     Amtrak has not asked USI whether Amtrak can use any of the unleased spaces. (Gardner Tr. 142:16-21.)

44.     Amtrak said at the hearing for the first time that it may want to reoccupy the office space previously leased at the Station. (Gardner Tr. 55:2-7.) Amtrak surrendered that leased space in 2018. (Gardner Tr. 103:19-22.) The office space is currently vacant, and Amtrak can choose to lease the office space at any time for the fair market value. (Rebibo Tr. 303:3-5; 312:18-21.)

45.     At the hearing, Amtrak also raised, for the first time, that possession was required to prepare for a new Acela train launch, which would introduce 28 new Acela trains to the network thereby increasing passengers. (Gardner Tr. 30:13-19; 94:15-18.) An Office of Inspector General memorandum, dated September 29, 2023, reports that this train launch will be delayed because the vendor has not yet received FRA approval on their computer models—preventing the trainsets from "operat[ing] in revenue service—let alone at the advertised speed of 160 miles per hour"— and each of the produced trainsets and café cars have defects that require either structural and design modifications or corrections. (Amtrak, MAJOR PROGRAMS: Company Improved Management of New Acela Program, but Additional Delays and Cost Increases are Likely, https://amtrakoig.gov/sites/default/files/reports/OIG-A-2023-013%20%28REDACTED%29_v2.pdf (last visited on Oct. 10, 2023).)

**D. Amtrak's Plans for Possession Would Fundamentally Alter Use of Historic Station and Would Decimate the Value of the Property**

46.     Since taking over USI management, Lender has "a significant amount of capital invested in the Station, hundreds of millions of dollars" and considers making the Station "self-sustaining from a financial standpoint, and profitable, hopefully" as its fiduciary responsibility. (Rebibo Tr. 304:19-24.)

47.     Since Lender took over USI management, the accounts receivable "has been whittled down" and there is "zero balance in terms of bills owed" at the Station. (Barry Tr. 319:11-13.) USI's activity at the Station is regularly reported to its landlord, USRC. (Barry Tr. 336:20-23.)

14

48.     Once granted possession, Amtrak plans to redesign the Station so that Amtrak is "able to utilize the whole building, essentially put the train station back into the train station." (Gardner Tr. 45:10-11.) With possession of the Leasehold Interest, Amtrak seeks to undo the re-development work accomplished in the 1980s at the direction of Congress in order to align the Station with Amtrak's desire of having a "Waiting Hall and Concourse." (JX 4 at 47-49.)

49.     Amtrak sees the Station as "fundamentally a transportation asset" that should "process people quickly, allow people to get in and out to their destination" rather than "a mall, which is oriented primarily around folks having a leisurely time, spending time shopping, spending time circulating but not necessarily having a destination." (Gardner Tr. 20:5-6; 10-12; 18-21.)

50.     Amtrak's schematic views alter the Station's current use by "putting some of the passenger functions and support back into the train station, back into the main building." (Gardner Tr. 47:15-19.) The schematics showcase how Amtrak intends "to repurpose the majority of the station to fit certain needs that Amtrak may have." (Rebibo Tr. 274:2-4.) These schematics include adding MARC and VRE waiting areas, restrooms, baggage claim, Metropolitan and VIP lounges, quiet waiting rooms, and a kid's area to the Historic Concourse. (Pl. Ex. 10 at 1.) The Main Hall sees additional spaces for red cap service, baggage handling, Amtrak ticketing, MARC/VRE ticketing, a ticketed waiting area, and a long waiting area. (*Id.*) On the Concourse Mezzanine Level, Amtrak intends to create open dining seating areas, meeting room spaces, a second floor to the lounges, additional restrooms, and a new location for the Amtrak Police. (Pl. Ex. 10 at 2.)

51.     Amtrak never shared these schematics with USI or Lender until shortly before the original hearing date in August 2023. (Rebibo Tr. 296:22-24.)

52.     These changes to the Claytor Concourse and the Main Hall, specifically the East Hall, show that Amtrak is "repurposing and redesignating existing space for waiting areas or all

types of other alternative uses, which would significantly eliminate a significant portion of the commercial space of the property." (Rebibo Tr. 274:20-275:1.)

53.     The spaces being eliminated include leased space for food and beverage tenants, retail operations, some amenity spaces for the building, some tourism-related spaces, and other spaces used for a variety of purposes. (Rebibo Tr. 275:2-6.)

54.     In the Lower Level, large amounts of space would be converted to Amtrak "back of house", HVAC and utility, baggage, lost and found, and train services spaces. (Pl. Ex. 10 at 3.)

55.     Currently, the Lower Level houses the food court, the busiest area of the Station during the day. "[I]t looks from here that the majority of the food court would be repurposed and that there would be some limited food options, but effectively, the food court today serves as a – an affordable option where you have [] more fast food type of users in that space, and seems like most of that has gone in exchange for a baggage area, some train services, some other uses related to Amtrak's needs." (Rebibo Tr. 275:11-23.)

56.     The Station is more than just a transportation hub, having space for retail tenants, food and beverage, apparel, alternative uses of retail, tourism-related tenants, offices, digital sign-age companies, and event space that is used for a variety of functions, including "public functions to Presidential inauguration dinners to weddings to all kinds of things, so pretty diverse." (Rebibo Tr. 272:16-273:1.)

57.     Amtrak's schematics would significantly minimize the commercial and retail uses of the Station, changing the use for the majority of the space at the property. (Rebibo Tr. 274:2-11.) If "Amtrak were to take possession of the Station today and implement the plan they have, it would significantly, significantly not only devalue the property but alter the use of it ever [] coming back to what it was pre-COVID or [] meeting its full potential." (Rebibo Tr. 276:3-7.) Changing

16

the current tenant spaces to Amtrak-support spaces "would basically undo all those efforts [to improve the condition of the property and negotiate deals with existing and new tenants] and make it impossible to – or significantly damage the ability to continue the progress that's been made." (Rebibo Tr. 278:5-17.)

58.    The uses currently being performed at the Station—retail, food and beverage, event space—"would cease to exist." (Rebibo Tr. 277:1-2.) Following Amtrak's schematics for its intended use of the Station changes the fundamental use from "a mixed-use commercial property to an area which serves as a seating area, waiting room, baggage claim area. . . . [O]ne generates revenue[,] the other one doesn't." (Rebibo Tr. 277:11-15.)

59.    Although the Complaint alleges that Amtrak needed the Leasehold Interest so that it could receive the income from the non-train uses (ECF Doc No. 1 at ¶ 55), Amtrak's revealed plans show that if granted possession Amtrak would choke off revenue sources.

**E.  WUS's Governance Structure Resembles Other Stations With Amtrak**

60.    Despite Gardner referencing that for the stations along the Northeast Corridor, Amtrak "own[s] the station and control[s] the station generally" (Gardner Tr. 68:4-69:3), the governance structure in them is quite similar to that of WUS, namely, the ownership entity has a master lease with an operator or developer and Amtrak has control over a portion of the facility by lease or other structure but does not operate and manage the entire facility.

61.    Gardner testified that Amtrak is a "tenant of another transportation entity" at South Station in Boston where the parties are "in good alignment because the fundamental missions of the owner and [Amtrak] are aligned." (Gardner Tr. 68:10-14.) South Station is owned by the Massachusetts Department of Transportation, but the long-term leasehold-position as operator of the station is owned by none other than Ben Ashkenazy (the former owner of USI through

USSM) with Amtrak as a subtenant of Ashkenazy. (Ashkenazy Acquisition, South Station Boston, http://www.aacrealty.com/portfolio/south-station-boston (last visited Oct. 10, 2023).)

62.     Moynihan Station in New York is not owned by Amtrak; it is owned by the Empire State Development Corporation with Amtrak holding a condominium position. (Gardner Tr. 68:21-69:3.) That project has been developed by private developers, The Related Companies L.P. and Vornado Realty Trust. (U.S. Department of Transportation, Center for Innovative Finance Support, https://www.fhwa.dot.gov/ipd/project_profiles/ny_moynihan_train_hall.aspx (last visited Oct. 10, 2023).)

### F.  Amtrak is Unprepared To Take Possession

63.     Under Amtrak's current lease, it only rents a "portion of Union Station, roughly 15 percent or 20 percent." (Rebibo Tr. 272:12-15.)

64.     Transferring possession would require Amtrak to take on responsibility outside of its demised area to account for all of the commercial and support spaces, as well as "for all retail and office leasing (including billboards and kiosks), advertising, and operations of the retail tenants" that it does not currently have. (JX 4 at 11.) Amtrak would become responsible for safety and security, maintenance and repair, operations, leasing, and use of the entire Station rather than its confined area. (JX 4 at 5.)

65.     Amtrak would "rely on third party resources for the property management of WUS as Amtrak does not currently have internal resources for this purpose." (JX 3 at 8-9.)

66.     As one example of how Amtrak performs basic property management within its own leased space, consider the question of bathrooms. Amtrak recognized that "bathroom capacity is a constant challenge." (Gardner Tr. 51:24-25.) Amtrak's schematics intend to "create a much better bathroom experience" for the benefit of "customer satisfaction." (Gardner Tr. 52:1-3.)

67.     Bathrooms are currently located in the Concourse in Amtrak's leased area. (Rebibo Tr. 279:25-280:2.) In 2017, Amtrak signed an agreement with USI where Amtrak would plan, design, and build new bathrooms and refurbish the existing bathrooms in the interim. (Rebibo Tr. 280:2-5; Lender Ex. 22.) The existing bathrooms represent approximately 200-square-feet of space that required some cosmetic upgrades to the sinks and wall tiles. (Rebibo Tr. 280:9-14.) Instead of using commercial-grade materials, Amtrak opted for residential-grade materials. (Rebibo Tr. 280:15-18.) Even then, Amtrak took six years to finish the project, and "[t]here's all kinds of issues with it, which even they've complained about it." (Rebibo Tr. 280:6-18.)

68.     According to the action plan prepared by Amtrak after the Court inquired about Amtrak's preparedness at the hearing in January 2023, Amtrak did not expect to achieve a "better understand[ing of] the responsibilities and risks involved with the facility" until after it secured possession. (JX 4 at 5.) This action plan was the "first written documentation and presentation of an action plan" by Amtrak. (Kostura Dep. Des. 114:1-3; 114:22-115:2.)

**G. Amtrak's Offer To Purchase Sought To Capitalize on a "Unique Opportunity"**

69.     Amtrak's Board approved a resolution to offer to purchase and acquire the Leasehold Interest by contract or eminent domain after reviewing information presented to the Board by Amtrak's management. (JX 3.) According to the various Board materials, the "loan defaults and scheduled foreclosure sales" associated with the Leasehold Interest presented a "unique opportunity for Amtrak to pursue the acquisition." (JX 6 at 4.)

70.     When Amtrak first took up acquiring the Leasehold Interest in late 2021, the Leasehold Interest was subject to a senior mortgage loan in the original principal amount of $330 Million (Lender's Ex. 13) and a mezzanine loan in the original principal amount of $100 Million (Lender's Ex. 14). (Rebibo Tr. 268:21-269:1.) The borrowers had been in default for nonpayment since May

2020. (Rebibo Tr. 269:5-6.). Before making its one offer to USI in April 2022, Amtrak was aware of this information. (Gardner Tr. 75:16-18; Newman Tr. 170:22-171:1; JX 6 at 5.)

71.     The information presented to Amtrak's Board in December 2021 indicates that Amtrak saw the "loan defaults and scheduled foreclosure sales" associated with the Leasehold Interest to be a "unique opportunity for Amtrak to pursue the acquisition" of the property interests. (JX 6, at 4.) The loan defaults were the "primary impetus" to move forward with an acquisition. (Gardner Tr. 110:11-16.)

72.     On December 27, 2021, Amtrak made a nonbinding offer to the then-special servicer of the mortgage loan, Green Loan Services LLC ("SL Green"), in the amount of $300 Million. (Pl. Ex. 2.) The offer was for $300 Million for USI's Leasehold Interest in the Station once SL Green acquired it. (Newman Tr. 182:15-21.) SL Green rejected the offer "because they had hoped to get more." (Newman Tr. 183:25-1; 184:10-12.)

73.     Amtrak never made an offer to Lender to acquire the loans or the Leasehold Interest directly. (Rebibo Tr. 284:4-7; 287:16-19; *see also* Newman Dep. Des. 23:17-24:6; 32:13-16.)

74.     Internally, Amtrak prepared a draft schedule to present to the Board regarding the acquisition of the Leasehold Interest. (Newman Tr. 191:9-18.) Amtrak's schedule provided a maximum period of seven days between Amtrak's offer to USI and Amtrak's filing of the eminent domain action. (JX 3 at 25.) Amtrak made its offer to USI on Thursday April 6, 2022, with a deadline for response of April 13, 2022 (JX 7 at 6), and the Complaint in condemnation was filed on Friday, April 14, 2022.

75.     In the months leading up to the offer, Amtrak understood that there was an estimated total outstanding debt of $550 Million associated with the Leasehold Interest. (JX 6 at 5.) Amtrak requested pre-programming authority from the FRA to help fund a potential acquisition

based on a total estimated cost of $551 Million. (JX 3 at 22-23.) Amtrak understood from Lender that a partial interest of the property had been recently valued at $700 Million. (Rebibo Tr. 284:6-13.) Amtrak apparently secured other valuations of the Station or its components before making the $250 Million offer. (Gardner Tr. 150:24-25.). Amtrak even had access to a recent third-party appraisal of the Leasehold Interest, which valued the property at $830.9 Million. (JX 6 at 9.) Amtrak adjusted the assumptions of the third-party appraisal to devalue the interest to $229.1 Million. (JX 6 at 10-12.)

76.    Instead of relying on any of this other information supportive of the high value of the Leasehold Interest, Amtrak cited an appraisal by Cushman & Wakefield that valued the Leasehold Interest at $250 Million. (Lender's Ex. 24.) But that appraisal warned Amtrak that the appraiser did not have access to "significant information" that is "likely to materially affect the findings of this report." (*Id.* at 8-9.) Cushman & Wakefield did not have: access to office and event space; current contract rent of spaces; leases of retail tenants; rent payment details to USRC; rent rolls; operating/income statements of the various spaces at the Station; operating budget for the next year; occupancy cost and retail sales information; signage revenue; rentable area for event spaces; past and budgeted capital expenditures; co-tenancy clause summaries; tenant improvement allowances; or brokerage commissions. (*Id.*)

77.    On April 6, 2022, Amtrak sent USI an offer letter with a $250 Million purchase price. (JX 8.) This was the first and only offer made to USI. (Newman Tr. 181:11-13.)

78.    Contrary to both Gardner's testimony (Gardner Tr. 91:23-92:1) and Newman's testimony (Newman Tr. 178:24-179:1), USI did respond to Amtrak's offer and asked Newman for a meeting after receiving Amtrak's letter (JX 7). Newman refused to meet with USI unless USI

provided a counteroffer. (Newman Tr. 188:1-6; JX 7 at 1.) When USI questioned Amtrak on the "urgency here on timing", Newman did not respond. (Newman Tr. 187:19-25; JX 7 at 1.)

79.     Amtrak justified its condensed seven-day offer window because Amtrak "did not want to leave an offer out [] on a distressed asset . . . for a long period of time." (Newman Tr. 189:11-13.) At the time of the offer letter, the loans had already been in default for a period of two years. (Newman Tr. 189:20; Rebibo Tr. 269:6.)

80.     Amtrak was not invited by DOT or USRC to become the master tenant at Union Station. (Amtrak Response to Lender's Interrogatory No. 1.)

81.     After the litigation was filed, Lender has provided Amtrak a dollar number that it would accept for sale of the Leasehold Interest and has also proposed a variety of other solutions. (Rebibo Tr. 289:23-290:10.) Rebibo testified at the hearing that in response to Lender's latest proposal, Gardner said that "he wanted to see how the hearing went before responding to me," and had not at that time provided a counteroffer. (Rebibo Tr. 298:2-20.)

## CONCLUSIONS OF LAW

**I.      Amtrak has not Demonstrated an Immediate Need for Possession Prior to a Ruling on Whether Amtrak has Authority To Condemn the Leasehold Interest.**

82.     There is no precedent where a court transferred possession of a property interest to Amtrak over the possessor's objection while Amtrak's authority to condemn that property interest was being challenged. *See* Joint Opposition to Motion for Immediate Possession (ECF Doc. No. 83 at 36.)

83.     There is no reported precedent for Amtrak acquiring by eminent domain an interest in property owned by the United States or an interest in a contract established by the United States.

84.     While Amtrak's request for immediate possession is not framed as a request for a temporary or preliminary injunction, the transfer of the interest can properly be analogized to an

injunctive request where the movant should demonstrate a likelihood of ultimate success on the merits (that Amtrak will be found to have properly exercised its eminent-domain power) and relative harms should the requested transfer be approved or denied. *Pantaja v. Martinez*, 567 F. Supp. 3d 76, 80 (D.D.C. 2021), *aff'd*, 21-7118, 2022 U.S. App. LEXIS 7977 (D.C. Cir. Mar. 25, 2022) (test for mandatory preliminary injunction).

85.     Lender and USI have a meritorious challenge to Amtrak's exercise of eminent domain. Under, Amtrak's statutory authority does not expressly allow it to condemn interests in federal property or federal contracts. Second, the statutory requirements that eminent-domain power can only be exercised (a) if the efforts to acquire the interest voluntarily were unsuccessful, and (b) the property to be taken is necessary for intercity passenger-rail service have not been met. 49 U.S.C. § 24311(a)(1)(A). The "property interest must have a 'significant relationship' with Amtrak's provision of intercity rail passenger transportation," a phrase that the Court has construed as something between absolute necessity and that the acquisition would be desirable by Amtrak. *Nat'l R.R. Passenger Corp. v. 3.44 Acres More or Less of Land & Bldg. located at 900 2nd St. NE, Washington, DC 20002-3557*, 266 F. Supp. 3d 63, 69 (D.D.C. 2017).

86.     The record undermines the argument that Amtrak's control of the Leasehold Interest is necessary for intercity passenger-rail service. For almost 40 years, Amtrak has been providing intercity passenger-rail service without owning this interest. Congress and DOT have never deemed Amtrak's control of this interest as being necessary or even desirable. Congress did not install Amtrak as the master tenant; the United States did not enter into a direct lease with Amtrak; and the Federal Government did not invite Amtrak to acquire this interest. Since the 1980s, Amtrak has wanted to be in the position of master tenant. Instead, the Federal Government structured the leases for its property with Amtrak as a space tenant, not the master tenant.

87.     Under the current lease structure, Amtrak has not been prohibited or limited in its proper operations or its plans for growth. The record belies the assertion that transfer of immediate possession would materially change anything regarding current projects or operations because there is no evidence to support the conclusion that the Leasehold Interest or USI's ownership of the Leasehold Interest is the cause of any alleged problem. USI has been cooperative and has acted without default in connection with its duties as Amtrak's landlord.

88.     This eminent domain was triggered by Amtrak's perception that the prospect of a foreclosure was a "unique opportunity" to acquire the leasehold position that the Federal Government had denied it but which Amtrak had long coveted. The rushed scenario of using a facially inadequate valuation number, a short-time fuse, a lack of information sharing, and an internal calendar showing that Amtrak would take possession by August 2022 was an inadequate fig leaf to cover the statutory "negotiation" prong before filing eminent domain.

89.     In its Complaint, Amtrak alleged that "[p]rior to the filing of this Complaint, Amtrak attempted in good faith to negotiate a purchase price for the Subject Property Interest with USI pursuant to 49 U.S.C. § 24311(a)(2)." (ECF Doc. No. 1 at ¶ 69.) The record developed during discovery and at the hearing does not support a finding of good-faith negotiation. Specifically, Amtrak made a single offer to USI with no backup, support, or analysis; Amtrak gave an exceedingly short timeframe of one week for USI to respond and then conditioned discussions on USI making a counteroffer; Amtrak told USI that "time was of the essence," when there were no time constraints; the offer number of $250 Million was based on a single appraisal whose own authors acknowledged that their lack of "significant information" was "likely to materially affect the findings of this report;" and the $250 Million offer was materially lower than other contemporaneous indications of true market value of the Leasehold Interest known to Amtrak,

including recent third-party appraisals that had valued the interest above $700 Million; estimated total outstanding debt of $550 Million associated with the Leasehold Interest; Amtrak's offer to SL Green only months earlier of $300 Million, which was rejected as too low; and Amtrak's statement to the FRA in connection with approval for pre-programming funding that the estimated cost of acquisition was $551 Million.

90.     The immediate transfer to Amtrak could cause significant harm to Lender and USI. The loss of property interests and consent rights constitutes irreparable harm. *See Patriot-BSP City Ctr. II v. U.S. Bank Nat. Ass'n*, 715 F. Supp. 2d 91, 95-96 (D.D.C. 2010); *Empresas Calbevision, S.A.B. de C.V. v. JPMorgan Chase Bank N.A.*, 680 F. Supp. 2d 625 (S.D.N.Y. 2010), *aff'd and remanded*, 381 Fed. Appx. 117 (2d Cir. 2010). Moreover, USI has rights as a party in privity with the United States not to have its interest stripped away by a process external to the lease itself. Amtrak has revealed in discovery and at the hearing that it would seek to immediately remake the Station by converting many of its revenue-generating areas into non-revenue-generating ones and by fundamentally restructuring what Congress has decreed regarding the mix of uses and purposes at this federal property, and by undermining the lease terms that have been implemented by the United States. Steps that Amtrak would take while in possession might be difficult if not impossible to undo thereafter.

91.     Even if Amtrak's limited statutory authority to condemn property included the Declaration of Taking Act's presumption that possession should be awarded as a "quick take" (it does not, *see* ECF Doc. No. 83 at 36-39), the same evidence demonstrating irreparable harm to Lender supports a finding of undue hardship, justifying a temporal delay to any transfer of possession.

## **CONCLUSION**

92.     For all the foregoing reasons, Amtrak has failed to demonstrate any immediate need for the possession of the Leasehold Interest to be transferred prior to the Court ruling on whether Amtrak has authority to condemn the Leasehold Interest.

Dated: New York, New York
October 11, 2023

*/s/ Y. David Scharf* _____           */s/ Paul J. Kiernan* _____

  MORRISON COHEN LLP              HOLLAND & KNIGHT LLP
  Y. David Scharf                Paul J. Kiernan
  Brett Dockwell                 Louis J. Rouleau
  Kristin T. Roy                 800 17th Street N.W.
  Latisha V. Thompson            Suite 1100
  Amber R. Will                  Washington, D.C. 20006
  Mahnoor Misbah                 (202) 663-7276
  *Admitted pro hac vice*
  909 Third Avenue
  New York, New York 10022        *Attorneys for Defendant Kookmin*
  (212) 735-8600                  *Bank Co., Ltd.*