## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK) | * | |
| | * | CIVIL ACTION NO. 1:22-CV-01043 |
| PLAINTIFF, | * | |
| v. | * | |
| SUBLEASE INTEREST OBTAINED PURSUANT TO AN ASSIGNMENT AND ASSUMPTION OF LEASEHOLD INTEREST, et al. | * | |
| | * | |
| DEFENDANTS. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

### NATIONAL RAILROAD PASSENGER CORPORATION'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING MOTION FOR POSSESSION

Lindsay C. Harrison, DC Bar #977407
Jessica Ring Amunson, DC Bar #497223
JENNER & BLOCK, LLP
1099 New York Avenue, NW, Suite 900
Washington, D.C. 20001-4412
Telephone: 202-639-6000
Fax: 202-639-6066
lharrison@jenner.com
jamunson@jenner.com

Patricia McHugh Lambert, US DC Bar ID MD0008
Kambon R. Williams, US DC Bar ID MD29872
PESSIN KATZ LAW, P.A.
901 Dulaney Valley Road, Suite 500 Towson, MD  21204
Telephone: 410-938-8800
Fax: 410-832-5650
plambert@pklaw.com
kwilliams@pklaw.com

*Counsel for Plaintiff National Railroad Passenger Corporation*

National Railroad Passenger Corporation ("Amtrak") respectfully proposes that the Court enter the following findings of fact and conclusions of law upon consideration of the evidence presented at the September 11, 2023 hearing and submissions of the parties.

## BACKGROUND

1.      Congress vested Amtrak with authority to condemn property interests. 49 U.S.C. § 24311. Pursuant to that statute, on April 14, 2022, Amtrak filed this condemnation proceeding to acquire a leasehold interest (the "Subject Property Interest") in property located at 50 Massachusetts Ave. NE, Washington, D.C. 20002, known as Washington Union Station (the "Station" or "WUS"). At the same time, Amtrak deposited $250 million with the Court, where it has remained since April 2022.

2.      The parties agree that once Amtrak filed its Declaration of Taking and deposited "the amount of money Amtrak estimates is just compensation for the interest" with the Court, title to the Subject Property Interest vested in Amtrak. *See* 49 U.S.C. § 24311(b); *see also* January 18, 2023 Hearing Transcript at 35:11-19, 37:9-11.

3.      Prior to this action, Union Station Investco, LLC ("USI") held the relevant leasehold interest. For a time both before and immediately after this action was filed, an entity known as Union Station Sole Member, LLC ("USSM") claimed to be the rightful owner of USI. USSM is wholly owned by Ashkenazy Union Station Holdings LLC and an affiliate of the Ashkenazy Acquisition Corporation, a real-estate investment firm, which in the past served as the manager for USI. *See* Plaintiff Ex. 8.[1]

4.      When the action was filed, loans encumbered the interests of both USI (the "Senior Loan") and USSM (the "Mezzanine Loan"). *See* Lender Exs. 13, 14, 15. Since May 2020, both

---

[1] "JX" refers to the Joint Exhibits introduced at the September 11, 2023 hearing. "Plaintiff Ex." refers to Amtrak's exhibits. "Lender Ex." refers to the Defendants' exhibits.

loans had been in default and were scheduled for a foreclosure sale in early January 2022. That sale was called off shortly before it was set to take place, when Kookmin Bank Co., Ltd. Trustee of KTB CRE Debt Fund No. 8, a Korean Investment Trust ("Kookmin" or "Lender"), purchased the Senior Loan. JX 3 at 0000089. USI has alleged that USSM's ownership interest in USI was disposed of in June 2022 by this foreclosure sale. *See* Plaintiff Ex. 8.

5.     When Amtrak filed this action, two sets of parties purported to file an answer on behalf of USI. *See* ECF Nos. 36, 38, 55, 57, 60. That dispute, along with numerous issues relating to the control of the Station, resulted in various hearings before this Court on May 26, 2022, July 21, 2022, and August 9, 2022, and eventually, separate litigation in the United States District Court for the Southern District of New York. *See* Plaintiff Ex. 8. On August 25, 2022, that Court preliminarily resolved the dispute over control of USI when it issued a preliminary injunction enjoining USSM from holding itself out as either owning or controlling USI. *See* ECF No. 83-5.

6.     On July 8, 2022, Amtrak filed a Motion for Immediate Possession of the Subject Property Interest. ECF No. 72.[2] After initial briefing, the Court held a hearing on January 18, 2023, during which the parties agreed to continue attempting to reach agreement on a purchase price and terms for sale of the Subject Property Interest to Amtrak. The parties were unable to agree and at a March 23, 2023 hearing, Amtrak agreed to produce discovery related to its motion for possession. Amtrak subsequently produced documents and four deponents. On September 11, 2023, the Court held an evidentiary hearing on Amtrak's motion at which the parties presented testimony and other evidence. By that time, more than sixteen months had elapsed since Amtrak filed its Declaration

---

[2] Amtrak previously filed an Emergency Motion for Interim Term of Possession (ECF No. 41), which sought limited relief to retain the current property manager until possession transferred to Amtrak and requested a schedule to determine the terms under which possession would be transferred by August 2022. That motion was withdrawn after the Lender and Borrower agreed to not remove the property manager until the Court resolved all issues of ownership and possession. *See* ECF No. 47.

of Taking, deposited $250 million with the Court, and first sought possession in its Complaint.

## LEGAL STANDARD

7.      No court has interpreted in detail the legal standard by which Amtrak takes possession of property condemned under 49 U.S.C. § 24311. The Amtrak condemnation statute contains provisions almost identical to the Declaration of Taking Act ("DTA"), under which the federal government may obtain possession by "quick-take" measures. Under both statutes, the condemning party must file a Declaration of Taking containing: (1) a statement of the public use for which the interest is taken; (2) a description of the property sufficient to identify it; (3) a statement of the estate or interest in the property taken; (4) a plan showing the land or interest taken; and (5) a statement of the amount of money estimated by the acquiring authority to be just compensation for the land or interest taken. *Compare* 40 U.S.C. § 3114(a)(1)-(5), *with* 49 U.S.C. § 24311(b)(1)(A)-(E).[3]

8.      In applying the DTA, the Supreme Court has stated that, upon the deposit of funds, "[t]itle and right to possession thereupon vest immediately in [the condemning authority]." *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 5 (1984); *United States v. Miller*, 317 U.S. 369, 381 (1943) (noting that a primary purpose of the DTA was "to give the [condemning authority] immediate possession of the property"). This reading is consistent with the statutory text. In the DTA, Congress specified that courts have a limited role in transferring possession: they may "fix the time within which, and the terms on which, the parties in possession shall be required to surrender possession to the petitioner." 40 U.S.C. § 3114(d). Congress therefore did not provide

---

[3] The DTA requires that, for land acquired outside the District of Columbia, the Declaration must be "signed by the authority empowered by law to acquire the land described in the petition." 40 U.S.C. § 3114(a). No similar requirement exists in Amtrak's condemnation statute. *See* 49 U.S.C. § 24311(b)(1) (specifying the requisite contents of the Declaration, but not specifying by whom it should be signed). The Declaration of Taking filed by Amtrak in this case meets all the statutory requirements in § 24311(b)(1). While Defendants suggest otherwise, *see* ECF No. 35 at 41, they cite only the DTA's inapplicable signatory requirement.

courts with authority to decide *whether* possession may be transferred, only *when* and *how*. Thus, under the DTA, a court *must* award possession unless "some undue hardship to the present landowner or occupant might warrant some temporal gap between the filing of the declaration of taking and the owners' surrender of possession." *United States v. 74.57 Acres of Land, More or Less*, No. Civ. A. 12-0239, 2012 WL 1231933, at *2 (S.D. Ala. Apr. 11, 2012).

9.      In Amtrak's condemnation statute, Congress used the same language regarding possession, specifying *when* and *how*, but not *if*, courts may transfer possession. *See* 49 U.S.C. § 24311(b)(2)(A) (providing courts with authority to determine "the time by which, and the terms under which, possession of the property is given to Amtrak"). It is a well-settled canon of statutory interpretation that the same language used across statutes addressing related subject matters should be construed similarly. *See, e.g.*, *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 530-37 (2015). Indeed, the use of "the same language in two statutes having similar purposes" creates a "presum[ption] that Congress intended that text to have the same meaning in both statutes." *Smith v. City of Jackson*, 544 U.S. 228, 233 (2005). That is especially true here because Congress has not included analogous quick-take language in all eminent domain statutes but did so in the Amtrak statute. *See E. Tenn. Nat. Gas Co. v. Sage*, 361 F.3d 808, 822 (4th Cir. 2004) (noting the Natural Gas Act lacks quick-take provisions like those in the DTA).

10.     However, as the Court has previously observed, the Amtrak statute also differs from the DTA in two relevant respects. First, unlike the government, "Amtrak may exercise the power of eminent domain only if it cannot (A) acquire the interest in the property by contract; or (B) agree with the owner on the purchase price for the interest." 49 U.S.C. § 24311(a)(2). Second, unlike the government's ability to acquire any property, Amtrak may acquire only property that is "necessary for intercity rail passenger transportation, except property of a rail carrier, a State, a

4

political subdivision of a State, or a governmental authority[.]" *Id.* § 24311(a)(1)(A). So while Congress authorized Amtrak to take possession under quick-take procedures similar to the government, before a transfer of possession, Amtrak must make some showing that it was "unable to agree with the owner on a purchase price for the interest," and that the property it seeks to condemn is "necessary for intercity rail passenger transportation."[4] Upon review of the evidence, including live testimony which the Court finds credible, Amtrak has made each showing.[5]

## I.   AMTRAK AND THE DEFENDANTS WERE "UNABLE TO AGREE" ON A PURCHASE PRICE.

11.   Amtrak has shown that the parties were "unable to agree with the owner on a purchase price for the interest." 49 U.S.C. § 24311(a)(2). "[M]inimal evidence" is needed to satisfy this standard. *See Hubenak v. San Jacinto Gas Transmission Co.*, 141 S.W.3d 172, 184-85 (Tex. 2004). Courts applying similar statutory language have found this requirement met when previously made offers had been "rejected or ignored." *Id.* at 185.

12.   Undisputed evidence demonstrates that by letter dated January 28, 2022, Amtrak invited USI to an inspection by Amtrak's appraiser. *See* Plaintiff Ex. 3. That same day, USI responded demanding "that Amtrak refrain from conducting the inspection, and cease and desist from seeking or obtaining a valuation appraisal…." Plaintiff Ex. 4. The inspection nevertheless

---

[4] Amtrak disputes that it must make this showing as a precondition to the transfer of possession and reserves all rights to argue that this reading of the statute is incorrect but incorporates the Court's previous interpretation into these Proposed Findings and Conclusions for consistency with the Court's previous statements.

[5] Defendants have argued for application of a preliminary injunction standard, but the quick-take provisions of 49 U.S.C. § 24311 do not support application of that standard. Even if this Court were to apply it, Amtrak has shown it is likely to succeed on the merits, it risks irreparable harm if it is not awarded possession, and the balance of equities and public interest favors awarding Amtrak possession. Without possession, Amtrak will face delays in numerous projects, a lack of control over the use of the Station, the prospect that areas that Amtrak needs will be leased to others, the inability to engage in negotiations with USRC regarding the need to update the lease that was signed in 1988, the hampering of work and planning efforts, and general operational and managerial uncertainty at the Station. The testimony and exhibits demonstrate that the Department of Transportation and Federal Railroad Administration support Amtrak's acquisition of the Subject Property Interest. *See* JX 3 at 0000106; Plaintiff Ex.1. Finally, Defendants have failed to present evidence that they would suffer any harm, other than potentially monetary harm, if possession is transferred to Amtrak.

occurred and Amtrak obtained an appraisal dated January 31, 2022, which appraised the Subject Property Interest at $250 Million. *See* Lender Ex. 24.

13.     With this appraisal in hand, on April 6, 2022, Amtrak offered to purchase the Subject Property Interest for $250 Million. *See* JX 8; T. 170:9-171:5. That offer letter demonstrated Amtrak's willingness to engage in discussions: it stated the offer would be open until April 13, 2022 but also advised that "Amtrak is willing to meet with USI to discuss the acquisition" and to review any information USI might send. *See* JX 8. Other evidence also demonstrates this willingness. Dennis Newman, Amtrak's Executive Vice President, Strategy, Planning & Accessibility, transmitting the offer letter by email, stated: "I look forward to your reply." *See* JX 7. Mr. Newman testified that he "was looking forward to [Joe Press'] reply so that we could move forward with—on advancing negotiations." T. 171:22-25. A telephone call between Mr. Newman and Mr. Press took place the next day, T. 172:3-13, and over the next several days, Mr. Press and Mr. Newman exchanged emails, each responding quickly to the other, T. 172:3-173:6. Mr. Press invited Amtrak to New York for a meeting, but Mr. Newman instead made two requests—one on April 7, 2022 and one on April 9, 2022—for a "Teams or Zoom meeting." *See* JX 7. After several days without any response to his April 9, 2022 email after Mr. Press had responded quickly to prior emails, Mr. Newman reasonably concluded that further negotiations would be futile. *See* T. 92:1-93:15, 178:15-179:1.

14.     Defendants did not explain why USI did not respond to the April 9, 2022 email. As Mr. Newman noted, USI could have requested more time to respond or to provide a counteroffer, could have advised Amtrak to also speak to Kookmin, then a lienholder, or could have supplied additional information related to the offer. Instead, USI went completely silent without explanation. *See* T. 174:2-19, 188:17-20. The evidence shows that Amtrak tried to negotiate with

USI but did not come to an agreement as to price or contract terms.

15.     The dispute over who controlled USI may have made it harder for the parties to agree to a purchase price or terms of a sale. *See* T. 309:4-19 (discussing disputes as to control of USI and ability to negotiate post-filing). Indeed, Michael Rebibo, the managing principal of the Rexmark investment firm now controlling USI, testified that USI lacked the ability to "do anything effectively while [the] loan [was] in default." T. 308:6-309:2. And inability to agree on price can be established when "there are a multitude of ownership interests in the property." 6 Julius Sackman et al., *Nichols on Eminent Domain*, § 24.13[1][b] (Matthew Bender, 3d ed. 2023) (citing, *e.g.*, *Town of Hertford v. Harris*, 140 S.E.2d 420 (N.C. 1965) ("[W]hen several are asserting title to the lands to be acquired, the condemnor is not required to unravel the divergent interests and negotiate with each claimant. . . . 'Inability to acquire the title of some of the owners makes it unnecessary to negotiate with the others'" (internal citation omitted)).

16.     If more evidence of "inability to agree" was needed, the parties still could not reach agreement even after this case was filed.[6] Amtrak personnel met nine to ten times with Mr. Rebibo to negotiate and discuss the possibility of resolution. *See* Plaintiff Exs. 5 & 6; T. 179:2-180:17. Following these meetings, there was still no agreement. T. 307:24-308:5.

17.     Defendants argue that Amtrak knew the Defendants would not agree to a purchase price of $250 million and did not allow adequate time for negotiations before condemning the Subject Property Interest. Defendants suggest, therefore, that Amtrak did not negotiate in good faith, implying that the Court should impute a "good faith" requirement into the statute. No such requirement exists, but even if it did, Amtrak meets it.

---

[6] The Court may consider evidence that the parties could not agree even after the filing of the condemnation. *See United States v. 6.584 Acres of Land, More or Less, Hidalgo Cnty., Tex.*, 533 F. Supp. 3d 482, 500 (S.D. Tex. 2021) ("'[A] court may direct further negotiations as a conditions precedent to condemnation if it finds the negotiations have, so far, been inadequate.'" (citation omitted)); *Hubenak*, 141 S.W.3d at 184 (same).

18.     Beginning with the text, the statute says only that Amtrak may exercise the power of eminent domain "if it cannot agree with the owner on the purchase price for the interest." 49 U.S.C. § 24311(a)(2)(B). It does not matter *why* the parties were unable to agree on a purchase price. The Supreme Court previously interpreted materially identical "unable to agree" language in a predecessor statute to § 24311 as lacking a "good faith" requirement. *See Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*, 503 U.S. 407, 423 (1992) (quotation marks omitted). There, the party challenging condemnation argued that "Amtrak failed to prove the parties were 'unable to agree' on terms of sale," suggesting that the statute "demands that Amtrak engage in 'good faith…negotiations' before it may invoke its condemnation powers." *Id.* The Supreme Court disagreed. The Interstate Commerce Commission tasked with reviewing this proposed condemnation had interpreted the "unable to agree" language "in a more narrow fashion, to mandate nothing more than a factual determination that the parties will not be able to reach agreement through further negotiations." *Id.* The Supreme Court upheld the ICC's interpretation: "This is a reasonable interpretation of the phrase 'unable to agree upon terms for the sale,' and we do not substitute a different view." *Id.*

19.     Other courts interpreting similar statutory language have agreed. *See, e.g.*, *Mars. & Ne. Pipeline, L.L.C. v. Decoulos*, 146 F. App'x 495, 498 (1st Cir. 2005) (finding no "good faith negotiation" obligation in the Natural Gas Act, 15 U.S.C. § 717f(h), which contains similar "unable to agree" language); *Hubenak,* 141 S.W.3d at 185-87 (concluding that, when the state statute required showing that the parties were unable to agree, "[a]n inquiry into the subjective" intent of the condemnor was unnecessary and "antithetical" to the prophylactic purpose of pre-filing negotiations preventing unnecessary litigation and "largely duplicative" of the required determination of the property's value made later in the proceedings).

20.     The statutory structure also supports this reading. Congress understood that Amtrak, even relying on an appraisal, could potentially underestimate the value of condemned property and built in a different remedy for that potential: payment of interest of 6 percent a year on the delta between Amtrak's estimate and the Court's judgment of just compensation.[7] *See* 49 U.S.C. § 24311(b)(3). And though it could have, Congress did not write the statute to forestall transfer of possession until just compensation is determined. *See also Nat'l R.R. Passenger Corp. v. Penn Cent. Corp.*, No. 89 C 1631, 1989 WL 51406, at *2 (N.D. Ill. May 11, 1989) ("Deposit of inadequate compensation is not ordinarily a basis for delaying condemnation.").

21.     Even if a good faith requirement were to exist, Amtrak meets it. Amtrak obtained a third-party appraisal that valued the Subject Property Interest at $250 million and based its offer on that appraisal. *See* Lender Ex. 24; JX 8; T. 170:9-171:5. Indeed, the appraised value on which Amtrak based its offer was slightly higher than Amtrak's own internal analysis of $229 million, which had been presented to Amtrak's Board of Directors in December 2021. *See* JX 6 at 0000017. Amtrak has made a prima facie showing of good faith. *See also State ex rel. Mo. Highway & Transp. Comm'n v. Pinnell*, 774 S.W.2d 528, 531 (Mo. Ct. App. 1989) (where condemnation statute required good faith negotiations, requirement was met where an offer was made and accepted, and "[t]he relationship between an offer and the value of the property to be condemned is not significant in the determination of good faith").

22.     Finally, separate from Defendants' good faith argument, Defendants suggest

---

[7] The Court is not in a position now to determine the accuracy of any appraisal or make findings as to the value of the property interest. The parties have not yet engaged in discovery on the value of the Subject Property Interest, and no expert discovery or exchange of expert opinions has occurred. Furthermore, given the Court's direction as to the limited scope of discovery, only the Defendants have taken any discovery. Amtrak has not yet had the opportunity to take any discovery from the Defendants, including discovery which might confirm Amtrak's estimated value of the Subject Property Interest. Accordingly, it is premature to assess valuation now. *See* March 23, 2023 Hearing Tr. at 13 (acknowledging that "the ultimate question of authority and valuation" come at a separate "stage of the proceedings"); *compare* 49 U.S.C. § 24311(b)(2) (process for transferring possession), *with id.* § 24311(b)(3) (process for determining just compensation).

Amtrak acted too hastily in initiating condemnation. But 49 U.S.C. § 24311 places no requirement on Amtrak to negotiate for a particular amount of time before condemning property. Indeed, Defendants have admitted that "[t]he statute does not enumerate what steps or activities are required." ECF No. 83 at 9. Additional delay to prolong fruitless negotiations is not needed when the parties cannot agree on a price. *See United States v. 6.584 Acres of Land, More or Less, Hidalgo Cnty., Tex.*, 533 F. Supp. 3d 482, 499-500 (S.D. Tex. 2021) (holding that, while the government was required to engage in negotiations, it was "sufficient that negotiations proceed far enough to indicate that an agreement is impossible, and, where it is apparent that the parties cannot agree on the amount to be paid, a formal effort to agree is not necessary" (quotation marks omitted)). Furthermore, Amtrak's executive officers Stephen Gardner and Dennis Newman testified that when Amtrak made its decision to file this action, Amtrak feared a USI bankruptcy or other financial instability that could imperil the Station, a reasonable fear given the earlier foreclosures and loan sales. *See* T. 92:1-93:15, 178:7-14. Those concerns, rather than any supposed bad faith, reasonably explain the short time frame Amtrak allowed for negotiation prior to filing.

23.     In summary, Amtrak made an offer, and USI refused an invitation to participate in an appraisal walk-through of the Station, demonstrating its lack of interest in a sale; prior to condemnation, USI never made a counteroffer to Amtrak and never agreed to Amtrak's offer; Mr. Rebibo subsequently made clear that he would not accept Amtrak's offer of $250 million, and even after USI finally made a counteroffer the week before the initial hearing date on Amtrak's possession motion, Amtrak did not accept it. T. 307:13-23, 93:16-94:5, 179:19-180:17; *see also* Plaintiff Ex. 2. Amtrak has sufficiently shown inability to agree as to price.

## II.     AMTRAK HAS MADE A SUFFICIENT SHOWING OF NECESSITY.

24.     To qualify as "necessary" under Section 24311(a)(1)(A), Amtrak need only show

that the Subject Property Interest has "a 'significant relationship' with Amtrak's provision of intercity rail passenger transportation." *Nat'l R.R. Passenger Corp. (Amtrak) v. 3.44 Acres More or Less of Land & Bldg. located at 900 2nd Street NE, Washington, DC 20002-3557*, 266 F. Supp. 3d 63, 69 (D.D.C. 2017) (hereinafter "*900 2nd Street NE*"). In *900 2nd Street NE*, which concerned a condemnation adjacent to the Station, Judge Cooper explained that the "relevant question" in an eminent domain proceeding under 49 U.S.C. § 24311 is whether the taking has "some direct nexus to Amtrak's goals." *Id*. at 69, 72. This standard requires a showing more stringent than mere "usefulness" but "more lenient than absolute, last-resort need"—in other words, Amtrak does not need to establish that the property is "indispensable." *Id*. at 69-70 (internal quotation marks omitted). "The upshot is that Amtrak may condemn property only if it has a significant connection to its goal of providing intercity passenger rail transportation." *Id*. at 72. If the property has such a connection, then the taking is "necessary." *Id*. at 73-74.

25.    Amtrak has made an adequate showing of necessity. Stephen Gardner, the Chief Executive Officer of Amtrak, testified that "Amtrak is a provider of inter-city passenger rail…created by Congress… that operate[s] a 21,000-mile network, 46 states, three provinces, servicing about 32 million passengers pre-pandemic." T. 12:2-7. He explained that the Station "is really a hub of the whole network" and part of the "northeast corridor, which is the North America's busiest passenger railroad" that goes from Washington to Boston, and also has routes to the south and west. T. 12:8-13:1.

26.    The Station's indisputably complicated ownership and governance structure looms in the background of Amtrak's case for why it needs to acquire the Subject Property Interest. The U.S. Government ("USG") acquired ownership of the Station in 1988, with the Department of Transportation ("DOT") and Federal Railroad Administration ("FRA") providing oversight of this

property. In 1985, the USG subleased the Station to Union Station Redevelopment Corporation (USRC), a District of Columbia non-profit chartered to manage day to day activities at the property. T. 57:6-19, 144:21-145:2. USRC in turn subleased a portion of the Station to Union Station Venture LTD ("USV"), which was assigned to USI. Amtrak subleases only limited space at the Station from USI. JX 5, 6; Lender Exs. 4-8, 12, 17-20.

27.     The limited space that Amtrak currently subleases at the Station is towards the back of the Station near where passengers board and alight trains. *See* T. 28:5, et seq. While ridership at the Station has grown substantially in the last 30 years ("about 250 percent"), the space Amtrak subleases in the Station has remained the same. *See* T. 14:24-17:6. Mr. Gardner testified about the problems caused by this limited space, which include: crowding in the concourse (T. 30:18-33:1) with "substandard conditions in terms of personal space" (T. 32:3-6); insufficient space for ticketing operations (T. 33:15-24.); inadequate space for a ticketed waiting areas or a first class traveler lounge of the type at other major train stations (T. 34:1-36:2); and inadequate control to permit signage to aid passengers entering the Station to easily locate the Station's transportation features (T. 36:3-37:17). Mr. Gardner also described how Amtrak could use currently-vacant space in the Station for crew base personnel, police, engineers, designers, and planners, moving 500 to 600 operations personnel into the Station to service intercity passenger rail transportation. *See* T. 37:24-41:9, 41:16-20. The acquisition would also afford Amtrak the space it needs for passenger amenities to compete with major airports, including not only the ticketed waiting areas and lounges previously discussed but also dedicated space for families traveling with children. *See* T. 44:4-22. Mr. Gardner explained why Amtrak seeks "to utilize the whole building, [and] essentially put the train station back in to the train station . . . ." *See* T. 45:3-14; *see also* T. 66:1-67:6. As he put it, there is currently "a mismatch between expectations and motivations" of "a private developer,

who's looking to maximize retail and revenue, and Amtrak, who is trying to serve largely the transportation needs first and foremost and have commercial [activity] be sympathetic and supportive of that." T. 69:16-21.

28.     Amtrak also presented evidence that today's problems will be compounded in the future because Amtrak has "a tremendous growth trajectory," with the federal government having recently invested "$60 billion in Amtrak and passenger rail" and with Amtrak setting itself a "goal … to double [its] ridership" by 2040. T. 13:10-15. This growth goal is essential due to "the need for passenger rail to take on a bigger role of inter-city transportation and to help [Amtrak] meet both sustainability goals and mobility in the future," T. 13:19-24. The Station is critical to this growth plan, which anticipates an "increase about 80 percent [in] capacity between Washington and New York." T. 14:24-15:19. Amtrak projects that train service will increase at the Station from "about 220 trains today" to "over 500 trains a day between Amtrak and [its commuter rail] tenants" by that date. T. 17:7-15.

29.     Mr. Gardner testified that acquisition of the Subject Property Interest would also simplify the Station's governance. T. 46:14-23 (testifying that condemnation would "remove any layers that are unnecessary there and create the level of control we need to get good outcomes for passengers in the business"). As Mr. Gardner described, Amtrak needs the Subject Property Interest so that Amtrak can "have a direct relationship with USRC, be able to advance [its] projects, and be able to utilize the facility to meet the needs of [intercity] passenger rail service" *See* T. 57:20-58:2; s*ee also* T. 58:3-64:5 (discussing projects to repair the Station's subbasement and modernize the Station's main concourse). The former head of USRC confirmed this when she testified that if Amtrak controlled the USI sublease, Amtrak could take a variety of actions within the Station without having to seek USI's permission. *See* T. 260:2-261:2. And while that witness

13

did not personally observe USI impeding the progress of certain projects, she also admitted that the governance structure was complex and she was not personally aware of all the conversations between USI and Amtrak.[8] *See* T. 255:25-257:19. Amtrak, on the other hand, presented evidence that it could not get the approvals it needed for projects it wanted to complete, including the Subbasement Project and Concourse Modernization Project, *see* T. 59:18-21, 62:13-18, and could not get quick approval from USI on other matters, for example, its requests for fire suppression systems relating to Track 22, *see* T. 333:18-334:23. Eliminating USI as a middleman would simplify all these interactions by allowing Amtrak to work directly with USRC.

30.     Acquisition of the Subject Property Interest would also allow Amtrak to invest in the Station. *See* T. 65:10-25. Amtrak is "now anxious to be able to invest in the station… because of the infrastructure bill and the huge resources it provides to Amtrak and for passenger rail." T. 65:4-10. Without acquisition, there are financial restraints on that investment; Amtrak cannot "invest our federal dollars" in the areas of the station that Amtrak does not sublease because of "requirements that come from federal laws and grants through Amtrak." T. 65:14-19. By increasing the areas of the Station that Amtrak subleases, the condemnation would better enable Amtrak to spend federal dollars to make needed investments.

31.     Amtrak has adequately made the requisite showing that the foregoing needs for the Subject Property Interest have a significant relationship to Amtrak's numerous statutory goals. Amtrak must "provide modern cost-efficient, and energy-efficient intercity rail passenger transportation throughout the United States," 49 U.S.C. § 24101(a)(1). It must "use its best business judgment" to "maximize the Federal investments" including, "controlling or reducing

---

[8] Defendants also rely on a single weekly report to suggest USI was not impeding the progress of major capital projects. But Defendants present only that one report, never even purporting that it is representative, and USRC's former president testified that other weekly reports not presented by Defendants would have shown USI responsible for outstanding items. *See* T. 258:2-15.

…operating costs" and "providing economic benefits to the communities it serves." *Id.* §§ 24101(c)(1)(E) & (F). It must "carry out strategies to achieve immediately maximum productivity and efficiency," to "improve generally the performance of Amtrak," and to "coordinate the uses of the Northeast Corridor, particularly intercity and commuter rail passenger transportation." *Id.* §§ 24101(c)(3), (8) & (11). As the statutory language makes clear, Amtrak must exercise business judgment as to these duties, including determining how to "maximize the use of its resources, including... real property." *Id.* § 24101(c)(12). As set forth in 49 U.S.C. §§ 24305(a)(1) and (2), Amtrak "may acquire…facilities necessary for intercity and commuter rail passenger transportation" and "operate and control directly, to the extent practicable, all aspects of the rail passenger transportation it provides."

32.     Moreover, Amtrak's decision to acquire the Subject Property Interest was not undertaken precipitously. It had a "team across various departments" considering, for months, the issues and opportunities at the Station in relation to these statutory goals. *See* T. 71:12-72:16. Amtrak management, including Mr. Gardner, concluded the acquisition "was necessary for our business, for inter-city passenger rail, and for the future of both [Amtrak's] capacity and performance and [brand] standard." *See* T. 72:3-12. Management provided a business case for acquisition to its Board of Directors each month, from December 2021 to March 2022. *See* T. 76:18-85:16; JX 6 at 13 ("The time is now to enact change at WUS to ensure the longevity of WUS as a multimodal transportation and a key asset of Amtrak's core business"); JX 1 at 14 (calling the acquisition "vital to the success of both Amtrak operations and WUS as a national historic multimodal transportation center of national significance"); JX 2 at 11 (stating that without the acquisition, "WUS will continue to experience significant deferred maintenance, become out of date, and fail to evolve to permit growth and redevelopment"); JX 3 at 11 (observing that the

project is "justified economically" and "[t]he time is now to enact change at WUS").

33.     On March 22, 2022, Amtrak's Board, including DOT's representative, concluded that the acquisition was "necessary to ensure the condition and longevity of…WUS as a multimodal transportation and a key asset of Amtrak's core business, and provides an opportunity to improve the lease structure of WUS to serve the long-term interests essential to this multimodal station," and the Amtrak Board unanimously approved an acquisition strategy. *See* T. 84:13-85:16, 81:16-83:6; Plaintiff Ex. 1. DOT supported the acquisition not only by having its representative vote for the acquisition (T. 83:4-5) but also by approving funding (JX 3 at 0000107).

34.     The undisputed evidence is that Amtrak carefully considered its statutory purposes and goals in making the decision to acquire the Subject Property Interest. *See* T. 73:14-15. Additionally, Amtrak considered the risk of not moving to acquire the Subject Property Interest when it did, including risks "in advancing projects and getting improvements made," including potential inability "to progress the facility improvements necessary to support the launch of the new Acela trains," and risks related to USI's financial situation. *See* T. 74:11-76:14. The undisputed facts collectively demonstrate that the condemned interest has a significant connection to Amtrak's goal of providing intercity passenger rail transportation.

35.     Defendants assert that Amtrak does not need the Subject Property Interest now because the timeline for certain construction projects at the Station will remain the same with or without possession. But Mr. Gardner testified that the lack of possession currently prevents Amtrak from making substantial *immediate* improvements that would directly relate to intercity rail passenger transportation. *See* JX 4; T. 87:21-90:7; 94: 19-95:3. This evidence is significant, persuasive and, for the most part, unrebutted. Moreover, the Court is not in a position to, and need not, determine the optimal timeline for projects Amtrak has determined to pursue. *See 900 2nd*

*Street NE*, 266 F. Supp. 3d at 73 (explaining that assuming Amtrak's goals have a requisite connection to the property, the Court "is not in a position to assess….the optimal way to further that mission"); *see also Nat'l R.R. Passenger Corp. v. 4.945 Square Feet of Land More or Less Situated in Cnty. of Bristol, Mass.*, 1 F. Supp. 2d 79, 82 (D. Mass. 1998) (concluding "that 'necessary' should be construed to mean that Amtrak finds that an acquisition is a useful and appropriate way to accomplish its goals," and that courts should "review Amtrak's decision ... to determine if it has abused its discretion by making an unreasonable business judgment that the condemnation of the property is necessary"). Amtrak has made a sufficient showing to permit a transfer of possession.

36.     Defendants also argue that acquisition of the Subject Property Interest alone would not allow Amtrak to achieve all its objectives at the Station because Amtrak will still need approval from other entities to proceed. While approvals for certain projects may be needed from DOT, FRA and/or USRC, no evidence suggested such approvals would be unattainable. Rather, the evidence establishes that DOT and FRA support the condemnation because the DOT representative on Amtrak's Board voted in favor of an acquisition strategy that included the condemnation action, and Amtrak anticipates that it will be able to work with USRC. *See* T. 86:25-87:3. Moreover, the need for some future approvals for some projects does not undercut Amtrak's conclusion that the Subject Property Interest is needed now. Amtrak determined that by possessing the USI sublease, it could immediately make "huge improvement[s]" and immediate changes without needing any further approvals. *See* T. 86:15-90:7. Finally, property may have a "significant connection" to Amtrak's "goal of providing intercity passenger rail transportation," even if it may not be sufficient for Amtrak to fulfill all its goals. The statute does not require Amtrak to demonstrate that property will be sufficient for all purposes; it only requires necessity

17

for intercity rail passenger transportation.

37.     Defendants next argue that Amtrak has no need to acquire the Subject Property Interest because, post-filing, USI has new management. But the condemnation statute anticipates determining necessity prior to, not after, the filing of the condemnation action. USI obtaining new management after the filing of this action is legally irrelevant. Moreover, Amtrak's need for the Subject Property Interest does not depend on who runs USI. *See* T. 69:7-70:14.

38.     Finally, Defendants argue that Amtrak could sublease additional space from USI rather than condemning the leasehold. But Amtrak does not currently have the right to sublease the entire Subject Property Interest. *See* T. 302:21-303:16. And Mr. Gardner testified that Amtrak's "experience with USI in the past has been that any conversation about using additional space has come with financial demands and difficult negotiations"—and subleasing space from USI was not Amtrak's goal. *See* T. 142:10-15. Furthermore, Mr. Rebibo's own testimony supports the conclusion that Amtrak would not easily be able to obtain the space it desires. He opined that Amtrak's desired use of space would significantly alter the core use of the property and, in his view, devalue it. *See* T. 274:2-11, 276:3-7. He also admitted that in any new sublease, he would insist on rental payments from Amtrak at what USI felt was the "fair market share." T. 312:18-21; 313:1-8. In any case, Mr. Gardner was emphatic that subleasing as opposed to acquiring additional space would not satisfy all of Amtrak's space needs. *See* T. 46:4-23. He described numerous potential uses of the Station for rail, security, passenger-related functions, restrooms and offices. T. 46:24-55:7; *see also* Plaintiff Ex.10. Most importantly, 49 U.S.C. § 24311 does not require Amtrak attempt to negotiate for a lesser interest from a property owner before seeking to condemn a property interest. In *900 2nd Street NE*, the court rejected the argument that Amtrak should have obtained a lesser interest, such as an easement pre-suit, making a taking not "necessary." 266 F.

Supp. 3d at 73. Where securing something less than the full interest "would not afford Amtrak the necessary flexibility as it continued to expand Union Station," the possibility of a securing a lesser interest "does not undermine the soundness of Amtrak's conclusion or its compliance with [49 U.S.C.] § 24311." *Id*. And the Court "is not in a position to assess" whether a lesser property interest would be sufficient to accomplish Amtrak's goals. *Id*. Instead, the statute places the discretion to make that decision with Amtrak.

39.     The Court therefore finds that Amtrak has made an adequate showing of necessity under Section 24311(a)(1)(A) to permit an immediate transfer of possession.[9]

## III.    DEFENDANTS HAVE MADE NO SHOWING OF UNDUE HARDSHIP

40.     Under the undue hardship test applied to possession under the DTA, district courts have limited discretion over the transfer of possession to the condemnor. Specifically, they may only "examine the equities of the matter to evaluate whether some undue hardship to the present landowner or occupant might warrant some temporal gap between the filing of the declaration of taking and the owners' surrender of possession." *74.57 Acres of Land, More or Less*, 2012 WL 1231933, at *2 (emphasis added). "Although the district court fixes the time and any terms of the possession, the government takes possession of the condemned property as a matter of course, unless the landowner or occupant demonstrates some undue hardship that warrants a delay." *E. Tenn. Nat. Gas Co.*, 361 F.3d at 825; *see also United States ex rel. TVA v. Temp. Right to Enter Land in Meigs Cnty. Tenn.*, 397 F. Supp. 3d 1111, 1114 (E.D. Tenn. 2019) (noting that § 3114(d) "affords the Court some limited discretionary administrative power over how and precisely when

---

[9] To the extent Defendants object that any evidence presented at the September 11, 2023 hearing was not discussed in the Complaint, that objection is meritless. Rule 71.1(c)(2) only requires "a short and plain statement" of the taking's purpose. Amtrak's Complaint did much more, explaining that the Subject Property Interest was needed for intercity passenger rail transportation and providing many examples and details in support. *E.g.*, Complaint ¶¶ 1, 7-15, 27-63 (Dkt. No. 1). Defendants then had the opportunity to explore Amtrak's need for the taking in discovery, including document production, interrogatories, and depositions. Finally, Defendants did not object on this basis to any of the evidence admitted at the September 11, 2023 hearing, thus any objection is waived.

the Government may possess the property, [but] ultimate possession . . . is inevitable").

41.     The type of hardship necessary for a court to delay an award of possession to a condemnor was best described in *United States v. 6,576.27 Acres of Land, More or Less, in McLean County, North Dakota*, 77 F. Supp. 244 (D.N.D. 1948). There, the federal government condemned thousands of acres of farmland in connection with the construction of a dam on the Missouri River. *Id*. at 244-45. The court issued an ex parte order providing that possession of the property should be delivered to the Government within 30 days. *Id*. at 245. The day before the 30 day period had run, the affected landowners moved the court to delay the Government's possession. *Id*. The court considered the "time and terms of possession" wording of the DTA under the "facts and circumstances" of the case and found:

> a possessory order . . . which provided that possession must be given to the Government . . . at the beginning of or during the seeding season, might very well work hardship and therefore injustice to the farm families who are currently residing upon and have been operating the lands in question and who have commenced or are about to commence their seeding operations. The order, according to the record, was served upon them only a matter of a few days prior to the date for possession. In the very nature of things, it would be difficult, if not impossible, for such farm families to move by the date fixed in the order, much less for them to acquire other farm lands so that they could make their livelihood during the year 1948.

*Id*. at 246. The court thus amended its prior order to permit the owners temporarily to keep the land already taken for the 1948 farming season in exchange for rental payments. *Id*. at 248.

42.     With Amtrak having made the requisite showing to transfer possession, Defendants may only delay a transfer with a showing of undue hardship. They have not made such a showing. USI has been in possession since the filing of this action—a period of over 16 months. This fact alone mitigates against any argument of undue hardship: USI has already had more than the short transition period authorized by the cases discussed above. Yet instead of preparing for a potential transition of possession, USI has been increasing the burden on the Subject Property Interest,

negotiating numerous leases and agreements *after* the filing of this condemnation case. T. 335:20-21. They have done so knowing that Amtrak now holds the legal title to the Subject Property Interest, knowing that Amtrak had deposited $250 million in exchange for that title, and they did so without consulting or involving Amtrak. *See* T. 328:2-25. Knowing that Amtrak held the title and was seeking possession, USI cannot now argue that loss of possession will deprive it of the benefits of its unilateral conduct: USI may not create its own harm as a means of defeating Amtrak's possession. *Cf. Di Biase v. SPX Corp.*, 872 F.3d 224, 235 (4th Cir. 2017) (denying injunction where movants "have not shown that they availed themselves of opportunities to avoid the injuries of which they now complain"). The only hardship Defendants could claim is purely financial, and that is capable of compensation later in the case.[10] Finally, Defendants' desire to keep the interest is not the type of hardship that prevents transfer of possession. As the Fourth Circuit has explained: "We fully understand that condemnation often forces landowners to part with land that they would prefer to keep for many reasons, including sentimental ones. However, the Supreme Court long ago recognized that 'in view of the liability of all property to condemnation for the common good, loss to the owner of nontransferable values deriving from his unique need for property or idiosyncratic attachment to it . . . is properly treated as part of the burden of common citizenship.'" *E. Tenn. Nat. Gas Co.*, 361 F.3d at 829 (*citing Kimball Laundry Co. v. United States*, 338 U.S. 1, 5 (1949) (ellipsis in original)). In sum, Defendants have not shown undue hardship sufficient to forestall a transfer of possession.[11]

---

[10] While USI has a possessory interest, USSM and the Lender do not. In describing the relationship between USI and Kookmin, Mr. Rebibo indicated that Kookmin was a lender with a lien on the Subject Property Interest. Prior to the filing of this condemnation action, Kookmin had not foreclosed upon that interest and was not in control of the Subject Property Interest. T. 309:4-310:12; Plaintiff Ex. 8. As a lender and lienholder, any harm it may experience is financial and therefore by definition not undue hardship that qualifies to forestall a transfer of possession.

[11] If Defendants are owed any outstanding charges related to the Subject Property Interest, the court will later have an opportunity to determine "the disposition of outstanding charges related to the property." 49 U.S.C. § 24311(b)(2)(B); *Cf. Meigs Cnty.*, 397 F. Supp. 3d at 1115 (noting that the condemnee could not stop a transfer of possession, but "[i]f

43.     While Amtrak has no obligation to demonstrate any sort of hardship, Amtrak presented evidence that Defendants' current leasing and contracting activity may hamper Amtrak's ability to use the property as it needs. *See* T. 328:2-25, 330:20-331:10. Without possession, Amtrak cannot prevent Defendants from encumbering the property. And unlike Amtrak, Defendants have not deposited any amount with the Court to compensate Amtrak for the consequences of these burdens. Mr. Gardner persuasively explained why possession should not be further delayed:

> Every day we wait, we're postponing the opportunity to improve the facility. We are increasing project costs, which are ultimately going to be borne by the federal taxpayer, which is our investor. We are delaying the services and improvements necessary to really give our passengers the experience that our owners expect from us and that out passengers expect. We are getting further behind to meet the coming increase of passengers associated with our new Acela train launch. All of these things just get farther behind. Today we've invested $250 million, a credible amount of money, to acquire, but we do not have control.

T. 94:6-20.

44.     In sum, Defendants have shown no undue hardship, and though Amtrak need not show any hardship, it has shown that USI's possession is harming Amtrak's ability to fulfill the purposes for which it has condemned the Subject Property Interest.

## IV.   DEFENDANTS' OTHER EFFORTS TO AVOID TRANSFER OF POSSESSION ARE UNAVAILING.

45.     Defendants presses several other arguments opposing transfer of possession, but each is unavailing.

46.     First, Defendants argued that Amtrak can only condemn property at the Station pursuant to 49 U.S.C. § 24311(a)(1)(B), claiming that because Amtrak did not act at the Secretary's request as that provision requires, the condemnation action cannot proceed. This position misreads the statute. 49 U.S.C. § 24311(a)(1) allows Amtrak to use its eminent domain

---

and when such a hardship should arise," could "seek relief pursuant to 40 U.S.C.A. § 3114(d)," the DTA's analogous provision).

powers when "necessary for intercity rail passenger transportation" *or* when the Secretary makes a request related to the Station in connection with the Secretary's duty to build an "intermodal transportation terminal" at the Station. The use of the disjunctive "or" allows Amtrak to act under either subsection. And while subpart (A) does carve out certain exceptions where Amtrak's authority is restricted—for property of a rail carrier, a political subdivision of a State, or a government authority—it does not carve out any property at the Station, including the Subject Property Interest.[12] Accordingly, the natural reading is not that subpart (A) applies everywhere in the country except at the Station, but rather that subpart (B) creates a second and alternative basis for an eminent domain action regarding the Station—namely where a property interest at the Station devoted solely to intermodal transportation usage could be acquired by Amtrak even if it was potentially not necessary for intercity rail passenger transportation.

47.     Second, Defendants argued for the first time at the September 11, 2023 hearing that Amtrak's condemnation authority under 49 U.S.C. § 24311(a)(1)(A) has been abrogated as it relates to the Subject Property Interest by either the Union Station Redevelopment Act of 1981 (Pub. L. No. 97-125, 95. Stat. 1667) (the "Redevelopment Act")[13] and/or the leases made for property interests. *See* Lender Exs. 4, 8, and 17. This Court rejects these arguments on both procedural and substantive grounds. While the Lender alleges in its Answer that 49 U.S.C. § 24311 "does not authorize Amtrak to disrupt [the leasing] arrangement and 'condemn over' the existing leases that the government and government-controlled entities established," (ECF No. 35 at 36), it nowhere asserts the Redevelopment Act nor any lease as a defense that limits Amtrak's

---

[12] The Subject Property Interest is not property of a rail carrier, a political subdivision of a State, or a government authority because it is a sublease held by USI, a private corporation.
[13] The Redevelopment Act was originally enacted as 95 Stat. 1667, Public Law No. 97-125 and codified at 40 U.S.C. §§ 801, 802, 811-19, revised to 40 U.S.C. §§ 6901-6910.

condemnation rights.[14] Federal Rule of Civil Procedure 71.1 thus prohibits this Court from considering these objections. *See*, *e.g.*, *United States v. 14.02 Acres of Land More Or Less In Fresno Cnty.*, 547 F.3d 943, 953 (9th Cir. 2008) (agreeing that condemnee waived argument "that the condemnation is unlawful" for failure to obtain approval from state regulator because argument was not raised in answer); *Gov't of V.I. v. 19.623 Acres of Land, Etc.*, 536 F.2d 566, 569-70 (3d Cir. 1976) (construing the predecessor to Rule 71.1 and holding that it was "incorrect for the trial court here to have raised a defense not claimed by the landowners in their answers.").

48.     Even if the Lender had preserved these arguments, they would fail: neither the Redevelopment Act nor any lease limits Amtrak's condemnation authority as authorized by Congress in 49 U.S.C. § 24311. The Redevelopment Act addresses how the Federal Government can acquire an interest in property related to Union Station and provides that the Secretary of Transportation "may" manage "any property interest the Secretary holds or acquires for the Government," but it does not state that *only* the government or Secretary can do so. 40 U.S.C. § 6904(b). The legislative history of the Redevelopment Act confirms this: it states that it "enable[s] the Federal Government to withdraw from active management of Union Station" and have one "managing entity" but that "DOT need not be this entity," and the redeveloped parcel "might be entrusted to AMTRAK, which will be its primary user, to a private firm, to another public agency, or to a nonprofit, public-private development corporation created for the purpose." S. Rep. No. 97-269, at 13 (1981), *as reprinted in* 1981 U.S.C.C.A.N. 2711, 2723. Far from *limiting* Amtrak's ability to acquire the Subject Property Interest and/or to exercise its condemnation powers, the Act allows for it.

49.     Defendants' lease argument is equally unavailing. First, Defendants could not

---

[14] The only time the Redevelopment Act is mentioned is on page 10 of the Answer to refer the Court to it "for its full import and meaning" as part of a general denial of paragraph 10 of the Complaint describing said Act.

explain how a lease can preempt a federal statute. It cannot. Congress vested Amtrak with the power to condemn, and neither DOT nor USRC (a private entity) can take that away, much less via a lease. *See Biodiversity Assocs. v. Cables*, 357 F.3d 1152, 1172 (10th Cir. 2004) ("The executive branch does not have authority to contract away the enumerated constitutional powers of Congress or its own successors, and certainly neither does a private group."). No precedent supports Defendants' invented doctrine of "lease preemption." Second, even if *a* lease could preempt Amtrak's condemnation statute, the leases that have been submitted as Lender Exs. 4, 8, and 17 do not bar Amtrak from condemning the Subject Property Interest. Each lease contains provisions acknowledging that condemnation could occur and was not prohibited. Furthermore, the language Defendants rely upon limits only the Lessee's ability to transfer the lease—but condemnation is not a transfer by the Lessee. Nothing in the leasing structure limits the statutory eminent domain rights given to Amtrak by Congress. Third, Defendants have no adequate response to DOT's approval of Amtrak's acquisition, which would appear to undermine substantially the argument that DOT's lease bars the acquisition. For these reasons, Defendants' lease argument has no bearing on possession.

## V.   ORDER OF POSSESSION

This Court enters the proposed Order Requiring Delivery of Possession to Amtrak Under Stated Terms and Conditions, attached as **Exhibit 1** hereto. The Defendants shall retain the ability to continue to contest viability of the taking after the entry of this Order.

Respectfully submitted,

COUNSEL FOR PLAINTIFF NATIONAL RAILROAD
PASSENGER CORPORATION

/Patricia McHugh Lambert

25

Patricia McHugh Lambert, US DC Bar ID MD0008
Kambon R. Williams, US DC Bar ID MD29872
PESSIN KATZ LAW, P.A.
901 Dulaney Valley Road, Suite 500
Towson, MD  21204
Telephone: 410-938-8800
Fax: 410-832-5650
plambert@pklaw.com
kwilliams@pklaw.com


/Lindsay C. Harrison
Lindsay C. Harrison, DC Bar #977407
Jessica Ring Amunson, DC Bar #497223
JENNER & BLOCK, LLP
1099 New York Avenue, NW, Suite 900
Washington, D.C. 20001-4412
Telephone: 202-639-6000
Fax: 202-639-6066
lharrison@jenner.com
jamunson@jenner.com