APPEAL,TYPE–E

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: <u>1:22–cv–01043–APM</u>
### *Internal Use Only*

NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK) v. SUBLEASE INTEREST OBTAINED PURSUANT TO AN ASSIGNMENT AND ASSUMPTION OF LEASEHOLD INTEREST MADE AS OF JANUARY 25, 2007 et al
Assigned to: Judge Amit P. Mehta
Cause: 28:1358 Land Condemnation

Date Filed: 04/14/2022
Jury Demand: None
Nature of Suit: 210 Condemnation
Jurisdiction: Federal Question

**Plaintiff**

| | | |
|---|---|---|
| **NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK)** | represented by | **Lindsay C. Harrison** |

**NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK)**

represented by

**Lindsay C. Harrison**
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001–4412
(202) 639–6865
Email: <u>LHarrison@jenner.com</u>
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jessica Ring Amunson**
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
(202) 639–6023
Fax: (202) 661–4993
Email: <u>jamunson@jenner.com</u>
*ATTORNEY TO BE NOTICED*

**Kambon R. Williams**
PESSIN KATZ LAW, P.A.
901 Dulaney Valley Road
Suite 500
Towson, MD 21204
(410) 769–6142
Fax: (410) 832–5639
Email: <u>kwilliams@pklaw.com</u>
*ATTORNEY TO BE NOTICED*

**Patricia M. Lambert**
PESSIN KATZ LAW, P.A.
901 Dulaney Valley Road
Suite 500
Towson, MD 21204

1

(410) 339–6759
Fax: (410) 832–5628
Email: plambert@pklaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**SUBLEASE INTEREST OBTAINED
PURSUANT TO AN ASSIGNMENT
AND ASSUMPTION OF
LEASEHOLD INTEREST MADE AS
OF JANUARY 25, 2007**
*with said property interest PERTAINING
TO DESCRIBED LEASEHOLD
INTERESTS AT WASHINGTON UNION
STATION*

**Defendant**

**UNION STATION INVESTCO, LLC**          represented by   **James H. Hulme**
ARENT FOX LLP
1717 K Street, NW
Washington, DC 20036–5344
(202) 857–6144
Fax: (202) 857–6395
Email: james.hulme@afslaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven Jay Willner**
NEUBERGER, QUINN, GIELEN,
RUBIN & GIBBER, P.A.
One South Street
27th Floor
Baltimore, MD 21202
410–332–8542
Email: sjw@nqgrg.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas Moss Wood , IV**
NEUBERGER, QUINN, GIELEN,
RUBIN & GIBBER, P.A.
One South Street
27th Floor
Baltimore, MD 21202
410–332–8523
Fax: 410–332–8564
Email: tmw@nqgrg.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian M. Boyle**
BERMAN, BOYLE & ENGEL LLC
1777 Reisterstown Road
Suite 265
Baltimore, MD 21208
240–746–1180
Email: bmb@bbelaw.com
*ATTORNEY TO BE NOTICED*

**Daniel James Koevary**
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, NY 10019
212–506–1700
Email: DKoevary@kasowitz.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**David Mark**
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, NY 10019
212–506–1700
Email: dmark@kasowitz.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**David Ross**
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, NY 10019
212–506–1700
Email: dross@kasowitz.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Henry B. Brownstein**
KASOWITZ BENSON TORRES LLP
1401 New York Avenue, NW
Suite 401
Wasington, DC 20005
202–760–3403
Email: hbrownstein@kasowitz.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**UNION STATION SOLE MEMBER,**
**LLC**

represented by **James H. Hulme**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel James Koevary**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**David Mark**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**David Ross**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Henry B. Brownstein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**KOOKMIN BANK CO., LTD.**
*Individually and in its capacity as trustee*
*of KTB CRE Debt Fund No. 8, a Korean*
*Investment trust*

represented by  **Amber R. Will**
MORRISON COHEN, LLP
909 Third Avenue
New York, NY 10022
212–735–8600
Email: awill@morrisoncohen.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brett Dockwell**
MORRISON COHEN, LLP
909 Third Avenue
New York, NY 10022
212–735–8600
Email: bdockwell@morrisoncohen.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brian M. Boyle**
(See above for address)
*TERMINATED: 05/17/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kristin T. Roy**
MORRISON COHEN, LLP
909 Third Avenue
27th Floor
New York, NY 10022
212–735–5584

Fax: 212–735–8790
Email: kroy@morrisoncohen.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Latisha Thompson**
MORRISON COHEN, LLP
909 Third Avenue
New York, NY 10022
212–735–8600
Email: lthompson@morrisoncohen.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Louis J. Rouleau**
WOMBLE BOND DICKINSON (US)
LLP
1200 19th Street, NW
Suite 500
Washington, DC 20036
(202) 857–4558
Fax: (202) 467–6910
Email: louis.rouleau@hklaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paul J. Kiernan**
HOLLAND & KNIGHT LLP
800 17th Street, NW
Suite 1100
Washington, DC 20006
(202) 955–5564
Email: paul.kiernan@hklaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas Moss Wood , IV**
(See above for address)
*TERMINATED: 05/17/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Y. David Scharf**
MORRISON COHEN, LLP
909 Third Avenue
New York, NY 10022
212–735–8604
Email: dscharf@morrisoncohen.com
*LEAD ATTORNEY*
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Defendant**

**UNKNOWN OWNERS**

| Date Filed | # | Docket Text |
|---|---|---|
| 04/14/2022 | 1 | COMPLAINT against KOOKMIN BANK CO., LTD., SUBLEASE INTEREST OBTAINED PURSUANT TO AN ASSIGNMENT AND ASSUMPTION OF LEASEHOLD INTEREST MADE AS OF JANUARY 25, 2007, WITH SAID PROPERTY INTEREST PERTAINING TO DESCRIBED LEASEHOLD INTERESTS AT WASHIN, UNION STATION INVESTCO, LLC, UNION STATION SOLE MEMBER, LLC, UNKNOWN OWNERS ( Filing fee $ 402 receipt number ADCDC–9170560) filed by NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK). (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Summons, # 4 Summons, # 5 Summons, # 6 Summons, # 7 Civil Cover Sheet)(Harrison, Lindsay) (Entered: 04/14/2022) |
| 04/14/2022 | 2 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK) (Harrison, Lindsay) (Entered: 04/14/2022) |
| 04/14/2022 | 3 | NOTICE */ Praecipe for Deposit of Money Into Court* by NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK) (Attachments: # 1 Order Regarding Deposit With the Court Registry Investment System)(Harrison, Lindsay) (Entered: 04/14/2022) |
| 04/14/2022 | 4 | DECLARATION *of Taking* by NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK) re 1 Complaint,, filed by NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK), 3 Notice (Other) filed by NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK). (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Harrison, Lindsay) (Entered: 04/14/2022) |
| 04/14/2022 | | Case Assigned to Judge Amit P. Mehta. (znmg) (Entered: 04/14/2022) |
| 04/14/2022 | 5 | NOTICE */ Line Regarding Notice of Filing of Condemnation* by NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK) (Harrison, Lindsay) (Entered: 04/14/2022) |
| 04/14/2022 | 6 | NOTICE */ Line Regarding Notice of Filing of Condemnation* by NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK) (Harrison, Lindsay) (Entered: 04/14/2022) |
| 04/14/2022 | 7 | NOTICE *of Condemnation* by NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK) (Harrison, Lindsay) (Entered: 04/14/2022) |
| 04/14/2022 | 8 | NOTICE *of Condemnation* by NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK) (Harrison, Lindsay) (Entered: 04/14/2022) |
| 04/14/2022 | 9 | NOTICE *of Condemnation* by NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK) (Harrison, Lindsay) (Entered: 04/14/2022) |
| 04/14/2022 | | DEPOSIT of Funds in the amount of $250,000,000.00; Receipt Number DCXCCA22–00142. (znmg) (Entered: 04/15/2022) |

| 04/15/2022 | 10 | NOTICE of Appearance by Patricia M. Lambert on behalf of NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK) (Lambert, Patricia) (Entered: 04/15/2022) |
|---|---|---|
| 04/15/2022 | 11 | NOTICE of Appearance by Jessica Ring Amunson on behalf of NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK) (Amunson, Jessica) (Entered: 04/15/2022) |
| 04/15/2022 | 12 | NOTICE of Appearance by Kambon R. Williams on behalf of NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK) (Williams, Kambon) (Entered: 04/15/2022) |
| 04/15/2022 | 13 | SUMMONS (4) Issued Electronically as to KOOKMIN BANK CO., LTD., SUBLEASE INTEREST OBTAINED PURSUANT TO AN ASSIGNMENT AND ASSUMPTION OF LEASEHOLD INTEREST MADE AS OF JANUARY 25, 2007, UNION STATION INVESTCO, LLC, UNION STATION SOLE MEMBER, LLC. (Attachments: # 1 Notice and Consent)(znmw) (Entered: 04/15/2022) |
| 04/18/2022 | 14 | ORDER regarding deposit with court registry investment system. See attached Order for details. Signed by Judge Amit P. Mehta on 4/18/2022. (lcapm2) (Entered: 04/18/2022) |
| 04/27/2022 | 15 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. UNION STATION INVESTCO, LLC served on 4/15/2022, answer due 5/6/2022 (Harrison, Lindsay) (Entered: 04/27/2022) |
| 04/27/2022 | 16 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. UNION STATION SOLE MEMBER, LLC served on 4/15/2022, answer due 5/6/2022 (Harrison, Lindsay) (Entered: 04/27/2022) |
| 04/27/2022 | 17 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. KOOKMIN BANK CO., LTD. served on 4/26/2022, answer due 5/17/2022 (Harrison, Lindsay) (Entered: 04/27/2022) |
| 05/06/2022 | 18 | Unopposed MOTION for Extension of Time to File Answer re 1 Complaint,, by UNION STATION INVESTCO, LLC, UNION STATION SOLE MEMBER, LLC. (Attachments: # 1 Text of Proposed Order)(Hulme, James) (Entered: 05/06/2022) |
| 05/06/2022 | | MINUTE ORDER granting 18 Unopposed Motion to Extend Time to Answer Complaint. Defendants Union Station Investco, LLC and Union Station Sole Member, LLC shall respond to the complaint on or before May 20, 2022. Signed by Judge Amit P. Mehta on 5/6/2022. (lcapm2) (Entered: 05/06/2022) |
| 05/09/2022 | 19 | NOTICE of Appearance by Brian M. Boyle on behalf of KOOKMIN BANK CO., LTD. (Boyle, Brian) (Entered: 05/09/2022) |
| 05/09/2022 | 20 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Mahnoor Misbah, Filing fee $ 100, receipt number ADCDC–9224157. Fee Status: Fee Paid. by KOOKMIN BANK CO., LTD.. (Attachments: # 1 Declaration of Mahnoor Misbah, # 2 Text of Proposed Order of Mahnoor Misbah)(Boyle, Brian) (Entered: 05/09/2022) |
| 05/09/2022 | 21 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Y. David Scharf, Filing fee $ 100, receipt number ADCDC–9224207. Fee Status: Fee Paid. by KOOKMIN BANK CO., LTD.. (Attachments: # 1 Declaration Y. David Scharf, # 2 Text of Proposed Order Y. David Scharf)(Boyle, Brian) (Entered: 05/09/2022) |

| 05/09/2022 | 22 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Kristin T. Roy, Filing fee $ 100, receipt number ADCDC–9224235. Fee Status: Fee Paid. by KOOKMIN BANK CO., LTD.. (Attachments: # 1 Declaration Kristin T. Roy, # 2 Text of Proposed Order Kristin T. Roy)(Boyle, Brian) (Entered: 05/09/2022) |
|---|---|---|
| 05/09/2022 | 23 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Latisha V. Thompson, Filing fee $ 100, receipt number ADCDC–9224254. Fee Status: Fee Paid. by KOOKMIN BANK CO., LTD.. (Attachments: # 1 Declaration Latisha V. Thompson, # 2 Text of Proposed Order Latisha V. Thompson)(Boyle, Brian) (Entered: 05/09/2022) |
| 05/09/2022 | 24 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Brett D. Dockwell, Filing fee $ 100, receipt number ADCDC–9224264. Fee Status: Fee Paid. by KOOKMIN BANK CO., LTD.. (Attachments: # 1 Declaration Brett D. Dockwell, # 2 Text of Proposed Order Brett D. Dockwell)(Boyle, Brian) (Entered: 05/09/2022) |
| 05/09/2022 | 25 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Amber R. Will, Filing fee $ 100, receipt number ADCDC–9224286. Fee Status: Fee Paid. by KOOKMIN BANK CO., LTD.. (Attachments: # 1 Declaration Amber R. Will, # 2 Text of Proposed Order Amber R. Will)(Boyle, Brian) (Entered: 05/09/2022) |
| 05/09/2022 | 26 | NOTICE of Appearance by Thomas Moss Wood, IV on behalf of KOOKMIN BANK CO., LTD. (Wood, Thomas) (Entered: 05/09/2022) |
| 05/09/2022 |  | MINUTE ORDER granting 20 , 21 , 22 , 23 , 24 , 25 Motions for Admission Pro Hac Vice. Attorneys Mahnoor Misbah, Y. David Scharf, Kristin T. Roy, Latisha V. Thompson, Brett Dockwell, and Amber R. Will are hereby admitted pro hac vice to appear in this matter. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Amit P. Mehta on 5/9/2022. (lcapm2) (Entered: 05/09/2022) |
| 05/11/2022 | 27 | NOTICE of Appearance by Y. David Scharf on behalf of KOOKMIN BANK CO., LTD. (Scharf, Y.) (Entered: 05/11/2022) |
| 05/11/2022 | 28 | NOTICE of Appearance by Kristin T. Roy on behalf of KOOKMIN BANK CO., LTD. (Roy, Kristin) (Entered: 05/11/2022) |
| 05/11/2022 | 29 | NOTICE of Appearance by Latisha Thompson on behalf of KOOKMIN BANK CO., LTD. (Thompson, Latisha) (Entered: 05/11/2022) |
| 05/11/2022 | 30 | NOTICE of Appearance by Brett Dockwell on behalf of KOOKMIN BANK CO., LTD. (Dockwell, Brett) (Entered: 05/11/2022) |
| 05/11/2022 | 31 | NOTICE of Appearance by Amber R. Will on behalf of KOOKMIN BANK CO., LTD. (Will, Amber) (Entered: 05/11/2022) |
| 05/16/2022 | 32 | NOTICE of Appearance by Paul J. Kiernan on behalf of KOOKMIN BANK CO., LTD. (Kiernan, Paul) (Entered: 05/16/2022) |
| 05/16/2022 | 33 | NOTICE of Appearance by Louis J. Rouleau on behalf of KOOKMIN BANK CO., LTD. (Rouleau, Louis) (Entered: 05/16/2022) |
| 05/17/2022 | 34 | NOTICE OF WITHDRAWAL OF APPEARANCE as to KOOKMIN BANK CO., LTD.. Attorney Brian M. Boyle and Thomas Moss Wood, IV terminated. (Wood, Thomas) (Entered: 05/17/2022) |
| 05/17/2022 | 35 |  |

| | | |
|---|---|---|
| | | ANSWER to Complaint by KOOKMIN BANK CO., LTD..(Scharf, Y.) (Entered: 05/17/2022) |
| 05/19/2022 | | MINUTE ORDER. I hereby notify the parties that I have known counsel for Kookmin Bank Co., Paul Kiernan, for many years. His spouse and I were colleagues and later partners at Zuckerman Spaeder, LLP (she is no longer a partner there), and we have remained social friends ever since. Pre–pandemic, I would estimate socializing with Mr. Kiernan and his spouse once or twice per year. I do not believe that my relationship with Mr. Kiernan requires my recusal, but I provide this information in the interest of disclosure and for the parties' consideration. Signed by Judge Amit P. Mehta on 5/19/2022. (lcapm2) (Entered: 05/19/2022) |
| 05/19/2022 | 36 | ANSWER to Complaint by UNION STATION INVESTCO, LLC.(Boyle, Brian) (Entered: 05/19/2022) |
| 05/19/2022 | 37 | NOTICE of Appearance by Thomas Moss Wood, IV on behalf of UNION STATION INVESTCO, LLC (Wood, Thomas) (Entered: 05/19/2022) |
| 05/19/2022 | 38 | ANSWER to Complaint by UNION STATION INVESTCO, LLC, UNION STATION SOLE MEMBER, LLC.(Hulme, James) (Entered: 05/19/2022) |
| 05/19/2022 | 39 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by UNION STATION INVESTCO, LLC (Hulme, James) (Entered: 05/19/2022) |
| 05/19/2022 | 40 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by UNION STATION SOLE MEMBER, LLC (Hulme, James) (Entered: 05/19/2022) |
| 05/20/2022 | 41 | WITHDRAWN PURSUANT TO NOTICE FILED 5/25/2022.....Emergency MOTION for Interim Term of Possession re 1 Complaint,, by NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK). (Attachments: # 1 Memorandum in Support, # 2 Attachment 1 – Declaration of Patricia McHugh Lambert, # 3 Attachment 2 – Declaration of Dr. David Handera, # 4 Text of Proposed Order)(Harrison, Lindsay) Modified on 5/26/2022 (zeg). (Entered: 05/20/2022) |
| 05/20/2022 | | MINUTE ORDER. Defendants shall respond to Amtrak's 41 Emergency Motion for Interim Term of Possession by no later than noon on May 25, 2022. The parties shall appear for a hearing on the Emergency Motion on May 26, 2022, at 2:30 p.m. in Courtroom 10. Signed by Judge Amit P. Mehta on 5/20/2022. (lcapm2) (Entered: 05/20/2022) |
| 05/20/2022 | 42 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– David E. Ross, Filing fee $ 100, receipt number ADCDC–9253811. Fee Status: Fee Paid. by UNION STATION INVESTCO, LLC, UNION STATION SOLE MEMBER, LLC. (Attachments: # 1 Declaration of David E. Ross in Support of Motion for Admission Pro Hac Vice, # 2 Text of Proposed Order)(Brownstein, Henry) (Entered: 05/20/2022) |
| 05/20/2022 | 43 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– David J. Mark, Filing fee $ 100, receipt number ADCDC–9253830. Fee Status: Fee Paid. by UNION STATION INVESTCO, LLC, UNION STATION SOLE MEMBER, LLC. (Attachments: # 1 Declaration of David J. Mark in Support of Motion for Admission Pro Hac Vice, # 2 Text of Proposed Order)(Brownstein, Henry) (Entered: 05/20/2022) |
| 05/20/2022 | 44 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Daniel J. Koevary, Filing fee $ 100, receipt number ADCDC–9253876. Fee Status: Fee Paid. by UNION |

|  |  | STATION INVESTCO, LLC, UNION STATION SOLE MEMBER, LLC. (Attachments: # 1 Declaration of Daniel J. Koevary in Support of Motion for Admission Pro Hac Vice, # 2 Text of Proposed Order)(Brownstein, Henry) (Entered: 05/20/2022) |
|---|---|---|
| 05/23/2022 | 45 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by KOOKMIN BANK CO., LTD. (Scharf, Y.) (Entered: 05/23/2022) |
| 05/23/2022 |  | MINUTE ORDER granting 42 Motion for Admission Pro Hac Vice. Attorney David E. Ross is hereby admitted pro hac vice to appear in this matter. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Amit P. Mehta on 5/23/2022. (lcapm2) (Entered: 05/23/2022) |
| 05/23/2022 |  | MINUTE ORDER granting 43 Motion for Admission Pro Hac Vice. Attorney David J. Mark is hereby admitted pro hac vice to appear in this matter. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Amit P. Mehta on 5/23/2022. (lcapm2) (Entered: 05/23/2022) |
| 05/23/2022 |  | MINUTE ORDER granting 44 Motion for Admission Pro Hac Vice. Attorney Daniel J. Koevary is hereby admitted pro hac vice to appear in this matter. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Amit P. Mehta on 5/23/2022. (lcapm2) (Entered: 05/23/2022) |
| 05/24/2022 | 46 | NOTICE *Suggestion of Mootness* by KOOKMIN BANK CO., LTD. (Kiernan, Paul) (Entered: 05/24/2022) |
| 05/25/2022 | 47 | WITHDRAWAL of Motion by NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK) re 41 Emergency MOTION for Interim Term of Possession re 1 Complaint,, filed by NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK) . (Attachments: # 1 Exhibit A)(Harrison, Lindsay) (Entered: 05/25/2022) |
| 05/25/2022 |  | NOTICE of Hearing: A status conference is set for May 26, 2022 at 2:30 PM via videoconference before Judge Amit P. Mehta. The courtroom deputy shall circulate Zoom information to the parties. Members of the public or media may access the hearing by dialing the court's toll−free public access line: (877) 848−7030, access code 321−8747. The in−person oral argument set for May 26, 2022 is hereby vacated. (zjd) (Entered: 05/25/2022) |
| 05/26/2022 | 48 | NOTICE of Appearance by David Ross on behalf of UNION STATION INVESTCO, LLC, UNION STATION SOLE MEMBER, LLC (Ross, David) (Entered: 05/26/2022) |
| 05/26/2022 | 49 | NOTICE of Appearance by David Mark on behalf of UNION STATION INVESTCO, LLC, UNION STATION SOLE MEMBER, LLC (Mark, David) (Entered: 05/26/2022) |
| 05/26/2022 | 50 | NOTICE of Appearance by Daniel James Koevary on behalf of UNION STATION INVESTCO, LLC, UNION STATION SOLE MEMBER, LLC (Koevary, Daniel) (Entered: 05/26/2022) |
| 05/26/2022 |  |  |

| | | |
|---|---|---|
| | | Minute Entry for proceedings held before Judge Amit P. Mehta: Status Conference held via videoconference on 5/26/2022. Parties directed to meet and confer and submit by 5/31/2022, a proposed briefing schedule. (Court Reporter William Zaremba.) (ztg) (Entered: 05/26/2022) |
| 05/26/2022 | | MINUTE ORDER. Pursuant to the status conference held on May 26, 2022, the parties shall file a proposed briefing schedule on or before May 31, 2022. Signed by Judge Amit P. Mehta on 5/26/2022. (lcapm2) (Entered: 05/26/2022) |
| 05/31/2022 | 51 | PROPOSED BRIEFING SCHEDULE *Ltr – The Honorable Amit P. Mehta* by NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK). (Lambert, Patricia) (Entered: 05/31/2022) |
| 05/31/2022 | 52 | PROPOSED BRIEFING SCHEDULE re 36 Answer to Complaint */ Letter from David E. Ross regarding Proposed Briefing Schedule on Owners' Motion to Strike* by UNION STATION INVESTCO, LLC, UNION STATION SOLE MEMBER, LLC. (Ross, David) (Entered: 05/31/2022) |
| 06/01/2022 | | MINUTE ORDER entering the briefing schedules proposed by the parties in their letters, ECF Nos. 51, 52. The schedule for further proceedings in this matter is as follows: (1) Defendants Union Station Investco, LLC and Union Station Sole Member, LLC (collectively, "Owners") shall file their motion to strike on or before June 3, 2022, at 5:00 p.m.; (2) Defendants Kookmin Bank Co., Ltd. and Union Station Investco, LLC, as represented by the law firm Neuberger, Quinn, Gielen, Rubin & Gibber P.A., shall file their opposition on or before June 17, 2022, at 5:00 p.m.; (3) Owners shall file their reply on or before June 24, 2022; (4) Amtrak shall file its motion for possession on or before July 18, 2022; (5) oppositions to the motion shall be filed on or before September 23, 2022; and (6) Amtrak shall file its reply on or before October 24, 2022. Signed by Judge Amit P. Mehta on 6/1/2022. (Entered: 06/01/2022) |
| 06/01/2022 | 53 | NOTICE of Change of Address by Henry B. Brownstein (Brownstein, Henry) (Entered: 06/01/2022) |
| 06/03/2022 | 54 | TRANSCRIPT OF STATUS CONFERENCE VIA ZOOM PROCEEDINGS before Judge Amit P. Mehta held on May 26, 2022; Page Numbers: 1–44. Date of Issuance: June 3, 2022. Court Reporter/Transcriber: William Zaremba; Telephone number: (202) 354–3249. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from t he court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, PDF or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 6/24/2022. Redacted Transcript Deadline set for 7/4/2022. Release of Transcript Restriction set for 9/1/2022.(wz) (Entered: 06/03/2022) |

| | | |
|---|---|---|
| 06/03/2022 | 55 | MOTION to Strike 36 Answer to Complaint by UNION STATION INVESTCO, LLC, UNION STATION SOLE MEMBER, LLC. (Attachments: # 1 Memorandum in Support, # 2 Declaration Of Yossi Preiserowicz, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6, # 9 Exhibit 7, # 10 Text of Proposed Order)(Ross, David) (Entered: 06/03/2022) |
| 06/17/2022 | 56 | Memorandum in opposition to re 55 MOTION to Strike 36 Answer to Complaint filed by KOOKMIN BANK CO., LTD.. (Attachments: # 1 Declaration of Michael Rebibo, # 2 Exhibit A – Citi_Union Station – Deed of Trust, # 3 Exhibit B – Union Station Loan Agreement, # 4 Exhibit C – Union Station Mezzanine Loan Agreement, # 5 Exhibit D – Citi_Union Station – Pledge and Security Agreement, # 6 Exhibit E – Union –– Notice of Exercise of Rights Under 8a of Pledge (Executed), # 7 Exhibit F – Union –– Notice of Exercise of Rights Under 9a of Pledge (Executed), # 8 Exhibit G – Union –– Letter re Intent to Exercise Rights as Attorney in Fact (Executed), # 9 H – Final – Foreclosure Cover Letter – Union Station (747786187_1), # 10 Declaration of Y. David Scharf, # 11 Exhibit A – Transcript 08.30.21, # 12 Exhibit B – Transcript 10.05.21, # 13 C – Transcript 02.15.05)(Scharf, Y.) (Entered: 06/17/2022) |
| 06/17/2022 | 57 | Memorandum in opposition to re 55 MOTION to Strike 36 Answer to Complaint filed by UNION STATION INVESTCO, LLC. (Wood, Thomas) (Entered: 06/17/2022) |
| 06/23/2022 | 58 | MOTION for Leave to File *Limited Briefing on Amtrak's Legal Status in Connection with Defendants Union Station Investco LLC's and Union Station Sole Member LLC's Motion to Strike* by NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK). (Attachments: # 1 Exhibit A, # 2 Text of Proposed Order)(Harrison, Lindsay) (Entered: 06/23/2022) |
| 06/24/2022 | | MINUTE ORDER granting Amtrak's 58 Motion for Leave to File Limited Briefing on Amtrak's Legal Status in Connection with Defendants Union Station Investco LLC's and Union Station Sole Member LLC's Motion to Strike. Signed by Judge Amit P. Mehta on 6/24/2022. (lcapm2) (Entered: 06/24/2022) |
| 06/24/2022 | 59 | WITHDRAWN PURSUANT TO NOTICE FILED ON 8/4/2022.....MOTION for Order of *Approval of Contract with Property Manager* by KOOKMIN BANK CO., LTD.. (Scharf, Y.) Modified on 8/8/2022 (zed). (Entered: 06/24/2022) |
| 06/24/2022 | 60 | REPLY to opposition to motion re 55 MOTION to Strike 36 Answer to Complaint */ Reply Memorandum of Law in Further Support of Defendants Union Station Investco LLCs and Union Station Sole Member LLCs Motion to Strike* filed by UNION STATION INVESTCO, LLC, UNION STATION SOLE MEMBER, LLC. (Ross, David) Modified docket event/text on 6/28/2022 (zed). (Entered: 06/24/2022) |
| 06/24/2022 | 61 | DECLARATION *of Michael Rebibo* by KOOKMIN BANK CO., LTD. re 59 MOTION for Order *of Approval of Contract with Property Manager* filed by KOOKMIN BANK CO., LTD.. (Attachments: # 1 Exhibit 2.1 – Ex. A – Memo of Sale, # 2 Exhibit 2.2 – Ex. B – Notice of Foreclosure, # 3 Exhibit 2.3 – Ex. C – C&W Status Report, # 4 Exhibit 2.4 – Ex. D – Auction Transcript, # 5 Exhibit 2.4.1 – Ex. D–1 EX 0001 Auction 061422, # 6 Exhibit 2.4.2 – Ex. D–2 EX 0002 Auction 061422, # 7 Exhibit 2.4.3 – Ex. D–3 – EX 0003 Auction 061422, # 8 Exhibit 2.4.4 – Ex. D–4 – EX 0004 Auction 061422, # 9 Exhibit 2.4.5 – Ex. D–5 – EX 0005 Auction 061422, # 10 Exhibit 2.5 – Ex. E – Notice to Ashkenazy, # 11 Exhibit 2.6 – Ex. F – Notice to USRC, # 12 Exhibit 2.7 – Ex. G – Notice to Amtrak, # 13 Exhibit 2.8 – Ex. H – Thirteenth Amendment Master Retail Management Agreement, # 14 Exhibit 2.9 |

| | | |
|---|---|---|
| | | – Ex. I – Retail Management Only Agreement, # 15 Exhibit 2.10 – Ex. J – Notice to JLL, # 16 Exhibit 2.11 – Ex. K – Union Station Proposal)(Scharf, Y.) (Entered: 06/24/2022) |
| 06/24/2022 | 62 | DECLARATION *of Y. David Scharf* by KOOKMIN BANK CO., LTD. re 59 MOTION for Order *of Approval of Contract with Property Manager* filed by KOOKMIN BANK CO., LTD.. (Attachments: # 1 Exhibit 3.1 – Ex. A – E–mails between JLL, Morrison Cohen, M. Rebibo, # 2 Exhibit 3.2 – Ex. B – Letter from Kasowitz to Y. David Scharf 6.23.22, # 3 Exhibit 3.3 – Ex. C – Letter from Y. David Scharf)(Scharf, Y.) (Entered: 06/24/2022) |
| 06/26/2022 | 63 | ENTERED IN ERROR.....RESPONSE re 59 MOTION for Order *of Approval of Contract with Property Manager /Letter from David E. Ross re: Kookmin Bank emergency motion* filed by UNION STATION INVESTCO, LLC, UNION STATION SOLE MEMBER, LLC. (Ross, David) Modified on 6/28/2022 (zed). (Entered: 06/26/2022) |
| 06/27/2022 | 64 | MEMORANDUM re 59 MOTION for Order *of Approval of Contract with Property Manager* filed by KOOKMIN BANK CO., LTD. by UNION STATION INVESTCO, LLC. (Wood, Thomas) (Entered: 06/27/2022) |
| 06/28/2022 | | NOTICE OF ERROR regarding 63 Response to motion,. The following error(s) need correction: Incorrect format (Letter)– correspondence is not permitted (LCvR 5.1(a)). Please refile. (zed) (Entered: 06/28/2022) |
| 06/30/2022 | 65 | WITHDRAWN PURSUANT TO NOTICE FILED ON 8/4/2022.....MOTION for Hearing re 59 MOTION for Order *of Approval of Contract with Property Manager / Request of Kookmin Bank Co. Ltd. to Schedule Hearing* by KOOKMIN BANK CO., LTD.. (Scharf, Y.) Modified on 8/8/2022 (zed). (Entered: 06/30/2022) |
| 06/30/2022 | 66 | Memorandum in opposition to re 65 MOTION for Hearing re 59 MOTION for Order *of Approval of Contract with Property Manager / Request of Kookmin Bank Co. Ltd. to Schedule Hearing* filed by UNION STATION INVESTCO, LLC, UNION STATION SOLE MEMBER, LLC. (Ross, David) Modified docket event/text on 6/30/2022 (zed). (Entered: 06/30/2022) |
| 06/30/2022 | 67 | RESPONSE re 65 MOTION for Hearing re 59 MOTION for Order *of Approval of Contract with Property Manager / Request of Kookmin Bank Co. Ltd. to Schedule Hearing* filed by NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK). (Harrison, Lindsay) (Entered: 06/30/2022) |
| 07/07/2022 | 68 | ENTERED IN ERROR.....REPLY to opposition to motion re 65 MOTION for Hearing re 59 MOTION for Order *of Approval of Contract with Property Manager / Request of Kookmin Bank Co. Ltd. to Schedule Hearing* filed by KOOKMIN BANK CO., LTD.. (Attachments: # 1 Declaration of Michael Rebibo In Support of Hearing and Emergency Relief About Property Management, # 2 Exhibit Ex. A – E–mail dated June 16 – July 1 2022, # 3 Exhibit Ex. B – PEPCO correspondence_07_07_2022)(Scharf, Y.) Modified on 7/7/2022 per request of counsel, will refile correct entry (zjm). (Entered: 07/07/2022) |
| 07/07/2022 | 69 | REPLY re 65 MOTION for Hearing re 59 MOTION for Order *of Approval of Contract with Property Manager / Request of Kookmin Bank Co. Ltd. to Schedule Hearing* filed by KOOKMIN BANK CO., LTD.. (Attachments: # 1 Declaration of Michael Rebibo In Support of Hearing and Emergency Relief About Property Management, # 2 Exhibit Ex. A – E–mail dated June 16 – July 1 2022, # 3 Exhibit |

| | | |
|---|---|---|
| | | Ex. B – PEPCO correspondence_07_07_2022)(Scharf, Y.) (Entered: 07/07/2022) |
| 07/08/2022 | 70 | RESPONSE re 59 MOTION for Order *of Approval of Contract with Property Manager / Plaintiff national Railroad Passenger Corporation's Opposition to Defendant Kookmin Bank Co. Ltd's Motion for Approval of Contract with Property Manager* filed by NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK). (Harrison, Lindsay) (Entered: 07/08/2022) |
| 07/08/2022 | 71 | Memorandum in opposition to re 59 MOTION for Order *of Approval of Contract with Property Manager* filed by UNION STATION INVESTCO, LLC, UNION STATION SOLE MEMBER, LLC. (Attachments: # 1 Declaration Of Yossi Preiserowicz, # 2 Exhibit 1: Email Chain with Rexmark Representative re May Bills, # 3 Declaration of David E. Ross, # 4 Exhibit 1: Email Chain Between Kookmin and JLL)(Ross, David) (Entered: 07/08/2022) |
| 07/08/2022 | 72 | MOTION for Immediate Possession of the Subject Property Interest by NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK). (Attachments: # 1 Memorandum in Support, # 2 Declaration of Lindsay C. Harrison, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Text of Proposed Order)(Harrison, Lindsay) (Entered: 07/08/2022) |
| 07/15/2022 | 73 | REPLY re 59 MOTION for Order *of Approval of Contract with Property Manager* filed by KOOKMIN BANK CO., LTD.. (Attachments: # 1 Declaration of Michael Rebibo in Further Support of Emergency Motion of Defendant Kookmin Bank Co., Ltd for Approval of Contract with Property Manager, # 2 Ex. A – Mezzanine Loan, # 3 Ex. B – Pledge Agreement)(Scharf, Y.) (Entered: 07/15/2022) |
| 07/20/2022 | | NOTICE of Hearing: Oral Argument set for 7/21/2022 at 10:30 AM via videoconference before Judge Amit P. Mehta. Members of the public or media may access the hearing by dialing the court's toll–free public access line: (877) 848–7030, access code 321–8747. (zjd) (Entered: 07/20/2022) |
| 07/21/2022 | | Minute Entry for proceedings held before Judge Amit P. Mehta: Oral Argument held via videoconference on 7/21/2022. Joint Status Report due by 7/29/2022. (Court Reporter: William Zaremba) (zjd) (Entered: 07/21/2022) |
| 07/29/2022 | 74 | ENTERED IN ERROR.....Joint STATUS REPORT by UNION STATION INVESTCO, LLC, UNION STATION SOLE MEMBER, LLC. (Ross, David) Modified on 7/29/2022 (zed). (Entered: 07/29/2022) |
| 07/29/2022 | | NOTICE OF ERROR regarding 74 Status Report. The following error(s) need correction: Incorrect format (Letter)– correspondence is not permitted (LCvR 5.1(a)). Please refile. (zed) (Entered: 07/29/2022) |
| 07/29/2022 | 75 | Joint STATUS REPORT by UNION STATION INVESTCO, LLC, UNION STATION SOLE MEMBER, LLC. (Ross, David) (Entered: 07/29/2022) |
| 07/29/2022 | | MINUTE ORDER. The parties shall file an additional Joint Status Report by August 3, 2022, which updates the court on their ongoing discussions. Signed by Judge Amit P. Mehta on 7/29/2022. (lcapm2) (Entered: 07/29/2022) |
| 08/03/2022 | 76 | Joint STATUS REPORT by UNION STATION INVESTCO, LLC, UNION STATION SOLE MEMBER, LLC. (Ross, David) (Entered: 08/03/2022) |
| 08/04/2022 | | MINUTE ORDER. The parties shall appear for a remote status conference on August 9, 2022, at 10:00 a.m. Signed by Judge Amit P. Mehta on 8/4/22. (lcapm2) (Entered: |

| | | 08/04/2022) |
|---|---|---|
| 08/04/2022 | 77 | NOTICE OF WITHDRAWAL OF MOTION by KOOKMIN BANK CO., LTD. re 65 MOTION for Hearing re 59 MOTION for Order *of Approval of Contract with Property Manager / Request of Kookmin Bank Co. Ltd. to Schedule Hearing*, 59 MOTION for Order *of Approval of Contract with Property Manager* (Kiernan, Paul) (Entered: 08/04/2022) |
| 08/09/2022 | | MINUTE ORDER. The parties shall file an additional Joint Status Report by September 2, 2022, which updates the court on the ongoing Southern District of New York litigation. Signed by Judge Amit P. Mehta on 8/9/2022. (lcapm2) (Entered: 08/09/2022) |
| 08/12/2022 | 78 | TRANSCRIPT OF MOTION HEARING VIA ZOOM PROCEEDINGS before Judge Amit P. Mehta held on July 21, 2022; Page Numbers: 1–47. Date of Issuance: August 12, 2022. Court Reporter/Transcriber: William Zaremba; Telephone number: (202) 354–3249. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, PDF or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 9/2/2022. Redacted Transcript Deadline set for 9/12/2022. Release of Transcript Restriction set for 11/10/2022.(wz) (Entered: 08/12/2022) |
| 08/12/2022 | 79 | TRANSCRIPT OF STATUS CONFERENCE VIA ZOOM PROCEEDINGS before Judge Amit P. Mehta held on August 9, 2022; Page Numbers: 1–41. Date of Issuance: August 12, 2022. Court Reporter/Transcriber: William Zaremba; Telephone number: (202) 354–3249. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased f rom the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, PDF or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 9/2/2022. Redacted Transcript Deadline set for 9/12/2022. Release of Transcript Restriction set for 11/10/2022.(wz) (Entered: 08/12/2022) |

| 09/02/2022 | 80 | Proposed STATUS REPORT by KOOKMIN BANK CO., LTD.. (Attachments: # 1 Exhibit Ex A – Preliminary Injunction Order, # 2 Exhibit Ex B – Transcript)(Scharf, Y.) (Entered: 09/02/2022) |
|---|---|---|
| 09/02/2022 | 81 | Proposed STATUS REPORT by UNION STATION SOLE MEMBER, LLC. (Attachments: # 1 Exhibit Ex A – Preliminary Injunction Order, # 2 Exhibit Ex B – Transcript)(Ross, David) (Entered: 09/02/2022) |
| 09/06/2022 | | MINUTE ORDER. In view of the preliminary injunction ordered by the Southern District of New York (SDNY), the court presumes that the Kasowitz Benson Torres law firm will no longer claim to represent Union Station Investco, LLC in this matter, pending the outcome of the proceedings in the SDNY on the merits. If the court's understanding is mistaken, the Kasowitz Benson Torres law firm shall so advise. Signed by Judge Amit P. Mehta on 9/6/2022. (lcapm2) (Entered: 09/06/2022) |
| 09/23/2022 | 82 | Memorandum in opposition to re 72 MOTION for Immediate Possession of the Subject Property Interest / *Union Station Sole Member, LLC's Response in Opposition to Amtrak's Motion for Immediate Possession of the Subject Property Interest* filed by UNION STATION SOLE MEMBER, LLC. (Ross, David) Modified docket event/text on 9/23/2022 (zed). (Entered: 09/23/2022) |
| 09/23/2022 | 83 | RESPONSE re 72 MOTION for Immediate Possession of the Subject Property Interest *Joint Opposition of Lender and Union Station Investco, LLC* filed by KOOKMIN BANK CO., LTD.. (Attachments: # 1 Declaration Scharf Declaration – Opposition to Possession, # 2 Exhibit Ex. A – Lenders Answer, # 3 Exhibit Ex. B – Transcript from July 21, 2022 before J. Mehta, # 4 Exhibit Ex. C – Transcript from Aug. 23, 2022 before J. Woods, # 5 Exhibit Ex. D – Preliminary Injunction Order, # 6 Exhibit Ex. E – Lenders status report to J. Mehta, # 7 Exhibit Ex. F – USSM status report to J. Mehta, # 8 Exhibit Ex. G – Lenders document requests, # 9 Exhibit Ex. H – Amtraks response to document requests, # 10 Declaration Rebibo Declaration – Opposition to Possession Motion, # 11 Exhibit Ex. A – USI.USRC 3rd amendment to sublease May 9, 2008, # 12 Exhibit Ex. B – Mortgage Loan Agreement, # 13 Exhibit Ex. C – Mezzanine Loan Agreement, # 14 Exhibit Ex. D – Pledge and Security Agreement, # 15 Exhibit Ex. E – Complaint, # 16 Exhibit Ex. F – Notice on Foreclosure Sale)(Scharf, Y.) (Entered: 09/23/2022) |
| 10/24/2022 | 84 | REPLY to opposition to motion re 72 MOTION for Immediate Possession of the Subject Property Interest / *Reply in Further Support of National Railroad Passenger Corporation's Motion for Immediate Possession of the Subject Property Interest* filed by NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK). (Harrison, Lindsay) (Entered: 10/24/2022) |
| 01/12/2023 | | MINUTE ORDER. The parties shall appear for a hearing on January 18, 2023, at 5 p.m. in Courtroom 10 before Judge Amit P. Mehta. Signed by Judge Amit P. Mehta on 1/12/2023. (lcapm2) (Entered: 01/12/2023) |
| 01/12/2023 | | Set/Reset Hearings: Status Conference set for 1/18/2023 at 5:00 PM in Courtroom 10– In Person before Judge Amit P. Mehta. (smc) (Entered: 01/12/2023) |
| 01/18/2023 | | Minute Entry for proceedings held before Judge Amit P. Mehta: Motion Hearing held on 1/18/2023 re 72 Motion for Immediate Possession of the Subject Property Interest. Status Conference set for 2/22/2023 at 5:00 PM in Courtroom 10 before Judge Amit P. Mehta. (Court Reporter: William Zaremba) (zjd) (Entered: 01/18/2023) |
| 01/24/2023 | 85 | |

|  |  | TRANSCRIPT OF MOTION HEARING PROCEEDINGS before Judge Amit P. Mehta held on January 18, 2023; Page Numbers: 1–73. Date of Issuance: January 24, 2023. Court Reporter/Transcriber: William Zaremba; Telephone number: (202) 354–3249. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the c ourt reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, PDF or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 2/14/2023. Redacted Transcript Deadline set for 2/24/2023. Release of Transcript Restriction set for 4/24/2023.(wz) (Entered: 01/24/2023) |
| 01/31/2023 | 86 | Joint MOTION for Protective Order / *Joint Motion for Entry of Stipulated Protective Order* by NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK). (Attachments: # 1 Proposed Stipulation and Protective Order)(Harrison, Lindsay) (Entered: 01/31/2023) |
| 02/01/2023 | 87 | ORDER entering 86 Stipulation and Protective Order. Please see attached Order for additional details. Signed by Judge Amit P. Mehta on 2/1/2023. (lcapm2) (Entered: 02/01/2023) |
| 02/17/2023 | 88 | STATUS REPORT *re: Amtrak's Motion for Immediate Posession* by KOOKMIN BANK CO., LTD.. (Scharf, Y.) (Entered: 02/17/2023) |
| 02/17/2023 | 89 | STATUS REPORT by NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK). (Harrison, Lindsay) (Entered: 02/17/2023) |
| 02/17/2023 | 90 | STATUS REPORT by UNION STATION SOLE MEMBER, LLC. (Ross, David) (Entered: 02/17/2023) |
| 02/20/2023 |  | MINUTE ORDER. The status conference scheduled for February 22, 2023, is hereby vacated and rescheduled for March 23, 2023, at 8:45 a.m. The court shall hold this conference remotely unless the parties request an in–person hearing. Signed by Judge Amit P. Mehta on 2/20/2023. (lcapm2) (Entered: 02/20/2023) |
| 03/21/2023 | 91 | NOTICE of Appearance by Steven Jay Willner on behalf of UNION STATION INVESTCO, LLC (Willner, Steven) (Entered: 03/21/2023) |
| 03/22/2023 | 92 | Joint STATUS REPORT *OF LENDER AND UNION STATION INVESTO, LLC* by KOOKMIN BANK CO., LTD., SUBLEASE INTEREST OBTAINED PURSUANT TO AN ASSIGNMENT AND ASSUMPTION OF LEASEHOLD INTEREST MADE AS OF JANUARY 25, 2007, UNION STATION INVESTCO, LLC. (Kiernan, Paul) (Entered: 03/22/2023) |
| 03/22/2023 | 93 | STATUS REPORT by NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK). (Harrison, Lindsay) (Entered: 03/22/2023) |

| 03/22/2023 | | MINUTE ORDER. In view of Amtrak's 93 status report, the court will proceed with the status conference scheduled for March 23, 2023, at 8:45 a.m. Signed by Judge Amit P. Mehta on 3/22/2023. (lcapm2) (Entered: 03/22/2023) |
| --- | --- | --- |
| 03/23/2023 | | Minute Entry for proceedings held before Judge Amit P. Mehta: Status Conference held via videoconference on 3/23/2023. (Court Reporter: William Zaremba) (zjd) (Entered: 03/23/2023) |
| 03/24/2023 | 94 | TRANSCRIPT OF STATUS HEARING VIA ZOOM PROCEEDINGS before Judge Amit P. Mehta held on March 23, 2023; Page Numbers: 1–31. Date of Issuance: March 24, 2023. Court Reporter/Transcriber: William Zaremba; Telephone number: (202) 354–3249. Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, PDF or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 4/14/2023. Redacted Transcript Deadline set for 4/24/2023. Release of Transcript Restriction set for 6/22/2023.(wz) (Entered: 03/24/2023) |
| 04/04/2023 | | MINUTE ORDER. As discussed during the status conference on March 23, 2023, the parties shall file a Joint Status Report on or before April 6, 2023, which provides an update on the status of negotiations and discovery. Signed by Judge Amit P. Mehta on 4/4/2023. (lcapm2) (Entered: 04/04/2023) |
| 04/06/2023 | 95 | Joint STATUS REPORT by NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK). (Harrison, Lindsay) (Entered: 04/06/2023) |
| 04/06/2023 | | MINUTE ORDER. The limited discovery that the court permitted at the March 23, 2023, status conference shall proceed as set forth in the parties' 95 Joint Status Report. Defendants shall submit a joint Rule 30(b)(6) notice to Plaintiff by May 17, 2023. Discovery shall close on June 6, 2023. The parties shall submit a Joint Status Report on June 6, 2023, which proposes a schedule for further proceedings. Signed by Judge Amit P. Mehta on 4/6/2023. (lcapm2) (Entered: 04/06/2023) |
| 05/17/2023 | 97 | NOTICE – *DEFENDANT'S NOTICE OF CONFIDENTIALITY ORDER* by KOOKMIN BANK CO., LTD. (Kiernan, Paul) (Entered: 05/17/2023) |
| 05/18/2023 | | MINUTE ORDER sealing Defendants' 96 Notice of Deposition. Signed by Judge Amit P. Mehta on 5/18/2023. (lcapm2) (Entered: 05/18/2023) |
| 06/06/2023 | 98 | Joint STATUS REPORT by NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK). (Harrison, Lindsay) (Entered: 06/06/2023) |
| 08/03/2023 | | NOTICE of Hearing: Evidentiary Hearing set for 8/9/2023 at 9:30 AM in Courtroom 10 before Judge Amit P. Mehta. (zjd) (Entered: 08/03/2023) |

| 08/09/2023 | | NOTICE of Hearing: The Evidentiary Hearing set for August 9, 2023 is hereby vacated and continued to September 11, 2023 at 9:00 AM in Courtroom 10 before Judge Amit P. Mehta. (zjd) (Entered: 08/09/2023) |
|---|---|---|
| 09/11/2023 | | Minute Entry for proceedings held before Judge Amit P. Mehta: Evidentiary Hearing held on 9/11/2023. (Court Reporter: William Zaremba; Plaintiff's Witnesses: Stephen Gardner and Dennis Newman; Defense Witnesses: Beverley K. Swaim–Staley, Michael Rebibo, and Matthew Barry.) (zjd) (Entered: 09/11/2023) |
| 09/11/2023 | 101 | Plaintiff's Exhibit List. (zjd) (Entered: 11/29/2023) |
| 09/11/2023 | 102 | Lender's Exhibit List (not subject to objections and whose admissibility has not been challenged). (zjd) (Entered: 11/29/2023) |
| 09/11/2023 | 103 | Lender's Exhibit List (subject to objections and whose admissibility has been challenged). (zjd) (Entered: 11/29/2023) |
| 09/11/2023 | 104 | Joint Exhibit List. (zjd) (Entered: 11/29/2023) |
| 09/29/2023 | | MINUTE ORDER. The court understands that the parties received the September 11, 2023, evidentiary hearing transcript on September 20, 2023. As discussed at that hearing, the parties shall file their proposed findings of fact and conclusions of law by October 11, 2023. The parties shall appear for oral argument on November 28, 2023, at 2:00 P.M. in Courtroom 10. Signed by Judge Amit P. Mehta on 9/29/23. (lcapm2) (Entered: 09/29/2023) |
| 10/11/2023 | 99 | Proposed Findings of Fact by KOOKMIN BANK CO., LTD.. (Scharf, Y.) (Entered: 10/11/2023) |
| 10/11/2023 | 100 | Proposed Findings of Fact by NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK). (Attachments: # 1 Exhibit 1)(Harrison, Lindsay) (Entered: 10/11/2023) |
| 11/28/2023 | | NOTICE of Hearing: The public access line will be connected for the Oral Argument scheduled on November 28, 2023. Members of the public or media may access the hearing by dialing the court's toll–free public access line: (877) 848–7030, access code 321–8747. (zjd) (Entered: 11/28/2023) |
| 11/28/2023 | | Minute Entry for proceedings held before Judge Amit P. Mehta: Oral Argument re 72 Motion for Immediate Possession of the Subject Property Interest. Arguments heard and taken under advisement. (Court Reporter: William Zaremba) (zjd) (Entered: 11/28/2023) |
| 02/29/2024 | 105 | TRANSCRIPT OF ORAL ARGUMENT PROCEEDINGS before Judge Amit P. Mehta held on November 28, 2023; Page Numbers: 1–104. Date of Issuance: February 29, 2024. Court Reporter/Transcriber: William Zaremba; Telephone number: (202) 354–3249. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, PDF or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal |

| | | |
|---|---|---|
| | | identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 3/21/2024. Redacted Transcript Deadline set for 3/31/2024. Release of Transcript Restriction set for 5/29/2024.(Zaremba, William) (Entered: 02/29/2024) |
| 04/17/2024 | 106 | MEMORANDUM OPINION re: Plaintiff's 72 Motion for Immediate Possession of the Subject Property Interest. Plaintiff has proven that its condemnation is necessary for intercity rail transportation and that it was unable to agree with Defendants as to contract terms or a purchase price. The court further finds that Defendants have not demonstrated any undue hardship warranting the denial of immediate possession to Plaintiff. The parties shall meet and confer to negotiate reasonable conditions under which "possession of the property is given to Amtrak." 49 U.S.C. § 24311(b)(2)(A). The parties shall submit a Joint Status Report to the court on or before May 1, 2024, that (1) sets forth the agreed–upon and disputed conditions of the transfer of possession and (2) proposes a schedule for further proceedings, including the determination of just compensation. See the attached Memorandum Opinion for additional details. Signed by Judge Amit P. Mehta on 4/17/24. (lcapm2) (Entered: 04/17/2024) |
| 04/17/2024 | | Set/Reset Deadlines: Joint Status Report due by 5/1/2024 (zglw) (Entered: 04/17/2024) |
| 05/01/2024 | 107 | Joint STATUS REPORT by NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK). (Attachments: # 1 Exhibit 1)(Harrison, Lindsay) (Entered: 05/01/2024) |
| 05/09/2024 | | MINUTE ORDER. The parties shall file an additional Joint Status Report by May 14, 2024, which updates the court on the parties' discussions concerning outstanding transition issues. The parties shall appear for a status conference on May 16, 2024, at 9:30 a.m. in Courtroom 10. D.C.–based counsel are expected to appear in person; out–of–town counsel or parties may appear remotely. The court will separately enter an order governing the discovery schedule for further proceedings. Signed by Judge Amit P. Mehta on 5/9/24. (lcapm2) (Entered: 05/09/2024) |
| 05/09/2024 | | Set/Reset Deadlines/Hearings: Status Report due by 5/14/2024. Status Conference set for 5/16/2024 at 09:30 AM in Courtroom 10– In Person before Judge Amit P. Mehta. (znbn) (Entered: 05/09/2024) |
| 05/09/2024 | 108 | ORDER regarding further proceedings in this matter: (1) USI, Lender and USSM shall provide Amtrak with the name of any nonparty that has or claims an interest in the Subject Property Interest, along with an explanation as to the claimed or actual interest by June 17, 2024. The deadline for joinder of parties, including defendants pursuant to Rule 71.1(c)(3), and amendments of pleadings is June 24, 2024. (2) The parties shall serve requests for the production of documents by July 1, 2024. The parties shall serve written responses and objections on or before August 1, 2024, and shall complete their production of documents by September 16, 2024, unless extended by mutual agreement or court order. The parties shall not serve more than thirty requests for production absent leave of court. (3) The parties shall submit a Joint Status Report regarding the status of discovery by September 20, 2024. (4) All fact witness depositions shall be taken by October 31, 2024. (5) Amtrak shall submit any |

| | | |
|---|---|---|
| | | expert report(s) it intends to rely upon by November 21, 2024. USI, Lender and USSM shall serve any expert report(s) they intend to rely upon by December 23, 2024. Rebuttal expert reports must be served by the parties within the time limits set forth by Rule 26(a)(2)(D)(ii) or January 30, 2025, whichever is later. (6) The parties shall submit a Joint Status Report regarding the status of expert discovery by February 3, 2025. (7) All discovery shall conclude on March 5, 2025. (8) A Post–Discovery Status Conference is set for March 12, 2025, at 10:00 a.m. via videoconference. (9) Pretrial briefs shall be due by March 26, 2025. The pretrial briefs shall set forth (i) the relevant legal framework for determining just compensation, (ii) state the parties' positions on just compensation, and (iii) provide a factual summary of expected evidence at trial to support those positions. The pretrial briefs shall not exceed 15 pages. (10) The parties' Joint Pretrial Statement shall also be due by March 26, 2025. It shall contain (i) a schedule of expected witnesses, (ii) an exhibit list, (iii) stipulations reached by the parties, and (iv) designations of deposition testimony. Additionally, the parties shall identify any expected evidentiary issues that might arise at trial. (11) The parties shall appear for a Pretrial Conference on April 2, 2025, at 9:30 a.m. in Courtroom 10. (12). Trial in this matter shall commence on April 7, 2025, at 9:30 a.m. in Courtroom 10. See the attached Order for additional details. Signed by Judge Amit P. Mehta on 5/9/24. (lcapm2) (Entered: 05/09/2024) |
| 05/09/2024 | | Set/Reset Deadlines/Hearings: Amended Pleadings due by 6/24/2024. Discovery due by 3/5/2025. due by 9/16/2024. Pretrial Statement due by 3/26/2025. Status Report due by 9/20/2024 Jury Trial set for 4/7/2025 at 09:30 AM in Courtroom 10– In Person before Judge Amit P. Mehta. Pretrial Conference set for 4/2/2025 at 09:30 AM in Courtroom 10– In Person before Judge Amit P. Mehta. Status Conference set for 3/12/2025 at 10:00 AM in Telephonic/VTC before Judge Amit P. Mehta. (see 108 for full details) (znbn) (Entered: 05/09/2024) |
| 05/14/2024 | 109 | Joint STATUS REPORT by NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK). (Attachments: # 1 Exhibit A)(Harrison, Lindsay) (Entered: 05/14/2024) |
| 05/15/2024 | | NOTICE of Hearing: Status Conference set for 5/16/2024 at 9:30 AM in Courtroom 10– In Person before Judge Amit P. Mehta. (zjch, ) (Entered: 05/15/2024) |
| 05/16/2024 | | Minute Entry for proceedings held before Judge Amit P. Mehta: Status Conference held on 5/16/2024. Status Report due by 5/22/2024 Court Reporter William Zaremba. (zjch, ) (Entered: 05/16/2024) |
| 05/23/2024 | 110 | NOTICE of Proposed Order *Granting Motion for Immediate Possession* by NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK) re Status Conference, Set Deadlines/Hearings (Harrison, Lindsay) (Entered: 05/23/2024) |
| 05/24/2024 | 111 | ORDER granting Plaintiff's 72 Motion for Immediate Possession. See the attached Order for additional details. Signed by Judge Amit P. Mehta on 5/23/24. (lcapm2) Modified to correct date signed on 5/24/2024 (smc). (Entered: 05/24/2024) |
| | | *Main Document* |
| | | Attachment # 1 *Exhibit* |
| 05/24/2024 | 112 | Joint MOTION to Continue *Trial Date* by NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK). (Attachments: # 1 Proposed Order)(Harrison, Lindsay) (Entered: 05/24/2024) |

| | | |
|---|---|---|
| 05/28/2024 | | MINUTE ORDER granting <u>112</u> Joint Motion to Continue Trial Date. Trial in this matter shall now commence on May 6, 2025, at 9:30 a.m. in Courtroom 10. The original trial date of April 7, 2025, is hereby vacated. Signed by Judge Amit P. Mehta on 5/28/24. (lcapm2) (Entered: 05/28/2024) |
| 05/28/2024 | | Set/Reset Hearings: Bench Trial set for 5/6/2025 at 9:30 AM in Courtroom 10– In Person before Judge Amit P. Mehta. (zjch, ) (Entered: 05/28/2024) |
| 06/04/2024 | <u>113</u> | TRANSCRIPT OF STATUS CONFERENCE PROCEEDINGS before Judge Amit P. Mehta held on May 16, 2024; Page Numbers: 1–14. Date of Issuance: June 4, 2024. Court Reporter/Transcriber: William Zaremba; Telephone number: (202) 354–3249. Transcripts may be ordered by submitting the <u>Transcript Order Form</u><br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, PDF or ASCII) may be purchased from the court reporter.<br><br>**<span style="color:red">NOTICE RE REDACTION OF TRANSCRIPTS:</span>** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 6/25/2024. Redacted Transcript Deadline set for 7/5/2024. Release of Transcript Restriction set for 9/2/2024.(Zaremba, William) (Entered: 06/04/2024) |
| 06/05/2024 | <u>114</u> | NOTICE OF APPEAL TO DC CIRCUIT COURT as to <u>111</u> Order by KOOKMIN BANK CO., LTD.. Filing fee $ 605, receipt number ADCDC–10944506. Fee Status: Fee Paid. Parties have been notified. (Scharf, Y.) (Entered: 06/05/2024) |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
----------------------------------------------------------------- X

NATIONAL RAILROAD PASSENGER
CORPORATION (AMTRAK),

        Plaintiff,                            Case No. 1:22-cv-01043 (APM)

        v.

SUBLEASE INTEREST PERTAINING TO
DESCRIBED LEASEHOLD INTERESTS
AT WASHINGTON UNION STATION, et al.

        Defendants.
----------------------------------------------------------------- X

## DEFENDANTS' NOTICE OF APPEAL

Defendants Kookmin Bank Co., Ltd., individually ("Kookmin") and in its capacity as trustee ("Trustee") of KTB CRE Debt Fund No. 8, a Korean Investment Trust (the "Trust"), by its agent on behalf of the Trust in Korea, Daol Fund Management Co. ("Daol"), and by its agent on behalf of the Trust in United States, Rexmark Holdings LLC d/b/a Rexmark ("Rexmark," and together with Kookmin, Trustee, the Trust, and Daol, "Lender") and Union Station Investco, LLC ("USI") hereby give notice of their appeal, pursuant to 28 U.S.C. § 1291 or, alternatively, 28 U.S.C. § 1292(a)(1), to the U.S. Court of Appeals for the District of Columbia Circuit, of each and every part of this Court's Order Granting Plaintiff National Railroad Passenger Corporation's ("Amtrak's") Motion For Immediate Possession, dated May 24, 2024 (the "Order") (ECF Doc. No. 111), and each and every part of the Court's Memorandum Opinion regarding that Order, dated April 24, 2024 (ECF Doc. No. 106).

Lender and USI further give notice of their intent to appeal any and all orders and judgments relating to these matters entered after the filing of this Notice.

Dated: June 5, 2024


  */s/ Y. David Scharf*  
Y. David Scharf  
Brett Dockwell  
Kristin T. Roy  
Latisha V. Thompson  
Amber R. Will  
Mahnoor Misbah  
*Admitted pro hac vice*  
MORRISON COHEN LLP  
909 Third Avenue  
New York, New York 10022  
(212) 735-8600  
ydscharf@morrisoncohen.com  

Paul J. Kiernan  
Louis J. Rouleau  
HOLLAND & KNIGHT LLP  
800 17th Street N.W.  
Suite 1100  
Washington, D.C. 20006  
Phone: 202-663-7276  
Paul.Kiernan@hklaw.com  

*Attorneys for Defendant Kookmin Bank Co., Ltd.*

  */s/ Thomas M. Wood IV*  
Thomas M. Wood IV  
Steven J. Willner  
NEUBERGER, QUINN, GIELEN RUBIN & GIBBER, P.A.  
One South Street, 27th Floor  
Baltimore, Maryland 21202  
(410) 332-8541  
tmw@nqgrg.com  
sjw@nqgrg.com  

*Attorney for Defendant Union Station Investco, LLC*

2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL RAILROAD PASSENGER          *
CORPORATION (AMTRAK)
                                     *        CIVIL ACTION NO. 1:22-CV-01043
        PLAINTIFF,
                                     *
v.
                                     *

SUBLEASE INTEREST OBTAINED PURSUANT
TO AN ASSIGNMENT AND ASSUMPTION      *
OF LEASEHOLD INTEREST, et al.
                                     *
        DEFENDANTS.
                                     *

*    *    *    *    *    *    *    *    *    *    *    *    *

## ORDER GRANTING MOTION FOR IMMEDIATE POSSESSION

For the reasons set forth in the Court's Memorandum Opinion dated April 17, 2024[1], the Court GRANTS the Motion for Immediate Possession filed by Plaintiff National Railroad Passenger Corporation ("Amtrak").

The Court directs Union Station Investco, LLC to turn over to Amtrak possession of the Subject Property Interest consistent with following terms and conditions:

1.      Transfer of Possession:  Possession of the Subject Property Interest is transferred to Amtrak as of 12:01 a.m. on July 15, 2024, which shall be hereinafter referred to as the "Possession Date." This transfer of possession includes the transfer of rights of USI (or any other Defendant) in and to any subleases, leases and licenses, and all rents, other payments and security deposits relating thereto from the date of the Possession Date.

2.      Future Obligations and Future Liabilities:  Beginning on the Possession Date,

---

[1] Unless otherwise defined herein, capitalized terms shall have the meaning ascribed to them in the Memorandum Opinion dated April 17, 2024.

Amtrak will be solely responsible for the performance of future obligations (i.e. obligations that accrue on or after the Possession Date, which shall hereinafter referred to as "Future Obligations") or liabilities arising after the Possession Date ("Future Liabilities") that USI would otherwise have had: (1) in connection with the Subject Property Interest; and (2) any sublease, lease, or license for a portion of the station that is a part of the Subject Property Interest and for which Amtrak is being granted possession.

3.     <u>Jones Lang LaSalle</u>:  Prior to the Possession Date, Amtrak may contact Jones Lang LaSalle (JLL) concerning a future business relationship relating to the Subject Property Interest.

4.     <u>Transfer of records, documents, and other materials relating to the operation of the Subject Property Interest in USI's possession, custody or control</u>: Information, records, documents, and other materials will be provided by Lender and USI to Amtrak as set forth below.  The information transferred will receive the same confidentiality protections as those set forth in the previously entered protective order, with the understanding that Amtrak may also use the information received for transition purposes and/or operational purposes with respect to the Subject Property Interest.

5.     <u>Timing for the production of documents</u>:  On May 9, 2024, Amtrak provided to USI and Lender a document itemizing the documents, reports, spreadsheets, contracts, and other materials that Amtrak would like to receive from USI and Lender in connection with this transition efforts. USI and Lender shall create and furnish a data room to be available to Amtrak with the requested documents.  Consistent with the previously entered protective order and the prior paragraph, Amtrak shall have the right to download and use documents from the data room. USI and Lender shall begin producing documents immediately following entry of this Order. Leases and licenses, and their modifications and amendments, as well as the last known   contact

information (person, address, email address, and, if available phone number) for all lessees and licenses, and the service contracts for the Subject Property Interest shall be produced by May 28, 2024.  All other documents in the Lender's or USI's possession, custody or control that are reasonably accessible to Lender and USI shall be produced by June 14, 2024.

6.     <u>Security deposits, advance payments, and rents</u>:  Lender and USI shall provide to Amtrak information regarding security deposits held, advance payments received, accounts relating to rent payments, and similar information, subject to confidentiality protections, by May 28, 2024.

7.     <u>Special Events</u>:  Lender and USI shall provide to Amtrak by May 28, 2024 a list of all upcoming special events to be held at the Station, and all related agreements and documents (including event contracts).  Lender and USI shall not schedule or contract for special events that will take place after the Possession Date unless Amtrak specifically consents in writing to the event schedule and terms.

8.     <u>Transfer of rent collection and utilities and other expense payment responsibilities</u>:  Rent, utilities and expense payments for the period after the Possession Date shall be the responsibility of Amtrak.  Lender and USI shall provide to Amtrak a list of such obligations on or before May 28, 2024, with all documents related thereto to be produced by June 14, 2024.

9.     <u>Transfer of operation and maintenance responsibilities</u>:  As of the Possession Date, all current and future operation and maintenance responsibilities of the Subject Property Interest shall be transferred to Amtrak.   Lender and USI shall provide to Amtrak all information in their possession, custody and control and reasonably accessible regarding current operation and maintenance responsibilities pertaining to the Subject Property Interest by May 28, 2024, with documents related thereto being produced by June 14, 2024.

3

10.    <u>Identification and transfer of work-in-progress responsibilities</u>:  Lender and USI shall provide to Amtrak by May 28, 2024 a list of all capital work-in-progress responsibilities, with all documents related thereto being produced by June 14, 2024.   Beginning May 14, 2024, Lender and USI shall not start any new capital work in the Subject Property Interest unless Amtrak specifically consents in writing to the work.

11.    <u>Status of retail and office leasing activity</u>:  Lender and USI shall provide to Amtrak a list of and information about the current status of retail and office leasing activity (including current draft leases exchanged with prospective tenants) by May 28, 2024.  Lender and USI shall be bound by the restrictions on future leasing activities as described below. Separately, there are three current lawsuits involving previous Station tenants or arising from occupancy agreements. Lender and USI shall coordinate with Amtrak about these lawsuits.

12.    <u>Digital and other advertising agreements and revenues</u>:  Lender and USI shall provide to Amtrak all reasonably accessible information and documents in their possession, custody and control regarding digital and other advertising agreements and revenues by June 14, 2024.

13.    <u>Assessment of the physical conditions of space outside of the pre-existing Amtrak sublease</u>:  Lender and USI provided a walk-through of most of the space covered by the Subject Property Interest and outside of the pre-existing Amtrak sublease; Lender shall provide all reasonably accessible documents and information to Amtrak regarding the physical condition and operational requirements of the space covered by the Subject Property Interest Amtrak in their possession, custody and control by June 14, 2024.

14.    <u>Letter to Tenants and Licensees</u>:  On the Possession Date, Amtrak, USI and Lender shall send a joint letter to tenants and licensees using the template of Exhibit A. The parties shall

4

make immediate preparations so that the letter can be sent to the appropriate contact address for tenants and licensees on the Possession Date.

15.     <u>Restrictions on USI during the Interim Period-Operations</u>:   From the date of this Order until the Possession Date (the "Interim Period"), USI shall continue to manage the day-to-day operations at the Subject Property Interest, and: (1) abide by the terms of the sublease with USRC; (2) follow the terms of its existing retail leases and other commercial agreements with tenants and third parties; (3) pay required operating expenses and other obligations; and (4) provide all necessary services, including repair, maintenance, and other operational services and continue working on existing projects.

16.     <u>Restrictions on USI during the Interim Period—Leasing and Other Activities</u>: During the Interim Period, USI shall not do any of the following without Amtrak's prior written consent: (1) negotiate with a third party for any long-term new leases or other commercial agreements; (2) enter into any new leases, amendments or modification to existing leases or other commercial agreements or any amendments and modification of existing commercial agreements that extend beyond the Interim Period (including but not limited to license, service contracts, and agreements for events and event space); or (3) undertake any new activity that affects the station structure at the Subject Property interest, including renovations, improvements, infrastructure modifications, build-out or non-emergency repairs beyond routine repair and maintenance.

17.     <u>Restrictions on USI during the Interim Period—Negotiations</u>:   USI shall not negotiate any new retail leases, licenses or other commercial agreements or any amendments thereof, except as follows: (1) USI can undertake efforts as to collection of existing Account Receivables and enforce its existing rights and obligations under the retail leases and licenses; (2) USI is not restricted from ordinary lease administration activities, including collection of rent and

payment of expenses; (3) USI can undertake or continue leasing activity to which Amtrak has given its prior written consent; and (4) USI shall not enter into any licenses or other commercial agreements that would encumber Amtrak after the Possession Date, unless Amtrak specifically consents in writing to the contract and its contract and its terms.  Subsection 4 of this paragraph shall not apply to leases, licenses or other commercial agreements where an amendment or modification relates only to a period of time before the Possession Date (*i.e.* commercial agreements that may be cancelled on 30 days written notice).

So ORDERED this ____ day of May, 2024.

Amit Mehta

Digitally signed by Amit Mehta
Date: 2024.05.23 22:11:16 -04'00'

_____

The Honorable Amit P. Mehta
United States District Court Judge

6

# EXHIBIT A

**[Joint Letterhead]**


**[Date of Possession]**


[Name and address of each retail tenant and licensee to be inserted]

Re: Introduction of New Landlord at Washington Union Station

Dear Tenant/Licensee:

As you may be aware, National Railroad Passenger Corporation ("Amtrak") filed a legal action on April 14, 2022 entitled National Railroad Passenger Corporation v. Sublease Interest Obtained Pursuant to an Assignment and Assumption of Leasehold Interest made as of January 25, 2007, with said property interest pertaining to Described Leasehold Interests at Washington Union Station, et al. United States District Court for the District of Columbia Case No. 1:22-cv-01043. Recently, the United States District Court for the District of Columbia ordered possession of the Union Station Investco, LLC ("USI") sublease interest in Washington Union Station ("Sublease Interest") to be turned over to Amtrak.  In light of this Order, a copy of which is enclosed, USI will no longer be in possession of the Sublease Interest and/or your landlord/licensor.  From the date of this letter forward, the addressee of this letter ("You") should be dealing with Amtrak with respect to all issues relating to your lease/license at Washington Union Station ("WUS").

By separate letter, Amtrak will be following up with You as to the particulars regarding the management and operation of WUS, and matters relating to Your lease/license including Your payment of rent.

Sincerely,

Union Station Investco, LLC                    National Railroad Passenger Corporation


By: _____            By: _____
    Name:                                        Name:
    Title:                                         Title:


Attachment

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| NATIONAL RAILROAD PASSENGER ) | |
| CORPORATION (AMTRAK), ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **Case No. 22-cv-1043 (APM)** |
| ) | |
| SUBLEASE INTEREST OBTAINED ) | |
| PURSUANT TO AN ASSIGNMENT AND ) | |
| ASSUMPTION OF LEASEHOLD INTEREST ) | |
| MADE AS OF JANUARY 25, 2007, WITH ) | |
| SAID PROPERTY INTEREST ) | |
| PERTAINING TO DESCRIBED LEASEHOLD ) | |
| INTERESTS  AT WASHINGTON UNION ) | |
| STATION LOCATED AT 50 ) | |
| MASSACHUSETTS AVENUE, NE ) | |
| WASHINGTON, D.C. 20002, et al., ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |

<u>**MEMORANDUM OPINION**</u>

This case is about who gets to possess the leasehold interest to the iconic Union Station rail terminal in Washington, D.C.  Contrary to what some may think, Plaintiff National Railroad Passenger Corporation ("Amtrak") does not own, or even manage, Union Station.  It subleases only a portion of the terminal, which generally consists of the back of the building where passengers arrive and wait to board departing trains.  The remainder of the station, including its majestic Great Hall—the building's front entrance and much of its retail space—is controlled by a privately owned enterprise, Union Station Investco, LLC ("USI").  USI manages Union Station through a leasehold interest.  Amtrak subleases space from USI and thus is USI's tenant.

Amtrak filed this action to change that leasehold structure through its statutory power of eminent domain.  *See* 49 U.S.C. § 24311.  Congress gave Amtrak the authority to acquire "interests

in property" that are "necessary for intercity rail passenger transportation," which it cannot secure through a negotiated purchase. *Id.* § 24311(a)(1), (a)(1)(A). Amtrak seeks to condemn the leasehold interest presently held by USI ("USI Sublease"). If successful, Amtrak would step into the shoes of USI and control all of Union Station, subject to lease terms.

At this stage of the case, Amtrak seeks to invoke what it calls a "quick take" provision under § 24311. That statutory mechanism permits Amtrak to take immediate possession of the condemned property before the court determines the amount of just compensation and enters final judgment. Amtrak's "quick take" authority, however, is not absolute. If challenged, Amtrak must convince a court that (1) the taking is "necessary for intercity rail passenger transportation" and (2) it was unable to purchase the property. *Id.* § 24311(a)(1)(A), (a)(2). Amtrak also must deposit the amount of money it believes is just compensation with the court. *Id.* § 24311(b)(1). Here, Amtrak has valued the USI Sublease at $250 million, and it has tendered that sum to the court. By doing so, Amtrak now has legal title over the USI Sublease, but it does not yet have the right to possess the property.

USI is presently owned by a Korean bank, Defendant Kookmin Bank Co., Ltd. ("Kookmin"), and managed by a U.S.-based investment firm, Rexmark. Kookmin and Rexmark oppose Amtrak's attempt to acquire immediate possession of the USI Sublease, contending that Amtrak has failed to satisfy the statutory prerequisites and that, even if it has, the court should permit Kookmin and Rexmark to remain in control.

The parties have extensively briefed the instant motion, taken limited discovery, presented testimonial and documentary evidence at a hearing, filed proposed findings of fact and conclusions of law, and presented oral arguments before the court. The court has reviewed the parties'

submissions, considered the evidence presented, weighed the credibility of the witnesses, and applied the relevant law.

For the reasons that follow, the court finds that Amtrak has met its burden of proof to exercise its "quick take" authority over the USI Sublease.  The court, however, will withhold entering an order conferring immediate possession of the leasehold interest until Amtrak, in consultation with the relevant interested parties, presents the court with an acceptable plan for the orderly transition of Union Station's operations and management.

## I.      BACKGROUND

This case has a complex factual and historical landscape.  Acts of legislation, lease agreements, ownership disputes, and the needs of a modern passenger rail company are just some of the subjects that inform the question before the court.  To frame its decision, the court starts with the statutory regime under which Amtrak operates.  It next provides a brief history of Union Station.  The court then discusses Amtrak's eminent domain authority.  This background section concludes with a review of this matter's procedural history.

### A.      Amtrak

In 1970, Congress established the National Railroad Passenger Corporation, known as Amtrak, as part of the Rail Passenger Service Act.  Pub. L. 91-518, 84 Stat. 1327, 1328, § 301 (1970).  It did so "to avert the threatened extinction of passenger trains in the United States." *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 383 (1995).  Congress determined that "modern, efficient, intercity railroad passenger service is a necessary part of a balanced transportation system," and that "the public convenience and necessity require[d] the continuance and improvement of such service to provide fast and comfortable transportation between crowded urban areas and in other areas of the country."  84 Stat. at 1328, § 101.  Amtrak's purpose was "to

3

provide intercity rail passenger service, employing innovative operating and marketing concepts so as to fully develop the potential of modern rail service in meeting the Nation's intercity passenger transportation requirements." *Id.* at 1330, § 301.

Amtrak has a quasi-public, quasi-private status.  Although it is publicly owned, Congress provided "that Amtrak 'shall be operated and managed as a for profit corporation.'"  *Lebron*, 513 U.S. at 385 (citing 49 U.S.C. § 24301(a)(2)).  Among its statutorily defined goals are that Amtrak "shall":

- "use its best business judgment in acting to maximize the benefits of Federal investments," including by "controlling or reducing management and operating costs";

- "carry out strategies to achieve immediately maximum productivity and efficiency consistent with safe and efficient transportation";

- "improve generally the performance of Amtrak through comprehensive and systematic operational programs and employee incentives";

- "carry out policies that ensure equitable access to the Northeast Corridor by intercity and commuter rail passenger transportation"; and

- "maximize the use of its resources, including [choosing] the most cost-effective use of employees, facilities, and real property[.]"

49 U.S.C. § 24101(c).  To advance these statutory goals, Congress has encouraged Amtrak "to make agreements with private sector entities and to undertake initiatives that are consistent with good business judgment and designed to generate additional revenues[.]"  *Id*. § 24101(d).

Due to its unique origin, governance structure, and public ownership, the Supreme Court has recognized that "the political branches exercise substantial, statutorily mandated supervision over Amtrak's priorities and operations."  *Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 52 (2015).  For example, Amtrak's Board is composed of 10 directors, all of whom but one—the Chief Executive Officer—are appointed by the President and confirmed by the Senate.  49 U.S.C.

§ 24302(a)(1).   The Secretary of Transportation is a permanent Board member.   *Id.* § 24302(a)(1)(A).   Today, the Secretary of Transportation holds all of Amtrak's preferred stock, as well as most of its common stock.   *Ass'n of Am. R.R.*, 575 U.S. at 51.   Thus, "Amtrak is not merely in the temporary control of the Government (as a private corporation whose stock comes into federal ownership might be); it is established and organized under federal law for the very purpose of pursuing federal governmental objectives, under the direction and control of federal governmental appointees."   *Lebron*, 513 U.S. at 398.

The Northeast Corridor rail line is particularly significant to Amtrak's operations. Extending from Washington, D.C. to Boston, Massachusetts, the Northeast Corridor is Amtrak's most trafficked route.   Congress recognized the region's significance in delivering passenger rail services.   It provided that Amtrak shall "carry out policies that ensure equitable access to the Northeast Corridor by intercity and commuter rail passenger transportation" and "coordinate the uses of the Northeast Corridor, particularly intercity and commuter rail passenger transportation." 49 U.S.C. § 24101(c)(10), (11).

### B.   Washington Union Station

At the turn of the 20th century, two passenger rail terminals served Washington, D.C., one of which was located along the National Mall.   In 1901, major rail companies announced an intent to construct a single terminal, eventually leading Congress to pass an act authorizing the construction of Washington Union Station.   Pub. L. 57-122, 32 Stat. 909, § 1 (1903).   Congress decreed that the station "shall be monumental in character."   *Id.* at 911, § 2.   The original station would be privately owned by the Philadelphia, Baltimore, and Washington Rail Company, a corporation created by the merger of two major rail companies.   *Id.*

By the 1960s, rail service was in decline and so too was Union Station.   In 1968, Congress passed the National Visitor Center Facilities Act, which called for the Secretary of the Interior to

5

create a National Visitor Center in Union Station for use during the bicentennial celebrations. National Visitor Center Facilities Act of 1968, Pub. L. 90-264, 82 Stat. 43 § 101 (1968).  Rail services were displaced to a temporary facility behind Union Station.  *See* Union Station Redevelopment Act of 1981, Pub. L. 97-125, 95 Stat. 1667, § 2(2) (1981).  The National Visitor Center proved unpopular, and it closed in 1978.

In 1970, Congress enacted the Rail Passenger Service Act.  In addition to creating Amtrak, the legislation committed substantial funding to improving passenger rail service, particularly in the Northeast Corridor.  84 Stat. at 1338, § 601; 95 Stat. at 1667, § 2(3).  As a result, demand for passenger rail grew, and so too did the need to return Union Station, which had become "unsafe and unusable," 95 Stat. at 1667, § 2(4), to its original purpose as "a sound and fully operational transportation terminal," *id.* § 2(5).

Congress responded in 1981 by passing the Union Station Redevelopment Act.  The Act's stated purposes were "to achieve the goals of historic preservation and improved rail use of Union Station with maximum reliance on the private sector and minimum requirement for Federal assistance."  *Id.* § 2(7).  Congress directed the Secretary of the Interior to assign "right, title, and interest in the Union Station complex" to the Secretary of Transportation.  *Id.* at 1668, § 111(a). It also authorized the Secretary of Transportation to purchase Union Station itself.  *Id.* at 1669, § 113(b).  Congress tasked the Secretary of Transportation to "provide for the rehabilitation and redevelopment of the Union Station complex primarily as a multiple-use transportation terminal serving the Nation's Capital, and secondarily as a commercial complex[.]"  *Id.* at 1668, § 112. Among the Secretary's statutorily assigned objectives were (1) the "[r]estoration and operation of a portion of the historic Union Station building as a rail passenger station, together with holding facilities for charter, transit, and intercity buses in the Union Station complex," (2) the

6

"[c]ommercial development of the Union Station complex that will, to the extent possible, financially support the continued operation and maintenance of such complex," and (3) the "[w]ithdrawal of the Federal Government from any active role in the operation and management of Union Station." *Id.* § 112(b)–(d).

The Act permitted the Secretary to work with the private sector to accomplish these goals. Congress gave the Secretary authority to enter into development agreements with "one or more responsible individuals, corporations, or other private entities with demonstrated experience in the financing, undertaking, and managing of commercial real estate development," *id.* at 1670, § 115(a), as well as any other agreements deemed "necessary or desirable," *id*. § 115(d).

The Secretary carried out this charge, establishing a leasehold structure that largely resembles what is in place today.  Acting through the Federal Railroad Administration ("FRA"), a subagency of the Department of Transportation, the Secretary entered into a 99-year lease agreement with Union Station Redevelopment Corporation ("USRC"), a District of Columbia nonprofit organization established to assist the FRA Administrator to "achiev[e] the objectives of [the Act] and generally to facilitate the rehabilitation and redevelopment of the Union Station complex."  Lender's Ex. 8.  Simultaneously, USRC entered into a 99-year sublease with a private developer, Union Station Venture, Ltd., a District of Columbia limited partnership, on terms nearly identical to its own lease.  Lender's Ex. 9.[1]  Union Station Venture in turn, subleased space to Amtrak permitting it to occupy a portion of Union Station for passenger rail operations and services, whose term was coextensive with the other lease agreements.  Lender's Ex. 4.  This multi-tiered leasehold structure remains in place today.

---

[1] To be more precise, both the FRA-USRC and USRC-Union Station Venture leases are for an initial term of 29 years with five 14-year extensions at the option of the lessee, for a total of 99 years.  *See* Lender's Exs. 8 & 9.

In January 2007, Union Station Venture assigned its leasehold interest to Union Station Investco, LLC, or USI, thereby making USI Amtrak's landlord at Union Station.  Lender's Ex. 20. Union Station Sole Member LLC, as its name implies, was the sole member, or owner, of USI.

### C.    Amtrak's Eminent Domain Authority

Congress granted Amtrak the authority to condemn property in § 6 of the Amtrak Improvement Act of 1973.  Pub. L. 93-146, 87 Stat. 548, 550, § 6 (1973).  Codified today at 49 U.S.C. § 24311, the Act provides, as relevant here, that "[t]o the extent financial resources are available, Amtrak may acquire by eminent domain . . . interests in property . . . necessary for intercity rail passenger transportation."  *Id.* § 24311(a)(1)(A).   Amtrak, however, "may exercise the power of eminent domain only if it cannot" "acquire the interest in the property by contract" or "agree with the owner on the purchase price for the interest."  *Id.* § 24311(a)(2).

The Act also prescribes the procedures for a taking.  Amtrak must initiate a civil action in the U.S. District Court in which the property is located by filing a "declaration of taking" and depositing with the court "an amount of money estimated . . . to be just compensation."  *Id.* § 24311(b)(1).  The declaration must set forth: (1) "a statement of the public use for which the interest is taken"; (2) "a description of the property sufficient to identify it"; (3) "a statement of the interest in the property taken"; (4) "a plan showing the interest taken"; and (5) "a statement of the amount of money Amtrak estimates is just compensation for the interest."  *Id.* § 24311(b)(1)(A)–(E).  Upon the filing of the declaration and the deposit, "title to the property vests in Amtrak in fee simple absolute or in the lesser interest shown in the declaration, and the right to the money vests in the person entitled to the money."  *Id.* § 24311(b)(2).

Although title to the property transfers automatically upon Amtrak's satisfaction of the statutory procedures, possession does not.  The court "may decide . . . the time by which, and the

terms under which, possession of the property is given to Amtrak." *Id.* § 24311(b)(2)(A).  As a final stage of the proceedings, after a hearing "the court shall make a finding on the amount that is just compensation for the interest in the property and enter judgment awarding that amount and interest on it." *Id.* § 24311(b)(3).  "If the award is more than the amount [deposited with the court], the court shall enter judgment against Amtrak for the deficiency." *Id.* § 24311(b)(4).

### D.    Procedural History

Amtrak initiated this action under § 24311 on April 14, 2022, seeking to condemn "the property interest that [USI] obtained from Union Station Venture II, LLC by an Assignment and Assumption of Leasehold Interest made as of January 25, 2007," that is, the USI Sublease.  Compl., ECF No. 1, at 2.

On the same day that Amtrak filed its complaint, it also filed the Declaration of Taking required by § 24311(b)(1).  Decl. of Taking, ECF No. 4.  Amtrak included in the Declaration a "statement of the public use for which the interest is taken," which explained the need for the condemnation as follows:

> Amtrak's acquisition of the Subject Property Interest is necessary for and will be used for intercity rail passenger transportation. Amtrak is acquiring the Subject Property Interest to ensure that [Union Station] reaches its full potential as a premier rail passenger station and multimodal transportation hub.  In particular, Amtrak needs to acquire the Subject Property Interest to, among other things, repair and reinforce the train tunnel under the Station, expand the existing passenger waiting area, and to manage effectively the Station now and in the future.  With the acquisition of the Subject Property Interest, Amtrak will gain control of the essential day-to-day management and operations at [Union Station] and will be able to make necessary improvement to and investments in the Station.

*Id.* ¶ 1.  The Declaration also estimated the value of just compensation for the USI Sublease to be $250 million.  *Id.* ¶ 5.  Amtrak deposited that sum with the court.  *See* Praecipe for Deposit of

Money into Ct., ECF No. 3.  All three named defendants—USI, Union Station Sole Member

("USSM"), and Kookmin—then filed answers to the condemnation petition.  ECF Nos. 35, 36, 38.

Soon afterwards, it became apparent that USI's ownership was in dispute.  The contest

centered on whether Kookmin, the trustee of the debt issued to USSM, had acquired control over

USI due to USSM's default on the debt.  The relevant loan was originated by Rexmark, a

management and investing firm, and was secured by USSM's ownership of USI.  Defendants

asked the court to resolve USI's ownership by determining which party-defendant had properly

filed an answer on behalf of USI: Kookmin or USSM.  Def. USSM's Mot. to Strike, ECF No. 55-

1; Lender's Mem. of L. in Opp'n to USSM's Mot. to Strike, ECF No. 56.  Reluctant to resolve a

complex ownership dispute through a procedural motion, the court encouraged the parties to

resolve their conflict, *see* Hr'g Tr., ECF No. 78, at 23:8-20, but they were unsuccessful, Jt. Status

Report, ECF No. 76.

Ultimately, on August 25, 2022, Kookmin and Rexmark established themselves, at least

preliminarily, as the rightful owner of USI.  They secured a preliminary injunction in the

U.S. District Court for the Southern District of New York that barred USSM from "holding itself

out as the owner of or in control of [USI]" or from "exercising or purporting to exercise any

contractual or legal right of USI."  Prelim. Inj. Order, *Daol Rexmark Union Station v. USSM*, No.

22-cv-6649 (S.D.N.Y.), ECF No. 39.  Kookmin thus now possesses and exercises the controlling

interest in USI for purposes of this litigation, as does Rexmark, which serves as Kookmin's agent

in the United States.  Today, Rexmark oversees the USI Sublease and the day-to-day operations at

Union Station.  For ease of reference, the court will refer to Kookmin, Rexmark, and associated

entities as "Lender."

10

Meanwhile, on July 8, 2022, Amtrak filed a Motion for Immediate Possession of the Subject Property Interest, Pl.'s Mot. for Immediate Possession, ECF No. 72 [hereinafter Pl.'s Mot.], which all Defendants opposed, *see* Def. USSM's Opp'n to Pl.'s Mot., ECF No. 82; Defs. Lender and USI's Opp'n to Pl.'s Mot., ECF No. 83.  To demonstrate that it was unable to purchase the USI Sublease, Amtrak submitted evidence that on April 6, 2022, it offered USI $250 million to acquire the USI Sublease, and USI neither accepted the offer nor proposed a counteroffer by the deadline of April 13, 2022.  Ex. 3 to Pl.'s Mot., ECF No. 72-5, at 2.  Amtrak filed this action the following day.  Compl., ECF No. 1.

On January 18, 2023, the court held a hearing on the motion for immediate possession but did not rule.  Hr'g Tr., ECF No. 85.  Instead, it questioned whether "Amtrak ha[d] done enough [] to try and achieve some negotiated agreement with the property owner." *Id.* at 11:18-19.  The court gave the parties 30 days to attempt to reach a deal.  *Id*. at 57:11-15; 59:24-25.

The negotiations proved unsuccessful.  After approximately nine to 10 meetings over a two-month period, the parties announced that they had been unable to reach an agreement. Jt. Status Report, ECF No. 92; Hr'g Tr., ECF No. 94, at 4:6-7.  They then sought a limited period of discovery as to Amtrak's pending motion for immediate possession, which the court ordered for a period of two months, to conclude on June 6, 2023.  *See* Hr'g Tr., ECF No. 94, at 14:14-25; Minute Order, Apr. 6, 2023.

The court held an evidentiary hearing on September 11, 2023.  Hr'g Tr., Sept. 11, 2023 [hereinafter Evid. Hr'g Tr.].  Amtrak called its Chief Executive Officer, Steven Gardner, who testified about Amtrak's strategic plans and goals should it acquire Union Station and the necessity of the USI Sublease for Amtrak's provision of intercity passenger rail service. *Id.* at 11:5–166:19.

11

Amtrak also called its Vice President of Strategy and Planning, Dennis Newman, to testify about Amtrak's attempts to acquire the USI Sublease.  *Id*. at 168:2–197:4.

Lender called three witnesses.  The court heard from the former Chief Executive Officer of USRC, Beverly Swaim-Staley, who addressed the need for Amtrak to acquire the USI Sublease and the working relationships among the Department of Transportation, USRC, USI, and Amtrak. *Id.* at 213:2–265:10.  Lender also called the Managing Principal of Rexmark, Michael Rebibo, to testify about developments under Rexmark's management of the USI Sublease; USI's relationship with Amtrak; and the negotiations to acquire the USI Sublease.  *Id.* at 266:15–313:9.  Finally, Lender presented Matthew Barry, the General Manager of Union Station, to speak about the current state of the station.  *Id.* at 315:2–337:3.  The parties submitted various documents into evidence.  *See* ECF Nos. 101–104 (exhibit lists).

The court then received the parties' proposed findings of fact and conclusions of law. Lender's Proposed Findings of Fact & Conclusions of Law, ECF No. 99 [hereinafter Lender's PFFCL]; Pl.'s Proposed Findings of Fact & Conclusions of Law, ECF No. 100 [hereinafter Pl.'s PFFCL], and it held an oral argument on November 28, 2023, Hr'g Tr., ECF No. 105 [hereinafter Oral Arg. Tr.].

## II.    FINDINGS OF FACT

Having considered the testimony presented, the exhibits submitted, and the parties' filings, the court makes the following findings of fact.

### A.    The Parties

1.    Amtrak is a federally charted, for-profit corporation whose statutory purpose is to provide passenger rail service throughout the United States.  The Department of Transportation is a majority shareholder of Amtrak.

2.      Kookmin is trustee of KTB CRE Debt Fund No. 8, a Korean Investment Trust that holds a loan to USI that is secured by the USI Sublease.  Lender's Answer to Compl. for Condemnation, ECF No. 35, at 2.  Rexmark serves as the Trust's agent in the United States and oversees the day-to-day management of the loan.  *Id.*; Evid. Hr'g Tr. at 270:18-22.

3.      USI is a limited liability corporation organized under Delaware law.  It is the USI Sublease that Amtrak seeks to condemn and immediately possess.

4.      USSM is a limited liability corporation organized under Delaware law.  Until 2022, it was the sole owner of USI.

5.      Neither the Department of Transportation nor USRC is a party to this matter, and neither has intervened in this case.

**B.      Legal Interests in Union Station**

6.      Pursuant to its authority under the USRA, the Secretary of Transportation purchased Union Station in 1988.  Jt. Ex. 3, at 0000089.

7.      USRC is a corporation organized under the District of Columbia Non-Profit Corporation Act.  The Secretary of Transportation and the Administrator of the FRA are ex officio members of USRC's Board of Directors, 40 U.S.C. § 6905, and the Chief Executive Officer of Amtrak sits on USRC's Board, as well, Evid. Hr'g Tr. at 57:9-15, 255:14-24.

8.      On October 31, 1985, the United States, acting through the FRA, entered into a lease agreement with USRC that conveyed right, title, and interest in Union Station to USRC.  Lender's Ex. 8, at 9; Evid. Hr'g Tr. at 246:2-3.  The purpose of the agreement is to "facilitate rehabilitation and development of the Union Station complex."  Lender's Ex. 8, at 1.  The lease provides that USRC would "enter[] into a firm business arrangement with a developer" preselected

13

by the Secretary "to redevelop Union Station."  *Id.* at 1–2.  The Secretary selected Union Station Venture, Ltd. ("USV"), a limited partnership formed under District of Columbia law.  *Id.*

9.      As contemplated, USRC simultaneously entered into a sublease with USV, whose terms largely mirror USRC's lease with the FRA.  Lender's Ex. 17.  The USRC-USV sublease authorizes the use of Union Station "only as a multiple use passenger rail station and commercial complex and for related purposes."  *Id.* at 33, § 12.1.  The sublease requires USV to "provide access twenty-four (24) hours per day, seven (7) days per week, by rail patrons to the facilities leased by Amtrak" and to "maintain and operate the retail portion of the Project primarily for retail uses."  *Id.* at 33–34, § 12.3(c)(i)–(ii).

10.     On January 25, 2007, USV II (a successor entity to USV) assigned its leasehold interest in the USRC-USV sublease to USI.  Lender's Ex. 21.  As USV's successor-in-interest, USI stepped into USV's shoes.  The Assignment and Assumption of Leasehold Interest agreement that conveyed the USV's leasehold interest to USI is the interest that Amtrak seeks to condemn in this matter, i.e., the USI Sublease.  Ex. 1 to Decl. of Taking, ECF No. 4-1.

11.     USI was previously wholly owned by USSM.  USSM is a limited liability company wholly owned by Ashkenazy Union Station Holdings, LLC, a New York-based redevelopment company.  Jt. Ex. 3, at 5; Compl., *Daol Rexmark Union Station v. USSM*, No. 22-cv-6649 (S.D.N.Y.), ECF No. 1, ¶ 8 [hereinafter *Rexmark* Compl.]; Answer, *Daol Rexmark Union Station v. USSM*, No. 22-cv-6649 (S.D.N.Y.), ECF No. 45 [hereinafter *Rexmark* Answer], at 3.

12.     On May 8, 2018, Citi Real Estate Funding, Inc. and Natixis Real Estate Capital, LLC loaned $330 million to USI secured by the USI Sublease ("Senior Note").  Lender's Ex. 13. On the same day, Rexmark originated a $100 million loan to USSM, secured by USSM's

14

ownership of USI ("Mezzanine Loan").  Lender's Ex. 14; Evid. Hr'g Tr. at 270:18-19.  Kookmin was designated as trustee of the Mezzanine Loan.  Evid. Hr'g Tr. at 270:13-17.

13.     In May 2020, USI and USSM defaulted on both the Senior Note and the Mezzanine Loan.  *Rexmark* Compl. ¶ 28; *Rexmark* Answer at 6.  The holders of both the Senior Note and the Mezzanine Loan accelerated the loan payments, as authorized under the agreements, and proceeded to foreclosure.  Jt. Ex. 3, at 5.

14.     The Senior Note and the Mezzanine Loan were scheduled for foreclosure auctions on January 4, 2022, and January 6, 2022, respectively.  *Id.*  These auctions were called off, however, because on January 5, 2022, Rexmark, or Lender, exercised an option to acquire the Senior Note.  *Id.*; Evid. Hr'g Tr. at 271:2; *Daol Rexmark Union Station v. USSM* Hr'g Tr., Ex. B to Proposed Status Report, ECF No. 81-2, at 30:23 [hereinafter *Rexmark* Tr.].  Lender's acquisition of the Senior Note and USSM's default on the Mezzanine Loan threw the ownership of USI and the control of the Station into question.  *See generally Rexmark* Tr. at 30–33.

15.     In June 2022, Lender foreclosed on the Mezzanine Loan and bid approximately $140 million in exchange for the equity interests in USI.  *Rexmark* Tr. at 32:25–33:2; Evid. Hr'g Tr. at 269:7-12.  Following the foreclosure sale, Lender owned and controlled USI, which retained its contractual right to possess and manage Union Station, pursuant to the USI Sublease.  *Rexmark* Tr. at 28:1-4, 33:12-14, 56:19-23.

16.     Today, USI is a subsidiary of an entity called Daol Rexmark Union Station, LLC, which Rexmark manages.  Evid. Hr'g Tr. at 271:7-10.  Rexmark is Kookmin's agent in the United States and is, "for all effective purposes," the entity "that runs the investment."  *Id.* at 270:21-22; 269:13–270:2.

17.     At present, Lender controls the USI Sublease.

15

18.     The USI Sublease is the property interest that Amtrak seeks to condemn in this matter.  That is, Amtrak seeks to substitute itself for USI as the lessee of the USRC-USI lease to become USRC's tenant and control the Station.

### C.      The USI-Amtrak Sublease

19.     The FRA-USRC lease contemplated that Amtrak would enter into a ground lease covering a portion of Union Station.  Lender's Ex. 8, at 22–23.  Amtrak entered into that sublease with USV in 1988.  Lender's Ex. 4.

20.     Amtrak currently occupies less than 20% of Union Station.  Evid. Hr'g Tr. at 272:14-15.

21.     Section § 2.2 of the USV-Amtrak Sublease affords Amtrak the option to lease space adjacent to its original leased premises, but that option, which Amtrak has exercised, is limited to the West and East Concourses.  Lender's Exs. 4, 7, 22.  Amtrak thus does not presently have an option to lease the remainder of the Station.  For instance, Amtrak does not have a right to lease the Great Hall under its existing sublease.  Evid. Hr'g Tr. at 303:12-16.

22.     If Lender were open to leasing the Great Hall to Amtrak, Amtrak would have to negotiate with Lender over the fair market value of that property.  *Id*. at 302:12-17, 312:18–313:8.

### D.      Passenger Rail Services at Union Station

23.     Amtrak's ridership has grown dramatically in the past four decades, transforming Union Station into a major transportation hub.  *Id*. at 246:5-11.  In 1988, Amtrak's annual rail passenger ridership out of Union Station was a mere three million riders.  *Id*. at 16:7-22.  By 2018, that number had increased to 14 million.  *Id*.

24.     Union Station serves more than just Amtrak passengers.  Millions of people pass through the terminal using various modes of transportation.  That includes commuter rail

16

passengers who use the Maryland Area Rail Commuter and Virginia Railway Express systems; riders on the Washington Metro Area Transit Authority; and inter-city bus passengers.  In 2021, approximately 37 million people passed through Union Station through some mode of transportation.  Jt. Ex. 5, at 0008622.

25.     Growth, particularly of the Northeast Corridor line, is essential for Amtrak's continued success.  Evid. Hr'g Tr. at 15:6-7, 246:18-21.  To that end, Amtrak plans to double its ridership between present day and 2040, in part by increasing train volumes at Union Station from about 220 trains per day to over 500 trains per day, including commuter rail.  *Id*. at 17:7-18. Amtrak has purchased 28 new Acela trains that will increase Amtrak's capacity between Washington, D.C. and New York City by about 80%.  *Id*. at 15:14-19.

## E.     The Concourse Modernization Project

26.     Today, Amtrak primarily operates in Union Station out of what is known as the Claytor Concourse.  *Id*. at 18:13-14.  This is the area where Amtrak boards, queues, and provides services to passengers, such as ticketing, baggage drop-off and retrieval, restroom facilities, and seating.  *Id*. at 28:11-22.  The Concourse does not contain a ticketed waiting area.  *Id*. at 34:19-21.

27.     On a typical day, during peak travel times, it is not unusual for there to be a thousand passengers within the Concourse area.  That number surges when trains are delayed, sometimes doubling the number of passengers within the Concourse.  *Id*. at 28:21-22, 30:24–31:6.

28.     Amtrak conducted an internal analysis of its pedestrian flow in the Concourse, and it yielded results showing a poor passenger experience, both at on- and off-peak times.  *Id*. at 31:15–32:11.  The Concourse offers no waiting area and insufficient seating options to meet demand.  *Id*. at 32:15-24.  As a result, for many, the passenger experience at Union Station is frustrating.  *Id*. at 249:9-13.

29.     The Concourse Modernization Project ("CMP") is a project executed by Amtrak, the FRA, USRC, and USI, which was designed to remedy some of these issues.  *See* Lender's Ex. 1, at 0014799.  It is part of the Second Century program, a series of projects that began in 2012. Evid. Hr'g Tr. at 222:17.  The CMP entails renovating and expanding the Concourse to increase passenger space and amenities.  Lender's Ex. 3, at 5; Evid. Hr'g Tr. at 254:7-8.  The vision of the CMP is not necessarily confined to the Concourse and could be expanded depending on the ultimate design.  Evid. Hr'g Tr. at 226:5-18.

30.     During Swaim-Staley's tenure as Chief Executive Officer for USRC, USRC agreed that the CMP was necessary for Amtrak to continue serving the Northeast Corridor.  *Id*. at 253:16-17.  Swaim-Staley met with Amtrak and USI weekly, with the FRA joining those meetings beginning around 2019 or 2020, to advance the project.  *Id*. at 228:12-23.

31.     The CMP has been in the planning stages for over a decade.  *Id*. at 222:14–223:8. It hit a major roadblock around 2019 when the FRA rejected the initial design as insufficient.  *Id*. at 227:13-25.  The FRA must approve construction permits before any actual changes can take place in the historic part of the station.  *Id*. at 106:22-24; 218:11-25.

32.     Thereafter, in 2020, USRC was asked to take over the CMP as a design-build project, but Amtrak reclaimed responsibility for it in August 2021, causing the project effectively to restart.  *Id*. at 126:12–127:10, 228:1-4.

33.     As of March 2023, the CMP remained in the pre-design phase and only 10% complete, meaning that Amtrak had not yet submitted designs to the FRA for approval.  *Id*. at 236:16-21, 227:2-8; Lender's Ex. 2, at 4.  The earliest projected construction start date is January 2025.  Lender's Ex. 2, at 5.

18

### F.      The Subbasement Project

34.      Another component of the Second Century program is the Subbasement Project. The Subbasement Project was initiated a decade ago, when authorities discovered serious issues with the supporting structures for the track beds under Union Station.  Evid. Hr'g Tr. at 224:7-11. The Subbasement Project seeks to replace existing degraded bridging structure within the First Street tunnel.  Lender's Ex. 3, at 5.  To facilitate this structural repair, the utilities infrastructure must be relocated.  *Id.*

35.      When Amtrak began planning the CMP and the Subbasement Project years ago, it did so assuming that it would remain a subtenant of Union Station, not become the leaseholder of the entire property.  Dep. of Gretchen Kostura, at 121:8-10 (citing Lender's Ex. 2).

36.      The Subbasement Project remains in the early stages.  As of April 2023, the Subbasement Project was only 5% complete, and it had moved out of the "planning" phase. Lender's Ex. 2, at 1.

37.      According to Amtrak, if it possessed the leasehold interest in Union Station, it would immediately advance the CMP and the Subbasement Project by moving along the project designs.  Evid. Hr'g Tr. at 89:25–90:7.

### G.      Redesign and Repurposing of Union Station

38.      If it were to obtain immediate possession of the entire leasehold, Amtrak proposes making multiple immediate changes to improve the customer experience.  Those include creating temporary seating and waiting areas for passengers, improving "redcap" services to assist customers, locating Amtrak customer service representatives throughout the station, creating a temporary ticketing area, adding temporary signage to guide passengers, and bolstering security through both Amtrak police and contracted private security.  *Id*. at 87:21–90:7.

39.     Amtrak also has developed a concept design that envisions how it might remake Union Station if it were to possess the USI Sublease.  *See* Pl.'s Ex. 10.  To be clear, the concept design is preliminary.  It reflects only Amtrak's vision of how it might redesign and repurpose the space in Union Station.  Evid Hr'g Tr. at 47:5-25.

40.     Among other things, Amtrak would like to expand its Metropolitan Lounge for first-class passengers, add additional signage to increase the prominence of Amtrak's branding, move Amtrak's office space for employees and Amtrak police within the station, create a crew base, and increase event space for job fairs and children's play areas.  *Id*. at 35:2-22, 36:23–37:9, 37:18–41:20, 43:9–44:18, 52:14–53:4.  The concept designs are depicted below:



20



## Concourse Mezzanine Floor



## Lower Level

Pl.'s Ex. 10.

21

41.    If Amtrak's concept design were to come to fruition, the amount of space devoted to commercial purposes would shrink significantly, which would mark a major shift from Union Station's present use.  Jt. Ex. 4, at 47–49; Pl.'s Ex. 10; Evid. Hr'g Tr. at 274:5-12.  Currently, large parts of the station outside of Amtrak's control are leased to retailers and food establishments. Evid. Hr'g Tr. at 275:4-6.

42.    To manage the station, Amtrak would rely on a third-party property management company, because it does not have sufficient internal resources.  Jt. Ex. 3, at 8–9.  Amtrak intends to retain the current property management company, Jones Lang Lasalle, upon possessing the USI Sublease.  Evid. Hr'g Tr. at 161:5-24; Jt. Ex. 4, at 0007757.

43.    Amtrak has not discussed these proposed changes with USI.  Evid. Hr'g Tr. at 142:5–143:1, 290:25–291:8, 324:7-19.

## H.    The Parties' Working Relationship

44.    As a subtenant within Union Station, Amtrak must seek USI's permission to take certain actions.  *Id*. at 62:13-17.  Amtrak believes that "dealing with USI" has "often [been] an impediment to the pace and outcomes that [it] wanted to see" at the station.  *Id*. at 63:14-16; *see also id.* at 105:19-22 (identifying the Track 22 project as "heavily impeded for a long time by USI" and Amtrak was "delayed as a result of it," impacting "both [Amtrak's] cost and schedule"); Jt. Ex. 6, at 2, 4.

45.    That "challenge," according to Amtrak, stems from "a different set of interests." Evid. Hr'g Tr. 63:9-10.  USI's interests are primarily "commercial," whereas Amtrak views the station as a primarily "transportation facility."  *Id.* at 63:10-13.

46.    USI's manager through Rexmark, Michael Rebibo, believes that he has a "very good working relationship" with Amtrak, with ample communication and no outstanding

22

problems.  *Id*. at 300:5-13.  Rebibo's opinion of the Amtrak-USI working relationship, however, is limited to the preceding 20 months, because he only began liaising with Amtrak in August 2022. *Id.* at 306:8-17.

47.     The current on-site property manager of Union Station, Matthew Barry, also has a limited historical understanding of the Amtrak-USI relationship.  He began working with Amtrak in November 2022.  *Id.* at 325:12-23.  Since Lender secured control of Union Station, and since the filing of this action, neither Jones Lang Lasalle nor USI have consulted Amtrak when negotiating or renegotiating subleases with retail vendors.  *Id*. at 330:3–331:13.

48.     The parties have different understandings of the productivity of their working relationship.  Although Amtrak has cited few actual examples of USI hindering Amtrak's ability to achieve its transportation goals, there is no evidence that Amtrak has manufactured its past challenges with USI as a pretext to acquire the USI Sublease.

**I.     Amtrak's Efforts to Purchase the USI Sublease**

49.     On June 10, 2021, the Amtrak Board met to consider issues relating to Union Station.  A management presentation to the Board described the station's governance structure as "obsolete and complex" due in part to "misalignment between parties."  Jt. Ex. 5, at 5.  The presentation also identified a host of existing challenges at Union Station, including poor customer experience, inadequate facilities, high vacancy rates, and a backlog of critical maintenance.  *Id.* at 6–10.  Amtrak's strategy then was to focus on "collaboration with DOT/FRA to chart a new path" through "[i]ncreased capacity for rail service growth" and the Second Century Plan, among other things.  *Id*. at 18, 19.

50.     On December 7, 2021, the Amtrak Board met to consider a different approach: purchasing the USI Sublease.  *See* Jt. Ex. 6.  According to a management proposal submitted to

23

the Board, USI's "loan defaults and scheduled foreclosure sales" presented a "unique opportunity" for Amtrak to acquire USI's leasehold interest.  *Id.* at 3.

51.     Amtrak management submitted that acquisition of the leasehold would better position Amtrak to efficiently implement repair, maintenance, and capital improvement projects. *Id.* at 4.  It also would "improve the Amtrak customer experience," "enhance[] Amtrak's product," and "diversify[] existing revenue streams."  *Id.*  It further stated that "[n]either the current ownership and governance structure, nor the physical condition of [Union Station] affords Amtrak sufficient direct and effective control over the passenger experience at [Union Station]," "hinder[ing] the ability for growth of intercity rail at [Union Station] in a way that limits Amtrak's ability to meet future travel market demands."  *Id.* at 5.  On the other hand, "[a] status quo condition at [Union Station] will lead to continued underinvestment, deferred maintenance[,] and compounding deterioration of a historical federal asset."  *Id.* at 6.

52.     Amtrak's management projected that acquiring the USI Sublease would yield financial benefits by, among other things, injecting capital funding into Amtrak, diversifying its assets, and gaining returns on investment.  Evid. Hr'g Tr. at 78:17-19.

53.     The proposal identified three possible paths to acquisition: (1) purchasing the debt from the then-holder of the Senior Note before the scheduled foreclosure sale on January 6, 2022; (2) bidding at the foreclosure sale; or (3) "[e]xercis[ing] Amtrak's statutory right of eminent domain and condemn[ing] the Sublease Interests."  Jt. Ex. 6, at 3.

54.     In estimating possible acquisition costs, management identified a third-party appraisal that valued the USI Sublease at $830.9 million (based on a 10-year net present value of cash flow plus terminal capitalization value).  *Id.* at 8.  Amtrak management disagreed with that appraisal.  In the Board proposal, it "adjusted assumptions . . . to more accurately reflect the

24

operating realities in [Union Station]" and determined an appraised value of $229.1 million. *Id.* Amtrak was aware that USI's outstanding debt was $550 million. *Id.*

55.     The Board authorized management to move forward with attempting to purchase the leasehold interest from the holder of the Senior Note (Lender had not yet exercised the option to purchase the Senior Note).  Pl.'s Ex. 1, at 5; Evid. Hr'g Tr. at 85:5-16.

56.     To secure the funding, Amtrak requested pre-programming authority from the FRA to put $550 million towards acquiring the USI Sublease.  Lender's Ex. 9.  The FRA formally approved the request on January 5, 2022.  Lender's Ex. 10, at 0001983.

57.     On December 27, 2021, Amtrak offered to purchase USI's leasehold interest in the Station from the original holder of the Senior Note for $300 million.  Pl.'s Ex. 2; Evid. Hr'g Tr. at 183:13-24.  The offer letter indicated: "Amtrak has determined that ownership of the Property is necessary for intercity rail passenger transportation and an improved customer experience." Pl.'s Ex. 2, at 1.  The offer was rejected.  Evid. Hr'g Tr. at 183:25–184:12.

58.     Amtrak then decided to bid at the scheduled foreclosure sale with the purpose of acquiring the USI Sublease.  *Id.* at 80:4-15.  The auction was called off, however, when Lender, as the originator of the Mezzanine Loan, exercised an option to acquire the Senior Note. Pl.'s Ex. 1, at 3.

59.     Three weeks after the auction's cancellation, Amtrak and Lender had a meeting at which Amtrak expressed interest in acquiring the leasehold interest.  Evid. Hr'g Tr. at 283:11– 284:3.  At that meeting, Amtrak did not make a firm offer, but Rebibo informed Amtrak that Lender recently had received an offer of approximately $700 million for a partial interest.  *Id.* at 284:8-13.

60.     On January 28, 2022, Amtrak advised USI that it intended to conduct its own appraisal of Union Station, but USI objected to Amtrak doing so.  *See* Pl.'s Exs. 3, 4.

61.     On February 18, 2022, the Amtrak Board met to again discuss the proposal to acquire the USI Sublease.  Jt. Ex. 2; Evid. Hr'g Tr. at 79:25–81:3.

62.     Around this time, Amtrak management had engaged FTI Consulting, a management consulting firm, to advise on the valuation of the USI Sublease.  Jt. Ex. 2, at 182; Jt. Ex. 3, at 20.  Based on publicly available data and market-based assumptions, FTI estimated a high-end value of no greater than approximately $400 million, with a "more likely valuation" of less than $250 million.  Jt. Ex. 3, at 20.  Cushman & Wakefield, a real estate services firm, also prepared an appraisal that estimated the USI Sublease to be worth $250 million.  Lender's Ex. 24.

63.     On March 22, 2022, the Amtrak Board met once more and this time adopted a Resolution to acquire the USI Sublease.  *See* Pl.'s Ex. 1.  In its Resolution, the Board stated that the "current USI sublease at [Union Station] has led to serious concerns as to the execution of necessary maintenance, capital improvements[,] and future redevelopment at [Union Station], as well as accountability for cleanliness, safety, security[,] and operational efficiencies befitting a multimodal transportation center of national significance necessary for intercity rail passenger transportation[.]"  *Id.* at 3.  The Board further found that "acquisition of the Sublease Interests is necessary to ensure the condition and longevity of [Union Station] as a multimodal transportation center and a key asset of Amtrak's core business and provides an opportunity to improve the lease structure of [Union Station] to serve the long-term interests of this essential multimodal station[.]"  *Id*. at 4.  The Board unanimously authorized and approved "the acquisition of the Sublease Interests by either entering into a binding Negotiated Deal, submitting a binding bid at Auction, or by Condemnation[.]"  *Id.* at 5.  The Board further authorized management to undertake the actions

necessary to acquire the USI Sublease, including "executing . . . documents for condemnation proceedings[.]"  *Id.*

64.     The FRA Administrator, as the representative of the Secretary of Transportation, was present at this meeting and voted in favor of acquiring the USI Sublease, including through condemnation.  *Id.* at 1.  The FRA again approved pre-programming authority for the acquisition. *Id.* at 4; Jt. Ex. 3, at 22 (requesting FRA approval of $66 million).

**J.     Amtrak's Efforts to Acquire the USI Sublease**

65.     On April 6, 2022, Amtrak made an offer to USI to purchase the USI Sublease for $250 million.  Jt. Ex. 8.  The offer expired on April 13, 2022.  *Id.*

66.     The next day, representatives from Amtrak and USI spoke over the phone regarding the offer, and USI proposed setting up a meeting with the owner of USSM.  Jt. Ex. 7, at 0015462– 0015464; Evid. Hr'g Tr. at 172:8-13.   After the call, the parties communicated about a next meeting, which Amtrak said would need to "occur within the timeframe indicated in our offer as time is of the essence."  Jt. Ex. 7, at 0015461.  Amtrak also said that it would need to have a counteroffer from USI prior to the meeting.  *Id.* at 0015460.  USI responded, protesting the professed urgency, but otherwise disregarding Amtrak's efforts to set a remote meeting.  *Id.*

**K.     Post-Suit Negotiations**

67.     Amtrak filed suit on April 14, 2022, the day after its offer to USI expired.  Compl., ECF No. 1.

68.     Following a hearing on January 18, 2023, and at the court's direction, Hr'g Tr., ECF No. 85, at 59, the parties began efforts to reach a deal.  Their negotiations centered on a purchase price and other solutions, such as amending the parties' existing sublease, a possible joint

venture, or an alternative structure akin to Amtrak's status at the Moynihan Train Hall in New York City.  Evid. Hr'g Tr. at 288:21–289:5, 289:23–290:10.

69.     The parties met nine to 10 times, but by March 23, 2023, they had reached an impasse.  Hr'g Tr., ECF No. 94, at 4.  The parties were unable to reach an agreement as to a purchase price or alternative terms.  Evid. Hr'g Tr. at 181:11-19, 307:13–308:5.

## III.    CONCLUSIONS OF LAW

Having made its findings of fact, the court sets out below its conclusions of law.  The court begins with the standard governing the present motion, before turning to the merits.

### A.     49 U.S.C. § 24311 Is a Quick-Take Statute

The parties agree that, when Amtrak filed its declaration of taking and deposited the sum of $250 million in the court's registry, title to the USI Sublease passed to Amtrak.  49 U.S.C. § 24311(b)(2).  Their dispute centers on the process and legal standard for Amtrak to take actual possession of that interest.  Pl.'s PFFCL ¶ 2 (citing Hr'g Tr., ECF No. 85, at 35:11-19, 37:9-11).

Amtrak argues that its eminent domain statute, 49 U.S.C. § 24311, contains a "quick take" provision that authorizes it to take immediate possession of condemned property upon its filing of a declaration of taking and the required deposit.  That procedure, Amtrak says, is analogous to the quick-take provision in the Declaration of Takings Act ("DTA"), 40 U.S.C. § 3114(b)(1), which is the general federal condemnation statute.  The only additional showings required by § 24311 are nominal showings of "necessity" and an inability to otherwise acquire the property.  Pl.'s PFFCL ¶¶ 7–10 & n.4; Oral Arg. Tr. at 8:9-20 (arguing in favor of a "pleading-plus" standard).  Lender, on the other hand, demands Amtrak prove more.  It maintains that Amtrak can only secure possession of the leasehold interest before entry of final judgment by satisfying the traditional, four-factor preliminary injunction standard.  Lender's PFFCL ¶ 84.

28

No court appears to have addressed a motion under § 24311 for immediate possession before a final adjudication of the merits. *Id.* ¶ 82. Courts that have applied § 24311 have done so under circumstances different than those presented here. *Cf. Nat'l R.R. Passenger Corp. v. 3.44 Acres More or Less of Land & Bldg. located at 900 2nd St. NE, Wash., D.C. 20002-3557*, 266 F. Supp. 3d 63, 66 (D.D.C. 2017) ("*3.44 Acres*") (parties stipulated to Amtrak's possession of the property pending disposition of the merits); *Nat'l R.R. Passenger Corp. v. 4.0446 Acres More or Less of Land & Fixtures*, No. 17-cv-1752, 2019 WL 1057932, at *1 (E.D. Pa. Mar. 6, 2019) (summary judgment based on stipulated facts); *Nat'l R.R. Passenger Corp. v. 4,945 Square Feet of Land More or Less Situated in Cnty. of Bristol*, 1 F. Supp. 2d 79, 83 (D. Mass. 1998) ("*Bristol*") (summary judgment resulting in an order of possession to Amtrak, where there was no prior request for pre-judgment possession).

Notwithstanding the novelty of the issue presented, its resolution is not difficult based on a reading of § 24311(b)(2). The statute states that "[w]hen the declaration is filed and the deposit is made . . . title to the property vests in Amtrak in fee simple absolute or in the lesser interest shown in the declaration, and the right to the money vests in the person entitled to the money." 49 U.S.C. § 24311(b)(2). Similar text is contained in the DTA. *See* 40 U.S.C. § 3114(b)(1) ("On filing the declaration of taking and depositing in the court, to the use of the persons entitled to the compensation, the amount of the estimated compensation stated in the declaration . . . title to the estate or interest specified in the declaration vests in the Government[.]"). Courts have interpreted § 3114(b)(1) of the DTA as "vest[ing]" the government's "right of possession [] immediately upon filing a declaration of public use and assuring the court that the government will pay the full just compensation amount, once determined, by deposit, appropriation, or otherwise." *Transwestern Pipeline Co. v. 17.19 Acres of Prop. Located in Maricopa Cnty.*, 550 F.3d 770, 774 (9th Cir. 2008);

29

*Transcon. Gas Pipe Line Co. v. Permanent Easements for 2.14 Acres & Temp. Easements for 3.59 Acres in Conestoga Twp., Lancaster Cnty., Tax Parcel No. 1201606900000*, 907 F.3d 725, 734 (3d Cir. 2018) (describing the DTA as providing quick-take authority because "title vests automatically with the United States" upon the filing of a declaration of taking and a deposit of estimated compensation).   Given the parallel statutory text, § 24311(b) should likewise be interpreted to vest immediate possession in Amtrak when it fulfills the quick-take provision's procedural requirements.   *See United States v. Davis*, 139 S. Ct. 2319, 2329 (2019) (courts "normally presume that the same language in related statutes carries a consistent meaning"); *see also Nat'l R.R. Passenger Corp. v. 025 Acres More or Less of Land*, No. 23-cv-2158 (JKB), 2023 WL 5940042, at *1 (D. Md. Sept. 12, 2023) (reading § 24311 to contain a quick-take provision).

There is one notable distinction between the two statutes.   Whereas the DTA expressly provides that upon filing the declaration and making the deposit "the land is condemned and taken for the use of the Government," 40 U.S.C. § 3114(b)(2), Congress did not include similar text in § 24311(b).   But the court does not view that difference to negate Amtrak's quick-take power (nor has Lender made that argument).   Nothing in the statutory text imposes any greater evidentiary standard or procedural burden on Amtrak to secure immediate possession of property.   *Cf. E. Tenn. Nat. Gas Co. v. Sage*, 361 F.3d 808, 825 (4th Cir. 2004) (holding that a preliminary injunction standard applies to a motion for immediate possession under the Natural Gas Act's statutory eminent domain provision, because under that Act "title . . . does not pass until compensation is determined and paid").

**B.      No Statute or Lease Term Bars Amtrak's Taking of the USI Sublease**

Lender makes a variety of arguments rooted either in federal statutes or the relevant leases to assert that Amtrak's eminent domain authority does not extend to the USI Sublease.  The court is not persuaded by any of these.

*1.      The USI Sublease Is Not Property of a "Governmental Authority"*

Section 24311(a)(1)(A) prohibits Amtrak from acquiring by eminent domain the "property of . . . a governmental authority[.]"  49 U.S.C. § 24311(a)(1)(A); *see Bristol*, 1 F. Supp. 2d at 83 ("Amtrak has no statutory eminent domain authority with respect to the property owned by governmental entities.").  Lender argues that "the provision of Subsection A that forbids Amtrak from taking property belonging to a governmental authority" prohibits Amtrak's condemnation of the USI Sublease, because the federal government owns the Union Station facility and its grounds in fee simple.  Jt. Opp'n of Lender & USI to Pl.'s Mot., ECF No. 83, at 30 [hereinafter Lender & USI's Opp'n]; Lender's PFFCL ¶ 85 (arguing that "Amtrak's statutory authority does not expressly allow it to condemn interests in federal property or federal contracts").  But the bar on Amtrak's acquisition of government property is not applicable here.

In the context of eminent domain, the Supreme Court has said that the term "property" refers to "the group of rights inhering in the citizen's relation to the physical thing, as the right to possess, use and dispose of it."  *United States v. Gen. Motors Corp.*, 323 U.S. 373, 377–78 (1945).  When the government "exercises the power of eminent domain[,] it substitutes itself in relation to the physical thing in question in place of him who formerly bore the relation to that thing[.]"  *Id.* at 378.  The subject "property" is thus "what lawyers term 'interest' in the thing in question.  That interest may comprise the group of rights for which the shorthand term is 'a fee simple' or it may be the interest known as an 'estate or tenancy for years,'" as was the case in *General Motors*.  *Id.* In this case, the "thing," or property "interest," is not the fee simple interest to Union Station or

31

any agreement in which the federal government holds a property interest.  It is USI's leasehold interest as the tenant in the USRC-USI lease.  USI and USRC are both private entities.  Thus, Amtrak seeks to take a private property interest, not a government one, which it is permitted to do under § 24311.

Last, any concern regarding Amtrak's acquisition of a leasehold interest covering a parcel owned in fee simple by the United States is obviated by the fact that the Secretary of Transportation has expressly consented to the taking.  He did so both through his Board vote to approve condemnation and through the FRA's approval of pre-programming authority to fund it.  *See infra* Section III.B.3.

### 2.   Amtrak Can Take the USI Sublease without a "Request" from the Secretary of Transportation

Section 24311 provides that Amtrak may acquire "interests in property" necessary for rail passenger transportation, but it also allows Amtrak to take interests "requested by the Secretary of Transportation in carrying out the Secretary's duty to design and build an intermodal transportation terminal at Union Station in the District of Columbia if the Secretary assures Amtrak that the Secretary will reimburse Amtrak." 49 U.S.C. § 24311(a)(1)(B).  Lender contends, somewhat half-heartedly, that this provision means that "any appropriation . . . relating to the 'intermodal transportation terminal at Union Station' must be initiated by the Secretary of Transportation." Lender & USI's Opp'n at 26.  Because the Secretary did not "request" the taking of USI's leasehold, Lender contends, Amtrak lacks the authority to do so.

But that reading ignores that § 24311 uses the disjunctive "or" to separate the two grounds on which Amtrak can exercise eminent domain.  "Canons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings, unless the context dictates otherwise." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979).  Each provision typically should

32

be accorded its "independent and ordinary significance." *Id.* at 338–39.  Also, the "'[t]he word "or" has an inclusive sense (A or B, or both) as well as an exclusive one (A or B, not both),' and is 'generally used in the inclusive sense.'" *Rush v. Kijakazi*, 65 F.4th 114, 120 (4th Cir. 2023) (quoting *Varga v. Colvin*, 794 F.3d 809, 815 (7th Cir. 2015)).  Here, nothing about the text or structure of § 24311(a)(1) suggests that Congress meant (a)(1)(B) to restrict Amtrak's general eminent domain authority granted under (a)(1)(A) as to Union Station.  Lender's interpretation would have the court place an "unless" or "only if" at the start of (a)(1)(B) (*e.g.*, "unless" or "only if" requested by the Secretary of Transportation).  Those terms are simply not present.

Further, to the extent that the text of the statute is ambiguous, the legislative history of § 24311 supports the plain text interpretation.  As part of the Amtrak Improvement Act of 1973, Congress granted Amtrak the general eminent domain authority that is now codified in subsection (a)(1)(A).  *See* 87 Stat. at 550, § 6.  The following year, as part of the Amtrak Improvement Act of 1974, Congress added the provision that is now codified in subsection (a)(1)(B).  Pub. L. No. 93-496, 88 Stat. 1526, 1528, § 6 (1974).  When it made that amendment, the conference committee members "agreed to amend Section 305 of existing law in order to allow Amtrak to condemn any property at the request of the Secretary . . . in order to facilitate completion of the intermodal terminal" at Union Station "within the required time," but "wished to emphasize that this amendment in no way alters Amtrak's existing authority under such section 305."  H.R. Rep. No. 93-1441, at 19 (1974) (Conf. Rep.).  This history thus makes clear that Lender's reading of § 24311(a)(1)(B) as a limitation on Amtrak's general eminent domain authority is inaccurate.

### 3.   The Union Station Redevelopment Act Does Not Limit Amtrak's Eminent Domain Authority

Next, Lender asserts that the Union Station Redevelopment Act of 1981 ("USRA") implicitly forecloses this taking.  Lender's PPFCL ¶ 6; Oral Arg. Tr. 46–47, 74, 78–79.  The USRA

marked an important milestone in the history of Union Station.  The train station had fallen into

disrepair and, after a roof collapse in 1981, Congress authorized the Secretary of Transportation

to take control over Union Station from the Secretary of the Interior to oversee the rehabilitation

and redevelopment of the facility as a multi-use transportation terminal.  *See* Pub. L. 97-125, 95

Stat. 1667, § 3 (1981).[2]  When Congress did so, it expressed that the purposes of the Act were to

be achieved "with maximum reliance on the private sector and minimum requirement for Federal

assistance."  *Id.* at 1667, § 2(7).  It also authorized the Secretary to enter into the present lease

structure with private developers, under which Amtrak is a sublessee of space within the station.

Lender's PFFCL ¶ 6.  To disrupt the status quo, Lender contends, would be to subvert the intent

of Congress by allowing Amtrak to become not a mere "space tenant (subtenant) at the Station,

[but] the operator or developer," which is not the structure that Congress envisioned.  *Id.*; *see also*

Oral Arg. Tr. at 78–79 (same).  What's more, Lender says, the contemplated new structure would

require use of significant taxpayer funds to justly compensate for the leasehold interest, also

contrary to Congress's intent to minimize the use of public funding to operate Union Station.

Oral Arg. Tr. at 45–46.

Absent some textual hook in the USRA, the mere impression of congressional intent upon

which Lender relies is not enough to hold that the USRA bars Amtrak's exercise of eminent

domain here.  Courts "approach federal statutes touching on the same topic with a 'strong

presumption' they can coexist harmoniously."  *Dep't of Agric. Rural Dev. Rural Hous. Serv. v.*

*Kirtz*, 601 U.S. 42, 63 (2024) (quoting *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018)).  Thus,

"[w]hen confronted with two Acts of Congress allegedly touching on the same topic, [courts are]

not at 'liberty to pick and choose among congressional enactments.'"  *Epic Sys.*, 584 U.S. at 510

---

[2] *See* Blaine Harden, *Union Station, Leaking Badly, Closed as Unsafe*, Wash. Post, (Feb. 24, 1981), available at
https://perma.cc/RH6N-U7GJ.

(quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)).  If the "two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective."  *Morton*, 417 U.S. at 551.  "A party seeking to suggest that two statutes cannot be harmonized, and that one displaces the other, bears the heavy burden of showing 'a clearly expressed congressional intention' that such a result should follow."  *Epic Sys. Corp.*, 584 U.S. at 510 (quoting *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 533 (1995)).  "The intention must be 'clear and manifest.'"  *Id.* (quoting *Morton*, 417 U.S. at 551).  Lender has not met that burden.

Lender points to no text in the USRA that speaks, even indirectly, to Amtrak's power of eminent domain.  The only provision addressing a takings power is one that grants the Secretary of Transportation the authority to "acquire for the United States, by lease, purchase, or otherwise, any interest in real property . . . and any other property interest . . . in or relating or adjacent to the Union Station complex that the Secretary [] deems necessary to carry out the purposes" of the Act. 95 Stat. at 1671, § 116(a)(1) (codified at 40 U.S.C. § 816(a)(1)).  Had Congress wished to bar Amtrak from operating Union Station as its primary leaseholder, it could have said so.

Importantly, the taking here does not impinge upon the broad grant of authority that Congress gave to the Secretary of Transportation to develop and manage the terminal.  The USRA leaves it to the Secretary to determine which development agreements to enter into and with whom, *id.* at 1670, §§ 115, 116(b) (codified at 40 U.S.C. §§ 815, 816(b)), and the Secretary has given his approval for Amtrak's taking of the USI Sublease.  On March 22, 2022, Amtrak received pre-programming authority from the FRA of $66 million to acquire the USI Sublease.  Pl.'s Ex. 1, at 4.  The FRA conditioned its approval of future programming requests "on Amtrak's successful renegotiations of the USI Sublease," whose terms the FRA deemed were "unsatisfactory and [did]

not serve the long-term interests of this essential multimodal station." Jt. Ex. 3, at 23 (letter from the FRA to Amtrak). The approval letter further referenced the "many discussions" among Amtrak, the Department of Transportation, and the FRA "about the acquisition of the USI Sublease." *Id.* at 24. The Secretary also later expressed his support for the condemnation by voting in favor of the acquisition of the USI Sublease as an ex-officio member of Amtrak's Board. 49 C.F.R. § 700.2; Pl.'s Ex. 1.

Amtrak's exercise of eminent domain, both as a matter of law and in its execution, is thus consistent with the broad grant of authority statutorily vested in the Secretary of Transportation under the USRA.

### 4.   The USRC Sublease Does Not Preempt Amtrak's Taking

Finally, Lender contends that Amtrak's taking is barred by the lease between the FRA and USRC, which expressly contemplates that USRC would sublease its interest in Union Station to USV. USV later assigned its property interest to USI. Lender's Ex. 21; Lender's Ex. 8, at 2; Evid. Hr'g Tr. at 199–201. According to Lender, "Amtrak cannot countermand and doesn't have the unilateral authority to countermand the decision of the United States regarding the management" of Union Station. Evid. Hr'g Tr. at 199:12-15.

But there are two problems with that argument. The first is that the power of eminent domain cannot be contracted away and any effort to do so would be invalid. *See Georgia v. Chattanooga*, 264 U.S. 472, 480 (1924) (stating that the power of eminent domain "cannot be surrendered, and, if attempted to be contracted away, it may be resumed at will"); *4.0446 Acres More or Less of Land & Fixtures*, 2019 WL 1057932, at *9 (observing that if, as part of a settlement agreement, Amtrak had waived the right to exercise its power of eminent domain such waiver "would be invalid") (citing *Georgia*, 264 U.S. at 480). In view of this settled law, the court

36

will not read the USRC sublease to foreclose Amtrak's long-held eminent domain authority, simply because the parties originally contracted to have USV manage Union Station.

The second problem with Lender's argument is that the USRC sublease, as well as the downstream lease between USRC and USV, both contemplate the possibility of a condemnation. Each lease contains a detailed article titled "Condemnation," which sets forth the impact of a taking upon the lessee's obligations under the lease. Lender's Ex. 8, art. 18 (USRC sublease); Lender's Ex. 17, art. 19 (USRC-USV lease). That the parties contemplated that a "condemning authority" could take the applicable property interests cannot be squared with Lender's position that the leases foreclose Amtrak's taking here. Lender's Ex. 8, § 18.1; Lender's Ex. 17, § 19.1.

### C. Amtrak's Taking Satisfies the Conditions Contained in Section 24311

Section 24311 does require Amtrak to make two showings that the DTA does not. The statute permits a taking by Amtrak (1) that is "necessary for intercity rail passenger transportation," and (2) "only if it cannot acquire the interest in the property by contract" or "agree with the owner on the purchase price for the interest." 49 U.S.C. § 24311(a)(1)(A), (a)(2). Therefore, while § 24311 is a quick-take statute, the court must determine whether Amtrak has met its burden to show that the taking satisfies these two conditions. Amtrak has done so.[3]

#### 1. Necessary for Intercity Rail Passenger Transportation

To prove necessity, Amtrak must demonstrate that the USI Sublease has a "significant relationship" with Amtrak's provision of intercity rail passenger transportation. *3.44 Acres*, 266 F. Supp. 3d at 69 (quoting *Nat'l R.R. Passenger Corp. v. Two Parcels of Land One 1691 Sq. Foot More or Less Parcel of Land in Town of New London*, 822 F.2d 1261, 1265 (2d Cir. 1987)). "In other words, the taking must have some direct nexus to Amtrak's goals," which are set forth by

---

[3] The court has found no case that addresses the applicable evidentiary standard, whether it is a preponderance of the evidence or something higher. Whatever the standard, the court concludes that Amtrak has met its burden.

statute.  *Id.*; *see also Nat'l R.R. Passenger Corp. v. Bos. & Me. Corp.*, 503 U.S. 407, 419, 417 (1992) (interpreting the term "required for intercity rail passenger service" in a since-repealed eminent domain provision under the Rail Passenger Service Act, 45 U.S.C. § 562(d) (1992), and finding it satisfied where the acquisition "is a useful and appropriate way to accomplish [Amtrak's] goals"); *see id.* (rejecting the court of appeals' reading, which "limited Amtrak's condemnation authority to property that was necessary, in the sense of indispensable, to Amtrak's operations").

Amtrak wishes to condemn the USI Sublease to expand and improve its delivery of rail passenger services at Union Station, consistent with its statutory mandates.  49 U.S.C. § 24101(c)(3), (10), (12) (setting forth Amtrak's purposes, including implementing "strategies to achieve immediately maximum productivity and efficiency consistent with safe and efficient transportation," ensuring "equitable access to the Northeast Corridor," and "maximiz[ing] the use of its resources, including the most cost-effective use of employees, facilities, and real property").  An increased footprint would enable Amtrak to make immediate changes to enhance the customer experience, such as by placing ambassadors throughout the facility, increasing signage, expanding ticketing operations, and beefing up security.  *See* Jt. Ex. 4, at 5.

Also, according to Amtrak's Chief Executive Officer, immediate possession would allow Amtrak to accelerate work on important capital projects, such as the Concourse Modernization Project and the Subbasement Project.  More long-term control of the entire facility would facilitate Amtrak's redesign of the terminal to, among other things, increase passenger seating areas, develop first-class lounges, and create dedicated workspaces for Amtrak personnel, including its police force.  More space is essential to Amtrak's planned expansion of its rail passenger services. Amtrak's ownership also would displace a landlord whose primary commercial interests are misaligned with Amtrak's core mission as a transportation provider.  There can be little doubt that

"Amtrak's past and planned uses for [Union Station] bear an indisputable link with its transportation goals." *3.44 Acres*, 266 F. Supp. 3d at 72.

Lender does not genuinely dispute that there is "significant relationship" between the USI Sublease and Amtrak's provision of intercity rail passenger transportation. *See* Evid. Hr'g Tr. at 203:11-15 (Lender's counsel stating, "[N]obody is arguing that Union Station is not necessary for city rail passenger transportation.  That's what it's for.  I think we can probably all agree that the station as a property is necessary for passenger rail.").  Instead, Lender's challenges are variants of one overarching theme: Amtrak has not shown that it cannot accomplish its stated objectives through actions short of a complete condemnation of the USI Sublease.  That contention demands more than what the statute requires.

### a.   The present subleasing arrangement

Lender contends that Amtrak can achieve through its existing sublease what it hopes to accomplish through condemnation.  The present subleasing arrangement permits Amtrak to (1) proceed with scheduled projects (and Amtrak, not the landlord, is largely to blame for their delays), Lender's PFFCL ¶¶ 7–32; (2) rent additional space to carry out its envisioned redesign and expand customer offerings, *id.* ¶¶ 33–37, 42; and (3) implement the immediate service changes that it wishes to make, *id.* ¶¶ 38–41.  Thus, Lender contends, "under the current lease structure, Amtrak has not been prohibited or limited in its proper operations or its plans for growth," and "there is no evidence to support the conclusion that the Leasehold Interest or USI's ownership of the Leasehold Interest is the cause of any alleged problem." *Id.* ¶ 87.

That argument misconstrues the "necessity" standard and Amtrak's burden in multiple ways.  First, "Amtrak must show that the *property* it seeks to acquire is 'necessary for intercity passenger rail transportation,' not that condemnation is the necessary *means* of acquiring that property." *3.44 Acres*, 266 F. Supp. 3d at 68.  Amtrak thus need not show that condemnation of

the USI Sublease is the superior means to achieving its goals.  *See 4.0446 Acres More or Less of Land & Fixtures*, 2019 WL 1057932 at *8 (rejecting a similar argument that Amtrak had not shown necessity because it "is already receiving electricity from the Substation and can continue to receive its electricity distribution from the Substation through its current leasehold agreement").

Second, Amtrak does not need to establish that it is asserting its condemnation power as a "last resort."  *3.44 Acres*, 266 F. Supp. 3d at 73.  It therefore is not required to first explore modifying the sublease terms or attempting to lease more space before it may condemn, as Lender seems to suggest.  *See id.* (rejecting the property owner's argument that Amtrak could have taken lesser steps than condemnation, such as clarifying the current easement or negotiating for more space under the existing lease).

Third, Lender improperly dismisses the significance of a post-taking structural change, whereby Amtrak would become the tenant under the lease with USRC.  When Congress gave Amtrak eminent domain authority, it recognized that current lease arrangements may not be the optimal way, logistically or economically, for it to carry out its mission.  *See id.* (describing legislative history).  That is Amtrak's reason for the present condemnation.  In its view, the current governing structure is "[o]bsolete and complex" and "built for a different era and different task." Jt. Ex. 5, at 5.  The structure "imped[es] progress in improving the operating conditions at [Union Station] and thereby imped[es] Amtrak's ability to provide intercity passenger railroad transportation at [Union Station]."  Jt. Ex. 3, at 2.  To be sure, as Lender has shown, Amtrak is hardly free from fault.  It would appear that the responsibility for the slow movement on major improvement projects rests in no small part on Amtrak.  Still, the court "is not in a position to assess" what property arrangement and interest "is the optimal way [for Amtrak] to further [its]

mission." *3.44 Acres*, 266 F. Supp. 3d at 73.  Amtrak is entitled to some deference on matters pertaining to its governance.

      b.    <u>Amtrak's business judgment</u>

Lender also questions the reasonableness of Amtrak's "business judgment" in pursuing condemnation.  Oral Arg. Tr. at 62–63.  It contends that the court must reject the taking as unnecessary because Amtrak can achieve the same objectives as USI's subtenant, without expending hundreds of millions of dollars on just compensation.  *Id.*  That argument is not well taken.  As already addressed, Amtrak need not show that condemnation is superior to alternative means of achieving the same ends.  But even if the court must look for "business judgment," there is ample evidence of it in the record.  *See Bristol*, 1 F. Supp. 2d at 82 (court's review of Amtrak's necessity determination is for abuse of discretion through an "unreasonable business judgment" that condemnation is necessary).

Amtrak presented a business case to both the FRA and its Board to condemn the USI Sublease.  The FRA twice approved pre-programming and pre-award authority: first to purchase USI's outstanding debt in the planned foreclosure sale, Lender's Ex. 10, and then to acquire the USI Sublease by purchase or condemnation, Jt. Ex. 3, at 22–24.  Management's presentations to the Board contained a financial analysis of the proposed acquisition, submitting that it was "justified economically."  *See, e.g.*, *id.* at 12.  The Board evidently agreed.  *See* Pl.'s Ex. 1.

Lender has offered no evidence that the FRA or Amtrak's Board failed to thoroughly consider the proposed acquisition of the USI Sublease.  At most, Lender *assumes* that renegotiating the sublease's terms, including renting more space, is a better business proposition than an acquisition of the leasehold interest.  It presents no evidence to support that position.  The court thus declines to find that Amtrak has failed to demonstrate necessity because it purportedly did not exercise reasonable business judgment.

41

c.      Amtrak's opportunism

Next, Lender claims that Amtrak's case for necessity is dubious because the "need" for the leasehold interest arose only after USI defaulted on its loan obligations, making the leasehold a target for acquisition.  Lender's PFFCL ¶¶ 69–71, 88.  According to Lender, because Amtrak saw the loan default as a "unique opportunity" to acquire the leasehold interest, the FRA and the Board made decisions that were "not based upon factual information on the ground" or "what was actually going on at the station in terms of the necessity."  Oral Arg. Tr. at 63–64.

But any opportunism on Amtrak's part is not a reason to reject the necessity of the taking.  "[T]he mere consideration of economic factors cannot defeat an otherwise valid taking.  Amtrak's takings power is restricted by the terms [of] § 24311, but so long as it does not exceed its statutory power, Amtrak is not forbidden from considering additional factors before seeking to acquire a multi-million-dollar property."  *3.44 Acres*, 266 F. Supp. 3d at 73; *accord 4.0446 Acres More or Less of Land & Fixtures*, 2019 WL 1057932, at *8 ("Amtrak is clearly not forbidden from considering economic factors in its decision to acquire the Substation.").  The fact that Amtrak saw USI's financial distress as a "unique opportunity" to acquire the leasehold interest does not undermine its necessity.

d.      Amtrak need not be the best possible lessee

Last, Lender contends that since it took over management of the station, it has made material improvements that lessen the necessity of a taking.  Lender also doubts Amtrak's experience and capacity to manage the Station and fears the Station will lose value in Amtrak's hands.  Lender's PFFCL ¶¶ 63–68.  But the statute nowhere requires that Amtrak be the best possible lessee, or even better than the current lessee at maintaining the property value.  To the extent that Lender has concerns about Amtrak's preparedness to manage the terminal, including subleases with various retailers and food vendors, the court can address those in a transition order.

42

\*       \*       \*

Having considered the entirety of the record and the parties' arguments, the court finds that the USI Sublease is "necessary for intercity rail transportation."

### D.     Amtrak and Lender Negotiated in Good Faith and Were Unable to Agree

A taking by Amtrak is valid only if it "cannot acquire the interest in the property by contract or agree with the owner on the purchase price for the interest."  49 U.S.C. § 24311(a)(2).  The parties dispute whether the statute requires Amtrak to show that it acted in good faith and whether it did so here.  Pl.'s PFFCL ¶¶ 17–21; Lender's PFFCL ¶ 89.  The court need not resolve that contest, however, because it finds that Amtrak has satisfied any statutory "good faith" requirement, should one exist.

Following a hearing at which the court expressed reservations that Amtrak's pre-filing efforts—transmittal of an offer letter, a phone call, and a handful of email communications that failed to yield an in-person meeting—were sufficient to satisfy § 24311(a)(2), the parties negotiated for more than two months, meeting nine to 10 times, before reaching an impasse. *See supra*, Part II ¶¶ 65–66.  The parties discussed both a purchase price and alternative structures to achieve Amtrak's objectives short of condemnation.  *See id.*  Their efforts were not successful.

Lender complains that the "record developed during discovery and at the hearing does not support a finding of good-faith negotiation."  Lender's PFFCL ¶ 89.  That argument rests primarily on the fact that Amtrak's offer of $250 million was lower than multiple other contemporaneous benchmarks of which Amtrak had notice, including an appraisal of $700 million, Amtrak's first pre-programming funding approval of $551 million, USI's total outstanding debt of $550 million, and Amtrak's earlier offer to purchase the debt for $300 million.  *Id.*  Lender also points to the hurried, minimal discussions that took place prior to Amtrak's filing suit as evidence of lack of good faith.  *Id.*

43

This argument suffers from two flaws.  First, the court can consider the parties' post-suit negotiations in determining whether Amtrak and Lender have been unable to agree to terms. *See Burlington N. Santa Fe Ry. Co. v. A 50-Foot Wide Easement Consisting of 6.99 Acres more or less*, 346 F. App'x 297, 302–03 (10th Cir. 2009) (finding that the district court did not err "when it admitted evidence of confidential [post-filing] settlement negotiations and then relied upon that evidence in reaching its decision" to determine whether parties had engaged in good-faith negotiations prior to condemnation); *United States v. 6.584 Acres of Land, more or less, Hidalgo Cnty.*, 533 F. Supp. 3d 482, 500 (S.D. Tex. 2021) (directing further negotiations after the filing of suit and using impasse as evidence that negotiations were futile).  Lender does not claim that Amtrak acted in bad faith during the post-suit negotiations.

Second, there is record evidence to support the reasonableness of Amtrak's opening offer. In January 2022, management assessed that, based on "the operating realities in [Union Station]," the USI Sublease was worth $229.1 million.  Jt. Ex. 1, at 8.  That analysis explained why Amtrak management's estimate diverged from a much higher third-party appraisal, along 10 different variables.  *Id.* at 9–11.  Amtrak then hired a third-party consultant, FTI Consulting, "to assist with reviewing the internal analysis . . . previously done by Management" and provide other advice. Jt. Ex. 2, at 182; Jt. Ex. 3, at 20.  FTI Consulting estimated that the high end of the USI Sublease's value to be "no greater than approximately $400 million," but it "believe[d] the more likely valuation of the Sublease Interests to be less than $250 million."   Jt. Ex. 3, at 20.   The reasonableness of that estimate is corroborated by the Cushman & Wakefield appraisal, which values the property interest at $250 million.  *See* Lender's Ex. 24.  The record thus demonstrates a good faith basis for Amtrak's initial offer of $250 million.[4]

---

[4] To be clear, the court makes no judgment at this time about the appropriate just compensation for condemning the USI Sublease.

44

Accordingly, the court is satisfied that Amtrak has shown that it "cannot acquire the interest in the property by contract or agree with the owner on the purchase price for the interest." 49 U.S.C. § 24311(a)(2).  *Cf. Bos. & Me.*, 503 U.S. at 423 (interpreting the "unable to agree" condition in the since-repealed eminent domain provision of the Rail Passenger Service Act, 45 U.S.C. § 562(d) (1992), as requiring only "a factual determination that the parties will not be able to reach agreement through further negotiations"); *Wilson v. Union Elec. Light & Power Co.*, 59 F.2d 580, 581 (8th Cir. 1932) ("An absolute inability to acquire the property by contract is not necessary.  All that is required under such section is that there be a bona fide effort to so acquire the property which may be desired.") (Federal Power Act, 16 U.S.C. § 814).[5]

### E.     Lender Has Not Demonstrated Undue Hardship

The final issue before the court is whether Lender has demonstrated that it would face "undue hardship" should the court award Amtrak immediate possession.  Under the DTA's quick-take provision, "[a]lthough the district court fixes the time and any terms of the possession, the government takes possession of the condemned property as a matter of course, unless the landowner or occupant demonstrates some undue hardship that warrants a delay."  *E. Tenn. Nat. Gas Co.*, 361 F.3d at 825; *see also .025 Acres More or Less of Land*, 2023 WL 5940042, at *1 (suggesting that the "undue hardship" exception applies under § 24311).  Lender states that if

---

[5] The Natural Gas Act contains a similarly worded provision to § 24311(a)(2).  *See* 15 U.S.C. § 717f(h) (authorizing exercise of power of eminent domain where the certificate holder cannot "acquire by contract, or is unable to agree with the owner of property to the compensation to be paid for").  Courts consistently have found that requirement satisfied in circumstances similar to this case.  *See also, e.g., Daubenmire v. Columbia Gas Transmission*, 614 F. Supp. 3d 601, 608 (S.D. Ohio 2022) (holding that where an offer based on appraisal was rejected, and the counteroffer was much higher, the negotiation requirement was satisfied); *Columbia Gas Transmission v. 84.53 Acres of Land, More or Less, in Calhoun, Marshall, Ritchie, Tyler, & Wetzel Cntys.*, 310 F. Supp. 3d 685, 691 (N.D. W.Va. 2018) (holding that parties were unable to agree where certain offers were declined or owners failed to respond); *USG Pipeline Co. v. 1.74 Acres in Marion Cnty.*, 1 F. Supp. 2d 816, 824–25 (E.D. Tenn. 1998) (holding that making a monetary offer and demonstrating a desire to acquire easements by negotiation and settlement rather than by eminent domain was "more than sufficient" to meet requirement).

Amtrak were awarded immediate possession, it would face undue hardship in the form of "loss of property interests and consent rights."  Lender's PFFCL ¶¶ 90–91.

But loss of property rights, without more, is insufficient to establish "undue hardship." After all, the end result of a condemnation is the taking of a property interest.  Moreover, to the extent Lender claims financial harm, monetary loss is remediable through the statutory just compensation provision, and Lender will have every opportunity to prove the value of the leasehold interest.  49 U.S.C. § 24311(b)(3).  Lender claimed at oral argument that it will be harmed from the potential discontinuation of USI's subleases with vendors, Oral Arg. Tr. at 52:22–53:2, but the monetary value of those leases will be awarded as part of the final compensation amount.  Finally, although Lender asserted at argument that the discontinuation of a profit-motivated business plan would harm USI, *id*. at 52:22–53:11, that is just another complaint about financial harm, which just compensation will remedy.

When courts have found undue hardship, it has been under circumstances where expulsion from condemned property within a short timeframe would not be feasible.  *See United States v. 6,576.27 Acres of Land, More or Less, in McLean Cnty.*, 77 F. Supp. 244 (D.N.D. 1948)); *see also United States v. Certain Land in Borough of Manhattan*, 332 F.2d 679, 682 (2d Cir. 1964) (remanding for consideration of undue hardship where government sought to condemn residential property with only five days' notice to residents).  Here, Lender has had notice of the condemnation of the USI Sublease for over two years.  It has not established a hardship that would warrant denying Amtrak immediate possession.

## IV.    CONCLUSION

To summarize, the court finds that Amtrak has proven that its condemnation of the USI Sublease is necessary for intercity rail transportation and that Amtrak was unable to agree with Lender as to contract terms or a purchase price.  The court further finds that Lender has not demonstrated any undue hardship warranting the denial of immediate possession to Amtrak.

The court will withhold a final order of immediate possession for now.  The parties shall meet and confer to negotiate reasonable conditions under which "possession of the property is given to Amtrak."  49 U.S.C. § 24311(b)(2)(A).  The parties shall submit a Joint Status Report to the court on or before May 1, 2024, that (1) sets forth the agreed-upon and disputed conditions of the transfer of possession and (2) proposes a schedule for further proceedings, including determining just compensation.

Dated:  April 17, 2024

Amit P. Mehta
United States District Court Judge