**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---------------------------------------------------------------- X

NATIONAL RAILROAD PASSENGER
CORPORATION (AMTRAK),

           Plaintiff,                      No. 1:22-cv-01043 (APM)

           v.

SUBLEASE INTEREST PERTAINING TO
DESCRIBED LEASEHOLD INTERESTS
AT WASHINGTON UNION STATION, et al.

           Defendants.

---------------------------------------------------------------- X

## MEMORANDUM OF LAW IN SUPPORT OF
## LENDER AND UNION STATION INVESTCO, LLC'S
## JOINT MOTION FOR STAY PENDING APPEAL

MORRISON COHEN LLP
Y. David Scharf
Brett Dockwell
Kristin T. Roy
Latisha V. Thompson
Amber R. Will
Mahnoor Misbah
*Admitted pro hac vice*
909 Third Avenue
New York, New York 10022
(212) 735-8600
ydscharf@morrisoncohen.com

HOLLAND & KNIGHT LLP
Paul J. Kiernan
Louis J. Rouleau
800 17th Street N.W.
Suite 1100
Washington, D.C. 20006
Phone: 202-663-7276
Paul.Kiernan@hklaw.com

*Attorneys for Defendant Kookmin
Bank Co., Ltd.*

NEUBERGER, QUINN, GIELEN RUBIN &
GIBBER, P.A.
Thomas M. Wood IV
Steven J. Willner
One South Street, 27th Floor
Baltimore, Maryland 21202
(410) 332-8541
tmw@nqgrg.com
sjw@nqgrg.com

*Attorneys for Defendant Union Station
Investco, LLC*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT ....................................................................................................................... 4

I.      LENDER AND USI HAVE A STRONG LIKELIHOOD OF
SUCCESS ON THE MERITS ................................................................................... 5

      A.     This Court Misinterpreted the Amtrak Statute ........................................... 6

            i.     This Court Erred By Reading Section 24311(a)(1)(B)
Out of the Amtrak Statute ............................................................. 7

            ii.    This Court Erred Regarding The Scope Of Amtrak's
Quick-Take Authority .................................................................... 8

      B.     This Court Prejudiced Lender By Converting Amtrak's Motion
For Immediate Possession Into A Motion For Summary Judgment .................... 10

      C.     Amtrak Failed To Show Necessity Under the Amtrak Statute ............................ 14

      D.     This Court Incorrectly Relied On Post-filing Negotiations To Cure
Amtrak's Deficiencies ................................................................... 19

II.     THE PUBLIC INTEREST FAVORS GRANTING STAY PENDING APPEAL
AND NO ONE WILL BE HARMED BY THE ISSUANCE OF A STAY ..................... 22

III.    LENDER AND USI WILL BE IRREPARABLY HARMED ABSENT A STAY ........ 23

IV.    THIS COURT'S ORDER IS APPEALABLE ................................................................. 29

CONCLUSION ...................................................................................................................... 32

CERTIFICATE OF SERVICE ............................................................................................. 33

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### FEDERAL CASES

*7-Eleven, Inc. v. Khan*,
   977 F. Supp. 2d 214 (E.D.N.Y. 2013) .................................................................27

*Alsaaei v. Bush*,
   No. 05-2369 (RWR), 2006 U.S. Dist. LEXIS 56599 (D.D.C. July 19, 2006).......................24

*AMTRAK v. 900 2nd St. NE*,
   266 F. Supp. 3d 63 (D.D.C. 2017).......................................................15, 19

*Burlington N. Santa Fe Ry.*
   *Co. v. A 50-Foot*....................................................................20, 21

*Carson v. Am. Brands*,
   450 U.S. 79 (1981)...............................................................................30

*Catlin v. United States*,
   324 U.S. 229 (1945)........................................................................30, 31

*Celsis in Vitro, Inc. v. CellzDirect, Inc.*,
   664 F.3d 922 (Fed. Cir. 2012)..................................................................27

*Citizens for Resp. & Ethics in Wash. v. Office of Admin*,
   593 F. Supp. 2d 156 (D.D.C. 2009) ..................................................... *passim*

*Cobell v. Kempthorne*,
   455 F.3d 317 (D.C. Cir. 2006) ................................................................30

*Country Club Estates, L.L.C. v. Town of Loma Linda*,
   213 F.3d 1001 (8th Cir. 2000) ...............................................................12

*Helwig v. Vencor, Inc*.,
   251 F.3d 540 (6th Cir. 2001) ................................................................12

*Hessel v. A. Smith & Co.*,
   15 F. Supp. 953 (E.D. Ill. 1936).............................................................10

*Jones v. L.A. Cent. Plaza LLC*,
   74 F.4th 1053 (9th Cir. 2023) ...............................................................12

*Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Grp.*,
   230 F. Supp. 2d 12 (D.D.C. 2002)...........................................................23

*Lebron v. Nat'l R.R. Passenger Corp.*,
    513 U.S. 374 (1995)................................................................................6

*Loretto v. Teleprompter Manhattan CATV Corp.*,
    458 U.S. 419 (1982)..............................................................................27

*Monument Realty LLC v. Wash. Metro. Area Transit Auth.*,
    540 F. Supp. 2d 66 (D.D.C. 2008)......................................................25

*Nat'l R. Passenger Corp. v. Two Parcels of Land*,
    822 F.2d 1261 (2d Cir. 1987).................................................................6

*National Parks Conservation Ass'n. v. Semonite*,
    282 F. Supp. 3d 284 (D.D.C. 2017)....................................................28

*Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*,
    992 F.2d 430 (2d Cir. 1993).................................................................26

*Northwest Airlines, Inc. v. Equal Emp. Opportunity Comm'n*,
    No. 80-2342, U.S. App. LEXIS 12446 (D.C. Cir. Nov. 10, 1980)............6

*Open Top Sightseeing USA v. Mr. Sightseeing, LLC*,
    48 F. Supp. 3d 87 (D.D.C. 2014)........................................................28

*Patriot-BSP City Ctr. II v. U.S. Bank Nat'l Ass'n*,
    715 F. Supp. 2d 91 (D.D.C. 2010)......................................................25

*Philipp v. Fed. Republic of Germany*,
    436 F. Supp. 3d 61 (D.D.C. 2020)......................................................22

*Pursuing America's Greatness v. FEC*,
    831 F.3d 500 (D.C. Cir. 2016).............................................................23

*Register.com, Inc. v. Verio, Inc.*,
    356 F.3d 393 (2d Cir. 2004).................................................................27

*Republic of Sudan v. Harrison*,
    587 U.S. 1 (2019)..................................................................................9

*Shvartser v. Lekser*,
    308 F. Supp. 3d 260 (D.D.C. 2018)....................................................24

*Smoking Everywhere, Inc. v. U.S. FDA*,
    680 F. Supp. 2d 62 (D.D.C. 2010), *aff'd sub nom., Sottera, Inc. v. FDA*, 627
    F.3d 891 (D.C. Cir. 2010)....................................................................26

*United States v. All Assets of Statewide Auto Parts*,
    971 F.2d 896 (2d Cir. 1992).................................................................30

*United States v. Chase*,
 135 U.S. 255 (1890).........................................................................................8

*Washington Metro. Area Transit Auth. v. One Parcel of Land*,
 514 F.2d 1350 (D.C. Cir. 1975)......................................................................29

*Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*,
 559 F.2d 841 (D.C. Cir. 1977)......................................................................5, 24

*Zuver v. Sprigg*,
 No. 16-2505 (DLF), 2018 U.S. Dist. LEXIS 107978 (D.D.C. June 13, 2018).......................12

## STATUTES & RULES

28 U.S.C. § 1292..............................................................................................30

40 U.S.C. § 812...............................................................................................16

40 U.S.C. § 3114............................................................................................2, 8, 9

40 U.S.C. § 3115...............................................................................................9

49 U.S.C. § 24101.............................................................................................19

49 U.S.C. § 24311........................................................................................*passim*

Pub. L. 97-125, 95 Stat. 1667, § 2(7) (1981)......................................................15

Rail Passenger Service Act of 1970 (RPSA), § 101, 84 Stat. 1328, 1330......................6

U.S. Const. Amend. V .......................................................................................6

## OTHER AUTHORITIES

Carol M. Highsmith & Ted Landphair, *Union Station: A History of Washington's
 Grand Terminal* (2d ed. 1998)....................................................................16, 17

Lender[1] and Union Station Investco, LLC ("USI") respectfully submit this memorandum of law in support of their motion for a stay pending appeal of this Court's Order, dated May 24, 2024 (the "Order") (ECF Doc. No. 111), which orders USI to transfer possession of the Leasehold Interest at Union Station to National Railroad Passenger Corporation ("Amtrak") on July 15, 2024, for the reasons set forth in this Court's Memorandum Opinion, dated April 17, 2024 (the "Memorandum Opinion") (ECF Doc. No. 106).

## **PRELIMINARY STATEMENT**

For more than 40 years, iconic Washington Union Station ("Union Station") has been managed and operated under a lease structure established by the United States Department of Transportation ("DOT"), acting under the Congressional direction embodied in the Union Station Redevelopment Act (the "USRA").  Among the key objectives that Congress sought to promote in the USRA were the "commercial development of the Union Station complex that will, to the extent possible, financially support the continued operation and maintenance of such complex" and the "withdrawal of the Federal Government from any active role in the operation and management of Union Station."  (ECF Doc. No. 106 at 6-7.)  DOT carried out this Congressional mandate by entering into a 99-year lease with Union Station Redevelopment Corporation ("USRC") and directed USRC to lease much of the property to a private developer, USI's predecessor-in-interest.[2]  (*Id.* at 6-7.)  This structure has been in place, undisturbed, for four decades.

---

[1] The term "Lender" refers collectively to Kookmin Bank Co., Ltd., individually ("Kookmin") and in its capacity as trustee ("Trustee") of KTB CRE Debt Fund No. 8, a Korean Investment Trust (the "Trust"), by its agent on behalf of the Trust in Korea, Daol Fund Management Co. ("Daol"), and by its agent on behalf of the Trust in United States, Rexmark Holdings LLC d/b/a Rexmark ("Rexmark").

[2] The lease from DOT to USRC directed USRC to enter into the lease with USI's predecessor-in-interest. The form of that lease (sublease) was attached as an exhibit to the DOT-USRC lease. The leases also required that the tenant and subtenant provide for leases to Amtrak as a station and office tenant. In other words, Amtrak's position as a station tenant and office tenant was baked into the structure created by DOT acting under Congressional direction.

Notwithstanding this longstanding arrangement and without any intervening change in the relevant laws, on April 14, 2022, Amtrak instituted this action, seeking to condemn the Leasehold Interest under 49 U.S.C. § 24311 (the "Amtrak Statute").  Shortly thereafter, in July 2022, Amtrak moved for immediate possession of the Leasehold Interest, without moving to resolve the pleaded defenses and objections regarding Amtrak's authority.   On April 24, 2024, this Court issued its Memorandum Opinion, ruling that Amtrak was entitled to possession of the Leasehold Interest. (ECF Doc. No. 106.)  On May 24, 2024, the Court issued its Order, directing USI to transfer the Leasehold Interest to Amtrak on July 15, 2024.  (ECF Doc. No. 111.)

Respectfully, this Court's Memorandum Opinion and Order are based on three grave mistakes that have created numerous errors of law and threaten Lender and USI with irreparable and unjustified injury.  These mistakes warrant a stay of the Order's transfer of possession while Lender and USI seek reversal from the D.C. Circuit.

First, this Court mistakenly treated Amtrak as if it were the federal Government for purposes of quick-take possession.  Amtrak is not the Government, but this Court nevertheless interpreted the Amtrak Statute with reference to how the Declaration of Takings Act (the "DTA") treats the sovereign federal Government, holding that the Amtrak Statute "should likewise be interpreted to vest immediate possession in Amtrak when it fulfills the quick-take provision's procedural requirements." (ECF Doc. No. 106 at 30.)  But this is plainly incorrect.  Whereas the Government's powers of eminent domain are only limited by the payment of just compensation, Amtrak's eminent domain powers are strictly limited by the Amtrak Statute.  This difference in power is reflected in the statutes themselves, as the DTA states that upon the Government's compliance with its procedures, "the land is condemned and taken for the use of the Government." 40 U.S.C. § 3114(b)(2).  The Amtrak Statute, however, has no similar language.  The federal

Government and Amtrak also have very different resources.  Whereas the Government can, and is committed to, pay any just compensation awarded (thanks to the U.S. Treasury and the Full Faith and Credit of the United States), Amtrak can only pay what is allowed by appropriation.  Hence, Section 24311(a)(1) of the Amtrak Statute begins "[t]o the extent financial resources are available."  Thus, contrary to this Court's holding, these differences in powers and resources between the Government and Amtrak are *not* inconsequential.  They explain the differences between the DTA and Amtrak Statute, and why Congress did not intend to provide Amtrak quick-take powers equivalent to those of the United States.  This Court erred in concluding that Amtrak had such quick-take authority.

Second, this Court's misinterpretation of the Amtrak Statute led it to wrongfully convert Amtrak's motion for immediate possession into a motion for summary judgment.  During the motions process, this Court repeatedly emphasized that it was only going decide the issue of immediate possession, but this Court's Memorandum Opinion and Order effectively decided the merits of Lender's and USI's defenses and concluded that, as a matter of law, Amtrak was authorized to take the Leasehold Interest.  This Court did so only after first *limiting* discovery to the issue of immediate possession, not Amtrak's authority under the Amtrak Statute.  This was not just some minor procedural irregularity.  Rather, this Court deprived Lender and USI of their fundamental right and the opportunity to develop through discovery more evidence—from Amtrak, Lender's co-defendants, the federal Government, and third parties—that Amtrak had not met its burden under the Amtrak Statute.  This evidence would have shown that Amtrak's assertions of "necessity" under Section 24311(a)(1)(A) were (i) not what Amtrak told its Board, (ii) invented and pretextual, and (iii) insufficient under any reasonable standard of necessity under the Amtrak Statute.

3

Finally, the Court committed reversible error in applying the Amtrak Statute in isolation from the controlling provisions of the USRA, with the result that the assessment of whether the proposed taking is "necessary for the intercity rail passenger transportation" ignored the unique strictures that Congress and the DOT have placed around Union Station. This statutory and leasehold structure at Union Station contains a strong preference for its "commercial development" to be privately managed, and more than 40 years ago Congress rejected Amtrak's request to be the developer at Union Station. Thus, Amtrak should have been required to prove that it would be more than merely preferable or useful for Amtrak to be the leaseholder and for important commercial uses of Union Station to be converted into Amtrak-support spaces and waiting rooms. But this Court's Order failed to take adequate account of Union Station's unique statutory and leasehold structure. Instead, this Court accepted, with great deference, Amtrak's arguments of "necessity." This too was error.

This Court's mistakes have fatally undermined this proceeding and resulted in numerous legal errors, described more fully below. If not remedied, Lender and USI will suffer irreparable and unjustified injury. Accordingly, Lender and USI respectfully request that this Court immediately stay its Order transferring possession pending Lender and USI's appeal.

## ARGUMENT

When determining whether to grant a stay pending appeal, the Court considers "(1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the Court grants the stay; and (4) the public interest in granting the stay." *Citizens for Resp. & Ethics in Wash. v. Office of Admin*, 593 F. Supp. 2d 156, 159 (D.D.C. 2009). The moving party need not establish a high probability of success if the probability of success is paired with a

certain degree of irreparable injury.  *Id.*; *see also Alabama Ass'n of Realtors*, 539 F. Supp. 3d at 213 ("[C]ourts in this Circuit have continued to analyze the factors 'on a sliding scale whereby a strong showing on one factor could make up for a weaker showing on another.'" (citation omitted)). A stay pending appeal "seeks to maintain the status quo pending a final determination of the merits of the suit." *Citizens for Resp. & Ethics*, 593 F. Supp. 2d at 159 (citation omitted).

## I.    LENDER AND USI HAVE A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS

To warrant a stay pending appeal, the moving party must "present a strong likelihood of prevailing on the merits of their appeal." *Citizens for Resp. & Ethics*, 593 F. Supp. 2d at 160; *see also Alabama Ass'n of Realtors*, 539 F. Supp. 3d at 214.  Under the precedent in the D.C. Circuit, "[t]he court is not required to find that ultimate success by the movant is a mathematical probability, and indeed, . . . may grant a stay even though its own approach may be contrary to movant's view of the merits." *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977).  Instead, "when a serious legal question is presented, when little if any harm will befall other interested persons or the public, and when denial of the order would inflict irreparable injury on the movant," maintaining the *status quo* through a stay is appropriate.  *Citizens for Resp. & Ethics*, 593 F. Supp. 2d at 160; *see also Holiday Tours, Inc.* 559 F.2d at 844-45 ("What is fairly contemplated is that tribunals may properly stay their own orders when they have ruled on an admittedly difficult legal question and when the equities of the case suggest that the status quo should be maintained."); *Alabama Ass'n of Realtors*, 539 F. Supp. 3d at 218 (granting stay pending appeal because movant raised a "serious legal questions").  Thus, issues of first impression require a stay "to permit careful, effective review of the District Court's order." *Northwest Airlines, Inc. v. Equal Emp. Opportunity Comm'n*, No. 80-2342, U.S. App. LEXIS 12446, at *1 (D.C. Cir. Nov. 10, 1980); *see also Citizens for Resp. & Ethics*, 593 F. Supp.

2d at 161 (recognizing that "question of whether OA is an 'agency' under the FOIA 'is a close one, and is not easily resolved by reference to the limited body of D.C. Circuit case law addressing the agency status of units with the EOP'" (citation omitted)).

Here, Lender and USI have satisfied this standard because this Court's Memorandum Opinion and Order creates a number of serious legal problems that should be carefully reviewed on appeal before possession of the Leasehold Interest is transferred to Amtrak and the *status quo* is upended in this unprecedented case.  *See infra* Part III.

### A.    This Court Misinterpreted the Amtrak Statute

At the outset, there are serious questions of law concerning how this Court interpreted Amtrak's taking statute, 49 U.S.C. § 24311.

While the U.S. Government's taking power is only constrained by the payment of just compensation, *see* U.S. Const. Amend. V, Amtrak's statutory taking power is substantially more limited.  Amtrak is a private corporation, not an "agency or establishment of the United States Government."  Rail Passenger Service Act of 1970 (RPSA), § 101, 84 Stat. 1328, 1330; *see also Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 391 (1995) (recounting Amtrak's creation as a private corporation); *Nat'l R. Passenger Corp. v. Two Parcels of Land*, 822 F.2d 1261, 1264-65 (2d Cir. 1987) (observing that Amtrak "has not been authorized to exercise the sovereign's power of eminent domain").  Although Amtrak did not have eminent domain power when it was created, Congress gave it limited eminent domain power in a series of statutes enacted between 1973 and 1976. That power has explicit limitations, such as the prohibition against taking property that belongs to a state or municipality or a governmental authority or that belongs to another railroad. 49 U.S.C. § 24311(a)(1)(A).   There are also express conditions to the exercise of the power: Amtrak must first show that a property is "necessary for intercity rail passenger transportation,"

49 U.S.C. § 24311(a)(1)(A), or, in the specific case of Union Station, that the taking was "requested by the Secretary of Transportation in carrying out the Secretary's duty to design and build an intermodal transportation terminal at Union Station in the District of Columbia if the Secretary assures Amtrak that the Secretary will reimburse Amtrak," *id.* at § 24311(a)(1)(B).  Amtrak must also show that it "cannot acquire the interest in the property by contract; or agree with the owner on the purchase price for the interest."  *Id.* at § 24311(a)(2)(A)-(B).  Even though Amtrak's taking power is so limited, however, this Court's Memorandum Opinion and Order misinterpreted and thereby expanded Amtrak's takings power in two critical ways, both matters of first impression.

**i.     This Court Erred By Reading Section 24311(a)(1)(B) Out of the Amtrak Statute**

First, this Court incorrectly interpreted the Amtrak Statute to allow Amtrak to take the Leasehold Interest at Union Station without a request from the Secretary of DOT.[3]  (*See* ECF Doc. No. 106 at 32-33.)  This case presents the first instance in which Amtrak has sought to exercise its limited eminent domain authority over a portion of Union Station.  As discussed above, Union Station is the only property specifically discussed in the Amtrak Statute, making it subject to its own specific rules.  Lender and USI argued as much in opposition to Amtrak's motion, asserting that Amtrak could not be entitled to possession because (i) 49 U.S.C. § 24311(a)(1)(B) required the Secretary of DOT to initiate any taking by Amtrak at Union Station, and (ii) the Secretary of DOT had not done so.  (ECF Doc. No. 83 at 26.)  This Court, however, accepted that Amtrak could independently exercise its limited takings power to condemn the Leasehold Interest under 49 U.S.C. § 24311(a)(1)(A). (ECF Doc. No. 106 at 32-33.)

---

[3] Amtrak specifically disavowed that the Secretary of Transportation had requested this eminent domain acquisition by Amtrak, and Amtrak said it was not proceeding under that section of its condemnation statute.  (*See* ECF Doc. No. 1.)  As discussed below, the Court made a finding that the Secretary had approved this action by Amtrak (ECF Doc. No. 106 at 35-36), a finding on which there was no discovery taken or record support provided.

7

This was error.   By allowing Amtrak to proceed with this action under Section 24311(a)(1)(A), this Court read the more specific Section 24311(a)(1)(B)—which specifically concerns takings at Union Station—out of the statute.  *See United States v. Chase*, 135 U.S. 255, 260 (1890) ("It is an old and familiar rule that, where there is, in the same statute, a particular enactment, and also a general one, which, in its most comprehensive sense, would include what is embraced in the former, the particular enactment must be operative, and the general enactment must be taken to affect only such cases within its general language as are not within the provisions of the particular enactment." (internal quotation marks omitted)).  This Court compounded this error by preventing Lender and USI from adequately discovering the exact views and processes of the DOT with respect to Amtrak's taking.  *See infra* Part I.B.  Instead, this Court relied on the fact that the Secretary of DOT was on Amtrak's Board and did not object to this action.  (ECF Doc. No. 106 at 36.)  But this Court's unfounded assumption should not have substituted for a thorough evaluation of Amtrak's compliance with Section 24311(a)(1)(B).

This Court's erroneous interpretation of the Amtrak Statute is a matter of first impression and a serious question of law that warrants a stay pending appeal.

ii. **This Court Erred Regarding The Scope Of Amtrak's Quick-Take Authority**

Second, this Court committed reversible error when it determined that the Amtrak Statute provided Amtrak with quick-take authority akin to that afforded to the U.S. Government under the DTA, 40 U.S.C. § 3114(b)(1).  (ECF Doc. No. 106 at 28-30.)  This Court based this holding on the fact that both the DTA and 49 U.S.C. § 24311(b)(2) allow title to transfer upon the filing of a declaration of taking and a deposit of estimated just compensation.  (*Id.*)  And this Court observed that the differences between the DTA and Amtrak Statute were inconsequential, as "[n]othing in the statutory text imposes any greater evidentiary standard or procedural burden on Amtrak to

secure immediate possession of property." (*Id.* at 30.)  However, this was incorrect:  there are two critical differences between the DTA and Amtrak Statute that underscore why Amtrak does not have the quick-take authority granted by this Court.

First, the DTA explicitly sets forth a procedure for the United States to quickly acquire property because, upon the Government filing its the declaration of taking and making a deposit of estimated just compensation, "the land is condemned and taken for the use of the Government." 40 U.S.C. § 3114(b)(2).  This broad authority is provided to the Government because its eminent domain power is inherent, and any taking by the Government is only limited by its need to pay just compensation.  The Amtrak Statute, by contrast, does not include similar language allowing Amtrak to take property immediately upon its filing of a declaration of taking and estimated just compensation.  Instead, it sets forth conditions before Amtrak may lawfully exercise eminent domain, in recognition of the fact that Amtrak's eminent domain power is not inherent and is significantly limited.  *See* 49 U.S.C. § 24311.  This textual difference between the DTA and the Amtrak Statute confirms that Congress did not intend to provide to Amtrak the same quick-take powers that the U.S. Government enjoys.[4]  *Cf. Republic of Sudan v. Harrison*, 587 U.S. 1, 12 (2019) ("Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another." (quotation omitted)).

Second, the DTA recognizes that when the U.S. Government exercises its quick-take powers, it irrevocably commits to pay the full amount of the just compensation eventually awarded.  *See* 40 U.S.C. § 3115(a) (discussing irrevocable commitment to pay ultimate award); *Hessel v. A. Smith & Co.*, 15 F. Supp. 953, 956 (E.D. Ill. 1936) (discussing the "irrevocable commitment of the United States to pay the ultimate award in the pending condemnation

_____

[4] This Court observed that this distinction was "notable," but that it did not negate Amtrak's quick-take powers.  (ECF Doc. No. 106.)

proceeding" when the government proceeds under the DTA).  But Amtrak—a private corporation that has never turned a profit—does not have the same backing or binding commitment.  Instead, Amtrak may only take property if the "financial resources are available" for its taking.  49 U.S.C. § 24311.  Consequently, unlike the U.S. Government under the DTA, Amtrak is not irrevocably committed to pay the just compensation ultimately awarded under the Amtrak Statute.  This distinction should also apply to preclude Amtrak from exercising quick-take authority.  Otherwise, Amtrak will be allowed to quick-take property even though, just as here,[5] the ultimate just compensation awarded might exceed Amtrak's ability to pay, which itself is based on a limited authorization from the Federal Railroad Administration ("FRA").  This would defy common sense.

Given these clear differences between the DTA and Amtrak Statute, this Court erred when it interpreted the latter as conferring quick-take authority on Amtrak.  The statutes are substantially different, and reflect the differences between the U.S. Government, a sovereign, and Amtrak, a private corporation with limited taking power and limited resources.  The Memorandum Opinion and Order is the first decision giving Amtrak quick-take authority typically reserved for the U.S. Government.  A stay of this Court's Order pending appeal is needed to address this Court's interpretation of the Amtrak Statute.

**B.    This Court Prejudiced Lender By Converting Amtrak's Motion For Immediate Possession Into A Motion For Summary Judgment**

The scope and underlying procedure of this Court's Memorandum Opinion and Order also require appellate review.  Although Amtrak only moved for immediate possession of the

---

[5] Lender has repeatedly emphasized that Amtrak's deposit is likely short of just compensation for the Leasehold Interest *by hundreds of millions of dollars*.  (*See, e.g.*, ECF Doc. No. 35 at 6.)  In fact, even the FRA's approval of Amtrak's request for pre-programming authority for $550 million (*see* ECF Doc. No. 106 ¶ 56) is considerably less than the Leasehold Interest's market valuation based on transactions at the property.  (ECF Doc. No. 35 at 5-7; ¶¶ 69-70, 72.)  It would be a grave injustice for Amtrak to receive possession of the Leasehold Interest only for it to later turn out that Amtrak cannot pay the just compensation owed to Lender and USI.

Leasehold Interest, it seems that this Court determined that the only way to determine the issue was to *sua sponte* convert Amtrak's motion into one for summary judgment.  This Court's conversion of Amtrak's motion is inconsistent with the record and prejudiced Lender.

Relevant here, Amtrak's filed its motion for immediate possession on July 8, 2022.  (ECF Doc. No. 72.)  Amtrak repeatedly disclaimed that it was seeking a ruling on the ultimate issues of whether Amtrak's taking was valid under the Amtrak Statute, and both this Court and Amtrak indicated that Lender and USI would still be able to challenge the validity of Amtrak's taking after immediate possession was determined.  (ECF Doc. No. 72-1 at 16-17; ECF Doc. No. 84 at 7; ECF Doc. No. 94 at 13:23-14:2, 23:22-24:1; ECF Doc. No. 100 at 25.)  Consistent with this procedural posture, when the Court authorized limited discovery in connection with Amtrak's motion, it limited the discovery to only issues affecting immediate possession, not the validity of Amtrak's taking itself.  (*See* ECF Doc. Nos. 94-95, 98.)  Accordingly, the parties engaged in limited discovery, and, consistent with this Court's directive, Lender refrained from engaging in third party, or even co-defendant, discovery.  At the September 11, 2023 evidentiary hearing, the parties presented evidence on Amtrak's purported need for immediate possession.  Thereafter, Lender submitted its proposed findings of fact and conclusions of law, which only concerned whether Amtrak had demonstrated its entitlement to immediate possession of the Leasehold Interest.  (ECF Doc. No. 99.)  The Court did not require the parties to—and the parties did not—brief a motion for summary judgment or other dispositive motion on the legality of Amtrak's condemnation.

Yet, despite the fact that discovery was purposefully limited to the issue of immediate possession, the Memorandum Opinion that the Order relies upon is not so limited.  To the contrary, this Court not only determined that Amtrak was entitled to immediate possession, but also that "Amtrak has proven that its condemnation of the USI Sublease is necessary for intercity rail

transportation" (ECF Doc. No. 106 at 47), and that "Amtrak has shown that it cannot acquire the interest in the property by contract or agree with the owner on the purchase price for the interest" (*id.* at 45). Thus, this Court decided the validity of Amtrak's taking under the Amtrak Statute, and effectively dismissed Lender's and USI's affirmative defenses and objections.

Because this Court's Memorandum Opinion and Order blessed Amtrak's taking, it is clear that this Court converted Amtrak's motion for immediate possession into one for summary judgment and issued its Order, directing USI and Lender to turn over possession. This was plain error and prejudicial to Lender and USI, as Amtrak had not requested summary judgment and the parties were not on notice of this Court's intention to treat Amtrak's motion as such. *Cf. Jones v. L.A. Cent. Plaza LLC*, 74 F.4th 1053, 1060 (9th Cir. 2023) ("Given the due process and fairness concerns presented, a district court generally must provide the parties with adequate notice that it is contemplating invoking a particular procedural device *sua sponte*."); *Country Club Estates, L.L.C. v. Town of Loma Linda*, 213 F.3d 1001, 1005 (8th Cir. 2000) (noting, in different context, that conversion to motion for summary judgment requires notice to responding party); *Helwig v. Vencor, Inc.*, 251 F.3d 540, 553 (6th Cir. 2001) (observing "the court's conversion to summary judgment a prejudicial surprise"). Had the parties been advised that this Court intended to treat Amtrak's motion for immediate possession as equivalent to a motion for summary judgment, Lender and USI would have sought considerably more expansive discovery and offered additional evidence to challenge the underlying validity of Amtrak's taking. *See Zuver v. Sprigg*, No. 16-2505 (DLF), 2018 U.S. Dist. LEXIS 107978, at *13 (D.D.C. June 13, 2018) (finding conversion of motion to dismiss to motion for summary judgment would be unfair in light of parties' only partial discovery).

In order to build the record for a summary judgment motion on Amtrak's authority, Lender's and USI's additional discovery would have included, *inter alia*: (i) nonparty discovery from crucial nonparties to this action, such as the DOT (whose approval of Amtrak's taking has been disputed), the FRA, and USRC, (ii) additional documents from Amtrak concerning the history and development of its projects at Union Station, (iii) additional interrogatories, (iv) depositions of critical fact witnesses at Amtrak regarding intended uses of the Leasehold Interest and its renegotiation, (v) expert discovery, and (vi) discovery from co-defendants. This additional discovery would have allowed Lender and USI to fairly challenge the validity of Amtrak's taking on a number of grounds.

From what has been gleaned even from limited discovery, Amtrak's plan to acquire Leasehold Interest through condemnation alone dates back to at least November 2021. Additional discovery would have demonstrated that Amtrak never planned to acquire the Leasehold Interest through normal processes, such as a negotiated acquisition—a conclusion that would have allowed Lender and USI to more fully challenge Amtrak's lack of good faith in the parties' negotiations under Section 24311(a)(2). Regular discovery also would have allowed Lender and USI to better probe Amtrak's pretextual reliance on its redevelopment plans for the Leasehold Development, which it produced for the first time on the eve of the evidentiary hearing. *See infra* Part I.C. These redevelopment plans were <u>not</u> the basis of Amtrak's motion for immediate possession (*see* ECF Doc. No. 1), and were not relied upon by Amtrak's Board or any federal actor in 2021 and 2022.

In its Memorandum Opinion, the Court also assumed that the Secretary of Transportation endorsed this taking by Amtrak or maybe even was the authority promoting this taking—an assumption that was contrary to the record and a fact on which Lender had not had discovery to assess. *See supra* Part I.A. Had this Court not curtailed discovery, Lender and USI would have

sought documents and a deposition from DOT to understand whether the Secretary of DOT was behind this taking and approved Amtrak's redevelopment plans.  This discovery would have gone to the heart of Amtrak's taking and DOT's ability to alter contracts it entered into with private parties.  For example, although Amtrak may have sought its Board approval for condemnation on the basis of the Concourse Modernization and Subbasement Projects, discovery from DOT might have revealed that DOT was opposed to the redevelopment plans now so heavily relied upon by Amtrak.   This discovery also would have clarified whether, and to what extent, DOT had considered any of Lender's and USI's other legal arguments on Amtrak's taking, such as the USRA's impact on Amtrak's taking authority.  Plainly, had Lender and USI been provided a fair opportunity to engage in fulsome discovery, they could have better contested the issues decided by this Court's Memorandum Opinion and Order.  (*See, e.g.*, ECF Doc. No. 106 at 35-36.)

Because this Court limited Lender's and USI's discovery and failed to provide the parties notice that Amtrak's motion would be treated as a summary judgment motion, Lender and USI were prejudiced in objecting to Amtrak's purported authority to condemn the Leasehold Interest. Accordingly, Lender's and USI's appeal presents a serious question of law concerning the procedures utilized by this Court.

### C.    Amtrak Failed To Show Necessity Under the Amtrak Statute

Even putting aside the procedure used by this Court, however, this Court's substantive analysis of Amtrak's showing under 49 U.S.C. § 24311(a)(1)(A) was flawed.  This Court was simply wrong where it concluded that "Amtrak has proven that its condemnation of the USI Sublease is necessary for intercity rail transportation" under 49 U.S.C. § 24311(a)(1)(A).  (ECF Doc. No. 106 at 47.)

As discussed above (*see supra* Part I.A), a taking by Amtrak is not lightly presumed, as it is for the U.S. Government. Instead, to show that its taking is "necessary for intercity rail transportation" under 49 U.S.C. § 24311(a)(1)(A), Amtrak must show that its taking is more than merely useful. *See AMTRAK v. 900 2nd St. NE*, 266 F. Supp. 3d 63, 69 (D.D.C. 2017) ("The Court finds that § 24311's standard is best read as more stringent than mere usefulness, but more lenient than absolute, last-resort need."). Amtrak's taking must also have "a 'significant relationship' with Amtrak's provision of intercity rail passenger transportation." *Id.* In evaluating this prong, courts "simply do not owe Amtrak's determinations of necessity the same sort of substantive deference that federal agencies and other government entities receive when condemning property." *Id.* at 67.

Here, this Court made critical errors in evaluating the necessity of Amtrak's taking. First, the Court's analysis of necessity failed to account for how the USRA and similar statutes affected the standard for necessity of Amtrak's taking.[6] Of all the properties which might be categorized as "necessary for intercity rail passenger transportation," only one is the subject of federal legislation detailing how it should be operated and by whom. The USRA specifically requires Union Station to be redeveloped with "maximum reliance on the private sector and minimum requirement for Federal assistance." *See* Pub. L. 97-125, 95 Stat. 1667, § 2(7) (1981). And Congress has directed elsewhere that Union Station be developed as a multiple-use transportation terminal with a commercial complex that would support the operations and maintenance of the station through its commercial development. *See* 40 U.S.C. § 812. These statutory directives were not for nothing: Congress specifically intended to redevelop Union Station from what was

---

[6] This Court incorrectly concluded that the USRA did not limit Amtrak's taking power, and did not factor the USRA into its analysis of necessity. (ECF Doc. No. 106 at 33-36.) This error presents a serious question of law, warranting a stay pending appeal.

essentially a large waiting room for railroad passengers into a mixed-use, commercial space that could be self-sustaining.

For example, prior to the USRA's enactment in 1981, Union Station was essentially one large waiting room, as evidenced by this photo of Union Station in the 1940s:



(Carol M. Highsmith & Ted Landphair, *Union Station: A History of Washington's Grand Terminal* 59 (2d ed. 1998)).  Determining that this was not adequate for a landmark of Union Station's importance, Congress passed the USRA, and DOT created the leasehold structure at Union Station to commercialize Union Station's space into one that could support its function as a railroad station but also support private-public partnerships for the benefits of passengers.  As demonstrated by the photographic evidence, the USRA and the subsequent structuring of Union Station's leaseholds accomplished this goal:



(Carol M. Highsmith & Ted Landphair, *Union Station: A History of Washington's Grand Terminal* 120-121 (2d ed. 1998)).  This successful transformation, and the intent behind the USRA, call into question Amtrak's entire theory of necessity here.

As this Court is aware, Amtrak had originally claimed that its taking was necessary to advance the Subbasement and Concourse Modernization Projects, and that it saw an "opportunity to improve the lease structure of WUS to serve the long-term interests of this essential multimodal station." (ECF Doc. No. 1.)  Lender squarely addressed these purported needs in its limited discovery and the evidentiary hearing, and showed that these "needs" were entirely pretextual, as even this Court recognized that (i) the Subbasement Project had been started despite Lender's control of the Leasehold Interest, and (ii) the Concourse Modernization Project had not been delayed by Lender, but by the fact that the FRA had rejected Amtrak's conception of the project. (*See* ECF Doc. No. 106 ¶¶ 26-37.)  Moreover, Lender established its control of the USI sublease in parallel litigation.  (*See id.* ¶¶ 14-17.)  This left Amtrak to almost exclusively rely on its "need" to redesign the Leasehold Interest.  Consequently, on the eve of the evidentiary hearing, Amtrak

17

produced what it subsequently marked as Plaintiff's Exhibit 11.[7]  This exhibit purported to show Amtrak's plans to redesign and repurpose the commercial areas of Union Station into benches and other seating for customers.  (*See id.* at 20-21.)  This Court placed heavy reliance on this exhibit its Memorandum Opinion, ultimately concluding that Amtrak had shown that there was a direct nexus between the Leasehold Interest and Amtrak's redesign goals.  (*Id.* at 38 (justifying necessity of taking on basis that "an increased footprint would enable Amtrak to make immediate changes to enhance the customer experience").)

But this Court's reliance on Amtrak's redevelopment plans to find necessity was plain error.  Amtrak's redevelopment plans seek to revert Union Station to a large waiting area for Amtrak customers.  ***This runs contrary to the precise intent of the USRA and similar government directives, including the very lease that is the subject of this taking***.  Amtrak never addressed this aspect of its taking, and even admitted at the evidentiary hearing that it had not considered the USRA when it instituted this action.  This Court only considered whether the USRA overrode Amtrak's taking statute altogether.  (ECF Doc. No. 106 at 33-36.)  However, this Court should have factored in Amtrak's compliance with these Congressional statutes as part of its necessity analysis.  It is simply illogical that a taking by Amtrak could be "necessary for intercity rail passenger transportation" when it contradicts Congressional statutes and a federal lease (DOT-USRC lease) that describes how and where railroad service is provided in an existing federally-owned train station.   This Court's failure to consider the USRA and related government directives in its necessity analysis is a serious question of law requiring appellate review.

---

[7] Given that Plaintiff's Exhibit 11 was provided during the exchange of potential exhibits for the evidentiary hearing—well after the conclusion of the limited discovery—the parties had no opportunity to engage in discovery on Amtrak's plans to repurpose the Leasehold Interest.  The record remains incomplete on Amtrak's purported necessity of the entirety of the Leasehold Interest.  *See supra* Part I.B.

Even putting aside the USRA, however, there is simply nothing "necessary" about Amtrak's redesign plans in the first place.  Union Station in its currently structured form has adequately served Amtrak's needs for over 40 years.  Although this Court recognized that case law requires there to be some direct nexus between Amtrak's needs and Amtrak's goals, it erred where it concluded that Amtrak's preference to spend hundreds of millions of dollars to take and redesign Union Station to purportedly improve the consumer experience could be connected to Amtrak's goals of maximum productivity and efficiency, ensuring equitable access to the Northeast Corridor, or maximizing the use of its resources.  (*See* ECF Doc. No. 106 at 38 (citing 49 U.S.C. § 24101(c)(3), (10), (12)).)  None of these goals can be read so broadly to capture Amtrak's stated desire to redevelop Union Station into large waiting rooms for their customers.  This is particularly the case where Amtrak's purported "need" is inconsistent with other of its stated goals.  *See* 49 U.S.C. § 24101(c)(1)(C), (1)(F), (2) (stating that Amtrak's goals include providing food service to customers, providing economic benefits to its communities, and minimizing government subsidies).  Clearly, Amtrak's desire to improve the customer experience at the Leasehold Interest is precisely the sort of "mere usefulness" that cannot justify a taking under 49 U.S.C. § 24311(a)(1)(A).  *See 900 2nd St. NE*, 266 F. Supp. 3d at 69.

All told, this Court's application of 49 U.S.C. § 24311(a)(1)(A) was erroneous.  This Court should have considered the impact of the USRA and required Amtrak to show actual necessity, not mere usefulness.  Appellate review is needed to clarify this Court's interpretation and application of Section 24311(a)(1)(A), and this Court's order should be stayed pending appeal.

### D.    This Court Incorrectly Relied On Post-filing Negotiations To Cure Amtrak's Deficiencies

A serious legal question also exists concerning the Court's interpretation of the Amtrak Statute regarding pre-filing efforts to acquire the Leasehold Interest consistent with 49 U.S.C.

§ 24311(a)(2).  Earlier in this case, the Court observed that Amtrak's "week-long negotiation, if you even want to call it that, doesn't seem to me to be terribly adequate."  (ECF Doc. No. 85 at 11:11-12:15.)  To try to remedy this defect in Amtrak's taking, this Court ordered the parties to negotiate for the Leasehold Interest while Amtrak's motion for immediate possession remained pending.  (*Id.* at 56:18-59:25; *see also* ECF Doc. No. 88.)

During these negotiations, Lender made multiple offers to Amtrak, including proposals for a variety of other solutions on station governance.  (ECF Doc. No. 99 at ¶ 99.)  Amtrak rejected Lender's offers without any counter, noting days before the evidentiary hearing that Amtrak's CEO wanted to see how the hearing went before responding with any counteroffer.  (*Id.*)  Amtrak's first offer issued in writing was not until October 5, 2023, and included a number of conditions and indicated in no uncertain terms that Amtrak would not negotiate further until this Court ruled on Amtrak's motion for possession.  Nevertheless, this Court relied on these post-filing negotiations as evidence of Amtrak's good faith and compliance with the statutory prerequisites to any exercise of eminent domain.  (ECF Doc. No. 106 at 43-45.)  This was reversible error.  The record shows that Amtrak never attempted to negotiate in good faith, whether prior to the filing of the declaration of taking or after.

In any event, this Court's reliance on post-filing negotiations was erroneous as a matter of law because the Amtrak Statute does not include language that would suggest that post-filing negotiations could satisfy this requirement.  And this is for good reason, as otherwise Section 24311(a)(2) would not act to limit Amtrak's eminent domain powers at all, since Amtrak could file any condemnation action it wished and only then engage in negotiations for the property.  Moreover, the Court's analysis was flawed where it concluded that it could consider post-filing negotiations on the basis of two cases:  *Burlington N. Santa Fe Ry. Co. v. A 50-Foot Wide Easement*

*Consisting of 6.99 Acres more or less*, 346 F. App'x 297, 302-03 (10th Cir. 2009), and *United States v. 6.584 Acres of Land, more or less, Hidalgo Cnty., Tex.*, 533 F. Supp. 3d 482, 500 (S.D. Tex. 2021). Neither case stands for the Court's proposition that it could rely on post-filing negotiations to satisfy the requirement of 49 U.S.C. § 24311(a)(2)(B). The *Burlington* court only concluded that, under the Federal Rules of Evidence, post-filing negotiations were admissible as to a condemnor's good faith post-filing. 346 F. App'x at 302-03. It did not conclude, however, as the Court did here, that post-filing negotiations were relevant to, or could prove, a condemnor's good-faith in ***pre-filing negotiations***. Similarly, *Hidalgo Cnty., Tex.* did not even concern, or turn on, how courts should treat evidence of post-filing negotiations for the purposes of adjudging pre-filing negotiations. Instead, that case was much more straightforward, as the landowner admitted that the parties had engaged in pre-filing negotiations for six months prior to the taking, without any specific explanation as to how the United States had failed to negotiate in good faith. 533 F. Supp. 3d at 500. That is very different from here, where Lender has consistently and specifically pointed to Amtrak's one week, exploding offer as indicative of Amtrak's bad faith. (*See, e.g.*, ECF Doc. No. 35 ¶¶ 69-70, 72.)

Given this Court's own skepticism of Amtrak's initial compliance with Section 24311(a)(2) and these errors in this Court's analysis, a serious legal question exists concerning whether Amtrak satisfied Section 24311(a)(2).

For all of the foregoing reasons, Lender and USI have established that their appeal presents serious questions of law, many of which are matters of first impression. These questions of law show that this Court's Memorandum Opinion and Order are based on flawed interpretations of the Amtrak Statute, prejudicial procedures, and findings unsupported by the limited record before this Court. Consequently, this Court's Order should be stayed during the pendency of Lender's and

USI's appeal.  This is particularly true where, as here, Amtrak's condemnation authority is being used to divest property rights from a foreign investment fund who has more than $460 million invested in Union Station.  *See Philipp v. Fed. Republic of Germany*, 436 F. Supp. 3d 61, 67 (D.D.C. 2020) (finding that "serious and important legal questions" that "can affect relations between the United States and foreign nations" favor granting a stay).

## II.  THE PUBLIC INTEREST FAVORS GRANTING STAY PENDING APPEAL AND NO ONE WILL BE HARMED BY THE ISSUANCE OF A STAY

Another factor in determining whether a stay pending appeal is appropriate focuses on where the public interest falls.  *Citizens for Resp. & Ethics*, 593 F. Supp. 2d at 164-65.  "The public interest is a uniquely important consideration in evaluating a request for [interim relief]."  *Id.* at 165.

Here, the public interest supports granting a stay.  Given that Union Station serves the public, the public interest clearly favors continuity and avoiding any interruptions or confusion at Union Station.  Yet, that is precisely what this Court's Order threatens, as it seeks to transfer possession of the Leasehold Interest to Amtrak even while Lender and USI have an appeal pending. And as discussed above, Amtrak has already stated its intent to utilize its possession to significant ends, including ousting subtenants and making considerable changes at the Leasehold Interest.  *See supra* Part I.C.  Thus, Amtrak's immediate possession of the Leasehold Interest pending appeal is likely to have a number of negative effects on the public and third parties, including, but not limited to, (i) creating conflicts with subtenants at the Leasehold Interest that Amtrak wishes to oust (despite the express terms of their subleases), (ii) allowing Amtrak to undertake considerable construction on portions of the Leasehold Interest currently used or leased by the public or third parties, and (iii) creating confusion for third parties (including travelers, subtenants, service providers, contractors, potential tenants, etc.) as to whether Amtrak's control of the Leasehold

Interest will continue following Lender's and USI's appeal.  These negative effects on third parties and the public are contrary to the public interest, and are sure to harm the perception of Union Station while its control remains disputed.

The public interest is also in favor of a stay because of the Government's involvement here. As numerous courts have recognized, "the government's interest is the public interest." *Ala. Ass'n of Realtors*, 593 F. Supp. 2d at 164-65; *see also Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016).  And here, although the Government is not a party to this action, the Government has an obvious interest in the deliberate statutory enactments and administrative actions that brought about USI's private ownership of the Leasehold Interest, including the USRA. *See supra* Part I.C.  In fact, Congressional members have already expressed this same view.  As this Court is aware, Representative and Chairman of the Committee on Transportation and Infrastructure Sam Graves, along with Member Tom Cole, sent a letter to Pete Buttigieg, the Secretary of Transportation, on March 6, 2024, in which they expressed concerns that Amtrak's takeover plan "may be contrary to law" and requested an in-person briefing on the DOT's plan to "maintain the existing public-private partnership for Union Station, as required by law." (*See* ECF Doc. No. 107-1.)  To Lender's and USI's knowledge, no such briefing has yet occurred. Consequently, this letter only further confirms that the public interest would best be served by caution here, as further Governmental involvement would likely only complicate the transfer of possession to Amtrak while Lender's and USI's appeal is pending.

## III.    LENDER AND USI WILL BE IRREPARABLY HARMED ABSENT A STAY

Finally, on a motion for a stay pending appeal, "the harms to each party are tested for 'substantiality, likelihood of occurrence, and adequacy of proof.'" *Citizens for Resp. & Ethics*, 593 F. Supp. 2d 156 at 161 (D.D.C. 2009) (quoting *Judicial Watch, Inc. v. Nat'l Energy Policy*

*Dev. Grp.*, 230 F. Supp. 2d 12, 15 (D.D.C. 2002)).  As part of this analysis, "[a] [c]ourt must consider the significance of the change from the *status quo* which would arise in the absence of a stay, as well as likelihood of occurrence of the claimed injury, when determining whether parties have truly met their burden of demonstrating irreparable harm justifying imposition of a stay." *Citizens for Resp. & Ethics*, 593 F. Supp. 2d at 161.  This is because the primary purpose of a stay pending appeal is to preserve the *status quo* while the appeal proceeds.  *See Holiday Tours, Inc.*, 559 F.2d at 844 ("Generally, [a stay pending appeal] is preventative, or protective; it seeks to maintain the status quo pending a final determination of the merits of the suit."); *Alsaaei v. Bush*, No. 05-2369 (RWR), 2006 U.S. Dist. LEXIS 56599, at *3 (D.D.C. July 19, 2006) ("A primary purpose of a stay pending resolution of issues on appeal is to preserve the status quo among the parties.").

Here, absent a stay, the *status quo* will be drastically altered and Lender and USI will be dispossessed of its Leasehold Interest while their appeal of this Court's order is pending.  This irreparable harm will take several forms.

First, Lender and USI's loss of their real property interests alone constitutes irreparable harm.  *See Shvartser v. Lekser*, 308 F. Supp. 3d 260, 267 (D.D.C. 2018) ("[I]t is well-settled that unauthorized interference with a real property interest constitutes irreparable harm as a matter of law, given that a piece of property is considered to be a unique commodity for which a monetary remedy for injury is an inherently inadequate substitute." (quotation omitted)).  Lender and USI's harm is even more pronounced than usual, however, because the Leasehold Interest concerns Union Station, a unique and historic transportation hub whose value as a landmark is not limited to its economic potential.  Courts have repeatedly recognized that the loss of a unique, landmark

property like Union Station constitutes irreparable harm.[8]   *See Patriot-BSP City Ctr. II v. U.S.*

*Bank Nat'l Ass'n*, 715 F. Supp. 2d 91, 95-69 (D.D.C. 2010) (finding irreparable harm to exist

where plaintiff was at threat to lose its interest in a "historic landmark"); *Monument Realty LLC v.*

*Wash. Metro. Area Transit Auth.*, 540 F. Supp. 2d 66, 75-76 (D.D.C. 2008) (finding irreparable

harm to exist where movant was at risk of losing interest in property "valued for its uniqueness").

Worse, even if Amtrak's taking were valid (which it is not), Lender and USI will be dispossessed

of their unique Leasehold Interest while it remains unclear whether Amtrak will have the funds

available to pay Lender and USI the just compensation assessed by this Court.  *See supra* Part I.A.

This too constitutes irreparable harm.

Second, the carefully-crafted ownership structure of Union Station will be disregarded.  As

this Court recognized in its Opinion, the preexisting ownership structure of Union Station was the

result of specific Congressional and administrative action, including, but not limited to, the passage

of the USRA (ECF Doc. No. 106 at 6), the Secretary of Transportation's purchase of Union Station

in 1988 (*id.* ¶ 6), the lease entered into by and between the FRA and USRC in 1985 (*id.* ¶ 8), the

Secretary of Transportation's selection of Union Station Venture, Ltd. ("USV") as Union Station's

developer (*id.* at ¶ 9), and the sublease between USRC and USV, which was eventually assigned

to USI in 2007 (*id.* ¶ 10).  These were all specific actions taken to ensure that Union Station was

maintained and operated by a private entity just like USI.  If this Court's Order is not stayed, this

entire scheme will be undone, and Lender and USI will be deprived of the benefit of these

---

[8] Lender and USI's irreparable harm from its loss of the Leasehold Interest is not lessened because this harm arises in the context of condemnation proceedings.  Although this Court suggested in its Opinion that the loss of property rights could not constitute "undue hardship" because the "end result of a condemnation is the taking of a property interest" (ECF Doc. No. 106 at 45-46), that analysis is completely different from the question whether Lender and USI would suffer irreparable harm if the Order is not stayed pending appeal.  As this Court has recognized, its undue hardship analysis only arose out of a narrow line of cases finding that there might be circumstances where "expulsion from condemned property within a short timeframe would not be feasible" in the face of quick-take provisions.  (*Id.* at 46.)  By contrast, irreparable harm in the context of a motion for a stay pending appeal is a separate inquiry that gives consideration to protecting the *status quo*.  *See Citizens for Resp. & Ethics*, 593 F. Supp. 2d at 161.

Congressional and administrative actions, which crafted the corporate leasehold structure here.  In fact, to exactly this point, Amtrak has already indicated that, after it takes possession, it intends to negotiate a new lease between it and the FRA.  This means that even if Lender and USI could conceivably regain control of the property at some point in the future, they would no longer have the benefit of the current lease, which is the asset upon which Lender has invested.    Because Amtrak may seek to significantly modify the lease—even terminate it in favor of a new lease— the loss of the current leasehold structure is not compensable by monetary damages.

Third, Lender and USI will suffer irreparable harm from the effect of the Order on USI's business (which Lender manages).  The record establishes that USI exists solely to manage and operate the Leasehold Interest at Union Station, which it has done since 2007.  (ECF Doc. No. 106 ¶ 10.)  But if the Order goes forward and possession of the Leasehold Interest is transferred to Amtrak, there will be no business for USI to conduct at all.  Its entire corporate purpose will be undermined, and its existence as a business will assuredly cease.  This harm is intangible and irreparable, as it cannot be remedied by a mere consideration of lost profits.  *See Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*, 992 F.2d 430, 436 (2d Cir. 1993) (finding irreparable harm where harm "threaten[ed] [a business's] continued existence"); *Smoking Everywhere, Inc. v. U.S. FDA*, 680 F. Supp. 2d 62, 76 (D.D.C. 2010) (finding irreparable harm where movants established threats to "the continued viability of their respective enterprises"), *aff'd sub. nom., Sottera, Inc. v. FDA*, 627 F.3d 891 (D.C. Cir. 2010).

Fourth, Lender's and USI's relationships with third parties will be irreparably harmed by the Order.  As this Court is aware, Amtrak has already shown that it intends to make large-scale changes to the Leasehold Interest, including changes that are likely to cause "the amount of space devoted for commercial purposes [to] shrink significantly."  (ECF Doc. No. 106 ¶ 41.)  Thus, it is

Lender's and USI's understanding that Amtrak intends to repudiate or otherwise void the subleases of a number of subtenants who had entered into agreements with USI while operated by Lender. This will destroy Lender's and USI's business relationships, goodwill, and reputation with those same subtenants.  This constitutes irreparable harm, as these relationships with subtenants are unlikely to be repaired, even if this Court's Order were reversed.  *See Celsis in Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012) (noting that "loss of goodwill" and "damage to reputation" are "valid grounds for finding irreparable harm"); *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (affirming lower court's determination that irreparable harm could stem from loss of "reputation, good will, and business opportunities").

Finally, Lender and USI will suffer irreparable harm because Amtrak will make large-scale (and potentially irreversible) alterations to the Leasehold Interest.  Amtrak has already stated its intent to do so.  (ECF Doc. No. 106 ¶¶ 38-41.)  This would impair Lender's and USI's still-disputed property rights, as Lender and USI will lose their rights to control the use, layout, and furnishings of the Leasehold Interest.  Moreover, even if this Court's Order were reversed, Amtrak's changes to the Leasehold Interest may not be reversed or otherwise compensable by monetary damages, especially given the unique and landmark status of Union Station.  This constitutes its own category of irreparable harm.  *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982) (observing that property rights include the rights to "possess, use and dispose of it"); *7-Eleven, Inc. v. Khan*, 977 F. Supp. 2d 214, 234 (E.D.N.Y. 2013) (finding irreparable harm to flow from "owner's lack of control over features, fixtures, and equipment located on the site" (citation omitted)).

By comparison, Amtrak will not suffer any irreparable harm from its possession of Union Station being stayed while the merits of Lender's and USI's appeal is litigated.  Although Amtrak

27

has previously relied on the Subbasement Project and its associated safety concerns to argue that a denial of its possession of Union Station would cause it irreparable harm (ECF Doc. No. 84 at 14), the record shows that the Subbasement Project was initiated a decade ago and is already underway, notwithstanding Lender's control of USI and the Leasehold Interest.  (ECF Doc. No. 106 ¶¶ 34-37.)  This calls into question whether Amtrak would suffer ***any harm*** if this Court's Order were stayed, as Amtrak has advanced the Subbasement Project notwithstanding its lack of possession of the Leasehold Interest.  Indeed, all that Amtrak will suffer from a stay is a delay in implementing its plans to expand its waiting areas and displace commercial tenants for its own "back room" offices, which plainly is not irreparable harm.

Moreover, when Amtrak moved for immediate possession, it did not do so by way of an emergency motion, nor did it seek any injunction to address its stated safety concerns.  Instead, Amtrak's motion for immediate possession was litigated over a period of almost two years, with Amtrak encouraging the need for an evidentiary hearing on its immediate possession.  (ECF Doc. No. 98 ¶ 8.)  And at the evidentiary hearing before this Court, Amtrak did not prove that there were imminent safety concerns, nor that Lender was preventing the development of the Subbasement or Concourse Modernization Projects.  Based upon the evidence that Amtrak chose to put forward, this Court was only able to conclude that, according to Amtrak, immediate possession would allow it to "immediately advance" the Subbasement Project.  (ECF Doc. No. 106 ¶ 37.)  Plainly, this evidentiary showing did not support Amtrak's prior argument that it would suffer irreparable harm.  *See National Parks Conservation Ass'n. v. Semonite*, 282 F. Supp. 3d 284, 288 (D.D.C. 2017) (finding no irreparable harm where there was "ample time to fully brief the merits").  Consequently, Amtrak's lack of evidence and its lack of urgency confirm that Amtrak is not at risk of irreparable harm if this Court were to stay its Order pending appeal.  *See Open Top*

*Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 91 (D.D.C. 2014) (observing that delay and prolonging of briefing "demonstrated that any alleged harm lack[ed] the urgency and immediacy required" to be irreparable).

For all of the foregoing reasons, Lender and USI face irreparable harm if this Court's Order is not stayed, but Amtrak does not.  Accordingly, this Court should stay its Order to preserve the *status quo* while Lender's appeal proceeds.

## IV.   THIS COURT'S ORDER IS APPEALABLE

Although Lender and USI have shown their entitlement to a stay pending appeal (*see supra* Parts I-III), Lender and USI anticipate that Amtrak may contest whether this Court's Order is appealable at all.  Therefore, for the avoidance of doubt, Lender and USI will address this issue here.

First, Lender and USI submit that the Order is immediately appealable under this Circuit's standard set forth in *Washington Metro. Area Transit Auth. v. One Parcel of Land*, 514 F.2d 1350, 1351 (D.C. Cir. 1975).  In that case, the court had appellate jurisdiction to review an order granting WMATA possession of a right to conduct soil borings even though the issues of WMATA's ultimate authority to construct on the site or the amount of compensation for the taking has not yet been adjudicated.  The Court stated that "an order of possession is final and subject to review if it operates to defeat the right of the property owner to challenge the validity of the taking in the condemnation proceeding."  514 F.2d at 110.  The Court noted that had the appellate court not issued a stay of the possession order, "Metro would long since have taken possession and completed its borings, thereby defeating any remedy the Cemetery may have."  514 F.2d at 111.  Thus, even if this Court has not yet entered judgment on Amtrak's condemnation action, its Order

is reviewable because it has nevertheless adjudged that Amtrak's taking is valid and authorized, with Lender having no available defenses.[9]

The Order is also appealable under 28 U.S.C. § 1292(a)(1) as an order effectively granting injunctive relief.  *See Cobell v. Kempthorne*, 455 F.3d 317, 322 (D.C. Cir. 2006) ("To qualify as an injunction, then, an order must (1) be directed to a party; (2) be enforceable by contempt; (3) be designed to accord or protect substantive relief; and (4) threaten a serious, perhaps irreparable, consequence and be challengeable only by immediate appeal." (internal quotation marks and citation omitted)).  This Court's Order requires Lender and USI to turn over possession of the Leasehold Interest to Amtrak by July 15.  Were Lender or USI not to comply, it would be punishable by contempt.  *See id.*  The Order also grants Amtrak a portion of its substantive relief, as Amtrak will be granted possession of the same Leasehold Interest it seeks to condemn.  Thus, even if it is not final, the Order is nevertheless equivalent to a mandatory injunction, and will have "serious, perhaps irreparable consequences" once it dispossesses Lender and USI of the Leasehold Interest.  *Carson v. Am. Brands*, 450 U.S. 79, 84 (1981); *see also Cobell*, 455 F.3d at 322; *United States v. All Assets of Statewide Auto Parts*, 971 F.2d 896, 901 (2d Cir. 1992) (finding interlocutory order appealable where it "has all of the effects of an injunction").  These serious consequences include the irreparable harm that Lender and USI will suffer from the Order.  *See supra* Part III.

Amtrak may argue that the rule set forth in *Catlin v. United States*, 324 U.S. 229, 233 (1945), should bar an interlocutory appeal, but Amtrak's position is incorrect.  As the D.C. Circuit held in the *WMATA* case, while *Catlin* stands for the proposition that ordinarily in condemnation cases only a final order disposing of the whole case, including compensation, is appealable, "[i]t

---

[9] The Court's scheduling order for the balance of the case is solely about just compensation.  (ECF Doc. Nos 108, 112.)  There is no provision for filing of dispositive motions.  A nonjury trial for the determination of just compensation has been set for May 2025; there is no reference to trial on the defenses.

is not true, however, that no order issued in a condemnation case can be an appealable order before all issues raised in the condemnation proceeding, including just compensation, have been adjudicated." 514 F.2d at 110. Moreover, in *Catlin*, the condemning authority was the U.S. Government exercising its powers under the War Purposes Act, which specifically and clearly authorized an immediate transfer of possession following the filing of a petition. *See* 324 U.S. at 235 (noting that War Purposes Act's purpose was to allow for "emergency action"). Amtrak is not the U.S. Government. It has limited statutory authority to exercise eminent domain if and only if it is adjudicated to have satisfied statutory conditions. Because this Court's Memorandum Opinion and Order defeats Lender's right to challenge the validity of Amtrak's taking and threatens Lender and USI with irreparable harm (*see supra* Part III), the Memorandum Opinion and Order are immediately appealable.

For all of these reasons, Lender and USI can appeal the Order to the D.C. Circuit, and their appeal is a proper basis for this joint motion.

## <u>CONCLUSION</u>

For the aforementioned reasons, Lender and USI respectfully request that the Court enter a stay of its Order, dated May 24, 2024, directing the transfer of possession of the Leasehold Interest pending Lender and USI's appeal.

| | |
|---|---|
| _/s/ Y. David Scharf_ | _/s/ Steven J. Willner_ |
| Y. David Scharf | Thomas M. Wood IV |
| Brett Dockwell | Steven J. Willner |
| Kristin T. Roy | NEUBERGER, QUINN, GIELEN RUBIN & |
| Latisha V. Thompson | GIBBER, P.A. |
| Amber R. Will | One South Street, 27th Floor |
| Mahnoor Misbah | Baltimore, Maryland 21202 |
| *Admitted pro hac vice* | (410) 332-8541 |
| MORRISON COHEN LLP | tmw@nqgrg.com |
| 909 Third Avenue | sjw@nqgrg.com |
| New York, New York 10022 | |
| (212) 735-8600 | *Attorney for Defendant Union Station* |
| ydscharf@morrisoncohen.com | *Investco, LLC* |

Paul J. Kiernan
Louis J. Rouleau
HOLLAND & KNIGHT LLP
800 17th Street N.W.
Suite 1100
Washington, D.C. 20006
Phone: 202-663-7276
Paul.Kiernan@hklaw.com

*Attorneys for Defendant Kookmin Bank Co., Ltd.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this the 6th day of June, 2024, I served a true and correct copy of the foregoing Opposition and supporting papers on counsel of record via the CM/ECF filing system.

_/s/ Y. David Scharf_____
Y. David Scharf