UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK), | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiff, | | |
| v. | | Case No. 22-cv-1043 (APM) |
| SUBLEASE INTEREST OBTAINED PURSUANT TO AN ASSIGNMENT AND ASSUMPTION OF LEASEHOLD INTEREST MADE AS OF JANUARY 25, 2007, WITH SAID PROPERTY INTEREST PERTAINING TO DESCRIBED LEASEHOLD INTERESTS AT WASHINGTON UNION STATION, et al., | | |
| Defendants. | | |

**MEMORANDUM OPINION AND ORDER**

Defendants Kookmin Bank Co. and Union Station Investco, LLC (collectively "Lender") move to stay pending appeal the court's Order Granting Motion for Immediate Possession ("Order"), ECF No. 111. For the reasons explained below, the Motion is denied.

**I.**

The background and procedural history of this matter are set forth in detail in the Memorandum Opinion entered on April 17, 2024, so the court does not repeat it here. Mem. Op., ECF No. 106 [hereinafter Mem. Op.], at 3–12. For present purposes, it suffices to say that the court entered the challenged Order on May 24, 2024, which directed transfer of Lender's Leasehold Interest in the Union Station complex to Amtrak as of 12:01 a.m. on July 15, 2024. Order, ECF No. 111; *see* 49 U.S.C. § 24311(b). Lender noticed an appeal on June 5, 2024, ECF No. 114, and the next day moved to stay the Order pending appellate review, Lender's Mot. for a

Stay Pending Appeal, ECF No. 116 [hereinafter Lender's Mot.].  Then, after the Motion became ripe, the court on July 9, 2024, extended the transfer date by two weeks to July 29, 2024, to allow sufficient time for this court to address Lender's Motion and for possible appellate review.  Order, ECF No. 122.

## II.

A stay pending appeal is "extraordinary relief" that courts do not grant lightly.  *Citizens for Resp. & Ethics in Wash. v. Fed. Election Comm'n*, 904 F.3d 1014, 1017 (D.C. Cir. 2018).  Such relief is an "intrusion into the ordinary processes of administration and judicial review," and accordingly "is not a matter of right, even if irreparable injury might otherwise result to the appellant."  *Nken v. Holder*, 556 U.S. 418, 427 (2009) (internal quotation marks and citations omitted).

A motion for stay is analyzed using the same four criteria as a motion for preliminary injunction.  *See Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 842–43 (D.C. Cir. 1977).  The moving party "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *accord Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985) (per curiam) (citing *Holiday Tours*, 559 F.2d at 843).

Courts in this Circuit traditionally have analyzed these four factors on a "sliding scale," whereby "a strong showing on one factor could make up for a weaker showing on another."  *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011).  The "sliding scale" framework allows a movant to remedy a lesser showing of likelihood of success on the merits with a strong showing

2

as to the other three factors, provided that the issue on appeal presents a "serious legal question" on the merits. *See Holiday Tours*, 559 F.2d at 844.

Whether the sliding scale framework survives the Supreme Court's decision in *Winter v. Natural Resources Defense Council* remains unresolved in this Circuit. *See Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022); *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014). Thus, "it remains an open question whether the 'likelihood of success' factor is an 'independent, free-standing requirement,' or whether, in cases where the three other factors strongly favor issuing an injunction, a plaintiff need only raise a 'serious legal question' on the merits." *Aamer*, 742 F.3d at 1043 (quoting *Sherley*, 644 F.3d at 393, 398).

Still, this court remains bound by *Holiday Tours*' sliding scale. So, it may grant an injunction pending appeal if a "serious legal question is presented, . . . little if any harm will befall other interested persons or the public, and . . . denial of the order would inflict irreparable injury on the movant." *Holiday Tours*, 559 F.2d at 844.

**III.**

The first factor—likelihood of success—does not require a showing of "absolute certainty of success." *Pop. Inst. v. McPherson*, 797 F.2d 1062, 1078 (D.C. Cir. 1986). "[I]t will ordinarily be enough that the [movant] has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation." *Holiday Tours*, 559 F.2d at 844.

Lender maintains that the court committed three overarching errors that warrant closer inspection on appeal. They are: (1) the court "mistakenly treated Amtrak as if it were the federal Government for purposes of quick-take possession," 42 U.S.C. § 24311; (2) the court's "misinterpretation of [§ 24311] led it to wrongfully convert Amtrak's motion for immediate

3

possession into a motion for summary judgment"; and (3) the court "committed reversible error in applying [§ 24311] in isolation from controlling provisions of the [Union Station Redevelopment Act], . . . [thereby] ignor[ing] the unique strictures that Congress and the [Department of Transportation] have placed around Union Station." Lender's Mem. of L. in Supp. of Lender's Mot., ECF No. 116-1 [hereinafter Lender's Mem.], at 2–4. Lender also makes various other sub-arguments. The court addresses Lender's challenges in the order presented.

### A.      Lender Has Not Raised a Substantial Question Concerning Amtrak's Quick-Take Authority.

#### 1.      *Amtrak Properly Exercised Quick-Take Authority Under § 24311(a)(1)(A).*

Lender first maintains that the court erred when it allowed Amtrak to take its Leasehold Interest under subsection (a)(1)(A) of § 24311, instead of (a)(1)(B). Lender's Mem. at 7–8. The former provision permits Amtrak to condemn interests in property that are "necessary for intercity rail passenger transportation," and the latter authorizes a taking "requested by the Secretary of Transportation in carrying out the Secretary's duty to design and build an intermodal transportation terminal at Union Station in the District of Columbia if the Secretary assures Amtrak that the Secretary will reimburse Amtrak." 49 U.S.C. § 24311(a). (No enumerated statutory exception in subsection (a)(1)(A) is applicable). This court concluded that the plain text of § 24311(a), specifically the use of the disjunctive "or," demonstrates that subsection (a)(1)(B) does not restrict the application of (a)(1)(A). Mem. Op. at 32–33. The court also quoted from a congressional committee report to support its reading. *Id.*

Lender does not address this rationale. Instead, it relies solely on the rule of statutory construction that the specific governs the general to argue that the court improperly "read the more specific Section 24311(a)(1)(B) . . . out of the statute." Lender's Mem. at 8. According to Lender, because subsection (a)(1)(B) "specifically concerns takings at Union Station," Amtrak's

4

condemnation of the Leasehold Interest can occur *only* under that section. *Id*. Lender's exclusive reliance on a single canon of construction leads it to misread the statute.

Because "statutory language cannot be construed in a vacuum," "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989). So, in addition to the text, the court must consider the statute's "structure, purpose and legislative history." *Genus Med. Techs. LLC v. FDA*, 994 F.3d 631, 641 (D.C. Cir. 2021).

History provides important context to understand why Lender is wrong. As the court noted in its opinion, Congress first granted Amtrak the power of eminent domain (presently codified in subsection (a)(1)(A)) as part of the Amtrak Improvement Act of 1973 ("1973 Act"). Mem. Op. at 33 (citing Pub. L. No. 93-146, 87 Stat. 548, 550, § 5 (Nov. 3, 1973)). The following year, as part of the Amtrak Improvement Act of 1974 ("1974 Act"), Congress added the provision that is now codified in subsection (a)(1)(B). *Id.* (citing Pub. L. No. 93-496, 88 Stat. 1526, 1528, § 6 (1974)).

Why did Congress add subsection (a)(1)(B) only one year after granting Amtrak the power of eminent domain in (a)(1)(A)? It did so for a distinct purpose: to empower the Secretary of Transportation to carry out the statutorily mandated task of rapidly designing and constructing a much-needed modern transportation hub in Washington, D.C. The 1974 Act expressly directed the Secretary of Transportation "to design, plan, and coordinate the construction of a model intermodal transportation at Union Station in the District of Columbia." 88 Stat. at 1533, § 15. Congress issued that instruction in response to emergent changes to the area's transportation needs. The Rail Passenger Services Act of 1970 had led to a dramatic increase in ridership in the Northeast Corridor. *See* S. REP. 93-1015, at 6164 (1974). Also, commuter rail traffic from Maryland and Virginia was on the rise at Union Station, and it was expected that foot traffic at the Station would

5

grow even more once the Metro subway system built a stop there. *Id.* Congress viewed this confluence as an opportunity to "make the replacement of the existing Union Station in the District of Columbia a model intermodal terminal." *Id.* Congress tasked the Secretary with that responsibility in § 15 of the 1974 Act. It appropriated $5 million for that purpose, and it contemplated that designs would be completed within two years and construction within five. 88 Stat. at 1533, § 15.

As for subsection (a)(1)(B), it was not in the original version of the bill. The conference committee added it later to empower the Secretary to condemn any property needed to carry out the Union Station project. The committee report states that "[t]he conferees also agreed to amend section 305 of existing law in order to allow Amtrak to condemn any property at the request of the Secretary (upon assurance of full reimbursement) *in order to facilitate completion of the intermodal terminal within the required time*." S. REP. 93-1248, at 6183 (1974) (emphasis added). The conference committee also made clear that the new provision did not diminish Amtrak's general condemnation authority granted only the year prior. The committee report stated: "The conferees wish to emphasize that this amendment *in no way* alters Amtrak's existing authority under such section 305." *Id.* (emphasis added); *see* Mem. Op. at 33.

This history helps to frame subsection (a)(1)(B)'s proper meaning and its purpose in Amtrak's condemnation statute. Once more, the subsection provides that Amtrak may condemn interests in property "requested by the Secretary of Transportation in carrying out the Secretary's duty to design and build an intermodal transportation terminal at Union Station in the District of Columbia if the Secretary assures Amtrak that the Secretary will reimburse Amtrak." 49 U.S.C. § 24311(a)(1)(B). The "Secretary's duty" means the mandate contained in § 15 of the 1974 Act. *Id.* "[T]o design and build an intermodal transportation terminal at Union Station" refers to the

6

Act's five-year plan to modernize Union Station to meet the area's emergent, multi-faceted transportation needs. *Id.* And "if the Secretary assures Amtrak that the Secretary will reimburse Amtrak" pertains to refunding Amtrak the costs of any condemnation it carried out to facilitate Union Station's development under the 1974 Act. *Id.* Congress thus did not intend for subsection (a)(1)(B) to impose a Union Station-specific restriction on Amtrak's general condemnation power.

The 1973 Act did enumerate certain property that was beyond Amtrak's condemnation authority (i.e., "property of a railroad" and government-owned property), but a privately held leasehold interest in Union Station is not part of that exclusion. 87 Stat. at 550, § 6. Amtrak therefore properly exercised eminent domain authority under § 23411(a)(1)(A) to take the Leasehold Interest.

2. *Section 23411(b) Grants Amtrak Quick-Take Authority.*

Lender further argues that the court improperly read § 24311(b) as allowing Amtrak to quick-take property in the same manner as the federal government under 40 U.S.C. § 3114. Lender's Mem. at 9. Lender offers two arguments that it did not make previously. First, it contends that key text that appears in § 3114(b)(2)—"the land is condemned and taken for the use of the Government"— is missing in § 24311(b), thereby indicating that Congress did not grant Amtrak quick-take authority. *Id.* Second, Lender points to the introductory clause in § 24311(a)(1)—"[t]o the extent financial resources are available"—as another key textual difference from § 3114 that signals Congress's intent not to grant Amtrak quick-take authority. *Id.* at 9–10.

These arguments are not "substantial," because by raising them for the first time in this Motion, Lender has forfeited them. *See Liff v. Off. of Inspector Gen. for U.S. Dep't of Labor*, 881 F.3d 912, 919 (D.C. Cir. 2018) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below.") (quoting *Singleton v. Wulff*, 428 U.S. 106, 120

7

(1976)); *Campbell v. Dist. of Columbia*, 894 F.3d 281, 288 (D.C. Cir. 2018) (stating that the court will address issues raised for the first time on appeal only in "exceptional cases or particular circumstances") (quoting *Singleton*, 428 U.S. at 120).

Lender is also wrong on the merits. Lender's first argument is incorrect because, as originally enacted in 1973, § 24311 *did contain* language nearly identical to that which Lender claims confers the federal government's quick-take authority under § 3114(b)(2). That text does not appear in § 24311 today only because of a non-substantive code revision that Congress made 20 years later. As originally enacted in 1973, Amtrak's eminent domain statute provided that, "[u]pon the filing of a declaration of taking and the depositing in the court of the amount of money estimated in such declaration to be just compensation for the property, the property *shall be deemed to be condemned and taken for the use of the Corporation*." 87 Stat. at 550, § 6 (emphasis added). The italicized text is nearly the same as what appears in § 3114(b)(2): "the land is condemned and taken for the use of the Government." Lender concedes this language in § 3114(b)(2) is indicative of quick-take authority for the federal government. That Congress used nearly identical language in the 1973 Act means it gave Amtrak quick-take authority, too.

Why then is the italicized text not in § 24311 today? The 1973 Act's original condemnation authority was codified at 45 U.S.C. § 545(d), and the italicized text appeared in the first sentence of § 545(d)(3). 45 U.S.C. § 545(d) (1988). Section 545(d)(3) remained unaltered until 1994. That year, Congress revised and recodified under Title 49 a host of transportation-related laws, including § 545(d), "without substantive change." Pub. L. No. 103-272, 108 Stat. 745, § 1 (July 5, 1994) (providing certain transportation laws "are revised, codified, and enacted" "without substantive change") ("1994 Act"). What was § 545(d)(3) became § 24311(b). *Id.* at 915–16; 49 U.S.C. § 24311(b) (1994). The Historical and Revision Notes accompanying the new § 24311

make clear that the first sentence of the old § 545(d)(3) was incorporated into § 24311(b)(1) without substantive change. § 24311 (1994), Historical and Revision Notes. Since 1994, § 24311(b)(1) has provided that "[a]n interest is condemned and taken by Amtrak for its use" upon the filing of the declaration of taking and deposit of the estimated amount of just compensation with the court. § 24311(b) (1994). But, as noted, this revision worked no substantive change. The original text from the 1973 Act providing that the "property shall be deemed to be condemned and taken for use of the Corporation" is still present substantively in § 24311(b) today.

This history also addresses Lender's second contention, which is that § 24311's introductory clause "[t]o the extent financial resources are available" is inconsistent with quick-take authority. This text, too, was in the 1973 Act. 97 Stat. at 550, § 6 ("The Corporation is authorized, to the extent financial resources are available, to acquire . . ."). So, the language at issue co-existed from the start with the provision that "the property shall be deemed to be condemned and taken for the use of the Corporation."

Moreover, as Amtrak points out, the analogous federal takings law contains similar financial feasibility language. *See* 40 U.S.C. § 3115(a) ("Action under section 3114 of this title irrevocably committing the Federal Government to the payment of the ultimate award shall not be taken unless the head of the executive department or agency or bureau of the Government empowered to acquire the land believes that the ultimate award probably will be within any limits Congress prescribes on the price to be paid."). And both statutes contain legal protections for the property owner if the amount deposited by the condemning authority is less than the final amount deemed just compensation. *Compare* 49 U.S.C. § 24311(b)(4) ("If the [compensation] award is more than the amount received, the court shall enter a judgment against Amtrak for the deficiency."), *with* 40 U.S.C. § 3114(c)(3) ("If the compensation finally awarded is more than the

9

amount of money received by any person entitled to compensation, the court shall enter judgment against the Government for the amount of the deficiency."). That Congress permitted condemnation "[t]o the extent financial resources are available" therefore is not contrary to Amtrak possessing quick-take authority. 49 U.S.C. § 24311(a)(1).

> **B.   Lender's Claim That the Court Silently Converted Amtrak's Motion for Immediate Possession into a Motion for Summary Judgment Lacks Merit.**

Next, Lender makes the mystifying assertion that the court "*sua sponte* convert[ed] Amtrak's motion into one for summary judgment." Lender's Mem. at 11. According to Lender, because the court made findings about necessity and Amtrak's inability to acquire the property by agreement, as required under § 24311(a)(1)(A) and (2), it "decided the validity of Amtrak's taking under the Amtrak Statute." *Id.* at 11–12. Nothing could be further from the truth.

The court only found that "Amtrak ha[d] met its burden of proof to exercise its 'quick take' authority over the USI Sublease." Mem. Op. at 3. In fact, the court contrasted this case's posture with Amtrak condemnation matters decided on summary judgment. *Id.* at 29 (citing cases). The court well understands that a final decision as to the legality of Amtrak's taking will have to await more robust discovery. *See* Hr'g Tr., ECF No. 94, at 4–5 (Mar. 24, 2023) (recognizing three phases of the case: "a possession stage," "a summary judgment motion concerning the authority of Amtrak to take—to conduct the taking," and an "evaluation stage"). The court's decision on immediate possession is not a final judgment.

Lender further complains that the court unfairly restricted the scope of pre-hearing discovery only to the issues of necessity and acquisition through agreement. Lender's Mem. at 11. Lender says that if it understood the court would treat Amtrak's motion as one for summary judgment, it would have sought more expansive discovery on various other topics. *See id.* at 12–13; Lender's Reply in Further Supp. of Lender's Mot., ECF No. 121 [hereinafter Lender's Reply],

10

at 9–10. But Lender never contested the scope of discovery. And it never asked to broaden it once discovery was underway. The court is simply dumbfounded that Lender now claims the court tied its hands on the information it could seek from Amtrak, when Lender never once specified any additional discovery that it needed.

Amtrak points to the court's finding that the Secretary of Transportation approved Amtrak's taking of the Leasehold Interest as an example of a key issue on which it would have sought more discovery. Lender's Mem. at 13–14. But the court made that finding only to make the point that Amtrak's taking was not, as Lender argued, at odds with the Union Station Redevelopment Act of 1981 ("USRA"), which granted the Secretary of Transportation control over Union Station. Mem. Op. at 35–36. The finding itself was firmly rooted in the record evidence. Amtrak received approvals from the Federal Railroad Administration (a subagency of the Department of Transportation) for the taking and it secured unanimous approval from its Board, on which the Secretary sit as an ex-officio member. *Id.* at 26, 35–36.

In any event, the court has made no final factual determination about the Secretary's approval, and Lender will have every opportunity to prove otherwise following the next round of discovery.

### C. Lender Has Not Raised a Substantial Question as to the Court's Necessity Finding.

Lender also asserts that the court "was simply wrong" when it determined that Amtrak had made the required "necessity" finding under § 24311(a)(1)(A). Lender's Mem. at 14. Lender makes multiple legal and factual arguments in support. It challenges the standard the court used in assessing whether condemnation of the Leasehold Interest was "necessary for intercity rail passenger transportation." Lender's Reply at 6. It also contends that the court "failed to account for how the USRA and similar statutes affected the standard for necessity of Amtrak's taking."

11

Lender's Mem. at 15, 18. Finally, it maintains that the court committed "plain error" when it relied on a concept design of Amtrak's redevelopment plans for Union Station (Plaintiff's Exhibit 10) when making its necessity finding. *Id.* at 18.

*First*, Lender contends that the court should have applied the dictionary definition of "necessary" and determined whether condemning the Leasehold Interest was "essential" for intercity rail passenger transportation, instead of whether there was a "significant relationship" between the two. Lender's Reply at 6. This argument is doubly late. Lender never raised it before and even now it does so for the first time in its reply brief. The argument is also contrary to what Lender has said before. Lender has consistently cited the "significant relationship" test in its papers. *See* Lender's Proposed Findings of Fact and Conclusions of Law, ECF No. 99, ¶ 85; Lender's Opp'n to Amtrak's Mot. for Immediate Possession, ECF No. 83, at 27–28. Having repeatedly forfeited the argument, it cannot be "substantial."

Lender also fails to address a persuasive Second Circuit decision and an analogous Supreme Court decision, neither of which support reading "necessary" to mean "essential." *See* Mem. Op. at 37–38. In *National Railroad Passenger Corp. v. Two Parcels of Land One 1691 Square Foot More or Less*, the court confronted the pre-1994 version of § 24311(a)(1)(A), which required Amtrak to show that acquiring property by eminent domain was "required [for] intercity rail passenger service." 822 F.2d 1261, 1265 (2d Cir. 1987) (quoting 45 U.S.C. § 545(d)(1)(B) (1982)).[1] The court in *Two Parcels* agreed that Amtrak had shown a "significant relationship between the condemned property and the provision of intercity rail passenger service." *Id.* Similarly, in *National Railroad Passenger Corp. v. Boston and Maine Corp.*, the Supreme Court interpreted a since-repealed eminent domain provision under the Rail Passenger Service Act,

---

[1] Congress changed the term "required" to "necessary" as part of the 1994 Act. *See* 49 U.S.C. § 24311(a)(1)(A) (1994). That revision did not work a substantive change to the statute. *See supra* Section III.A.2.

12

45 U.S.C. § 562(d) (1992), which allowed Amtrak to ask the Interstate Commerce Commission to grant it authority to condemn rail property if "required for intercity rail passenger service." 503 U.S. 407, 410–411 (1992).  The Court held that a taking was "required when it is a useful and appropriate way to accomplish [Amtrak's] goals." *Id.* at 419.  In doing so, it rejected a more stringent showing that would "limit[] Amtrak's condemnation authority to property that was necessary, in the sense of indispensable, to Amtrak's operations." *Id.* at 417, 419.  Lender makes no effort to grapple with either of these decisions, let alone try to distinguish them.  And it cites no case that has accepted its more restrictive reading of the "necessity" inquiry.

*Second*, Lender insists that "[t]his Court's failure to consider the USRA and related government directives in its necessity analysis is a serious question of law requiring appellate review." Lender's Mem. at 18.  This argument, too, is new and thus forfeited and, for that reason alone, does not raise a "substantial" question.[2]

Even considering it now, Lender has not demonstrated error.  Lender focuses on Congress's policy statement at the start of the USRA that "the purposes of this Act are to achieve the goals of historic preservation and improved rail use of Union Station with maximum reliance on the private sector and the minimum requirement for Federal assistance." *Id.* at 15 (quoting Pub. L. No. 97-125, 95 Stat. 1667, § 2(7).  Lender is correct that the USRA authorized—though did not require—the Secretary of Transportation to enter into agreements with private entities to rehabilitate and redevelop Union Station, 95 Stat. at 1670, § 115(a), and enter into lease agreements to manage and operate the property, *id.* § 116(b).  It also set out as a goal "[c]ommercial development of the Union Station complex that will, to the extent possible, financially support the continued operation and

---

[2] To be fair, Lender did assert that the USRA implicitly foreclosed Amtrak's taking of Leasehold Interest, and the court did address that argument.  Mem. Op. at 33–34.  Lender did not, however, contend that the court must consider the USRA's policy statements as part of the "necessity" inquiry.

13

maintenance of such complex." *Id.* § 112(c).  But what Lender ignores is that Congress expressly prioritized the USRA's purposes.  It tasked the Secretary with "provid[ing] for the rehabilitation and redevelopment of the Union Station complex *primarily* as a multi-use transportation terminal system serving the Nation's Capital, and *secondarily* as a commercial complex."  *Id.* § 112 (emphasis added).  Thus, to the extent Lender suggests the court should have ignored or discounted Amtrak's stated present and future goals for improving rail passenger service in favor of maintaining Union Station's commercial character, that approach has it backwards.

*Third*, Lender contends that the court committed "plain error" in making its necessity finding when it relied on Plaintiff's Exhibit 10, which were drawings of potential redesigns of Union Station to make it a more passenger-centered facility.  Lender's Mem. at 18.[3]  This argument is misplaced for a host of reasons.  For one, the court did not exclusively rely on Plaintiff's Exhibit 10 to make the necessity finding.  It also considered the "immediate changes" Amtrak wished to make to "enhance the customer experience," the expected acceleration of important capital projects, and "the significance of a post-taking structural change," which would "displace a landlord whose primary commercial interests are misaligned with Amtrak's core missions as a transportation provider."  Mem. Op. at 38, 40.  Moreover, Lender never objected to Exhibit 10, and in fact *Lender* sought its admission into evidence after Amtrak had offered it only as a demonstrative.  *See* Hr'g Tr. at 47, 163 (Sept. 11, 2023).

Defendant also claims that Exhibit 10 does not support necessity because it shows that Amtrak "seek[s] to revert Union Station to a large waiting area for Amtrak customers."  Lender's Mem. at 18.  That description is grossly inaccurate.  Exhibit 10 contemplates a redesign of Union Station that admittedly would prioritize the customer experience, but it also includes areas for retail

---

[3] Lender's Motion incorrectly identifies the exhibit as Exhibit 11.

14

and food offerings (albeit fewer than now), event spaces, and offices for Amtrak crew, police, and support functions. To be sure, Exhibit 10 is a concept design, and the court understood it as such. But it does convey the importance, at least to Amtrak, of reconfiguring Union Station from its present layout to one that would enhance the rail passenger customer experience.

*Finally*, Lender maintains that, even under the "significant relationship" standard the proof fell short. *Id*. at 19. Lender again refers to Amtrak's redevelopment plans as little more than converting Union Station "into a large waiting rooms for their customers," but that description mischaracterizes the entire record. *Id.* Amtrak offered multiple compelling reasons for its condemnation of the Leasehold Interest. Mem. Op. at 38–40. That Lender does not believe them to be justified does not raise a substantial question as the sufficiency of the showing made by Amtrak.[4]

D.     **The Court Did Not Err by Relying on Post-Filing Negotiations.**

Lender further contends that it was "reversible error" for the court to rely on post-filing negotiations when finding, as required by § 24311(a)(2), that Amtrak was unable to acquire the Leasehold Interest through negotiations. Lender's Mem. at 19–20. Lenders cite no authority that barred the court's consideration of post-filing negotiations. Lender merely distinguishes the cases the court cited. *See id.* at 21. The court acknowledges that these cases are not on all fours, but they do illustrate the point that other courts had have relied on post-filing negotiations in condemnation cases. In any event, Lender has offered no principled reason why the court could not rely on post-filing negotiations. Under Lender's approach, the court could have considered

---

[4] In its reply, Lender criticizes the portion of the court's opinion stating that Lender does not "genuinely dispute that there is a 'significant relationship' between the USI Sublease and Amtrak's provision of intercity rail passenger transportation." Lender's Reply at 7 (citing Mem. Op. at 39). Lender says it only conceded that there is a "significant relationship" between the *Union Station property* and intercity rail passenger transportation, not that there is such a nexus between the Leasehold Interest and that objective. *See id.* The court understood that to be Lender's position. The court explained at length why it believed the evidence supported the contrary conclusion. Mem. Op. at 16–23 (¶¶ 23–48), 37–43.

them if, after the parties had reached an impasse, Amtrak had dismissed the complaint and then refiled it the very next day. That result makes little sense.

> E. **The Court Need Not Resolve Whether Its Order is Subject to Interlocutory Review.**

Amtrak also argues that Lender cannot show a likelihood of success because the court's Order is not immediately appealable. Amtrak's Resp. to Lender's Mot., ECF No. 117 [hereinafter Amtrak Opp'n], at 4–8. The court declines to offer an opinion on this issue, as the D.C. Circuit is better suited to consider it in the first instance.

## IV.

To meet the "high standard for irreparable injury," the moving party must demonstrate an injury that is "both certain and great" and must also "show '[t]he injury complained of is of such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm.'" *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)).

Lender identifies five types of irreparable harm: (1) the loss of its property interest in a landmark building, (2) the "carefully-crafted ownership structure of Union Station will be disregarded," (3) its "entire corporate purpose will be undermined, and its existence as a business will assuredly cease," (4) its relationship with vendors will be harmed, and (5) Amtrak may make large-scale and irreversible alterations to Union Station. Lender's Mem. at 24–27. Notably, Lender has offered no evidence in the form of an affidavit, or otherwise, to support any of these claimed harms.

All of them (except perhaps the fifth) can, in a sense, by answered by a single response: the grant of immediate possession is not a final judgment. Lender still may seek to prove that Amtrak's taking of the Leasehold Interest does not satisfy the requirements of § 24311. If that

happens, Lender will resume control of the Leasehold Interest, having suffered harm only temporarily. The same result would obtain if Lender were to convince the D.C. Circuit that the court erred after entry of final judgment, albeit on a longer timeline. Return of the Leasehold Interest, plus compensation for financial losses, presumably would repair any damage suffered by Lender.

In any event, none of the claimed harms, whether considered individually or collectively, is irreparable. *First*, Lender does not articulate how the loss of legal control of the Leasehold Interest during a period of appeal will cause "great" harm. Under Lender's theory, any award of immediate possession of condemned property would be irreparable. That cannot be. Each of the three cases that Lender cites is inapposite because none involve a condemnation, and they all involve injunctions to halt a foreclosure sale or other sale of subject property. *See Shvartser v. Lesker*, 308 F. Supp. 3d 260, 267 (D.D.C. 2018) (injunction granted to halt foreclosure sale); *Patriot–BSP City Ctr. II v. U.S. Bank Nat. Ass'n*, 715 F. Supp. 2d 91, 95–96 (D.D.C. 2010) (same); *Monument Realty LLC v. Wash. Metro. Area Transit Auth.*, 540 F. Supp. 2d 66, 74–75 (D.D.C. 2008) (injunction granted to prohibit sale of property). There is no threat here that Amtrak will turn around and sell the Leasehold Interest.

*Second*, the temporary loss of the status quo ownership structure is not irreparable. Lender fears that Amtrak may negotiate lease modifications that could be contrary to Lender's interests and that Lender could end up stuck with such changes. Lender's Mem. at 26. But Amtrak has represented that "it will not significantly modify the sublease or terminate it in favor of a new sublease before final judgment." Amtrak's Opp'n at 21. That representation mitigates the risk of harm. Moreover, the claimed harm is pure conjecture. Nowhere does Lender specify what such

17

lease modifications would entail or why they could not be reversed if the Leasehold Interest reverted to Lender.

*Third*, Lender's claim that its very existence will be threatened by even a temporary loss of control is simply untrue. Today, Lender can ask the court to release up to $250 million that Amtrak has deposited in the court registry. 49 U.S.C. § 24311(b)(4) ("On application of a party, the court may order immediate payment of any part of the amount deposited in the court for the compensation to be awarded."). Lender may not be able to manage Union Station in the near term, but it easily can avoid going out of business by requesting immediate payment under § 24311(b)(4).

*Fourth*, Lender has not articulated how a temporary loss of the Leasehold Interest would result in an irretrievable loss of good will and reputation with its commercial subtenants. The subtenants have been made aware that Amtrak will be taking control of Union Station's management by court-ordered condemnation. *See* Jt. Status Report, Ex. A, ECF No. 109-1. Lender does not explain how under those circumstances it would lose good will or suffer a loss of reputation if Amtrak were to mismanage the subtenant relationships. Also, such harm is far from "certain."

*Fifth*, Lender fears that Amtrak could make large-scale, potentially irreversible physical changes to Union Station that could impair its commercial interests. Lender's Mem. at 27. Amtrak, however, has represented that it "has no plans to make any immediate permanent or irreversible alterations to the Station." Amtrak's Opp'n at 21. Even if Amtrak sought to make such changes, it would not happen overnight. Amtrak would have to seek the consent of the Federal Railroad Administration, which must approve and license any major improvement projects

at Union Station. Mem. Op. at 18 ¶ 31. Thus, the likelihood that Amtrak will work a radical makeover of Union Station is remote.

## V.

Evaluating the equities requires the court to carefully "balance the competing claims of injury," and to weigh "the effect on each party of the granting or withholding of the requested relief." *Singh v. Berger*, 56 F.4th 88, 96 (D.C. Cir. 2022) (quoting *Winter*, 555 U.S. at 24).

The equities here tip in favor of Amtrak. The harms articulated by Lender are largely commercial and personal in nature. While the court does not discount such injuries, Lender has not shown that temporary loss of the Leasehold Interest would cause it significant hardship.

On the other hand, a stay would delay for months, if not years, Amtrak's plans to improve the rail passenger experience at Union Station. Mem. Op. at 17 ¶ 28, 23 ¶ 49. Amtrak's current leased space, for instance, offers no waiting area and insufficient seating to meet demand. *Id.* at 17 ¶ 28. Amtrak plans to address its space constraints and other problems by "creating temporary seating and waiting areas for passengers, improving 'redcap' services to assist customers, locating Amtrak customer service representatives throughout the station, creating a temporary ticketing area, adding temporary signage to guide passengers, and bolstering security through both Amtrak police and contracted private security." *Id.* at 19 ¶ 38. Indefinitely delaying such improvements will harm both Amtrak and the public.

The court also has considered the harms that might befall sub-tenants at Union Station absent a stay, including lease termination or changes. Amtrak has left open that possibility. Amtrak's Opp'n at 24. Still, the prospects for such action are uncertain, and the court finds it difficult to assess with any degree of precision how many subtenants might be affected by allowing the property transfer to go into effect.

19

The court therefore finds that the balance of equities weighs against staying the Order.

## VI.

As noted, the court believes that the public would benefit from Amtrak's planned improvements at Union Station. Lender contends otherwise. It says that a stay is needed to avoid confusing the public and "harm[ing] the perception of Union Station while its control remains disputed." Lender's Mem. at 22–23. But rail passengers have long given Union Station poor marks for customer experience. Mem. Op. at 17 ¶ 28, 23 ¶ 49. And many people already believe that Amtrak controls the station. *See* Hr'g Tr. at 70:9-14 (Sept. 11, 2023). Lender has not made the case that the public would be harmed by allowing Amtrak to take immediate possession.

Lender also cites an ongoing congressional inquiry into Amtrak's taking of the Leasehold Interest as evidence that the public interest favors a stay. Lender's Mem. at 23. That inquiry informs the public interest, but so too does Amtrak's receipt of the required Executive Branch and Board approvals before moving to condemn the property. Mem. Op. at 32. Ultimately, Amtrak's planned improvements to Union Station to enhance the passenger experience are what tilt the public interest against a stay.

## VII.

Each of the four injunction factors weighs against staying the Order pending appeal. Accordingly, Lender's Motion, ECF No. 116, is denied.

Dated: July 15, 2024

Amit P. Mehta
United States District Court Judge