**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK),<br><br>                Plaintiff,<br><br>    v.<br><br>SUBLEASE INTEREST OBTAINED PURSUANT TO AN ASSIGNMENT AND ASSUMPTION OF LEASEHOLD INTEREST MADE AS OF JANUARY 25, 2007, WITH SAID PROPERTY INTEREST PERTAINING TO DESCRIBED LEASEHOLD INTERESTS AT WASHINGTON UNION STATION LOCATED AT 50 MASSACHUSETTS AVENUE, NE WASHINGTON, D.C. 20002, et al.,<br><br>                Defendants. | Case No. 1:22-cv-01043-APM<br><br>**ORAL ARGUMENT REQUESTED** |

**DEFENDANT USSM'S CONSOLIDATED OPPOSITION TO
MOTION TO DISMISS AND MOTION FOR ENTRY OF A CONSENT ORDER**

Defendant Union Station Sole Member LLC ("USSM") submits this memorandum of law in opposition to the motion to dismiss USSM as a defendant in this action [ECF No. 168] (the "Dismissal Motion") and the motion for entry of a consent order [ECF No. 167] (the "Consent Order Motion" and, together with the Dismissal Motion, the "Motions").

## PRELIMINARY STATEMENT

Since the onset of the COVID-19 pandemic, Lender, along with its predecessor in interest and certain conspiring investors, has sought to steal the equity in the Union Station leasehold from USSM and its affiliates. Unsuccessful in doing so before this action was filed (and rights to condemnation proceeds fixed by law), Lender initiated a litigation in New York (the "New York Action")[1] to preemptively cut USSM out of this case. But that action remains pending, and the New York court previously noted that it was unlikely to award Lender a "windfall" (*i.e.*, any amount over the amount of the accrued debt and interest) from the condemnation award.[2] Since its efforts to quickly win the New York Action were rebuffed, Lender has now agreed to an egregiously low settlement of this case which pays off Lenders' debt, but cuts USSM out of any recovery from Amtrak's private deal with Lender. Not only that, but Amtrak (presumably at Lender's urging) moves to dismiss USSM from the case entirely to avoid having to litigate the actual value (and USSM's likely recovery of hundreds of millions of dollars in equity) of the property. USSM was entirely excluded from the settlement talks giving rise to the deal and was

---

[1]   *Daol Rexmark Union Station LLC, et al. v. Union Station Sole Member LLC*, Case No. 1:22-cv-06649-GHW (S.D.N.Y.)

[2]   In the New York Action, the court remarked that "I think that my hope is that the parties—-and in particular the lender—-will be thinking about the extent to which retaining the full condemnation proceeds is I'll call it a windfall and whether or not the parties should be talking about a way to potentially resolve how to deal with any potential proceeds that exceed the principal and accrued interest on the loan." *See* Ex. 5 at 33:17-23.

1

unaware they were ongoing until Amtrak's counsel blindsided USSM with a request to consent to the Dismissal and Consent Order Motions last week. But, all of these efforts should be rebuffed, the Motions should be denied, and this action should proceed to trial.

First, Amtrak seeks to dismiss USSM from this case on the basis that it never was the title owner of the Union Station leasehold. But that was not the basis on which Amtrak joined USSM as a necessary party, nor is it now the relevant inquiry for determining who is a proper party and whether that party is due a share of the condemnation award. Amtrak also ignores relevant precedent from around the nation permitting parties like USSM— with a contractual interest in the condemnation award and equitable right to recovery as of the date of the condemnation's filing—to participate and share in a condemnation award. As the sole owner of USI on the date of condemnation, USSM is a proper party in interest in this condemnation and is entitled to have a trial on valuation and an award of just compensation.

In addition, this Court previously encouraged Lender and USSM to have their respective rights in this property determined by another court. The New York action is presently pending before Judge Woods with a fully briefed summary judgment motion *sub judice*. Though USSM submits that its standing and right to just compensation in this case are beyond valid dispute, the Court should also consider deferring a determination of the issues lest it risk an inconsistent ruling and treading on issues presently before Judge Woods.

Second, Amtrak and Lender ask the Court to rubber stamp a settlement setting the value of the Union Station leasehold at approximately $500 million. This settlement was negotiated without USSM and, thus, is not authorized under the Loan Agreements. Moreover, the value of this deal makes plain that Lender's sole motivation is to cut USSM out of the agreement and pay itself off. The Court should not countenance this gamesmanship, especially where the Court is

being asked to sign on to a "settlement" which deprives USSM of potentially hundreds of millions of dollars. This purported settlement is the opposite of "just compensation" — when this action was filed, Amtrak represented that the just compensation amount was $250 million, and the revised appraisal it recently served did not meaningfully increase that amount. And yet Amtrak now wants the public to spend over $500 million of its money to purchase the leasehold. At the same time, less than three months ago, Lender testified that the value is at least $200 million greater than the settlement amount — a value between $700 million and $1 billion. Significantly, that testimony is supported by independent third-party appraisals before this action was filed, including one received by Lender in late 2021. And yet Lender now purports to accept $505 million in total which robs USSM of its hundreds of millions of dollars in equity above that figure under Lender's own estimate of value.[3] The settlement tries to sweep all of this under the rug in a simple dismissal motion and hopes the Court and the public won't notice.

As set out herein, the Dismissal Motion and the Consent Order Motion each should be denied.

## ARGUMENT

### I. THE DISMISSAL MOTION SHOULD BE DENIED

#### A. USSM Had, And Has, An Interest In This Action

Amtrak's sole argument for dismissal of USSM from this proceeding is that USSM no longer has, or never had, any ownership interest in the Union Station leasehold Amtrak seeks to

---

[3] Because Amtrak and Lender have not made their settlement agreement public, and because USSM was not included in or notified about these discussions, USSM cannot be sure this number is accurate. In particular, neither Amtrak nor Lender discloses whether Lender is retaining the revenue it (or USI under its control) received during the period Amtrak owned but did not operate Union Station (from the date of the condemnation filing through this court's order granting immediate possession).

3

condemn here. *See* Dismissal Motion at 7. Amtrak also takes the position, but cites no support for, the proposition that USSM *never* had an interest in this case at all. *Id*. Both are wrong. While Amtrak recites that proper parties to a condemnation with "either a legal or equitable interest in the property may share in the condemnation award" it makes no attempt to argue that USSM possesses no such rights here or that USSM did not have such rights when this action was filed and without regard for subsequent actions, as the law requires. Dismissal Motion at 6 (citing *State v. Lee,* 163 Wash. App. 1007, 2011 WL 35030203, at *3 (2011)). Nor does Amtrak examine the contracts governing the rights of USI, USSM, and Lender, and which address who is entitled to share in the condemnation award or to negotiate any settlement. As set out below, USSM has, and had at the beginning of this case, both legal and equitable rights to participate in this case. Accordingly, Amtrak's Dismissal Motion does not carry its burden to show that USSM has no rights to participate here whatsoever, and the facts and the law demonstrate just the opposite.

     As an initial matter, the Dismissal Motion repeatedly references events that took place after this action was initiated, including the putative foreclosure sale of USSM's interests in USI after this condemnation action was filed—a course of conduct unprecedented and not discussed in any published court decisions of which USSM is aware—and the resulting, if valid, change in corporate ownership of USI. *See* Dismissal Motion at 4-5, 9. But the law is clear that those actions are irrelevant to the Court's determination here. No less than the United States Supreme Court has repeatedly reaffirmed that the payment of a just compensation award is treated "as if it had been 'paid contemporaneously with the taking.'" *Knick v. Twp. of Scott*, 588 U.S. 180, 190 (2019) (quoting *Jacobs v. United States*, 290 U.S. 13, 17 (1933)); *Danforth v. United States*, 308 U.S. 271, 284 (1939) ("For the reason that compensation is due at the time of taking, the owner

4

at that time, not the owner at an earlier or later date, receives the payment."); *see also Barron v. United States*, 174 Fed. Cl. 114, 121 (2024) (holding that courts must determine ownership as of the date of the taking—not later—to assign and distribute the just compensation award). And the statute pursuant to which Amtrak brings this action also confirms that the rights to the award here vested, including in USSM, at the beginning of this case. *See* 49 U.S.C. § 24311(b)(2) ("When the declaration is filed and the deposit is made under paragraph (1) of this subsection, title to the property vests in Amtrak in fee simple absolute or in the lesser interest shown in the declaration, and ***the right to the money vests in the person entitled to the money***." (emphasis added)).

Actions that occurred after the date of taking (here, April 14, 2022) cannot and do not alter which parties are entitled to share in the condemnation award.[4] While Amtrak argues otherwise, the cases Amtrak cites in its Dismissal Motion support USSM's argument here. *See Mt. Valley Pipeline, LLC v. Easements to Construct, Operate & Maintain a Nat. Gas Pipeline Over Tracts of Land in Giles Cty.*, No. 17-cv-00492, 2020 WL 2840165, at *3 (W.D. Va. June 1, 2020) (cited at Dismissal Motion at 9) (dismissing later joined party to whom the owner at the time of condemnation sold the property after the condemnation action began; prior owner, not current owner was owed compensation).

Amtrak also is wrong that the only proper parties to a condemnation action are the legal title owners of the property being condemned and that USSM must be dismissed because it was

---

[4] For this reason, Amtrak's citations to purported "admissions" from USSM's Rule 30(b)(6) deposition have no impact on USSM's entitlement to participate in this case or to collect its portion of the condemnation award. *See* Dismissal Motion at 3-5. Whether changes to the structure of the entities involved in the ownership and operation of Union Station occurred has no impact on who was vested with rights when this action was filed. *See Danforth*, 308 U.S. at 284; *Barron*, 174 Fed. Cl. at 121.

5

merely the owner of USI. Motion at 7-9. The principal case that Amtrak cites for this assertion, *Port of Grays Harbor v. Bankr. Est. of Roderick Timber Co.*, 73 Wash. App. 334 (1994), does not support that conclusion. In *Grays Harbor* a shareholder of the bankrupt entity whose property was the subject of the proceeding sought attorney's fees. *Id*. at 339-40. The court held that the bankruptcy trustee was a party to the condemnation and, by law "it [was] the trustee's duty to protect the interests of the 'entire community of interests in the corporation – creditors as well as stockholders" (citation omitted), which included the shareholders of the owner who sought to participate in the proceeding. *Id*. Thus, far from not being entitled to participate in the condemnation, the *Grays Harbor* court found that the shareholders of the property owner were already represented in the case. *Id*. By contrast, USSM is not represented in this action by any other party. Were that not enough, to the extent *Grays Harbor* can be read to exclude shareholders of a property owner from participating in a condemnation, the Washington Supreme Court later limited the rule to the context in the case—an application for attorney's fees, not substantive participation in the condemnation action. *See Pub. Util. Dist. No. 1 of Okanogan Cnty. v. State*, 182 Wash. 2d 519, 530 (2015).

Other cases bolster the unsurprising proposition that shareholders of the entities that own the property at the time of taking have a protectable interest in the condemnation or in any *in rem* proceeding about the subsidiary owner's property. *Jacobucci v. Dist. Court of Jefferson*, 189 Colo. 380, 388 (1975) (shareholders of Colorado water company were real party in interest in condemnation action, not only the company, because the rights to use water vested in individual shareholders); *see also Rambo v. United States*, 117 F.2d 792, 794 (5th Cir. 1941) (rejects intervention by shareholders of dissolved corporation that owned the condemned property, because they were already represented by the receiver of the corporation in the litigation).

6

There are further reasons to deny the Dismissal Motion as a matter of law. Courts routinely allow parties who are not the legal owners of condemned property to participate in a condemnation action and to share in the condemnation award. Indeed, parties whose connection to the condemned property is a contract or use of the land absent ownership are routinely permitted to join. *See, e.g.*, *Dep't of Transportation v. McMeans*, 294 Ga. 436, 438 (Ga. 2014) (owners of business located on condemned land, not owner of property, was properly a party to condemnation to seek compensation); *Transcon. Gas Pipe Line Corp. v. Calco Enterprises*, 132 N.C. App. 237, 243 (N.C. 1999) (month-to-month tenant, who leases from SPV created for the purpose of leasing the property, had standing to challenge the exercise of eminent domain); *State, by Com'r of Transp. v. Jan-Mar Inc.*, 210 N.J. Super. 236, 245 (Law. Div. 1985) (tenant with option to purchase leasehold interest has standing to participate at the hearing to value condemned leasehold interest and could submit evidence of value of the unexercised option to purchase.); *United States v. Detroit Int'l Bridge Co.*, 7 F.3d 497, 499-503 (6th Cir. 1993) (permitting intervention in condemnation action of adjoining landowner).

Were Amtrak correct that only the legal title owners of the condemned property could be parties to a condemnation action, Lender would not be permitted to be a party here. *Shavers v. Duval Cnty.*, 73 So. 2d 684, 687 (Fla. 1954) ("[A] mortgagee of lands sought to be condemned cannot be held to be an 'owner.'").

USSM plainly has a sufficient legal and equitable interest in this action. It is undisputed that, as of the filing of this action on April 14, 2022, USSM was the sole owner of USI, both of which entities were controlled and operated by affiliates of Ashkenazy Acquisition Corporation ("AAC"). Lender had a lien on the leasehold and on USSM's interest in USI through a mortgage and mezzanine loan respectively. *See* Ex. 1 [Mortgage Loan Agreement] Sec. I. Definition of

7

Security Instrument; Definition of Land]; Ex. 2 [Mezzanine Loan Agreement] Sec. I, Definition of Collateral, Pledge Agreement. From the structure of the contracts governing those loans, proceeds of this action flow first to USI to pay any amounts due on the mortgage loan for which USI is the borrower and second to USSM to pay any amounts due on the mezzanine loan for which USSM is the borrower. *See* Ex. 1 at Sec. 5.2.2; Ex. 2 at Sec. 5.2.2.

Were it otherwise, the provision of the Mezzanine Loan Agreement providing that proceeds of a condemnation of the leasehold must be used to pay off the mezzanine loan would have no force or effect. *Muzak Corp. v. Hotel Taft Corp.*, 1 N.Y.2d 42, 46 (1956) ("The rules of construction of contracts require us to adopt an interpretation which gives meaning to every provision of a contract or, in the negative, no provision of a contract should be left without force and effect.").[5] In other words, by contract, USSM has a direct legal interest in the proceeds of this action because any amount over the Mortgage and Mezzanine Loan debts will be property of, per the Loan Agreements, USSM.

Section 5.2.2 of the Mezzanine Loan Agreement also provides that "if the Property [*i.e.* the Leasehold interest], is sold through foreclosure or otherwise, prior to the receipt by Lender [*i.e.* the Mezz Lender] of the Award [i.e. the condemnation award], Lender shall have the right . . . to receive the Award or a portion thereof *sufficient to pay the Debt in full*. USSM is contending in the New York Action that this provision limits the Lender's recovery to the amount of its debt and that *USSM is entitled to any excess*. Ex. 3 at 23-25.

But that is not the full extent of USSM's interest as of the date of the taking. As of the date of the condemnation here, USSM, through AAC, operated Union Station. While USI holds the leasehold, AAC and its employees managed the station or contracted with others (including

---

[5] The Loan Agreements are governed by New York law. *See* Ex. 1-2 at Sec. 11.3.

8

Jones Lang LaSalle Americas, Inc., the limited scope property manager) to run the station. Ex. 6. As stated above, running a business on condemned property also gives a party a legal or equitable right to participate in and receive a share of a condemnation award. *McMeans*, 294 Ga. at 438.

Finally, USSM has an equitable interest in the property and proceeds of this action. As explained more fully in USSM's briefing in the New York Actions, that Lender has any interest at all now is the result of Lender's tortious, bad faith acts including its failure to approve an investment of new capital into Union Station (prior to the condemnation) that would have brought the Mortgage and Mezzanine Loans current and would have provided for funds for continuing operation of Union Station during the throes of the COVID-19 pandemic.[6] *See* Ex. 3 at 13-20. But, as set out in those papers, Lender's failure to approve the transaction was just one component of a yearslong effort by this Lender and its predecessors to steal the equity in Union Station, which wrongful, inequitable conduct continues through this exclusionary self-dealing settlement. USSM, at a minimum, has an equitable right against Lender and Amtrak to receive its share of the condemnation award, which otherwise will almost certainly flow only to Lender and its affiliates.[7]

---

[6] As more fully described in Exhibit 3, the investment—agreed to be made by the world's largest sovereign wealth fund—valued the Union Station leasehold at more than $700 million and was supported by a $100 million cash deposit. Ex. 3 at 4.

[7] In addition, while Amtrak has now agreed to a valuation of Union Station around $500 million, at the outset of this case, Amtrak asserted that the leasehold was worth just $250 million, and, prior to the present motions, it has never indicated that its position changed. *See* Declaration of Taking, ECF No. 4, at ¶ 5. Had Amtrak provided a more reasonable valuation of the property when this action was filed, when USSM controlled USI, it is highly possible that litigation could have been avoided entirely. Amtrak certainly has no credibility now, when it tries to force through a settlement that is twice the amount Amtrak says is just. Amtrak's gamesmanship plainly is not just.

9

### B. Alternatively, the Court Should Wait to Make any Determination Until a Decision in the New York Action

Alternatively, the Court can stay any decision on the Dismissal Motion (and, by extension, the Consent Order Motion) until these issues, which are *sub judice* in the New York Action, are resolved.

In the New York Action, Lender seeks a declaration that USSM is not entitled to share in the condemnation award entered by this Court. USSM opposes that relief. *See* Ex. 3. The issue has been joined in a summary judgment motion filed by Lender and the motion has been *sub judice* since briefing was completed in June 2024. Since the issue was first presented to the New York court overseeing the New York Actions, it may be appropriate—including to avoid potential conflicting orders—to wait for a decision there before entertaining these motions. Amtrak's appeals to "expedite" the decision here are of little moment where there is no prejudice to it: Amtrak currently operates Union Station. Neither Amtrak nor Lender provide any reason why after nearly three years of litigation, the Court must rush a decision now that only has monetary consequences that plainly prejudices USSM. *See Florida v. United States*, 820 F. Supp. 2d 85, 91 (D.D.C. 2011) (holding that the timeline "belies [movants'] contention that expedition of this action is essential . . . . At this point . . . [movants'] schedule will unfairly prejudice the opposing parties").

Indeed, waiting for resolution of the New York Action on this point is exactly what this Court previously indicated would be prudent. When this case was filed there was a dispute regarding the validity of the unprecedented Mezzanine foreclosure following condemnation and control of USI. The Court advised the parties that those issues were not properly before it and urged the Lender and USSM to seek resolution of their respective claims in a separate action. *See* Transcript of July 21. 2022 Conference [ECF No. 78] at 14-18, 21-22. As a result, the

10

Lender filed the New York Action where the issues articulated by the Court at the July 21, 2022 conference are now *sub judice*.

## II.     THE CONSENT ORDER MOTION SHOULD BE DENIED

Neither Amtrak nor Lender has provided grounds for the Court to enter the proposed Consent Order other than a generic appeal to the value of settlement. However, even that interest is lost if USSM, as a separate party with a protectable interest, is not included in the proposed settlement. Thus, the proposed Consent Order should be denied. Moreover, the Consent Order, and the process through which it was reached, suffers from substantive flaws, meriting denial of the Consent Order Motion on those grounds as well.

First, Lender, in its capacity as mortgage lender, does not, as it claims, have actual exclusive authority to settle this action without USI and USSM.[8] In support of this broad power grab, Lender cites a provision of the Loan Agreement that grants it a limited power of attorney to "to collect, receive and retain any [Condemnation] Award and to make any compromise or settlement in connection with any Material Condemnation." *See* Ex. 1-2 at Sec. 5.2.2. The provision is deceivingly simple but it has no application in a case such as this where the mortgage lender is being paid in full and has no interest in seeking a higher settlement that would benefit other parties. Moreover, every court that has considered similar provisions has disagreed with Lender's assertion of exclusive authority and has found that such provisions require consent from the parties who would benefit from a higher settlement value to resolve a condemnation and Lender does not have any "exclusive" authority beyond first priority payment to satisfy the

---

[8]     Lender did not make this argument in favor of the Consent Order Motion—indeed, no such arguments in favor were made by anyone—but raised it only in opposition to USSM's request for an extension of time to respond to the Dismissal and Consent Order Motions. *See* Joint Opposition to Motion for Extension of Time [ECF No. 172] at 2.

11

debt. *See JPMCC 2006-CIBC14 Eads Parkway, LLC v. DBL Axel, LLC*, 977 N.E.2d 354, 362 (Ind. Ct. App. 2012) (holding that identical language does not grant rights but simply "describes the lender-borrower relationship in the event of a government taking;" neither lender nor borrower becomes the other's "representative" for the purpose of the condemnation); *In re Olde Prairie Block Owner, LLC*, 452 B.R. 687, 693 (Bankr. N.D. Ill. 2011) (substantially similar provision; finding "[u]nder agreement of the parties quoted earlier, Debtor had a perfect right to engage . . . negotiations [without the lender's involvement]."), *order amended on reconsideration* 460 B.R. 201 (Bankr. N.D. Ill. 2011); *see also City of Englewood v. Exxon Mobile Corp.*, 406 N.J. Super 110, 118 (N.J. App. Div. 2009) ("A total taking under eminent domain changes the interests of the parties to the mortgage . . . the condemnation award is a substitute for the land when all or part of the mortgaged land is taken for public use . . . . If the entire property subject to the mortgage is condemned, the mortgage is entitled to [as much of the award] as necessary to satisfy the mortgage debt."). Because USSM was excluded from the settlement process and is not a party to the Consent Order Motion, Lender has violated this provision of the Loan Agreements requiring USSM's involvement.

Second, the settlement amount in the Consent Order is egregiously low and raises inferences of bad faith by Lender and/or Amtrak. Since the beginning of this case, Amtrak has stated the value of the Union Station leasehold is approximately $250 million, ECF No. 4, at ¶ 5, and recently submitted expert reports supporting a similar valuation. But now, it has agreed to pay nearly double that to settle this action. As Lender has argued throughout this proceeding, this about-face strongly suggest that Amtrak's original valuation was not a reasonable or good faith estimate of the property's value and that this action was not initiated in good faith. On the other hand, Lender's conduct is two-faced and unlawful. During discovery, Lender's corporate

12

representative testified that the Union Station leasehold was worth between $700 million and $1 billion.  *See* Ex. 4.  Lender has provided no basis—and there is no valid one—for so drastically departing from that valuation.  The real reason, likely, is that Lender, but no one else, will be made whole by this Consent Order.  While Lender has not provided a calculation of the amount due on the Mortgage and Mezzanine Loans (leaving aside the parties' dispute about the effect of the Mezzanine Loan foreclosure and whether the loan still exists), the settlement amount likely pays Lender slightly more than all of the amounts (including interest) outstanding.  *See* Ex. 1-2 at Definitions of Loan, Mortgage Loan and Mezzanine Loan (total original principal on the loans combined is $430 million).  USI, which is controlled by Lender, has no reason to seek a higher price.  By seeking to dismiss USSM from this action, despite its indisputable interest in the amount above the debt (as described above), Amtrak and Lender seek to have the Court endorse an order that would otherwise never be possible, since the record makes clear that none of the settling parties actually believe in the amount of "just compensation" they have agreed to, and that amount is obviously not just compensation to USSM.

       Third, there is no compelling reason for any hasty or hurried consideration as requested by Amtrak and the Lender.  In fact, their request for expedited treatment should raise concerns with the Court.  The Consent Order for the settlement is solely a monetary matter that has no bearing whatsoever on the operation of Union Station.  Amtrak already possesses and controls the station.  There is no prejudice to any party from giving this issue careful and thorough consideration.  No expeditious decisions regarding the settlement are necessary or appropriate.

       Other than the possible impact of the change in administration in Washington D.C., the timing of the settlement is very curious, especially Lender's agreement, given that Lender's valuation of the leasehold—sure to show a value in line with Lender's corporate representative's

13

testimony—would have been due this week if not for the putative settlement. Similarly, it is unclear why Lender also does not wish to wait for the New York Action to be resolved. Potentially, it is because the New York court has already indicated an unwillingness to award Lender a "windfall" by keeping all of the proceeds of this action, implicitly agreeing with USSM's interest here. *See* Ex. 5 at 33:17-23 ("I think that my hope is that the parties—-and in particular the lender—-will be thinking about the extent to which retaining the full condemnation proceeds is I'll call it a windfall and whether or not the parties should be talking about a way to potentially resolve how to deal with any potential proceeds that exceed the principal and accrued interest on the loan.").

These reservations about the settlement, along with Amtrak's and Lender's failure to provide any substantive defense of it in the Consent Order Motion, merit denial of the Consent Order Motion separate and apart from USSM's rights in this case.

## CONCLUSION

For the reasons stated herein, the Court should deny the Dismissal Motion and the Consent Order Motion. The Court should re-set the deadlines for the completion of discovery and trial preparation and should, to the extent the Court believes it to be fruitful, order the parties to collectively discuss settlement of this case anew.

DATED: February 14, 2025

                                                           Respectfully Submitted,

                                                           KASOWITZ BENSON TORRES LLP

                                                           /s/ *David E. Ross*

                                                           David E. Ross (*admitted pro hac vice*)
                                                           David J. Mark (*admitted pro hac vice*)
                                                           Daniel J. Koevary (*admitted pro hac vice*)
                                                           1633 Broadway
                                                           New York, NY 10019

Telephone: (212) 506-1700
dross@kasowitz.com
dmark@kasowitz.com
dkoevary@kasowitz.com

ARENTFOX SCHIFF LLP
James H. Hulme
1717 K Street, NW
Washington, D.C. 20006
Telephone: (202) 857-6000
james.hulme@afslaw.com

*Attorneys for USSM*

15