# EXHIBIT 3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

DAOL REXMARK UNION STATION LLC
and KOOKMIN BANK CO., LTD., in its
capacity as trustee of KTB CRE DEBT FUND
NO. 8, a Korean Investment Trust, by its agent
in Korea DAOL FUND MANAGEMENT CO.
and by its agent in United States REXMARK
HOLDINGS LLC d/b/a REXMARK,

               Plaintiffs,

    v.

UNION STATION SOLE MEMBER, LLC,

               Defendant.

Case No. 1:22-cv-06649-GHW

## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

KASOWITZ BENSON TORRES LLP

David E. Ross
David J. Mark
Daniel J. Koevary
Andrew W. Breland
1633 Broadway
Tel.: (212) 506-1700

*Attorneys for Defendant Union Station Sole Member LLC*

### **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT .................................................................................... 1

FACTUAL BACKGROUND AND DISPUTED MATERIAL FACTS........................ 3

ARGUMENT .................................................................................................................. 7

    I.     LENDER IS BARRED BY THE PLAIN LANGUAGE OF THE LOAN AGREEMENT FROM PURSUING ITS PUTATIVE FORECLOSURE SALE AFTER THE CONDEMNATION ACTION WAS FILED ...................... 7

    II.    LENDER'S INEQUITABLE CONDUCT BARS THE AFFIRMATIVE RELIEF IT SEEKS HERE................................................................................... 13

          A.    USSM May Assert Equitable Defenses .................................................... 13

          B.    Lender Took The Mortgage Loan Subject To The Prior Lender's Defects ...................................................................................................... 16

          C.    Questions Of Fact Remain About USSM's Defenses............................... 17

               1.    The Original Mortgage Loan Lender Prevents A Refinancing And Repayment Of The Mezzanine Loan ................................... 18

               2.    Plaintiffs Interfere With The Management Of The Property........ 20

    III.    LENDER'S RECOVERY IS LIMITED BY SECTION 5.2.2 OF THE LOAN AGREEMENT ............................................................................... 23

CONCLUSION.............................................................................................................. 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adler v. Penn Credit Corp.*,
   No. 19-CV-7084 (KMK), 2022 WL 744031 (S.D.N.Y. Mar. 11, 2022) ...............................20

*Alto v. Sun Pharm. Indus., Inc.*,
   2021 WL 4803582 (S.D.N.Y. Oct. 13, 2021) ........................................................................11

*Bank of China v. Chan*,
   937 F.2d 780 (2d Cir. 1991).....................................................................................................18

*Beal Sav. Bank v. Sommer*,
   10 Misc. 3d 1062(A), (Sup. Ct. N.Y. Cty. 2005),
   *aff'd*, 29 A.D.3d 388 (1st Dep't 2006),
   *aff'd*, 8 N.Y.3d 318 (2007)......................................................................................................12

*Cognetta v. Bonavita*,
   330 F. Supp. 3d 797 (E.D.N.Y. 2018) .....................................................................................14

*Consol. Risk Servs., Inc. v. Auto. Dealers WC Self Ins. Tr.*,
   No. 1:06-CV-871, 2010 WL 2735701 (N.D.N.Y. July 9, 2010) ......................................19, 21

*Diematic Mfg. Corp. v. Packaging Indus., Inc.*,
   516 F.2d 975 (2d Cir. 1975).....................................................................................................13

*Dogwood Assocs., L.P. v. Douglas Elliman-Gibbons & Ives, Inc.*,
   No. 91 CIV 7895 (JFK), 1993 WL 361655 ..............................................................................17

*In re Enron Corp.*,
   No. 01-16034 (AJG), 2005 WL 3873890 (Bankr. S.D.N.Y. June 16, 2005) .........................15

*Evans Prod. Co. v. Decker*,
   52 A.D.2d 991 (3d Dep't 1976) ...............................................................................................10

*Franklin v. Krueger Int'l, Inc.*,
   1997 WL 691424 (S.D.N.Y. Nov. 5, 1997)..............................................................................14

*Gulfstream Aerospace Corp. v. Mayacamas Corp.*,
   485 U.S. 271 (1988)............................................................................................................13, 15

*Hunte v. Rushmore Loan Management Services, LLC*,
   2024 WL 1076683 (S.D.N.Y. March 11, 2024) ......................................................................17

*Incredible Foods Grp., LLC v. Unifoods, S.A. de C.V.*,
  No. 14-CV-5207 (KAM)(JO), 2015 WL 13742422 (E.D.N.Y. Oct. 2, 2015) ........................16

*Int'l Multifoods Corp. v. Com. Union Ins. Co.*,
  309 F.3d 76 (2d Cir. 2002) ........................................................................................12

*JPMCC 2006-CIBC14 Eads Parkway, LLC v. DBL Axel, LLC*,
  977 N.E.2d 354 (Ind. Ct. App. 2012) .............................................................................8

*Knick v. Twp. of Scott, Pennsylvania*,
  588 U.S. 180 (2019) ..................................................................................................24

*Leeber Realty LLC v. Trustco Bank*,
  No. 17-CV-2934 (KMK), 2019 WL 498253 (S.D.N.Y. Feb. 8, 2019),
  *aff'd*, 798 F. App'x 682 (2d Cir. 2019) ........................................................................20

*N. Star IP Holdings, LLC v. Icon Trade Servs., LLC*,
  No. 22-CV-7324, 2024 WL 36978 (S.D.N.Y. Jan. 3, 2024) ...............................................15

*Nomura Home Equity Loan, Inc., Series 2006-FM2 v. Nomura Credit & Capital, Inc.*,
  30 N.Y.3d 572 (2017) ................................................................................................10

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*,
  324 U.S. 806 (1945) ..................................................................................................17

*Prudential Ins. Co. of Am. v. S.S. Am. Lancer*,
  870 F.2d 867 (2d Cir. 1989) ......................................................................................25

*Rajic v. Faust*,
  165 A.D.3d 716 (2d Dep't 2018) .................................................................................14

*Renaissance Complex Redevelopment Corp. v. Renaissance Assocs.*,
  255 A.D.2d 274 (1st Dep't 1998) ................................................................................24

*Rosenberg v. Allen*,
  258 F. Supp. 511 (S.D.N.Y. 1966) ...............................................................................20

*U.S. Bank Nat. Ass'n v. Rich Albany Hotel, LLC*,
  42 Misc. 3d 1201(A), 983 N.Y.S.2d 207 (N.Y. Sup. Ct. 2013) .........................................9

*In re U.S. Lines, Inc.*,
  318 F.3d 432 (2d Cir. 2003) .......................................................................................16

*Walsh v. Ocwen Loan Servicing, LLC*,
  217 A.D.3d 802 (2d Dep't 2023) ................................................................................15

*Yang v. Kosinski*,
  960 F.3d 119 (2d Cir. 2020) .......................................................................................16

**Statutes**

49 U.S.C. § 24311(b)(2) ................................................................................................7

**Other Authorities**

Charles A. Wright & Arthur R. Miller, 10B Fed. Prac. & Proc. § 2758 (4th ed.) .....................15

Defendant Union Station Sole Member LLC ("USSM") respectfully submits this memorandum of law in opposition to the motion for summary judgment (the "Motion") filed by Plaintiffs Daol Rexmark Union Station LLC ("Daol") and Kookmin Bank Co., Ltd. ("Kookmin" or "Lender").

## PRELIMINARY STATEMENT

Plaintiffs' Motion seeks judicial approval, on a limited and incomplete record, of its pattern of predatory, fraudulent, and manipulative efforts. This effort should fail.

Discovery has revealed that for more than two years after the onset of the COVID-19 pandemic Plaintiffs, through their representatives and agents, sought to take advantage of the pandemic to wrest control of Union Station in Washington, D.C. from USSM and its affiliates. Originally, Plaintiffs worked with third-parties to accomplish this goal, but following Plaintiffs' purchase of the Mortgage Loan on Union Station in 2022, Plaintiffs pursued this plan on their own. Now, Plaintiffs seek to have this Court endorse their improper conduct and declare that USSM has no rights whatsoever in the Station.

This action concerns loans taken out by USSM and its affiliate Union Station Investco LLC ("USI") in connection with a leasehold interest in Union Station. The two loans—a Mortgage Loan for $330 million and a Mezzanine Loan for $100 million—were made in 2018 by, respectively, an entity affiliated with Citibank and Kookmin (the "Mortgage Loan Lender" and "Mezzanine Loan Lender").[1] Plaintiff Kookmin acquired the Mortgage Loan in 2022 and became the sole lender.

---

[1]     The Mortgage Loan subsequently was securitized and the "lender" for the Mortgage Loan became the securitization trustee, acting through its servicers.

This case arose out of a putative foreclosure sale on the Mezzanine Loan conducted by Plaintiffs in May 2022. The foreclosure sale followed closely the filing of a condemnation action in federal court in Washington, D.C. whereby the National Passenger Railroad Administration ("Amtrak") seized the leasehold interest in Union Station (the "Condemnation Action"). That action remains pending. In this action, Plaintiffs seek an affirmative declaration that USSM has no interest in Union Station following the foreclosure and barring USSM from any participation in a condemnation award from the D.C. court.

Plaintiffs' claims are not ripe for adjudication on summary judgment as numerous questions of material fact remain, and Plaintiffs' legal entitlement to judgment is not established.

First, as USSM argued in connection with Plaintiffs' motion for a preliminary injunction, the Loan Agreements and other loan documents (the "Loan Documents") did not permit Plaintiffs to foreclose on the Mezzanine Loan after the Condemnation Action was filed. In short, the Mezzanine Loan Agreement specifically provides for both the Mezzanine Lender's and USSM's rights and remedies after the effectiveness of a condemnation. Foreclosure is not provided for there and, thus, was not available to Plaintiffs.

Second, even if the foreclosure was permitted, Plaintiffs are not entitled to equitable relief in this case—which is what they seek. The law is clear that the declarations Plaintiffs seek are equitable. Thus, USSM can raise equitable defenses in response. Among those, USSM has alleged that Plaintiffs' relief is barred by unclean hands, bad faith, and equitable estoppel. The pattern of fraudulent behavior and plot to steal equity in the station recounted below and in USSM's Rule 56.1 Counterstatement raises numerous questions of fact as to Plaintiffs' entitlement to any relief.

Finally, even if the Court is inclined to grant some relief to Plaintiffs, Plaintiffs' Complaint seeks a windfall—receipt of all of any condemnation award in the Condemnation Action. The Loan Agreement does not provide for this and, in fact, makes clear that USSM is entitled to excess of that award over the amount of the Mortgage and Mezzanine Loans.

For the reasons set out herein, Plaintiffs' Motion for Summary Judgment should be denied.

## **FACTUAL BACKGROUND AND DISPUTED MATERIAL FACTS**

USSM respectfully refers the Court to its Local Rule 56.1 Objections and Counter-Statement of Material Facts ("CS") submitted herewith for its responses to Lender's Statement of Undisputed Facts and a recitation of additional material facts that are in dispute. However, as this case turns on a pattern of inequitable and fraudulent conduct pursued by Plaintiffs and their predecessor-in-interest, Plaintiffs provide here a summary of certain facts revealed in discovery material to this Opposition.

As with other retail and transportation sites around the country, the COVID-19 pandemic had a severe impact on Union Station. Prior to the pandemic, USSM and USI were current on all of their obligations under the Loan Documents, including their payment obligations. CS ¶ 346. However, Union Station's business was devastated by the pandemic. Among other things, lockdowns and travel restrictions led to an enormous reduction in the number of travelers, shoppers, and other visitors to Union Station beginning in March 2020. CS ¶ 347. That systemic shock caused a substantial decrease in USI's and USSM's revenue. CS ¶ 347. This drastic decline in revenue, in turn, affected USI's and USSM's ability to make payments on the Loans. CS ¶ 347. Beginning with a payment due on or before May 9, 2020, Borrowers were unable to make full monthly debt service payments on either the Mortgage Loan or the

Mezzanine Loan. CS ¶ 348. Thereafter, USI, USSM, and the then-existing lenders entered into extensive negotiations and forbearance agreements. CS ¶ 349.

In December 2020, an affiliate of USSM entered into an agreement with a large and well-capitalized sovereign wealth fund ("Investor"), providing for the Investor to purchase an ownership stake in an affiliate of USSM, in exchange for capital valuing USI's lease at more than $700 million (the "Investment"). CS ¶ 350. This investment would have allowed both USI and USSM to come current under the Loans, including paying off the Mezzanine Loan, and would have provided additional funds for the operation of the Station. CS ¶ 350. In February 2021, as an indication of its intention to close the transaction, the Investor deposited the extraordinarily large amount of *$100 million* into an escrow account. CS ¶ 49.

Due to the proposed change in ownership structure and pursuant to the Mortgage Loan Agreement, USI sought consent from the Mortgage Loan Lender to the Investment. CS ¶ 352. While, the Mortgage Loan Agreement provides that "consent shall not be unreasonably withheld or delayed," *see* Mortgage Loan Agreement § 4.2.12, the Mortgage Loan Lender (Plaintiffs' predecessor in interest as owner of the Mortgage Loan) unreasonably refused to even consider granting consent to the transactions necessary to close the Investment in violation of its contractual obligations under the Mortgage Loan Documents. CS ¶ 353. This prevented the transaction from closing, and the Investor walked away. CS ¶ 353. Specifically, after the Borrowers advised the Mortgage Loan Lender of the proposed investment, the Mortgage Loan Lender responded on March 26, 2021 by accelerating the Mortgage Loan. CS ¶ 57. By letter dated April 12, 2021, USI formally requested the Senior Lender's approval of the Investment. CS ¶ 62. The Mortgage Lender responded on April 26, 2021, refusing to even consider approving the investment until and unless USI made payments totaling over $10.8 million and

even if those payments were made, the Mortgage Lender made clear that it could still refuse to approve the Investment and proceed to exercise remedies including foreclosure. CS ¶ 74. The Investor terminated the Investment and withdrew its $100 million escrow deposit expressly because the Prior Mortgage Lender refused to grant the required consent. CS ¶ 252.

This excuse masked a nefarious plot. At the same time USI was seeking consent to the Investment, the Mortgage Loan Lender and Mezzanine Loan Lender (*i.e.*, Plaintiffs) were discussing foreclosing on the Mezzanine Loan and splitting the equity in the station between the lenders. At the time, the Mezzanine Lender resisted these efforts—even threatening a lawsuit over the Mortgage Loan Lender's refusal to consent to the Investment and reckless breach of its contractual obligations and its fiduciary duties. CS ¶ 355. In fact, Plaintiffs' representative Michael Rebibo advised USSM's principal Ben Ashkenazy of the Mortgage Loan Lender's demand for equity as part of any deal and described the Mortgage Lender as a "predatory lender." CS ¶ 354.

Eventually Plaintiffs' approach changed and they aligned themselves with the original Mortgage Loan Lender. After negotiations between the lenders, Plaintiffs purchased the Mortgage Loan in January 2022. While USSM was led to believe that Plaintiffs' purchase of the Mortgage Loan would allow the parties to work together cooperatively to reinvigorate Union Station, that did not come to pass.

After becoming the sole lender, Plaintiffs unlawfully interfered with the day-to-day operation of Union Station. CS ¶ 265, 271, 273-74. In particular, Plaintiffs interfered with USSM's and its affiliates' ability to lease space in Union Station to prospective tenants and held themselves out as owners of Union Station before any foreclosure or condemnation. CS ¶ 268. They also refused to grant consent to the signing of either of the two leases that Plaintiffs

presented them, causing additional difficulties in signing any new leases at the station. As USSM's corporate designee explained, Plaintiffs' refusal to consent to market-rate "good leases" made it harder, if not impossible, to incentivize any new tenants to sign leases at the station. In addition, Plaintiffs intervened in leasing discussions with a large hospitality company, Sage Hospitality Group ("Sage"), with whom USSM and its affiliates were in discussions to sign the largest lease in Union Station history. After Plaintiffs intervened, Sage ceased all communications with USSM and its affiliates, and the lease never was signed. CS ¶¶ 308, 309, 312. Around the same time, Plaintiffs also refused to approve two leases that USSM and its affiliates negotiated in order to begin to rehabilitate Union Station after the COVID-19 pandemic that would have paid $700,000 per year to the Station to replace non-paying tenants. CS ¶¶ 331, 334.

Plaintiffs interference was not only with tenants. Holding themselves out as owners of the leasehold, Plaintiffs entered into negotiations with Amtrak regarding a potential transaction involving the Station. CS ¶ 130. In connection with that proposed transaction, Amtrak requested detailed financial information. CS ¶¶ 131,132,133. However, Lender conditioned providing information to Amtrak on Amtrak's signing of a non-disclosure agreement which would have, among other things, prevented Amtrak from negotiating or executing a deal with anyone other than Rexmark (Plaintiffs' agent) and Mr. Rebibo, including USI. CS ¶ 134. Understandably, Amtrak refused to give up its right to negotiate a transaction with USI, which was owned and managed at the time by USSM and which actually owned the leasehold. CS ¶ 136.

Plaintiffs also were applying pressure to USSM directly. Following their purchase of the Mortgage Loan, Plaintiffs demanded that as any resolution of the outstanding loans, USSM and

its affiliates would not only have to pay all outstanding amounts (to which Plaintiffs were contractually entitled) but would also have to cede majority control of the Union Station leasehold interest to Plaintiffs.  USSM resisted these demands and the foreclosure sale followed.

## ARGUMENT

## I.    LENDER IS BARRED BY THE PLAIN LANGUAGE OF THE LOAN AGREEMENT FROM PURSUING ITS PUTATIVE FORECLOSURE SALE AFTER THE CONDEMNATION ACTION WAS FILED

As an initial matter, the premise upon which Plaintiffs bring this case—that they exercised contractual authority to foreclose the Mezzanine Loan—is false.  Neither the Mezzanine Loan Agreement nor any of the other Loan Documents give Plaintiffs the right to foreclose on the Mezzanine Loan after a condemnation.  Instead, Plaintiffs were limited to the remedial provisions in the Section of the Loan Agreements related to condemnations specifically.  This is the only reading of the Loan Documents which does not render parts of them superfluous and which does not vitiate rights USSM holds under the Loan Documents.[2]

The law is clear that immediately upon the filing of the Complaint and Declaration of Taking by Amtrak in the Condemnation Action, along with Amtrak's deposit of funds with the D.C. court, title to the leasehold interest in Union Station vested in Amtrak, the entity effecting the condemnation.  49 U.S.C. § 24311(b)(2).  Upon notice of the condemnation, the rights and obligations of the parties under the Mezzanine Loan Agreement became subject to the specific condemnation-related provisions of Section 5.2.2 of the Mezzanine Loan Agreement.  That section specifies both rights (*i.e.*, protections) and obligations of both the Mezzanine Borrower

---

[2]    USSM acknowledges that the Court rejected this argument in connection with Plaintiffs' motion for a preliminary injunction.  *See* Transcript of Preliminary Injunction Hearing, Scharf Decl. Ex. B.  However, USSM respectfully submits that the Court's decision was erroneous for the reasons stated herein.

and the Mezzanine Lender following a condemnation of the mortgage collateral.  *See* Mezzanine

Loan Agreement § 5.2.2, Rebibo Decl. Ex. A-3.  The distinction is important: since

condemnation could only occur as to the collateral for the Mortgage Loan (*i.e.*, the leasehold

interest in Union Station), the protections of Section 5.2.2 ensure that neither the Mezzanine

Lender nor the Borrower will be prejudiced by the condemnation or the actions of their

contractual counterparty.  The only court to consider an identical posture put it succinctly:  the

condemnation provision of the loan agreement "describes the lender-borrower relationship in the

event of a government taking." *JPMCC 2006-CIBC14 Eads Parkway, LLC v. DBL Axel, LLC*,

977 N.E.2d 354, 362 (Ind. Ct. App. 2012).

Specifically, Section 5.2.2 of the Mezzanine Loan Agreement provides the Mezzanine

Lender with security that its loan will be repaid from proceeds of a condemnation of the

mortgage collateral, which otherwise would not occur, and further provides that the Lender

participates in the negotiation of the resolution of the condemnation.  But the provision also

limits the Mezzanine Lender's involvement once a condemnation has been effected to

participation in the collection of any award, the negotiation of the settlement, or participation, on

their own behalf, in litigation.  *See* Mezzanine Loan Agreement § 5.2.2 ("Lender shall have the

opportunity to participate, at Borrower's reasonable cost and expense, in any applicable litigation

or proceeding and settlement discussions in respect [of the condemnation] . . . Lender shall have

the right . . . to receive the [condemnation] Award or a portion thereof sufficient to pay the Debt

in full.").  The Mezzanine Borrower is still the real party in interest as to any condemnation, and

the Mezzanine Loan Agreement grants the Borrower—not the Lender—authority to contest the

condemnation; it must only "consult" with the Lender.  *Id.* ("Borrower shall, at its cost and

expense, diligently prosecute or cause Mortgage Borrower to diligently prosecute any such

litigations or proceedings, and shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such litigations or proceedings.").

Not only that though—the provision also gives USSM certain rights.  In particular, the last sentence of section 5.2.2 then provides:

> Subject to the rights of Mortgage Lender under the Mortgage Loan Documents, if the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the Award or a portion thereof sufficient to pay the Debt in full.

Mezzanine Loan Agreement § 5.2.2.  This sentence affirms that following a condemnation of the property, the sole source of repayment for the Mezzanine Loan is the condemnation award.  That is, the loan remains non-recourse to the Mezzanine Borrower.  *See U.S. Bank Nat. Ass'n v. Rich Albany Hotel, LLC*, 42 Misc. 3d 1201(A), 983 N.Y.S.2d 207 (N.Y. Sup. Ct. 2013) ("[T]he loan was non-recourse, subject to certain exceptions described as 'Borrower's Recourse Liabilities' and 'Springing Recourse Events.'  Absent the triggering of one of these exceptions, plaintiff acknowledges that its' sole recourse upon a default is to foreclose against the property, leaving the borrower and guarantors exempt from personal liability.").  In other words, the Mezzanine Lender cannot use the condemnation as a pretext to appropriate the borrower's equity.  Instead, this provision is carefully calibrated to ensure that the Mezzanine Lender and Mezzanine Borrower are aligned in seeking the largest possible payment resulting from the condemnation (or reversal of the action) in order to maximize returns to both parties.

Plaintiffs' conduct here ignored this straightforward analysis and, in doing so, fundamentally altered the terms of and assumptions underlying the Loan Documents regarding a condemnation.  For example, Plaintiffs claim that their putative foreclosure sale transferred USSM's remaining equity in Union Station to the Mezzanine Lender, without regard for the

outstanding amount of the Mezzanine Loan.  Motion at 11.  As discussed, that is exactly what

this provision seeks to avoid.  And permitting the foreclosure to have that effect would write this

part of Section 5.2.2 out of the Loan Agreement entirely.  *Nomura Home Equity Loan, Inc.,*

*Series 2006-FM2 v. Nomura Credit & Capital, Inc.*, 30 N.Y.3d 572, 581 (2017) ("Courts may

not, through their interpretation of a contract, add or excise terms or distort the meaning of any

particular words or phrases . . . .").  Moreover, permitting a post-condemnation Mezzanine Loan

foreclosure places the Mezzanine Lender in a better position than the Mortgage Loan Lender,

since the Mortgage Lender cannot foreclose following a condemnation, as the Property no longer

belongs to the Mortgage Borrower, but instead to the condemnor.  Especially in light of the fact

that the condemnation provisions in both agreements are in substance identical, there should not

be any disconnect between the authority of the Lenders under the two agreements, since the Loan

Agreements are part of the same transaction and, thus, must be read together.[3]  *Evans Prod. Co.*

*v. Decker*, 52 A.D.2d 991, 992 (3d Dep't 1976) (collecting cases and noting "it is a well-

established rule of contract law that all contemporaneous instruments between the same parties

relating to the same subject matter are to be read together and interpreted as forming part of one

and the same transaction").[4]

That is all to say that following the initiation of the Condemnation Action, the Mezzanine

Lender was limited to the specific remedies and authorities in Section 5.2.2 of the Mezzanine

Loan Agreement.  Plaintiffs' only response is that the Mezzanine Loan Agreement provides that

---

[3]     The only difference between the condemnation provisions of the two agreements is that
the condemnation section in the Mezz Agreement makes the rights of the Mezz Lender subject to
the rights of the Mortgage Lender.  *See* Ross Decl. Ex. 1.

[4]     Plaintiffs weakly argue that the last sentence of Section 5.2.2 does not apply because the
Property has been condemned, not "sold" to Amtrak.  Motion at 9. In context, the phrase "if the
Property is sold, through foreclosure or otherwise," clearly includes a conveyance as a result of a
condemnation.

the Lender's remedies are "cumulative." Motion at 8-9. But Plaintiffs' argument has it backward. Where a specific provision of a contract appears to be in tension with a more generally applicable one, the more specific provision must apply. *Alto v. Sun Pharm. Indus., Inc.*, 2021 WL 4803582, at *41 (S.D.N.Y. Oct. 13, 2021). Here, Section 5.2.2, which is specific to and only activated by a condemnation of Union Station, is the more specific provision.

And the provisions are in tension. Simply, Section 5.2.2 states (and restates) rights remedies that are also included elsewhere in the Loan Documents. For example, Section 5.2.2 provides that "[n]otwithstanding the Condemnation," payments on the loan remain due. *See* Mezzanine Loan Agreement § 5.2.2. Other provisions of the Loan Documents already provide for loan payments in the normal course. *See* Mezzanine Loan Agreement § 2.3. Plaintiffs must answer, then, why Section 5.2.2 restates a requirement already found elsewhere in the contract. Another example—elsewhere in the contract, the Mezzanine Lender possesses certain rights in the normal course when an Event of Default is in effect and continuing. Mezzanine Loan Agreement § 10.2. Section 5.2.2 includes its own post-condemnation Event of Default provision which grants Lender some, *but not all*, of the rights discussed elsewhere in the Loan Agreement. Again, in order to succeed on their motion, Plaintiffs must explain why these provisions are not superfluous under their reading of the Mezzanine Loan Agreement. USSM submits that there is no explanation and that the only reading of the Mezzanine Loan Agreement which does not render the language in Section 5.2.2 entirely repetitive of other provisions in the Mezzanine Loan Agreement is that Section 5.2.2 contains the sole remedies the Mezzanine Lender is permitted to exercise following a condemnation. This gives effect to Section 5.2.2 without writing out any of the remedial provisions that Plaintiffs cite, which apply outside of the limited *sui generis*

circumstance of condemnation.  *Int'l Multifoods Corp. v. Com. Union Ins. Co.*, 309 F.3d 76, 86 (2d Cir. 2002) (collecting cases).

A strict reading of Section 5.2.2 also is appropriate since the provision not only grants the Mezzanine Lender remedies, but also grants USSM rights following a condemnation.  Plaintiffs' claims, if successful, would entirely excise these rights from the agreement.  For example, Section 5.2.2 provides USSM, not the Mezzanine Lender, with the specific right to prosecute any litigation relating to a condemnation proceeding.  *See, e.g.*, Mezzanine Loan Agreement § 5.2.2 ("[USSM] shall, at its cost and expense, diligently prosecute or cause Mortgage Borrower to diligently prosecute any such litigations or proceedings, and shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such litigations or proceedings.").[5]  Plaintiffs' purported foreclosure, which is not provided for among the condemnation rights the Mezzanine Lender possesses under the Loan Agreement, would bar USSM from participating in the condemnation at all.

Because USSM is granted rights in the agreement, those rights necessarily limit any non-condemnation-specific remedies in other portions of the Loan Documents once a condemnation takes place.  *Cf. Beal Sav. Bank v. Sommer*, 10 Misc. 3d 1062(A), at *8 (Sup. Ct. N.Y. Cty. 2005) (holding that contract remedy must be understood in the context of the whole agreement between the parties), *aff'd*, 29 A.D.3d 388 (1st Dep't 2006), *aff'd*, 8 N.Y.3d 318 (2007). Plaintiffs have not, and cannot, explain how USSM's contractual rights survive the extra-contractual actions Plaintiffs seek to enforce here.  The Motion should be denied because

---

[5]     This right makes sense.  The Mezzanine Borrower is the party incentivized to achieve the maximum value as just compensation for a condemnation since, as discussed above, the Mezzanine Loan Lender is limited to recovering the value of the Mezzanine Loan from the award and not any remaining equity.

Plaintiffs' putative foreclosure was not permitted by the plain language of the Mezzanine Loan Agreement.

## II. LENDER'S INEQUITABLE CONDUCT BARS THE AFFIRMATIVE RELIEF IT SEEKS HERE

Even if, notwithstanding Section 5.2.2, the Mezzanine Lender is permitted to foreclose after a condemnation of Union Station was noticed and effected, Plaintiffs cannot obtain affirmative relief from the Court because of misconduct attributable to them, including as successor owners of the Mortgage Loan. Specifically, because Plaintiffs seek equitable relief from this Court, USSM can raise equitable defenses to the claims. As set out above, and explained further below, discovery has made clear that this putative foreclosure was simply the latest effort by Plaintiffs to steal the equity in Union Station for themselves—a plot that had been formulated and ongoing for several years. Among the other steps in that process, Plaintiffs purchased the Mortgage Loan secured by Union Station. As the successor Mortgage Lender, and especially because Plaintiffs' purchase of the Mortgage Loan was made in furtherance of the same scheme, Plaintiffs' ability to enforce its Mezzanine Loan rights carry the defects and liabilities the previous lender incurred. Here, these defects bar Plaintiffs from getting relief.

### A. USSM May Assert Equitable Defenses

As an initial matter, Plaintiffs' declaratory judgment claim here is equitable. Thus, it is subject to equitable defenses.

"Actions for declaratory judgments are neither legal nor equitable, and courts have therefore had to look to the kind of action that would have been brought had Congress not provided the declaratory judgment remedy." *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 284 (1988); *accord Diematic Mfg. Corp. v. Packaging Indus., Inc.*, 516 F.2d 975, 978 (2d Cir. 1975) ("A declaratory judgment action is a creature of statute . . . neither legal nor

equitable . . .[and] requires that we look to what the basic nature of the suit would have been had there been no Declaratory Judgement Act.").  In this case, Plaintiffs have sought their declaration in an effort to validate their putative foreclosure sale and to effectuate their foreclosure on the Mezzanine Loan.  In particular, Plaintiffs' claim goes far beyond construing the language of the Mezzanine Loan Agreement and instead seeks affirmative rulings, akin to an injunction, that "1) Lender is entitled under Section 5.2.2 of the Mezzanine Loan Agreement to act as USSM's attorney-in-fact and 2) all of USSM's right, title, and interest in and to USI have been extinguished by the foreclosure sale, and Lender is now the sole owner of USI."  *See* Complaint ¶ 141.

The most analogous "nature of suit" in which such an action might be brought is either an action for a judicial foreclosure or a quiet title action to finally settle the ownership of disputed property, both of which are equitable in nature.  *See Cognetta v. Bonavita*, 330 F. Supp. 3d 797, 810 (E.D.N.Y. 2018) (finding that a federal Declaratory Judgment Act claim was equitable where the alternative claim was similar to one to quiet title); *Rajic v. Faust*, 165 A.D.3d 716, 717 (2d Dep't 2018) (foreclosure is an equitable action, triggering equitable powers of the court).  As a result, equitable defenses can serve to bar the relief sought here.  *See Franklin v. Krueger Int'l, Inc.*, 1997 WL 691424, at *5 (S.D.N.Y. Nov. 5, 1997) ("Because the plaintiff's request sounds in equity, it is properly subject to equitable defenses." (citing *Merex A.G. v. Fairchild Weston Systems, Inc.*, 29 F.3d 821, 824-26 (2d Cir. 1994))).

Plaintiffs' response to this argument largely is their own say-so that this action is legal, not equitable.  *See* Motion at 12-14.  Plaintiffs do not attempt to grapple with the question regarding what type of action they would have brought if the Declaratory Judgment Act did not

exist.  *See Gulfstream Aerospace*, 485 U.S. at 284.  That is, Plaintiffs do not attempt to

categorize their own claim as equitable or legal at all.

Instead, Plaintiffs repeat that equitable defenses cannot be used to "unwind a UCC sale"

while citing to cases in which Borrowers raise affirmative equitable claims.  *See* Motion at

12-13, citing *Atlas MF Mezzanine Borrower, LLC v. Macquarie Texas Loan Holder LLC*, 174

A.D.3d 150, 153 (1st Dep't 2019).  There, a foreclosed borrower brought affirmative declaratory

judgment claims against the foreclosing lender seeking to have the sale declared invalid.  *Id*. at

157.  The court refused, holding that equitable claims, including allegations of bad faith and

fraud, could not affirmatively unwind the foreclosure sale.  *Id*. at 162-63.  The other cases

Plaintiffs cite on this point are the same.  *See N. Star IP Holdings, LLC v. Icon Trade Servs.,*

*LLC*, No. 22-CV-7324 (JGLC), 2024 WL 36978, at *8 (S.D.N.Y. Jan. 3, 2024) (dismissing

counterclaim that licenses remained in effect notwithstanding UCC sale); *Walsh v. Ocwen Loan*

*Servicing, LLC*, 217 A.D.3d 802, 804 (2d Dep't 2023) (dismissing borrower claims for

declaratory judgment and injunction to prevent transfer of shares and lease securing a loan).[6]

But none of those cases are this case.  Plaintiffs—not USSM—seek for the Court to

invoke its discretionary equitable jurisdiction to issue a declaration and, effectively, to enjoin

USSM rather than seeking damages at law.[7]  This entitles USSM to raise equitable defenses that

could alter the Court's analysis or change the outcome.  Charles A. Wright & Arthur R. Miller,

---

[6]     *In re Enron Corp.,* No. 01-16034 (AJG), 2005 WL 3873890 (Bankr. S.D.N.Y. June 16,
2005) is dissimilar insofar as it concerned objections filed in a bankruptcy to a notice of
disposition of collateral.  *Id*. at *3.  In any event, it remains the case that in *In re Enron* the party
seeking relief was seeking to affirmatively unwind a sale.  *Id*. at *10.  Again, that is not the case
here.

[7]     Plaintiffs may respond that absent a declaratory judgment they are left with no remedies
for their alleged claims.  Not so.  If Plaintiffs believe their foreclosure sale was successful,
Plaintiffs can bring an action for trespass, nuisance, or another tort to receive damages, each of
which can be pleaded as a legal, not equitable, claim.

10B Fed. Prac. & Proc. § 2758 (4th ed.)  (collecting cases and noting that "[t]he court, however, in the exercise of the discretion that it always has in determining whether to give a declaratory judgment, properly may refuse declaratory relief if the alternative remedy is better or more effective."); *see also Yang v. Kosinski*, 960 F.3d 119, 136 (2d Cir. 2020) (describing the "extraordinary remedy of injunction" (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008))).

This is particularly appropriate here, where Plaintiffs' participation in a multi-year scheme to wrest control of the ownership of Union Station from USSM and its affiliates is the type of inequitable conduct that bars the relief Plaintiffs seek.  *Cf. In re U.S. Lines, Inc.*, 318 F.3d 432, 437 (2d Cir. 2003) ("[I]t is well-established that a litigant who seeks equity must do equity." (citing *Overall v. Estate of Klotz*, 52 F.3d 398, 404 (2d Cir. 1995)).  In its Answer, USSM has asserted several equitable defenses to this end, including unclean hands, bad faith, estoppel, frustration of purpose, and laches, and discovery supports the application of these defenses to this action.  *See infra* at Section II.C.

**B.    Lender Took The Mortgage Loan Subject To The Prior Lender's Defects**

As the successor to the Prior Mortgage Lender, Lender is, in equity, chargeable with its predecessor's misconduct.  Under the Assignment Agreement, Lender "assumes and agrees to fulfill, perform and discharge, from and after the date hereof, ***all of the various commitments, obligations and liabilities of Assignor*** [the original mortgage lender] under the Purchased Loan Interest accruing from and after the date hereof."  CS ¶ 106 (emphasis added).  Such language constituted an implied assumption of the seller's obligations.  *Incredible Foods Grp., LLC v. Unifoods, S.A. de C.V.*, No. 14-CV-5207 (KAM)(JO), 2015 WL 13742422, at *2 (E.D.N.Y. Oct. 2, 2015) ("Specifically, Judge Orenstein found that iSell expressly and impliedly assumed the obligations of IFG, noting, inter alia, the Assignment Agreement between Empacadora San

16

Marcos USA ('San Marcos'), IFG and iSell that assigned all of IFG's "rights and obligations" to iSell,").

Similarly, here, the assignment agreement expressly provides that the Mezzanine Lender agrees to assume "all of the various commitments, obligations and liabilities of Assignor." While Plaintiffs argue that its liability is prospective only, based on the language "from and after the date hereof" this clause at most creates a factual question as to whether plaintiff assumed liability for all of the actions of the mortgage lender. *See Dogwood Assocs., L.P. v. Douglas Elliman-Gibbons & Ives, Inc.*, No. 91 CIV 7895 (JFK), 1993 WL 361655, at *3 (finding that language of assignment agreement presents a fact issue regarding the scope of the assumption); *see also Hunte v. Rushmore Loan Management Services, LLC*, 2024 WL 1076683 (S.D.N.Y. March 11, 2024) (declining to dismiss complaint alleging the successor liability of a subsequent mortgage holder).

Finally, even if this were not a question of fact, Plaintiffs cannot reasonably argue that USSM's equitable defenses to this action accrued prior to its ownership of the Mortgage Loan. As explained above, while Plaintiffs' scheme to gain control of Union Station began before it purchased the Mortgage Loan, it was only actuated and putatively achieved after the purchase. *See supra* at 5-7. These defenses did not accrue and continued to crystallize after Plaintiffs' purchase of the Mortgage Loan. Thus, they apply to Plaintiffs regardless.

**C.    Questions Of Fact Remain About USSM's Defenses**

Finally, summary judgment is inappropriate here because—contrary to Plaintiffs' arguments—USSM's defenses, at a minimum, raise questions of fact that prevent summary judgment. As set out herein, discovery supports the existence of questions of fact as to whether Plaintiffs' misconduct "transgress[ed] equitable standards of conduct" sufficient to preclude summary judgment. *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806,

815 (1945) (describing the unclean hands defense); *see also Bank of China v. Chan*, 937 F.2d 780, 789 (2d Cir. 1991) (noting that "bad faith . . . if proved, would be a complete defense").

Principally, questions of fact preclude summary judgment because discovery has shown that this action is the culmination of a multi-year plot by Plaintiffs to wrongly and fraudulently take control of Union Station for themselves.  In short, Plaintiffs, first in concert with the original Mortgage Loan Lender, and then on their own, used difficulties caused by the COVID-19 pandemic fraudulently and in bad faith to manipulate USSM and its affiliates, prevent USSM and its affiliates from coming current on the Mortgage and Mezzanine Loans, impersonated the owners of Union Station in communications with vendors, tenants, and others, and, ultimately, demanded to actually become the majority owners of the station.  After those latter efforts failed, Plaintiffs only then proceeded to foreclose and file this action to effectuate their fraud to completion.

### 1. The Original Mortgage Loan Lender Prevents A Refinancing And Repayment Of The Mezzanine Loan

As described above, following the onset of the COVID-19 pandemic, USSM and its affiliates sought an infusion of capital to stabilize Union Station, which had been severely impacted by declines in travel and retail shopping.  A deal was negotiated with a large sovereign wealth fund to inject more than $100 million of capital into the station, to pay off entirely the Mezzanine Loan, and to come current on the Mortgage Loan.  But, the original Mortgage Loan Lender refused to consent to the transaction—not because of any objection to it in principal, but because it demanded to receive equity in the project.  While ostensibly the original Mortgage Loan Lender was requesting that USI make over $10 million in payments on the Mortgage Loan before it would even the consider approving the transaction, discovery has shown that, secretly,

including in conversations with the Mezzanine Lender (*i.e.*, Plaintiffs), that the Mortgage Loan Lender was conspiring to obtain an equity interest in Union Station moving forward.

There was no basis in the contract for this demand. The Mortgage Loan Agreement provided that the Mortgage Loan Lender could not "unreasonably" withhold consent. CS ¶¶ 64, 117. Whether this refusal constitutes reasonable action is a question of fact.[8] *See Consol. Risk Servs., Inc. v. Auto. Dealers WC Self Ins. Tr.*, No. 1:06-CV-871, 2010 WL 2735701, at *5 (N.D.N.Y. July 9, 2010) ("[T]he question is whether Plaintiff exercised reasonable care in the exercise of that discretion, which is a question of fact for the jury." (citing *King v. Crossland Sav. Bank,* 111 F.3d 251, 259 (2d Cir. 1997))). As discussed above, this unreasonable denial is chargeable against Plaintiffs here.

Moreover, discovery revealed that Plaintiffs engaged in prolonged conversations with the original Mortgage Loan Lender regarding the Loans, including ways to extract USSM's and its affiliates' equity in Union Station through foreclosure or otherwise—precisely the plan the Plaintiffs thought was unreasonable and actionable mere months earlier. Importantly though, as part of these discussions, rather than bring claims against the Mortgage Loan Lender for the denial of consent to the transaction, Plaintiffs *released* all of their claims against the Mortgage Loan Lender related to their refusal to consent to the Investment and the resulting to prejudice to the Mezzanine Loan Lender's rights. Questions of fact exist, at a minimum, regarding the reasons for this release and the Mezzanine Loan Lender's participation with the Mortgage Loan Lender in a common plan to control Union Station.

---

[8]     USSM, of course, submits that this denial was unreasonable. Notably, Plaintiffs agreed at the time. CS ¶ 355. Indicating the seriousness of their concerns, before negotiating about the purchase of the Mortgage Loan, the original Mortgage Loan Lender required that Plaintiffs waive any damages claims regarding this denial of consent. CS ¶ 357.

## 2.      Plaintiffs Interfere With The Management Of The Property

Later, however, Plaintiffs acted alone.  Following their purchase of the Mortgage Loan, Plaintiffs began to interfere with the operation of Union Station and held themselves out as the owner of the station while cutting USSM and its affiliates out.

Plaintiffs generally do not dispute what events occurred or when.  *See* Motion at 18-21. Instead, they just argue that all of the actions they took were proper without additional citation or factual support.  This, simply, is not sufficient to eliminate questions of fact.  *See Adler v. Penn Credit Corp.*, No. 19-CV-7084 (KMK), 2022 WL 744031, at *9 n.16 (S.D.N.Y. Mar. 11, 2022) (collecting cases and noting that conclusory and "self-serving statements are also insufficient grounds to grant summary judgment in [movant's] favor."); *see also Rosenberg v. Allen*, 258 F. Supp. 511, 515 (S.D.N.Y. 1966) ("The submission of affidavits by the defendants saying, in effect, 'we didn't' and opposing affidavits by plaintiffs saying 'you did' is not justification for taking the disputed issues of fact from the fact-trier and deciding those issues as a matter of law.").

Specifically, Plaintiffs first argue that they had the right to interfere in the management of Union Station (*i.e.*, to negotiate with tenants, to interface with vendors, etc.) pursuant to Section 3.1 of the Assignment of Leases and Rents.  Motion at 18.  That agreement provides, among other things, that the Mortgage Loan Lender can exercise all of the rights of the Borrower with respect to Leases.  CS ¶ 118.  However, that provision is qualified by the requirement that the rights granted by that section are limited by applicable law, in this case New York Law.  CS ¶ 118.  Under New York law the rights granted by assignments of rents and leases in favor of a lender are not self-executing and require the lender to take affirmative steps such as first commencing a foreclosure action and obtaining the appointment of a receiver.  *Leeber Realty LLC v. Trustco Bank*, No. 17-CV-2934 (KMK), 2019 WL 498253, at *6 (S.D.N.Y. Feb. 8,

2019), *aff'd*, 798 F. App'x 682 (2d Cir. 2019). Here, Plaintiffs did not take any such enforcement action before interfering with the Borrower' rights. Accordingly, Plaintiffs cannot rely on the Assignment of Rents and Leases.

To the extent Plaintiffs also dispute the evidence that they engaged in interference, that dispute merely creates an issue of fact. Thus, Lender concedes that it retained Cushman & Wakefield ("C&W"), a well-known real estate broker, but alleges that it only retained C&W to market the Mezzanine Loan for sale and not to engage in any leasing activities. Motion at 18. However, this unsupported allegation—which only comes from Plaintiffs' corporate witness—is contradicted by the testimony of USSM's witnesses as well as undisputed evidence that C&W met with several potential tenants, not loan purchasers. Scharf Decl. Ex. G; Rebibo Dep. Tr. at 124:12-126:13, Rebibo Decl. Ex. BB; Press Decl. at ¶ 18. While Plaintiffs assert that the only matters discussed at those meetings was a possible sale of the Mezzanine Loan, the presence of potential tenants, including a small museum operator with whom USSM's representatives previously had discussed leasing, puts the lie to that argument or, at a minimum, raises questions of fact.

Plaintiffs also dispute USSM's claim that they improperly disapproved of leases. Plaintiffs argue, first, that they had absolute discretion to disapprove of any lease during the occurrence of an event of default, and second, that it acted reasonably regardless. Motion at 21. As to the latter, reasonableness of discretion is a quintessential question for the finder of fact. *Consol. Risk Servs.*, 2010 WL 2735701, at *5. As to the former, Lender relies on Section 4.1.9(c) of the Mezzanine Loan Agreement for their absolute authority. *See* Motion at 21. However, that section explicitly states that "approval shall not be unreasonably withheld, conditioned or delayed" with an exception not relevant here. CS ¶ 118. Simply put, Plaintiffs'

reasons for not approving the two leases at issue do not make sense and are contradicted by what USSM's witnesses testified that they were told at the time.  Accordingly, these matters also raise issues of fact.

Specifically, Plaintiffs claim that they developed a "joint leasing plan" with USSM and its affiliates to only lease to short-term tenancies during the COVID-19 pandemic.  Motion at 21. USSM disputes that there was any joint leasing plan.  Moreover, for the two leases Plaintiffs address, the space at issue was vacant and the rent was at market terms, even considering the expectation that the leasing market would improve following the end of the pandemic.  CS ¶ 331. These are quintessentially issues of fact which the Court cannot resolve on this motion.

Finally, Plaintiffs also assert that disapproving the two leases at issue was immaterial since, even if the leases had been approved, USSM would not have sufficient revenue to repay both the Mortgage Loan and the Mezzanine Loan.  Motion at 21.  However, that is not the relevant inquiry.  USSM's corporate witness testified that Lender's refusal to approve any long-term leases made it impossible for Borrowers to increase the Property's revenue to a level that would have made it feasible to refinance the existing loans and that these disapprovals made leasing *any* space in the station harder in any event.  CS ¶ 123.  Plaintiffs do not dispute that fact at all.  Thus, another question of fact exists with respect to the impact Plaintiffs' refusals had on leasing at Union Station overall.

In sum, Plaintiffs chose to file an affirmative claim for equitable relief in connection with their putative foreclosure sale.  They cannot now complain that their affirmative equitable claim subjects them to equitable defenses.  And discovery has provided a more than sufficient basis for these questions to be resolved by the trier of fact.  The Motion, thus, should be denied.

## III.  LENDER'S RECOVERY IS LIMITED BY SECTION 5.2.2 OF THE LOAN AGREEMENT

Even if, notwithstanding Section 5.2.2, the Mezzanine Lender is permitted to foreclose and Plaintiffs are otherwise entitled to judgment in their favor, Plaintiffs' recovery is limited by the last sentence of Section 5.2.2 of the Mezzanine Loan Agreement which limits the Mezzanine Loan Lender's recovery to the portion of the condemnation award "sufficient to pay the Debt in full." Thus, Plaintiffs are not entitled to the declaration they seek that USSM is entitled to none of the award from the Condemnation Action.

Plaintiffs argue that this provision is limited to situations in which there has not been a default and that Plaintiffs should be entitled to the entirety of the award resulting in the D.C. action. Motion at 7. However, nothing in Section 5.2.2 limits the operation of the last sentence of section 5.2.2 to situations in which there has not been a default. In fact, that Section explicitly addresses situations in which an event of default has occurred and is continuing. *See* Mezzanine Loan Agreement § 5.2.2. Moreover, Plaintiffs' reading of this provision makes little sense, since, as discussed above, once the Property is condemned there is no source of revenue to make payment to the Mezzanine Loan thereby making a default almost inevitable. USSM's reading is further supported by the specific reference in the provision to a foreclosure sale.[9]

In order to avoid the clear import of the last sentence of Section 5.2.2, Plaintiffs point to the following sentence of Section 5.2.2:

> Subject to the rights of Mortgage Lender under the Mortgage Loan Documents, Lender is hereby irrevocably appointed to act after the occurrence and during the continuance of an Event of Default as

---

[9]  The foreclosure sale referred to is a foreclosure sale of the "Property" by the Mortgage Lender. However, Section 5.2.2 of the Mezzanine Loan Agreement is borrowed almost word for word from Section 5.2.2 of the Mortgage Loan Agreement so it is clear that the last sentence of Section 5.2.2 speaks to the post-default context and nevertheless provides that the Lender is not entitled to more than full payment of the Debt.

> Borrower's attorney-in-fact, coupled with an interest, with
> exclusive power to collect, receive and retain any Award and to
> make any compromise or settlement in connection with any
> Material Condemnation.

Plaintiffs interpret this provision as authorizing it to retain the full amount of any award even if

the amount of the award greatly exceeds the amounts due to Lender and even in the absence of a

foreclosure.  Motion at 7.  That is an implausible reading of that provision and is contrary to

basic principles of commercial law.  *See Renaissance Complex Redevelopment Corp. v.*

*Renaissance Assocs.*, 255 A.D.2d 274, 274 (1st Dep't 1998) ("The mortgagee's bidding in of the

debt to purchase the mortgaged property at foreclosure constituted a satisfaction of the debt, and

any amount it received in excess of the judgment is surplus that it is holding in trust for the

mortgagor. . . .").  A more plausible reading of this sentence is that it entitles the Mezzanine

Loan Lender to retain the award up to the amounts due under the Loan Documents.  This reading

has the further advantage of making this sentence consistent with the last sentence of Section

5.2.2.[10]

 And, restricting Plaintiffs only to the amount of the debt, and not the equity controlled by

USSM, is appropriate under principles of equity and condemnation law.[11]  The law is clear that

condemnation awards are calculated "as if it had been 'paid contemporaneously with the

taking[.]'"  *Knick v. Twp. of Scott, Pennsylvania,* 588 U.S. 180, 190 (2019) (quoting *Jacobs v.*

---

[10]    Plaintiffs' reading of this provision is also inconsistent with its position that it has
completed a foreclosure at which it bid in the full amount of its debt.  CS ¶ 207.  If so, any
appointment as an attorney-in-fact for USSM will have expired as the Loan would not be in
default after it was paid in full.

[11]    The Court previously identified this windfall concern as one it was concerned with.  *See*
Transcript of November 3, 2022 Conference, ECF No. 61, at 33:17-23 ("I think that my hope is
that the parties—and in particular the lender—will be thinking about the extent to which
retaining the full condemnation proceeds is I'll call it a windfall and whether or not the parties
should be talking about a way to potentially resolve how to deal with any potential proceeds that
exceed the principal and accrued interest on the loan.")

*United States,* 290 U.S. 13, 17 (1933)).  At the time the Condemnation Action was filed, USSM owned USI and unquestionably was entitled to proceeds above the amount of the loan debt from the condemnation award.  Likewise, principles of equity do not permit Plaintiffs, as lenders, to collect a windfall above the amount of the loan debts, especially where the lenders conduct caused, at least in part, the continuing default under the loans.  *Prudential Ins. Co. of Am. v. S.S. Am. Lancer*, 870 F.2d 867, 871 (2d Cir. 1989) ("[E]quity, we believe, abhors a windfall.").  In short, neither the contracts nor applicable law permits Plaintiffs to collect more than the amount of the Mortgage and Mezzanine Loan debts from any Condemnation Action award.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiffs' motion for summary judgment.

Dated: May 30, 2024          KASOWITZ BENSON TORRES LLP

By:   /s/ *David E. Ross*
　　　David E. Ross
　　　David J. Mark
　　　Daniel J. Koevary
　　　Andrew W. Breland
　　　1633 Broadway
　　　Tel.: (212) 506-1700
　　　New York, NY 10019
　　　dross@kasowitz.com
　　　dmark@kasowitz.com
　　　dkoevary@kasowitz.com
　　　abreland@kasowitz.com

　　　*Attorneys for Defendant Union Station*
　　　*Sole Member LLC*