**DOCUMENT UNDER SEAL**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK) ) ) ) | |
| Plaintiffs, ) | 1:22-cv-01043-APM |
| ) | Judge Amit P. Mehta |
| v. ) | |
| ) | |
| SUBLEASE INTEREST PERTAINING TO DESCRIBED ) LEASEHOLD INTERESTS AT WASHINGTON ) UNION STATION, et al. ) | |
| ) | |
| Defendants. ) | |

**DEFENDANTS' MOTION TO ENFORCE SETTLEMENT AGREEMENT**

The Lender Defendants[1] ask the Court to declare that by the terms of the Settlement Agreement, Amtrak is obligated to (a) recognize that tenant rents paid to USI prior to the settlement date are deemed paid and therefore cannot be clawed back from USI, either by Amtrak or by the tenants, and (b) pay or otherwise address obligations associated with the operation of Union Station extant as of the date of settlement. Defendants further ask that the Court order Amtrak to perform its obligations consistent with that construction of the Settlement Agreement.

The express terms of the Settlement Agreement capture the parties' intent that their settlement was a global settlement in which USI's obligations for Union Station ended and Amtrak would not seek payment or offset or further performance from USI for what came before the date of settlement. The issue of third parties was expressly addressed in Paragraph 2.4 of the Agreement. Lenders compromised millions of dollars in value and released Amtrak in exchange for having a global resolution that relieved them from obligations preceding the date of settlement and avoided further litigation. Amtrak is trying

---

[1] "Lender" refers to Defendants Kookmin Bank Co. Ltd, individually and in its capacity as trustee of KTB CRE Debt Fund No. 8, a Korean Investment Trust (the "Trust"), and its agent on behalf of said Trust in Korea, Daol Fund Management Co. and its agent on behalf of the Trust in United States, Rexmark Holdings LLC d/b/a Rexmark along with Union Station Investco, LLC ("USI").

to do indirectly what the settlement bars it from doing directly, namely have USI pay for the obligations of vendors or repay tenants for rental payments that predate the settlement. Amtrak cannot defy the letter and the spirit of the Settlement Agreement by seeking further payments from USI. Amtrak should be directed to square accounts as appropriate with tenants and vendors.

    **1.  Standard of review.**  A settlement agreement is a contract that is "construed under general principles of contract law" and enforced "just like any other contract." *See Daniel v. Smoot*, 316 F.Supp. 3d 79, 97 (D.D.C. 2018) (citing *In re Estate of Drake*, 4 A.3d 450, 453 (D.C. 2010)).[2] Under the objective law of contracts, the Court gives effect to the parties' intent as expressed in the written terms of the contract by discerning what a reasonable person in the parties' position would have thought the provisions meant. *See, e.g., Steele Foundations, Inc. v. Clark Constr. Group, Inc.*, 937 A.2d 148, 154 (D.C. 2007); *District of Columbia v. C.J. Langenfelder & Sons, Inc.*, 585 A.2d 1155, 1159 (D.C. 1989).  The Court can look at the circumstances that existed at the time the contract was made in assessing what a reasonable person in the parties' position would have believed was the meaning of the words. *See, e.g., Intercounty Constr. Corp. v. District of Columbia*, 443 A.2d 29, 32 (D.C. 1982).

    **2. Terms of Contract.** The Settlement Agreement (copy attached as <u>Exhibit A</u>) was entered into at the conclusion of a long and complex case. The Agreement was intended to conclude any and all obligations, as reflected in the preamble: "[T]he Parties intend to resolve and settle all differences, obligations and disputes arising out of or relating to the Condemnation Action, the FOIA Action and/or the Subject Property Interest…" (Settlement Agreement at 1.)

    In detailing what the parties were settling or releasing, the Settlement Agreement refers to "Specific Released Claims," which, in pertinent part, is defined as follows:

> any claim arising from or relating in any way to: (1) the Condemnation Action, including any claims relating to filing of the Condemnation Action, the taking of legal title to and ***possession of the Subject Property Interest***, any defenses to any

---

[2] The parties agreed that their Settlement Agreement should be construed in accordance with District of Columbia law. Settlement Agreement at ¶5.11).

claim relating to the taking, claims for just compensation for the Subject Property Interest, ***claims related to possession of or turnover of possession***, as well as claims for costs, expenses and/or attorney fees; (2) claims that Amtrak and Lender may have against each other where such claims relate to the Condemnation Action or the Subject Property Interest, ***including but not limited to claims for monies paid by third parties as rent pursuant to subleases or monies owed to third parties associated with the operation of Union Station or the Subject Property Interest***…[and] the management and operation of the Subject Property Interest.

(Agreement at ¶ 2.4, emphasis added). The italicized language makes clear that the claims, obligations, or disputes being released included those arising out of and during possession by the respective parties. Contrary to the arguments raised by Amtrak at the Status Conference on May 27, 2025 (Hearing Tr. at 15, 18), the parties expressly intended to cover payments involving third parties under the umbrella of settlement. (Agreement at ¶2.4 ("including but not limited to claims for monies paid by third parties…or monies owed to third parties")). The agreement underscores the breadth of the settlement by listing different types of claims being released:

> Specific Released Claims includes any and all claims that ***were or could have been raised*** in the Condemnation Action, the FOIA Action, or any lease by any party to this Agreement, including claims for restitution, equitable claims, set off claims, contract claims, accounting, allocation, or related to any court order entered in said actions. (*Id.*)

Under the Settlement Agreement, the parties mutually released each other for these Specific Released Claims. (Agreement ¶¶ 4.1.4 and 4.2.4.) The language is broad, global, and unambiguous in reflecting that Amtrak would not seek additional money from USI associated with the operation of Union Station. That contractual commitment is inconsistent with Amtrak's actions thereafter in failing to acknowledge that USI retained tenant rents paid to USI before the settlement or in directing Station creditors to USI for satisfaction. Amtrak cannot do indirectly what it agreed not to do directly.

**3. Circumstances of the Agreement.** Not only does the plain language of the Settlement Agreement dictate the result Defendants seek, but the circumstances surrounding the Agreement confirm what a reasonable person would understand the settlement to mean. *See, e.g., Intercounty Constr. Corp. v. District of Columbia*, 443 A.2d 29, 32 (D.C. 1982)

The taking was filed on April 14, 2022. As of that date, Amtrak held legal title to the Subject Property Interest, which was defined as the leasehold interest that USI held under its lease with Union Station Redevelopment Corporation (USRC). Amtrak acquired the Subject Property Interest subject to all existing leases—that is, Amtrak was stepping into USI's leasehold position entirely. However, Amtrak did not assume possession of that position until two years later when the Court granted Amtrak's Motion for Immediate Possession.

At the time of the taking, USI was controlled by the Ashkenazy interests; Lender assumed control a few months after the taking. When Lender assumed control of USI in August 2022, the Station's operations were in disarray. Utility bills had not been paid, leading to threatened cutoff of service. There were substantial tenant vacancies and receivables. Ashkenazy did not provide any cooperation regarding transfer of knowledge or responsibilities. Financial records were not reliable. While JLL, the incumbent property manager, was ultimately retained by USI to serve as property manager, there remained a black box about what had happened before Lender assumed control because Ashkenazy had control over that information. Nevertheless, Lender stepped in and righted the ship by putting the Station on sound financial footing, addressing overdue bills and deferred maintenance, and otherwise investing millions of dollars to benefit the Station's future value. (Declaration of Michael Rebibo, attached as Exhibit B, at ¶ 3).

Lender and Amtrak did not have a contract governing operations of the Station during the time that Amtrak owned the leasehold and Lender was in possession of it. Lender served as the landlord—entering into leases, paying bills, collecting rents, maintaining the property, paying rent to USRC, and so on. Amtrak did not ask for any accounting of the operations, did not ask for the rents, did not pay the bills, did not pay USI for managing the Station, and did not ask USI to pay anything to Amtrak to manage the Station. (Rebibo Decl. at ¶ 4).

In connection with the transfer of possession ordered by the Court in July 2024, the parties agreed to certain terms regarding the sharing of information, assignment of contracts, notification to tenants,

4

and other matters. USI fulfilled all of its obligations in connection with the transfer. (Rebibo Decl at ¶ 5). The Court's Order Granting Motion for Immediate Possession reflects that, beginning on the date set for transfer of possession

> Amtrak will be solely responsible for the performance of future obligations (i.e. obligations that accrue on or after the Possession Date…or liabilities arising after the Possession Date … that USI would otherwise have had (1) in connection with the Subject Property Interest; and (2) any sublease, lease, or license for a portion of the station that is part of the Subject Property Interest and for which Amtrak is granted possession.

(Doc #111 ¶ 2). Separately, the Order also states that "Rent, utilities and expense payments for the period after the Possession Date shall be responsibility of Amtrak." (*Id.* at ¶ 8.) The Order does not have corresponding language regarding USI or the status of contractual or lease obligations as of the transfer date. The Order does not require a reconciliation of accounts as of the date of possession, and such a reconciliation did not occur. The whole idea of reconciliation was superseded by the global settlement the parties later reached.

Following the transfer of possession and through the fall of 2024, there were tenants who paid their rents to USI's account. Amtrak knew that this had happened. Indeed, Amtrak told inquiring tenants and vendors to talk to USI about the money. (Rebibo Decl. at ¶ 6).

As pretrial work was coming to a close, Amtrak advised that it would seek at trial payment from USI for USI's use of the Station during the period following the date of taking—essentially "rent" for USI having had use of the Subject Property Interest for over two years.  (Rebibo Decl at ¶ 8).

**4. Negotiation of the Settlement.** It was under these conditions and with this menu of issues that the settlement was negotiated. The parties went back and forth, but always with the goal of determining a single dollar amount that Amtrak would pay the Lender Defendants to resolve all matters globally. (Rebibo Decl at ¶ 9). The goal of global resolution necessarily meant covering all pending issues regarding payments due or obligations incurred. It also meant covering Amtrak's claim that USI should pay for its use of the Station during the pendency of the case as well as any dispute about whether one side or

the other should get credit for expenses paid or revenues received since the date of taking until the date of settlement.

During December 2024-February 2025, both sides wanted to arrive at a settlement promptly. The decision was made not to have a reconciliation of accounts or an allocation of revenues and expenses. (Rebibo Decl. at ¶¶ 9-10). The Settlement Agreement reflects an understanding that the date of settlement (rather than the date of transfer of possession or even the date of taking) would be the date at which each side's position is locked. Thus, if USI was holding tenant rent money, it kept it; if USI had already paid a contractor, USI would not recover that money from Amtrak; if Amtrak had collected rent money for any period from any tenant, it kept it. Amtrak would not get a payment for USI's use of the Station during the litigation, and USI would not ask Amtrak to reimburse it for the millions of dollars in rent concessions it had to make to deal with tenants' delinquencies stemming from COVID. There was a double-line drawn as of the date of settlement and each side held onto whatever it had at that time.

While extrinsic evidence is not necessarily appropriate here because the Settlement Agreement is an integrated contract (Agreement ¶¶ 5.10, 5.14),  it should be pointed out that in the series of drafts circulated over a week's time, the concept of including third-party obligations was raised and left in place. (Rebibo Decl. at ¶¶ 12-13.) As shown in the February 3, 2025 redline draft that contains Amtrak's comments on Lender's proposed language for Paragraph 2.4 (Exhibit 2, attached to Rebibo Declaration), Amtrak did not strike the inclusion of third-party references; the concept, as Amtrak reworded it slightly, stayed in the document through execution. (Exhibits 3-5). This demonstrates that both parties were aware of the issues of rent collected by USI (or Amtrak) that might have otherwise been deemed transferable to the other party, as well as third-party-contractor obligations, and yet the parties did not include language in the Agreement assigning responsibility to the other party for the rents received or the expenses due. To the contrary, if an obligation was still due as of the date of settlement, Amtrak had to deal with it; if the rent had already been paid by the tenant and was still in possession of USI, USI kept it; if rent

6

had been paid to Amtrak that might have been transferable to USI, Amtrak kept it.

Near the end of the negotiations, Amtrak's representative made clear that Amtrak was not willing to pay more to USI in the settlement. (Rebibo Decl at ¶ 11). But, of course, leaving the paid rents with USI did not require Amtrak to pay more money to USI. Neither would recognizing the obligations to the contractors, at least the ones under continuing contracts with Amtrak. Moreover, Amtrak's reference was about payment of more money as part of the settlement, not expenditures associated with operating the property going forward.

Both sides had substantial dollars at issue in connection with the settlement. From Lender's side—in addition to the amount of just compensation—there were major amounts at issue regarding contract payments, costs incurred in running the Station, potential legal exposure to third parties, costs advanced for the benefit of the Station that would not be reconciled at closing of settlement. (Rebibo Decl at ¶¶ 10, 14). From Amtrak's side, there were similar potential liabilities and benefits. Lender agreed to a substantial compromise of its potential recovery in order to have a global settlement. Having decided to cut to the bottom line and reduce everything to a single dollar amount and mutual global releases, the parties made informed decisions to settle the way they did and to reflect it in the signed document. That is why the mutual releases were broad:

> Amtrak expressly acknowledges and agrees that this Agreement, including the releases herein, is intended to and does include any and all claims comprising or arising out of the Specific Release Claims which Amtrak *may now or hereafter have, known or unknown.*

(Agreement ¶4.2.2. *See also* Lender's parallel release at Agreement ¶4.1.2.)

This is an integrated contract, *see* Agreement ¶¶5.10, 5.14, which the parties agreed should be construed as if jointly prepared (that is, no adverse inference is drawn against one party or the other). *See* Agreement ¶5.11. There is no side agreement about the subject rents or vendor bills, even though their existence and the controversy about them was well known to Amtrak.

**5. Amtrak is Breaching the Settlement.** Amtrak sought, and in some cases has received, a second payment from tenants who had tendered rent in 2024 to USI and which Amtrak agreed it would not seek to recover from USI directly. These tenants have approached USI to be paid. Amtrak has also told tenants to seek payment of the rent money from USI. But Amtrak agreed that it had no claim to that money and the parties did not provide for its payment in the Settlement Agreement. Amtrak is doing indirectly what it agreed it could not do directly—namely, getting paid the rent money paid to USI before the settlement.

Amtrak's current argument is that the pre-settlement payments were not "rent" because they were not delivered to Amtrak as landlord. (Hearing Tr. at 15 19). But that argument misstates the record and everyone's understanding as to what those payments represented. The tenant understood it was paying rent and Amtrak understood that it would not seek to recover that payment from USI. In trying to avoid its agreement, Amtrak is subverting the plain language of the Settlement Agreement as well as the spirit of the settlement.

Finally, while Amtrak may say that it did not want to pay the contractors or credit the tenant's rents, its Settlement Agreement provides otherwise. The final Settlement Agreement controls, not the discussions made during its negotiation. (Agreement ¶ 5.10 ("This Agreement represents the complete understanding between the parties hereto and supersedes all prior negotiations, representations or agreements, either written or oral, as to the matters described herein."

Amtrak did not reserve out of the settlement a claim that it was still owed rent for the same period as was delivered by tenants to USI pre-settlement. Amtrak cannot create a "second claim" for that money and tell the tenants to chase USI for it. Indeed, Amtrak specifically warranted in the settlement that it has not "sold, assigned, transferred, conveyed or otherwise disposed of any claims, obligations or causes of action released herein (including the Specific Released Claims)." (Agreement ¶ 4.23. That representation would be false if Amtrak created claims identical to the released claims and handed them to tenants to

pursue. Amtrak stepped into USI's shoes—just as Lender had stepped into Ashkenazy's shoes—and Amtrak has agreed to bear the costs of operating the Station. It should not be allowed to shift back to USI the costs of operating the Station in light of the negotiated global settlement and release.

Lender requests that the Court declare that the Settlement Agreement unambiguously requires that Amtrak deal with the tenant and vendor issues in such a way that USI is not called upon to pay the tenants or vendors or Amtrak.

*/s/ Paul J. Kiernan*
Paul J. Kiernan
Louis J. Rouleau
HOLLAND & KNIGHT, LLP
800 17th Street, N.W., Suite 1100
Washington, D.C. 20006
Phone: (202) 663-7276
Fax: (202) 955-5564
Paul.Kiernan@hklaw.com

*/s/ Y. David Scharf*
Y. David Scharf
Kristin T. Roy
Latisha V. Thompson
Amber R. Will
Mahnoor Misbah
*Admitted pro hac vice*
MORRISON COHEN, LLP
909 Third Avenue
New York, New York 10022
ydscharf@morrisoncohen.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 10th day of June 2025, I served a true and correct copy of the foregoing

Defendant's Motion to Enforce Settlement Agreement on counsel of record via the CM/ECF filing sys-

tem.

/s/ Paul J. Kiernan_____
Paul J. Kiernan

# EXHIBIT A

## Documents Under Seal

## AGREEMENT OF SETTLEMENT

This AGREEMENT OF SETTLEMENT ("Settlement Agreement"), is made as of February 5, 2025, between (a) **National Railroad Passenger Corporation ("Amtrak")** and (b) **Union Station Investco, LLC ("USI"), Kookmin Bank Co., LTD., individually and in its capacity as trustee of KTB CRE Debt Fund No. 8, a Korean Investment Trust ("Kookmin"), together with its agent on behalf of the trust in Korea, Daol Fund Management Co. ("Daol Fund") and its agent on behalf of the trust in the United States, Rexmark Holdings LLC d/b/a/ Rexmark ("Rexmark").**





**2.4    SPECIFIC RELEASED CLAIMS**: Specific Released Claims shall include any claim arising from or relating in any way to: (1) the Condemnation Action, including any claims relating to filing of the Condemnation Action, the taking of legal title to and possession of the Subject Property Interest, any defenses filed to any claim relating to the taking, claims for just compensation for the Subject Property Interest, claims related to possession or turnover of possession, as well as claims for costs, expenses and/or attorney fees; (2) claims that Amtrak and Lender may have against each other where such claims relate to the Condemnation Action or the Subject Property Interest, including but not limited to claims for monies paid by third parties as rent pursuant to subleases or monies owed to third parties associated with operation of Union Station or the Subject Property Interest; (3) the FOIA Action, including any claims asserted therein by the plaintiff or on behalf of plaintiff's clients, and all claims for costs, expenses and attorney fees, (4) the Subject Property Interest, including any claims relating to performance under any lease, title to the Subject Property Interest, or possession of the Subject Property Interest; (5) the management and operation of the Subject Property Interest. Specific Released Claims includes any and all claims that were or could have been raised in the Condemnation Action, the FOIA Action, or any lease by any party to this Agreement, including claims for restitution, equitable claims, set off claims, contract claims, accounting, allocation, or related to any court order entered in said actions.

**2.5    DATE OF VESTING:**  Date of Vesting shall mean April 14, 2022, the date the Subject Property Interest was acquired by Amtrak by eminent domain, pursuant to 49 U.S.C. § 24311(a)(2).



**3.2    PAYMENT BY AMTRAK**: The parties agree that the total amount of just compensation and all interest thereon to be paid by Amtrak equals $505,000,000. As of the execution of this Settlement Agreement, Amtrak has paid $250,000,000 in just compensation, which the Lender received through the withdrawal and release of the funds deposited into the registry of the Court. The balance of the just compensation, namely $255,000,000 ("***Additional Settlement Proceeds***"), shall be paid as follows:

(i)    Upon execution of the Settlement Agreement, Amtrak will pay $50,000,000 (the ***First Installment***) directly to Lender within three business days;

(ii)    Amtrak will pay a further $175,000,000 directly to Lender thirty days following the filing of the joint motions set forth in Section 3.2.2, (the ***Potential Interim Installment***) if no Consent Order has yet been entered by that date;

(iii)    On the same day that Amtrak pays the Potential Interim Installment, Amtrak will deposit the additional sum of $30,000,000 in an interest-bearing account held by a third party approved by the Parties with directions that the Potential Interim Installment be paid as directed in (iv) below.

(iv)    Within five business days after the Consent Order has been entered, Amtrak will pay directly to Lender the balance of the Additional Settlement Proceeds due (the ***Final Installment***), either $205,000,000, or if the Potential Interim Installment has already been sent, the release of the additional $30,000,000, plus accrued interest, that was held in the interest-bearing account described in 3.2(iii).



**3.2.3**    The parties agree to use their best efforts to cause each of the conditions set forth above to be fulfilled expeditiously. Lender agrees that its obligation to cooperate includes using its best efforts to defeat USSM's opposition, if any, to the entry of the requested relief. Amtrak likewise agrees that it will cooperate using its best efforts with Lender should it need Amtrak's testimony or involvement in the action pending in the U.S. District Court for the Southern District of New York, *Daol Rexmark Union Station LLC et al. v. Union Station Sole Member, LLC*, 1:22-cv-06649. By providing the foregoing cooperation, Amtrak is not consenting to be added as a party to that action or to file its own action.

**4.1.2**    Lender expressly acknowledges and agrees that this Agreement, including the releases herein, is intended to and does include any and all claims comprising or arising out of the

4

Specific Released Claims which Lender may now or hereafter have, whether known or unknown.



**4.1.4**    Lender hereby remises, releases, and forever discharges Amtrak from any and all obligations, debts, demands, actions, causes of action, contract claims, tort claims of any kind and nature, statutory claims of any kind, administrative claims, charges, suits, accounts, covenants, contracts, agreements,  relocation claims, just compensation claims, restitutions claims, regulatory claims, loss of use claims, property damage claims, claims for consequential damages, claims for liquidated damages, claims for damages of all kind and nature, claims for equitable relief, claims for punitive damages, claims for attorney fees, costs and expenses, and any and all claims, demands, liabilities whatsoever of every name and nature, both in law and at equity, which Lender now has, may have or ever had against Amtrak, as now appearing or as may appear at any time in the future, both known or unknown, suspected or unsuspected, for any act or omission occurring up to and including the date of this Agreement, where such claims in any way arise out of or are in any way associated with or related to the Specific Released Claims. Lender recognizes and understands that it is releasing Amtrak for any act, omission or injury occurring up to and including the date of this Agreement where such act relates in any way to the Specific Released Claims, regardless of whether Lender knows of said act, omission or injury.

**4.2.2**    Amtrak expressly acknowledges and agrees that this Agreement, including the releases herein, is intended to and does include any and all claims comprising in or arising out of the Specific Released Claims which Amtrak may now or hereafter have, whether known or unknown.

**4.2.3**    Amtrak represents and warrants that no other person or entity has any interest in any claims released herein (including the Specific Released Claims) and that they have not sold, assigned, transferred, conveyed or otherwise disposed of any claims, obligations, or causes of action released herein (including the Specific Released Claims).

**4.2.4**    Amtrak hereby remises, releases, and forever discharges Lender from any and all obligations, debts, demands, actions, causes of action, contract claims, tort claims of any kind and nature, statutory claims of any kind, administrative claims, charges, suits, accounts, covenants, contracts, agreements, relocation claims, just compensation claims, restitutions claims, regulatory claims, loss of use claims, property damage claims, claims for consequential damages, claims for liquidated damages, claims for damages of all kind and nature, claims for equitable relief, claims for punitive damages, claims for attorney fees, costs and expenses, and any and all claims, demands, liabilities whatsoever of every name and nature, both in law and at equity, which Amtrak now has, may have or ever had against Lender, as now appearing or as may appear at any time in the future, both known or unknown, suspected or unsuspected, for any act or omission occurring up to and including the date of this Agreement, where such claims in any way arise out of or are in any way associated with or related to the Specific Released Claims. Amtrak recognizes and understands that it is releasing Lender for any act, omission or injury occurring up to and including the date of this Agreement where such act relates in any way to the Specific Released Claims, regardless of whether Amtrak knows of said act, omission or injury.



7



**5.10.    ENTIRE AGREEMENT AND OBLIGATION TO FURTHER COOPERATE.** This Agreement represents the complete understanding between the parties hereto and supersedes all prior negotiations, representations or agreements, either written or oral, as to the matters described herein.  No term or provision of this Agreement may be varied, changed, modified, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against whom the enforcement of the variation, change, modification, waiver, discharge or termination is sought.  Lender shall have the obligation to cooperate with Amtrak with respect to any issues with respect to title to and possession of the Subject Property Interest (including any

issues with respect to title insurance), including if necessary, executing and filing any documents that are reasonably requested by Amtrak.

**5.11.    CONSTRUCTION AND GOVERNING LAW.** This Agreement and its provisions shall be construed in accordance with and governed by the laws of the District of Columbia. The Parties acknowledge and agree that that the Agreement shall be construed as if jointly prepared by all Parties.

**5.12.    EFFECT OF AGREEMENT.** This Agreement shall bind and inure to the benefit of the Parties named and their respective heirs, personal representatives, successors, and assigns.  No person or entity which is not a party to this Agreement shall acquire any rights hereunder, whether as a purported third-party beneficiary or otherwise, except as expressly stated herein.



**5.14.    MERGER.** This Agreement contains the entire understanding of the Parties. There are no representations, warranties, promises, memoranda, covenants or undertakings other than those expressly set forth in this Agreement, and the Parties have not relied on any representation except as provided herein and have made such independent investigations as they in their sole

9

discretion, have chosen to make. All prior discussions, memoranda and correspondence as to the subject matter hereof are merged into this Agreement and do not survive this Agreement. This Agreement supersedes all prior agreements, promises, understandings, letters of intent, covenants, arrangements, communications, representations or warranties, whether oral or written, by any party hereto or by a related or unrelated third party. The Parties hereto have been given full right and opportunity to consult with counsel. This Agreement was drafted jointly by counsel for Amtrak and Lender.

EXHIBIT **1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL RAILROAD PASSENGER     *
CORPORATION (AMTRAK),

      PLAINTIFF,                  *     CIVIL ACTION NO. 1:22-CV-01043

                                 *

v.                                 *

SUBLEASE INTEREST OBTAINED PURSUANT
TO AN ASSIGNMENT AND ASSUMPTION OF    *
LEASEHOLD INTEREST, *et al.*

                                 *

      DEFENDANTS.

                                 *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## CONSENT ORDER

Upon the request of Plaintiff, National Railroad Passenger Corporation ("Amtrak") and

Defendants Union Station Investco, LLC ("USI") and Kookmin Bank Co., LTD., individually and

in its capacity as trustee of KTB CRE Debt Fund No. 8, a Korean Investment Trust ("Kookmin"),

together with its agent on behalf the trust in Korea, Daol Fund Management Co. ("Daol Fund")

and its agent on behalf of the trust in the United States, Rexmark Holdings LLC d/b/a/ Rexmark

(Rexmark"), with AMTRAK, USI, KOOKMIN, Daol Fund and Rexmark being collectively

referred to as the "Parties," having represented to this Court that they have resolved among

themselves all issues relating to this proceeding by way of agreement, it is hereby:

**ORDERED,** that because Union Station Sole Member LLC ("USSM") does not hold a

ownership interest in the Subject Property Interest and because USI and Kookmin have withdrawn

any objections to the taking to Amtrak's exercise and use of its eminent domain powers,

specifically 49 U.S.C. §24311, to acquire the Subject Property Interest that USI obtained from

12

Union Station Venture II, LLC by an Assignment and Assumption of Leasehold Interest made as of January 25, 2007 (the "Subject Property Interest"), the Court finds that absolute title to the Subject Property Interest vested in Amtrak free and discharged of all claims and liens of every kind whatsoever as of the date of April 14, 2022, ; and it is further

**ORDERED,** with Kookmin having the right to retain the amounts previously withdrawn from the registry of the Court, Judgment is entered against plaintiff Amtrak and in favor of Kookmin and Union Station Investco, LLC in the amount of $255,000,000, which is the total amount of additional just compensation and any interest through the date of the entry of this Order, and payment for all related claims. The terms of the payment of the Judgment have been agreed to by the parties, Within five days after payment of the Judgment as agreed, Lender and USI are ordered to file a Satisfaction of Judgment.

**ORDERED,** that all other claims and defenses are dismissed; and it is further

**ORDERED,** that any pending motions are denied as moot; and it is further

**ORDERED,** each party shall bear its own costs, expenses and attorney's fees; and it is further

**ORDERED,** the Court will retain jurisdiction to address any issues under the separate settlement agreement.

It is **SO ORDERED** this _____ day of _____, 2025.

_____
Amit P. Mehta
United States District Court

13

**EXHIBIT 2**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **HOLLAND & KNIGHT LLP** | * | |
| | * | **CIVIL ACTION NO. 1:23-CV-000361** |
| PLAINTIFF, | * | |
| v. | * | |
| **NATIONAL RAILROAD PASSENGER** | * | |
| **CORPORATION (AMTRAK)** | | |
| | * | |
| DEFENDANT. | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

### JOINT STIPULATION OF DISMISSAL

Pursuant to Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure, Plaintiff Holland & Knight LLP and Defendant National Railroad Passenger Corporation (Amtrak), by counsel, hereby jointly stipulate to the dismissal of this case with prejudice, with each party to bear its own attorneys' fees and costs of suit.

Respectfully Submitted,

**COUNSEL FOR PLAINTIFF HOLLAND & KNIGHT LLP**

*/s/ Paul J. Kiernan*
Paul J. Kiernan (D.C. Bar No. 385627)
Sara Benson (D.C. Bar No. 1767612)
800 17th Street N.W. Suite 1100
Washington, D.C. 20006
Phone: 202-663-7276
Fax: 202-955-5564
Paul.Kiernan@hklaw.com

14

Sara.Benson@hklaw.com

**COUNSEL FOR DEFENDANT NATIONAL RAILROAD PASSENGER CORPORATION**

*/s/ Lindsay C. Harrison*
Lindsay C. Harrison, DC Bar #977407
Jessica Ring Amunson, DC Bar #497223
JENNER & BLOCK, LLP
1099 New York Avenue, NW, Suite 900
Washington, D.C. 20001-4412
Telephone: 202-639-6000
Fax: 202-639-6066
lharrison@jenner.com
jamunson@jenner.com

*/s/ Patricia McHugh Lambert*
Patricia McHugh Lambert, US DC Bar ID MD0008
Kambon R. Williams, US DC Bar ID MD29872
PESSIN KATZ LAW, P.A.
901 Dulaney Valley Road, Suite 500
Towson, MD  21204
Telephone: 410-938-8800
Fax: 410-832-5650
plambert@pklaw.com
kwilliams@pklaw.com

**CERTIFICATE OF SERVICE**

I hereby certify on this _____ of _____, 2025, I served a true and correct copy of the

foregoing Joint Stipulation of Dismissal on all counsel of record.

*/s/ Paul J. Kiernan*
Paul J. Kiernan

15

Exhibit 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL RAILROAD PASSENGER          *
CORPORATION (AMTRAK)
                                     *      CIVIL ACTION NO. 1:22-CV-01043
       PLAINTIFF,
                                     *
v.
                                     *
SUBLEASE INTEREST OBTAINED PURSUANT
TO AN ASSIGNMENT AND ASSUMPTION      *
OF LEASEHOLD INTEREST, made as of January
25, 2007, with said property interest      *
PERTAINING TO DESCRIBED LEASEHOLD
INTERESTS AT WASHINGTON UNION        *
STATION , et al.
                                     *
       DEFENDANTS.
                                     *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

### NATIONAL RAILROAD PASSENGER CORPORATION'S
### MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS
### USSM AS A DEFENDANT OR, IN THE ALTERNATIVE, SUBSTITUTE
### AN ENTITY CONTROLLED BY LENDER AS A PARTY INSTEAD OF USSM

    Plaintiff National Railroad Passenger Corporation ("Amtrak"), by and through undersigned

counsel, hereby submits this Memorandum in Support of its Motion to Dismiss Union Station Sole

Member, LLC ("USSM") as a Defendant or, in the alternative, substitute an entity controlled by

Lender[1] as a party instead of Union Station Sole Member, LLC.

### I.      INTRODUCTION

---

[1] For ease of reference, this Memorandum refers to Defendant Kookmin Bank Co. Ltd, individually and in its capacity as trustee of KTB CRE Debt Fund No. 8, a Korean Investment Trust, and its agent on behalf of said Trust in Korea, Daol Fund Management Co. and its agent on behalf of said Trust in United States, Rexmark Holdings LLC d/b/a Rexmark ("Kookmin"), along with Union Station Investco, LLC ("USI") as "Lender."

Federal Rule of Civil Procedure 71.1 ("Rule 71.1") required Amtrak in its Complaint (Compl.) (ECF No. 1), to "join as defendants only those persons who have or claim an interest in the property and whose names are then known." At the time of the filing Amtrak named USSM as a party because "USSM *may* have an interest in the Subject Property Interest" because "of its relationship with USI as sole member of USI." Compl. ¶ 18 (emphasis added). At the time it prepared the Complaint, Amtrak had limited information about USSM and its relationship to USI and the Subject Property Interest.  As discussed below, the uncontroverted facts, and admissions made by USSM in discovery, make that USSM presently has no interest in the Subject Property Interest and that USSM had no interest when the Complaint was filed. Furthermore, the Southern District of New York has enjoined USSM from "holding itself out as the owner of or in control of" USI and "exercising or purporting to exercise any contractual or legal right of USI."  Prelim. Inj. Order 2–3, *Daol Rexmark Union Station v. USSM,* Case No. 22-cv-6649 (S.D.N.Y. Aug. 5, 2022) (ECF No. 39). Accordingly, under Rule 71.1(i)(2), USSM should now be dismissed as a party, as USSM was "unnecessarily or improperly joined" as a defendant since it never had and does not presently have an ownership or other property interest in the Subject Property Interest.

Even if the Court were to conclude that USSM held a property interest at the time of filing, USSM should still be removed, by substitution, as a party.  Whatever interest USSM held at the time the Complaint was filed has now been foreclosed upon and transferred to an entity affiliated and controlled by the Lender—and thus under Rule 71.1(g) the present owner of such interest must be substituted for USSM as a party.

The removal of USSM as a party is not only required by the Rules.  It will also simplify these proceedings.  The removal of USSM from this case could help facilitate the possible resolution of this matter by reducing the number of parties whose claims would need to be resolved

as part of any potential settlement and by allowing the Court to resolve this case by means of a Consent Order, should Amtrak and Lender reach an agreement as to terms. If USSM were to remain in the case, it could attempt to extract leverage from its position to meddle with a resolution between Amtrak and Lender despite lacking any actual interest in the underlying property interest. Alternatively, if the case were not resolved, the removal of USSM from the case would still simplify things by streamlining preparations for, and the execution of a trial. Otherwise, the parties may need to spend time and resources on expert discovery, *Daubert* motions, and other motions in limine related to USSM, which would distract from the relevant issues in the case. Equally importantly,

For these reasons and as set forth below, this Court should dismiss USSM from this case.

## II.    BACKGROUND

Before this case was filed, Amtrak could get only limited information as to who would or could claim an interest in the Subject Property Interest. Amtrak knew that USSM had some involvement with USI, but the exact nature of the involvement was unclear. Amtrak had a limited ability to confirm these facts: for instance, Amtrak could not check a title report showing whether USI had transferred property rights to USSM because those reports do not cover subleases.

On April 14, 2022, Amtrak filed its Complaint to acquire the leasehold (the "Subject Property Interest"). *See generally* Compl. Amtrak alleged, based on the limited information available to it then, that USI was the owner of the Subject Property Interest, with USSM named as a defendant by virtue "of its relationship with USI as sole member of USI." Compl. ¶¶ 17–18. USSM's Answer to the Complaint affirmed this relationship: USI, a limited liability company (LLC), owned the Subject Property Interest and USSM was a "member" of this limited liability company. USSM's Answer at ¶ 12 (ECF No. 38) ("Investco is the owner of the Subject Property

18

interest and Sole Member is the sole member of Investco"). But the Answer did not resolve what control Ashkenazy may or may not still have regarding the Subject Property Interest.

Shortly after the filing of the Complaint, the nature of USSM's relationship to USI—as well as the question of who controlled USI—was of concern both to this Court (*see, e.g.,* ECF 54-57, 60) and at issue in heated litigation in the United States District Court of the Southern District of New York (*see* Prelim. Inj. Order 2–3, *Daol Rexmark Union Station v. USSM,* Case No. 22-cv-6649 (S.D.N.Y. Aug. 5, 2022) (ECF No. 39)). However, as discussed below, it is now clear that USSM was misjoined as a party in this case.

Recent depositions confirm that USSM's has no ownership interest in the Subject Property Interest. During the deposition of Yossi Preiserowicz, also known as Joe Press, the corporate designated witness for USSM, Mr. Press testified that USSM did not own the Subject Property Interest; rather, USSM was a member of USI, which was the owner of the Subject Property Interest. This can be seen in the following exchange:

> Q.    I have a couple of questions about the entities in general. USSM is an LLC, correct?
> A.    Yes.
> Q.    It is formed in Delaware?
> A.    I believe so.
> Q.    And it never held an ownership interest in the leasehold itself, is that correct?
> A.    I don't know if that's -- I mean it held an ownership in the entity that owned the leasehold.
> Q.    USI is a Delaware LLC [sic], correct?
> A.    I believe so.
> Q.    And it had membership interests, correct?
> A.    Yes.
> Q.    And one of the members was USSM, correct?
> A.    Yes.
> Q.    And so that's the interest that USSM had, not an interest in the property itself, correct?
> A.    Yes.
> Q.    And USI was the owner of the subject property interest as that term is used in the complaint as of 4/14/2022?

19

A.    Of the leasehold.

Dep. of Corporate Designee of USSM, Yossi Preiserowicz a/k/a Joe Press (Joe Press Dep.), 188:25–190:2; *see also* USI's Answer ¶ 17 (ECF No. 36) ("Defendant admits Defendant is a limited liability company organized under the laws of the State of Delaware and that Defendant is the current owner of the Subject Property Interest").[2] Discovery has also revealed that shortly after the Complaint was filed, USSM's membership interests in USI were purchased at a foreclosure sale and transferred to a new entity, Daol Rexmark Union Station LLC. *See* Dep. of Corporate Designee of Kookmin Bank Co. Ltd, individually and in its capacity as trustee of KTB CRE Debt Fund No. 8, Michael Rebibo (Micheal Rebibo Dep.), 32:25–33:15; [3] *see also* USSM's Responses to Lender's Requests for Admissions at pp. 9–11 (admitting that a foreclosure sale was held for USSM's membership interest in USI, USSM did not contemporaneously object to the sale or file for USI's bankruptcy, and the membership interests were purchased). Mr. Press, the corporate designee of USSM, confirmed that the entity's interest was transferred by virtue of the foreclosure sale to another entity, as noted in the following exchange:

> Q.    Now there was a foreclosure of the mezz loan on June 14, 2022, correct?
> A.    I don't recall the exact date.
> Q.    You're aware it's in June 2022, correct?
> A.    Yes.
> Q.    And this is one of the subject matters of the litigation in the Southern District of New York, correct?
> A.    Yes.
> Q.    The foreclosure was of the interest of USI, correct?
> A.    Yes.
> Q.    And that interest was subsequently transferred to Dow (sic) Rexmark. Is that correct?
> A.    I don't know the exact entity.

---

[2] The deposition transcript pages are attached as Exhibit 1. Mr. Press was the corporate designee for USSM. Joe Press Dep. 16:13–17:13.

[3] The deposition transcript pages are attached as Exhibit 2. Mr. Rebibo was the corporate designee for Kookmin Bank Co. Ltd, individually and in its capacity as trustee of KTB CRE Debt Fund No. 8. Michael Rebibo Dep. 9:10–21.

> Q.    It was transferred to another entity, correct?
>
> A.    Correct.

Joe Press Dep. 248:3–20.

Indeed, this Court in its Memorandum Opinion (ECF No. 106) issued April 17, 2024, found

that USI was no longer owned by USSM, stating:

> USI was previously wholly owned by USSM. USSM is a limited
> liability company wholly owned by Ashkenazy Union Station
> Holdings, LLC, a New York-based redevelopment company. Jt. Ex.
> 3, at 5; Compl., *Daol Rexmark Union Station v. USSM*, No. 22-cv-
> 6649 (S.D.N.Y.), ECF No. 1, ¶ 8 [hereinafter *Rexmark* Compl.];
> Answer, *Daol Rexmark Union Station v. USSM*, No. 22-cv-6649
> (S.D.N.Y.), ECF No. 45 [hereinafter *Rexmark* Answer], at 3.

ECF No. 106 at 14.

Daol Rexmark Union Station LLC ("Daol Rexmark") is now the managing member of

USI. Michael Rebibo Dep. 32:25–33:24. Daol Rexmark is owned by the KTB CRE Debt Fund

No. 8, and Mr. Rebibo is the asset manager as well as one of Daol Rexmark's managing members.

Michael Rebibo Dep. 33:25–34:25; *see also* Sept. 11, 2023, Hr'g Tr., Direct Examination of

Michael Rebibo, 271:4–10 ("USI is a subsidiary of another entity which was formed last year

called Daol Rexmark Union Station, LLC, and I'm one of the managing members of that entity").

Accordingly, USSM does not possess an ownership interest in the Subject Property

Interest.

## III.    LEGAL STANDARD

Under Rule 71.1(c)(1), which governs eminent domain actions filed in the United States

District Court, a condemnor must join as defendants entities that "have or claim an interest in the

property" being acquired. "Condemnation is an action *in rem,* involving the property itself. Only

parties with either a legal or equitable interest in the property may share in the condemnation

award. Where a party lacks such an interest, dismissal is appropriate." *State v. Lee,* 2011 Wash.

21

App. Lexis 1922, at *8 (Wash. Ct. App. 2011) (citations omitted)).

Rule 71.1 contemplates that after filing of an eminent domain action, the parties may investigate what property interests any defendant holds that could be relevant to the property being condemned. This investigation may reveal that the alleged interest never existed, no longer exists, or is not compensable; in any of those scenarios, the court has broad authority to dismiss "*at any time* a defendant who was unnecessarily or improperly joined." Fed. R. Civ. P. 71.1(i)(2) (emphasis added); *see also* Fed. R. Civ. P. 21 (permitting the Court, on motion or on its own, to "drop a party" that has been misjoined).

"[A] properly joined party may later be dismissed 'where it develops that he has no interest.'" *United States v. 88.28 Acres of Land,* 608 F.2d 708, 712 (7th Cir. 1979) (quoting the original Advisory Committee Note for Rule 71A(i), the predecessor to current Rule 71.1(i)); *see also EQT Gathering, LLC v. A Tract of Prop.*, Case No. 12-58-ART, 2012 U.S. Dist. LEXIS 120911, at *11, 2012 WL 3644968 (E.D. Ky. Aug. 24, 2012) ("[U]nder Rule 71.1(i)(2), the Court may dismiss any defendants who no longer have an interest in the property to be condemned."); *Port of Grays Harbor v. Bankr. Estate of Roderick Timber Co.,* 869 P.2d 417, 420 (Wash. Ct. App. 1994) (citing *88.28 Acres of Land* and Deborah B. Dove, Annotation, *Dismissal, Under Rule 71A(i)(3) of Federal Rules of Civil Procedure, of Defendant Unnecessarily or Improperly Joined in Condemnation Action*, 57 A.L.R. Fed. 490 (1982)).

In determining whether a party has or claims a proper interest in the condemned property, "courts generally turn to an examination of state law, and examine whether the [condemnation] actually interfered with the claimant's antecedent bundle of rights." *Mt. Valley Pipeline, LLC v. Easements to Construct, Operate & Maintain a Nat. Gas Pipeline Over Tracts of Land in Giles Cty.,* Case No. 7:17-cv-492-EKD, 2019 U.S. Dist. LEXIS 129783, at *31, 2019 WL 3536825

22

(W.D. Va. Aug. 2, 2019) (internal citations and quotation marks omitted) (cleaned up).

## IV.    ARGUMENT

### A. USSM should be dismissed because it was unnecessarily or improperly joined.

USSM should be dismissed because it has never held, and does not now hold, an interest in the Subject Property Interest.

To the extent USSM may claim an interest, that interest would have to stem from its prior membership in USI, a Delaware LLC. Under Delaware law, neither shareholders of a corporation nor holders of membership interests in a limited liability company hold an interest in property owned by such business entities. *See Jordan v. Mirra*, Case No. 14-1485, 2022 U.S. Dist. LEXIS 30589 at *27, 2022 WL 610713 (D. Del. Feb. 22, 2022). "Delaware courts have long recognized that a shareholder's equitable interest 'in the profits and in the distribution of assets on liquidation' does not grant them any 'interest in any specific assets of the corporation.' . . . This holds equally true for the non-incorporated business entities such as LLCs. The Delaware LLC Act states that 'a member has no interest in specific limited liability company property.'" *Id.* (quoting *Buechner v. Farbenfabriken Bayer Aktiengesellschaft*, 38 Del. Ch. 490, 154 A.2d 684, 686 (Del. 1959) and 6 Del. Code § 18-701)). Thus, USSM and Daol Rexmark did not and do not have an interest in the Subject Property Interest, which was real property owned by USI.

The preeminent treatise on condemnation agrees: Ownership interest in a business entity that holds real property being acquired in an eminent domain action does not make the holder of such business ownership interest a proper party to an eminent domain action. *See* 2 Julius Sackman et al., *Nichols on Eminent Domain* § 5.06[2] (Matthew Bender, 3d ed. 2024) ("A stockholder of the condemnee has no interest in the property being condemned and is not a proper party to the action.").

23

Case law further supports dismissal of holders of such tangential interests. For example, the appellate court in *Port of Grays Harbor*, an eminent domain action, considered whether the lower court's refusal to dismiss the sole stockholders of a corporate entity that owned the condemned land was error. 869 P.2d at 418. More specifically, the condemned land was held by a company of which the shareholders were the sole shareholders, a bank later foreclosed on a deed of trust, and the company was deemed bankrupt. *Id.* at 418–19. The condemnor initially named as defendants the bankruptcy trustee and the foreclosing bank, and joined the shareholders to the condemnation proceedings later once they asserted a claim and argued that as the sole shareholders they would receive any money left after satisfying creditors. *Id.* at 419. The appellate court determined that "it was clearly proper for the Port to join [the shareholders] in the first instance, because they were vocally asserting or claiming an interest in the property." *Id.* But the court further found that "[i]f it is determined that the putative condemnee [did] not have the requisite interest in the property, then dismissal from the proceedings should follow." *Id.* at 420. The appellate court determined that the motion to dismiss the shareholders as defendants should have been granted as the shareholders had "no interest in the property being condemned, and are not necessary parties to a condemnation action." *Id.* (citing 2 Nichols on Eminent Domain § 5.08 (3d rev. ed. 1989) and *Riverside v. Malloch*, 226 Cal. App.2d 204, 37 Cal. Rptr. 862 (1964) (shareholder of a mutual water company in eminent domain proceeding could not assert an interest in the property being condemned when the property was owned by the water company)). It did not matter that the shareholders claimed economic consequences would flow from the condmenation: "Persons who might suffer only collateral economic consequences are not entitled to participate." *Port of Grays Harbor*, [cite].

The same principles have been repeated in countless other condemnation cases. *See, e.g.*,

*Mt. Valley Pipeline, LLC v. Easements to Construct, Operate & Maintain a Nat. Gas Pipeline Over Tracts of Land in Giles Cty.*, Case No. 7:17-cv-00492, 2020 U.S. Dist. LEXIS 95497, at *8, 2020 WL 2840165 (W.D. Va. June 1, 2020) (dismissing from condemnation action a later joined party to whom the owner sold the property subject to the condemned property interests after the condemnation action began when the prior owner was to whom just compensation was owed); *United States v 29.16 Acres, etc.*, 496 F. Supp. 924, 928–930 (E.D. Pa. 1980) (entry of judgment where named party had no legally cognizable claim to title upon examination of state law).

Like the defendants in *Port of Grays Harbor, Mt. Valley Pipeline, LLC* and *597.75 Acres of Land*, who as a matter of law had no interest in the property being acquired through condemnation, USSM should be dismissed as a party.

### B. Alternatively, Daol Rexmark should be substituted as a party.

While this Court should simply dismiss USSM as a party, Amtrak seeks, as alternative relief only, that Daol Rexmark instead be substituted for USSM as a party.

Fed. R. Civ. P. 71.1(g) provides: "If a defendant dies, becomes incompetent, or transfers an interest after being joined, the court may, on motion and notice of hearing, order that the proper party be substituted." *See also Constitution Pipeline Co., LLC v. Permanent Easement for 1.80 Acres*, Case No. 3:14-CV-2049 (NAM), 2021 U.S. Dist. LEXIS 193693, at *4, 2021 WL 4624486 (N.D.N.Y. Oct. 7, 2021) (granting contested motion to substitute in condemnation action as state law and the unambiguous language of the contract granted the new owners rights to the condemnation proceeds despite party being substituted arguing that transfer of the condemned property was invalid).

USSM's interests in USI were foreclosed upon and transferred. USSM's Responses to Lender's Requests for Admissions at pp. 9–11. Further, USSM is enjoined from asserting that

they own or control USI, exercise USI's legal rights, or can control transfer of assets to or from USI. *See* Prelim. Inj. Order 2–3, *Daol Rexmark Union Station v. USSM,* Case No. 22-cv-6649 (S.D.N.Y. Aug. 5, 2022) (ECF No. 39). Consequently, as alternative relief to dismissal under Rule 71.1(i)(2), Amtrak seeks relief under Rule 71.1(g) and asks this Court to substitute Daol Rexmark as a party in place of USSM. Daol Rexmark is, of course, controlled by the Lender.

### C. Dismissal or substitution would simplify this proceeding.

The continued presence of USSM as a party unnecessarily complicates this matter.

"Rule 71.1 has been characterized as a rule to provide a simple and uniform procedure that allows landowners to receive their *compensation* more quickly." *Mt. Valley Pipeline, LLC*, 2019 U.S. Dist. LEXIS 129783, at *37 (emphasis in original) (citing 12 Charles Alan Wright et al., *Federal Practice and Procedure* § 3041 (3d ed. 2018)). It is now undisputed that the Subject Property Interest at the time the instant action was filed was owned by USI—as the property's *only* owner, with Kookmin holding a lien on said property. Because USSM did not and does not hold an interest in the Subject Property Interest, this Court should determine that it is not entitled to distribution of just compensation—and consequently it has no right to participate further in these proceedings.

Allowing USSM to remain a party will complicate and prolong these proceedings. Expert discovery is proceeding right now, but if USSM insists on participating, either by presenting its own expert testimony or by seeking to take discovery as to the other parties' experts, its presence will impose additional and unnecessary costs and delays. Amtrak and/or the Lender may seek to exclude that testimony from the trial, whether under *Daubert* or under Rule 403, since USSM lacks any interest in the Subject Property Interest; USSM's participation therefore means additional motion practice that could be avoided if it were dismissed. Likewise, USSM may seek to

participate in the trial, which would mean multiple sets of attorneys presenting and/or cross-examining witnesses, again prolonging a trial that the actual parties in interest (and, likely, the Court) would like to see streamlined.

Furthermore, Lender believes that it has the right to make agreements with Amtrak with respect to this matter. *See* Michael Rebibo Dep. 332:3–23 ("The lender has the sole discretion to negotiate and settle on behalf of the -- all the parties"); USSM's Answer ¶ 12 ("Though the answer filed by defendant Kookmin asserts that it alone has the authority to act on behalf of Investco, Kookmin is wrong"). If Amtrak and the Lender were able to reach agreement on terms, then their proposed settlement could be stymied by the continued participation of USSM, which likely would seek to hold up a motion for entry of a Consent Order proposed by Amtrak and Lender. Allowing USSM to block a proposed settlement when USSM has no right to participate in this case would contravene Rule 71.1(j)(2)'s command that "the court and attorneys must expedite the proceedings so as to distribute the deposit and to determine and pay compensation."

And allowing USSM to participate in the compensation phase of this case also contravenes the injunction issued by the New York court. Specifically, the Southern District has enjoined USSM from "holding itself out as the owner of or in control of" USI and "exercising or purporting to exercise any contractual or legal right of USI." Prelim. Inj. Order 2–3, *Daol Rexmark Union Station v. USSM,* Case No. 22-cv-6649 (S.D.N.Y. Aug. 5, 2022) (ECF No. 39). To the extent USSM seeks to derive compensation here relating to property owned by USI, such an effort would violate the terms of that injunction.

Finally, USSM being dismissed or substituted does not leave it without recourse or its collateral interest in the outcome unguarded. USSM's and the Lender's litigation before the United States District Court for the Southern District of New York is ongoing, and USSM can seek relief

from that Court.  That Court—and not this Court which sits *in rem*—should resolve any issues between Lender and USSM, particularly as those disputes do not concern who is the owner of the Subject Property Interest.

## V.    CONCLUSION

Based on the foregoing, Amtrak respectfully requests that the Court find that USSM should be dismissed as a defendant pursuant to Fed. R. Civ. P. 71.1(i)(2), or alternatively, USSM should be substituted as a party.  A proposed order is attached to this Motion.

Respectfully submitted,

**COUNSEL FOR PLAINTIFF NATIONAL RAILROAD PASSENGER CORPORATION**

Patricia McHugh Lambert, US DC Bar ID MD0008
Kambon R. Williams, US DC Bar ID MD29872
PESSIN KATZ LAW, P.A.
901 Dulaney Valley Road, Suite 500
Towson, MD  21204
Telephone: 410-938-8800
Fax: 410-832-5650
plambert@pklaw.com
kwilliams@pklaw.com

Lindsay C. Harrison, DC Bar #977407
Jessica Ring Amunson, DC Bar #497223
JENNER & BLOCK, LLP
1099 New York Avenue, NW, Suite 900
Washington, D.C. 20001-4412
Telephone: 202-639-6000
Fax: 202-639-6066
lharrison@jenner.com
jamunson@jenner.com

28

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL RAILROAD PASSENGER          *
CORPORATION (AMTRAK),
                                     *      CIVIL ACTION NO. 1:22-CV-01043
         PLAINTIFF,
                                     *
v.
                                     *
SUBLEASE INTEREST OBTAINED PURSUANT
TO AN ASSIGNMENT AND ASSUMPTION OF   *
LEASEHOLD INTEREST, *et al.*
                                     *
         DEFENDANTS.
                                     *
*    *    *    *    *    *    *    *    *    *    *    *    *

**[PROPOSED] ORDER GRANTING JOINT MOTION TO FILE UNDER SEAL**

For the reasons set forth in the Parties' Joint Motion the Court GRANTS the Parties'

Joint Motion to File Under Seal.


So ORDERED this _____ day of May 2025.


                                    _____
                                    The Honorable Amit P. Mehta
                                    United States District Court Judge

# EXHIBIT B

Documents Under Seal

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

NATIONAL RAILROAD PASSENGER CORPORATION )
(AMTRAK)                                )
                                        )       1:22-cv-01043-APM
      Plaintiffs,                       )       Judge Amit P. Mehta
                                        )
      v.                                )
                                        )
SUBLEASE INTEREST PERTAINING TO DESCRIBED )
LEASEHOLD INTERESTS AT WASHINGTON       )
UNION STATION, et al.                   )
                                        )
      Defendants.                       )
_____)

**DECLARATION OF MICHAEL REBIBO IN SUPPORT OF**
**DEFENDANTS' MOTION TO ENFORCE SETTLEMENT AGREEMENT**

Michael Rebibo declares and states as follows:

1.    I am the Founder and Managing Principal of Rexmark Holdings LLC d/b/a Rexmark ("Rexmark"), a real-estate-investment management firm focused on debt and equity investments throughout the United States and Europe. I make this declaration on behalf of Union Station Investco, LLC and the Lender Defendants in support of their Motion to Enforce Settlement. I am over 18 years of age and have personal knowledge of the facts set forth herein.

**A. Background to Settlement**

2.    I was the principal negotiator on behalf of the Defendants in connection with the settlement of our eminent-domain action and the resolution of our claims with Amtrak. Over the period of November 2024 through the execution of the Settlement Agreement in February 2025, I estimate I met with Amtrak's representatives more than a half-dozen times either in person or by phone.

3.      Back in 2022, shortly after the filing of the eminent-domain action, Lender assumed control of USI, taking over from the Ashkenazy group after the borrower had defaulted on a $100 Million mezzanine loan. What we discovered when we took over control was that the financial conditions at Union Station were in disarray. Utilities were threatening to discontinue service because of unpaid bills. Repair work was needed. Tenant vacancies and receivables were high. The Station needed millions of dollars in investment and payment of expenses. We wound up shouldering that obligation, not Amtrak.

4.      We never had a contract or arrangement with Amtrak about running Union Station. We were not "hired" by Amtrak as its agent. Amtrak did not request payment of "rent" from us while we possessed the station nor did Amtrak ask for turnover of rents or agree to pay expenses while we were in possession. While we remained in possession of the leasehold position, we did not receive financial assistance from Amtrak for the costs of running the Station and investing in the property, apart from the payment from Amtrak as a tenant under its space-lease obligations. We paid the costs for improving the Station, marketing leases, re-tenanting spaces, and improving the premises, in addition to paying the expenses that we inherited from Ashkenazy's mismanagement. Because we did not get reasonable cooperation from Ashkenazy when they were replaced in management and never had a genuine handoff from Ashkenazy, we continued to uncover obligations that had been deferred or ignored, and had to deal with those out of our own pocket.

5.      Once the Court granted Amtrak's Motion for Immediate Possession in 2024, we cooperated fully with Amtrak regarding the turnover of information, books, records, leases, and other property information. We set up a dataroom for Amtrak containing copies of everything we had about the property and its management and contracts and status so that Amtrak would be fully

informed about the situation. We assigned contracts to Amtrak as it requested and transferred to Amtrak the tenant security deposits we held. We coordinated with Amtrak its mailing of notice to the tenants about the change in landlord. During this transition time, we discussed with Amtrak whether we would have a reconciliation of accounts and proration of revenues and expenses like one would do in connection with the sale of a building. Such a reconciliation was not part of the order regarding transfer and the issue was deferred.

6.      After the transfer of possession, we no longer had access to the Station's accounting records and cash receipts information, while Amtrak did have access. We did not have current information from Amtrak or JLL about rent receipts, expense payments, and other matters about the operation of the Station following the transfer of possession.

7.      Following the transfer of possession in July 2024, USI received rent and lease payments to our lockbox from some tenants of Union Station. We held those payments because we could not be sure whose it was and because we might eventually do a reconciliation. I know that Amtrak knew about USI holding the rent payments because Amtrak raised the subject with us in the autumn of 2024 about accounting for those rent payments from tenants. Moreover, some tenants reached out to us in the autumn of 2024 and they advised us that Amtrak told them to call us.

8.      During the fall of 2024, Amtrak, through counsel, raised the position that come trial Amtrak would seek an award or offset against just compensation to account for the value of the Union Station leasehold during the pendency of the suit, namely an amount of money payable by the Defendants to Amtrak for the right to control the Subject Property Interest for the two years that USI remained in possession. Issues were also raised by Amtrak about how to account for revenues and expenses of the Station since the taking was filed in April 2022.

**B. Negotiation of Settlement.**

9. ███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

10. ███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████.

11. ███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

12. ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████

13.    I have attached to this Declaration copies of the draft settlement agreements, starting with Amtrak's opening draft (Attachment 1), followed by Amtrak's redlined responses to our proposed language (Attachments 2-5). Focusing on the evolution of Paragraph 2.4 (Specific Released Claims), it is clear to me that we intended to cover and address claims associated with third-party tenants or vendors in our final agreement.

14.    It was our intent that with the payment of the settlement amount and fulfillment of the other terms of the Settlement Agreement, USI would not be responsible to pay over the rents that had been received through the settlement date or discharge any extant vendor obligations associated with the Station and, further, that we would not pursue Amtrak for rents or expenses that flowed in the other direction (like rents that Amtrak received for rental periods preceding the transfer of possession).

15.    Amtrak is now claiming that the Settlement Agreement allowed Amtrak to demand rent payments from tenants who had already paid rents which were received by USI and which Amtrak agreed it had no claim to receive from us. Amtrak has also directed tenants and vendors

to us for satisfaction of claims that are Amtrak's responsibility under our settlement. This is a clear end run around what the parties intended to achieve through their Settlement Agreement. It's an effort to conduct a partial reconciliation of accounts that the parties agreed they were not going to do. I believe that by pushing tenants or vendors to demand the money from USI after the settlement, Amtrak is violating our settlement and puts USI at a risk that we had settled to avoid.

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge.

Executed this 10th day of June, 2025.

Michael Rebibo, Managing Principal
Rexmark Holdings LLC d/b/a Rexmark

# EXHIBIT 1



**2.4    SPECIFIC RELEASED CLAIMS:**  For purposes of this Agreement, the term **Specific Released Claims** shall include all those claims which relate in any way to: (1) the Condemnation Action, including any claims relating to filing of the Condemnation Action, the taking of legal title to and possession of the Subject Property Interest, any defenses filed to any claim relating to the taking, claims for just compensation for the Subject Property Interest, claims related to possession or turn-over of possession, as well as claims for costs, expenses and/or attorney fees; (2) the FOIA Action, including any claims asserted therein by Lender and/or its counsel and all claims for costs, expenses and attorney fees, (3) the Subject Property Interest, including any claims relating to title and/or possession of the Subject Property Interest from the Date of Vesting (defined below), (4) the management and operation of the Subject Property Interest, (5) any and all matters or claims that were or could have been raised in the Condemnation Action and/or the FOIA Action by either party, including claims for restitution, equitable claims, set off claims, contract claims and/or claims related to any order entered in said actions.



4

# EXHIBIT 2

# EXHIBIT 3

# EXHIBIT 4

# EXHIBIT 5