DOCUMENT UNDER SEAL

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK) | ) ) | |
| Plaintiff, | ) ) ) | 1:22-cv-01043-APM Judge Amit P. Mehta |
| v. | ) ) | |
| SUBLEASE INTEREST PERTAINING TO DESCRIBED LEASEHOLD INTERESTS AT WASHINGTON UNION STATION, et al. | ) ) ) ) | |
| Defendants. | ) ) ) | |

**DEFENDANTS' OPPOSITION TO AMTRAK'S MOTION TO ENFORCE SETTLEMENT AGREEMENT**

In its Motion to Enforce Settlement Agreement, Amtrak agrees with the Lender Defendants[1] that the Settlement Agreement is unambiguous. *See* Amtrak Motion at 7. But Amtrak is wrong about what the Agreement provides because Amtrak ignores the plain meaning of the language the parties used and Amtrak does not properly account for the conditions that existed at the time of the settlement. Because Amtrak's motion spends a lot of time talking about what's *not* in the Agreement, the motion fails to grapple with the more important analysis of what *is* in the Agreement. Amtrak's Motion should be denied.

**A. Plain language of the Agreement.**

Paragraph 2.4 of the Settlement Agreement contains the critical language in describing

---

[1] "Lender" refers to Defendants Kookmin Bank Co. Ltd, individually and in its capacity as trustee of KTB CRE Debt Fund No. 8, a Korean Investment Trust (the "Trust"), and its agent on behalf of said Trust in Korea, Daol Fund Management Co. and its agent on behalf of the Trust in United States, Rexmark Holdings LLC d/b/a Rexmark along with Union Station Investco, LLC ("USI").

what is being mutually released, settled, and resolved:

> any claim arising from or relating in any way to: (1) the Condemnation
> Action, including any claims relating to filing of the Condemnation Action,
> the taking of legal title to and possession of the Subject Property Interest…
> claims related to possession of or turnover of possession, as well as claims
> for costs, expenses and/or attorney fees; (2) claims that Amtrak and Lender
> may have against each other where such claims relate to the Condemnation
> Action or the Subject Property Interest, including but not limited to claims
> for monies paid by third parties as rent pursuant to subleases or monies owed
> to third parties associated with the operation of Union Station or the Subject
> Property Interest…[and] the management and operation of the Subject
> Property Interest.

In construing a contract, the terms "related to" or "in connection with" are considered "quite broad" and even broader than "arising from*." See, e.g., Azima v. RAK Investment Auth.*, 926 F.3d 870, 877-78 (D.C. Cir. 2019). *See also John Wyeth & Brother Ltd. v. Cigna Int'l Corp.*, 119 F.3d 1070, 1074-75 (3d Cir. 1997)(Alito, J.) (phrase "arising in relation to" a contract is broader than "arising under" a contract). In *Azima*, in construing a forum-selection clause, the Court wrote that "arising out of" a contract is not as broad as "in connection with" the contract. 926 F.3d at 878.

Here, Paragraph 2.4 of the Settlement Agreement defines the released claims very broadly: "any claim arising from or relating in any way to" the lawsuits, the possession, the transfer, the management and operation of the Subject Property, and more.

The language about third parties, rents, and monies owed associated with the operation of Union Station dates back to the exchange of proposals and counterproposals prior to the drafting of the Settlement Agreement. As discussed in Defendants' Motion to Enforce Settlement Agreement, in the fall of 2024 Amtrak made a demand on Defendants to pay over to Amtrak the money retained as rent received from tenants after the transfer of possession in July 2024, and to deal with expenses incurred in the operation of Union Station during the time USI was in

possession. In a letter dated November 8, 2024, Amtrak counsel stated:

> There are a number of debts and obligations that were incurred but not paid
> for by your client during the period April 14, 2022 [date of taking] to July 29,
> 2024 [date of transfer of possession]. USI/Lender has not paid various vendor
> debts, contractor invoices (some who have filed or may file mechanic liens
> claims and recorded liens on Washington Union Station), monies owed
> [property manager] JLL, and various taxes, including the DC Possessory
> Interest Tax. These debts do not belong to Amtrak and we seek reassurance
> that USI/Lender will promptly pay such obligations. If they are not paid, then
> Amtrak may seek Court intervention. Additionally, USI/Lender has received
> some rental payments that are attributable to the period after July 29, 2024.
> These should be paid over to Amtrak.

*See* Declaration of Paul J. Kiernan, attached as Exhibit A, at Exhibit 1. Amtrak also demanded that

Defendants pay Amtrak fair-market rent for the use of Union Station after the date of taking

through the date of transfer of possession. *Id.*

It was in this context that the parties exchanged a series of settlement proposals and

counterproposals in December 2024 and January 2025. Although the parties never executed a letter

of intent—Amtrak requested to go from proposals right to a draft settlement agreement—it was

clear during the exchange of proposals that the parties were seeking a global settlement.

Defendants introduced the language regarding rents and expenses during the proposal stage. It was

not, as Amtrak's Opposition suggests, a last-minute addition. *See* Supplemental Declaration of

Michael Rebibo, attached to this Opposition as Exhibit B.

Language about "third parties" was introduced in early versions of the draft of the

settlement document begun by Amtrak, *see* Rebibo Declaration in Support of Defendants' Motion

to Enforce Settlement Agreement at Ex. 2, and "third parties" remained when it came time to sign

the document. That is because the parties agreed that there was no reconciliation of accounts; no

analysis of obligations or payments straddling the time of the taking or the time of the change in

possession; no review of who paid what to whom before the date of settlement. Each party would

3

not seek payment from the other for any expenses or revenues. See Supplemental Rebibo Decl. ¶ 6.

The Settlement Agreement specifically references "monies paid as rent pursuant to subleases," because the parties were agreeing that regardless of which signatory received rents from tenants, the parties would not have to account to the other for the money received. Likewise, the parties would not seek from each other payment towards "money owed to third parties associated with the operation of Union Station." The plain language of the Agreement leads to the conclusion that as of the settlement date, Defendants did not have to contribute any more to the operation of Union Station either by way of repaying "monies paid by third parties as rent pursuant to subleases" or by discharging "monies owed to third parties."

Amtrak has not offered a plausible alternative construction of the language of Paragraph 2.4. Why would "monies paid by third parties pursuant to subleases" and "monies owed to third parties associated with operation of Union Station," even be included in a section about claims being mutually released between Lender and Amtrak if not for the purpose of each party releasing the other from any obligations associated with those sums? Moreover, as detailed in Lender's Motion to Enforce Settlement Agreement, by the time the Settlement Agreement was signed on February 5, 2025, there had been numerous issues affecting whether Amtrak owed money or Lender owed money, including Amtrak's November 2024 demand to be paid the rents that USI had received—all of which issues were settled and resolved with the Settlement Agreement.

While Amtrak argues now that "Amtrak was not willing to agree to any deal that would have Amtrak waive its right to pursue rents from tenants that they owed to Amtrak," (Amtrak Motion, at 2), they did not assert such a position during the preparation of the Settlement Agreement and the final Agreement itself does not have any such carve out or reservation. Rebibo

4

Suppl. Declaration at ¶ 9. It was not until after settlement was consummated that Amtrak went after its tenants to be paid a second time and directed those tenants to contact us about money.

In construing a contract, the Court should try to give meaning to all of the terms in the contract so that none of those words is superfluous. *See Steele Foundations, Inc. v. Clark Constr. Group, Inc.*, 937 A.2d 148, 154 (D.C. 2007) ("Contractual provisions are interpreted taking into account the contract as a whole, so as to give effect, if possible, to all provisions in the contract.") The Defendants' construction gives meaning to all of the terms in the Settlement Agreement to arrive at the conclusion that Amtrak is responsible for the amounts at issue. That is the plain meaning of language releasing claims against Defendants "relating in any way to. . . claims for monies paid by third parties as rent pursuant to subleases." Amtrak's construction fails to account for the specificity of this language and, instead, argues that the "monies paid by third parties as rent" under leases Amtrak controls were not really rent. (Amtrak Motion at 1-2.)

Amtrak argues that Defendants are not giving meaning to the phrase "claims that Amtrak and Lender may have against each other" in Paragraph 2.4. (Amtrak Motion at 2.) But that is not accurate. Defendants' construction accounts for this language because the contract is only between Defendants and Amtrak. But when the subtenants tendered their rents in late 2024 to USI instead of to Amtrak, Amtrak asserted a claim against USI for that specific money because it was "Amtrak's rent." Amtrak agreed to release that claim against USI, meaning that USI did not have to pay over to Amtrak those months of rent for those tenants. It follows that Amtrak should not be allowed to reopen the claim for that money by forcing the tenants to pay those rents a second time and pushing tenants to try to get the payment from USI. In effect, Amtrak created claims against USI for the very same dollars that it had released and handed those claims to tenants to pursue USI for the money. That conduct is not consistent with the release language of the Settlement

Agreement itself.

Amtrak also misreads the Court's Order Granting Motion for Immediate Possession (Doc #111). Amtrak says that the Order "specif[ies] that Amtrak was responsible for only those vendor payments for services incurred after the Possession Date." (Amtrak Motion at 4.) In fact, the Order states: "Beginning on the Possession Date, Amtrak will be solely responsible for the performance of future obligations…or liabilities arising after the Possession Date…" (Doc #11 at 1-2.) There is a big difference between being responsible for "only" certain payments and being "solely responsible" for certain payments. The Order reflected needed certainty as to who was in charge as of the turnover date, not an allocation of responsibility. Moreover, the Settlement Agreement reflects that Amtrak released any claims "related to any court order entered in said actions." (Agreement at Para 2.4.)

### B. Negotiations.

Although extrinsic evidence is not necessarily relevant when construing an unambiguous agreement, both parties have presented the Court with the drafting history of the document. As reflected in the drafts that Lender attached to its Motion, *see* Rebibo Decl. in Support of Defendants' Motion to Enforce Settlement Agreement at Ex. 3 (copy also attached to Flack Decl at Ex. 5), after the parties had drafted what became the final language of Paragraph 2.4 about third parties, Lender proposed additional language which ultimately was not included, namely: "… it being expressly understood that Amtrak will be solely responsible to discharge any extant debts, claims, taxes, and obligations associated with the operation of Union Station or the Subject Property Interest."

As Amtrak expressed at the time, it did not want to be responsible for dealing with a possessory-interest-tax claim that had been raised by the District of Columbia against USI. USI

6

agreed with Amtrak that, even if the claim by the District was valid, the issue was USI's to deal with as a tax against it, not against the Station or the leasehold. Therefore, Amtrak would not be responsible for it and the proposed language for the Settlement Agreement would not be appropriate. *See* Declaration of Paul Kiernan, attached as Exhibit A at ¶ 7.

Moreover, by the time that Lender proposed the additional language to Paragraph 2.4 quoted above, Amtrak had already received approval from its Board for the settlement total reflected in the final settlement and the parties were nearing execution of the agreement which was targeted for execution that week. Amtrak expressed the concern that it did not want to have to return to its Board to get additional approval for the proposed language. As one of Amtrak's attorneys expressed it in explaining why Amtrak would not agree to the additional language, Lenders "you have the language you need." Kiernan Decl. ¶5. Defendants are not certain how Amtrak leadership explained the settlement to the Amtrak Board or how exactly leadership analyzed and weighed the claims and costs and expenses and compensation and risk in arriving at the final settlement number that was accepted by Defendants. Rebibo Suppl. Decl ¶10. But what is clear is that Amtrak was seeking prompt resolution of the settlement along with the global settlement.

Because Amtrak should not be allowed to retrade its settlement after the settlement has been consummated, its Motion should be denied. Defendants ask that the Court grant Defendants' Motion to Enforce Settlement Agreement and thereby affirm the global settlement and release that the parties bargained for.

*/s/ Paul J. Kiernan*
Paul J. Kiernan
Louis J. Rouleau
HOLLAND & KNIGHT, LLP
800 17th Street, N.W., Suite 1100
Washington, D.C. 20006
Phone: (202) 663-7276
Fax: (202) 955-5564
Paul.Kiernan@hklaw.com

*/s/ Y. David Scharf*
Y. David Scharf
Kristin T. Roy
Latisha V. Thompson
Amber R. Will
Mahnoor Misbah
*Admitted pro hac vice*
MORRISON COHEN, LLP
909 Third Avenue
New York, New York 10022
ydscharf@morrisoncohen.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of June 2025, I served a true and correct copy of the foregoing Defendant's Motion to Enforce Settlement Agreement on counsel of record via the CM/ECF filing system.

/s/ Paul J. Kiernan
Paul J. Kiernan

#523350810_v3

# EXHIBIT A

## Documents Under Seal

**DOCUMENT UNDER SEAL**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK)        ) <br>        ) <br>        ) <br>     Plaintiff,      ) <br>        ) <br>     v.        ) <br>        ) <br> SUBLEASE INTEREST PERTAINING TO DESCRIBED  ) <br> LEASEHOLD INTERESTS AT WASHINGTON    ) <br> UNION STATION, et al.      ) <br>        ) <br>     Defendants.    ) <br>        ) | 1:22-cv-01043-APM <br> Judge Amit P. Mehta |

**DECLARATION OF PAUL J. KIERNAN IN SUPPORT OF DEFENDANTS'**
**OPPOSITION TO AMTRAK'S MOTION TO ENFORCE SETTLEMENT AGREEMENT**

I, Paul J. Kiernan, declare and state as follows:

1. I serve as counsel to the Lender Defendants in this matter and was involved in the negotiation of the settlement of the case. I have personal knowledge of the facts stated in this Declaration.

2. On Friday November 8, 2024, I received from Pat Lambert, Amtrak counsel, the letter attached to this Declaration as Exhibit 1. This letter was sent as we were nearing the end of fact discovery in the underlying litigation. Ms. Lambert's letter stated, in part:

> There are a number of debts and obligations that were incurred but not paid for by your client during the period April 14, 2022 [date of taking] to July 29, 2024 [date of transfer of possession]. USI/Lender has not paid various vendor debts, contractor invoices (some who have filed or may file mechanic liens claims and recorded liens on Washington Union Station), monies owed [property manager] JLL, and various taxes, including the DC Possessory Interest Tax. These debts do not belong to Amtrak and we seek reassurance that USI/Lender will promptly pay such obligations. If they are not paid, then Amtrak may seek Court intervention. Additionally, USI/Lender has received some rental payments that are attributable to the period after July 29, 2024. These should be paid over to Amtrak.

I understood this language to represent Amtrak's position that (a) amounts were due to be paid by Lender Defendants to Amtrak associated with rent collected from tenants in the second half of 2024, and (b) USI/Lender had an obligation to Amtrak to address various contractor invoices and expenses associated with Union Station. It was my understanding from the letter that Amtrak intended to seek relief to address these claims should they not otherwise be resolved. Shortly after we received this letter, the parties turned to seeing if the disputes between them could be resolved.

3. Ms. Lambert's letter also contained a demand for payment of fair-market-rental value to Amtrak by USI/Lender covering the period of the taking through the date of transfer of possession. The letter said that Amtrak would seek intervention by the Court with respect to this demand if this demand was not satisfactorily resolved. Again, this fair-market-rental value demand was never resolved because the parties moved ahead with settlement discussions.

4. During the last week of January and the first week of February 2025, I was part of the group for the Lender Defendants working on documenting the terms of a settlement. I was working on the drafting issues and my primary contact on the Amtrak side was attorney Christopher Flack, with whom I had a number of conversations during this period. My experience with Mr. Flack in the litigation left me with the firm impression that he was an honest and careful attorney.

5. Although I understand that a settlement agreement is not final until everyone signs it, I also understand that parties "agree" on certain language even while working through edits. I understood that the parties had "agreed" on certain provisions of Paragraph 2.4 which defined the obligations that the parties would release as part of the settlement. Specifically, as reflected in the draft sent by Amtrak to us at 1:20 pm on February 4, 2025, the parties had tentatively agreed on the language that was eventually contained in Paragraph 2.4(2):

> (2) claims that Amtrak and Lender may have against each other where such claims relate to the Condemnation Action or the Subject Property Interest,

2

> including but not limited to claims for monies paid by third parties as rent pursuant to subleases or monies owed to third parties associated with the operation of Union Station or the Subject Property Interest;

(Copy attached to Rebibo Declaration in Support of Defendants' Motion to Enforce Settlement Agreement as Ex. 3.) That same draft reflected tentative agreement on the rest of Paragraph 2.4, including that the Specific Released Claims included claims arising from or relating in any way to "(5) the management and operation of the Subject Property Interest."

6. By email at 4:50 pm on February 4, 2025, we sent back to Amtrak proposed language for Paragraph 2.4(2) as well as other points. *See* Flack Decl. at Ex. 4. In Paragraph 2.4(2), we added the following: "… it being expressly understood that Amtrak will be solely responsible to discharge any extant debts, claims, taxes, and obligations associated with the operation of Union Station or the Subject Property Interest." Later that night (9:06 pm), Amtrak sent back a draft that deleted that language. *See* Flack Decl. at Ex. 5.

5. I talked with Mr. Flack about the proposed language that was not accepted. He conveyed to me that the proposed language was not necessary because "you have the language you need." I understood his comment to mean that they viewed our proposed language as unnecessarily raising issues on their side, including potentially obtaining additional approvals. We were all targeting having the agreement signed the week of February 4th. It was my impression from Mr. Flack and from the tone of the other negotiations that the people negotiating and documenting the settlement were under pressure to wrap up the transaction promptly and avoid returning to the Amtrak Board where there might be additional questions that could slow or even torpedo the resolution of the case.

7. Our proposed language had also included "taxes" as being the obligation of Amtrak. However, upon reflection, that language could only refer to the possessory-interest taxes that the

District of Columbia claimed were owed by USI. Ms. Lambert's November 8, 2024, letter had identified the possessory-interest taxes as a claim that needed to be addressed. We did not agree with the District's position that possessory-interest taxes were due from USI, but because we acknowledged that the possessory-interest taxes (if owed) were a personal obligation of USI and not an expense of operating Union Station, the taxes language was properly not part of the Amtrak settlement.

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge.

Executed: June 17, 2025

Paul J. Kiernan

#523395736_v2

# EXHIBIT 1



901 DULANEY VALLEY ROAD
SUITE 500
BALTIMORE, MD 21204

BALTIMORE I COLUMBIA I BELCAMP

TELEPHONE 410-938-8800
FAX 410-832-5600
PKLAW.COM

*Patricia McHugh Lambert - 410-339-6759 - 410-832-5628 (f) - plambert@pklaw.com*

November 8, 2024

*SENT VIA ELECTRONIC MAIL (paul.kiernan@hklaw.com)*

*Re:*   *National Railroad Passenger Corporation v. Sublease Interest Obtained Pursuant to an Assignment and Assumption of Leasehold Interest made as of January 25, 2007, with said property interest pertaining to Described Leasehold Interests at Washington Union Station, United States District Court for the District of Columbia, Case No: 1:22-cv-01043:* unpaid debts and obligations from the time USI was in possession post-filing

Dear Paul:

As you are aware, Amtrak filed a Complaint for Condemnation and Request for Possession of Union Station Investco, LLC's ("USI") leasehold interest acquired from Union Station Venture II, LLC (the "Subject Property Interest") located at Washington Union Station, 50 Massachusetts Avenue, NE, Washington, D.C. 20002 ("WUS") on April 14, 2022. Pursuant Court Order, possession of the Subject Property Interest was transferred to Amtrak on July 29, 2024.

There are a number of debts and obligations that were incurred but not paid for by your client during the period April 14, 2022 to July 29, 2024. USI/Lender has not paid various vendor debts, contractor invoices (some who have filed or may file mechanic lien claims and recorded liens on Washington Union Station), monies owed JLL, and various taxes, including the DC Possessory Interest Tax. These debts do not belong to Amtrak and we seek reassurance that USI/Lender will promptly pay such obligations. If they are not paid, then Amtrak may seek Court intervention. Additionally, USI/Lender has received some rental payments that are attributable to the period after July 29, 2024. These should be paid over to Amtrak.

Furthermore, USI/Lender must also pay Amtrak the fair market rental value of the Subject Property Interest for the hold-over period. Please advise as to what you assert to be the appropriate value. We are willing to discuss this amount with you. Unless we obtain resolution, Amtrak will seek intervention of the Court with respect to that.

ATTORNEY WORK PRODUCT

Mr. Paul Kiernan                                    Pessin Katz Law, P.A.
RE: USI Unpaid Debts and Obligations
November 8, 2024
Page 2


      Thank you for your attention to this matter and we look forward to your prompt response.

                                 Sincerely,

                                   Patricia McHugh Lambert

PML/rpj
cc: All counsel of record

# EXHIBIT B

Documents Under Seal

**DOCUMENT UNDER SEAL**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK) )<br><br>Plaintiff, )<br><br>v. )<br><br>SUBLEASE INTEREST PERTAINING TO DESCRIBED LEASEHOLD INTERESTS AT WASHINGTON UNION STATION, et al. )<br><br>Defendants. ) | 1:22-cv-01043-APM<br>Judge Amit P. Mehta |

**SUPPLEMENTAL DECLARATION OF MICHAEL REBIBO IN SUPPORT OF DEFENDANTS' OPPOSITION TO AMTRAK'S MOTION TO ENFORCE SETTLEMENT AGREEMENT**

I, Michael Rebibo, declare and state as follows:

1. I have signed and submitted a Declaration in support of Defendants' Motion to Enforce Settlement Agreement. This Supplemental Declaration is to respond to several points in Amtrak's Motion to Enforce Settlement Agreement. I have personal knowledge of the facts stated in this Declaration.

2. Amtrak's Motion suggests that the language regarding the mutual release of claims for tenant rents and for expenses associated with operating Union Station in the Settlement Agreement was a late addition to the discussion. That is not true. All through the discussions preceding the execution of the Settlement Agreement, it was clear that we were addressing those issues through our settlement. Amtrak's current position is an improper effort to retrade the deal after the Settlement Agreement was signed and the litigation was dismissed.

3. In November 2024, we received an express demand from Amtrak to pay to them rents

that had been delivered by Station tenants to USI. We also received a demand to pay expenses incurred at the Station as well as a demand to pay Amtrak rent for the time in which USI was in possession of the Station following the taking. See November 8, 2024, letter from Amtrak counsel, attached here as Exhibit 1. In addition, we had communications from Amtrak about specific expenses due and rents received, always accompanied by a demand that we pay those expenses or turn over to Amtrak the rents. The New Traditions account, for example, was specifically raised with us by Amtrak and we told Amtrak that was not our responsibility. These were the circumstances as we started exchanging settlement proposals in December 2024.

4. Amtrak made a written settlement proposal by letter dated December 13, 2024. A copy is attached as Exhibit 2. Among the terms that Amtrak proposed was that the eventual settlement agreement would include a release of claims "including any sums that could be claimed relating to the transfer of possession or management of the Station."

5. We responded to Amtrak by letter dated December 19, 2024. A copy of our counterproposal is attached as Exhibit 3. In addition to requesting a higher payment amount to settle, we included a term that there would be "mutual global releases with each other to resolve any claims relating to title, possession, operation of the Station, transfer of possession, and the lawsuit or amounts claimed due for the Station or the lawsuit." Exhibit 3, at ¶ 4. We also specified that the parties "each agree that they will not seek payment from the other party for revenues received or expenses paid by or incurred by the other party in operating the Station or performing under the lease (Subject Property Interest) after April 14, 2022 (date of taking)." Exhibit 3, at ¶ 2. That sentence was to address directly the claims that had been asserted by Amtrak in its letter of November 8, 2024.

6. On January 9, 2025, Amtrak responded to our counterproposal. *See* letter attached as

2

Exhibit 4. Although Amtrak did not respond to each numbered paragraph of our counterproposal, Amtrak again included that the settlement agreement would have release of claims "including any sums that could be claimed relating to the transfer of possession or management of the Station." That language was consistent with my verbal discussions with Amtrak's business negotiator, Vice President of Real Estate and Commercial Development Louis Wolfowitz, that the parties were not going to conduct a reconciliation of accounts and claims and that there would be a "clean wash" with the settlement. Since the consummation of our settlement, Amtrak's two primary business negotiators, Mr. Wolfowitz and Amtrak President Stephen Gardner, have left Amtrak's employ.

7. By letter dated January 10, 2025, we responded to Amtrak's offer letter of January 9, 2025. A copy of our response is attached as Exhibit 5. Although we sent this letter in the form of a term sheet or letter of intent that both parties could sign, we wound up not signing this document and, instead, went from agreeing on the settlement verbally to drafting the Settlement Agreement itself. Amtrak took the first cut at the settlement document.

8. The evolution of the documents during the December 2024-January 2025 period paralleled the discussions between the parties. At all times, the parties were working towards a settlement that would resolve all issues associated with payments and expenses of operating the Station as well as the condemnation and other matters. That agreement is reflected in the terms of the final, executed Settlement Agreement.

9. Contrary to the suggestion in Amtrak's Motion, during the negotiation of the Settlement Agreement Amtrak never asserted that it reserved the right to pursue Station tenants to collect the rents that had been paid to USI. If they had that secret plan in mind, they certainly did not mention it to me. It was not until after we signed the Settlement Agreement and dismissed the litigation that Amtrak started pressing its tenants to pay them a second time for the rent and pursue us.

10. I do not know for certain what was presented to Amtrak's Board by Amtrak leadership in connection with obtaining approval for the final settlement. I am not privy to how leadership analyzed the various factors and costs and expenses in securing the approval to settle. I do know that Amtrak leadership repeatedly raised its desire to resolve things promptly.

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge.

Executed: June 17, 2025

_____
Michael Rebibo

4

# EXHIBIT 1

# EXHIBIT 2

# EXHIBIT 3

# EXHIBIT 4

# EXHIBIT 5